No. 19-35460
(Consolidated with Nos. 19-35461 and 19-35462)

———————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————

LEAGUE OF CONSERVATION VOTERS, et al.,
*Plaintiffs/Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,
*Defendants/Appellants*.

———————

Appeal from the United States District Court for the District of Alaska
No. 3:17-cv-00101 (Hon. Sharon L. Gleason)

———————

**EXCERPTS OF RECORD**
**Volume 1 (pages 1–61)**

———————

<div style="margin-left:50%;">

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
ROBERT J. LUNDMAN

</div>

*Of Counsel*:

DENNIS DAUGHERTY     SARAH D. HIMMELHOCH
SUSAN HOVEN CASON    JUSTIN D. HEMINGER
*Attorneys*                  *Attorneys*
Division of Mineral Resources    Environment and Natural Resources Division
Office of the Solicitor          U.S. Department of Justice
U.S. Department of the Interior    Post Office Box 7415
                                 Washington, D.C. 20044
                                 (202) 514-5442
                                 justin.heminger@usdoj.gov

# INDEX

| Filing Date | ECF | Document | Page |
|---|---|---|---|
| | | **Volume 1** | |
| 3/29/2019 | 80 | Order Re Motions for Summary Judgment | 1 |
| 3/19/2018 | 45 | Order Re Motions to Dismiss | 33 |
| | | **Volume 2** | |
| 5/28/2019 | 82 | Federal Defendants' notice of appeal | 62 |
| 4/01/2019 | 81 | Judgment in a Civil Case | 64 |
| 2/28/2019 | 78 | Notice of errata | 65 |
| 6/8/2018 | 51 | Plaintiffs' summary judgment brief (excerpt) and standing declarations (exhibits 21 through 39) | 67 |
| 9/8/2017 | 36 | Plaintiffs' memorandum in opposition to motions to dismiss (excerpt) | 283 |
| 6/30/2017 | 13-1 | President Trump, Executive Order 13795, Implementing an America-First Offshore Energy Strategy (Apr. 28, 2017), 82 Fed. Reg. 20815 (May 3, 2017) | 285 |
| 6/30/2017 | 13-18 | President Obama, Memorandum on Withdrawal of Certain Portions of the United States Artic OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 860 (Dec. 20, 2016) | 289 |
| 6/30/2017 | 13-17 | President Obama, Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016) | 290 |

| Filing Date | ECF | Document | Page |
|---|---|---|---|
| 6/30/2017 | 13-16 | President Obama, Executive Order 13754, North Bering Sea Climate Resilience, 2016 Daily Comp. Pres. Docs. 836 (Dec. 9, 2016) | 291 |
| 6/30/2017 | 13-15 | President Obama, Memorandum on Withdrawal of Certain Areas of the United States OCS Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 1, 1 (Jan. 27, 2015) | 296 |
| 6/30/2017 | 13-14 | President Obama, Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 2010 Daily Comp. Pres. Docs. 1, 1 (Dec. 16, 2014) | 297 |
| 6/30/2017 | 13-13 | President Obama, Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 2010 Daily Comp. Pres. Docs. 1, 1 (Mar. 31, 2010) | 298 |
| 6/30/2017 | 13-12 | President George W. Bush, Memorandum for the Secretary of the Interior re Modification of the Withdrawal of Areas of the United States OCS from Leasing Disposition, 44 Weekly Comp. Pres. Docs. 986 (July 14, 2008) | 299 |
| 6/30/2017 | 13-11 | President George W. Bush, Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007) | 300 |
| 6/30/2017 | 13-10 | President Clinton, Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 34 Weekly Comp. Pres. Docs. 1107, 1111 (June 12, 1998) | 301 |

| Filing Date | ECF | Document | Page |
|---|---|---|---|
| 6/30/2017 | 13-9 | President George H.W. Bush, Memorandum for the Secretary of the Interior regarding Outer Continental Shelf (OCS) Oil and Gas Program for 1992-1997 (Aug. 4, 1992) (unpublished) | 302 |
| 6/30/2017 | 13-8 | President George H.W. Bush, Statement on OCS Oil and Gas Development, 26 Weekly Comp. Pres. Docs. 1001, 1006 (June 26, 1990) | 303 |
| 6/30/2017 | 13-7 | Secretary of the Interior Walter Hickel, Public Land Order 4587, 34 Fed. Reg. 5655–56 (Mar. 26, 1969) | 306 |
| 6/30/2017 | 13-6 | President Eisenhower, Proclamation 3339, Establishing the Key Largo Coral Reef Preserve, 25 Fed. Reg. 2352 (March 15, 1960) | 308 |
| 6/30/2017 | 13-2 | Truman Proclamation (Sept. 28, 1945) | 309 |
| 5/03/2017 | 1 | Plaintiffs' Complaint for Declaratory and Injunctive Relief | 310 |
| N/A | N/A | District court docket sheet | 334 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

LEAGUE OF CONSERVATION
VOTERS, *et al.*,

          Plaintiffs,

      v.

DONALD J. TRUMP, *et al.*,

          Defendants,

      and

AMERICAN PETROLEUM
INSTITUTE and STATE OF
ALASKA,

          Intervenor-
          Defendants.

Case No. 3:17-cv-00101-SLG

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT

Before the Court at Docket 50 is Plaintiffs Alaska Wilderness League, Center

for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of

Conservation Voters, Natural Resources Defense Council, Northern Alaska

Environmental Center, Resisting Environmental Destruction on Indigenous Lands,

Sierra Club, and The Wilderness Society's ("Plaintiffs") motion for summary

judgment.  Defendants Donald J. Trump, Ryan Zinke—later replaced by David

Bernhardt[1]—and Wilbur Ross ("Federal Defendants") opposed and moved for

---

[1] "David Bernhardt serves as Acting Secretary of the U.S. Department of the Interior."
U.S. Dep't of the Interior, David Bernhardt - Acting Secretary of the Interior,

summary judgment at Docket 55. Intervenor-defendant American Petroleum Institute ("API") opposed Plaintiffs' motion and cross-moved for summary judgment at Docket 58. Intervenor-defendant State of Alaska ("Alaska") opposed Plaintiffs' motion and moved for summary judgment at Docket 60. Plaintiffs replied in support of their motion at Docket 62. Federal Defendants replied in support of their motion at Docket 63. API replied in support of its motion at Docket 65. Alaska replied in support of its motion at Docket 67.[2] Oral argument was held on November 9, 2018 in Anchorage, Alaska.[3]

## BACKGROUND

In 1953, the Outer Continental Shelf Lands Act ("OCSLA" or "the Act") was enacted into law.[4] When enacted, OCSLA had two stated purposes.[5] The first

---

[https://perma.cc/7WRR-5CKU]; *see also* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.").

[2] *See* Docket 35 (Order re Joint Schedule Proposal).

[3] *See* Docket 75 (Minute Entry).

[4] Pub. L. No. 83-212, 67 Stat. 462 (1953) (codified at 43 U.S.C. § 1331 *et seq.*).

[5] OCSLA was amended in 1978. The 1978 amendments include the following purposes: (1) "[t]o establish a policy for the management of oil and natural gas in the Outer Continental Shelf"; (2) "to protect the marine and coastal environment;" (3) "to amend the Outer Continental Shelf Lands Act"; and (4) "for other purposes." Pub. L. No. 95-372, 92 Stat. 629, 629 (1978). Section 102 of the 1978 amendments lists ten, more detailed, purposes. Pub. L. No. 95-372, § 102, 92 Stat. 629, 631–32 (1978)

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 2 of 32

purpose was "[t]o provide for the jurisdiction of the United States over" OCS lands.[6]

The second purpose was "to authorize the Secretary of the Interior to lease such lands for certain purposes."[7]  OCSLA authorized the Secretary of the Interior to "provide for the assignment or relinquishment of leases, for the sale of royalty oil and gas" on OCS lands.[8]  This case concerns Section 12(a) of the Act, which provides as follows: "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."[9]  In 2015 and 2016, President Obama issued three memoranda and one executive order withdrawing certain areas of the Outer Continental Shelf from

---

(codified at 43 U.S.C. § 1802).

[6] Pub. L. No. 83-212, 67 Stat. 462, 462 (1953).

[7] Pub. L. No. 83-212, 67 Stat. 462, 462 (1953).

[8] Pub. L. No. 83-212, § 5(a), 67 Stat. 462, 464 (1953) (current version at 43 U.S.C. § 1334).

[9] Pub. L. No. 83-212, § 12(a), 67 Stat. 462, 469 (1953) (codified at 43 U.S.C. § 1341(a)).  The Court refers to Section 12(a), rather than to 43 U.S.C. § 1341(a), throughout this Order.

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 3 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 3 of 32

leasing.[10]   On April 28, 2017, President Trump issued Executive Order 13795, which purported to revoke the 2015 and 2016 withdrawals.[11]

On May 3, 2017, Plaintiffs filed their Complaint in this case.  Plaintiffs brought two claims: an alleged violation of the Constitution's Property Clause,[12] and an alleged violation of the President's statutory authority under Section 12(a).[13]  On July 21, 2017, the Court granted API's motion to intervene.[14]  On September 1, 2017, the Court granted Alaska's motion to intervene.[15]  On March 19, 2018, the Court denied Federal Defendants', API's, and Alaska's motions to dismiss.[16]  On

---

[10] *See* Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska From Leasing Disposition, DCPD201500059 (Jan. 27, 2015); Exec. Order 13754, 81 Fed. Reg. 90669, § 3 (Dec. 9, 2016); Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing, DCPD201600860 (Dec. 20, 2016); Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf From Mineral Leasing, DCPD201600861 (Dec. 20, 2016).

[11] *See* Exec. Order 13795, 82 Fed. Reg. 20815, §§ 4(c), 5 (Apr. 28, 2017).  For a thorough history of withdrawals under Section 12(a) of OCSLA, see Kevin O. Leske, *"Un-Shelfing" Lands Under the Outer Continental Shelf Lands Act (OCSLA): Can a Prior Executive Withdrawal under Section 12(a) Be Trumped by a Subsequent President?*, 26 N.Y.U. Envtl. L.J. 1, 12–22 (2017).

[12] *See* Docket 1 (Complaint) at 22–23, ¶¶ 55–61.

[13] *See* Docket 1 (Complaint) at 23, ¶¶ 62–66.

[14] *See* Docket 22 (Order Granting API's Motion to Intervene); Docket 14 (API's Motion to Intervene).

[15] *See* Docket 32 (Order Granting Alaska's Motion to Intervene); Docket 30 (Alaska's Motion to Intervene).

[16] *See generally* Docket 45 (Order re Motions to Dismiss); Docket 12 (Federal Defendants' Motion to Dismiss); Docket 25 (API's Motion to Dismiss); Docket 34 (Alaska's Motion to Dismiss).  The Court denied the motions to dismiss, holding that sovereign immunity does not apply because the President is alleged to have acted

---

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 4 of 32

June 8, 2018, Plaintiffs filed their summary judgment motion.[17]  On July 18, 2018,

Federal Defendants filed their motion for summary judgment.[18]  On August 2,

2018, API and Alaska filed their cross-motion and motion, respectively, for

summary judgment.[19]

## JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## LEGAL STANDARD

This case requires the Court to interpret a statute.[20]  When interpreting a

statute, a court looks first to the statute's text, and then, if necessary, to the context

---

outside of his constitutional and statutory authority; Plaintiffs can maintain a private right of action; declaratory relief against the President would be unnecessary because the Court can enjoin the President's subordinates from enforcing the Executive Order; and Plaintiffs have Article III standing.  Docket 45 at 8–29.

[17] *See* Docket 50.

[18] *See* Docket 55.

[19] *See* Docket 58; Docket 60.

[20] Federal Defendants and API maintain that the President has revocation authority under Article II of the Constitution.  *See* Docket 56 at 8–9, 30 (citing U.S. CONST. art. II, §§ 2–3); Docket 59 at 29–31; *see also* Exec. Order 13795, 82 Fed. Reg. 20815 (Apr. 28, 2017) (relying on "the authority vested in" the "President by the Constitution and the laws of the United States of America, including" OCSLA).  The Property Clause of the Constitution places with Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]"  U.S. CONST. art. IV, § 3, cl. 2.  The Supreme Court has recognized that "[t]he power of Congress to dispose of any kind of property belonging to the United States 'is vested in Congress without limitation.'"  *Alabama v. Texas*, 347 U.S. 272, 273 (1954) (per curiam) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915)).  OCSLA has, since its enactment, established that OCS lands are subject to federal "jurisdiction, control, and power of disposition as provided in" OCSLA.  Pub. L. No. 83-212, § 3(a), 67 Stat. 462, 462 (1953) (current version at 43 U.S.C. § 1332).  Although

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 5 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 5 of 32

in which the statute was enacted. It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[21]

## I. Statutory Text

Courts "begin with the understanding that Congress says in a statute what it means and means in a statute what it says there."[22] Judicial "inquiry begins with the statutory text, and ends there as well if the text is unambiguous."[23]

## II. Context

If the text of the statute is ambiguous, a court may rely on contextual clues to discern Congress's intent.[24] A judge may look to a statute's structure, as a

---

the President has the constitutional authority under Article II to provide for national security and conduct foreign affairs, the President's authority to dispose of OCS lands can arise only by delegation from Congress.

[21] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)).

[22] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (holding that bankruptcy statute authorizing "[t]he trustee" to recover expenses from secured creditor did not apply to insurer's recovery of unpaid premiums) (internal citations and quotation marks omitted).

[23] *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). For "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters*, 530 U.S. at 6 (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989)) (quotation marks omitted); *see also United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940) ("In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress.").

[24] *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)) ("A provision that

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 6 of 32

"statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[25]  Courts may also find congressional intent in legislative history,[26] in how Congress treated a term in prior statutes,[27] and in Congress's stated purpose in enacting the statute.[28]  In addition, although a court may consider actions subsequent to the statute's

---

may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

[25] *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) (holding that plaintiffs could not attach Iranian property under 28 U.S.C. § 1610(g), which subjected foreign government property to attachment "as provided in this section," because no other provision within that section applied to the property in question and interpreting §1610(g) as providing an independent basis for attachment would render the other provisions within that section "superfluous"); *see also Mellouli v. Lynch*, 135 S. Ct. 1980, 1989 (2015) ("Statutes should be interpreted as a symmetrical and coherent regulatory scheme.") (citation and quotation marks omitted); *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. ___, slip op. at 8–9 (2019) (a statute should be interpreted to "not contain surplusage") (quoting *Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 299 n.1 (2006)).

[26] *See, e.g.*, *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) ("This presumption [in favor of judicial review], however, may be overcome by clear and convincing indications, drawn from specific language, specific legislative history, and inferences of intent drawn from the statutory scheme as a whole, that Congress intended to bar review.") (citations and quotation marks omitted).

[27] *Allen v. Grand Cent. Aircraft Co.*, 347 U.S. 535, 541 (1954) ("The Government finds authority for the creation of this administrative machinery in [§] 405(b) of the Defense Production Act of 1950, when read in connection with the entire Act.  That section is derived from [§] 5(a) of the Stabilization Act of 1942.  To read the Defense Production Act of 1950 without reference to this model is to read it out of the context in which Congress enacted it.") (citation omitted).

[28] *See Burwell*, 135 S. Ct. at 2492–93 ("Here, the statutory scheme compels us to reject petitioners' interpretation because it would destabilize the individual insurance market in any State with a Federal Exchange, and likely create the very 'death spirals' that Congress designed the Act to avoid.").

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 7 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 7 of 32

enactment, "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment."[29]

## DISCUSSION

### I. Federal Defendants' Procedural Challenges

Federal Defendants maintain that Plaintiffs fail to overcome several procedural hurdles: standing, ripeness, sovereign immunity, and the lack of a private right of action.[30] The Court previously found for Plaintiffs as to each of these issues at the motion to dismiss stage.[31]

"In response to a summary judgment motion, . . . the plaintiff . . . must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true."[32] Here, Plaintiffs have set

---

[29] *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 169 n.5 (2001) (citation omitted); *cf. Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."), *superseded by statute on other grounds as recognized by Graham v. R.J. Reynolds Tobacco Co.*, 782 F.3d 1261, 1278–79 (11th Cir. 2015), *reh'g en banc granted, opinion vacated*, 811 F.3d 434 (11th Cir. 2016), *and on reh'g en banc*, 857 F.3d 1169 (11th Cir. 2017).

[30] *See* Docket 56 at 19–28.

[31] *See* Docket 45 at 8–11, 13–24.

[32] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation and internal quotation marks omitted) (citing Fed. R. Civ. P. 56(c)). *See also Pepper v. United States*, 562 U.S. 476, 506 (2011) ("Although we have described the law of the case as an amorphous concept, as most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (citation, quotation marks, and alterations omitted); *Nat. Res.*

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 8 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 8 of 32

forth sufficient specific facts to support their standing and right to pursue a private cause of action.[33]  Accordingly, the Court declines to reconsider these issues at the summary judgment stage.[34]

## II. The Text of Section 12(a)

At issue in this case is the meaning of Section 12(a) of OCSLA: "The President of the United States may, from time to time, withdraw from disposition

---

*Def. Council v. Patterson*, 333 F. Supp. 2d 906, 915 (E.D. Cal. 2004) (holding that defendants' challenge to plaintiffs' standing at summary judgment stage was "effectively foreclosed by the law of the case doctrine" because court had rejected those arguments at motion to dismiss stage).

[33] "Plaintiffs' members visit or otherwise use and enjoy" the lands at issue in this litigation.  Docket 51 at 22 (citing Exhibit 21 (Decl. of Regina A. Asmutis-Silvia) (Docket 51-21), Exhibit 22 (Decl. of Rosemary Ahtuangaruak) (Docket 51-22); Exhibit 24 (Decl. of John Hocevar) (Docket 51-24), Exhibit 26 (Decl. of Dr. Leslie S. Kaufman) (Docket 51-25), Exhibit 28 (Decl. of Pamela A. Miller) (Docket 51-28), Exhibit 29 (Decl. of Rob Moir) (Docket 51-29), Exhibit 30 (Decl. of Dan Ritzman) (Docket 51-30), Exhibit 32 (Decl. of Robert Thompson) (Docket 51-32), Exhibit 34 (Decl. of Michael Wald) (Docket 51-34), Exhibit 36 (Decl. of Kiliii Yuyan) (Docket 51-36)).

[34] One of Federal Defendants' arguments merits brief discussion.  The Court's Order re Motions to Dismiss concluded that "there would be no apparent incentive for the industry to conduct seismic surveying in areas closed off from drilling," so the Executive Order would sufficiently promote seismic surveying such that Plaintiffs had Article III standing at that stage of this litigation.  Docket 45 at 19 n.90.  In their summary judgment briefing, Federal Defendants cite instances in which operators had applied for "geophysical and geological exploration permits even in areas that have been withdrawn from development."  Docket 63 at 8.  But they cite to oil and gas leasing programs from 2012, long before the presidential withdrawals at issue in this case.  The Bureau of Ocean Energy Management responded to the Executive Order by beginning its evaluation of certain seismic surveying permit applications in areas where the permits had been denied prior to the Executive Order.  *See* Press Release, U.S. Dep't of the Interior, Interior Department Advances America-First Offshore Energy Strategy (May 10, 2017), [https://perma.cc/9ZCW-YQRU].  Therefore, the Court remains of the view that Plaintiffs have demonstrated standing.  The Court's reasoning is not affected by the Notice of Errata recently filed by Federal Defendants at Docket 78.

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 9 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 9 of 32

any of the unleased lands of the outer Continental Shelf."[35]  Plaintiffs maintain that this text only authorizes a President to withdraw lands from disposition; it does not authorize a President to revoke a prior withdrawal.  Plaintiffs assert that under the Property Clause of the U.S. Constitution, the authority to revoke a prior withdrawal was not delegated by this statute to the President and thus remains vested solely with Congress.[36]

Federal Defendants respond that "Section 12(a) does not cabin the President's authority in any way, other than to clarify that lands must be unleased in order to be withdrawn."[37]  Federal Defendants maintain that "Plaintiffs' reading of Section 12(a) renders the phrase 'from time to time' unnecessary" because the phrase "may . . . withdraw" implies the ability to do so "from time to time."[38]  API asserts that Section 12(a)'s "discretionary formulation—authorizing action that 'may' be taken 'from time to time'—carries with it a power to revise action previously taken under the delegated authority."[39]

---

[35] Pub. L. No. 83-212, § 12(a), 67 Stat. 462, 469 (1953) (codified at 43 U.S.C. § 1341(a)).

[36] Docket 51 at 33; U.S. Const. art. IV, § 3, cl. 2.

[37] Docket 56 at 29.

[38] Docket 63 at 12 (citation omitted).

[39] Docket 59 at 20 (citing 28 U.S.C. § 2071(a); U.S. Const., art. III, § 1; *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1234 n.6 (9th Cir. 1990) (O'Scannlain, J., concurring in part and dissenting in part); 35 Stat. 69, ch. 151 (1908), previously codified at 33 U.S.C. § 1233, *repealed by* 132 Stat. 4266 (2018)).  Alaska makes a similar claim.  Docket 61 at 5–6.

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 10 of 32

The text of Section 12(a) refers only to the withdrawal of lands; it does not expressly authorize the President to revoke a prior withdrawal.  Congress appears to have expressed one concept—withdrawal—and excluded the converse—revocation.  Furthermore, the phrase "from time to time" appears to clarify the President's withdrawal authority by giving him the discretion to withdraw lands at any time and for discrete periods; the phrase does not specifically give the President the authority to revoke a prior withdrawal.[40]  In any event, some

---

The authorities to which API cites are distinguishable from Section 12(a).  Under 28 U.S.C. § 2071(a), "[t]he Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business."  Inherent in the power to "prescribe rules" is the power to prescribe new rules that revise prior rules.  The power to revoke is not inherent in the power to withdraw.  The same principle applies to 33 U.S.C. § 1233, which has been repealed since the instant motions ripened.  That provision stated, "The Commandant of the Coast Guard is authorized and empowered in his discretion to issue from time to time regulations, not contrary to law, to promote the safety of life on navigable waters during regattas or marine parades." *Bay Area Peace Navy*, 914 F.2d at 1234 n.6 (O'Scannlain, J., concurring in part and dissenting in part) (quoting 35 Stat. 69, ch. 151 (1908), previously codified at 33 U.S.C. § 1233, *repealed by* 132 Stat. 4266 (2018)).  The authority to issue regulations includes the ability to revise prior regulations.

API also points to the constitutional provision authorizing Congress to "from time to time ordain and establish" lower courts.  U.S. CONST., art. III, § 1.  "The Congressional power to ordain and establish inferior courts includes the power of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good."  *Lockerty v. Phillips*, 319 U.S. 182, 187 (1943) (citations and quotation marks omitted).  No such ordination language exists in Section 12(a).

[40] Plaintiffs maintain that, in other OCSLA provisions, "Congress used [the phrase 'from time to time'] in the ordinary sense of *when* the authority might be exercised, not to expand a delegation to encompass the polar opposite power."  Docket 62 at 12 (citing 43 U.S.C. §§ 1335(a)(1), 1347(c), 1351(h)(3)) (emphasis in original).

43 U.S.C. § 1335(a)(1) provides that a copy of a mineral lease covering OCS lands must be filed with the Secretary within ninety days of the implementation of OCSLA "or

---

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 11 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 11 of 32

withdrawals appear to have been intended to be permanent; others, for a limited

time.[41]  President Obama's 2015 and 2016 Executive Orders each stated it was

---

within such further period or periods . . . as may be fixed from time to time by the Secretary[.]"  Plaintiffs maintain that "[t]he phrase can mean only that one or more such periods could be established at will, not that any could be unestablished."  Docket 62 at 12.  API seeks to distinguish this section because "the sole purpose of that statutory provision is to establish the timing by which holders of a state oil and gas lease issued on the OCS prior to the enactment of OCSLA could bring their lease within the protections of OCSLA."  Docket 65 at 12.  Alaska asserts that Section 1335(a)(1) allows the Secretary to reverse a prior filing period decision, just as Section 12(a) allows the President to revoke a prior withdrawal.  Docket 67 at 5.  The Court finds Plaintiffs' interpretation compelling; Congress did not explicitly authorize the Secretary to revoke a fixed filing date.

43 U.S.C. § 1347(c) states: "The Secretary of the Department in which the Coast Guard is operating shall promulgate regulations or standards applying to unregulated hazardous working conditions related to activities on the outer Continental Shelf when he determines such regulations or standards are necessary.  The Secretary of the Department in which the Coast Guard is operating may from time to time modify any regulations, interim or final, dealing with hazardous working conditions on the outer Continental Shelf."  In the Court's view, Section 1347(c) is not analogous to Section 12(a) because the term "modify" in Section 1347(c) inherently includes the power to revise, whereas the term "withdraw" in Section 12(a) does not inherently include the power to revoke that withdrawal.

43 U.S.C. § 1351(h)(3) provides that "[t]he Secretary shall, from time to time, review each plan approved under this section.  Such review shall be based upon changes in available information and other onshore or offshore conditions affecting or impacted by development and production pursuant to such plan.  If the review indicates that the plan should be revised to meet the requirements of this subsection, the Secretary shall require such revision."  The last sentence of  Section 1351(h)(3) explicitly authorizes revision.  Such explicit authorization is absent from Section 12(a).

[41] *Compare, e.g.*, Proclamation 3339, Establishing the Key Largo Coral Reef Preserve, 25 Fed. Reg. 2,352 (Mar. 15, 1960), by which President Eisenhower withdrew lands to "preserve[] the scenic and scientific values of this area unimpaired for the benefit of future generations," *with, e.g.*, Statement on Outer Continental Shelf Oil and Gas Development, 26 Weekly Comp. Pres. Docs. 1006, 1006 (June 26, 1990), by which President Bush supported a "moratorium" on leasing on certain OCS lands and the "delay" of leasing and development on other OCS lands "until after the year 2000."

---

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 12 of 32

intended to apply "for a time period without specific expiration," and contained language indicating that all future leasing was intended to be prohibited in the areas encompassed by the withdrawals.[42] The wording of President Obama's 2015 and 2016 withdrawals indicates that he intended them to extend indefinitely, and therefore be revocable only by an act of Congress.

Federal Defendants, API, and Alaska cite to various nonbinding authority to suggest that the phrase "from time to time" in Section 12(a) gives the President the power to revoke a prior withdrawal. *Illinois Central Railroad Co. v. United States* is one example.[43] Congress had enacted laws that granted the State of Illinois certain rights of way on certain federal public lands to construct a railroad. But previous laws had reserved certain federal public lands for military purposes. At issue was whether the subsequent land grant to Illinois included the land

---

[42] Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska From Leasing Disposition, DCPD201500059 (Jan. 27, 2015) ("This withdrawal prevents consideration of these areas for any future oil or gas leasing for purposes of exploration, development, or production."); Exec. Order 13754, 81 Fed. Reg. 90669, § 3 (Dec. 9, 2016) ("This withdrawal prevents consideration of these areas for future oil or gas leasing for purposes of exploration, development, or production."); Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing, DCPD201600860 (Dec. 20, 2016) ("The withdrawal directed by this memorandum prevents consideration of withdrawn areas for any mineral leasing for purposes of exploration, development, or production."); Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf From Mineral Leasing, DCPD201600861 (Dec. 20, 2016) ("This withdrawal prevents consideration of this area for any future mineral leasing for purposes of exploration, development, or production.").

[43] 1858 WL 4672 (Ct. Cl. 1858).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 13 of 32

previously reserved in military fortifications. In particular, the Court of Claims referenced a 1798 law that "enable[d] the President to erect fortifications in such places as the public safety should, in his opinion, require; and he was authorized to cause them to be erected under his direction, from time to time, as he should judge necessary."[44] The Court of Claims noted that in light of the statute's grant of authority for the President to erect fortifications, "it may be the proper construction of the acts of Congress that they, by implication, confer on him the power also, when the place designated and reserved becomes no longer necessary for the purposes of the reservation, to direct its abandonment by the War Department[.]"[45] But the Court of Claims did not directly resolve this issue, as it determined that the President had not directed the abandonment of the reserved military lands at issue in that case.[46] *Illinois Central*'s dicta regarding the maintenance of military fortifications during the 1850's is of little assistance in interpreting the scope of the President's authority in 2017 to revoke withdrawals of unleased lands in the OCS.

API also cites to *State v. McBride*.[47] That case involved the following Washington state constitutional provision: "The supreme court shall consist of five

---

[44] *Id.* at *1.

[45] *Id.* The opinion did not discuss the specific phrase, "from time to time." *See id.*

[46] *Id.*

[47] 70 P. 25 (Wash. 1902); Docket 59 at 20–21; Docket 65 at 9, 11–12. *See also* Docket

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 14 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 14 of 32

judges . . . .  The legislature may increase the number of judges of the supreme court from time to time . . . ."[48]  In 1901, the Washington legislature passed an act temporarily increasing the number of supreme court judges from five to seven; the act also provided that beginning in October 1902, the court would again seat only five judges.  A litigant asserted the portion of the act that purported to decrease the number of judges back to five was void because the state constitution contained no express provision authorizing a decrease.  The Washington Supreme Court disagreed, and held: "If, therefore, the legislature has power to increase the number of judges as occasion or convenience requires, and there is no restriction upon a decrease, except below five, it follows that a decrease may be had to this minimum when necessity or occasion requires, of which necessity or occasion the legislature is the exclusive judge."[49]  In its opinion, the Washington Supreme Court discussed the phrase, "from time to time," as follows:

> These words are defined by lexicographers to mean "occasionally." The word "occasionally" is defined to mean: "As occasion demands or requires; as convenience requires; accidentally, or on some special occasion."  But whatever may be the technical meaning of the words, they certainly cannot be held to mean that the legislature may not decrease the number of judges after the increase thereof.  If, therefore, the legislature has power to increase the number of judges as occasion or convenience requires, and there is no restriction upon a decrease, except below five, it follows that a decrease may be had to this minimum when necessity or occasion requires, of which

---

62 at 14.

[48] *McBride*, 70 P. at 26–27.

[49] *Id.* at 27.

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 15 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 15 of 32

necessity or occasion the legislature is the exclusive judge. Again, the fact that the constitution has placed a minimum limit and permitted an increase in the number of judges is a strong inference that the increased number may be reduced to the minimum. Furthermore, the legislative and the executive branches of the state government have placed this construction upon their powers, and, where these co-ordinate branches have construed a constitutional provision and acted upon it, great weight will be given thereto.[50]

In the instant case, the President is not "the exclusive judge" of determining the OCS lands subject to leasing; that power ultimately is vested in Congress under the Property Clause. Moreover, Congress has not acted to approve or reject Executive Order 13795. And as the *McBride* court acknowledged, "the fact that the [Washington state] constitution has placed a minimum limit and permitted an increase in the number of judges is a strong inference that the increased number may be reduced to the minimum."[51] But no such minimum limit exists in Section 12(a) with respect to the lands available for leasing in the OCS.

API and Alaska rely on other cases that are inapposite for a variety of reasons.[52] Some cases involved statutes that called for agencies to balance multiple factors in their decisionmaking process, thus reflecting a strong inference that Congress intended to authorize the reconsideration of a prior agency decision.[53] In other cases, the relevant subject matter in the statute or other

---

[50] *Id.*

[51] *Id.*

[52] Docket 59 at 20–21; Docket 61 at 5–6; Docket 65 at 11.

[53] *See In re A Community Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (quoting 42 U.S.C. §

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 16 of 32

authority was, by nature, subject to change.[54]  Some cases only stood for the general principle that statutes which grant authority can be overridden by later statutes withdrawing that authority.[55]

The text of Section 12(a) indicates that Congress expressly granted to the President the authority to withdraw unleased lands from the OCS; but the statute does not expressly grant to the President the authority to revoke prior withdrawals. However, the statute's inclusion of the phrase "from time to time" renders the text

---

4852a(a), (c)(5); citing 42 U.S.C. § 4851a(1), (3)) (holding that in EPA's carrying out of Congress's mandate to reduce lead-based paint hazards, "Congress did not want EPA to set initial standards and then walk away, but to engage in an ongoing process, accounting for new information, and to modify initial standards when necessary to further Congress's intent" and statute included  "the creation of a task force that would be instructed to advise EPA and HUD as to 'revising . . . regulations . . . issued by [HUD] and other Federal agencies") (alteration in original); *Lacquer & Chem. Corp. v. Mills*, 22 F.2d 697, 698–99 (E.D.N.Y. 1927)*, aff'd*, 22 F.2d 700 (2d Cir. 1927) (upholding revocation of denatured alcohol production permit pursuant to prohibition statute that ordered Treasury Secretary to issue regulations relating to percentage industrial alcohol use that would both "prevent diversion of the alcohol to illegal uses" and support the scientific and commercial uses of industrial alcohol).

[54] *See Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 564 (1919) (noting that statute gave Interstate Commerce Commission the power "to fix rates or to increase or to reduce them" when regulating railroad freight); *V. Mueller & Co. v. United States*, 115 F.2d 354, 361 (C.C.P.A. 1940) (analyzing statute that authorized the Secretary of the Treasury to adjust tariff rates); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 597–98 (1973) (describing statute that authorized Secretary of Agriculture to promulgate "rules and regulations" relating to federal land acquisitions); *Myers v. United States*, 272 U.S. 52, 119 (1926) (describing the President's constitutional authority to appoint and remove subordinates).

[55] *See Quinn v. Cal. Shipbldg. Corp.*, 76 F. Supp. 742, 743 (S.D. Cal. 1947) (explaining that Congress's "power to grant jurisdiction to the District Courts includes the power to withdraw jurisdiction"); *N. Border Pipeline Co. v. Jackson County*, 512 F. Supp. 1261, 1263 (D. Minn. 1981) (noting that state legislatures may withdraw local governments' zoning authority).

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 17 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 17 of 32

of Section 12(a) ambiguous.[56]  On the one hand, the phrase could be interpreted simply to make clear the President's authority to make withdrawals at any time and for discrete periods of time, as well as make withdrawals that extend indefinitely into the future unless and until revoked by Congress.  On the other hand, the phrase could be interpreted more broadly to accord to each President the authority to revoke or modify any prior withdrawal.  In light of the ambiguity created by this aspect of Section 12(a)'s text, the Court will look to the context of the statute in an effort to discern the intent of Congress.

## III. The Context of Section 12(a)

### A. The Structure of OCSLA

Section 8 of OCSLA, titled "Leasing of Outer Continental Shelf," authorizes the Secretary of the Interior to lease OCS lands "[i]n order to meet the urgent need for further exploration and development of the oil and gas deposits" beneath the OCS.[57]  Section 12 of the Act, as enacted in 1953, was titled "Reservations."  Most

---

[56] *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("The definition of words in isolation, however, is not necessarily controlling in statutory construction.  A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."); *see also King v. Burwell*, 135 S. Ct. 2480, 2492 (2015).

[57] Pub. L. No. 83-212, § 8(a), 67 Stat. 462, 468 (1953) (current version at 43 U.S.C. § 1337); *see also* Docket 65 at 14 (quoting *State of Cal. By & Through Brown v. Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981)).  The *Watt* court noted that "[t]he congressional purposes [stated in OCSLA's 1978 amendments] . . . reflect [Congress's] primary emphasis on expeditious development of the OCS, qualified by the recognition of a need for measures to alleviate or minimize its adverse impacts."  *Watt*, 668 F.2d at

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 18 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 18 of 32

of the provisions of that section address restrictions on the private use of OCS lands, and no subsection expands private sector use of these lands.[58]

Plaintiffs maintain that Sections 8 and 12(a) have different roles, with Section 8 promoting leasing and Section 12(a) being "entirely protective."[59] Federal Defendants do not directly address this argument. API responds by citing uplands legislation that, unlike Section 12, expressly granted revocation authority to the President.[60] Alaska maintains that "it cannot be said that Congress

---

1315.

Section 3(a) of OCSLA has, since its enactment, established that OCS lands are subject to federal "jurisdiction, control, and power of disposition as provided in" OCSLA. Pub. L. No. 83-212, § 3(a), 67 Stat. 462, 462 (1953) (current version at 43 U.S.C. § 1332).

[58] Pub. L. No. 83-212, § 12(a)–(f), 67 Stat. 462, 469–70 (1953) (current version at 43 U.S.C. § 1341). For example, Section 12(b) grants, during wartime or at the order of the President, the United States "the right of first refusal to purchase at the market price all or any portion of any mineral produced from" the OCS. Pub. L. No. 83-212, § 12(b), 67 Stat. 462, 469 (1953) (codified at 43 U.S.C. § 1341(b)). Section 12(d), in part, "reserves and retains the right to designate . . . as areas restricted from exploration and operation that part of the [OCS] needed for national defense[.]" Pub. L. No. 83-212, § 12(d), 67 Stat. 462, 470 (1953) (codified at 43 U.S.C. § 1341(d)). Section 12, as currently codified, is titled "Reservation of Lands and Rights." 43 U.S.C. § 1341.

[59] Docket 51 at 40. Plaintiffs also assert that because Section 8 authorizes the Secretary to decide which parcels to lease, interpreting Section 12(a) to accord to the President the authority to revoke withdrawals would be "largely redundant." Docket 51 at 40; Pub. L. No. 83-212, § 8(b), 67 Stat. 462, 468 (1953) (current version at 43 U.S.C. § 1337). But as Federal Defendants note in their briefing, the Secretary "[n]ot issuing a lease (a discretionary decision for a particular sale) is not the same as, or a duplication of, the decision of the President to close a particular area to leasing . . . ." Docket 63 at 24. API and Alaska make arguments akin to Federal Defendants' argument. Docket 59 at 24–25; Docket 61 at 7–8.

[60] Docket 59 at 24. The Court addresses uplands legislation below. *See infra* at 20–25.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 19 of 32

evidenced an intent in the statute for the Secretary to withhold *anything* from oil and gas leasing."[61]

The Court agrees with Plaintiffs on this point. Interpreting OCSLA to promote expeditious leasing in Section 8, but according to the President authority to prohibit leasing in specified areas in Section 12(a), gives effect "to all [of OCSLA's] provisions, so that no part will be inoperative or superfluous, void or insignificant."[62] Therefore, OCSLA's structure promotes the view that Section 12(a) did not grant revocation authority to the President.

*B. OCSLA's Legislative History and Prior Statutes*

The parties all address the import of the legislative history of Section 12(a). Federal Defendants cite to the Senate report in which the Committee on Interior and Consular Affairs stated that "it was vesting withdrawal authority 'comparable to that which is vested in [the President] with respect to federally owned lands on the uplands.'"[63] Federal Defendants maintain that the President was accorded the authority to revoke withdrawals on the uplands; thus, it maintains Section 12(a) should be interpreted to do the same.[64]

---

[61] Docket 61 at 8 (emphasis in original).

[62] *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018).

[63] Docket 56 at 38 (quoting S. Rep. No. 83-411, at 26 (1953)); *see also* Docket 56 at 34.

[64] Docket 56 at 38 (citing Exec. Order No. 10355, 17 Fed. Reg. 4831 (May 26, 1952)); Docket 56 at 32 (quoting *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 784 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006)) ("[A]t the time that OCSLA's Section 12(a) was enacted, federal statutes granting the authority to

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 20 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 20 of 32

Plaintiffs contend that "when Congress intended to pair the power to protect public land from disposition with the power to reverse such protections, [including in legislation related to the uplands,] it did so expressly." Plaintiffs cite as examples the Forest Service Organic Administration Act of 1897, the Pickett Act of 1910, and a 1935 act "concerning use of the Rio Grande[.]"[65] The Forest Service Organic Administration Act of 1897 authorized the President to "vacate altogether" public forest reservations.[66] The Pickett Act authorized the President "at any time in his discretion" to "temporarily withdraw" public lands, and provided that such "withdrawals or reservations" would be "in force until revoked by [the President] or by an Act of Congress."[67] The 1935 statute regarding use of the Rio Grande river

---

withdraw uplands were historically understood to temporarily suspend the operation of a public land disposal law, thus [']preserving the status quo until Congress or the Executive decides on the ultimate disposition of the subject lands.[']") (emphasis omitted). API makes a similar argument. Docket 59 at 24.

[65] Docket 51 at 35–36 (citing ch. 2, 30 Stat. 11, 36 (1897) (codified at 16 U.S.C. § 473); 36 Stat. 847 (1910), *repealed by* 90 Stat. 2792 (1976); 49 Stat. 660, 661 (1935), *repealed by* 90 Stat. 2792 (1976)).

[66] Ch. 2, 30 Stat. 11, 36 (1897) (codified at 16 U.S.C. § 473).

[67] 36 Stat. 847 (1910), *repealed by* 90 Stat. 2792 (1976). Federal Defendants maintain that "Congress intended to confer the same authority on the President with respect to the OCS that it had conferred upon the President in the Pickett Act. Because the Pickett Act authorized the President to modify and 'revoke' prior withdrawals, Congress's meaning can hardly be clearer, giving the President broad authority including the authority to revoke or modify prior withdrawals under OCSLA." Docket 63 at 23–24. However, as discussed below, the relevant Senate committee report on OCSLA indicates that Congress intended to give the President the same withdrawal authority as that provided in uplands legislation generally, not the Pickett Act specifically. The Pickett Act explicitly authorizes the President to revoke withdrawals; other uplands legislation, like OCSLA, did not explicitly provide revocation authority. *See infra* at 23.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 21 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 21 of 32

was similarly explicit in giving the President not only the power to "withdraw," but also the power to "revoke[]."[68] "Actions pursuant to statutes that grant two-way authority," Plaintiffs assert, "are irrelevant to interpreting a statute, like section 12(a), that specifies only the authority to withdraw."[69]

Plaintiffs cite to other uplands legislation that Congress had enacted prior to OCSLA's passage that expressly granted to the President only the authority to set aside lands. For example, in the Forest Reserve Act of 1891, Congress provided that the President "may, from time to time, set apart and reserve" forested public lands.[70] Similarly, the Antiquities Act of 1906 authorized the President to reserve public lands "of historic or scientific interest."[71] Neither of these laws explicitly granted revocation authority to the President. When enacting OCSLA, the Senate

---

[68] 49 Stat. 660, 661 (1935), *repealed by* 90 Stat. 2792 (1976) ("In order to carry out the provisions of this Act, the President, or any Federal agency he may designate is authorized . . . to withdraw from sale, public entry or disposal of such public lands of the United States as he may find to be necessary and thereupon the Secretary of the Interior shall cause the lands so designated to be withdrawn from any public entry whatsoever, and from the sale, disposal, location or settlement under the mining laws or any other law relating to the public domain and shall cause such withdrawal to appear upon the records in the appropriate land office having jurisdiction over such lands, and such lands may be used for carrying out the purposes of this Act: *Provided*, That any such withdrawal may subsequently be revoked by the President[.]") (emphasis in original).

[69] Docket 62 at 21. Alaska maintains that "[m]ost of the statutes cited by Plaintiffs . . . do not include the phrase 'from time to time[]'" and in some instances created reservations rather than withdrawals. Docket 61 at 6. The Court addresses reservations versus withdrawals *infra* at 23–24.

[70] Ch. 561, § 24, 26 Stat. 1095, 1103 (1891), *repealed by* 90 Stat. 2792 (1976).

[71] Pub. L. No. 59-209, § 2, 34 Stat. 225, 225 (1906) (codified at 54 U.S.C. § 320301).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 22 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 22 of 32

Committee on Interior and Consular Affairs expressed its intent only with regard to the President's authority to withdraw; it said nothing about any authority to revoke a prior withdrawal.[72] The Court finds Congress's silence in Section 12(a) as to according the President revocation authority was likely purposeful; had Congress intended to grant the President revocation authority, it could have done so explicitly, as it had previously done in several (but not all) of its previously enacted uplands laws.

Plaintiffs also maintain that "[w]hen it chooses the wording of a statute, Congress is presumptively aware of Executive Branch interpretations of similar language in parallel statutes."[73] Plaintiffs assert that prior Attorneys General had issued opinions "dating back nearly a century, that if Congress wanted the Executive to have such [revocation] authority, Congress would need to make that explicit."[74] For example, an 1878 Attorney General opinion stated that "if lands

---

[72] S. Rep. No. 83-411, at 26 (1953).

[73] Docket 51 at 37 (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 382 n.66 (1982); *Kent v. Dulles*, 357 U.S. 116, 127–28 (1958); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)).

[74] Docket 51 at 38 (citing Rock Island Military Reservation, 10 Op. Att'y Gen. 359, 364 (Nov. 8, 1862); Proposed Abolishment of Castle Pinckney National Monument, 39 Op. Att'y Gen. 185, 186–87 (Sept. 26, 1938); Camp Wright, California, 16 Op. Att'y Gen. 121, 123 (Aug. 10, 1878); Military Reservation at Fort Fetterman, 17 Op. Att'y Gen. 168, 168–69 (July 20, 1881); Naval Reservation—Restoration to Public Domain, 21 Op. Att'y Gen. 120, 120–21 (Jan. 19, 1895); Camp Hancock—Transfer from War Department to Department of Agriculture, 28 Op. Att'y Gen. 143, 144 (Jan. 24, 1910); Transfer of National Monuments to National Park Service in the Department of the Interior, 36 Op. Att'y Gen. 75, 79 (July 8, 1929)).

---

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 23 of 32

have been once set apart by the President in an order for military purposes, they cannot again be restored to the condition of public lands, or sold as such, except by an authority of Congress."[75]  Federal Defendants respond that "those opinions pertain to reservations, not withdrawals, and statutes enacted and opinions issued well before the enactment of OCSLA, and have no relevance here."[76]  But the Court finds those opinions persuasive, because Congress has used the terms "withdrawal" and "reservation" interchangeably for many decades.[77]  Indeed, in 1953, Congress titled Section 12, which contains the withdrawal provision at issue here, as "Reservations."[78]  Therefore, the Attorney General opinions support the view that Congress intended to authorize the President only to withdraw OCS lands from leasing in Section 12(a) of OCSLA, and did not authorize the President to revoke a prior withdrawal.[79]

---

[75] Camp Wright, California, 16 Op. Att'y Gen. at 123.

[76] Docket 56 at 36.

[77] *See* 41 Stat. 1063, 1063–64 (1920) (codified at 16 U.S.C. § 796(2)) (identifying one definition of "reservations" as including "lands . . . withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws"); *see also* S. Rep. No. 85-857, at 7 (1957) ("The term 'withdraw' is used interchangeably with the term 'reserve' to describe the statutory or administrative action which restricts or segregates a designated area of Federal real property from the full operation of the public-land laws relating to settlement, entry, location, and sales, which action holds them for a specific— and usually limited—public purpose.").

[78] Pub. L. No. 83-212, § 12, 67 Stat. 462, 469 (1953) (current version at 43 U.S.C. § 1341).

[79] Federal Defendants make two other arguments regarding the Attorney General opinion addressing the Antiquities Act.  First, they maintain that the Antiquities Act is unlike OCSLA in that its purpose is to "protect objects of historic or scientific interest,"

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 24 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 24 of 32

Federal Defendants also cite the deletion from a prior version of this section of the bill of a "limitation of [withdrawal] authority to withdrawals in the interest of national security" as evidence that "Congress intended to provide increased discretion to the President."[80]  Although this deletion gives the President greater discretion in making withdrawals, it does not authorize the President to revoke any of those withdrawals.

## C. The Purposes of OCSLA

Federal Defendants and API also cite OCSLA's purposes—to further oil and gas development on OCS lands and "to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade"—to support their claim

---

rather than to promote leasing.  Therefore, Federal Defendants contend, revocation is aligned with OCSLA's purposes, but not with the purposes of the Antiquities Act. Docket 56 at 37 (citing Proposed Abolishment of Castle Pinckney National Monument, 39 Op. Att'y Gen. 185 (1938)).  But the different purposes of the Antiquities Act and OCSLA do not, in this Court's view, warrant an expansive interpretation of the President's authority under Section 12(a).

Second, Federal Defendants assert that reliance on the Castle Pinckney Attorney General opinion is "misplaced" because that opinion stated that the President may modify national monuments.  Docket 56 at 37 (citing Proposed Abolishment of Castle Pinckney National Monument, 39 Op. Att'y Gen. at 188).  However, in that same opinion, the Attorney General rejected the President's "power to abolish a monument entirely."  Proposed Abolishment of Castle Pinckney National Monument, 39 Op. Att'y Gen. at 188.

[80] Docket 56 at 32 (citing S. Rep. No. 83-411, at 26 (1953); S. Rep. No. 83-411, at 39 (1953) (Comment from Assistant Attorney General J. Lee Rankin)).  API also makes this argument.  Docket 59 at 23–24.

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 25 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 25 of 32

"that Congress did not intend to foreclose presidential modification of withdrawals under OCSLA § 12(a)."[81]

The first purpose of OCSLA, as enacted in 1953, was "[t]o provide for the jurisdiction of the United States over" OCS lands.[82] Whether the President has revocation authority does not implicate this purpose; this case is about the scope of Executive authority, not federalism. The second purpose was "to authorize the Secretary of the Interior to lease such lands for certain purposes."[83] Although Congress clearly sought more leasing, it did not seek unbridled leasing. For the Act also provided that it was to "be construed in such manner that the character as high seas of the waters above the outer Continental Shelf and the right to navigation and fishing therein shall not be affected."[84] And Congress included Section 12—"Reservations"—to limit leasing activity. The fact that Congress expressly granted the President the authority to withdraw OCS lands from leasing,

---

[81] Docket 56 at 33 (quoting H.R. Rep. No. 83-1031, at 7 (1953) (Conf. Rep.)); Docket 59 at 22–23 (quoting 43 U.S.C. § 1802(1)). Alaska makes a similar argument. Docket 61 at 8.

[82] Pub. L. No. 83-212, 67 Stat. 462, 462 (1953).

[83] Pub. L. No. 83-212, 67 Stat. 462, 462 (1953).

[84] Pub. L. No. 83-212, § 3(b), 67 Stat. 462, 462 (1953) (current version at 43 U.S.C. § 1332). Section 5(a) has also, since OCSLA's enactment, authorized the Secretary to "at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein[.]" Pub. L. No. 83-212, § 5(a), 67 Stat. 462, 464 (1953) (current version at 43 U.S.C. § 1334).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 26 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 26 of 32

but did not expressly grant the President the authority to revoke such withdrawals, is not inconsistent with the second purpose of OCSLA as enacted in 1953, particularly as Congress itself retained the authority to revoke prior presidential withdrawals pursuant to the Property Clause of the U.S. Constitution.

Federal Defendants further contend that "Plaintiffs' interpretation of the statute leads to the illogical result that a President may perform a *de facto* repeal of OCSLA by withdrawing the entire OCS from exploration and development and that any such withdrawal is permanent and immutable unless revoked by an act of Congress."[85]    But as the Attorney General opinions reveal, Congress has previously authorized the President to tie future Presidents' hands.  As one of the Attorney General opinions cited by Plaintiffs states, "My predecessors have held that if public lands are reserved by the President for a particular purpose under express authority of an act of Congress, the President is thereafter without authority to abolish such reservation."[86]    President Eisenhower seems to have agreed on this point.  His establishment of the Key Largo Coral Reef Preserve, the first withdrawal under Section 12(a), sought to "preserve[] the scenic and scientific

---

[85] Docket 63 at 21.

[86] Proposed Abolishment of Castle Pinckney National Monument, 39 Op. Att'y. Gen. 185, 186–87 (1938) (citing Rock Island Military Reservation, 10 Op. Att'y Gen. 359 (Nov. 8, 1862); Military Reservation at Fort Fetterman, 17 Op. Att'y Gen. 168 (July 20, 1881); Transfer of National Monuments to National Park Service in the Department of the Interior, 36 Op. Att'y Gen. 75 (July 8, 1929)).

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 27 of 32

values of this area unimpaired for the benefit of future generations."[87]  And while Federal Defendants are technically correct that Section 12(a) would permit a President to permanently withdraw all of the unleased lands on the OCS, Congress could readily reverse such an action by either revoking the withdrawal itself[88] or amending Section 12(a) to expressly provide that a future President could also revoke a prior presidential withdrawal.

### D. OCSLA's Subsequent History

Plaintiffs assert that subsequent legislative history, in which Congress "added procedural checks on the Executive's discretion to dispose of outer continental shelf lands" but did not amend Section 12(a), "confirms that . . . [Congress] continued to view section 12(a) as providing only withdrawal authority."[89]  Alaska characterizes Congress's inaction as "unremarkable."[90] Federal Defendants maintain that, "[o]f the only twelve actions taken pursuant to OCSLA Section 12(a), at least five represent modifications of prior withdrawals and two of them – or seventeen percent – represent reductions of prior withdrawals,"

---

[87] Proclamation 3339, Establishing the Key Largo Coral Reef Preserve, 25 Fed. Reg. 2,352 (Mar. 15, 1960).

[88] U.S. CONST. art. IV, § 3, cl. 2.

[89] Docket 51 at 41–42 (citing S. Rep. No. 95-284, at 43, 48, 50–51, 61 (1977); H.R. Rep. No. 95-590, at 100 (1977); Pub. L. No. 95-372, § 208, 92 Stat. 629, 649–52 (1978) (current version at 43 U.S.C. §§ 1344–45)).

[90] Docket 61 at 8 (citing Pub. L. No. 95-372, § 208, 92 Stat. 629, 649–52 (1978) (current version at 43 U.S.C. §§ 1344–45)).

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 28 of 32

to which Congress did not object. Therefore, Federal Defendants assert, Congress has acquiesced to the President's authority to revoke under the statute.[91]

The Court finds Defendants' arguments unavailing. Congress's decisions not to challenge the small number of prior revocations falls far short of the high bar required to constitute acquiescence.[92] Furthermore, Congress's subsequent inaction with respect to Section 12(a) lacks sufficient support for this Court to draw any appropriate inference.[93] Too little information about Congress's limited

---

[91] Docket 56 at 35–36 (citing Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007); Memorandum on Modification of the Withdrawal of Areas of the United States Outer Continental Shelf from Leasing Disposition, 44 Weekly Comp. Pres. Docs. 986, 986 (July 14, 2008)). API also argues that "the practice under [Section 12(a)] over at least the past three decades illustrates that withdrawals have rarely, if ever, been treated as permanent or inviolate." Docket 59 at 27.

[92] Cf. United States v. Midwest Oil Co., 236 U.S. 459, 469–71 (1915) (holding that presidential withdrawal of public lands was lawful because Congress had "uniformly and repeatedly acquiesced" to the President's creation of roughly 250 reservations).

[93] The Supreme Court recently made a similar finding in National Labor Relations Board v. SW General, Inc. At issue in that case was whether subsection (b)(1) of the Federal Vacancies Reform Act of 1998 ("FVRA"), which established prerequisites for presidential appointment to certain vacant positions, applied to appointments made under subsections (a)(2) and (a)(3) of that Act. Subsequent to the FVRA's passage, "three Presidents ha[d], without congressional objection, submitted the nominations of 112 individuals who were serving as acting officers under subsections (a)(2) and (a)(3)." The Supreme Court found that "[i]n this context, Congress's failure to speak up does not fairly imply that it has acquiesced in the Board's interpretation." The Court reasoned that these 112 nominees "ma[d]e up less than two percent of the thousands of nominations to positions in executive agencies that the Senate ha[d] considered in the years since [the FVRA's 1998] passage." The Court found the facts of SW General to be in "sharp contrast" to those of National Labor Relations Board v. Noel Canning, in which the Supreme Court had found congressional acquiescence to presidential

Case No. 3:17-cv-00101-SLG, League of Conservation Voters, et al. v. Trump, et al.
Order re Motions for Summary Judgment
Page 29 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 29 of 32

inaction exists to "override" the Court's interpretation of Section 12(a) based on that section's "language and legislative history prior to its enactment."[94]

Based on the foregoing, the Court finds that Section 5 of Executive Order 13795, which purported to revoke prior presidential withdrawals of OCS lands for leasing, is unlawful, as it exceeded the President's authority under Section 12(a) of OCSLA.

## IV. Remedy

"Plaintiffs request a declaration that Section 5 of the Order is unlawful and invalid[.]"[95]  The Court will vacate Section 5 of Executive Order 13795.[96]  As a result, the previous three withdrawals issued on January 27, 2015 and December 20, 2016 will remain in full force and effect unless and until revoked by Congress.[97]

---

appointments under the Recess Appointments Clause of the Constitution.  The President's authority under that Clause had "attracted intense attention and written analysis from Presidents, Attorneys General, and the Senate.  The voluminous historical record dated back to 'the beginning of the Republic,' and included 'thousands of intra-session recess appointments.'"  The Court found that *Noel Canning's* reliance on "the chronicle of the Recess Appointments Clause . . . offer[ed] no support to the Board" in *SW General.  N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) (quoting *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 526, 529 (2014)).

[94] *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 169 n.5 (2001) (citation omitted).

[95] Docket 51 at 42.

[96] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952) (holding that President's wartime order to Secretary of Commerce to seize steel mills not within the constitutional power of the President and "cannot stand").

[97] Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska From Leasing Disposition, DCPD201500059 (Jan. 27, 2015); Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 30 of 32

Plaintiffs also seek "an injunction against the Secretaries of the Interior and Commerce preventing them from implementing Section 5 of the Order and thereby requiring them to act in conformity with President Obama's withdrawals."[98]  The Supreme Court has held that "recourse to the additional and extraordinary relief of an injunction" is not warranted where "a less drastic remedy []such as partial or complete vacatur . . . [is] sufficient to redress [the aggrieved party's] injury."[99] Plaintiffs do not show that vacatur alone would fail to redress their injuries. Therefore, injunctive relief is not warranted at this time.

//

//

//

//

//

//

//

---

Continental Shelf From Mineral Leasing, DCPD201600860 (Dec. 20, 2016); Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf From Mineral Leasing, DCPD201600861 (Dec. 20, 2016).

[98] Docket 51 at 42–43.

[99] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (holding that district court had abused its discretion in issuing nationwide injunction against planting of genetically modified alfalfa in part because vacatur of regulation may have achieved same ends as nationwide injunction).

Case No. 3:17-cv-00101-SLG,  *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 31 of 32

**CONCLUSION**

In light of the text and context of Section 12(a) of OCSLA, the Court holds that Section 5 of Executive Order 13795 is unlawful and invalid. Based on the foregoing, IT IS ORDERED that:

Plaintiffs' motion for summary judgment at Docket 50 is GRANTED.

Federal Defendants' motion, API's cross-motion, and Alaska's motion for summary judgment at Dockets 55, 58, and 60, respectively, are DENIED.

Section 5 of Executive Order 13795 is hereby VACATED. Plaintiffs' additional request for injunctive relief is DENIED.


DATED this 29th day of March, 2019 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions for Summary Judgment
Page 32 of 32

Case 3:17-cv-00101-SLG   Document 80   Filed 03/29/19   Page 32 of 32

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

LEAGUE OF CONSERVATION VOTERS, *et al.*,

                Plaintiffs,

      v.

DONALD J. TRUMP, *et al.*,

                Defendants.

Case No. 3:17-cv-0101-SLG

### ORDER RE MOTIONS TO DISMISS

Before the Court are the following motions: Defendants Donald J. Trump, Ryan Zinke, and Wilbur Ross's Motion to Dismiss at Docket 12[1]; Intervenor-Defendant American Petroleum Institute's Motion to Dismiss at Docket 25; and Intervenor-Defendant State of Alaska's Motion to Dismiss at Docket 34. The motions have been fully briefed.[2] Oral argument on the motions was held on November 8, 2017.[3] For the following reasons, the motions will be denied.

### BACKGROUND

For purposes of the motions to dismiss, the facts are briefly summarized as they are alleged in Plaintiffs' Complaint:

---

[1] *See also* Docket 13 (Mem. in Supp. Mot. to Dismiss).

[2] *See* Docket 36 (Opp'n); Docket 38 (Federal Defendants' Reply); Docket 39 (Intervenor-Defendant American Petroleum Institute's Reply).

[3] Docket 44 (Minute Entry for Oral Arg.).

The Arctic Ocean includes the Chukchi and Beaufort Seas, which are home to a wide array of wildlife, including polar bears, walruses, whales, seals, other mammals, birds, and fish, some of which are endangered.[4]  The Atlantic Ocean is also inhabited by various marine life and contains diverse habitats, including methane-dependent organisms that live in the undersea canyons found off the Atlantic continental shelf.[5] Businesses along the U.S. Atlantic coast are dependent on these habitats for tourism and commercial fishing.[6]

One of the reasons that Congress enacted the Outer Continental Shelf Lands Act ("OCSLA") was to provide protection to the environment.[7]  Section 12(a) of OCSLA provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."[8]  For the areas that are not withdrawn, OCSLA provides a process for oil and gas development activities, which includes the following: "(1) formulation of a five year leasing plan . . . ; (2) lease sales; (3) exploration by the lessees; (4) development and production."[9]  Seismic

---

[4] Docket 1 at 9, ¶ 21.

[5] Docket 1 at 10, ¶ 23.

[6] Docket 1 at 10, ¶ 24.

[7] Docket 1 at 14, ¶ 33; *see also* 43 U.S.C. § 1332(3) ("[T]he outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs.").

[8] Section 12(a) of OCSLA is codified at 43 U.S.C. § 1341(a).

[9] *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984); *see also* 43 U.S.C. § 1331 *et seq.*

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 2 of 29

surveying can occur before any of these stages and typically occurs two to four years prior to lease sales in order to locate areas with oil and gas prospects.[10]

On January 27, 2015, acting pursuant to Section 12(a) of OCSLA, President Obama withdrew coastal areas in the Arctic's Beaufort and Chukchi Seas from oil and gas leasing.[11]  President Obama cited as reasons for this action the importance of these areas to subsistence for Alaska Natives as well as the need to protect marine mammals and other wildlife.[12]  On December 20, 2016, again acting pursuant to Section 12(a) of OCSLA, President Obama withdrew another large portion of the U.S. Arctic Ocean and areas of the Atlantic Ocean from future oil and gas leasing.[13]  The combined withdrawals in the Arctic and Atlantic Oceans totaled 128 million acres.[14]

On April 28, 2017, President Trump issued Executive Order 13795 entitled "Implementing an America-First Offshore Energy Strategy."[15]  The Executive Order reverses President Obama's January 27, 2015 and December 20, 2016 withdrawals in the Arctic and Atlantic Oceans.   The stated purpose of the order is to encourage energy exploration and production of the outer continental shelf.  On April 29, 2017, the Secretary

---

[10] Docket 1 at 14, 17, ¶¶ 33, 43.

[11] Docket 1 at 18, ¶ 46.

[12] Docket 1 at 18, ¶ 46.

[13] Docket 1 at 17–18, ¶ 47.

[14] Docket 1 at 7, ¶ 16.

[15] Docket 1 at 21, ¶ 53; Docket 13-1 (Executive Order 13795).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 3 of 29

of the Interior issued an order implementing the Executive Order, calling for expedited consideration of seismic permitting applications for the Atlantic Ocean.[16]

There is industry interest in oil and gas activities in the Arctic and Atlantic Oceans, including industry groups expressing interest in conducting seismic surveys in those oceans. After the President issued the Executive Order, one seismic industry trade group called for seismic surveying in the previously withdrawn areas to proceed "without delay."[17] Several seismic operations companies have applied for permits to conduct "deep-penetration seismic surveys."[18]

Seismic surveys use loud, frequent sound pulses to map the sea floor in order to identify potential oil and gas deposits.[19] Plaintiffs maintain that these pulses are harmful to marine mammals as well as fish and shellfish, causing these animals to suffer loss of hearing and sensory capabilities, which could result in death.[20] In 2012, the National Marine Fisheries Service estimated that a two-month-long seismic survey would disrupt 60,000 ringed seals and 4,600 beluga whales in the Arctic Ocean.[21]

On May 3, 2017, Plaintiffs brought this action, which challenges Executive Order 13795. Plaintiffs include the following organizations: League of Conservation Voters, Natural Resources Defense Council, Sierra Club, Alaska Wilderness League, Defenders

---

[16] Docket 1 at 20, ¶ 54; Docket 13-5 (Secretarial Order).

[17] Docket 1 at 15, ¶ 39.

[18] Docket 1 at 16–17, ¶¶ 39–40.

[19] Docket 1 at 11, ¶ 27.

[20] Docket 1 at 12, ¶¶ 28, 29.

[21] Docket 1 at 12, ¶ 28.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 4 of 29

of Wildlife, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Center for Biological Diversity, Greenpeace, Inc., and The Wilderness Society.[22]

Plaintiffs allege that "President Trump acted in excess of his authority under Article II of the U.S. Constitution and intruded on Congress's non-delegated exclusive power under the Property Clause, in violation of the doctrine of separation of powers."[23] Plaintiffs also allege a cause of action for statutory *ultra vires* action, alleging that the President "lacks authority to reverse or undo Section 12(a) withdrawals" and "[n]either OCSLA nor any other statute authorizes the President to re-open for disposition areas withdrawn under OCSLA Section 12(a)."[24] Plaintiffs filed suit against President Donald J. Trump, who issued the Executive Order, Ryan Zinke, the Secretary of the Interior, who administers and implements OCSLA, and Wilbur Ross, Secretary of Commerce, who has the responsibility for administering and implementing the Marine Mammal Protection Act and the Endangered Species Act (collectively the "Federal Defendants").[25] The Federal Defendants are all sued in their official capacities. American Petroleum Institute ("API") intervened as a national trade association of the oil and natural gas industry.[26] The State

---

[22] Docket 1 at 3–7, ¶¶ 5–14.

[23] Docket 1 at 22, ¶ 60.

[24] Docket 1 at 23, ¶ 64.

[25] Docket 1 at 7–8, ¶¶ 18–20.

[26] Docket 22 (Order Granting API's Mot. to Intervene).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 5 of 29

of Alaska also intervened, asserting that some "State offshore land within the coastal zone of the Beaufort Sea is available for oil and gas leasing[.]"[27]

## LEGAL STANDARDS

Federal Defendants and the Intervenors all seek dismissal of Plaintiffs' Complaint under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### I.    Dismissal Under Rule 12(b)(1)

A "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."[28]  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."[29]  In this case, Federal Defendants assert a facial challenge.[30]  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."[31]

The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."[32]   However, "[t]his is not to

---

[27] Docket 30 (State of Alaska's Mot. to Intervene) at 3; Docket 32 (Order Granting State of Alaska's Mot. to Intervene).

[28] *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (emphasis omitted).

[29] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).

[30] Docket 13 at 16.

[31] *Safe Air for Everyone*, 373 F.3d at 1039.

[32] *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 6 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 6 of 29

say that plaintiff may rely on a bare legal conclusion to assert injury-in-fact[.]"[33]  The

plaintiff has the burden of establishing the elements of Article III standing.[34]

### II.  Dismissal Under Rule 12(b)(6)

When reviewing a Rule 12(b)(6) motion, a court considers only the pleadings and

documents incorporated into the pleadings by reference, as well as matters on which a

court may take judicial notice.[35]   "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"[36]   A claim is plausible on its face "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."[37]   Thus, there must be "more than a sheer possibility that a

defendant has acted unlawfully."[38]   A court "accept[s] factual allegations in the complaint

as true and construe[s] the pleadings in the light most favorable to the nonmoving party."[39]

Plaintiffs assert that this Court has jurisdiction over this action pursuant to 28

U.S.C. §§ 1331 and 1361.[40]

---

[33] *Maya*, 658 F.3d at 1068.

[34] *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

[35] *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1061 (9th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[37] *Id.* at 678.

[38] *Id.*

[39] *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

[40] Docket 1 at 2, ¶ 2.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 7 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 7 of 29

## DISCUSSION

Federal Defendants move to dismiss Plaintiffs' Complaint for the following reasons: (1) the Federal Defendants are immune from suit under sovereign immunity; (2) Plaintiffs do not have a private right of action; (3) a court cannot issue declaratory relief against the President of the United States; and (4) Plaintiffs lack Article III standing. API asserts in its motion to dismiss that the Court lacks jurisdiction to hear this case under OCSLA. The State of Alaska incorporates the arguments made by both parties in its motion to dismiss.

### I.    Sovereign Immunity

Federal Defendants first assert that "the United States is immune from suit except to the extent Congress unequivocally and expressly waives that immunity" and Plaintiffs have not shown that their action falls within a waiver of sovereign immunity.[41]

Generally, when an individual brings a lawsuit against the government, the plaintiff must obtain a waiver of the government's sovereign immunity, which must be expressed in statutory text.[42] Federal Defendants assert that the sovereign immunity waiver set forth in § 702 of the Administrative Procedure Act does not apply to this case "because the President is not an 'agency' and thus his actions are not reviewable under the APA."[43] Although Federal Defendants are correct in that Plaintiffs are not proceeding under that statute, the United States Supreme Court has held that there are circumstances where

---

[41] Docket 13 at 18.

[42] *See Lane v. Pena*, 518 U.S. 187, 192 (1996).

[43] Docket 38 at 11 (citing 5 U.S.C. § 702).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 8 of 29

the sovereign immunity doctrine does not apply. In *Larson v. Domestic & Foreign Commerce Corp.*, the Supreme Court held that sovereign immunity does not apply where:

> the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief.[44]

The *Larson* Court also acknowledged a second exception to the sovereign immunity doctrine: when an officer "take[s] action in the sovereign's name [and that action] is claimed to be unconstitutional."[45]

In this case, Plaintiffs allege that the President "acted in excess of his statutory authority" and "acted in excess of his authority under Article II of the U.S. Constitution."[46] Because Plaintiffs assert that the President acted beyond his delegated powers enumerated in OCSLA and the Constitution, the doctrine of sovereign immunity does not

---

[44] 337 U.S. 682, 689 (1949); *see also Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("In *Larson*, . . . we held that sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally *or* beyond his statutory powers.'" (internal citation omitted)); *United States v. Yakima Tribal Court*, 806 F.2d 853, 859 (9th Cir. 1986) ("[I]f a federal official, acting pursuant to a constitutional statute, commits an unconstitutional act, he cannot be acting on behalf of the government because his actions go beyond the scope of his authority and are *ultra vires*.").

[45] *Larson*, 337 U.S. at 691 & n.11; *see also Swan v. Clinton*, 100 F.3d 973, 981 (1996) ("The '*Larson-Dugan* exception,' [ ] holds that sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority, on the grounds that 'where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.'" (quoting *Larson*, 337 U.S. at 689; citing *Dugan v. Rank*, 372 U.S. 609, 621–23 (1963))); *Yakima Tribal Court*, 806 F.2d at 859 ("According to *Larson*, suits that charge federal officials with unconstitutional acts are not barred by sovereign immunity. In *Larson*, the Supreme Court noted that when a federal official commits an unconstitutional act, he is necessarily acting outside his official capacity." (internal citations omitted)).

[46] Docket 1 at 21, 23, ¶¶ 60, 65.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 9 of 29

apply, and Plaintiffs are not required to demonstrate a Congressional waiver of sovereign immunity in order to bring this suit.

## II.     Private Right of Action

Federal Defendants next contend that "Plaintiffs fail to identify any statute that provides them a right of action to enforce their alleged rights under OCSLA and the Property Clause."[47]

Relying on *Alexander v. Sandoval* and *Lonberg v. City of Riverside*, Federal Defendants assert that "private rights of action to enforce federal law must be created by Congress" and "courts may not create one, no matter how desirable that might be as a policy matter."[48]   *Sandoval* and *Lonberg* each involved the courts determining whether the plaintiffs had private causes of action to enforce a federal regulation against a third party.[49]

Plaintiffs respond that they are not seeking "to step into the statute-enforcing shoes of the federal government as to third parties."[50]   Instead, Plaintiffs allege that the President exceeded his statutory and constitutional authority and acted *ultra vires* in issuing Executive Order 13795; therefore, Plaintiffs are not seeking to enforce a federal law.  Courts have on occasion adjudicated causes of action alleging that the President

---

[47] Docket 13 at 19.

[48] Docket 13 at 19 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)); Docket 38 at 12 (quoting *Lonberg v. City of Riverside*, 571 F.3d 846, 848 (9th Cir. 2009)).

[49] *See Sandoval*, 532 U.S. at 278–79, 293 (holding private individuals may not sue to enforce disparate-impact regulations under § 602 of Title VI of the Civil Rights Act); *Lonberg*, 571 F.3d at 847, 852 (holding Americans with Disabilities Act transition plan regulations not enforceable by private right of action).

[50] Docket 36 at 20.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 10 of 29

has exceeded his constitutional or statutory authority.[51]   As the Supreme Court held in *Franklin v. Massachusetts*, "the President's actions may still be reviewed for constitutionality . . . [even if] they are not reviewable for abuse of discretion under the APA."[52]   Therefore, Plaintiffs do not need express Congressional authorization to maintain these causes of action.[53]

### III.   Declaratory Relief

Federal Defendants next argue that "[c]ourts may not issue declaratory relief against co-equal branches of government."[54]   Plaintiffs respond that they are not seeking an injunction against the President.   Rather, they seek only a declaration that he exceeded his authority.   They maintain that "[w]ith such a finding, Plaintiff's harm can be redressed by an injunction against the Defendant Secretaries."[55]

The power of this Court to issue a declaratory judgment against the President is limited at best.   In *Franklin v. Massachusetts*, a plurality of the Supreme Court held that

---

[51] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952) (holding that Executive Order directing Secretary of Commerce to seize steel plants exceeded constitutional power of President); *N.L.R.B. v. Noel Canning*, 134 S. Ct. 2550, 2574 (2014) (holding President's NLRB appointments were beyond scope of Recess Appointments Clause); *Dames & Moore v. Regan*, 453 U.S. 654, 667, 674 (1981) (holding that President and Secretary of Treasury did not act "beyond their statutory and constitutional powers").

[52] *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (citing *Youngstown*, 343 U.S. at 579; *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

[53] Federal Defendants also claim that Plaintiffs' causes of action fail because they did not provide notice in writing to the Secretary within 60 days of commencing this action.  Docket 13 at 21 (citing 43 U.S.C. § 1349(a)(2)(A)).  However, as discussed below, Plaintiffs' claims do not arise under § 1349.  *See infra* p. 24–28.

[54] Docket 13 at 21.

[55] Docket 36 at 26.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 11 of 29

an injunction against the President was improper, but nonetheless the plaintiffs had standing because injunctive relief against a subordinate federal official would likely redress the injury alleged.[56]

Federal Defendants cite to *Newdow v. Bush* to support their argument, a case from the District of Columbia District Court.[57] The plaintiff in *Newdow* sought a declaratory judgment and an injunction to prohibit the inclusion of prayers by invited clergy at the Presidential Inauguration. *Newdow* was not a challenge to an executive order issued by the President. The district court, quoting Justice Scalia's concurrence in *Franklin v. Massachusetts*, stated that the President is generally immune from declaratory relief as well as injunctive relief.[58] But the district court acknowledged there are exceptions to this immunity and that "the outer boundaries of the immunity remain unclear."[59] Plaintiffs in this case are primarily seeking injunctive relief against subordinate officials; they do not seek injunctive relief against the President.[60] In the event that Plaintiffs were to prevail on the merits, Plaintiffs' alleged harms may well be adequately redressed if an injunction

---

[56] *Franklin*, 505 U.S. at 803 (plurality opinion). The plurality opinion did not directly address the propriety of declaratory relief against the President, but stated, "[W]e may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the [relevant] statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Id.*

[57] 355 F. Supp. 2d 265 (D.D.C. 2005).

[58] *Id.* at 281 (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring, stating, "I think we cannot issue a declaratory judgment against the President.")).

[59] *Newdow*, 355 F. Supp. 2d at 281.

[60] *See* Docket 1 at 2, ¶ 1.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 12 of 29

against subordinate officials were to issue, in which event the President would be dismissed. But dismissal of the entire action on this basis is not warranted.[61]

### IV.    Article III Standing

Federal Defendants maintain that Plaintiffs lack Article III standing because Plaintiffs have not alleged an imminent, geographically specific, and particularized harm.[62]  Plaintiffs respond that "the complaint [provides that] the President's action has the immediate, purposeful effect of removing an absolute bar to new oil and gas leasing and development in protected areas of the Arctic and Atlantic Oceans."[63]

Article III standing requires that a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[64]  To establish injury in fact, Plaintiffs must establish that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[65]

---

[61] At oral argument, Federal Defendants suggested that the Court should at least dismiss the President from the case.  The parties may further address the propriety of that action in their merits briefing.

[62] Docket 13 at 25–26.

[63] Docket 36 at 28.

[64] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted).

[65] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotations and citations omitted).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 13 of 29

### A. Imminent Harm

Federal Defendants assert that Plaintiffs have not alleged an imminent harm sufficient to confer Article III standing.[66] Plaintiffs respond that they have alleged a substantial risk of future harm sufficient to support Article III standing.[67]

At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim."[68] "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'"[69]

Federal Defendants assert that although it is "certainly conceivable that oil and gas exploration and development will occur somewhere within the [128 million acres Plaintiffs claim are affected by the Executive Order] at some point in time," it is unclear "when or where such oil and gas exploration will occur."[70] Furthermore, Federal Defendants argue that because there are multiple steps to obtaining leases and drilling permits in the Arctic and Atlantic Oceans, there is no risk of imminent harm.[71]

---

[66] Docket 13 at 26.

[67] Docket 36 at 29.

[68] *Lujan*, 504 U.S. at 561 (internal quotations omitted) (citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 889 (1990)).

[69] *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 n.5 (2013)).

[70] Docket 13 at 28 (emphasis omitted).

[71] Docket 13 at 27.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 14 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 14 of 29

The Ninth Circuit recently considered whether a group of plaintiffs had a sufficient risk of future harm when they had yet to suffer any actual harm in *In re Zappos.com, Inc.*[72] In *Zappos*, the plaintiffs brought a class action against Zappos alleging that hackers had stolen their personal information from Zappos's servers.[73] The district court dismissed one group of plaintiffs, holding that the group did not have standing because their personal information had not yet been used by hackers and they had not incurred any financial harm.[74]

The Ninth Circuit reversed and held that there was Article III standing as to those plaintiffs. The court discussed the Supreme Court's holding in *Clapper v. Amnesty International USA.*[75] In *Clapper*, the plaintiffs challenged the Foreign Intelligence Surveillance Act, which authorizes surveillance of individuals who are not United States persons.[76] The plaintiffs—attorneys and human rights, labor, legal, and media organizations—were United States persons but argued that they had Article III standing to challenge the statute "because there [was] an objectively reasonable likelihood that their communications [would] be acquired under [the Act] at some point in the future."[77]

---

[72] No. 16-16860, 2018 WL 1189643, ___ F.3d ___ (9th Cir. March 8, 2018).

[73] *Id.* at *1.

[74] *Id.*

[75] 568 U.S. 398 (2013).

[76] *Id.* at 401; 50 U.S.C. § 1881a.

[77] *Clapper*, 568 U.S. at 406, 407.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 15 of 29

The Supreme Court held that the plaintiffs did not have standing because the risk of harm to them was too attenuated.[78]

The *Zappos* court also considered a similar Ninth Circuit case, *Krottner v. Starbucks Corp.*[79] In *Krottner*, a laptop was stolen that contained Starbucks employees' personal information. At issue was whether the employees had standing to sue Starbucks for negligence and breach of contract because there was "no indication that the private information ha[d] been misused" by anyone.[80] The Ninth Circuit held that the plaintiffs had standing, because they had "alleged a credible threat of real and immediate harm stemming from the theft of a laptop containing their unencrypted personal data."[81] In evaluating whether the plaintiffs had standing in *Zappos*, the Ninth Circuit reconciled its cases with *Clapper*. It found that the risk of harm in both *Krottner* and *Zappos* was imminent because the personal information obtained "could be used to help commit

---

[78] *Id.* at 410. The Court found that before the plaintiffs would suffer any harm, each of the following steps would need to occur:

> (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of [plaintiffs'] contacts; and (5) [plaintiffs] will be parties to the particular communications that the Government intercepts.

*Id.*

[79] 628 F.3d 1139 (9th Cir. 2010).

[80] *Id.* at 1141.

[81] *Id.* at 1143.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 16 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 16 of 29

identify fraud or identity theft."[82]  In contrast, the Circuit observed that the Supreme Court had found no standing in *Clapper* because the risk of harm in *Clapper* rested on a "multi-link chain of inferences [that] was thus 'too speculative' to constitute a cognizable injury in fact."[83]

The risk of harm in this case is similar to *Zappos*.  In *Zappos*, the harm had not yet occurred, but there was a risk of harm from hackers committing identity fraud or identity theft and those hackers had the means to be able to commit those crimes.  In this case, although third parties must obtain permits before seismic surveying and other activities may occur, there is no indication that the government will not promptly grant such permits, particularly in light of the Executive Order's stated purpose of expediting energy production.

The facts as alleged in the Complaint, when taken as true as required when considering a motion to dismiss, adequately support Plaintiffs' allegation that there is an imminent risk of harm from those activities in several respects.

First, the Complaint alleges that the stated purpose of the President's Executive Order is to expedite energy production in the Arctic and Atlantic Oceans.[84]  The Executive Order mandates expedited consideration of seismic survey permits, instructs revision of the schedule of oil and gas lease sales to include annual lease sales in the Arctic and Atlantic Oceans, and directs review of offshore safety and pollution-control regulations

---

[82] *Zappos*, 2018 WL 1189643, at *5.

[83] *Id.* at *4 (citing *Clapper*, 568 U.S. at 401).

[84] Docket 1 at 21, ¶ 53.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 17 of 29

and guidance documents. The Executive Order itself demonstrates that oil and gas exploration activities are intended to be imminent.[85]

Second, Plaintiffs allege current industry interest in oil and gas drilling in the previously withdrawn regions. According to Plaintiffs' Complaint, "[f]ollowing President Trump's April 28, 2017, executive order, one seismic industry trade group called for seismic surveying in the Atlantic and other frontier areas to proceed 'without delay' in order to 'allow for informed decisions as a new five-year lease plan is developed.'"[86] Plaintiffs allege that one seismic operator has already "sought federal authorizations to conduct 3-D seismic exploration in the Beaufort Sea nearshore area" and "[c]ollectively, the four companies with applications now pending before NMFS have proposed to run more than 126,000 linear kilometers of airgun surveys during the first year of exploration activity in the region."[87] In addition, Plaintiffs allege that "[i]n the Atlantic, at least six seismic operation companies have applied . . . for permits to conduct 'deep-penetration seismic surveys,' deploying large airgun arrays to prospect for oil and gas deposits miles beneath the seafloor."[88]

Plaintiffs maintain that seismic surveying can cause the following harmful effects to marine wildlife:

> Seismic surveying associated with oil and gas activities uses very loud, frequent sound pulses from airgun arrays to map the geology of the sea floor and identify potential oil and gas deposits. . . . Noise from seismic

---

[85] Docket 13-1 at 2–5.

[86] Docket 1 at 16, ¶ 39.

[87] Docket 1 at 16, 17, ¶¶ 39, 41.

[88] Docket 1 at 16–17, ¶ 40.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 18 of 29

operations harms marine mammals.  If animals are exposed to high enough levels of sound, such as exist close to some seismic airguns, they can suffer shifts in hearing thresholds and hearing loss that may result in mortality. . . . Seismic surveys also harm commercially important fish and shellfish.[89]

Plaintiff's Complaint adequately alleges a risk of imminent harm from seismic surveying for purposes of Article III standing.[90]

In addition, the Complaint alleges that over the past decade, "the federal government has considered, proposed, decided on, and/or authorized substantial industrial oil and gas activities in the Arctic and Atlantic Oceans pursuant to the OCSLA scheme."[91]  The Complaint alleges "companies also have sought approval to conduct seismic surveys even when lease sales are more than four years away and [are] not included in an existing or proposed five-year program."[92]  In February 2008, the government held a leasing sale in the Chukchi Sea, resulting in 487 leases covering nearly 2.8 million acres.[93]  Plaintiffs also allege that seismic surveying typically precedes oil and gas lease sales by two to four years in order to locate areas with promising oil and gas prospects.[94]  Therefore, the Complaint adequately alleges that previous oil and gas

---

[89] Docket 1 at 11–12, ¶¶ 27–29.

[90] Defendants further assert that seismic surveying is authorized by a separate statute and was not restricted by President Obama's withdrawals. Docket 38 at 5.  Although seismic surveying can go forward regardless of the legality of the challenged Executive Order, there would be no apparent incentive for the industry to conduct seismic surveying in areas closed off from drilling. Therefore, Plaintiffs' allegations on the effect of the Executive Order on seismic surveying activity are considered part of the alleged imminent harm.

[91] Docket 1 at 14, ¶ 34.

[92] Docket 1 at 17–18, ¶ 43.

[93] Docket 1 at 15, ¶ 35.

[94] Docket 1 at 17, ¶ 43.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 19 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 19 of 29

exploration and development activities in the Arctic and Atlantic Oceans support Plaintiffs' assertion that seismic surveying is imminent.

The Executive Order's clear intent to expedite energy production in the Arctic and Atlantic Oceans, the oil industry's eagerness to obtain seismic surveying permits, and the fact that seismic surveying typically precedes oil and gas lease sales, together indicate that Plaintiffs have adequately alleged a substantial risk of harm from the passage of Executive Order 13795 that is "imminent" for purposes of Article III standing.

### B. Geographic Specificity

Federal Defendants also assert that Plaintiffs have not alleged a "geographically specific" injury.[95] The Complaint alleges that the Executive Order reverses protections in "approximately 128 million acres of federally owned portions of the Arctic and Atlantic Oceans."[96] Plaintiffs allege that their "use and enjoyment of these areas and wildlife are affected by the condition of the areas and health of individual wildlife."[97] Federal Defendants take issue with the fact that Plaintiffs "do not identify any particular area within that 128 million acres that they use or enjoy that will be the subject of exploration or development activities as a result of the challenged Executive Order[.]"[98] Plaintiffs

---

[95] Docket 13 at 29.

[96] Docket 1 at 8, ¶ 16.

[97] Docket 1 at 7, ¶ 15.

[98] Docket 13 at 29.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 20 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 20 of 29

respond that they "allege the requisite 'geographical nexus between the individual asserting the claim and the location suffering the environmental impact.'"[99]

In *Center for Biological Diversity v. Kempthorne*, the plaintiffs alleged that regulations permitting the non-lethal "taking" of polar bears along the Beaufort Sea and the northern coast of Alaska violated the Marine Mammal Protection Act and the National Environmental Policy Act.[100] The Center alleged that its members had "viewed polar bears and walrus in the Beaufort Sea region, enjoy doing so, and have plans to return."[101] The government challenged the Center's standing to bring suit. The Ninth Circuit held that the Center had alleged a sufficiently "geographically specific" injury to confer standing.[102]

As the Ninth Circuit recognized in *Kempthorne*, the degree of geographic specificity required depends on the size of the area that is impacted by the government's

---

[99] Docket 36 at 34 (quoting *Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013)).

[100] 588 F.3d 701, 706 (9th Cir. 2009).

[101] *Id.* at 707–08.

[102] *Id.* at 708. The Ninth Circuit distinguished *Kempthorne* from *Summers v. Earth Island Institute*. *Id.* at 707 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 490 (2009)). In *Summers*, the plaintiffs obtained nationwide injunctive relief that prevented the U.S. Forest Service from enforcing a regulation that exempted certain small timber salvage projects from the notice, comment, and appeal process. An organization member had alleged she had repeatedly visited one of the sites, and had plans to do so again. *Summers*, 555 U.S. at 494. The government conceded that this allegation of harm satisfied Article III standing; however, the parties settled as to this particular site and the member's harm was remedied. *Id.* The Court held that the remaining allegations of harm including past injury, injury not subjected to the regulations, and nonspecific plans to visit unnamed national forests in the future were not enough to confer standing. *Id.* at 496. The *Kempthorne* court held that "[u]nlike the alleged injury in *Summers*, this injury is geographically specific, is caused by the regulations at issue, and is imminent. . . . The plaintiffs have standing." *Kempthorne*, 588 F.3d at 708.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 21 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 21 of 29

action.[103]   In this case, the area impacted by the Executive Order is 128 million acres located in the Arctic and Atlantic Oceans.[104]   Plaintiffs, similar to the plaintiffs in *Kempthorne*, allege that they "visit or otherwise use and enjoy the Atlantic Ocean, including near deepwater canyons, the Chukchi and Beaufort Seas, and coastal regions adjacent to these waters."[105]   Although the geographic area is very large, it is discrete and defined.  Therefore, Plaintiffs have alleged a sufficiently specific geographic area for their alleged harms for Article III standing.

### C. Particularized Harm

Finally, Federal Defendants maintain that Plaintiffs have not alleged a harm that is personal and particular to them.[106]   Plaintiffs respond that they allege a particularized injury because they have alleged "an interest in visiting, using, inhabiting, studying, and recreating in—or viewing wildlife that depends on—areas affected by President Trump's order."[107]

"For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"[108]   The Supreme Court has held that in environmental cases, "[t]he

---

[103] *See also Defenders of Wildlife v. EPA*, 420 F.3d 946, 954 (9th Cir. 2005) *rev'd on other grounds sub nom. National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("[I]n light of the statewide impact of the EPA's transfer decision, alleging an injury-in-fact covering large areas within the state simply reflects the relatively broad nature of the potential harm.").

[104] Docket 1 at 7, ¶ 16.

[105] Docket 1 at 7, ¶ 15.

[106] Docket 13 at 30–31.

[107] Docket 36 at 39.

[108] *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 22 of 29

relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff."[109]  Thus, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."[110]

In *Center for Biological Diversity v. Kempthorne*, discussed above, the Ninth Circuit found that the plaintiffs had alleged an injury that was particularized by alleging that

> they have viewed polar bears and walrus in the Beaufort Sea region, enjoy doing so, and have plans to return. If the plaintiffs' allegations are true, the . . . regulations threaten imminent, concrete harm to these interests by destroying polar bears and walrus in the Beaufort Sea.[111]

In this case, Plaintiffs allege that exposing animals to seismic surveying at "high enough levels of sound" will cause the animals to "suffer shifts in hearing thresholds and hearing loss that may result in mortality."[112]  The Complaint also asserts that

> members of the Plaintiff organizations visit or otherwise use and enjoy the Atlantic Ocean, including near deepwater canyons, the Chukchi and Beaufort Seas. . . . The members' use and enjoyment of these areas and wildlife are affected by the condition of the areas and health of individual wildlife and populations and their habitat in the wild.  Any activities, such as oil and gas exploration or development, including seismic surveying, that destroy, degrade, or diminish the wild and natural state of these areas, or that kill, injure, harm, harass, or displace wildlife, also interfere with Plaintiffs' members' use and enjoyment of the areas and associated wildlife.

---

[109] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

[110] *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

[111] *Kempthorne*, 588 F.3d at 707–08.

[112] Docket 1 at 12, ¶ 28.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 23 of 29

As such, these activities directly and irreparably injure the interests of Plaintiffs' members.[113]

Plaintiffs have adequately alleged harms as a result of oil and gas exploration and development activities that are personal to them.[114]

Based on the foregoing analysis, the Court finds that Plaintiffs have adequately pleaded facts that demonstrate Article III standing.[115]

### V.    API's Motion Under OCSLA

American Petroleum Institute filed a separate Motion to Dismiss at Docket 25.  It asserts jurisdiction over Plaintiffs' claims is governed by § 1349(c)(1) of the Outer Continental Shelf Lands Act, which provides that "any action of the [Interior] Secretary to approve a leasing program pursuant to section 1344 of [OCSLA] shall be subject to judicial review only in the United States Court of Appeal for the District of Columbia."[116]

---

[113] Docket 1 at 7–8, ¶ 15.

[114] Federal Defendants assert that Plaintiffs' claims raise "a generally available grievance about the government."  Docket 13 at 31.  However, "the fact that a harm is widely shared does not necessarily render it a generalized grievance."  *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 909 (9th Cir. 2011).

[115] Federal Defendants also assert that Plaintiffs' claims are not ripe.  Docket 13 at 23.  However, as Federal Defendants acknowledge, "the constitutional component of ripeness is coextensive with the injury-in-fact requirement of standing."  Docket 13 at 23 n.8 (citing *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996)).  Because the Court finds Plaintiffs have adequately alleged an injury in fact, the Court need not address constitutional ripeness.  Moreover, "[p]rudential considerations of ripeness are discretionary."  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000); *see also Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) ("[The request to decline to adjudicate the case on prudential grounds] is in some tension with our recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'") (quotation omitted) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013)).

[116] *See* Docket 25 at 17 (quoting 43 U.S.C. § 1349(c)(1)); *see also* 43 U.S.C. § 1349(c)(2) ("Any action of the Secretary to approve, require modification of, or disapprove any exploration plan or any development and production plan . . . shall be subject to judicial review only in a United States

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 24 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 24 of 29

Plaintiffs respond that they are not seeking review of administrative actions taken under OCSLA § 1344.[117]  Rather, they are claiming that the President acted *ultra vires* in issuing an executive order beyond the authority given to him under a different provision of OCSLA: § 1341.[118]  Plaintiffs also cite to section 1349(a)(6), which provides that "[n]othing in this section shall restrict any right which any person or class of persons may have under any other Act or common law to seek appropriate relief."

API maintains that the Ninth Circuit's holding in *California Save Our Streams Council, Inc. v. Yeutter* supports its assertion that Plaintiffs' claims may only be heard by the D.C. Circuit.[119]  In *Yeutter*, the plaintiffs, after failing to timely intervene in a Federal Energy Regulatory Commission ("FERC") proceeding, brought suit in district court to challenge certain conditions that the Forest Service had provided to FERC for inclusion in a proposed license to build a hydroelectric facility.[120]  Pursuant to the Federal Power Act ("FPA"), FERC was required to solicit and accept such conditions from the Forest Service.[121]  The FPA also provided for "*exclusive* jurisdiction for the Courts of Appeals to review and make substantive modifications to FERC licensing orders."[122]  The plaintiffs

---

court of appeals for a circuit in which an affected State is located.").

[117] Docket 36 at 22.

[118] Docket 1 at 23, ¶ 64.

[119] *See* Docket 39 at 14–17 (citing *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989)).

[120] *Yeutter*, 887 F.2d at 909–10.

[121] *Id.* at 912.

[122] *Id.* at 911 (emphasis in original).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 25 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 25 of 29

asserted that the exclusive review provision was inapplicable because their suit was filed against the Forest Service pursuant to NEPA and related statutes and was not attacking FERC's licensing decision.[123]  The Ninth Circuit rejected the plaintiffs' argument, holding that "although [plaintiffs] seek to characterize the proceedings as an attack on the Forest Service's actions, it is clear that the suit is an attempt to restrain the licensing procedures authorized by FERC" and was therefore subject to the exclusive jurisdictional limitation by the court of appeal.[124]

The harm that the plaintiffs alleged in *Yeutter* was different than that being alleged here in a critical respect—namely, Plaintiffs here have asserted that their alleged harms will occur long before a party could obtain judicial review of a leasing plan before the D.C. Circuit pursuant to 43 U.S.C. § 1349(c)(1).[125]  Furthermore, the practical consequences of allowing district court review in *Yeutter* would have been significantly more burdensome than in this case, given that substantial administrative proceedings before FERC had already occurred in *Yeutter*.[126]  Here, by contrast, there has been no revised leasing plan

---

[123] *Id.*

[124] *Id.* at 912.

[125] Plaintiffs allege that the seismic surveying they complain of could occur imminently.  *See* Docket 1 at 14, 17, ¶¶ 33, 43.  In *Yeutter*, the challenged conduct—construction of the hydroelectric facility—would not have taken place until after any review of the FERC license by the Ninth Circuit had concluded.  Therefore, "funnel[ing] all challenges to the courts of appeals . . . to hear all relevant arguments" was consistent with the FPA.  *Yeutter*, 887 F.2d at 912.

[126] In *Yeutter*, the Ninth Circuit emphasized the practical consequences of a ruling for plaintiffs, noting that "[a]fter the license applicant had initially fought his way through the administrative proceedings, he would then have to grind through the district court and, almost certainly, through the appeal as of right to the circuit court."  *Id.*  Here, by contrast, Plaintiffs have made a preliminary challenge prior to administrative proceedings.  Furthermore, the plaintiffs in *Yeutter* brought their challenge in the district court only after they failed to timely intervene in the FERC administrative proceedings, which has not occurred here.  *Id.* at 910.

---

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 26 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 26 of 29

developed at this time. Instead, Plaintiffs have alleged that independent of any subsequent leasing program established by the Interior Secretary, the Executive Order on its own will result in seismic surveying and the attendant harm. In *Yeutter*, the challenged action "ha[d] no significance outside the licensing process" that would ultimately be the cause of any harm.[127] Accordingly, *Yeutter*'s holding is not applicable here.

API also asserts that "[w]here, as here, a 'statute authorizes review of specified agency actions,' it is well settled that interrelated actions are all reviewable in the court of appeals."[128] API relies on *Cal. Energy Comm'n v. Dep't of Energy*, in which the Ninth Circuit held that it had jurisdiction over a claim brought under a provision of the Energy Policy and Conservation Act ("EPCA") over which it had not explicitly been granted jurisdiction in part because the claim was closely intertwined with agency action over which it did have express jurisdiction.[129] Here, however, the President's issuance of the

---

[127] *Id.* at 912.

[128] Docket 39 at 14 (quoting *Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1148 (9th Cir. 2009)) (alterations and citations omitted).

[129] *Cal. Energy Comm'n*, 585 F.3d at 1148. In *Cal. Energy Comm'n*, the Cal. Energy Commission ("CEC") challenged the denial of a waiver from the Department of Energy to establish state regulations relating to residential clothes washers. *Id.* at 1147. CEC brought its claim in the Ninth Circuit pursuant to the EPCA, which provided for direct court of appeal review of a claim by "[a]ny person who will be adversely affected by a rule prescribed under section 6293, 6294, or 6295 of this title." *Id.* at 1148 (quoting 42 U.S.C. § 6306(b)(1)). The Department of Energy ("DOE") contested jurisdiction, stating that the challenged action was an order under § 6297(d) and therefore "CEC [was] not challenging a rule adopted pursuant to §§ 6293, 6294, or 6295." *Id.* However, the Ninth Circuit held that the denial of CEC's petition for a waiver was "closely intertwined with the exercise of DOE's authority under § 6295" and thus the court of appeals had jurisdiction. *Id..* Furthermore, the "CEC [was] 'adversely affected by a rule prescribed under section . . . 6295' within the meaning of § 6306(b), which confers jurisdiction on the circuit courts of appeals." *Id.* (alterations in original). Therefore, the Ninth Circuit appeared to hold that it had jurisdiction over CEC's claim pursuant to the express language of the statute, and not solely as a

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 27 of 29

Case 3:17-cv-00101-SLG   Document 45   Filed 03/19/18   Page 27 of 29

Executive Order is a discrete action distinct from the future anticipated revised leasing plans by the agency and is far less "interrelated" or "intertwined" with agency action than was the case in *Cal. Energy Comm'n*. There, the Ninth Circuit held it had jurisdiction in part because "[t]he type of review required of us is qualitatively no different from the sort that we would engage in upon review of a rule promulgated under 42 U.S.C. § 6295, over which we are expressly assigned jurisdiction under the EPCA."[130] Here, a question of whether the Interior Secretary properly develops a five-year leasing program pursuant to § 1344 is distinct from the question of whether the President has the authority to reverse prior executive withdrawal orders issued pursuant to § 1341(a).[131]

Finally, API cites *Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp. Research & Special Programs Admin.*, 457 F.3d 956, 960 (9th Cir. 2006), for its statement that "[i]f there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals, we must resolve that ambiguity in favor of review by a court of appeals."[132] However, API does not identify the particular ambiguity that requires dismissal for lack of jurisdiction over Plaintiffs' claims in this Court. Instead, as the Ninth Circuit held in *Cal. Energy Comm'n*, "[u]nless Congress specifically maps a judicial review path for an

_____

result of interrelatedness.

[130] *Id.* at 1150.

[131] *See* Docket 25 at 13–14 (identifying considerations of the Interior Secretary in developing the five-year leasing program).

[132] Docket 39 at 18.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 28 of 29

agency, review may be had in federal district court under its general federal question jurisdiction."[133]

Plaintiffs' claims in this action are not challenging a leasing plan under § 1344 pursuant to § 1349(c)(1) and therefore do not need to be brought in the District of Columbia Circuit; this Court has jurisdiction to hear this case.[134]

## CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Motions to Dismiss at Dockets 12, 25, and 34 are each DENIED. The parties previously agreed to file a proposed schedule for summary judgment briefing within 45 days of the issuance of this order. However, the Court is not persuaded that 45 days is necessary for that task.[135] Accordingly, within **14 days** from the date of this order, the parties shall file a proposed schedule for summary judgment briefing (or proposed schedules if the parties are unable to agree).

DATED this 19th day of March, 2018 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[133] *Cal. Energy Comm'n*, 585 F.3d at 1148 (quoting *Owner–Operators Indep. Drivers Ass'n v. Skinner*, 931 F.2d 582, 585 (9th Cir. 1991)). API contends that "where a federal statute provides for direct review of an agency action in the court of appeals, such specific grants of exclusive jurisdiction to the courts of appeals override general grants of jurisdiction to the district courts." Docket 39 at 14 (alterations omitted) (quoting *Nuclear Info. & Res. Serv.*, 457 F.3d at 959). However, Plaintiffs' claim does not call for this Court's review of agency action pursuant to § 1344, but review of Presidential action under § 1341.

[134] While the Court recognizes the possibility, discussed at oral argument, that allowing this case to proceed could result in concurrent litigation being brought in the D.C. Circuit under § 1349(c)(1), API provides no authority for the proposition that the possibility of redundant or overlapping cases mandates dismissal, especially when the second case is merely hypothetical at this point.

[135] Docket 35 (Order re Joint Schedule Proposal).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 29 of 29