No. 19-35460
(Consolidated with Nos. 19-35461 and 19-35462)

———————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————

LEAGUE OF CONSERVATION VOTERS, et al.,
*Plaintiffs/Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,
*Defendants/Appellants*.

———————

Appeal from the United States District Court for the District of Alaska
No. 3:17-cv-00101 (Hon. Sharon L. Gleason)

———————

**EXCERPTS OF RECORD**
**Volume 2 (pages 62–354)**

———————

|  |  |
|---|---|
|  | JEFFREY BOSSERT CLARK |
|  | *Assistant Attorney General* |
|  | ERIC GRANT |
| *Of Counsel*: | *Deputy Assistant Attorney General* |
|  | ROBERT J. LUNDMAN |
| DENNIS DAUGHERTY | SARAH D. HIMMELHOCH |
| SUSAN HOVEN CASON | JUSTIN D. HEMINGER |
| *Attorneys* | *Attorneys* |
| Division of Mineral Resources | Environment and Natural Resources Division |
| Office of the Solicitor | U.S. Department of Justice |
| U.S. Department of the Interior | Post Office Box 7415 |
|  | Washington, D.C. 20044 |
|  | (202) 514-5442 |
|  | justin.heminger@usdoj.gov |

## INDEX

| Filing Date | ECF | Document | Page |
|---|---|---|---|
| | | **Volume 1** | |
| 3/29/2019 | 80 | Order Re Motions for Summary Judgment | 1 |
| 3/19/2018 | 45 | Order Re Motions to Dismiss | 33 |
| | | **Volume 2** | |
| 5/28/2019 | 82 | Federal Defendants' notice of appeal | 62 |
| 4/01/2019 | 81 | Judgment in a Civil Case | 64 |
| 2/28/2019 | 78 | Notice of errata | 65 |
| 6/8/2018 | 51 | Plaintiffs' summary judgment brief (excerpt) and standing declarations (exhibits 21 through 39) | 67 |
| 9/8/2017 | 36 | Plaintiffs' memorandum in opposition to motions to dismiss (excerpt) | 283 |
| 6/30/2017 | 13-1 | President Trump, Executive Order 13795, Implementing an America-First Offshore Energy Strategy (Apr. 28, 2017), 82 Fed. Reg. 20815 (May 3, 2017) | 285 |
| 6/30/2017 | 13-18 | President Obama, Memorandum on Withdrawal of Certain Portions of the United States Artic OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 860 (Dec. 20, 2016) | 289 |
| 6/30/2017 | 13-17 | President Obama, Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016) | 290 |

i

| Filing Date | ECF | Document | Page |
|---|---|---|---|
| 6/30/2017 | 13-16 | President Obama, Executive Order 13754, North Bering Sea Climate Resilience, 2016 Daily Comp. Pres. Docs. 836 (Dec. 9, 2016) | 291 |
| 6/30/2017 | 13-15 | President Obama, Memorandum on Withdrawal of Certain Areas of the United States OCS Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 1, 1 (Jan. 27, 2015) | 296 |
| 6/30/2017 | 13-14 | President Obama, Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 2010 Daily Comp. Pres. Docs. 1, 1 (Dec. 16, 2014) | 297 |
| 6/30/2017 | 13-13 | President Obama, Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 2010 Daily Comp. Pres. Docs. 1, 1 (Mar. 31, 2010) | 298 |
| 6/30/2017 | 13-12 | President George W. Bush, Memorandum for the Secretary of the Interior re Modification of the Withdrawal of Areas of the United States OCS from Leasing Disposition, 44 Weekly Comp. Pres. Docs. 986 (July 14, 2008) | 299 |
| 6/30/2017 | 13-11 | President George W. Bush, Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007) | 300 |
| 6/30/2017 | 13-10 | President Clinton, Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 34 Weekly Comp. Pres. Docs. 1107, 1111 (June 12, 1998) | 301 |

| Filing Date | ECF | Document | Page |
|---|---|---|---|
| 6/30/2017 | 13-9 | President George H.W. Bush, Memorandum for the Secretary of the Interior regarding Outer Continental Shelf (OCS) Oil and Gas Program for 1992-1997 (Aug. 4, 1992) (unpublished) | 302 |
| 6/30/2017 | 13-8 | President George H.W. Bush, Statement on OCS Oil and Gas Development, 26 Weekly Comp. Pres. Docs. 1001, 1006 (June 26, 1990) | 303 |
| 6/30/2017 | 13-7 | Secretary of the Interior Walter Hickel, Public Land Order 4587, 34 Fed. Reg. 5655–56 (Mar. 26, 1969) | 306 |
| 6/30/2017 | 13-6 | President Eisenhower, Proclamation 3339, Establishing the Key Largo Coral Reef Preserve, 25 Fed. Reg. 2352 (March 15, 1960) | 308 |
| 6/30/2017 | 13-2 | Truman Proclamation (Sept. 28, 1945) | 309 |
| 5/03/2017 | 1 | Plaintiffs' Complaint for Declaratory and Injunctive Relief | 310 |
| N/A | N/A | District court docket sheet | 334 |

JEFFREY CLARK
Assistant Attorney General
ERIC GRANT
Deputy Assistant Attorney General

SARAH D. HIMMELHOCH (MD Bar. No. 199212160064)
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0097
sarah.himmelhoch@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **LEAGUE OF CONSERVATION VOTERS**, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No. 3:17-cv-00101-SLG |
| | ) |
| v. | ) |
| | ) |
| **DONALD J. TRUMP**, et al., | ) |
| | ) |
| Defendants. | ) |
| ————————————————————— | ) |

Defendants President Donald J. Trump, Secretary of the Interior David Bernhardt,[1] and

Secretary of Commerce Wilbur Ross hereby appeal to the United States Court of Appeals for the

Ninth Circuit from the Judgment In A Civil Case (Document 81) entered on April 1, 2019, the

---

[1] Substituted by operation of Rule 25(d) of the Federal Rules of Civil Procedure for Ryan Zinke.

Order (Document No. 80) on motion and cross motion for summary judgment, filed on March 29, 2019, and the Order (Document No. 45) on motions to dismiss, filed on March 19, 2018.

Dated: May 28, 2019

Respectfully submitted,

JEFFREY CLARK
Assistant Attorney General
Environment & Natural Resources Division


_____*s/s*_____
SARAH D. HIMMELHOCH
MD Bar. No. 199212160064
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0057
sarah.himmelhoch@usdoj.gov

*Attorneys for Defendants*


## Certificate of Service

I hereby certify that on March 28, 2019, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide service to all attorneys of record.

*/s/*
_____
Sarah D. Himmelhoch
*Attorney for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

LEAGUE OF CONSERVATION
VOTERS, et al.,
          Plaintiffs,

                                Case Number 3:17-cv-00101-SLG

v.

DONALD J. TRUMP, et al.,
          Defendants.          **JUDGMENT IN A CIVIL CASE**

AMERICAN PETROLEUM
INSTITUTE and STATE OF
ALASKA,
          Intervenor-Defendants.

**DECISION BY COURT**. This action came to trial or decision before the Court. The issues have been tried or determined and a decision has been rendered.

IT IS ORDERED AND ADJUDGED:

That Plaintiffs' motion for summary judgment at Docket 50 is GRANTED.
Federal Defendants' motion, API's cross-motion, and Alaska's motion for summary judgment at Dockets 55, 58, and 60, respectively, are DENIED.
Section 5 of Executive Order 13795 is hereby VACATED. Plaintiffs' additional request for injunctive relief is DENIED.

APPROVED:


*s/Sharon L. Gleason*
SHARON L. GLEASON
United States District Judge

Date: April 1, 2019

*NOTE: Award of prejudgment interest, costs and attorney's fees are governed by D.Ak. LR 54.1, 54.3, and 58.1.*

                                          Lesley K. Allen
                                          Lesley K. Allen
                                          Clerk of Court

[Jmt2 - Basic - rev. 1-13-16}

JEFFREY CLARK
Assistant Attorney General

SARAH D. HIMMELHOCH
(MD Bar. No. 199212160064)
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0097
sarah.himmelhoch@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **LEAGUE OF CONSERVATION VOTERS**, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No. 3:17-cv-00101- SLG |
| | ) |
| v. | ) |
| | ) |
| **DONALD J. TRUMP**, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## NOTICE OF ERRATA TO
## FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
## THEIR MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL
## PROCEDURE 12(b)

On October 2, 2017, the Federal Defendants filed a reply in support of their motion to dismiss (Rec. Doc. 38). In that brief, these defendants stated that "the only operators to apply for seismic survey permits propose to conduct these activities in areas offshore the mid-Atlantic coastal states, far from the area in the Atlantic withdrawn by President Obama." *See* Rec. Doc. 38 at 5. On March 19, 2018, this Court denied the Defendants' Motion to Dismiss.

Subsequently, the Federal Defendants became aware that the quoted language in their reply brief was factually incorrect. While the court's ruling did not suggest that it relied on that misstatement, we nonetheless wish to correct the record. At the time the misstatement was made there were pending survey permit applications before the agency which included survey lines extending over three of the twenty-six canyons that were part of the Atlantic area withdrawn by President Obama. Those permit applications are currently under review by BOEM.

Dated: February 28, 2019                    Respectfully submitted,


                                             JEFFREY CLARK
                                             Assistant Attorney General
                                             Environment & Natural Resources Division

                                             /s/

                                             SARAH D. HIMMELHOCH
                                             MD Bar. No. 199212160064
                                             Senior Litigation Counsel
                                             U.S. Department of Justice
                                             Environment & Natural Resources Division
                                             601 D Street NW
                                             Washington, DC 20004
                                             Telephone: (202) 514-0180
                                             Facsimile: (202) 514-0057
                                             sarah.himmelhoch@usdoj.gov

                                             *Attorney for Federal Defendants*


## Certificate of Service

I hereby certify that on February 28, 2019, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide service to all attorneys of record.

                                             /s/
                                             Sarah D. Himmelhoch
                                             *Attorney for Federal Defendants*

Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*admitted pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Nancy S. Marks (N.Y. Bar No. 2121820) (*admitted pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
11th Floor
New York, NY 10011
T: 212.727.2700 / F: 415.795.4799
E: nmarks@nrdc.org

*Attorneys for Plaintiffs League of Conservation Voters et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP *et al.*,<br><br>*Defendants*,<br><br>AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA,<br><br>*Intervenor-Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 3:17-cv-00101-SLG |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

render the Obama memoranda identical to and redundant with Bush's, and the Obama withdrawals therefore of no effect. *Compare id.* at 2, *with* 44 Weekly Comp. Pres. Docs. 986. President Trump's order also directed the Secretary of the Interior to "give full consideration" to annual lease sales in, among other ocean areas, the Chukchi and Beaufort Seas and the mid-Atlantic Ocean, and to reconsider recently adopted safety and pollution rules applicable to outer continental shelf drilling in general and to Arctic drilling in particular. Ex. 1 at 1, 3. It also directed him, together with the Secretary of Commerce, to develop a streamlined seismic permitting approach and expedite the granting of offshore seismic permits, to the maximum extent permitted by law. *Id.*

Plaintiffs filed this lawsuit challenging President Trump's reversals on May 3, 2017. Subsequently, Interior Secretary Zinke has issued a draft proposed program of offshore drilling that would include three lease sales each in the Chukchi and Beaufort Seas and five in the north- and mid-Atlantic Ocean. Ex. 13 at 2-3. He has also issued an information request related to a proposed 2019 lease sale in the Beaufort Sea. Ex. 14 at 1.

ARGUMENT

## I.    PLAINTIFFS HAVE STANDING

Plaintiffs have standing to bring this case because their members have standing in their own right, the interests at stake are germane to Plaintiffs'

organizational purposes, and the lawsuit does not require the participation of individual members. *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Plaintiffs' members have standing because (1) they have suffered an injury-in-fact, (2) that is fairly traceable to the Order, and (3) that is likely to be redressed by the remedy sought here. *Id.* at 180-81; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs' members visit or otherwise use and enjoy specific areas of the Atlantic and Arctic Oceans from which the Order strips protections, and the fish and wildlife that depend on those areas. The Order enables and promotes activities related to oil and gas exploration or development, including seismic surveying, that destroy, degrade, or diminish the wild and natural state of these areas, or that kill, harm, harass, or displace wildlife. These activities interfere with Plaintiffs' members' use and enjoyment of the areas and associated wildlife. As such, the Order directly and irreparably injures the cognizable interests of Plaintiffs' members. *See, e.g.*, *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000). A declaration that the Order is illegal and an injunction preventing its implementation will redress Plaintiffs' injuries.

    A.    <u>Plaintiffs have suffered injury-in-fact.</u>

    To establish injury-in-fact, Plaintiffs must show an invasion of a legally protected interest that is (a) "concrete and particularized" and (b) "actual or

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG        10

imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 (1992) (internal quotation marks omitted).[6]  Plaintiffs satisfy this

test.

> 1.    *Harm to Plaintiffs' members is concrete.*

The oil and gas activities that the Order catalyzes, and seismic surveying in

particular, threaten harm to the broad areas affected by those activities and the

marine wildlife that depends upon those areas.  *See* Ex. 19 at 3-13 (National

Marine Fisheries Service environmental impact statement assessing effects of

seismic surveying and exploration activities in the Arctic Ocean if it is open to

leasing); *id.* at 42-57 (providing an overview description of noise effects on marine

mammals); *id.* at 58-67 (assessing aggregate chronic effects of industrial ocean

noise); *id.* at 58 (concluding that chronic higher background noise levels can "limit

the ability of marine species to detect and interpret important acoustic cues" and

"has the potential to decrease the value of habitat and can lead to consequent

chronic effects"); *id.* at 59 (noting ample evidence that decreasing listening and

communication space can negatively affect aquatic animals); *id.* at 67-84

---

[6] An individual's aesthetic or recreational interest in a particular place or species is a legally protected interest.  *See Ecological Rights Found.*, 230 F.3d at 1147, and cases cited therein.

(assessing bowhead whale impacts from seismic and drilling); *id.* at 85-92

(assessing beluga whale impacts from seismic surveying).

Plaintiffs' injury is geographically specific. "Although the geographic area is

very large, it is discrete and defined." Dkt. 45 at 22; *see also Ctr. for Biological*

*Diversity v. Kempthorne*, 588 F.3d 701, 708 (9th Cir. 2009) (holding that plaintiffs

with interests in viewing polar bears and walrus in the Beaufort Sea region alleged

a sufficiently geographically specific injury to confer standing). Plaintiffs'

members visit or otherwise use and enjoy the Atlantic Ocean, including areas near

deepwater canyons; the Chukchi and Beaufort Seas; the wildlife that depends upon

these regions; and coastal regions adjacent to these waters for cultural and

subsistence purposes, recreation, wildlife viewing, education, research,

photography, aesthetic and spiritual enjoyment, or their professions or livelihoods.

*See* Exs. 21 (Decl. of Regina A. Asmutis-Silvia), 22 (Decl. of Rosemary

Ahtuangaruak), 24 (Decl. of John Hocevar), 26 (Decl. of Dr. Leslie S. Kaufman),

28 (Decl. of Pamela A. Miller), 29 (Decl. of Rob Moir), 30 (Decl. of Dan

Ritzman), 32 (Decl. of Robert Thompson), 34 (Decl. of Michael Wald) & 36

(Decl. of Kiliii Yuyan).

Seismic surveying can cover large geographic areas, blanket the ocean with

sound intense enough to be harmful vast distances from the surveying vessels

themselves, and harm thousands of marine mammals. *See* Ex.19 at 67-71

(summarizing how far potentially harmful sound propagates in Beaufort from 2D/3D seismic; out to almost 75 km); *id.* at 75-77 (summarizing for Chukchi; out to over 100 km); *id.* at 32-33 (showing acoustic footprints of seismic survey systems in the Beaufort and Chukchi seas); *id.* at 35-39 (describing areas ensonified to different levels under various seismic and exploration drilling activity scenarios); *id.* at 23-27 (showing estimates of marine mammals exposed to potentially harmful sound for different activity scenarios in the Beaufort and Chukchi seas); Ex. 15 at 26-27 (National Marine Fisheries Service permit for a single two-month-long seismic survey in 2012 in the Arctic Ocean authorizing disturbance of over 60,000 ringed seals and 4,600 beluga whales); Ex. 38 at 4, 10-13 (estimating hundreds of thousands of disturbances to marine mammals from proposed south- and mid-Atlantic seismic activities). Thus Plaintiffs' use overlaps with the far-reaching harmful effects catalyzed by the Order.

## 2. *Harm to Plaintiffs' members is particularized.*

Plaintiffs' harm is particularized because their members' interests are impaired in a personal and individualized way. *See* Dkt. 45 at 22-24; *Spokeo, Inc.*, 136 S. Ct. at 1548. It has long been settled that environmental plaintiffs are personally injured when they use the affected area and "are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*,

405 U.S. 727, 735 (1972)). Like the plaintiffs in *Kempthorne*, 588 F.3d at 707-08,

Plaintiffs here have made that showing. Their members' personal use and

enjoyment of these areas and the wildlife that depends on them would be harmed

by seismic surveying and other oil and gas activities catalyzed by the Order. Exs.

21, 22, 24, 26, 28, 29, 30, 32, 34 & 36.

> *3.     Harm to Plaintiffs' members is imminent.*

The Order creates "a credible threat of real and immediate harm" sufficient to

support standing. *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir.

2010); *see also* Dkt. 45 at 17-20. In this case, "although third parties must obtain

permits before seismic surveying and other activities may occur, there is no

indication that the government will not promptly grant such permits, particularly in

light of the Executive Order's stated purpose of expediting energy production."

Dkt. 45 at 17; *see also In re Zappos.com, Inc.*, 888 F.3d 1020, 1025-29 (9th Cir.

2018). The Order "itself demonstrates that oil and gas exploration activities are

intended to be imminent." Dkt. 45 at 18. It purports to reverse protections that

barred oil and gas leasing and drilling in approximately 128 million acres of

federally owned portions of the Arctic and Atlantic Oceans. *See* Ex. 1 at 2; *see*

*also* Exs. 2, 3 & 4. The Order also mandates consideration of revising the federal

government's offshore oil and gas program so that it includes annual lease sales in

the Arctic and Atlantic Oceans. Ex. 1 at 1. And, critically, it requires the Secretaries of the Interior and Commerce to expedite seismic surveying. *Id.* at 3.

The Arctic Ocean has seen extensive seismic surveying and some exploration drilling in the recent past. *See* Ex. 19 at 29-30 (showing a list of past seismic and exploration drilling activities from 2006-2015 in the Arctic Ocean). Seismic surveying often precedes oil and gas lease sales by several years. *See* Dkt. 26 at 12 (¶ 43) ("API . . . admits that geological and geophysical activities may occur prior to lease sales . . . ."); Dkt. 49 at 12 (¶ 43) ("Defendants admit that seismic surveys are sometimes conducted prior to lease sales as an exploration tool to identify prospective resources."); Ex. 11 (showing three seismic survey programs completed in 2006 and one in 2007 preceding a 2008 lease sale in the Chukchi Sea; showing multiple seismic survey programs completed in the four years prior to a 2003 lease sale in the Beaufort Sea); Ex. 10 (showing lease sale dates). In the Atlantic, companies have sought approval to conduct seismic surveys even when lease sales were more than five years away and are not included in an existing or proposed five-year program. Dkt. 49 at 11-12 (¶ 40) (Atlantic seismic survey permit applications pending in June 2017); Ex. 9 (leasing schedule demonstrating no lease sales scheduled in the Atlantic in 2017); Ex. 8 (leasing schedule demonstrating no lease sales scheduled in the Atlantic through 2022).

Industry has demonstrated interest in oil and gas activities, including seismic surveying, in the previously withdrawn areas. *See* Dkt. 26 at 10 (¶ 39) ("API admits that some companies in the oil and gas industry remain interested in oil and gas development . . . in the Arctic Ocean."); *id.* at 11-12 (¶¶ 40-42) (Atlantic); Dkt. 49 at 11 (¶ 39) ("Defendants admit that some companies in the oil and gas industry remain interested in oil and gas development, in the Arctic Ocean."); *id.* at 11-12 (¶ 40) (Atlantic); Ex. 20 (industry statement calling for seismic surveying in frontier areas without delay). In the Atlantic, the Department of the Interior is evaluating applications submitted by at least seven companies to conduct seismic surveying, and the Department of Commerce is proposing to issue permits to four applicants to take marine mammals incidental to seismic surveying activities. Dkt. 26 at 11 (¶ 40); *see also* Ex. 12 (showing eight applications for seismic surveying in the Atlantic Ocean pending before the Department of the Interior). The threat of seismic surveying in both oceans has only grown as Defendants propose scheduling lease sales in both oceans and companies seek authorizations for seismic activities. *See* Ex. 39 (announcing receipt of an application to conduct seismic surveying in non-withdrawn areas of the Beaufort Sea over multiple years starting in July 2018); Ex. 13 at 2-3 (notice of draft proposed 2019-24 leasing schedule offering six lease sales in the Arctic Ocean and five in the north- and mid-

Atlantic Ocean); Ex. 14 at 1 (call for information for a Beaufort Sea lease sale in 2019).

### 4.  *Plaintiffs satisfy the other elements of standing.*

Plaintiffs' injury is traceable to the Order, because opening areas to leasing that were formerly permanently off limits to leasing likely increases oil and gas activities in those areas.  *See* Ex. 1 at 1 (purpose of the Order is to encourage offshore oil and gas development); Dkt. 45 at 17-18; Ex. 17 at 8 ("Leasing moratoria . . . decrease exploration activity."); Ex. 18 at 5, 7 (agency documents describing the absence of oil and gas activities in withdrawn areas of the outer continental shelf); Ex. 19 at 6 (assuming the Arctic Ocean is open to leasing, "[the National Marine Fisheries Service] expects to receive applications [for] . . . exploration activities"); *id.* at 8 (stating that the EIS activity scenarios present "a reasonable range and level of activities for which permits and authorizations may be requested in the foreseeable future"); *id.* at 8-13 (showing activity scenarios with multiple large-scale seismic and drilling activities occurring each year).

The Court can redress Plaintiffs' harm by declaring Section 5 of the Order unlawful and invalid and enjoining the Secretaries of the Interior and Commerce to act in accordance with the withdrawals.  *See* Dkt. 45 at 11-13; *infra* Part III-B.

The harm and threat of harm to Plaintiffs' members' aesthetic, economic, recreational, and subsistence interests in the Arctic and Atlantic Oceans represents

a concrete injury-in-fact, fairly traceable to the President's violation of law, and redressable by the relief Plaintiffs seek.  *See Lujan*, 504 U.S. at 560-61; *Ecological Rights Found.*, 230 F.3d at 1147.

Plaintiffs also meet the second and third elements of associational standing. Safeguarding the Arctic and the Atlantic Oceans from harmful offshore oil and gas activities is germane to the Plaintiffs' organizational purposes.  Exs. 23 (Decl. of Elisabeth Balster Dabney), 24, 25 (Decl. of Gene Karpinski), 27 (Decl. of Adam Kolton), 30, 31 (Decl. of Michael Senatore), 32, 33 (Decl. of Gina Trujillo), 35 (Decl. of Nicole Whittington-Evans) & 37 (Decl. of Brendan Cummings). Plaintiffs' members need not participate in this litigation because none of the claims asserted or the relief sought requires individualized proof.  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344 (1977).

## II.   PRESIDENT TRUMP UNLAWFULLY REVERSED OUTER CONTINENTAL SHELF WITHDRAWALS

### A.   There is no constitutional authority for President Trump's action.

President Trump's revocation of OSCLA section 12(a) protections for the Atlantic and Arctic Oceans is unconstitutional.  Under our system of separation of powers, "[t]he President's power . . . must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 586 (1952).  The Property Clause of the Constitution gives Congress the exclusive power to manage the United States' lands and associated resources.  *See*

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Executive Order 13795—Implementing an America-First Offshore Energy Strategy, 2017 Daily Comp. Pres. Docs. 287 (Apr. 28, 2017) |
| 2 | Presidential Memorandum—Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 59 (Jan. 27, 2015) |
| 3 | Presidential Memorandum—Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 860 (Dec. 20, 2016) |
| 4 | Presidential Memorandum—Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016) |
| 5 | The White House, Fact Sheet: President Obama Protects 125 Million Acres of the Arctic Ocean (Dec. 20, 2016) |
| 6 | The White House, Fact Sheet: Unique Atlantic Canyons Protected from Oil and Gas Activity (Dec. 20, 2016) |
| 7 | The White House, President Obama Protects Untouched Marine Wilderness in Alaska (Jan. 27, 2015) |
| 8 | Bureau of Ocean Energy Management (BOEM), 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program Lease Sale Schedule |
| 9 | BOEM, 2012-2017 Outer Continental Shelf Oil and Gas Leasing Program Lease Sale Schedule |
| 10 | BOEM, Alaska Lease Sales |
| 11 | BOEM, Alaska Geologic & Geophysical Exploration Permits |

| 12 | BOEM, Currently Submitted Atlantic OCS Region Geological and Geophysical Permits |
|---|---|
| 13 | BOEM, Notice of Availability of the 2019–2024 Draft Proposed Outer Continental Shelf Oil and Gas Leasing Program and Notice of Intent to Prepare a Programmatic Environmental Impact Statement, Notice and Request for Comments, 83 Fed. Reg. 829 (Jan. 8, 2018) |
| 14 | BOEM, Outer Continental Shelf, Alaska OCS Region, Beaufort Sea, Proposed Oil and Gas Lease Sale for 2019, Call for Information and Nominations, 83 Fed. Reg. 13,778 (Mar. 30, 2018) |
| 15 | National Marine Fisheries Service (NMFS), Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Marine Seismic Survey in the Beaufort and Chukchi Seas, Alaska, Notice and Issuance of an Incidental Take Authorization, 77 Fed. Reg. 65060 (Oct. 24, 2016) |
| 16 | BOEM, Denials of Atlantic Seismic Permit Applications (Jan. 6, 2017) |
| 17 | G. Dellagiarino *et al.*, Geological & Geophysical Data Acquisition: Outer Continental Shelf Through 2004-2005, OCS Report MMS 2007-049 (2007) (excerpt) |
| 18 | K. Ray & P. Godfriaux, Geological & Geophysical Data Acquisition: Outer Continental Shelf Through 2016, OCS Report BOEM 2017-02 (2017) (excerpt) |
| 19 | NMFS, Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement (Oct. 2016) (excerpts) |
| 20 | International Association of Geophysical Contractors, News Release, *IAGC Applauds Administration's First Step to Expand Offshore Exploration, Streamline Seismic* (Apr. 28, 2017) |
| 21 | Declaration of Regina A. Asmutis-Silvia |
| 22 | Declaration of Rosemary Ahtuangaruak |

23      Declaration of Elisabeth Balster Dabney

24      Declaration of John Hocevar

25      Declaration of Gene Karpinski

26      Declaration of Dr. Leslie S. Kaufman

27      Declaration of Adam Kolton

28      Declaration of Pamela A. Miller

29      Declaration of Rob Moir

30      Declaration of Dan Ritzman

31      Declaration of Michael Senatore

32      Declaration of Robert Thompson

33      Declaration of Gina Trujillo

34      Declaration of Michael Wald

35      Declaration of Nicole Whittington-Evans

36      Declaration of Kiliii Yuyan

37      Declaration of Brendan Cummings

38      BOEM, Atlantic OCS Proposed Geological and Geophysical
        Activities, Mid-Atlantic and South Atlantic Planning Areas, Final
        Programmatic Environmental Impact Statement, OCS EIS/EA BOEM
        2014-001 (2014) (excerpts)

39      BOEM, Notification of and Chronology for TGS-NOPEC Geologic
        and Geophysical Exploration Permit Application, Alaska Region
        G&G Survey 18-02, Beaufort Sea (2018)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

LEAGUE OF CONSERVATION VOTERS
*et al.*,

              *Plaintiffs,*

v.

DONALD J. TRUMP *et al.*,

              *Defendants,*

AMERICAN PETROLEUM INSTITUTE
and STATE OF ALASKA,

              *Intervenor-Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 3:17-cv-00101-SLG

**DECLARATION OF REGINA A. ASMUTIS-SILVIA**

I, Regina A. Asmutis-Silvia, declare as follows:

    1.     I am currently and have previously been a member of Defenders of Wildlife.

    2.     I have lived in Plymouth, Massachusetts for more than 20 years, and have been involved in research on and the conservation of imperiled marine species, including the North Atlantic right, blue, humpback, finback, minke, Sei, pilot, and beluga whales as well as Atlantic white sided, bottlenose, Risso's and common dolphins, harbor porpoise and marine ecosystems for more than 25 years. I have both worked from and vacationed in coastal Virginia since the early 1990s.

    3.     I enjoy boating, swimming, nature observation, photography, and other pursuits in and around right whale habitat. I also enjoy whale watching and have worked as a naturalist, first mate, and captain on whale watch vessels, providing me with many opportunities to see right

whales and visit their habitat. Over the past 16 years, I estimate that I have made more than 400 sightings of right whales in their natural habitat.

4.      I have a master's of science in biology, and, in addition to enjoying and studying whales and dolphins in the wild, I also participate in many activities through which I advocate for the protection and conservation of the these species and their habitat.

5.      I help to curate a sightings data base of 11 cetacean species found off the East Coast of the United States. I have used these data to comment on and provide supporting evidence for inclusion in NOAA's marine mammal stock assessment reports.

6.      I fostered a novel peer-reviewed study to analyze wounds associated with vessel strikes in living humpback whales.

7.      I am a founding member of a consortium of researchers whose work documents humpback whales in the mid-Atlantic and Southeast U.S.  My data has been used in peer reviewed publications including Population identity of humpback whales (*Megaptera novaeangliae*) in the waters of the U.S. mid-Atlantic states which has been cited by NOAA in its Stock Assessment Reports and Status Review of Humpback Whales.

8.      I assisted in the development and implementation of a dedicated cetacean survey off the coasts of Virginia and North Carolina where I documented sightings of humpback whales, harbor porpoise and bottlenose dolphins.

9.      I lead a project to protect North Atlantic right whales for Whale and Dolphin Conservation. In the course of this employment, I have worked on a number of right whale-related issues, including: petitioning for an expansion of designated critical habitat under the Endangered Species Act (ESA); requesting that the U.S. Coast Guard consider impacts to right whales before permitting offshore liquefied natural gas facilities off Boston; commenting on the

Mineral Management Service's programmatic environmental impact statement on alternative

energy and alternate use regarding potential impacts to right whales; submitting a formal request

to Congress for funding of right whale programs; taking action to reduce impacts to right whales

from the proposed Underwater Sea Warfare Training Site off Jacksonville, Florida, the only

known calving area for the species; commenting on the Department of Transportation's

programmatic environmental assessment on a proposed marine highway program; submitting

comments to the National Marine Fisheries Service (NMFS) on the ESA five-year status review

for the North Atlantic right whale; and working to reduce the risk of ship strikes to right whales

during the Volvo Ocean Race, an international sailing race that re-routed its course in 2009 to

avoid right whale habitats and the Stellwagen Bank National Marine Sanctuary.

10.     In addition, I have worked to reduce the risk of ship strikes to right whales by

assisting in efforts to challenge NMFS' failure to implement speed restrictions. I have met with

staff at the Office of Management and Budget to provide information regarding the

implementation of the North Atlantic right whale ship strike rule. I spearheaded a campaign to

ensure the ship strike rule was made permanent subsequent to its scheduled sunset in December

of 2013.

11.     I am a member of the Atlantic Large Whale Take Reduction Team, a stakeholder

group convened under the Marine Mammal Protection Act to advise NMFS on reducing right

whale mortality caused by U.S. fisheries, particularly the lobster fishery and other trap/pot

fisheries as well as gillnet fisheries. In this capacity, I advocate for fishing practices that reduce

the risk of entangling right whales. These efforts led to a rule requiring sinking ground line in

fixed fishing gear and the reduction of vertical lines used in trap/pot gear. Among other issues, I

have provided input on: the process of certification of the Atlantic fishery for spiny dogfish and

its impacts on right whales; Regulatory Amendment 9 to the Fishery Management Plan for the Snapper-Grouper Fishery and potential impacts to right whales; and restricting the use of gillnetting in the southeastern calving habitat for right whales.

12.     I am a member of the Harbor Porpoise Take Reduction Team, a stakeholder group convened under the Marine Mammal Protection Act to advise NMFS on reducing harbor porpoise mortality caused by U.S. fisheries, particularly the gillnet fisheries operating in the mid-Atlantic and Gulf of Maine. In this capacity, I advocate for fishing practices that reduce the risk of entangling harbor porpoise. These efforts led to a reduction in bycatch of harbor porpoise below the Potential Biological Removal level.

13.     I am a member of the North Atlantic Right Whale Consortium, through which I contribute data for research and have helped to create outreach programs to increase awareness of North Atlantic right whales.

14.     I provide lectures to school children using whale and dolphin artifacts and a life-size inflatable right whale to emphasize the need for conservation of these species.

15.     The photographs I have taken of whales and dolphins are used regularly in books, news articles, and blogs, some of which have international reach.

16.     I have taught marine mammal science, including lessons on right and humpback whales, to high school and college students; trips to whale habitat are often part of that curriculum.

17.     I am a member of the International Fund for Animal Welfare's and the New England Aquarium's Stranding Networks and have participated in rescues and necropsies of North Atlantic right, humpback, and minke whales, as well as a number of dolphin species.

4

18.     I implement a program for commercial whale watch operators in New York, New Jersey, and Virginia, which includes providing operators with information on identifying species and how to report sightings of North Atlantic right whales to NMFS.

19.     I have used my vessel to assist NMFS in documenting out of season and out of habitat sightings of North Atlantic right whales.

20.     I enjoy watching right whales from the coast of Massachusetts during the late winter and early spring each year and welcome the occasional sightings of these whales at other times of the year. The whales that I see in coastal areas in the Gulf of Maine and along the East Coast are the same whales that utilize deep water canyons that were protected by President Obama. With such a small population of right whales remaining, impacts in one critical area of their range will be felt throughout their range and could reduce my ability to observe them in the wild.

21.     I help administer a Facebook page dedicated to the protection and preservation of the North Atlantic right and North Atlantic humpback whales.

22.     I have written articles and created educational presentations about the benefits of the recovery of whale populations, including North Atlantic right whales, and how whales play a role in supporting the abundance of fish stocks and in fighting the effects of climate change.

23.     President Obama's decision to withdraw nearly 4 million acres of the Atlantic continental shelf break, running from Heezen Canyon offshore New England to Norfolk Canyon offshore the Chesapeake Bay, from oil and gas development was a tremendous conservation achievement. These underwater canyons are major biodiversity hotspots that provide habitat for deepwater corals, deep diving beaked whales, and many commercially valuable fishes and crabs.

5

In taking this action, President Obama cited the dangers of oil and gas exploration and development to both coastal communities and sensitive marine resources.

24.     President Trump's recent decision to undo this conservation legacy concerns me greatly. Oil and gas development can harm marine mammals, birds, and fish at every stage of its development from pre-lease seismic surveys to drilling activities to the heightened risk of devastating oil spills.

25.     For example, seismic surveys are a high-risk activity for marine animals. I am deeply concerned about how disorienting and harmful seismic surveys will be for cetaceans. Based on my knowledge of these species, I am gravely concerned that seismic survey activities will seriously injure or cetaceans, interfere with their ability to migrate and find food, cause them to move into areas where they may be at higher risk of entanglement and/or ship strikes, or increase their stress levels which can suppress their immune systems and ability to reproduce. Given the extremely limited number of surviving right whales (around 500 individual animals), I am particularly worried about the impact of seismic surveys on this vulnerable population's ability to survive and recover. Any decreased likelihood of the right whale's survival and recovery will adversely affect my enjoyment of watching and working with this species.

26.     I have actively opposed seismic testing in cetacean habitat. I am concerned that federal permits allowing companies to conduct seismic surveys are likely to lead to adverse impacts to cetaceans. I am concerned that these impacts will make it harder for me and other people who deeply value the oceans to see and cetaceans and other wildlife when out in the water or on the coast.

27.     I am also concerned about the potential adverse impacts of seismic exploration and subsequent fossil fuel extraction to coastal economies, particularly to the thriving whale and dolphin watching businesses with which I regularly interact.

28.     Beyond the impacts of seismic exploration, the act of oil drilling in these fragile deepwater canyons is fraught with peril for marine life. A catastrophic spill, along the lines of the Deepwater Horizon disaster in the Gulf of Mexico, could devastate right whales and marine life in the region, not to mention the economies of coastal communities from Plymouth, MA where I live, to Cape Cod, Long Island, the Jersey shore, the Delmarva peninsula, and down to the Outer Banks of North Carolina.

29.     Continued reliance on oil and gas development also will exacerbate climate change, which is already having significant impacts in the Arctic and the North Atlantic. Additional emission of carbon pollution from fossil fuels could lock in warming trends that cannot be easily reversed. Indeed, scientists now predict that the northeast Atlantic could warm three times as rapidly as the ocean at large, with potentially devastating impacts for marine species and the ecosystem of that region.

30.     Protecting the outer continental shelf benefits the ocean and the marine species that I care about, particularly North Atlantic right whales. If President Trump's decision to allow seismic exploration and oil and gas development along the Atlantic coast stands, I would have extreme concerns about everything I expressed above, including the effects to the ocean environment and marine life, particularly North Atlantic right whales.

31.     President Obama's decision to withdraw these areas from the outer continental shelf leasing program prohibits leasing and reduces incentives for seismic surveys. I understand that the Bureau of Ocean Energy Management recently denied applications for permits to

7

conduct "deep-penetration seismic surveys" and that the applicants are challenging these denials at the Interior Board of Land Appeals. Right now, the Bureau's decisions not to issue these permits benefits the ocean and the marine species that I care about, particularly North Atlantic right whales. If the Interior Board reverses or alters the Bureau's decisions not to allow seismic surveys, these species and my interest in them will be harmed.

32.     I do not believe either seismic exploration or the subsequent drilling for oil in the Atlantic can be accomplished safely without impacting right whales and other marine species. For a species like the right whale, drilling along its migratory corridors could literally be a death sentence. If this Court were to reject President Trump's attempt to undo President Obama's withdrawals of these areas under the Outer Continental Shelf Leasing Act, that would help address my concerns.

I declare under penalty of perjury that the foregoing is true and correct.

_____        May 23, 2018

Regina Asmutis-Silvia                    Date

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants.* | ) | |
| | ) | |

**DECLARATION OF ROSEMARY AHTUANGARUAK**

I, Rosemary Ahtuangaruak, hereby declare as follows:

1.      I was born in Fairbanks and I moved to the North Slope in 1980.  I now live in Nuiqsut.  In the past, I have lived in both Nuiqsut and Utqiagvik (formerly Barrow).

2.      I attended the University of Washington Medex Northwest Physician Assistant program.  I graduated in 1991 and was employed as a health aide in Nuiqsut for 14 years.  In 2017, I received an Honorary Doctor of Humanities degree from the Oberlin College and Conservatory.

3.      I am a current member of the Alaska Wilderness League (the League).  I joined the League in April of 2008 to work with others whose work helps to protect where I live.  I previously worked for the League as its Environmental Justice Advisor.

4.      I helped to found REDOIL, Resisting Environmental Destruction on Indigenous Lands, originally a project of the Indigenous Environmental Network and now its own free-standing organization, and have been a member since REDOIL's inception.  I have been a member of the Indigenous Environmental Network since 2000.

5.      I support the League and REDOIL's work to protect the Arctic, including the National Petroleum Reserve-Alaska (Reserve) and the adjoining Beaufort and Chukchi Seas.

6.      I am also involved with various entities involved in protecting our community and our health.  These entities include the Center for Disease Control & Prevention's (CDC) National Tribal Health Think Tank, a group working to promote tribal public and environmental health issues in communities, including those on the North Slope.  As part of this group, I have been able to address tribal environmental health concerns with various agencies.  As explained below, I initially became involved with CDC because of fish contamination issues we were experiencing around Umiat.

7.      I raised my family in Nuiqsut.  I have one daughter, four sons, ten granddaughters, and eight grandsons.  I live a very traditional lifestyle hunting, fishing, whaling, gathering and teaching our family and extended family and community members the traditional and cultural activities as my elders taught me.  We hunt and eat various birds, including ptarmigan, ducks and geese, fish, including char, salmon, whitefish, dolly varden, grayling, pike, trout, and cisco, land mammals, including caribou, moose and muskox, and marine mammals, including bearded seals, walrus, and beluga and bowhead whales.  We harvest berries, plants, roots and herbs.  We work together in harvesting plants and animals and sharing the harvest.

8.      We have extensive sharing traditions that unite our families and communities across the North Slope and beyond.  Others share their harvest with my family and we share our harvest with others, including extended family members in other places.  Other villages share their harvest with the people of Utqiagvik and the people of Utqiagvik in turn share their harvest with us.  These extensive sharing patterns have given us much of the variety we eat.  We hunt much of our own food, but others share unique items such as beluga whale and walrus meat.  We send cisco, caribou, moose, muskox, or bowhead to others.  We also share our harvest with those in need.  When my mother fell ill, villages across the North Slope reached out to her to make sure she had fermented walrus and others foods she wanted.

9.      My mother taught me the land hunting skills that she learned from her parents and family.  Other extended family members taught me how to hunt whales and other marine mammals.  I also learned the ways of preparing and preserving the foods, including how to ferment fish and walrus and whale meat, and how to prepare caribou meat by burying it in the snow.  I have family ties that bind me to Utqiagvik and other communities in the Arctic, and exposure to hunting and gathering is an important part of these ties.

10.     My family and I hunt, fish, and gather across the North Slope, including in various places along the Chukchi and Beaufort Sea coasts, multiple tributaries including the Colville River, and throughout the lands and waters around Nuiqsut and Utqiagvik. We have also hunted and gathered in Wainwright, Kaktovik, Atqasuk, Pt. Hope, Pt. Lay, and Anaktuvuk Pass. Our families have Native Allotments throughout the Teshekpuk Lake area and a cabin five miles from Utqiagvik. We travel with family and friends to hunt and harvest in all these places. My family shares all types of foods with me as I share foods with them. We share at potluck and feasts and receive from them too.

11.     Our family has a cabin eight miles from Nuiqsut. This cabin is located across the river from where the Alpine oilfield was built. Before the oilfield, this used to be our preferred place to hunt caribou and geese. The activity levels around the cabin are so high that hunting around there is greatly impacted; there are too many overflights, airboats, freighters, track vehicle traffic, and personnel contact for our boys to hope to get caribou near the cabin. Also, my oldest grandson who is now 10 years old, could not get a caribou there. These changes are affecting how our uncles are teaching our nephews to hunt in our traditional use areas. Caribou are not staying in areas around the cabin for insect relief, like they used to. Other community members have also noticed this and share this concern with us. We feel that the increased activities such as overflights are causing the caribou to avoid the area, forcing us to travel elsewhere to hunt for them. We still use the cabin as a stop-over place, and for fishing in tributaries that are away from the cabin, although my youngest son has stopped taking his nieces and nephews there altogether. I am concerned that disturbances to nesting grounds from oil and gas activities are also affecting the density of birds in our traditional hunting grounds near the cabin. We are not harvesting as many ducks and geese as we used to do. Our elders have

expressed concerns about the reduced numbers of birds and also for some species that have failed to return. Just like with fishing and caribou hunting, we now have to travel elsewhere and increase our efforts to get our birds. Due to the added travel and effort, our local hunts, including for caribou, require burning many more gallons of gas per year. There is an impact mitigation fund that was established to address these types of conflicts between oil and gas activities and hunting, but the funds are not sufficient to mitigate the actual costs we are experiencing due to more extended travel and increased effort. Because of decreased harvests near the cabin, we cannot share our foods with our extended families as we used to do and we also have less to consume ourselves. This raises concerns for our long-term health due to the failure to meet our traditional nutritional needs.

12.     My second youngest son was brought to the same area, near the cabin, where his dad caught his first caribou. My son shot a caribou there, but the wounded animal fled from a helicopter flying overhead, and moved into a water filled gravel pit, created for development of the Alpine oilfield, and drowned where we could not get to it. The conflict between attempting to harvest and share a successful hunt with the elders and members of the village and that of oil and gas development in our areas of traditional and cultural use changed my son's desire to attempt to hunt for many summers. Logical understanding that hunting around oil and gas development, including visualizing increased flight activities and vehicle traffic and contact with more and more people associated with the Alpine Development Unit in historically traditional and cultural use areas, leads to loss of harvest was a difficult lesson for him to learn at eleven and affected his hopes for future hunts. During the past decade or so, caribou herds do not migrate through the village of Nuiqsut as they used to. For this reason, our two youngest boys grew up not seeing the migrations through the village, experiences that our older children had. During

the last couple of years the caribou have showed up again. We have seen increased helicopter activity before the animals show up. We think this might be because the oil companies are herding the animals.

13.     My second youngest son was excited to move to Utqiagvik with the hopes to have lands and waters less impacted by industry to hunt and gather in. He saw the changes had less impact the first couple of years. However, the changes have impacted the herds of the North Slope and declines in numbers have caused him to travel hundreds of miles in each trip to try to harvest caribou. He travelled to Atqasuk and Wainwright travelling 328 miles in one trip. He did this trip 3 times in 2015. The last few years, in March, he has had to travel over 300 miles to get his caribou. One year, he was delayed on his return and we had to alert the search and rescue. The rescue plane was about to leave when he finally got home, with a broken arm. These extended hunting trips have greatly increased the stress in our family for his health and safety. We, and others who are similarly situated, also feel an increased reliance and dependence on search and rescue services and other technological advances.

14.     My son knows the changes he saw in Nuiqsut and the changes that came from Shell's increasing activity in Utqiagvik and all along the coast in connection with its past drilling plans have caused him great concern. For example, he saw during the first couple of years of living there that Utqiagvik did not have as many flights in traditional use areas, but this increased over time due to Shell's increased exploration activities. He saw during the first couple of years living in Utqiagvik that there were fewer interactions with personnel coming into traditional use areas for activities such as monitoring, permitting, research, and resource exploration activities, but this increased over time as well. He also saw less outsider boat activities when first arriving in Utqiagvik, something that has increased over time with Shell's exploration efforts and has a

negative impact on his traditional and cultural uses. He wanted to get out and hunt as much as he could because he listened to the helicopters and planes in Utqiagvik and knew the impact it would have on his hunting. He would be very frustrated as the lessons of his childhood were repeated around Utqiagvik and the surrounding areas. He is an Inupiat by blood and his ancestry is in conflict with the changes to the lands and waters affecting the seasons of living with the animals we depend upon. One change he's seen is that in 2015, for the first time ever, we have restrictions across the North Slope on caribou harvest. And that same year there was another proposal to cancel moose hunts. He has turned to some of the social ills of dealing with his conflict and makes known his frustrations.

15.     In previous years, helicopters have affected hunting activities, increasing the danger to hunters. Once when my ex-husband and I and two of my sons went to harvest caribou, we could not find any caribou, but we were able to hunt muskox, which is more territorial. There was a helicopter flying overhead that was using a route not identified in the industry's plans. After my ex-husband shot a muskox, the herd was disrupted by the helicopter and charged the hunters, causing my family to flee to our boat.

16.     I have owned a harpoon since 1982. I have shared this harpoon with a whaling crew in Utqiagvik, receiving a share of the whale from their harvest. Sometimes I participate in the Utqiagvik hunt, which occurs in the spring and perhaps again in the fall, if the quota allows. Other times, the whalers send meat to me. I have been out on the ice during whale hunts in Utqiagvik many times. I have helped to butcher whale in Utqiagvik and have shared in the community whale feasts in Utqiagvik.

17.     I have also shared my harpoon with whaling crews from Nuiqsut. I have received whale from Nuiqsut whalers for the use of my harpoon. Nuiqsut whalers hunt for whales in the

Beaufort Sea during the fall. We await the migration of the whales from Camden Bay for this hunt. The crews go to Cross Island in August. My sons help the crews with their preparation, but have not gone to the island yet. My youngest son went spring whaling in Utqiagvik a few years ago. My ex-husband has gone whaling from Cross Island with his uncle a few times, and has struck two whales with my harpoon.

18.     There is a feast in the village when a whale is caught by Nuiqsut whalers. A portion of the whale is cooked up when the whale is first brought to town. Everyone is invited to the successful captain's home to eat whale meat and other foods, teas and coffee. I have participated in several of these feasts in Nuiqsut. These feasts are a time of celebration, when stories are told about the hunt.

19.     We have a unique sharing system to divide the harvested whale among the crew striking the whale and the crews helping to land and butcher the whale. The whalers set aside a portion of the whale meat to share with those in need.

20.     Part of the catch is saved for feasting. We share the feast at the blanket toss—a traditional celebration during the summer—as well as Thanksgiving and Christmas. Families come to the feast area with utensils and receive their contribution of muktaq, meat, kidney, heart, tongue, intestine and flipper. The families get a share for each person and we eat together as well as take some home for later personal use. We bring some of the whale to share with those in need.

21.     In Nuiqsut and Utqiagvik, much of the year is planned around the whale hunt, with preparations during all seasons needed to help a hunt succeed. The work is divided amongst the crew members, and extended family networks pitch in. I feel that the joy of the harvest and the sharing of the whale bind the communities together. Whale feeds families

throughout the long, dark winter, and provides nourishment, warmth and fuel for our daily activities during the Arctic winter.

22.     Like whales, seals are also important to our culture and our traditions.  There can be many seals in the nearshore waters around Oliktok Point and the mouth of the Colville River during the open water period in the summer, especially in July, when they follow fish that are running up the river to spawn.  We usually see the most seals in the area when the fish are running up the Colville River to spawn in mid to late July.  During this time, spotted and ringed seals gather near the mouth of the river in larger numbers than usual.  The ringed seals will even try to follow fish upstream.  I have seen several ringed seals upriver.  It seems that they are attracted to the food source provided by the fish run.  These seals must come to the area from other parts of the Beaufort Sea, because when I have visited this area at other times of the year I have not seen as many seals in this area.

23.     I have been to Oliktok Point and the mouth of the Colville River on many occasions to hunt for seals.  One year, in July, I took my grandson on a three day trip to the ocean.  We camped at Oliktok Point.  We saw more than 40 seals in the water between Oliktok Point and Nuiqsapiat, about 20 miles to the northeast of Nuiqsut.  We hunted for bearded and spotted seals, and followed the seals into the waters where the mouth of the Colville meets the ocean.  Unfortunately, we were unable to catch any seals during that trip.  We also brought a fishnet with us and put it out to catch whitefish that were running up the Colville at that time.

24.     During other trips to that area, attempts to hunt for seals have been more successful.  For example, during two summers several years ago, I took children to the area between the Colville River and Oliktok Point to camp as part of the Arctic Slope Native Association summer camp.  Children from all seven communities on the North Slope came to the

camp to learn our traditional culture. During that time, the campers caught a spotted seal in the waters between Oliktok Point and the mouth of the Colville River. When they returned to camp with the seal, I cooked it and we all shared the meal.

25.     We make a delicacy called Kingitak, which is dried bearded seal meat in seal oil and blubber. My children and I enjoy this food and we eat a limited amount to make it last. It is harder to get bearded seals in the coastal waters near Nuiqsut than in other areas of the Beaufort Sea, so we often trade Arctic cisco to extended families in many places in exchange for bearded seal.

26.     In the last few years, we have seen an increase in seal harvests. We are unsure what this trend means, including for other villages, and we are wary about it. We think that changes in sea ice are affecting fish and thereby the seals. With the increased seal harvests, we are concerned about increased conflicts with non-subsistence activities. For example, in recent years, our hunters entering the traditional seal hunting areas near Oliktok Point have encountered more and more non-subsistence boats in the area. These boats are there to do monitoring or to support other industry-related activities. Our seal hunters are increasingly getting into conflict with these other boats. The impact mitigation funds allow families to travel further out to the ocean to hunt, but this takes them away from their preferred hunting areas and is also more hazardous due to longer travel, deeper water, and changes in the ice conditions.

27.     The foods we eat are important to our lives and health. We have activities associated with our harvesting throughout the year, such as skin sewing, sinew preparation, and craft making. The teaching of the activities and stories continues throughout the year with each generation sharing family hunting stories and such.

28.     I embrace the traditional and cultural activities that I learned from my elders and extended family members.  Sharing and passing these traditions onto my children, grandchildren and families is very important to me.  I fear that industrial oil and gas exploration and development activities in our lands and waters, including the Arctic Ocean and the Reserve, will continue to change our natural environment in negative ways and thereby affecting my ability to live and to effectively share and pass on our traditional way of life.  Increased contact with unnatural activities, like those in oil and gas exploration, causes a cascade of reactions.  Taking the next generation hunting and fishing in areas that now feature signs and sounds of industrial activity – gravel placement, flight activity, and more boat and personnel activity – is not the same.  Our animals change because of these changes in their environment.  The image of the great caribou herds, for example, does not show how our daily lives and our culture change because of these oil and gas proposals.  There is a growing need to work in cultural camps that teach the next generation our hunting traditions.  But teaching the young harvesters our traditions is getting harder because the animals, including caribou, whales, seals, and birds, have been pushed away from our traditional use areas and because there are increasing conflicts with non-traditional activities and uses in these areas.  These competing and conflicting activities, both on land and offshore, are deeply and adversely affecting us, our animals, our culture, and our ability to pass on our traditions to our future generations.

29.     Our grandparents tried to warn us of the impacts that fossil fuel activities would have on our lands and in our waters.  Our parents lived these impacts.  And now, my generation is sharing these lived impacts with our children and our grandchildren.

30.     Alpine Development Unit has affected our cultural camp at Nigliq and on the Colville River.  Both areas have been changed by oil and gas development activities.  Our camp

and traditional story telling are changing with the generations, with the expansion of the Alpine development, and changing how we use the land and our teachings. We have to find new ways to educate our youth about our traditional and cultural activities such as trying to teach a child to cut up a caribou from pictures and words. We have to become very creative in our efforts to share with our youth our knowledge of our traditions. Because of how these changes have affected our camp, we are limited in what our young campers brought back to their families. Encouraging the sharing of the hunting is affected. Traditional story telling is affected. As families change their activities to adapt to oil and gas activities, this causes gaps in story-telling and prevents natural discussions about our traditional and cultural uses from growing. Instead our children are learning how our elders used areas and how my generation's usage changed, and the children I taught will be faced with more changes. How will we take care of the future if the current generations don't use the lands and waters the way our elders and my generation do and the importance of traditional and cultural uses are lost? When activities from the expanding outer continental shelf oil and gas exploration activities conflict with our traditional and cultural activities and are permitted to dominate our landscape, the traditional usage of the areas that has persisted for generations loses out.

31. During previous cultural camps, our elders have noted how much the camps have changed since the arrival of the development activities at the Alpine oil field complex. One year, an elder also felt the changes in a very tangible way: when the boat got closer to the camp, and passed the complex where flaring was taking place, her breathing was affected. The same thing happened upon return from the camp. Since then, we have heard similar stories from other community members. By failing to enforce the air quality regulations, the federal, state, and borough agencies are subjecting our people to hazardous air conditions. The industry's air

quality monitoring project, with its modeling data, will not prevent our exposures and will continue to increase our adverse health risks.

32.      We have experienced so many changes around Nuiqsut and in our traditional hunting and fishing areas due to the oil and gas activities in the Reserve and the surrounding lands.  We have seen ice roads devastate the tundra and fish that were sucked up from the lakes stuck on the ice roads because of failed screens on the water withdrawal pumps.  Due to the water withdrawals, our hunters and fishers have seen water levels drop in the affected lakes. This affects the ice formation on the lakes and creates pockets that break down as we cross the lakes along our traditional routes.  Our elders have said that prepacking ice roads too early compacts soils and affects seasonal waterways that the fish use as migration paths.  I heard a story from an elder who caught over 300 broad whitefish in a lake that typically only gave 5-15 fish.  This meant that the fish were stuck in the lake because their migratory path was severed.  It has also been hard to see how our village is now completely surrounded by lights from the oil and gas infrastructure.  In 1986, the closest lights were 60 miles away; now they are all around us.  The Putu development is happening literally outside our doors.  We have also experienced concerns of damage to our camp areas and equipment.  Once, a tracked vehicle from the Alpine facility went off their approved transportation route and ran into our camp and right over the platform for our tent.  Some of our berry and plant picking areas are being converted into runways and other infrastructure.  Our animals are being deflected and birds forced away and new predators, like foxes, introduced because of the oil and gas activities.  Last but not least, oil and gas development on our lands has also created conflicts and division among our people. These conflicts are breaking the unity of our communities.  We are losing out on so many levels.

33.     Through the continued involvement of watching changes to lands and waters, we see many changes being discussed.  Suffering through the changes to the east, north, and west of our village, we cannot allow the south to be developed the same fashion.  The south side of our village currently allows migration of animals, including caribou, birds, and fish, to our village. We cannot allow the piecemeal changes to devastate our way of life and we must prevent any further activities on the east side of the GMT-2 proposed road until the process has come back to our village to discuss and plan how staggering of development would look like as well as identifying the restoration of migratory routes that are currently being impacted by the existing exploration and development activities.

34.     There is a stark disconnect between our concerns and the continual government permitting of oil and gas activities in our region.  Generations of our people have discussed and put together comments, mitigation measures, restrictions, prevention attempts, etc.  Yet in attempts to streamline development, the government has not prevented the loss of traditional and cultural activities, impacts that the Council on Environmental Quality for the Bush administration told us were illegal.  The Obama administration allowed activities to continue until it finally did the right thing by withdrawing most of the Arctic Ocean from oil and gas leasing, exploration and development.  And now the Trump Administration wants to take us right back where we were, push opening the ocean for more oil and gas exploration and development without any concern for losses and risks that these activities create for us.  At the same time, Bureau of Land Management's (BLM) decisions to offer oil and gas lease sales in the Reserve and President Trump's decision to revoke the Arctic Ocean withdrawals threaten our lands with more exploration and development activities, more greenhouse gases and worsening climate change impacts, and thus, increasing risks to our life, health, safety, and traditions and culture.

Instead of regional stability, these poor decisions are creating more instability, more division, while avoiding to look the cumulative impacts of all these decisions on our lands, waters, life, health, safety, and traditional culture. Decades of work by our people and others to defend our home and our life, health, and safety, and traditions, culture, and our future, are dismissed once again. These issues and concerns that we speak of are constant, urgent, and fundamental to our existence. They do not change with the changes in administrations. It is time we secure our lands and waters, the health, safety and traditional culture of our people, in a way that does not leave it up to any new administration to act in ways that undermine them.

35.    We have already lost harvests of whales, caribou, and other animals in our traditional hunting areas due to oil and gas activities. This affects the health of our people and hurts our transfer of knowledge to future generations. Hotdogs offered by industry in their meetings cannot replace the loss of our traditional and cultural foods.

36.    Oil and gas activities are affecting our animals. For example, during the seismic activity and exploration drilling in Camden Bay in the early 1990's, the whales struck by Nuiqsut whalers were between 18 and 25 miles off of Cross Island. In previous years, whales were struck within 10 miles of the island. One whale was struck and lost due to the weather turning bad during towing of the whale. The crew abandoned the whale in order to make it to shore as the increase in current was pulling the harvest back to the ocean. Once a whale is struck, even if it is then lost, it counts towards Nuiqsut's annual quota. The community also lost two boats that year. One was struck by a whale during the hunt and damaged beyond use. The whalers made it to an ice floe to stay afloat. Another boat was lost when the whale it had struck was lifted to the surface by a second whale. This caused the harpoon line to become entangled in the prop and the weight of the whale sunk the boat in minutes. The crew made it to a second boat, the last of

them escaping just before the nose of the damaged ship went under.  I believe that the noise from the drilling and seismic activity agitated the whales and made them more aggressive.  The whales were migrating further from the island, which increased the distance that hunters had to travel, the time it took to return to shore with a whale.  The harvest was diminished that year, as more of the meat spoiled before the whale could be brought to shore and butchered.

37.     The following winter, I heard of an unusually high rate of domestic violence in Nuiqsut and increases in suicide attempts and in suicides.  I heard of and witnessed increases in drug and alcohol use as well.  As a community health aid, I listened to people's stories of how difficult it was to hunt without success and the lack of resources and help from a food bank.  The winter was the worst I spent as a community health aide and that experience helped me to get busy and to speak out at meetings about oil development.

38.     Climate change is having huge impacts on our lives.  We have more rain and ice fog because of the open ocean.  Torrential rains and hydrology changes are causing erosion, including right here in Nuiqsut and along Colville River.  Erosion is affecting our transportation routes, including on the Colville River.  We are also experiencing more sink holes and permafrost thaw.  We've seen entire lakes disappear.  Every single ice cellar we have has been affected by permafrost thaw.  We got one community freezer but learned it could only fit one whale, not more.  We are trying to modify our ice cellars, and the ways in which we use them, to counter the warming.  We make them deeper, we pack them with snow, we add covers to create a buffer, and we change when we put food in there and when we take food out.  We also have to store more food in freezers and prepare our food differently to counter the lack of reliable ice cellars.  We pickle and smoke more now, which means we have to build smokehouses and get more wood.  All of this takes a lot of extra effort.

39.     Climate change is also having a toll on our animals.  We are seeing more parasites on caribou and fish; also more lesions on caribou and sores on seals.  Over the last couple of years, we have seen an increase in fish mold, notably in broad whitefish, because of rising water temperatures.  Over the last ten years, around June and July, I have measure water temperatures in the Colville River; it has reached up to 70 degrees F.  Caribou near our village are smaller. We are seeing species, like beavers, river rats, and bugs, north of Brooks Range that did not use to be here.  The torrential rains and the resulting erosion in the Colville River banks are destroying peregrine falcon and bald eagle nests, including ones with chicks in them.  I've seen it with my own eyes.

40.     We are also having rain on snow events.  We see bloody caribou trails that result when caribou break through the crust and break their hooves.  These trails make it easy for predators to find them.  It is also easier for us to hunt them but it is psychologically hard for me to see them suffer like that.  Increased rain and rain on snow events are also affecting us; our hunting and fishing trips are more dangerous because of wet conditions.  We have to protect our snow machines and other equipment from water.

41.     Now, with Trump's decision to reopen the Arctic Ocean for more oil and gas, the fears again reverberate through our people and our communities.  While various social programs have been put in place to mitigate the impacts of oil and gas activities on our people, I fear we will still pay the highest price for our nation's energy decisions.  I pray that the life, health, and safety of our people will not be the accepted price for our energy policies.

42.     President Trump's attempted revocation of Obama's decision to withdraw the Arctic Ocean from oil and gas leasing is a major concern to me.  It will expedite and spur further exploration and development activities in the Beaufort and Chukchi Seas and prevent us from

effectively protecting ourselves from these activities. These activities are detrimental to the traditional and cultural activities of our family and village, especially if these activities cause harm to whales and other marine mammals or result in an oil spill. We depend on traditional and cultural foods that migrate through both the Beaufort and Chukchi seas. Any harm from oil and gas activities, especially from seismic exploration and oil spills, to our resources, including bowhead, seals, fish and caribou, threatens our food and our health. When we are unable to harvest our traditional foods, we will have to find other ways to supplement our traditional diet. We will have to learn about these new foods, how to prepare these new foods, and how to pay for these foods. We are feeling it in our bodies when we are not getting the same value of nourishment and energy from other foods as we do from our traditional foods. We are seeing increased health problems and I believe they are related to not eating our traditional foods and living our traditional lifestyles.

43. I am concerned, as has been confirmed by past activities, that that oil and gas exploration and drilling activities will continue to harm our animals and their habitats. Seismic exploration and drilling, icebreaking, aircraft and helicopter flights, and other noisy activities in the Arctic Ocean will keep whales from their feeding areas or otherwise harm them. Any changes in the animal populations affect our hunters and whalers, including myself. We educate our families that a whale hunt must be respectful and quiet. If the noise from oil and gas activities causes our animals to move away from our traditional hunting and whaling grounds, I am concerned because this places more wear on our equipment and puts the hunters and whalers at greater risk.

44. I have similar concerns about how seismic surveys and other oil and gas activities in the Beaufort and Chukchi seas harm seals, as they have in the past. I worry that the noise and

disturbance from these activities could hurt seals or cause seals to abandon the nearshore waters. If seals that I would otherwise hunt are harmed by these activities, and this interfered with my ability to hunt those seals, this would harm me personally. Harm to the animals that my family and I hunt is direct harm to a resource that I depend on. Such harm, therefore, also injures me and impairs my ability to live the traditional subsistence lifestyle that has been passed down to me from my elders and to provide for my nutrition and that of my family and community.

45.     Finally, I am also concerned that seismic surveys may harm fish in the areas around the seismic boats. In the past, during seismic activities, we have seen fish wash up on shore. Any harm on the fish will adversely affect our harvest of fish, including those fish that travel between the Beaufort and Chukchi seas. This could also result in harm to the ecosystem, the seals and birds that feed on these fish and, in turn, to me and my family and my community. We are concerned about the rebound effects of the seismic surveys, as well as research and monitoring surveys, on the whole ecosystem.

46.     We have been taught not to put things in the water that may cause harm to our animals, including cause whales to turn away from the hunting grounds. I fear that oil drilling activities result in water discharges from drill ships or the presence of drilling muds in the water that could cause whales to avoid our hunting grounds.

47.     When whale hunts are less successful, the community will suffer, as it has in the past during times of shortage. Much of our year is planned around the whale hunt and if the hunt is unsuccessful, many of our traditional cultural activities and community celebrations are affected. Our experiences have proven that our seasons of cultural traditions and preparations for success will change to seasons of fear and unpreparedness and the real hardship of empty

food cellars. When whale meat is less available, our nutrition suffers as many mothers give the food to the hunter and the children first.

48.     If there is a spill and our animals become sick, I am concerned about how we will feed our families into the future and how we will be able to share our foods as our elders taught us. After the Exxon Valdez spill, we shared our foods with friends and families from boarding school days that were affected. If there is a spill in the Arctic, I wonder if others will share their foods with us when we all cannot get enough.

49.     I remember a local community meeting concerning oil and gas development in Umiat. There were concerns about levels of contaminates in fish, near the Umiat area, from earlier oil and gas development activities. Samples of the fish were being taken, but we were told not to worry because there was food in the lower 48 that had higher levels of contaminates. We were told about the health effects these contaminates can have on people who are exposed to them. The liver had the highest levels yet we eat the liver as a delicacy and for its high fat content. We share this with our elders and our grandchildren, two very sensitive populations that could have adverse effects from eating contaminated livers. After the meeting, a village member came to me crying. Her elder had gotten sick and had a severe neurological event similar to what was described in the meeting. She asked me if she caused the elder to get sick because she had shared this fish with her all winter. I tried to reassure her, but without efforts to adequately monitor our foods, I cannot be sure. I am afraid that we will have to worry about contaminates and the impacts on our health if there is a spill in the Arctic Ocean. As mentioned above, it was the Umiat fish contamination issues that resulted in my involvement with CDC, including the National Tribal Health Think Tank.

50.     I am concerned that helicopters and aircraft associated with both onshore and offshore exploration and development activities will continue to adversely affect caribou, including along the coast, and make the caribou avoid hunting areas, including traditional migratory routes and areas used for insect relief.  I am concerned that helicopters could affect caribou hunts.  I fear that helicopters might even endanger caribou and/or muskox hunters including members of my family, as they have in the past.

51.     I am very concerned that the oil companies and the government are ill-equipped and unprepared to prevent and clean up an oil spill in the Arctic.  I am very concerned that spill plans, as written on paper, will not work and I also worry about the lack of enforcement and regulatory resources if these plans do not work.  How can promises of "not one drop" be honored and not be broken when industry can cut costs to increase profits, leaving broken pipes at existing infrastructure that leak oil?  An oil spill, whether on land or in the Ocean, will cause harm to our fish and other animals and to our communities that rely on these resources.

52.     I am worried about the possibility of a well blow out as was experienced in early 2012 on the Colville Delta.  I am worried about the exposures from that blowout and the failure to get adequate safety, monitoring, prevention, and containment processes in place.  I am worried that decision-makers have failed to learn from the Repsol event and have not be take the mistakes from it into account in the decision making process for opening our lands and waters for more leasing and oil and gas activities.  I am worried about damage that oil could to do to the tundra, lakes, rivers, and to the Beaufort and Chukchi seas and coastal areas, including important traditional use areas for Nuiqsut.  I am concerned about the risks to our traditional diet, caribou, fish, birds, and marine mammals, from oil and the chemicals used in oil and gas exploration and development.  I am concerned for impacts on marine mammals such as the walrus who dig in the

shoals for food, from the dumping of discharges into the water. We should not depend on the currents to mix the discharges when Arctic mixing zones and associated tribal health risks are not fully understood. I am concerned that there are no animal resource centers on the North Slope that will be able to respond appropriately to the wildlife needs if there is a spill.

53.     I am concerned that the Trump Administration will not require appropriate safety measures to prevent a spill and will not be able to stop a leak. I am concerned that the oil companies are allowed to drill without adequate containment supplies and support from village response teams. As for seismic, I have equally little faith in the Administration's desire to ensure that any seismic exploration activities are conducted in a manner that does not harm marine mammals, including whales and seals, and fish that I depend for food, health, life, and my traditional culture. President Trump's collective efforts to cut key agencies, including BOEM, BSEE, EPA, and CDC, and to undermine environmental protections, pose serious threats to me and my communities.

54.     When oil and gas activities are permitted, whether on land or offshore, it is not a matter of "if" but "when" oil spills will happen. This was painfully demonstrated by the Deepwater Horizon spill in the Gulf of Mexico, and also by the Exxon Valdez spill. Watching the failure to stop the Deepwater Horizon spill really affected the psyche of our people. We are greatly stressed about, it is bringing out anger and fear, and it is breaking down our ability to work effectively together. When there will be a spill from oil drilling activities in the Arctic, the immediate risks to the people, our lands and waters, and the wildlife are severe and real. Many animals, like whales and birds, come to the Arctic for renewal of the next generations. When spills occur during this time, generations of these animals may be affected. Whole populations could collapse. We would then have to work to identify and assess any health changes to our

animals, and find the resources, facilities, and equipment to do these assessments. We might have to find alternate food. These effects would be profound and long lasting.

55. I am also concerned that we are not properly assessing and proactively preparing for the health effects that an oil spill will have on us. Past efforts to assess those impacts, notably the Health Impact Assessment relating to the NPR-A, were not done in consultation with us and thus did not reflect all our concerns. The health impact assessment does not tell us what the impacts to our health are from oil and gas activities, including spills. This information still needs to be collected. There is data for specific years that show impacts but that data was excluded from the assessment. There are no criteria in the documents to flag oil and gas concerns, including effects from flaring. Instead, they focus on smoking. We questioned how this will be interpreted without data specific to oil and gas activities. Because the models and data and controlled by the industry, the outcomes always come out to favor the industry, not us. I am concerned that the Trump Administration will not be concerned with doing such proactive health impact analyses either. I also worry that oil companies lack appropriate village notification processes and resources to monitor, assess, and help villagers protect their health when there is a spill.

56. Oil and gas development creates health issues for our people and in our communities. I saw and heard friends and family get sick during the Repsol blow out. I have talked to others who were sickened, some who have since died, by the efforts to clean up the Exxon Valdez spill. When there is a spill in the Arctic, I worry that our people will suffer from illness as the people who responded to that spill did.

57. At every meeting we attend, we elevate our health concerns. I am concerned that decisions about the effects of oil and gas activities are being made without adequate knowledge

of the impacts on the health of our people. We have no specialized health care assessments to assess the impacts from oil and gas activities and no guiding points to help make decisions based on the best for the health of the people who live where these activities are to occur. How will our health concerns be met? Who will help the diabetics, heart patients, and those with respiratory illness and educate them on how to protect themselves from the effects of oil and gas activities? Who will counsel people for social reactions to oil exploration and development and an oil spill? We have done so and we will continue to do so, but our resources are limited. We do not have the health care resources to deal with changes to our health that may be caused by oil and gas activities. Taking our people from our community to other areas is costly. I am worried that many of our people will have decreased longevity because of adverse health issues resulting from pollution and contamination. Oil exploration and drilling activities, and the effects of those activities, may compound our health issues without providing us resources to address them appropriately. I worry that we will have serious changes in our health if we are unable to live our traditional and cultural ways because changes brought to our lives and our environment by oil and gas activities.

58.     I have received calls from community members in every community in the Arctic and I have listened to their questions and concerns about past drilling activities and the possibility of an oil spill and what community members can do to help keep us all safe. I listened to many concerns from our people when we had the rare algae plume that was mistaken for an oil spill. These concerns have caused stress, anger, and frustration. They have caused many sleepless nights, difficult meetings and the breakdown in the unity of our communities over the divisive issues of oil and gas development, and much hard work to keep our families united together. These concerns have taken time away from my and others ability to practice our

traditional and cultural activities and from our families. Many people are worried that our traditional way of life may be over, and thank me for trying to protect it.

59.     The changes to our villages that could happen due to oil and gas exploration and development are severe to think about for me. I see the real frustration in our villages as people get drunk and talk on the VHF radios venting their frustrations and fears. I worry about the increase of drugs and alcoholism and the neglect and abuse that follows. I was recently asked to visualize all the things I have gone through over the last 20 years in trying to stand up for our people and then amplify those experiences to next 20 years. This visioning exercise made me terribly upset and concerned for our future. It made me realize that without significant protective measures put in place now, we will not survive the difficulties we will face in trying to protect the life, health, safety, and traditional culture of our people.

60.     I have learned from aboriginal people in Russia and Nigeria's experiences from Shell's oil and gas development projects, and have learned about serious environmental degradation, health impacts, social impacts, and conflicts with traditional and cultural activities caused by oil development and spills in these areas.

61.     I toured the Gulf of Mexico after the spill and saw a spill plan, like the ones Shell has used in the Arctic, in action. In the Gulf, I learned about ineffective boom placement, lack of maintenance of response equipment, inconsistent protective measures for special areas, and the lack of protective measure for workers. I saw uncoordinated response efforts, a lack of transparency, and empty promises to those at risk for losing the most. I saw divisions among the people and profit-making, not public health, as guiding decisions. It gives me no reassurance that oil companies allowed to operate here can protect the Arctic in our harsh atmosphere, icy waters, extensive darkness, and without infrastructure and Coast Guard presence.

62.     I can still see the eyes of the people who lived in the Gulf of Mexico and were working to try to respond to the spill.  I remember the haunting look in their eyes of wanting to protect their homes and livelihoods against the odds with the dread of knowing what they were responding to and of what they were losing every minute.  I have seen this same fear and anger in our people's eyes as they see the efforts to expand oil and gas development on our lands and waters.  The faces I saw in the Gulf as boats were taken out of the water on the first day of shrimp season are not the faces I want to see in the Arctic or on our people during whaling.

63.     Seeing the response in the Gulf confirmed to me the importance of our traditional knowledge.  Our traditional knowledge and experiences in travelling in our lands and waters conflict with the words in these spill plan documents.  I am concerned that the oil companies and the government are ill-equipped to protect the Arctic and lack a true understanding of our areas to be able to protect them from an oil spill.  I am concerned that there is a lack of understanding in the spill plans themselves, in the decisions to approve the spill plans, and in the decisions to allow oil and gas drilling activities to occur in the Arctic Ocean about the importance and vitality of the Arctic Ocean ecosystem, the inter-relationships between the environment and the migratory animals that depend upon it, and the necessity of critical habitat for wildlife, and how oil and gas activities.  I am concerned that the impacts from an oil spill and the recovery methods used to clean up a spill on the Arctic Ocean are not fully understood and may have a negative effect on the ecosystem.

64.     I have seen and heard about failures in spill response drills when they have been conducted in the Arctic.  I have heard about failures of recovery equipment when they have been deployed for testing.  I am concerned that these failures show a basic lack of understanding the Arctic environment.  Because of this lack of understanding about our lands and waters, I am

concerned that this has prevented adequate efforts to ensure effective spill response materials are in place in the Arctic, and I am concerned that these materials will not be maintained effectively. I am concerned that distribution of response equipment to protect tribal areas is almost non-existent. If there is a spill, I am also concerned that that our community members, who have volunteered for decades to be part of village response teams, will not be called out to help.

65.     I am concerned about the effects of dispersants on our communities and our animals. As more information is learned from the effects of the Gulf of Mexico, I have learned more about the chemicals in dispersants and their health effects. I fear that chemical companies and decision-makers are ignoring health concerns, and our people will be negatively affected if dispersants are used to clean-up a spill in the Arctic or along the migratory paths of our animals. I am concerned to the effects the Gulf of Alaska spill and the Gulf of Mexico spill has on the migrating birds and the study that shows egg shells are showing contamination. I worry how the migration of these birds is affected and the health of our people eating them. I worry how the new generations of birds will be continued to be impacted during their migrations through these areas. I worry what the contaminants in the egg shells accumulating in the birthing area of the birds will do to future generations. I learned from elders how some of our birds have never come back from the Exxon spill and now more are affected from the Gulf. These animals are coming with contaminates and spreading the concern to the food chain. So will the contamination spread to our people dependent on the food chain. I worry that oil and gas exploration and development activities will contaminate the birds, eggs, and other parts of the food chain that would negatively affect the health, both general and reproductive, of the people, myself and my family, who rely on these foods. I worry for the grown children I once taught basketball ("the little dribblers") who are now of reproductive age who have asked me reproductive health questions.

Many are having problems and fear the contaminants are affecting the health of our children. Some vent their fears and frustrations about what's happening to our lands and waters, to our health, on Facebook. I have pushed to get the data for the chemicals the oil and gas companies are releasing into our environment, but the government still has not collected it and shared it with us. We should have the quality of the data on these chemicals comparative to what is available in the European Union. There should be no more oil and gas lease sales and activities allowed in our waters and on our lands until we have that information.

66. I am concerned there is a lack of effective Arctic standards for spill response and recovery, and a lack of appropriate testing of those standards. I am also concerned that there is a lack of understanding by those who want to conduct oil and gas exploration drilling and by those who are allowing oil and gas drilling in the Arctic of the need for effective standards. I am concerned that because of a lack of standards, there may be a greater likelihood that an oil spill could occur and that any recovery efforts will not be adequate to clean up a spill. I am concerned that we, our local leadership and community members, will now need to learn about engineering and controls so that we can understand the spill plans and whether they effectively protect our lands and waters, and how safety measures for the Arctic can be improved to ensure our lands and waters are protected. I am concerned about how Alaska and the people of the North Slope, in particular, will be the ones who will be forced to address and respond to any problems that arise from oil and gas exploration and development. And I am worried that the need to protect public health, reduce energy consumption, restoration of areas impacted by industrial oil and gas activities and exploration should be an integral part of the planning process and not an afterthought. I am concerned when I see that many states are less than transparent in addressing the public's concerns with oil and gas development and how difficult it is to research the impacts

that oil and gas development have on public health.  Many people are researching and building the evidence of health concerns and suffering from oil anwd gas development in health impact assessments, and they are living with the reaction of not using precaution designed into the process.  Precaution to human health must be designed in the permitting and leasing processes and not as a result of the loss of life and lawsuits.  Prevention must be the basis of the effort, not added when the evidence builds.  Proactive assessment of all areas of industry to reduce emissions should be a continuous process of every permit and not a plan to find funding eventually.  Reducing energy consumption must be the goal of every permit, we should not be permitting on the design of the industry that produces and consumes the energy.  Every impacted area must be planned for restoration as part of every permit and we should not have to wait to plan and budget with other funding streams such as the helium process for restoration of the legacy wells as we did in Umiat.

  67. There are many oil development projects happening on the North Slope.  In order to have a voice in the process, I must devote considerable time to learning about these many projects.  I am forced to learn about complex development plans and projects that are very different than our traditional and cultural activities.  To make sure we are involved in the decision-making processes and to educate decision-makers about our lands and waters, I have attended many meetings and conferences with local, regional, state and federal agencies, and industry.  I have had to learn about NEPA, regulatory and enforcement processes, pipeline safety, environmental health and chemical toxins, and how to respond if there is an oil spill.  I am told that I must have training in oil spill response just to access traditional and cultural areas that have become developed by the oil industry.  I have travelled many miles to visit villages along the North Slope to given presentations at schools, tribal and city councils, and

communities that share facts and knowledge about these projects and their impacts on our communities that may not have been shared by the industry or the state and federal agencies. I have to do all of this voluntarily to be an informed community member to comment effectively at local community meetings where development plans are presented. I feel that I must spend this time in order to protect the wildlife and the environment that provide food for me and my family. I would rather spend this time gathering food, hunting, or enjoying my friends and family.

68.     Because of the increasing presence of oil and gas development projects in the Arctic, I feel that we have to become educated in our traditions and culture and in the technical and scientific world to keep pace. Because the decisions about these projects are important to our future, we have to try to be engaged in so many processes that seem to be beyond our control. I feel that we have to try to learn from others who have experienced oil spills in order to help us prepare to assess the potential damages that could result from spill in the Arctic. We have to read and assess volumes and volumes of documents and work to that oil and gas development project won't negatively affect in an area of traditional and cultural use and the animals we depend on or prevent our usage of an area for generations. I feel that we have to participate in many meetings to try to get answers to our questions and concerns about impacts from oil and gas development and its associated effects like oil spills. We try to make our concerns known during decision-making processes in the hope that the impacts to us and our traditional and cultural uses will be reduced. The stress and strain of these efforts are very tiring. But, our traditional and cultural activities are very important, so I feel we must do this work even though it brings additional stress and strain. I feel we have to endure the pain and hardship of these efforts to be involved in the decision-making process and to deal with bad decisions so that

we have hope that our future generations will be able to practice our traditional and cultural activities as we do now.

69.     We want to be Inupiat into the future not just residents in an industrialized area. We want our health and our culture and traditions to continue into the future, but these are jeopardized by the decisions of the Federal government to continue to lease our lands and waters to oil companies and allow more and more oil and gas exploration and development activities here.  The government makes these decisions without consulting with us, without our permission, without looking at the cumulative impacts they have on our lands and waters and our people.  The seasons of life and land are so intertwined for our people that I worry that these decisions, and all things that can follow from them, including a devastating oil spill, worsening climate change, more air and water pollution, and decreased animal populations will affect us for generations.  The cumulative impacts from all the piecemeal decisions made by various administrations, including the current one, are devastating our communities and threatening the life, health, safety, and traditional culture of our people.  After decades of involvement and engagement in these complex issues, efforts to protect our lands and waters, we are just seeing more lease sales and exacerbated changes which are affecting our way of life and breaking our communities apart.   Instead of more oil and gas lease sales and permitted activities in our waters and on our lands, we demand policies, processes, and decisions that are preventive, precautionary, protective, and proactive, ones that serve the long-term interests of our people and the Arctic, and that feed us with goodness instead of badness left behind by oil companies.

70.     The North Slope is my home, and I plan to stay here as long as I live.  I will continue to hunt, fish, boat, and camp with my family and share our cultural traditions and practices every year as I have in the past.  I will continue to encourage my children and

grandchildren to educate and involve themselves in local issues, and to fight for our life, health, safety, and traditional culture as our elders have directed us to do.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: June 7, 2018                By: _Rahtuanganuak_

Rosemary Ahtuangaruak

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants.* | ) | |
| | ) | |

**DECLARATION OF ELISABETH BALSTER DABNEY**

I, Elisabeth Balster Dabney, hereby declare as follows:

1.      I am the executive director of the Northern Alaska Environmental Center (Northern Center). I have been employed by the Northern Center since June 9, 2014. My responsibilities include communicating to the public, media, federal and state agencies, and our members about issues affecting the Arctic, the values Northern Center supports, and strategies they might employ to protect or to manage for these values. In this capacity, I am familiar with all aspects of the Northern Center's mission and activities as they relate to arctic Alaska, including the Chukchi and Beaufort seas and the adjoining onshore areas.

2.      Northern Center is a non-profit environmental organization based in Fairbanks, Alaska. Northern Center has approximately 900 members and over 3,000 supporters in Alaska and throughout the United States. The Northern Center's staff and members rely on Northern Center to represent their interests in issues affecting Alaska's public lands and waters.

3.      Since 1971, Northern Center has worked to educate its members, the public, the media, and decision-makers about critical land-use and resource development issues in Alaska, including the Arctic. Northern Center's mission is to promote "conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy." Northern Center seeks to educate its members and the general public through its web site, online platforms, the publication of a quarterly newsletter "The Northern Line," in which relevant environmental and resource issues are discussed in detail, and through public meetings, petition drives, and public awareness campaigns.

4.  The Northern Center has been a consistent advocate for protective plans and management structures across Alaska's Arctic lands and seas. We recognize the need for integrated approaches across America's Arctic to permanently protect treasured landscapes that

address combined threats and protections for the Arctic Ocean, coastal waters, and adjacent onshore lands.

5. The Northern Center has many concerns relating to oil exploration drilling in the Arctic Ocean and the associated industrial activities. Oil and gas exploration and development activities could permanently alter the currently unspoiled environments of the Chukchi and Beaufort seas, and pose serious threats to the health of the ocean and the adjoining coastal and terrestrial habitats and the dependent species and traditional lifestyles. Exploration and development will introduce new noise and pollution sources, including those from vessel and air traffic, and drilling rigs. Marine noise is known to cause disturbance in marine life, including whales, seals, Pacific walrus, and fish. Oil and gas activities also threaten the Arctic Ocean region with oil spills and other pollution that could have devastating effects on sensitive marine organisms and birds, including endangered bowhead whales and threatened spectacled and Steller's eiders and polar bears. The Northern Center is also concerned about the potential degradation of Chukchi and Beaufort seas coastal areas, including Kasegaluk Lagoon, and other terrestrial habitats within the National Petroleum Reserve-Alaska (Reserve) and the Arctic National Wildlife Refuge (Refuge) from potential oil spills and onshore activities associated with offshore exploration and development, including aircraft overflights, water and gravel withdrawals, roads, pipelines, and other infrastructure. These onshore areas provide important calving and insect-relief habitat for the Western Arctic Caribou Herd, polar bear denning critical habitats, as well as nesting, feeding, and staging habitats for many bird species. Oil exploration and development activities also risk migratory species on their route to and from their habitats in the Chukchi and Beaufort seas.

6. Development in the Arctic ocean would bring new strain to a sensitive and stressed marine environment. Exploration and development would occur in and around important biological areas for bowhead whales, polar bears, seals, and walrus. Disruptions from boat traffic, man-made structures, and noise threaten to alter whale migration routes and impact the feeding and reproduction of marine mammals. According to BOEM's own analysis, the full impact of industrial noise on marine life is not known. The Arctic Ocean is already undergoing rapid change, with a dramatic and steady reduction in pack ice and increasing acidification of ocean waters. Bowhead whales, fin whales, humpback whales, bearded and ring seals, and polar bears are all listed as threatened or endangered under the Endangered Species Act and walrus are under consideration for listing. Development activities would also take place near sensitive and important coastal areas, including the Arctic National Wildlife Refuge and Teshekpuk Lake. In addition to the impact of routine operations, all fossil fuel development carries the risk of accidents and spills. Based on historical spill rates, BOEM predicts that development of the Beaufort and Chukchi seas resulting from its five-year plan would result in up to nine spills greater than 1,000 barrels of oil and 83 spills between 50 and 1,000 barrels. The grounding of Shell's floating drill rig, the Kulluk, demonstrates that despite strict regulations and a culture of safety, accidents still happen. The offshore Arctic poses unique challenges. The Beaufort and Chukchi seas are covered in ice for most of the year, allowing only a short season for exploration and development and complicating the installation of permanent platforms. The state's Division of Oil and Gas includes in its list of geologic hazards earthquakes; sea ice and ice gouging; waves, erosion, and currents; unstable sediments and shallow gas deposits; and permafrost. Ocean conditions, including strong winds, currents, and the presence of ice, complicate the recovery of oil, and standard resources for spill response are unavailable. The nearest deepwater

port is in Dutch Harbor, roughly 1,100 nautical miles from Utqiagvik. The nearest Coast Guard Air Station is in Kodiak, 945 nautical miles from Utqiagvik. A very large spill could have catastrophic impacts on Arctic ecosystems and local residents.

7. The Northern Center envisions a Northern Alaska far into the future that remains a land of superlatives—as inspiring, healthy and supremely beautiful as it is today. Our globally important wildlands will remain biologically diverse and productive, with abundant fish and wildlife that support vigorous subsistence traditions and an extraordinary, increasingly sustainable quality of life for Alaskans. Alaskans will maintain these enviable qualities undiminished across generations by protecting our vast expanses of ecologically intact habitat, by shifting our economy toward sustainable use of renewable resources, and through careful stewardship of non-renewables. We thrive by respecting environmental carrying capacity, thereby safeguarding the rich natural environment that has supported Alaskans for over ten thousand years. We envision a Northern Alaska Environmental Center that plays a leading role in achieving this promising future through strong grassroots organizing, defensive work, exploring solutions, and by building broad coalitions that translate Alaskans' passion for our home into an environmentally and culturally sustainable future.

8. Regarding the revocation of the President Obama Arctic Ocean withdrawals, the Northern Center has strongly supported policies that would leave the Arctic Ocean off-limits to oil and gas development. A longstanding strategic plan mandate has been to protect the ecological integrity of the Beaufort and Chukchi Seas. The Northern Center has engaged in various public processes concerning oil and gas exploration and development in the Arctic Ocean. Regarding the leases, formerly held by Shell Oil, for which ASRC has requested Suspensions of Operations, the Northern Center has voiced these and other concerns in various

administrative processes related to Shell's exploration drilling program on those leases in the Chukchi and Beaufort seas. The Northern Center has submitted comment letters to the Bureau of Ocean Energy Management (BOEM) on Shell's 2010, 2012, and 2015 Chukchi Sea Exploration Plans and 2007-2009, 2010, 2011, and 2012 Beaufort Sea Exploration Plans, and to the Bureau of Safety and Environmental Enforcement on Shell's Chukchi and Beaufort seas 2010 and 2011 oil spill plans. The Northern Center also submitted comments on the Environmental Protection Agency Air Quality Control permits for Shell's *Discoverer* and *Kulluk* drillships and the National Marine Fisheries Service's incidental harassment authorizations for Shell's exploratory drilling in the Beaufort and Chukchi Seas. On June 21, 2015 the Northern Center gathered 164 signatures in eleven hours explicitly asking signers to petition President Obama to suspend all drilling leases in the Chukchi Sea. Throughout 2016 and 2017 we have supported legislation that is consistent with our strategic mandate to keep the Arctic Ocean protected and have opposed policies that would inhibit the transition away from fossil fuel dependency and aggravate strong mitigation strategies to curb carbon emissions.

9.   The Northern Center also has actively demanded protections for the Chukchi and Beaufort Seas and the Arctic region through other public processes. The Northern Center aims to defend the integrity of conservation units and wildlands in Arctic Alaska through planning process involvement and through supporting regional and local sustainable solutions concerning energy use, transportation, and economic development. Northern Center members attended BOEMs Fairbanks open house on the Five-Year OCS Oil and Gas Leasing Program for 2017 – 2022 and two staff members attended the Anchorage open house. Northern Center members and staff were able to comment at both events, respectively. The Northern Center has provided comment letters concerning the environmental impact statements for Chukchi Sea Lease Sale

193 and on the multi-sale Beaufort Sea Environmental Impact Statement (Lease Sales 186, 195, and 202). Additionally, the Northern Center has commented on the Five-Year OCS Oil and Gas Leasing Programs for 2007-12, 2010-15, 2012-17, and 2017-22; the draft multi-sale Beaufort and Chukchi Sea Environmental Impact Statement (Lease Sales 209, 212, 217, 221); National Marine Fisheries Service's incidental harassment authorizations for seismic surveys in the Beaufort and Chukchi Seas and the Draft Programmatic Environmental Impact Statement for Seismic Surveys in the Beaufort and Chukchi Seas; and the Environmental Protection Agency's wastewater general permits for oil and gas exploration drilling and geotechnical surveys in the Beaufort and Chukchi Seas. The Northern Center has also commented upon regulations from the Bureau of Safety and Environmental Enforcement and the Bureau of Ocean Energy Management governing Arctic OCS exploratory drilling and well control and safety equipment requirements. We submitted a scoping and RFI comment for the 2019 – 2024 Five-Year Plan and plan to submit comments for the proposed Beaufort Sea lease sale. The Northern Center filed substantive comments for BLM's draft environmental impact statement for Hilcorp's Liberty Project.

10.     The Northern Center testified, as did many of its members, at a BOEM hearing on the draft supplemental EIS for Chukchi Sea Sale 193, the first hearing on offshore leasing or exploration held in Fairbanks in 30 years. On July 14, 2015 we called 231 Northern Center members and urged them to participant in a Fairbanks rally protesting the presence of Shell in the Chukchi Sea. On July 18, 2015 we held two events in Fairbanks, Alaska, a flotilla and a community barbeque, to raise awareness of the risks of Shell's presence in the Chukchi Sea.

11.     Oil and gas development in the Arctic Ocean requires operating without accident under harsh conditions in a sensitive marine ecosystem upon which thousands of Alaskans rely.

Development in federal waters represents a large-scale expansion of fossil fuel development expected to produce billions of barrels of oil over several decades. The Northern Alaska Environmental Center opposes any new sale of leases in federal waters of the Beaufort and Chukchi seas. The Northern Center likewise opposes the development of any prospects on existing leases that involve substantial new production, require extensive new infrastructure, or pose significant environmental risks. Therefore, the Northern Alaska Environmental Center strongly supported President Obama's withdrawals through public education and advocacy efforts including, through our social media channels, online platforms, electronic mail newsletters, print newsletters, at advocacy events, comment letters and petitions, and in the print media. This outreach included advocacy to keep oil and gas in the ground in federally managed waters, including the withdrawal of the Arctic Ocean from future oil and gas development.

12. The Northern Center has invested significant organizational resources in numerous efforts to gain protection for the Chukchi and Beaufort seas, the adjacent Reserve and Refuge, and their outstanding wilderness and wildlife resources. The Northern Center has two high-priority objectives for the Arctic land-based program. The first is to permanently protect sensitive wildlands in Northern Alaska by promoting Wilderness designation where appropriate and other protective statuses when possible. The Northern Center places special emphasis on our largest and most biologically important conservation lands, including the National Petroleum Reserve–Alaska (Reserve), but with a keen sensitivity to the overall ecological integrity of Arctic Alaska. Our second priority is to defend the integrity of conservation units and wildlands in Arctic Alaska through planning process involvement and by supporting regional and local sustainable solutions concerning energy use, transportation, and economic development.

13.     The Northern Center has members who have used and enjoyed, and will continue

to use and enjoy, the Chukchi and Beaufort seas and adjacent onshore areas for various purposes,

including various forms of outdoor recreation, fishing, wildlife viewing, birding, photography,

and solitude. Members of Northern Center also enjoy observing Chukchi-and Beaufort-

dependent migratory whale and bird species along their migratory paths. Oil and gas activities

such as seismic surveying, exploratory oil drilling, noisy and polluting barge, icebreaker, and

other vessel, helicopter and aircraft traffic, and construction of offshore oil fields, pipelines,

roads, processing plants, docks, ports, and other infrastructure will negatively and permanently

interfere with these uses. Offshore development would impact North Slope residents directly

through increased air, noise, and light pollution and increased industrial activity and indirectly

through impacts to animals harvested through subsistence activities. North Slope residents are

already dealing with the impacts of climate change, including thawing ground, increased erosion,

and shifting patterns of fish and wildlife. The Northern Center acknowledges the role of fossil

fuel development in the economy of North Slope communities, but believes expanded

development runs counter to the steps necessary to protect the North Slope and all of Alaska

from the harmful impacts of climate change. Alaskans at the local, state, and national level share

a responsibility to protect all residents during the transition away from fossil fuels.

14.     The Northern Center's concerns about oil and gas leasing, exploration, and

development in the Chukchi and Beaufort seas extend throughout the Arctic. We are of the view

that the Department of the Interior is approaching planning for oil and gas development in the

Arctic in actions being taken independently of each other, without adequately assessing the

cumulative impacts of all the actions together. The Northern Center believes that carrying these

actions out independently leads the American public to believe that the actions are not inter-

related. The federal agencies rarely if ever put all of their proposed actions on maps that show the full picture of the industrialization of the area and therefore the Northern Center spends considerable resources compiling such information about proposed lease sale areas. The Northern Center advocates for all federal and state land and water managing agencies review any new development in state or federal waters with consideration of environmental risks and economic benefits to Alaskans in light of the need to dramatically reduce global greenhouse gas emissions. Production from existing projects must continue to demonstrate safe operation and compliance with state and federal law. Planning process should consider the landscape level potential impacts and the American Arctic should be seen holistically as one integrated ecosystem. Therefore, planning process should consider the overall, cumulative impacts of development to the area as a whole.

15.     The Northern Center is concerned that any revocation of the President Obama withdrawals will result in oil and gas companies exploring and potentially developing in America's Arctic Ocean causing harm to wildlife and communities that depend on the areas, and threatening catastrophic harm from an oil spill. The development of offshore resources would bring significant new industrial infrastructure and activities. BOEM predicts that one Beaufort Sea project would involve up to 25 production platforms, 1,840 wells, and 410 miles of underwater pipeline. Production in the Chukchi would require up to 300 miles of new pipeline onshore. New processing facilities, oilfield support facilities, and transportation facilities would likely be needed. Exploration, development, production, and decommissioning would likely result in noise from ship and air traffic, drilling, construction, and explosive platform removals; increased air and water traffic; discharge of liquid wastes, drilling mud, and cement residue; disturbance of the sea floor; air emissions; and light pollution. Not including the risk of major oil

spills, BOEM anticipates Arctic Ocean development to result in moderate impacts to marine mammals and marine benthic species, meaning impacts are unavoidable and possibly irreversible, and major impacts in the areas of sociocultural systems and environmental justice, which BOEM defines as "unavoidable disruptions to a degree beyond what is normally acceptable." Significant development in the offshore Arctic risks dramatically and irreversibly altering the natural and cultural landscape of the North Slope as well as the wild nature of the Arctic.

16.     Current and projected impacts of anthropogenic climate change demand the dramatic and immediate reduction of greenhouse gas emissions. Analysis has found that in order avoid the worst impacts of climate change—and to meet global goals set under the Paris Agreement of 2015—the vast majority of fossil fuel resources must be left undeveloped. While consumption of fossil fuels is ultimately driven by demand because of the global nature of fossil fuel markets, it is also necessary to consider supply. President Obama rightly recognized the climate impacts of oil and gas consumption and the government's role in enabling oil and gas production when the administration decided in late 2016 to stop offering new leases in a vast majority of America's Arctic Ocean. The scale and timing of OCS development in the Arctic make it incompatible with the need to shift away from fossil fuels. It is unreasonable to encourage such projects. In sum, if leasing and production of the Arctic's offshore oil and gas occurs it will harm the Northern Center and its members' interests in the Chukchi and Beaufort seas and surrounding areas and their goals to keep the planet within a two degree warming scenario.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: 06/06/18

By: _Curis Dabney_____
        Elisabeth Balster Dabney
        Executive Director
        Northern Alaska Environmental Center

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 3:17-cv-00101-SLG |
| | ) |
| DONALD J. TRUMP *et al.*, | ) |
| | ) |
| *Defendants*, | ) |
| | ) |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) |
| | ) |
| *Intervenor-Defendants.* | ) |
| | ) |

**DECLARATION OF JOHN HOCEVAR**

I, John Hocevar, hereby declare as follows:

1.      I currently live in Washington, DC. I am the Oceans Campaign Director and a member of Greenpeace USA, where I have worked for over fourteen years. I am also a member of the Center for Biological Diversity. I rely on Greenpeace and Center for Biological Diversity to represent my interests in protection of the Arctic Ocean ecosystems.

2.      I have a Masters degree in marine biology. I have worked with Greenpeace for more than fourteen years. I head our oceans work in the United States, and coordinate with our offices around the world. I oversee our campaigns to protect our nation's marine ecosystems. In my capacity at Greenpeace, I am familiar with Greenpeace's mission, operations, and organizational interests as they pertain to the protection of the Arctic Ocean ecosystem. Through my work at Greenpeace and other organizations, I have worked on environmental issues relating to oil and gas development for many years. In 2010, I organized a three month long research expedition, in collaboration with scientists from over a dozen institutions, to independently assess the scope and impacts of the BP Deepwater Horizon blowout on the Gulf of Mexico ecosystem.

3.      Greenpeace is a registered Internal Revenue Service 501(c)(4) non-profit entity organized under the laws of the State of California, with its headquarters located in Washington DC. It has regional offices and employees located across the United States. Greenpeace has worked in Alaska since the early nineteen seventies. Staff in Alaska have historically campaigned on fisheries, oil and climate issues, including the impact of oil drilling and global warming on ice dependent species such as polar bears.

4.      Greenpeace has over 840,000 active supporters in the USA, including numerous members that live in and visit Alaska. Greenpeace members rely on Greenpeace to represent

their interests in protection of the environment, including the lands and waters of Alaska and nationwide. Greenpeace communicates with our members through quarterly newsletters, regular e-mail messages, and social media. We also educate our members and the public at large through our website, face-to-face conversations while canvassing, and the media coverage highlighting our campaigning efforts.

5.      Greenpeace uses peaceful protest and creative communication to expose global environmental problems and to promote solutions that are essential to a green and peaceful future. With over 26 independent offices located throughout the world, Greenpeace works to protect our oceans and ancient forests, and to end toxic pollution, global warming, nuclear threats, and genetic engineering. Since 1971, Greenpeace has been the leading voice of the environmental movement by taking a stand against powerful political and corporate interests whose policies put the planet at risk. Greenpeace furthers its mission through research, advocacy, public education, and litigation with a staff that includes scientists, lawyers, campaigners, policy experts, and communications specialists.

6.      Greenpeace has a long and continuous history working on energy and climate issues in the United States and abroad, with a particular focus on the Arctic and the wildlife that live there, including polar bears. In the 1990s, Greenpeace campaigned to halt oil exploration and drilling in the Beaufort and Chukchi seas in off the north coast of Alaska in an effort to protect polar bears and other ice dependent species not only from the direct impacts of oil exploration, extraction and transportation, but also from the impacts of global warming that would be exacerbated when that oil is burned.

7.      Greenpeace sent its icebreaker, *Arctic Sunrise*, to the Alaska Arctic every summer from 1997 through 2000 to oppose offshore oil drilling in the Arctic Ocean as well as document

the impacts of global warming on polar bears, Pacific walrus and other ice dependent species. In 2005 and 2006, two Greenpeace volunteers attempted the first ever summer expedition to the North Pole to highlight the impact of global warming on polar bears.

      8.     Greenpeace has actively participated in the public processes by submitting substantive comments, individually and with other organizations, related to oil and gas activities in the Arctic Ocean. In preparation for the 2012 drilling season, Greenpeace voiced its concerns about Shell's exploration drilling activities in the Beaufort and Chukchi seas by sending written comments on Shell's 2012 Beaufort and Chukchi seas exploration plans and associated oil spill plans, the Bureau of Ocean Energy Management's preparation of environmental assessments for Shell's 2012 exploration drilling in the Beaufort and Chukchi seas, Shell's requests for coverage under the Arctic NPDES General Permit, Shell's air permits for its *Discoverer* and *Kulluk* drillships, the Bureau of Ocean Energy Management, Regulation and Enforcement's consideration of Shell's 2010 Beaufort Sea seismic survey, and Shell's incidental harassment authorization for Shell's 2010 seismic surveys for the Beaufort and Chukchi seas. In preparation for the 2015 drilling season, Greenpeace voiced its concerns about Shell's Chukchi Sea drilling activities in comments on Shell's application for Incidental Harassment permits and Shell's Exploration Plan and associated Environmental Assessment. We also commented on the Draft Second Supplemental EIS for Lease Sale 193, the Final EIS for Lease Sale 193, and BSEE's proposed Arctic drilling regulations, raising concerns about the dangers of Arctic Ocean drilling. We also commented on Hilcorp's draft development and production plan and the supporting draft EIS, and its application to construct a gravel island, pipeline, and other infrastructure in the Beaufort Sea for the proposed Liberty Island project. In 2017 and 2018, we submitted comments on the draft Proposed Program and scoping for the 2019-2024 Oil and Gas Five Year Plan, and

in 2016 we submitted comments regarding the Proposed Program and EIS for the 2017-2022 Oil and Gas Five-Year Plan. Also in May 2016 we co-organized a 1000+ person march in DC with local community members to call for permanently protecting the Arctic, Atlantic, and Gulf from offshore drilling, and we organized our members to call the White House to urge President Obama to permanently protect the Arctic, Atlantic, and Gulf. In December 2016 we signed onto a letter and created social media content celebrating and thanking the Obama administration for their announcement to withdraw the Chukchi and Beaufort Seas, and part of the Atlantic Ocean, from future oil and gas leases. In 2017, we joined a coalition press statement to oppose the Trump Administration's attempt to reverse the withdrawals, and in 2018 we collected and submitted comments from Greenpeace members opposing the 2019-2024 5 Year Plan, which proposes opening areas that are withdrawn. In addition, Greenpeace has submitted comments on the Beaufort Sea multi-sale EIS for Lease Sales 186, 195, and 202; the 2012-2017 oil and gas five-year leasing program, and proposed seismic surveys in 2012. Greenpeace also commented on U.S. Fish and Wildlife Service's (FWS) 2011 Beaufort Sea proposed incidental take rule for polar bears and Pacific walruses, and informed our members in 2010 about the opportunity to advocate to FWS to list the Pacific walrus under the Endangered Species Act. After the revelation by the DOI Inspector General of irregularities with the Lease Sale 193 EIS, we submitted a complaint to DOI under the agency's Scientific Integrity process. We also submitted a briefing to UNESCO regarding threats to the Wrangel Island World Heritage Site from Arctic drilling. In March 2018, we signed onto coalition comments opposing the 2019 Beaufort Sea Lease Sale and we plan to gather comments from Greenpeace members opposing the lease sale to submit to BOEM.

9.      We have also been engaged on the issue of drilling off the Atlantic Coast. Many of the above mentioned activities also pertained to the need for permanent protections for the Atlantic, including organizing marches, posting social media, and asking supporters to submit comments to BOEM opposing Atlantic drilling. In the fall of 2017, our ship the *Arctic Sunrise*, visited the Atlantic Coast of the United States. At stops in Norfolk, Virginia and Wilmington, North Carolina we hosted a number of events on the ship to educate and engage supporters and allies around the issue of Atlantic drilling and seismic testing.

10.      Greenpeace is concerned about the effects of activities related to oil and gas leasing, exploration, and development on the living resources of the Arctic Ocean. Greenpeace has members who reside near, visit, or otherwise use and enjoy the Beaufort and Chukchi seas and the surrounding areas for subsistence, recreation, solitude, artistic endeavors, and other purposes. Greenpeace, together with the support of its members, has worked to protect the Arctic Ocean environment for more than four decades. We have deeply held beliefs that wilderness areas and the wildlife that those areas support are extremely valuable, even priceless. Oil and gas drilling and production activities are inconsistent with Greenpeace and its members' interests in the region, and Greenpeace is concerned that President Trump's decision to revoke protections for the Arctic Ocean could trigger increased oil and gas activities in the region.

11.      Oil and gas leasing, exploration, and development activities threaten the Arctic region.  Oil and gas activities could lead to the construction of significantly more infrastructure and the general industrialization of the region, and could introduce the greater risk of catastrophic and chronic oil spills, air and water pollution, release of greenhouse gases that harm the global climate, and other likely impacts. The commencement of new seismic testing activities in the Arctic could cause significant harm to wildlife populations in the area. Industrial noise

from seismic surveying as well as from drilling, ice breaking, and vessel and aircraft traffic could disturb, displace, and even kill marine life, including Pacific walruses. Oil and gas exploration activities could risk the region with an oil spill, which could despoil the landscape and wildlife habitat, could result in the offshore displacement and possible population-level harm to Arctic wildlife, and could significantly harm the already ailing polar bear population in the Arctic. Should an oil spill occur in the Arctic, which is arguably the wildest place in the U.S., it would cause emotional trauma for many of our members, and the research operations that Greenpeace has conducted and supported in Arctic and sub-Arctic waters may no longer be possible. Similarly, should population level impacts on wildlife occur due to expanded seismic testing or increased industrial presence in the area, it would harm our members and influence our activities. We would need to shift more resources to documenting impacts and holding key actors accountable. All of these potential impacts would cause harm to Greenpeace as an organization, and our members.

12.    Given Greenpeace's long history and demonstrated interest in fighting climate change and halting destructive oil production in the Arctic, the Trump Administration's actions will prompt us to move resources from the numerous other issues and topics we work on, and redirect them toward stopping the expansion of Arctic oil drilling once again.

13.    In our role as one of the planet's loudest Paul Reveres, Greenpeace is often in the unenviable position of saying "I told you so" to corporations and policy makers who failed to hear the alarms we raised. There is no satisfaction in this, as it usually means that tremendous damage has occurred, which could have been prevented. It is not too late to protect the Arctic from an oil spill which will be impossible to adequately respond to, and which would have lasting, perhaps irrevocable impacts on the cultures and creatures that reside there and there

alone. I do not want to return to an Arctic that has been trashed by greed and reckless decision making, to stand with devastated Inupiats on an oil-covered coast amidst the carcasses of animals we love and say "we told you so."

14.     Since 2006, understanding – and reducing – anthropogenic impacts to Alaska's marine life has been a priority of my work. I have made numerous trips to the region, including three ship-based research expeditions. This is part of a broader interest in polar ecosystems; I have served as a member of the U.S. delegation to the Commission for the Conservation of Antarctic Marine Living Resources, and am currently planning a research expedition to the Weddell Sea.

15.     In 2012, I traveled to the Chukchi Sea aboard the Greenpeace ship *Esperanza*, where I piloted a submarine to conduct research dives to survey the seafloor. The purpose of our expedition was to increase understanding and awareness of the marine habitats that are at risk if oil companies are allowed to drill in the Arctic.

16.     I saw firsthand that the seafloor in the midst of the site where Shell drilled in 2015 is carpeted with marine life. We observed enormous numbers of brittle stars, as well as large numbers of basket stars, sea stars, and soft corals. I was surprised to see such abundant soft corals, as few cold water coral experts were aware of their presence in the Arctic. While Shell was aware of the presence of these corals – they were reported in studies funded by Shell and others – there was no mention of corals in the environmental reviews of oil drilling activities in the Chukchi Sea prepared by the Department of the Interior. Our findings were reported in the *Washington Post* and featured on Nightline, among others. The area we surveyed, and the abundant marine life it supports, is just one of many that would be put at risk by President

Trump's attempted revocation of the protections for the Beaufort and Chukchi Seas instated by President Obama.

17.    I also collaborated with Kelly Newman, a scientist from the University of Alaska-Fairbanks, who joined us on board the *Esperanza* to record vocalizations of marine mammals. We spent a good deal of time looking for marine mammals from the ship. We had hoped to see walrus, polar bears, bowheads, and narwhales, but instead were thrilled to see seals, humpbacks, fin whales, and belugas. I derived great pleasure from seeing these marine mammals in their Arctic environment.

18.    On a personal level, I was unprepared for the spectacular beauty of the sea ice we encountered. There was nothing about seeing the frozen surface of the ocean which seemed compelling to me before I saw it firsthand. The reality is something else entirely: I was awestruck. Few who have had the chance to witness the unique sculptures and unworldly colors of the ice edge will ever forget it.

19.    In addition to my 2012 Chukchi Sea trip, I have had the opportunity to travel to the Bering Sea and other Arctic destinations multiple times over the past years. I have been on three ship-based research expeditions in the Bering Sea, in 2007, 2008, and 2012. Marine mammal observation was the focus of the work in 2007, where we worked in collaboration with scientists studying killer whales and humpbacks. We recorded details such as location, behavior, time, and species for all marine mammals encountered. Many of these marine mammals are ones that migrate through the parts of the Beaufort and Chukchi seas where oil and gas drilling activities could occur. I derive great professional, scientific, recreational, aesthetic and spiritual benefit from the existence of these marine mammals. I also derive great benefit from the existence and persistence of their marine environment.

20.     In 2008, I was the principal investigator for an expedition using manned submersibles and a Remote Operated Vehicle to explore Zhemchug and Pribilof Canyons, along the Bering Sea shelf break. We discovered a new species of sponge, and documented dozens of species previously unknown to live in the Bering Sea. We took dozens of hours of high definition video and documented marine mammals such as Dahl's porpoises and killer whales. The ship continued on to meet with native communities throughout the Bering Sea, discussing their changing environment and impacts to the species upon which they depend for subsistence. We had extensive conversations about the changing climate and effects on sea ice and associated marine life, including marine mammals and birds that also migrate through the Beaufort and Chukchi seas.

21.     In 2012, I led our second expedition to survey the seafloor habitats of the Bering Sea canyons. We discovered the largest skate nursery encountered in the region to date, and documented spectacular sponge gardens on the Zhemchug Ridges. Seeing these areas firsthand was one of the highlights of my marine science career, and has made a lasting impression on me. We published findings from this expedition in the journal Global Ecology and Conservation, in a paper entitled Submarine Canyons as Coral and Sponge Habitat on the Eastern Bering Sea Slope.

22.     In addition to research expeditions to the Bering Sea and Arctic Ocean, I also participate in public education and advocacy on behalf of these ecosystems. I have presented findings at several universities and scientific conferences, and published papers in peer reviewed scientific journals. In the course of this work, I have partnered with scientists from the National Oceanic and Atmospheric Administration (NOAA), the University of Alaska-Fairbanks, and a wide range of other institutions. I regularly provide commentary for media articles on offshore drilling and related issues, such as seismic testing or so-called "rigs to reefs" programs.

23.     I have also engaged in policy discussions related to offshore drilling, testifying before the National Commission on the Deepwater Horizon Oil Spill and Offshore Drilling, sharing perspectives with the Department of Interior, and conducting hundreds of media interviews. In 2010 I participated in a workshop with native stakeholders and policy makers on marine spatial planning in the Arctic, and I challenged BSEE's predecessor agency, MMS, on their plan to allow drilling in the Chukchi Sea. My efforts on behalf of Greenpeace to protect the Arctic and Bering Sea ecosystems will remain an area of focus for the foreseeable future.

24.     In January 2017, I joined a team of Brazilian scientists in surveying the Amazon Reef, documenting this regional biodiversity hot spot for the first time. As in the Chukchi and Beaufort Seas, policy makers and oil companies are rushing ahead with plans to drill in the area despite having very little knowledge of the habitats that would be put at risk. The handful of scientists with expertise on these marine communities would all agree that we have only scratched the surface in understanding these unique areas. The public, which are the true stewards of our oceans, do not have anywhere close to enough information to be able to adequately assess the risks of allowing drilling.

25.     In January-February 2018, I sailed to Antarctica on the Greenpeace ship *Arctic Sunrise*. As a submarine pilot, I worked with Dr. Susanne Lockhart and other independent scientists to survey seafloor areas near the Antarctic Peninsula which are currently being considered for protection. My experience in the Arctic was very useful in understanding Antarctic marine ecosystems in many respects, such as the role of sea ice, seasonality, glaciers, and the compact nature of polar food chains. Similarly, my Antarctic research will provide me with new perspective and insights which I will be able to apply to the Arctic.

26.     As the Oceans Campaign Director for Greenpeace USA, I will continue to work on Arctic issues. I hope to return by ship within the next several years, and to have an opportunity to visit one or more of the North Slope communities in the near future, as will people I manage directly and work alongside. I will continue to visit and study the Bering Sea, from which numerous species migrate to and from the Beaufort and Chukchi seas where offshore drilling is once again being considered.

27.     Based on my experience assessing the scope and impacts of the BP Horizon blowout, my conversations with indigenous stakeholders in Point Hope and Utqiagvik, my exploration of Chukchi seafloor habitats, and my study of past Arctic drilling plans, I am extremely concerned about the President's attempts to revoke protections from oil and gas activities in the Chukchi and Beaufort Seas, which if allowed to stand could potentially lead to new drilling operations in the Arctic in the years to come.

28.     I have had conversations with representatives of the US Coast Guard, who all privately acknowledged that they have no capacity to respond to a spill in the Arctic. I attended a workshop where a senior USCG officer referred to an Arctic spill as the Coast Guard's "nightmare scenario." While there may eventually be a more significant USCG presence in the Arctic, there are no plans to develop the kind of infrastructure which would provide anywhere close to the capacity to respond adequately to a major spill. It is clear to me that the bulk of spill response efforts would be left to oil companies, which have proven to have a somewhat cavalier approach to these risks and lack expertise in responding to oil spills in icy waters. Further, based on the role BP was given in the Deepwater Horizon response, I am very concerned that the public – including researchers – would be denied access to much of the Arctic in the event of a

spill. If there is an oil spill the species and ecosystems of the Arctic will be harmed, and that will harm my interests in seeing, studying and protecting them.

29.     My strong opposition to drilling in the Arctic is informed by my experience in the Gulf of Mexico. In the research I coordinated after the *Deepwater Horizon* blew up and began pouring oil into the Gulf, I saw damage to wildlife, habitats and communities that will be felt for decades. Oil and dispersant entered the food chain, either being ingested directly by birds and marine life or after being taken up by plankton. It killed large numbers of endangered sea turtles, and put the Gulf's population of sperm whales at even greater risk of extinction. (We helped a team from the Littoral Acoustic Demonstration Center use acoustic monitoring buoys to record phonations of sperm and beaked whales. Their study confirmed that there were fewer sperm whales at the site closest to the Deepwater Horizon rig than in previous years.) Many of the oiled seabirds I saw will have died by now, but perhaps of greater concern is the impact on their nesting habitat. In our return visit to Louisiana this summer, more than two years after the blowout began, all the vegetation on several important nesting islands had died. As these plants are all that hold these low-lying islands together, they will soon succumb to erosion and sea level rise, putting the surviving birds at even greater risk.

30.     I saw what I estimated to be 50,000 dead hermit crabs in an area smaller than a football field, a disturbing indication that the beach itself had become incapable of supporting life. We worked with Rainer Amon and Clifton Nunnally of Texas A&M to look at oil in the water column and sediments. We collected water samples from 300 miles to the west of the spill origin that appear to be part of a subsurface plume. One of the sediment samples taken from a depth of about 1400 meters contained oil that we were able to confirm originated from the

Deepwater Horizon site. Further analysis will be needed to better understand the scope of the plume and the impacts on benthic invertebrates collected in the box core samples.

31.     We may never be able to adequately assess the impact of the Deepwater Horizon blowout and other oil spills on ecosystems and communities. However, it is clear that where we have offshore drilling, we have risk of serious accidents that can neither be cleaned up nor quickly recovered from – either ecologically or economically.

32.     Spill response can itself cause harm to marine and coastal ecosystems. Chemical dispersants introduce additional toxins into the environment, and break up oil into smaller particles that are more easily taken up by zooplankton. Zooplankton are then eaten by larger organisms, creating a path for dispersants to enter the food chain and contaminate seafood. Dispersants may also cause a greater portion of the oil to sink, which can have lasting impacts on benthic marine life. Based on the widespread and untested use of dispersants that was approved in the Gulf of Mexico in 2010, I am concerned that dispersants may again be used without adequate testing in the event of an Arctic spill.

33.     So-called controlled burns were also used as part of the Deepwater Horizon response. In addition to creating highly toxic air pollution, there were reports of marine life – including endangered sea turtles – being burned along with the oil. Soot and other contaminants from "controlled burns" would be very harmful in the Arctic, and I am also concerned about the possibility that Arctic sea birds and possibly even seals could be inadvertently killed by this approach.

34.     Oil and gas activities, which would be extremely risky operations, in remote and pristine waters of the Arctic would threaten harm to the fragile Arctic ecosystem, the indigenous communities which depend on it, and all of us who value this wildest of America's wilderness

13

areas. The Deepwater Horizon disaster again revealed the limitations of the oil industry and the government's abilities to control a spill, even in relatively manageable conditions of the Gulf of Mexico. In the treacherous Arctic, a blowout in a scenario where a relief well cannot be completed in the same drilling season could lead to oil gushing until at least next spring, with oil becoming trapped under sheets of thick ice. The longer oil remains in the ice, the greater the number of marine mammals and birds will be impacted.

35.     An oil spill in the Arctic would potentially result in the extinction of many of the endangered and threatened populations of marine mammals and sea birds in the region. Already struggling with the rapid changes brought by loss of sea ice and other climate-driven impacts, ice-dependent species like polar bears and several seals are already in too precarious a state to be able to withstand the monumental stress that would be caused by a major spill.

36.     Seismic surveying activities involve vessel traffic and use of loud air guns that create under-water noise pollution may cause displacement or harm to fish, marine mammals, and birds, including endangered and threatened species.  If widespread seismic surveying and expanded industrial presence were to have negative, population-level impacts on wildlife populations in the Arctic that would represent a significant loss for humanity, would greatly diminish my use and enjoyment of the regions, would reduce the resiliency and strength of the Arctic marine ecosystem, and would close off avenues for future scientific research.

37.     Oil and gas exploration, development, and production activities may introduce massive industrial operations, including increased infrastructure on- and offshore and vessel and aircraft traffic, in the Arctic Ocean. These activities may also create the risk of oil spills, generate substantial noise in the water, and emit pollutants into the air and allow the release of waste into the water, all of which could harm wildlife species not only at sea but onshore as well.

Industrialization of the Arctic Ocean and the likely occurrence of both small and major oil spills would further degrade an ecosystem already under threat from rapid warming and harm species already stressed by sea ice retreat. Such impacts would represent a significant loss for humanity, would greatly diminish my use and enjoyment of the regions, would reduce the resiliency and strength of the Arctic marine ecosystem, and would close off avenues for future scientific research

38.     Oil and gas development will contribute to greenhouse gas emissions, which will in turn lead to increased climate warming and ocean acidification. Climate warming and ocean acidification are already profoundly changing the Arctic marine and onshore environments, and the fish, marine mammals, birds, and other wildlife species that rely upon them. Increased oil and gas production will only serve to accelerate these trends, harming not only the wildlife in the region, but reshaping the landscape itself. Such impacts would represent a significant loss for humanity, would greatly diminish my use and enjoyment of the regions, would reduce the resiliency and strength of the Arctic marine ecosystem, and would close off avenues for future scientific research

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: 6 - 5 - 2018                          By: _____
                                                        John Hocevar

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants*. | ) | |
| | ) | |

**DECLARATION OF GENE KARPINSKI**

I, Gene Karpinski, hereby declare as follows:

1. I am the President of the League of Conservation Voters (LCV) and have been since 2006. I am familiar with LCV's mission, purpose, and activities and familiar with all aspects of LCV's mission and activities as they relate to the Atlantic Ocean and the Arctic Ocean in Alaska, including the Chukchi and Beaufort seas and the adjoining onshore areas.

2. LCV works to turn environmental values into national, state and local priorities. LCV advocates for sound environmental laws and policies, holds elected officials accountable for their votes and actions, and works to elect pro-environment candidates who will champion our priority issues. LCV is committed to stopping the expansion of offshore drilling, in particular to largely undeveloped areas such as the Arctic and Atlantic Oceans, to preserve coastal economies, ways of life, and sensitive marine life, and to accelerate the shift from dirty sources of energy to cleaner sources to combat climate change before it's too late. We educate policymakers, our members, and the media to achieve our policy goals.

3. LCV has a long history of engagement to stop the expansion of offshore drilling to the Arctic and Atlantic Oceans. We have engaged in numerous public processes to inform governmental decision-making on offshore drilling in the Arctic and Atlantic Oceans. For example, we submitted comments to the draft Programmatic Environmental Impact Statement for the Proposed 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program in support of prohibiting new leasing in the Arctic Ocean, and we specifically urged the Department of the Interior to exclude Beaufort Sea leasing. We also submitted comments to the 2019 – 2024 National Outer Continental Shelf Oil and Gas Leasing Draft Proposed Program opposing the expansion of offshore drilling, including opposing leasing in all waters off Alaska. We have also activated our members on numerous occasions, including in the context of the 2019-2024

National Outer Continental Shelf Oil and Gas Leasing Draft Proposed Program, to submit comments to the Bureau of Ocean Energy Management in opposition to new offshore drilling in both the Arctic and Atlantic Oceans. LCV engaged in advocacy in support of President Obama's decision to withdraw certain areas of the Outer Continental Shelf from oil and gas leasing, including educating decision-makers in the executive branch, sponsoring advertisements, and persuading members of Congress to sign letters to the president in support of this action.

4. LCV has nearly two million members, with more than 3,000 members based in Alaska and nearly 550,000 members in states located on the Atlantic seaboard. LCV members are from all walks of life, and include birders, scientists, hikers, outdoor enthusiasts, and small business owners. LCV's staff and members rely on LCV to represent their interests in issues affecting the Arctic and Atlantic Oceans—including the Beaufort and Chukchi Seas—the adjoining onshore areas, and the wildlife species that inhabit those areas. We communicate with our members on offshore drilling issues via regular email updates, postal mailings, and posts to our social media channels. Many of these communications allow our members to sign petitions, submit official comments, and otherwise share their views on Arctic and Atlantic drilling, and we provide a conduit to amplify their voices with decision-makers in Washington.

5. LCV is committed to protecting the Arctic and Atlantic Oceans from the risks of offshore drilling to the regions' people, wildlife, and climate. These areas are largely untouched by oil development and are home to sensitive marine and other wildlife. In the Arctic, we have a long history of working to protect the pristine Arctic National Wildlife Refuge, adjacent to the Beaufort Sea. The Arctic is also ground zero for the impacts of climate change, which would be exacerbated by additional oil and gas development. We also have a long history of working to protect the Atlantic Ocean, an economic engine that generates billions in economic activity,

supports hundreds of thousands of jobs in an array of industries all along the East Coast, and provides endless opportunity for recreation.  As an example, we have worked to bring attention to the network of thirty-one deep-water canyons that play host to myriad and diverse marine species.  Our members rely on us to be their voice to advance our shared values.

6.  President Trump's attempted revocation of President Obama's withdrawal of areas in the Arctic and Atlantic Ocean would harm LCV and LCV members' shared interest in protecting the regions' people, wildlife, and climate.  Oil and gas development in these areas would bring industrialization and increase the risk of catastrophic oil spills that would negatively and irrevocably impact our members and our organization's mission to preserve marine life in the area.  Opening up these areas to fossil fuel development—at a time when we should be accelerating our transition to cleaner sources of energy—signals to the world a lack of commitment to addressing climate change, thus harming our members' and LCV's mission to solve this problem before it's too late.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated:  6/6/18                    By:  _____
                                         Gene Karpinski, President
                                         League of Conservation Voters

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD J. TRUMP *et al.*, | ) Case No. 3:17-cv-00101-SLG |
| | ) |
| *Defendants* | ) |
| | ) |
| AMERICAN PETROLEUM INSTITUTE and STATE OF | ) |
| ALASKA, | ) |
| | ) |
| *Intervenor-Defendants.* | ) |
| | ) |

**DECLARATION OF DR. LESLIE S. KAUFMAN**

I, Leslie S. Kaufman, declare as follows:

1.      I am currently a member of Sierra Club and have been for a number of years.  I am also a participant in Sierra Club's National Marine Team.

2.      I am a Professor of Biology in the Marine Program of Boston University.  My Ph.D. is in theoretical ecology and evolutionary biology.  I have been working  as a marine biologist and living as a naturalist in the New England area since 1980.  For much of this time I have also variously been active in the work of the New England Fishery Management Council, the Massachusetts Audubon Society, and the Stellwagen Bank National Marine Sanctuary.  I have led marine research at The New England Aquarium and participated in or co-led offshore wildlife tours in offshore areas of New England including the continental shelf, shelf edge, and underwater canyons.

3.      The northeast Atlantic canyons that were withdrawn from oil and gas development by President Obama are an important part of my oceanic front yard, and are key to

both my research and recreational interests. Consequently, I am very concerned about their suddenly being made available for fossil fuel exploitation by President Trump.

4.  Shelf-edge canyons are one of the most critically important submarine features for marine resources and wildlife in our region. They are areas of peak biological diversity (i.e. impressive concentrations of marine wildlife species of all sorts), and are important feeding zones for marine mammals, seabirds, and giant ocean fishes. This exuberant profusion of life is highly concentrated, particularly at certain times of year. For the past five years or so as part of my research, I have been co-lead on a team of scientists studying a seabird called the great shearwater. Since we've been attaching radio telemetry packages to some of these birds, we know where they have been going. It is not uncommon to find them spending a lot of time as part of the canyon wildlife circus (e.g. see: https://stellwagen.noaa.gov/seabirds.html), which I also know from observing the extraordinary concentration of seabirds, whales, and other species that routinely gather out there.

5.  Another remarkable feature of canyon heads is their extreme importance to both commercial and recreational fishing. The canyons are a principal home to bluefin, albacore, yellowfin and bigeye tunas, mako shark, blue and white marlin, swordfish, dolphin (the fish), and other southern adventurers who come north along the Gulf Stream. There are commercial fisheries for red crab and lobster, squid, and butterfish. The wildlife that draws people out on single and multiple-day safaris include such spectacular creatures as beaked whales, sperm whales, sea turtles, and of course the seabirds. Indeed, our canyons are the very best place (and the only regular opportunity) for ordinary folks to come face to face with the wildness and beauty of the open ocean. The craggy bottom within the canyons is prime habitat for deep-sea corals—among the least well-understood and most and threatened of our New England and mid-

Atlantic invertebrates, and the anchor species for a host of other organisms that live in, on, and about these ancient coral trees.

6.      Most of my free time is a busman's holiday, spent fishing, birdwatching, canoeing, hiking, SCUBA diving, or doing some such activity.  I derive great enjoyment from observing the diverse fauna offshore and in and around the canyons, and recreational fishing for species that live there.  As I grow older, I plan to spend more and more time out in the canyons.

7.      The canyons are there for everybody, and their abundance is renewable—we have only to be good stewards to them to have their benefits forever.  I am very disturbed by the possibility that these unique and valuable areas that are so central to my life may be open to mineral exploration and exploitation.  Against natural challenges like the weather, the denizens of the canyons are powerful and resourceful organisms; yet, against the unfamiliar impacts of oil and mineral exploitation, these canyons are delicate places full of fragile creatures.  The chronic and acute effects associated with submarine fossil fuel exploitation threaten to destroy the canyons.

8.      Some of the whale populations I enjoy observing migrate to and from New England through areas to the south for which I understand companies have applied for authorization to conduct seismic operations to explore for oil and gas.  These types of seismic operations, whose effects are felt over vast distances, are well known to harm whales.  I worry that these beautiful creatures—some of which are protected by law as threatened and endangered—will be further depleted.  And we have had several graphic demonstrations in recent years of what an oil accident in deep water looks like, and for affected marine ecosystems it is a disaster.

9.      Given that, and the inevitable global trend away from fossil fuels, I strongly oppose opening these areas with their spectacular fisheries, wildlife, and biodiversity to mineral exploitation.  It amounts to a squandering of literally incalculable wealth in biological diversity.

I declare under penalty of perjury that the foregoing declaration is true and correct.


Dated:  June 4, 2018                          By: _____

                                                   Leslie S. Kaufman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants.* | ) | |
| | ) | |

**DECLARATION OF ADAM KOLTON**

I, Adam Kolton, hereby declare as follows:

1.      I am the Executive Director of the Alaska Wilderness League (the League).  I am familiar with the League's mission, purpose, and activities.

2.      The League is a non-profit organization with approximately 100,000 members and activists located in Alaska and throughout the United States.  The League was founded in 1993 to advocate for protection of public lands and waters in and offshore of Alaska for their own sake, for the sake of the fish and wildlife that rely on those lands and waters, and for the benefit of current and future generations.

3.      The League has Alaska offices in Anchorage, with two full-time employees, and headquarters its Arctic Environmental Justice Program in Anchorage.  Through advocacy and education, the League's Arctic Environmental Justice Program works closely with communities in the Arctic affected by development.  The League is committed to honoring the human rights and traditional values of the people of the Arctic, and the shared interest in protecting critical areas for future generations.

4.      The League supports legislative and administrative initiatives to protect public lands and waters in and offshore of Alaska, promotes national and local education and recognition of environment in and offshore of Alaska, and provides leadership within the environmental community on issues that concern public lands and waters in and offshore of Alaska.  Since its inception, the League has taken an active role on issues related to oil and gas exploration and development in and offshore of Alaska.

5.      The League has worked to protect ocean ecosystems in America's Arctic Ocean since the organization was created.  The League's long-term goal is to achieve permanent protection for the ecologically sensitive and vulnerable marine ecosystems of the Arctic Ocean

from activities that could cause harm to the Ocean's living marine resources, including subsistence resources. The League worked with our partners and Alaska Native leaders to encourage the Obama administration to issue withdrawals to protect the Chukchi and Beaufort seas as a step towards our long-term goal. The Trump administration's action attempting to undo these protections would undermine our efforts. Two of the most imminent threats are global warming and offshore oil and gas exploration and development activities. To address these threats the League works with a broad coalition of national and Alaska-based conservation and environmental organizations, as well as with Alaska Natives, Alaska Native organizations and their tribal governments on the North Slope which are concerned about the preservation of their subsistence way of life, social welfare, and public health. The League works to inform the public and decision makers of the risks posed by planned oil and gas development. This work is accomplished through public education, education and engagement of our members and activists, and partnering with Alaska Natives in support of legislative and legal remedies to halt harmful oil and gas related activities.

6.      The League advocates for protection of the world-class wildlife and habitat resources within the National Petroleum Reserve, Alaska (NPRA), which are also threatened by oil and gas activities. For the NPRA, the League advocates for long-term protection of sensitive areas, subsistence resources and wildlife especially the protections the Obama administration solidified in 2013. The League's efforts in this regard include public outreach, earned media, research, publications, partnering with other conservation and Alaska native organizations, participating in the public processes surrounding the Bureau of Land Management's (BLM) oil and gas programs in the NPRA, and, when necessary, challenging BLM's decisions in court.

**160**

7.      The League also works to protect the Arctic National Wildlife Refuge, through the creation and implementation of a campaign with elements including public outreach, earned media, research, publications, and advocacy in all three branches of government.  The League has led many efforts to collect comments from concerned citizen all around the country in support of a wilderness recommendation for the Coastal Plain as part of the U.S. Fish and Wildlife Service's (FWS) Comprehensive Conservation Planning Process.  The League also works with allies in Congress, Alaska, and around the country to pursue legislation that would permanently protect the Arctic Refuge Coastal Plain including overturning the requirements for two oil and gas lease sales in the Tax Cuts and Jobs Act (H.R.1).

8.      The League is concerned about the effects of activities related to oil and gas leasing, exploration, and development on the living resources, including subsistence resources, of the Arctic Ocean.  Rapid changes are taking place in the Arctic including the loss of sea ice due to climate change.  These changes are directly affecting the habitat that wildlife like walrus, whales, polar bears, seals, and other important subsistence resources rely on.  Increased stress on the Arctic from oil and gas activities could have lasting detrimental impacts on the ecosystem, the wildlife, including walrus, whales, polar bears, seals, and other subsistence resources of the Arctic Ocean.

9.      The League has actively participated in public processes related to governmental decisions authorizing oil and gas activities in the Chukchi and Beaufort seas.  Most recently, the League joined comments to the Bureau of Ocean Energy Management (BOEM) concerning the draft Proposed Program and scoping for an environmental impact statement for the 2019-2024 OCS Oil and Gas Leasing Program, which proposes to hold lease sales in areas of the Beaufort and Chukchi seas that President Obama had withdrawn from oil and gas activities.  Specifically,

Alaska Wilderness League and our members asked the Department of Interior not to offer the proposed 6 new lease sales in the Arctic Ocean. Arctic Ocean drilling is too risky with no credible means for cleaning up an oil spill in the Arctic's harsh and remote conditions. America's Arctic is ground zero for the devastating impacts of climate change – warming at twice the rate of the rest of the world – and offshore drilling will only exacerbate the problem.

      10.     The League has also participated in various public processes related to oil and gas exploration activities conducted by Shell Oil and others in the Arctic Ocean. From 2007 to 2015, the League submitted multiple comments to BOEM, and its predecessor agencies, regarding Shell's proposed exploration plans for the Chukchi and Beaufort Seas. In 2010 and 2011, the League sent comments to the Bureau of Safety and Environmental Enforcement (BSEE) regarding Shell's oil spill contingency plans for both the Chukchi and Beaufort seas. The League's members and our partner's members sent in over a million comments expressing safety concerns with the spill plans. The League has also commented on the Environmental Protection Agency (EPA)'s air permits for Shell's drillships; the National Marine Fisheries Service (NMFS)'s proposed incidental harassment authorizations to Shell for exploration drilling; and EPA's authorizations to discharge wastewater under the National Pollutant Discharge Elimination System general permit for Shell. In addition, we met with the Department of Interior (DOI) several times in 2012, 2013 and 2014 to express concerns and to urge DOI not to give any further approvals for Shell's drilling plans or future leasing in the region.

      11.     The League also actively participated in the public processes relating to the Chukchi Sea Lease Sale 193. The League has submitted comments on the 2006 draft EIS, 2007 final EIS, 2010 draft supplemental EIS, 2011 revised draft supplement EIS, the 2011 final supplemental EIS, and the 2014 draft second supplemental EIS for the lease sale.

12.     The League has also participated in the administrative process related to the National Ocean Council's development of a strategic action plan to address changing conditions in the Arctic.

13.     The League is concerned about the impact of seismic activities on the living marine resources, including subsistence resources, of the Arctic Ocean, including the Beaufort and Chukchi Seas.  In 2007, the League participated in the administrative processes related to the permitting by Minerals Management Service (MMS) and NMFS of seismic surveys in the Chukchi and Beaufort Seas.  On July 30, 2007, the League and other groups submitted comments on the Draft Programmatic EIS for Seismic Surveys in the Beaufort and Chukchi Seas.  Also, in 2006, the League was part of a coalition of organizations that commented on MMS's Draft Programmatic Environmental Assessment on Arctic Ocean Outer Continental Shelf (OCS) Seismic Surveys - 2006.  Additionally, in 2010, 2012, and 2013, the League submitted comments to NMFS regarding its proposed programmatic EIS on the effects of oil and gas activities in the Arctic Ocean.  The League has commented on numerous requests from Shell, Statoil, and other industry groups for incidental harassment authorizations and geotechnical permits from NMFS and BOEM for seismic surveys in the Chukchi and Beaufort

14.     The League has also commented on MMS's OCS Oil and Gas Leasing Program for 2002-2007 Draft EIS, on MMS's Draft EIS on the 2007-2012 OCS Offshore Leasing Program, on the Draft Proposed Outer Continental Shelf Oil and Gas Leasing Program 2010-2015, on BOEM's proposed 2012-2017 OCS Leasing Program and the draft programmatic EIS supporting the program, and on BOEM's Proposed Program and draft programmatic EIS for the 2017-2022 OCS Leasing Program.  The League has also submitted comments to the MMS's Call for Information and Nominations for Proposed Lease Sales in the Beaufort Sea and Chukchi Sea

(2007-2012), and to BOEM's Call for Information and Nominations for the proposed Chukchi Sea Lease Sale 237, Beaufort Sea Lease Sale 242 and proposed 2019 Beaufort Lease Sale.

15.     In the Beaufort Sea, it has commented on the Draft and Final EISs for the Beaufort Sea Planning Area Oil and Gas Lease Sales 186, 195, and 202; and the environmental assessments for Beaufort Sea Lease Sales 195 and 202.

16.     The League joined with other groups in 2007 to request MMS conduct a full EIS and public process before the agency approved a proposed development plan for the Liberty Project in the Beaufort Sea.  In 2016, the League submitted scoping comments to BOEM after it announced it would prepare an EIS for Hilcorp's proposed development and production plan for Liberty, and in 2017, the League submitted comments on the Draft EIS for the project.  Also in 2017, the League also submitted comments to the Army Corps of Engineers concerning Hilcorp's application to construct a gravel island, pipeline, and other infrastructure in the Beaufort Sea and onshore to support oil development and production from the Liberty Project.

17.     The League joined comments to BOEM concerning Eni's Initial Outer Continental Shelf Lease Exploration Plan for the Beaufort Sea, Alaska asking that the exploration not be approved. The League voiced its concerns about the scope of the agency's environmental analysis in its preparation of an Environmental Assessment (EA).

18.     The League has participated in litigation challenging the 2007-2012 Leasing Program and Lease Sale 193 in the Chukchi Sea.  The League also litigated MMS and NMFS's decision to authorize seismic exploration in the Chukchi and Beaufort Seas; BOEM's 2007, 2009, 2011, and 2015 approvals of Shell's Exploration Plans in the Beaufort and Chukchi seas; air permits issued to Shell by the Environmental Protection Agency for its Discoverer and Kulluk

drilling rigs, and the FWS's 2013 five-year regulation authorizing the incidental take of Pacific walruses during oil and gas exploration activities in the Chukchi Sea.

19.     During the 2017-2022 five-year plan process the League worked with our partners to help get the Arctic Ocean removed from the program and used the same advocacy to persuade the Obama administration to use its authority to withdraw and protect the Beaufort and Chukchi seas from future oil and gas leasing, exploration, and development activities. . Specifically, we worked to build public opposition to offshore drilling by engaging millions of voices from Alaska and around the country asking for no drilling in the Arctic.

20.     The League has also participated in the federal decision-making process concerning the extension of Endangered Species Act protection to the polar bear.  The League supported the listing of the polar bear, informed its members and the general public about the issues surrounding the polar bear, and encouraged their participation in the administrative process leading to the May 15, 2008 decision to list the bear.  More recently the League commented on the proposed rule for the Designation of Critical Habitat for Polar Bear in the United States.

21.     The League has also educated the public about environmental problems associated with the existing oil fields at Prudhoe Bay and the Trans-Alaska Pipeline, and advocated for more intensive oversight and regulation of existing oil and gas activities.

22.     The League uses several means to educate its members and the public on matters relating to the Chukchi and Beaufort Seas and other parts of the Alaskan Arctic.  These include frequent reporters notes on the topics of importance and ongoing conversations with key Alaska and national journalists, who cover these conservation issues.  The League also works with Alaska Natives to ensure their perspectives are shared with journalists.  In addition, the League

provides background information about its actions in its printed bi-monthly newsletter mailed to its members, as well as in the "Alaska Update," a monthly publication e-mailed to grassroots activists across the nation. The League also posts information on the offshore environment of Alaska to the "News and Events" and "Campaigns" sections of its web site.

23.     The League exists to help promote the protection of Alaska's environment, including the Arctic Ocean. These organizational goals are hampered by the Trump administration's actions in the instant case: President Trump's attempt to revoke President Obama's withdrawals of the Arctic Ocean from oil and gas leasing, exploration, and development will directly harm our members who engage in subsistence and recreation activities in the Beaufort and Chukchi seas because it opens the area once more to harmful offshore oil activity.

24.     The League has a strong organizational interest in the protection of the Chukchi and Beaufort Seas and the wildlife and people that depend upon these seas. The League's members enjoy and use the Chukchi and Beaufort Seas and surrounding areas, including the National Petroleum Reserve-Alaska and the Arctic National Wildlife Refuge, for numerous outdoor activities, all of which depend on vast open spaces, undeveloped wilderness, clean water and air, and abundant wildlife. Some of the League's members also reside near the Chukchi and Beaufort Seas and depend upon them for their subsistence way of life. The League's members rely on the League to advocate for their interests and educate them about activities occurring in the Arctic, including in the Chukchi and Beaufort Seas, that could impact wilderness, water and air, and wildlife. The League's members have specifically taken action to protect Arctic wildlife, including walrus, whales, polar bears, seals, and important subsistence resources, from

industrial activity and climate change and we work directly with communities and tribal governments that advocate for the protection of wildlife and other subsistence resources.

25.    Industrial activities will negatively affect League members' use of the Chukchi and Beaufort seas and surrounding areas for subsistence, recreation, solitude, artistic endeavors, and other purposes.  Oil and gas exploration and drilling activities are inconsistent with these uses critical to our members.  The League is concerned that future exploration and development activities in the Arctic Ocean will lead to disruptive noise from drilling equipment, boats and ice breakers, and aircraft, and spills that could harm League members' opportunity to enjoy the vast, undeveloped open spaces, wilderness, and wildlife of the Arctic, including through the offshore displacement and possible population-level harm to several species of whales, including bowhead whales, and to other marine species.  If there is a spill, the League is concerned the oil could stay under the ice and in the surrounding waters for many months, despoiling the landscape, and significantly impacting the habitat and food sources that is critically important to the already ailing polar bear population, walruses, and other wildlife at dates far into the future. Impacts from industrial activity and oil spills will harm League members' opportunity to enjoy the pristine, wilderness quality environment of the Arctic for subsistence uses and recreational opportunities, like wildlife viewing.

26.    Seismic surveys and associated activities also threaten to harm wildlife, including bowhead whales, beluga whales, gray whales, walrus, polar bears, seals, marine and coastal birds, including spectacled and Steller's eiders, that our members observe, enjoy, or use for subsistence purposes.  Seismic activity and associated vessel and aircraft noise threatens to harass, seriously injure and perhaps kill bowhead whales, beluga whales, seals, walrus, and other marine and coastal animals.  These potential harms threaten not only Chukchi and Beaufort Sea

wildlife but also the League members' interest in observing and enjoying this wildlife. These potential harms also threaten some League members' ability to pursue vital subsistence activities.

27.    The League is concerned that industrial activities associated with oil and gas drilling will significantly harm wildlife populations like the polar bear and walrus populations that are struggling to adjust to an environment rapidly changing due to climate change. Such harm could have devastating impacts on this already vulnerable populations, thus potentially causing long-term harm to the ability of the League's members to view these awe-inspiring species in their natural habitat and for subsistence needs.

28.    Because the Chukchi and Beaufort Seas provide important habitat for numerous migratory species, such as gray whales and humpback whales, potential impacts from oil and gas activities to these species in these areas affect the League members' interests in observing and enjoying these species not only in the Arctic, but also elsewhere in their range, including other parts of Alaska, the contiguous United States, and Hawaii.

29.    The Trump administration push to allow for future oil and gas activity after protects were already put in place through withdrawals diminishes the public land and wildlife values that are so important for the League's members. Our member's long-term interests will only be protected if current withdrawals stay in place and are expanded upon to ensure all offshore areas are protected for all the risks laid out above.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 6/1/18                          By: _____
                                           Adam Kolton
                                           Alaska Wilderness League

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants*. | ) | |
| | ) | |

**DECLARATION OF PAMELA A. MILLER**

I, Pamela A. Miller, hereby declare as follows:

1.      I live in Fairbanks, Alaska. I first came to Alaska to live in 1982. After some absences for graduate school and work, I have lived in Alaska continuously since 1996.

2.      I have a B.S. in Wildlife Biology from The Evergreen State College, Olympia, Washington, and a M.S. in Journalism from the University of Oregon, Eugene, Oregon.

3.      I have been a member of the League of Conservation Voters (since 1984). I am also a member of the Natural Resources Defense Council (since 1991), the Sierra Club (since 1988), Alaska Wilderness League (since 1996), the Northern Alaska Environmental Center (since 1991), and The Wilderness Society (since 1991). I rely on these groups to represent my interests in protecting the environment of the Arctic, including the Chukchi and Beaufort seas.

4.      I have a decades-long professional, scientific, and recreational interest in the Arctic, including the Chukchi and Beaufort seas, and have visited the area many times from 1982 to the present, and will continue to do so. Many of the areas I have visited would be threatened by oil and gas activities and associated negative impacts from oil and hazardous spills and wastes, and noise and disruption to sensitive marine life if President Trump's revocation of President Obama's withdrawals of the Chukchi and Beaufort Seas from oil and gas activities is allowed to stand.

5.      I was drawn to Alaska over two decades ago to study birds and intact, natural ecosystems. My move to Alaska was an exciting opportunity for me, as a field biologist, especially after I had studied polluted habitats in Puget Sound during college, and witnessed the ever-diminishing remnants of waterfowl and other bird habitats throughout that region. Many of which are used by Arctic-nesting bird species.

6.  In 1982, I began work as a biologist for the U.S. Fish and Wildlife Service on the staff of the Arctic National Wildlife Refuge. This was the opportunity of a lifetime—to study the nesting, staging, and feeding habitats of the sandpipers, loons, seaducks, and other birds I had known from the lower 48 wintering grounds. From 1982 to 1985, I studied tundra bird habitat use on the coastal plain and populations in the coastal lagoons in the summers and for two winters was an environmental observer for seismic exploration which took place in the Arctic Refuge. These studies were used in reports to Congress about the potential impacts of oil and gas development on the Arctic Refuge coastal plain.

7.  From 1985 to 1988, I worked for the Northern Alaska Ecological Services office where I reviewed the impacts of oil development projects in Prudhoe Bay and in the Beaufort Sea, conducted bird contaminant studies on the North Slope, and spent a summer in the Colville River delta as a field camp leader for a tundra bird study, and performed more work in the Arctic Refuge and along its coast in 1988.

8.  I worked the summer of 1985 on waterfowl disturbance studies at the Lisburne oil field on the North Slope for Alaska Biological Research on contract to Arco Alaska, Inc. and with my own eyes saw changes to the Beaufort Sea coast from ports, causeways, offshore drilling islands, ship traffic, and similar industrial activity.

9.  After leaving the U.S. Fish and Wildlife Service, I worked in Washington, DC for the Alaska Coalition. I was Alaska Representative for the National Wildlife Federation following the Exxon Valdez oil spill in 1989. I returned to Alaska in 1991 to work as Assistant Regional Director for The Wilderness Society. I moved again to Washington, DC to serve as Alaska Program Director from 1994 to 1995. From 2006 to July 2014 I served as Arctic Program

Director for the Northern Alaska Environmental Center in Fairbanks. During this time I took many trips to the Arctic National Wildlife Refuge and the Arctic Ocean.

10.     Since 1996, I have owned Arctic Connections, a small environmental consulting and guiding business and operated it as a full-time consultancy through December 2005, on a part-time basis from 2006 to July 2014, and full time since then. Arctic Connections focuses on the Arctic wild coasts and wilderness and the environmental impacts of oil and gas exploration and development. Through Arctic Connections, I personally guided people unfamiliar with the Arctic to its wild places, including the Beaufort Sea, Chukchi Sea, and Arctic National Wildlife Refuge, and contrasted this with the industrialized Prudhoe Bay oil fields. Many of my clients, as well as myself, enjoyed the freedom of standing on icebergs along the coast and experiencing the bird migration, marine mammals, and fresh air. I also enjoy being outdoors for my own recreation, and particularly enjoy the beauty, wildness, quiet and rich wildlife of the Arctic land, ocean and coasts as well whenever I am able to travel there. I will continue to travel as often as possible to the Chukchi and Beaufort Seas.

11.     I have professional and personal knowledge of potential oil spills from exploration and development operations in the Arctic Ocean. In 1999 and 2000, I was invited by Alaska Department of Environmental Conservation to attend required spill response drills in the Beaufort Sea. These tests were conditions of permits for the Northstar oil field development oil spill contingency plan. Going with them out in the Beaufort Sea, I witnessed the failure of industry tests of boom and skimmer operations in broken ice conditions even with very little ice. Also, the response barge that would have collected the oil got stuck in ice at the dock in October. There seemed to be a general lack of ability to carry out spill plan techniques. My participation as an invited observer on these drills was very educational and informed my basis of knowledge

regarding oil spill response procedures and the unique characteristics of weather, sea ice, fog, cold, and other Arctic limitations. Based on this experience, I am concerned that the lack of proven mechanisms to effectively clean up major oil spills in broken ice still exists.

12. I researched and was lead author for Oil in Arctic Waters: The Untold Story of Offshore Drilling in Alaska (1993), and The Reach of Oil in the Arctic (1997). I served on the Alaska OCS Region Advisory Council, U.S. Minerals Management Service (1997-2000). I provided invited testimony to the National Research Council, Committee to Review Alaskan OCS Environmental Information (1993). I have twice provided expert review of international oil and gas guidelines, (Miller, P. and S. Smith. January 2001. Review and Evaluation of Protection of the Arctic Marine Environment's (PAME) Arctic Offshore Oil and Gas Guidelines. WWF Arctic Programme. Oslo, Norway; Review of PAME Offshore Oil & Gas Guidelines, World Wildlife Fund Comments- April, 2008; Technical Analysis contributed by Pamela A. Miller, Arctic Connections, Fairbanks AK and Lois N. Epstein, P.E., LNE Engineering and Policy, Anchorage AK). In 2003, I provided invited testimony and peer-review for the National Research Council report, Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope. In 2006, I was invited to give a slide show of Beaufort Sea wildlife, Alaska Native culture and risks posed by further offshore oil and gas leasing and exploration as part of a public workshop in Anchorage. Based on these experiences, I am concerned about the risks that seismic surveys, exploration drilling, development and production in the Chukchi and Beaufort seas poses to the environment.

13. I conducted extensive research into current Alaskan North Slope and Beaufort Sea drilling practices for the report, Broken Promises: the Reality of Oil Development in America's Arctic, 2nd edition, published by The Wilderness Society. I researched Alaska Department of

Environmental Conservation North Slope spill records which showed on average 453 spills per year from 1996 to 2008 for total of more than 2.7 million gallons of 45 difference toxic substances in more than 5,895 spills. An updated version of my original report, Broken Promises: The Reality of Big Oil in America's Arctic was included as a chapter in the book Arctic Voices: Resistance at the Tipping Point edited by Subhankar Banerjee, published in 2012. I co-authored a report, Double Trouble for Polar Bears: Melting Arctic sea ice and offshore oil development with National Wildlife Federation in December 2009.

14.     I have worked with a GIS mapmaker to overlay wildlife resources such as polar bear denning areas with past Chukchi and Beaufort Sea lease sales. I have also helped to compile maps of proposed lease sale areas, many proposed seismic surveys, pipeline surveys, and offshore well locations onto maps so that the public can understand the many activities which are proposed simultaneously but are not put on single maps by the Bureau of Ocean Energy Management. We have mapped spill locations which showed that more than 400 toxic spills have taken place at offshore exploratory wells and offshore oil field developments in the Beaufort Sea. We have also mapped the overlays of polar bear habitats in the Beaufort Sea and proposed oil and gas leasing and drilling locations. These maps are posted online.

15.     I was invited by the U.S. Fish and Wildlife Service to present a paper, "Ecological Values of the Arctic National Wildlife Refuge in a Changing World," at their "Historic Symposium on Arctic National Wildlife Refuge 1960-2010," in January 20, 2011. My presentation addressed the historical context as well as new concerns due to climate change that riches of the land and sea were both at risk from offshore development of the Beaufort Sea, the need for cumulative impacts study of the effects to the Arctic Refuge from activities beyond its borders.

16.     On August 12, 2010, I participated in a "listening session" in Fairbanks held by federal Gulf Oil Spill Commission member Fran Ulmer, Alaska's former Lieutenant Governor and University of Alaska Anchorage Chancellor, to review the Deepwater Horizon oil spill disaster. The session included University of Alaska Fairbanks scientists in a panel discussion, and I raised many concerns at the meeting about risks of offshore drilling in the Arctic, including baseline information needed to measure ecological damage after spills. On February 8, 2011, I attended a presentation by Fran Ulmer reporting on the findings of the National Commission on the BP Deepwater Horizon Oil Spill, including implications for offshore exploratory drilling in the Arctic and  participated in the discussion.

17.     I first traveled to the Beaufort Sea in 1982 when I was a biologist with the U.S. Fish and Wildlife Service. I fell in love with this sublime coast and the vast, wild ocean at that time. Since then my favorite places to visit in the Arctic have been right along the coast and the ocean.

18.     In 1982, I participated as refuge staff on long-tailed duck molting studies and boated the Beaufort Sea from Kaktovik to Tapkaurak Island within the external boundaries of the Arctic National Wildlife Refuge. We camped on the island where I enjoyed photographing staging phalaropes in the surf, seaducks, loons, and other migratory birds feeding and migrating in the Beaufort Sea, and polar bear tracks on the beach. I photographed beautiful sunsets of icebergs in the untouched Arctic Ocean. I also was involved with a number of migratory bird aerial surveys of the coastal lagoons and viewed the expanse of the Beaufort Sea.

19.     From 1982 to 1984 as a refuge biologist, I counted tundra birds all summer near the Okpilak and Jago Rivers and hiked to view the Beaufort Sea where the ice sparkled and loomed as tall mirages. I also spent time in the village of Kaktovik at the field station and

enjoyed walking on the Beaufort Sea beach at the north edge of the island where nearly every day I saw migratory birds and ringed seals among the ever changing pristine sea ice and one time a polar bear on the island.

20.     During the summer of 1986, I conducted field studies of birds for the U.S. Fish & Wildlife Service at the Colville River delta where we accessed our study plots by zodiac boat, and often travelled out the river channel skirting the tidal mudflats of the Beaufort Sea to reach some study plots. I enjoyed boating in the open, wild waters of the Beaufort Sea. One day in early August, we took an excursion north towards the icebergs, as I accounted in my field notes at the time. The mirror-like calm blue waters enticed us to keep going towards the white band of ice in the distance. We traveled for about half an hour out into Harrison Bay and then turned off the motor as we approached a huge flock of ducks numbering about 1,000, mostly feeding surf scoters and molting long-tailed ducks that could not fly away from us. Further out, I estimated about 3,000 more ducks. Still captured under the sea's allure, we boated north about 10 more minutes seeing ringed seals, a flock of eiders, more long-tailed ducks. Finally, we touched an iceberg dripping water, greenish blue with pure white top glistening in the sun. At that point reality set in as a line of clouds gathered on the south horizon at lands's edge and we tracked a compass bearing straight back to shore and camp. On the long way back  shimmering, rippling ocean surrounded us. I wrote afterwards, "I cannot forget the feeling of the sky and sea as the same blue surface stretching forever beyond me." At the same time I was very sobered by the vulnerability of the Beaufort sea and its wildlife to development. I gave a slide show of this trip to the Alaska Bird Club in Fairbanks during the late 1980's as well as in more recent presentations about the area to the Anchorage Audubon Society.

21.     During the summer of 1987, I traveled by U.S. Fish and Wildlife Service boat in the Beaufort Sea from Prudhoe Bay to the east, visiting barrier islands where we counted common eider and other bird nests and sampled water quality and invertebrates in the marine waters. We visited Cross Island, an historic site and subsistence whaler's camp, and many other vulnerable barrier islands where I enjoyed camping, walking the beaches at "sunset," and the scientific work.

22.     I also conducted field studies of birds in the Arctic Refuge as a biologist for the U.S. Fish and Wildlife Service the summer of 1988 and had the occasion to fly many times along the Beaufort Sea coast. I took many photographs of birds, beautiful pristine broken sea ice, and open leads in July. In this job, I was reviewing oil and gas development permits and environmental documents and so I viewed the beautiful Beaufort Sea coast with a heavier heart, having more knowledge of the noise and disruption that offshore oil and gas development would bring. However, that year I was also deeply affected by the sight of huge exploratory drilling rigs offshore.

23.     In 1989, I volunteered for the U.S. Fish and Wildlife Service and traveled by large boat from Prudhoe Bay to Kaktovik helping with scientific studies and I took many photographs of the coast and Beaufort Sea on that trip. On that year, I viewed drill ship support vessels in Camden Bay and, with the devastation of the Exxon Valdez spill earlier that year, I was very concerned by the industrial activity taking place in the Beaufort Sea off the coast of the Arctic Refuge. The Exxon Valdez spill was deeply upsetting to me for the loss of oiled birds and pristine shorelines. I saw the massive but chaotic and ineffectual response to the spill which hit me with its toxic fumes, dead wildlife, and assault on the wilderness. I was heart sick and also

knew from my scientific knowledge that the effects would likely continue for years – and in fact has been now documented by the long-term investigations.

24.     I returned to the Beaufort Sea coast off the coast of the Arctic National Wildlife Refuge many times in the 1990's and 2000's. From 1996 to 2005, I guided many trips to the Beaufort Sea coast, including at Marsh Creek mouth viewing Camden Bay and at the Turner River mouth, and on many trips we started or ended the trips at Kaktovik where we walked the beach. On one trip the pilot landed on a barrier island and we viewed the ocean to the north and saw polar bear tracks. I traveled to Kaktovik and viewed congregations of polar bears feeding at the whale bone pile at the tip of Barter Island, and dozens out on Arey Island. In late fall, I viewed from a distance where a polar bear mother had emerged from a den at Manning Point and traveled across the sea ice. From my many trips, I have made copies of some photographs available for use by the Alaska Wilderness League, Natural Resources Defense Council, Sierra Club, and other organizations for slide shows and these continue to be used to the present. I have also sold some photographs as part of my business.

25.     I visited the Beaufort Sea north of the National Petroleum Reserve-Alaska in August 10-12, 1998, as a volunteer with Dr. Jon Bart of the U.S. Geological Survey, Biological Research Division, who was conducting initial work for a study of shorebird habitats in the Fish Creek area of the National Petroleum Reserve-Alaska. We traveled by Zodiac from a field camp in the Colville River delta to from the coast out in Harrison Bay then west of Fish Creek to view the salt marsh habitats, then back and up Fish Creek where we camped. I recorded information about birds, vegetation, and habitats on study plots in field notes, including about birds out in the Beaufort Sea. I took photographs on the trip including of the coastal salt marshes where the geese were feeding and along Fish Creek which I presented at an educational meeting of the

Anchorage Audubon Society. I later wrote of my experiences for the newsletter of the Alaska Wilderness League. I had several purposes for that trip. I wanted to explore new areas of the Arctic, and to experience the sound of the loons and other waterfowl on the Colville delta again because of it holds a special place in my heart. I also wanted to see that area once again before it was completely overrun with pipelines and other facilities for oil development. The trip also was an investment in my business as I wanted to enrich my understanding of the Arctic ecosystems by seeing other lands within the Reserve and Arctic Ocean in order to enhance my professional expertise of the arctic and to write articles about the changes transforming this wild landscape. I also wanted to see first hand some of the places that could be harmed by oil development.

26.     In 1999 and 2000, I was invited by Alaska Department of Environmental Conservation to attend required spill response drills in the Beaufort Sea. These tests were conditions of permits for the Northstar oil field development oil spill contingency plan. Going with them out in the Beaufort Sea, I witnessed the failure of industry tests of boom and skimmer operations in broken ice conditions even with very little ice. Also, the response barge that would have collected the oil got stuck in ice at the dock in October. There was a general lack of ability to carry out spill plan techniques, as I described in two followup reports on the drills. The lack of a mechanism to clean up major oil spills in broken ice still exists.

27.     On August 1, 2000, I flew with a group from Nuiqsut to do aerial photography and appreciate the vast wetland landscapes of Teshekpuk Lake and other areas. We traveled over the Beaufort Sea north of the edge of the Teshekpuk Lake goose molting and caribou areas, flying at roughly 4500' above ground level. One could appreciate the vast open Arctic Ocean and the vulnerability of the coastal habitats where lakes are eroding into the ocean. We also got a good perspective of the long lakes just barely above sea level used by the geese during molting.

Along the Beaufort Sea coast, the pilot pointed out an old staging area used for the Beaufort Sea OCS dry hole, Mukluk, drilled back in the 1980s and there was still old junk there from that time, in stark contrast to the pristine Teshekpuk wetlands, lakes, and Beaufort Sea coastline. We could also see and photograph caribou trails along Kogru Inland and Beaufort Sea coast, again showing their link to the coast, vulnerability to sea level rise and potential offshore spills. Some of my photographs from this trip were used on the web sites and in slide shows of the Northern Alaska Environmental Center and the Natural Resources Defense Council.

28. I traveled to Utqiaġvik (Barrow) for an Arctic Council meeting and walked along the Chukchi Sea coast for the first time in 1998. I returned to Utqiaġvik in 2000, and again walked the Chukchi Sea coast; I specifically remember walking past Browerville where I photographed polar bear prints in the snow and saw the moving broken ice present and forming shorefast ice with open water beyond along the shore north of Utqiaġvik at that time.

29. In July 10, 2001, I participated in a tour of Alpine and Prudhoe Bay with the National Research Council as part of their study on cumulative environmental effects of oil and gas activities on Alaska's North Slope. From the flight, I enjoyed briefly seeing the Beaufort Sea north of the Colville River delta and vast wetlands and other natural landscapes of the National Petroleum Reserve-Alaska. Many of the scientist participants were shocked at the large expanse of the North Slope oil facilities, even the newest Alpine field.

30. On August 31, 2002, I traveled with friends by boat from Nuiqsut to the historic site, Nannie Woods camp, near the mouth of the Nigliq (western Colville River) channel where it enters the Beaufort Sea. It has a beautiful view of the ocean and land to the west. Afterwards, because it was too late to return to town, we stayed overnight at a friend's cabin in the Colville River Delta where I enjoyed the loons calling (many fly out to feed in the Beaufort Sea). But I

was disturbed by the Alpine oil field, including the drilling rig, the huge planes lumbering in, helicopters, scarred land from seismic trails, and the rumble of the production facility and drilling creeping into the lulls between gusting wind.

31.     In June 2002, I toured the Beaufort Sea coast while guiding a media group from the Canadian Broadcasting Corporation. We saw eroding shorelines of  Barter Island where the old DEWLine dump, old barrels, metal tracked vehicle tracks, and overhanging tundra peat where  permafrost ice and ice wedges melted below, and glistening midnight sun accented muddy channels carrying melting permafrost onto the beach. I photographed icebergs in the Beaufort Sea that were later published by Earth Island Journal and The Northern Line, the quarterly newsjournal of the Northern Center. Afterwards, we went to Prudhoe Bay where the industrial infrastructure was evident along the shoreline and intruding into the ocean as far as the eye could see on the flight in.

32.     In June 2003, I traveled to the Beaufort Sea coast of the Arctic Refuge where  a moat of open water hugged the coast line and beyond there was much broken ice in the Beaufort Sea. I guided Chicago Tribune reporters to the Kongakut River, and flying enroute to the Jago River we landed on a barrier island where we saw fresh polar bear tracks. The sea ice was just a short distance away from the barrier island, and in the lagoon it was melting.In July 2003, I guided a trip to the Katakuruk River in the Arctic National Wildlife Refuge. At the end of the trip we flew into Kaktovik and viewed the Beaufort Sea.

33.     In September, 2003, I guided a TV documentary crew to Prudhoe Bay and then to Kaktovik where I photographed congregations of polar bears feeding on the bowhead whale bone pile in the darkness.

34.     In June 28, 2004, I guided a trip to the Turner River mouth at Demarcation Bay in the Beaufort Sea where we photographed each other on small icebergs along the shoreline; the ocean had much broken ice. The shoreline tundra was curved into long tongues hanging over indentions where the ice wedges had melted out. Forget-me-nots, arctic poppies and other flowers brightened the coastal tundra overlooking the bay. We saw amphipods, storm surge logs, caribou on ice chunks in a sheltered edge of the bay. It was beautiful clear weather and we felt so happy and free walking along the beach. We identified plants, birdwatched, and discussed the ocean environment and climate change as well as risks of oil spills from ocean drilling to this protected wilderness Bay within the Arctic Refuge and to the Beaufort Sea.

35.     On July 6, 2004, I took a guided hiking group to Kaktovik where we stayed overnight and walked along the Beaufort Sea beach and past Kaktovik Lagoon dotted with subsistence boats.

36.     In August 2004, I returned to the western Beaufort Sea with two reporters and other visitors. We traveled to Nuiqsut and then to Utqiaġvik (Barrow) on the Chukchi Sea, and we did flight-seeing enroute. Due to poor weather, there was little opportunity for photography but I enjoyed seeing Peard Bay and the coast near Utqiaġvik. We toured Point Barrow, and saw white-winged scoters, glaucous and Sabine's gulls, ruddy turnstones, black guillemots, Pacific loons, and ringed seals in Peard Bay and other birds in the area where the Chukchi and Beaufort Seas meet.

37.     On July 15, 2005, I traveled to Nuiqsut with another photographer. We boated the Nechilik Channel of the Colville River past the Alpine oil development with a local resident who told us about the anadromous fishery of the Colville River and pointed out impacts of the industrial site.

38.     I visited the Chukchi Sea coast at Point Hope in August 23-24, 2005 where there was a narrow band of open water and sea ice right against the beach. On beachcombing walks I saw many bones, starfish, and bird feathers. I bought a beautiful woven baleen basket topped with a whale fluke from one young artist in town and a mask carved of whalebone and trimmed with feathers and fur from another. I met with the tribal council. I toured the ancient and old village sites as well as the cemetery where bowhead whale jawbones were prevalent. The bowhead whales migrate along this coast, through the Chukchi Sea and then to the Beaufort Sea. I was guided down into a subterranean sod house with whalebone supports for the walls and roof and was told about the long history of the culture of this village. On August 26, 2005, I flew along the coast −largely free of ice− to Kotzebue.

39.     In July 5-6, 2006, I returned to Point Hope. On the flight in from Kotzebue, there was much broken ice, in tiny pieces and medium size icebergs, as well as leads visible as we approached the village. One could still walk on sea ice and hunters could not depart in their boats right off the coast from Point Hope. On this trip, the tundra flowers were spectacular, with phlox, forget-me-nots, wooly lousewort and dozens of kinds of wildflowers. On the beach ice formed where the surf lapped ashore. But the next day there was much open water and many large ice chunks along with many long-tailed duck feathers washed up on the beach. When I departed for Kotzebue, I saw much broken ice.

40.     In July 12-13, 2006, I traveled to Utqiaġvik (Barrow) for the Inuit Circumpolar Conference meeting that included Inupiaq dancing, blanket toss, a whaling umiaq boating demonstration, and many presentations. I attended a presentation at the library by author Riki Ott on the long-term human health and environmental impacts of the Exxon Valdez spill. On a beach walk I saw much broken ice slammed up against the shoreline and some open water channels.

The ice was melting quickly. I made beautiful photographs of the sublime light on the Chukchi Sea waters and icebergs, translucent in the sun. I toured the ice cellar of a local leader and heard concerns that many such cellars are melting due to climate warming. I stayed with a local family and appreciated the modern day subsistence livelihood  with family members coming and going from seal hunting, duck hunting, berry picking, and other gathering.

41.     In November 15-16, 2006, I again visited the Chukchi Sea coastline at Point Hope where waves of open water had washed up tiny starfishes and strands of snow lined the beach. I attended a public meeting held by the Minerals Management Service about Chukchi Sea lease sale 193 in which the agency had piggy-backed an expedited scoping session for the new Five Year plan. I listened to village speakers and spoke at the hearing. The next morning, I walked the beach again where low angle sun glistened on the water and a glaze of ice bound together stones on the beach.

42.     In September 19-20, 2007, I again visited the Chukchi Sea, where it meets the Beaufort Sea, on another trip to Utqiaġvik (Barrow) for the North Slope Borough Oil and Gas Forum. This year, the ice was so far offshore it could not be seen. I walked along the beach where jelly fish and a dead glaucous gull had washed up and where the huge sandbags for beach erosion control had been pushed out of place, no longer protecting the houses. At the meeting, I heard many moving testimonies about the risks of oil drilling to the marine life of the ocean and the people who depend on it for their culture and way of life.

43.     On April 11-12, 2008, I visited Kaktovik for a public hearing. Skies were bright blue and land fast sea ice rough icebergs sparkled in the Beaufort Sea during the flight in. On April 12, I took a walk along the Beaufort Sea shoreline of Barter Island and photographed extensive coastal erosion of the bluffs.

44.     On Feb 16-18, 2009, I again visited Kaktovik for a public meeting. Arrival day was clear so from the coast the view of the Brooks Range across the coastal plain of the Arctic Refuge was spectacular. By the next morning strong winds blew in and the challenges such weather poses to visibility and the challenging logistics of oil spill clean up operations was evident. On the morning of Feb 18, I hiked along the Barter Island shoreline and took extensive photographs of dramatic coastal erosion – the evidence of the rapid global climate change impacting the area.. I also photographed ridged lines of ice from what may be an ancient buried glacier as recently described by scientists. I searched for polar bear tracks and was on alert for bears which would have just emerged from their dens, but I did not view any on this trip.

45.     I was invited to Point Hope along the Chukchi Sea coast from July 13-18, 2009 to attend workshops hosted by the Native Village of Point Hope and the North Slope Borough/ Northwest Arctic Borough Economic Development summit. During the evenings after workshop and conference activities such as viewing historical films about Point Hope culture, traditional drumming, singing, and dancing, I enjoyed beachwalks, hiking, photography and birdwatching along the Chukchi Sea coast. I viewed starfish and shark egg cases; eiders, long-tailed ducks and other birds flying by; carved rock cultural artifacts, and enjoyed the endless ocean horizon and crashing waves. I searched for whales that my friends had seen earlier in the day. I visited with local friends on the beach while they caught flounder and salmon from the ocean. As they studied the ocean's surface for traveling fish movements, I gained an even better appreciation of the deep knowledge of the Arctic Ocean held by the Inupiat residents who depend on this area for their subsistence way of life. For my last night in Point Hope, I walked for eight hours through the midnight sun, on the beach and then on the adjacent tundra where blossoms like blue forget-me-nots, yellow cinquefoil, and other flowers were brilliant. This experience of spending

a week along the Arctic coast renewed my spirits and my professional commitment to protecting the ecological integrity of the wild Chukchi and Beaufort seas and their nearshore waters and tundra shores.

46.     On May 19 and 20, 2010, I visited Kaktovik for meetings. On the flight north, the beautiful Brooks Range mountains within the refuge were stunningly beautiful, but thick coastal fog slammed up against them and therefore the pilot could not land at the Kaktovik airport along the Beaufort Sea (also foggy as far as one could see), so we diverted west to Deadhorse and waited for hours until the weather improved enough to try again. Finally we landed in Kaktovik, you could see the jumbled ice and pressure ridges along the Beaufort Sea coastline. While in Kaktovik, I attended a public meeting and also attended a meeting of local polar bear guides and learned how climate change poses challenges to them and listened to their discussion of their efforts to improve interactions between visitors and the bears. This meeting was shortly after BP's *Deepwater Horizon* blowout in the Gulf of Mexico from offshore exploratory drilling, and I spoke with many Inupiaq residents of Kaktovik who expressed concern about how disastrous such a spill in the Beaufort Sea would be to the ocean and their way of life. While walking through the community and along the Beaufort Sea shoreline during this visit, I saw bowhead whale bones and much evidence of the connections of the people with the ocean.

47.     On January 10-12, 2011, I visited Utqiaġvik (Barrow) along the Chukchi Sea at the invitation of the Inupiat Community of the Arctic Slope for an environmental justice conference focused on Inupiat environmental and cultural effects of Arctic offshore oil and gas. My invited presentation addressed mapping of spills, pipelines, seismic, and other infrastructure and activities in the Arctic over decades along with information about wildlife migrations and human health impacts. The sun remained a deep rosy glow on the northern horizon and enjoyed

its beauty and appreciated the complexity of the Arctic Ocean sea ice during many walks along its shores. I enjoyed many Inupiaq songs and dance presentations which renewed my deep appreciation for the cultural ties of the coastal residents to the Beaufort and Chukchi seas as well as my sense of how lucky I am to interact and learn from the amazing people  the value this place and  culture which so contributes to our national heritage as Americans.

48.      During August 6 to 12, 2011, I visited the Arctic National Wildlife Refuge for a personal camping trip. We flew over the Brooks Range in a small plane and witnessed glaciers which have shrunk dramatically since I first saw them in the 1980's. We flew down the Hulahula River and north of the mountains the refuge's natural and narrow coastal plain swept before us as the river flowed all the way to the deep blue Beaufort Sea in a seamless expanse of unbroken ecosystems from land to sea. I could see the ocean as far west as seaward of the Canning River and east toward Canada. I cried. I was so happy to see this beautiful place and so happy that it still remained a pristine landscape and sea. There is nothing more important to me in the world, besides the love of my family, than to sustain this unique protected Arctic land and its connected sea. During the trip, we climbed ridges along the Aichilik River with vantage points where we could see the wild Beaufort Sea with sea ice sparkling in the sun. I took many photographs on this trip.

49.      I plan to visit the Arctic, including the Chukchi and Beaufort Sea regions into the future, as I have often in the past. I plan a trip to Kaktovik during August or September 2018 focused on migratory bird, polar bear and other marine life viewing along the Beaufort Sea. I will boat and walk the beaches, look for whales, seals and birds. I look forward to enjoying the beautiful shores, searching for animals like bowhead whales, ringed seals, and keeping a watchful eye for polar bears. The peaceful Beaufort Sea coasts in this area have brought me great

joy on earlier trips and I look forward to the solace of its natural quiet and viewing the vast

horizon across the wild Arctic sea as well as watching the activities of wildlife that concentrate

there. On future trips, I intend to camp along the shores of the Beaufort Sea in the Arctic Refuge

as I have other times in the past (although polar bears increasingly come ashore now to feed in

the fall so special planning would be necessary), to experience the red-throated loons uttering

their aching cry as they fly from tundra nests to the Beaufort Sea where they catch fish to bring

back to their young ones. In July and August clean waters dotted with phalaropes kicking their

feet to stir up food in the productive waters will be seen in lagoons and bays while other

migratory birds like eiders, scoters, and long-tailed ducks are likely to be seen as they fatten up

for to their migrations south. These experiences would be disturbed by offshore oil seismic or

drilling and the associated helicopters, boats, and ice-breaker vessels and air or water pollution.

50.     On the Chukchi, I plan a trip to one of the communities such as Point Hope or

Utqiaġvik in summer 2019. I look forward to seeing the vast, open ocean where large waves

crash ashore and visit with friends who have shown me features, such as four or more currents

running simultaneously within view. The Chukchi coast is quiet with clean water and pure air.

51.     I am very concerned about President Trump's attempted revocation of President

Obama's withdrawal of the Beaufort and Chukchi seas from oil and gas leasing, development,

and production. I was excited that President Obama removed the Beaufort and Chukchi seas

from oil and gas leasing, exploration, and development because it meant that the ecosystems and

wildlife I enjoy would be protected and preserved.  I am worried that President Trump's attempt

to revoke President Obama's action supports and encourages the resumption of oil and gas

activities in the Arctic Ocean and that those ecosystems and wildlife will be harmed as a result.

I was grateful for President Obama's action because it protected sensitive areas of the Beaufort

and Chukchi Seas that I have experienced in the past and plan to enjoy in the future. Furthermore, for decades, I have been involved in public processes listening to northern coastal residents' concerns about the risks offshore drilling and seismic exploration pose to their subsistence livelihood. Time and time again, I have shared my professional and personal knowledge about the sensitivities of migratory species of fish, birds, polar bears, seals, whales and other marine mammals and their vital habitats, and expressed my concerns about the devastation that could result from oil and gas activities to the cultural way of life of coastal residents and migratory life enjoyed by Americans far from these Arctic seas. After many decades of the public raising concerns about vast leasing of the Beaufort and Chukchi Seas only for offshore agency bureaucrats to ignore and brush them aside, it was such a relief that President Obama listened to our valid concerns and scientific information to protect the environmentally sensitive areas in the withdrawals.

52.     The Arctic coastline is a beautiful place that I am deeply concerned will be damaged by oil leasing and development. Oil and gas seismic, drilling, production and associated infrastructure and activities could permanently alter the currently unspoiled environments of Chukchi and Beaufort seas, and these industrial activities pose serious threats to the health of the ocean and the adjoining coastal and terrestrial habitats and the dependent species and traditional ways of life. Exploration and development will introduce new noise and pollution sources, including those from vessel and air traffic, and drilling rigs. There could be oil spills that could degrade the water quality and risk of major spills killing birds that could wash up along the shorelines. The ports along the shoreline or in the ocean at the drill platforms to support refueling or even oil tankers full of crude oil from which devastating spills could kill birds, polar bears, seals, whales and walrus. And the effects on wildlife and the ecosystem and fisheries from such

a spill could linger for decades, as they have from the Exxon Valdez spill and still continue to this day. Oil pipelines could be vulnerable to breaks along the shoreline, potentially causing disastrous spills killing migratory birds, seals, whales and polar bears and having long-term damage to the Arctic environment. In the event a major spill does occur, I am concerned that polar bears could be oiled and die in large numbers or the bears' critical habitat could be compromised by a spill.

53.     My visits to the Arctic will not be enjoyable, or as professionally rewarding, in the future if the whales, walrus, and seals are harmed by oil and gas exploration and development activities or if migratory birds, polar bears, and pristine coastlines are fouled by oil. Past drilling discovered oil at both the Kuvlum and Hammerhead areas (now called Sivulliq) in the Beaufort Sea so the risk of an oil spill is not hypothetical − it is very real to me. I would be heart-broken if the pristine ocean and coastlines are despoiled by oil.

54.     Would I return to enjoy and take photos of drill rigs, noisy seismic boats and dead animals killed by spills? I do not look forward to that. While over the past decades I have taken photos of both industrial operations to record air and water pollution at Prudhoe Bay, the Exxon Valdez spill and other places, I far prefer the experience of trying to capture the subtle beauty of natural arctic coasts and wild tundra in photographs so that others can be educated about their importance.  Harmful impacts from oil and gas activities could reduce my chances of seeing the remarkable concentrations of wildlife on future visits and increase my overall uncertainty that the riches of wildlife and pristine environments that I have experienced throughout my adult life will be around when my nieces and nephews reach my age.

55.     My enjoyment of the Chukchi and Beaufort seas will also be adversely affected by increased traffic, other industrial sounds and sights, and fouled air from pollution permitted

from drill ships and support vessels that might scare away the birds and marine mammals so that I am less likely to see them in the future. My concerns are amplified by President Trump's action to rescind the Beaufort and Chukchi Sea withdrawals because the entire Arctic Ocean is now at stake again for oil and gas activity. President Trump's action is a stark erasure of scientifically justified protective measures for the Chukchi and Beaufort seas, measures which culminated from over a decade of my public participation in processes that clearly identified environmentally sensitive Arctic Ocean and coastal areas where negative oil and gas effects would be too high.

56.     Climate change in the Arctic has proceeded at a such magnified pace. Oil and gas development will contribute to greenhouse gas emissions, which will in turn lead to increased climate warming, coastal erosion, permafrost melt, sea ice loss and ocean acidification. Climate warming and ocean acidification has and will profoundly change the Arctic marine and onshore environments, and the fish, marine mammals, birds, and other wildlife species that rely upon them. I am concerned about the potential consequences from climate warming and ocean acidification on the Beaufort and Chukchi seas, their adjoining coasts and onshore areas, and their wildlife. I have witnessed the changes in the sea ice conditions over the past three decades in the Beaufort Sea from repeated trips to the region and understand that dynamic sea ice conditions will still pose risks to offshore drilling and boat operations including spill cleanup which remains ineffective to impossible in most conditions. Fish and wildlife like polar bears and seals already face loss of habitats and food resources in the Arctic seas due to climate change, so further stresses and impacts from habitat loss, noise and disturbance, and pollution would have cumulative effects on the animals and the environment. I am concerned that these

impacts would diminish my ability to use and fully enjoy the Beaufort and/or Chukchi seas ecosystems.

57.     The vulnerability of the Arctic ecosystem, and the wildlife that rely upon it, to the negative effects of climate change on the Arctic ecosystem was highlighted by President Obama as justification for withdrawing the Chukchi and Beaufort seas from oil and gas activities. Furthermore, a myriad of environmental studies and public processes showing the impacts and threats of rapid climate change on the Arctic over the past decade undergirded the Beaufort and Chukchi seas withdrawals.  I am concerned about President Trump's action to toss aside the more precautionary course of action, which took into account climate change, in favor of pursuing an agenda that will fuel huge new sources of greenhouse gas emissions.  I am concerned the risks from the potential extraction of billions of barrels of oil and gas from the Arctic Ocean would harm not only the Arctic seas directly but also yield far-reaching climate change effects across the Arctic and the nation.

58.     I would be heart-broken if the pristine ocean and coastlines are despoiled by oil and the continued acceleration of climate warming and ocean acidification. In my mind, I can put a picture the exploration and development infrastructure in my mind and hear the industrial noise in my ears prior to it all happening. As I look through my pictures of the beautiful Chukchi and Beaufort seas coasts and memories of my many trips flood in, it hits me that I might never again see these open ocean waters and ocean breezes as clean and free of industrialization as they are today, free of oil rigs, armadas of drilling and seismic support vessels, including ice breakers, fleets of helicopters and other aircraft supporting the operations from land.

59.     In 1997, the Minerals Management Service approved an exploration plan for drilling 1-2 wells ("Warthog") in Camden Bay in the OCS. The approved plan said the bottom-

founded drill rig would be moved away after drilling was completed in 1997. Incrementally due to economics, sea ice conditions, etc. the corporation got extensions until the rig was finally moved over to another location in the Beaufort Sea in the year 2000. Each time I saw that rig for the five year period it was sitting off the coast of the Arctic National Wildlife Refuge, I was distressed that it was still there. It was concrete evidence that the exploration impacts were greater than were initially predicted. Furthermore, this past experience worries me that when oil and gas exploration activities resume in the Arctic Ocean, the rigs will never leave and the wild ocean will be lost.

60.    I have been personally affected by the impacts of past drilling in the Beaufort Sea. From my research and involvement in these issues, I know that when many wells were drilled, using drill ships, icebreakers, and seismic testing, as at Kuvlum and Hammerhead in Camden Bay in the Beaufort Sea, strong scientific documentation (including traditional knowledge) showed that the industrial activities disturbed the bowhead whales in fall migration. The bowhead whales were pushed much farther offshore and this harmed the subsistence hunt.

61.    Intensive seismic surveying is likely to be the first industrial activity that may occur in the Beaufort and/or Chukchi seas, and therefore would result in a more immediate ability to use and fully enjoy the Beaufort Seas and their wildlife.  Seismic exploration involves extensive vessel traffic and use of loud air guns that create under-water noise pollution may cause displacement or harm to fish, marine mammals, and birds, including endangered and threatened species.  Nearer to shore, on-ice seismic during winter can displace polar bears and crush their dens (most of which are not discovered prior to surveys). During on-ice seismic operations in the Beaufort Sea, ringed seal lairs and breathing holes in the ice where they raise their pups have been crushed and animals died.  I am concerned that the natural behaviors or

polar bears, seals, and other wildlife would be altered and animals injured due to seismic surveying. Such impact would combine with climate change impacts the wildlife and their habitats are already facing such as diminished rate of polar bears denning on sea ice and reduced Beaufort Sea populations.

62. Marine noise is known to cause disturbance in marine life, including whales, seals, Pacific walrus, and fish. Oil and gas activities also threaten the Chukchi Sea region with oil spills and other pollution that could have devastating effects on sensitive marine organisms and birds, including endangered bowhead whales and threatened spectacled and Steller's eiders and polar bears.

63. I am also concerned about the potential degradation of Chukchi Sea coastal areas, including Kasegaluk Lagoon, and other inter-tidal and terrestrial habitats within the National Petroleum Reserve-Alaska (Reserve) from potential oil spills and onshore activities associated with offshore exploration and development, including aircraft overflights, water and gravel withdrawals, roads, pipelines, and other infrastructure. These onshore areas provide important calving and insect-relief habitat for the Western Arctic Caribou Herd, critical polar bear denning habitat, as well as nesting, feeding, and staging habitats for many bird species.

64. I am concerned that oil exploration and development activities in the Chukchi Sea also pose risks to migratory species on their route to and from their habitats in the adjacent Beaufort Sea.

65. I am concerned that offshore oil and gas operations in the Beaufort Sea also will reach across boundaries of land and sea with direct and cumulative impacts from pollution, spills, infrastructure and noise disturbance (e.g. pipeline land falls, shorebases, gravel mines, flight routes, ice roads, permanent roads, ports, etc.) The direct and combined effects from

offshore seismic, exploration and development threaten the integrity of nearshore, rivers, coastal and tundra migratory birds, fish and wildlife habitats and migrations, and subsistence resources of the Coastal Plain of the Arctic National Wildlife Refuge and in the Teshekpuk Lake Special Area (NPR-A).I plan to continue returning to the area into the future. Yet if the Chukchi and Beaufort seas become industrialized by oil development, my continued use would be for professional interest and knowledge and not for the more important reasons for me – that this is an irreplaceable wild land and ocean that gives the deep rejuvenation of my spirit and that provides unique conservation and cultural values to the world. My future recreational, scientific, and professional interest in the wildlife and habitats of the Chukchi and Beaufort seas, and the Arctic Ocean as a whole, will be irreversibly harmed.

66.     My longstanding love of the birds that feed, molt, and migrate in the Chukchi and Beaufort seas and elsewhere along the Arctic Ocean coast and nest in adjacent coastal areas, and the wildness of their natural ecosystem is the basis for my involvement in professional and volunteer efforts to provide better protection for the Chukchi and Beaufort seas, and the adjacent coastal wildlife and wilderness habitat in the Arctic National Wildlife Refuge, and to prevent harm from oil and gas exploration and development.

67.     My experiences visiting the area in the future will be degraded by the industrial use of the area and the increased risk of oil spills that could devastate the wildlife. Even though I plan at this time to return in the future, if development proceeds, I would not be excited about returning because it will no longer be a wild Arctic Ocean that feeds my soul, or a place that I would be interested in taking other people to on guided trips or my personal vacations. I'm concerned that oil and gas exploration and development will put at great risk from oil industry

disturbances and spills the migratory birds I have enjoyed watching all of my adult life, and irreplaceably degrade the wild Chukchi and Beaufort seas.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: May 31, 2018                   By: *Pamela A. Miller*
                                          Pamela A. Miller

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 3:17-cv-00101-SLG |
| | ) |
| DONALD J. TRUMP *et al.*, | ) |
| | ) |
| *Defendants*, | ) |
| | ) |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) |
| | ) |
| *Intervenor-Defendants.* | ) |
| | ) |

**DECLARATION OF ROB MOIR**

I, Rob Moir, hereby declare that:

1.    I currently reside in Somerville, Massachusetts. I am a member of the Center for Biological Diversity and have been for several years. I became a member of the Center to help protect ocean biodiversity, in particular the Atlantic bluefin tuna.

2.    I have a strong desire to protect the environment and see increased responsible stewardship of natural resources, including oceans. I prepared for my career achieving this by earning a Bachelor of Arts in natural science from Hampshire College in 1977 and a Master of Science and Teaching from Antioch New England Graduate School in Keene, New Hampshire. I went on to earn a PhD in Environmental Studies from Antioch in 2002. I also hold a certification in ecology from the Marine Biological Laboratory in Woods Hole.

3.    I have been involved in environmental protection throughout my adult life and intend to further engage individuals and families as eco-stewards to create clean and healthy environments, and attain a better quality of life for humans and wildlife. I have been a leader of citizen-science efforts to clean up the Salem Sound and Boston Harbor, as president of the advocacy organizations Salem Sound Harbor Monitors, Salem Sound 2000 and later Save the Harbor/Save the Bay. I was also appointed by the Secretary of the Interior to the Boston Harbor Islands National Park Area Partnership.

4.    I have a long interest in marine science and natural history education and public outreach. I was the Sea Education Association's first assistant scientist to work consecutive voyages on the **R/V Westward** in 1979 and 1980 sailing from Newfoundland to Martinique. I have also been a curator of natural history at The Peabody Essex Museum in Salem, Mass., a curator of education at the New England Aquarium, and an executive director of The Discovery Museums in Acton, Mass. I am a former president of the National Marine Educators Association

and the Essex County Ornithological Club. I was given the James Centorino Award for Distinguished Performance in Marine Education from the National Marine Educators Association in 1988, and the Rockefeller Brothers Fund Award for the Development of a College Course on Cetacean Biology, Ecology and Conservation in 1976.

5. I currently serve as the Executive Director and President of the Ocean River Institute, and have been in this role since 2007. The Ocean River Institute is a nonprofit environmental organization that provides support services for environmental groups, citizen science training and support, environmental monitoring, survey and assessment, collaborative ecosystem-based management, bio-regional planning and management, and ecosystem and wildlife stewardship. I coordinate with local groups to help save the environment, maintaining a network of Ocean River Institute partners and connecting them with resources and services to maximize their impact. I have served on the Stellwagen Bank National Marine Sanctuary Advisory Council and am a former Chairman of the Advisory Council of the Boston Harbor Islands National Park Area, on which I still serve.

6. I have taken multiple trips to the edge of the Atlantic continental shelf, to the area designated as the Northeast Canyons and Seamounts Marine National Monument. I have seen sperm whales, large black deep-diving toothed whales, on each of my three trips to the area. On one trip, I charted a boat from Gloucester that motored all night. In the morning, we were above one of the deep sea canyons, roughly 140 miles southeast of Nantucket. I saw that the gray waters of Georges Bank had turned into a Mediterranean blue. The first sperm whale we saw was floating dead in the water. The sperm whale had injuries indicating that it had been struck by a ship. It was very upsetting to see this dead whale. Fortunately, we later saw two alive sperm whales, and watched them swim and dive through the water.

2

7.      I greatly enjoy watching sperm whales swim and dive in the ocean. I hope to return to the canyons of the Atlantic continental shelf next summer. I will charter a boat, motor all night, and get up in the morning to see the clear blue of deep water and search for sperm whales and other animals. In addition, I may sail again with Sea Education Association as a visiting scientist for a leg of the voyage that takes us to the deep sea canyons. I imagine that with advances in technology, this area will become a hotspot for watching sperm whales, whether by rerouting cruise ships, drones or high-speed boats of passengers.

8.      The Atlantic canyon areas support deep-water corals that aren't found closer to shore. We know very little about these corals, but what we do know shows that they are incredibly unique, biodiverse, and important to the marine ecosystem. Deep-sea corals pulled up by a mid-water trawl off the West coast of Ireland were determined to be 4,800 years old. These deep-sea corals are also incredibly sensitive, and because they lack algae, grow very slowly in the cold, dark environment. The canyons are considered biodiversity hotspots and give refuge to commercially valuable demersal ground fish like cod, haddock, pollack, hake and Acadian redfish, bottom dwelling lobster and skate, mid-water shoals of longfin squid, and frequented by five or more species of whales.

9.      In addition to my trips out to the edge of the Atlantic continental shelf, I also enjoy whale watching. It's a family tradition. On April 15, 1976 I was teaching a college course on whales and dolphins and arrived in Provincetown with two van loads of students for New England's first commercial whale watch. On the way to Stellwagen Bank, I pointed out seabirds and sea ducks to the annoyance of the whale spotter searching for whales. About fifteen years later my three sons and I went on a whale watch out of Provincetown. I pointed out a large white seabird: "Look, there's a gannet. They are like a large flying cross." Moments later we heard

3

over the loudspeaker: "Look, there's a gannet. They are like a large flying cross." I pointed out another bird: "There's a greater shearwater. They nest in the South Atlantic on Tristan da Cunha." The loud speaker came on and again said the exact same thing. This happened three times and Dads never sounded so good.

10.    I was the first whale watch narrator for the New England Aquarium. The Dolphin Fleet had sent two people on one of my watches and wrote down everything I said. Ever since my narrative descriptions of seabirds have been repeated on whale watches. I have a sailboat, a Nevins-built Rhodes 27, that winters in Mattapoisett and summers in Boston Harbor. Every spring we try to get the boat in the water in April so we may see right whales, fin and minke whales, gannets, shearwaters, petrels, loons, and red-breasted mergansers in Cape Cod Bay and Massachusetts Bay. Offshore, blue-water sailing is better in larger vessels. In April 2017, I sailed on the two masted, gaft-rigged, 100-foot sailing vessel **Tecla** from Amsterdam across the North Sea north to the Orkneys, over the top of Scotland and into the Western Isles. In August 2017, on board the **Bark Europa** I sailed from Bay of Islands Newfoundland to Louisburg Nova Scotia. This summer, I am scheduled to return to **Eda Frandsen**, a fifty-five-foot 1930s Danish gaff cutter, for a sail with my son through the Western Isles of Scotland west hopefully to reach St. Kilda, weather permitting. Nothing clears the head, humbles, and strengthens the soul like being far offshore, out of sight of land, taking the power of the wind to move the vessel over the waves, standing watch around the clock, and feeling kinship on the lonely sea when in the company of seabirds (fulmars and skuas), dolphins (white-sided, common and white-beaked) and whales (pilot, minke, and orcas).

11.    I am currently working on a new program with citizen-oceanographers to monitor vertical mixing of seawater caused by diving sperm whales in the canyons incised into the edge

of the continental shelf in the Atlantic. The program will help determine whether sperm whales, which dive thousands of feet ten to twenty times a day, are mixing the water masses to increase the absorption of excess carbon and heat from the atmosphere. I am also working with citizen-scientists to remotely monitor the surfacing and diving of whales in the area in relation to ship traffic. By alerting ships in the presence of whales to either slow down to ten miles per hour or reroute around the national park area, we hope to eliminate ship strikes killing whales.

12.    A healthy Atlantic Ocean environment is extremely important to, and greatly enhances, both my personal and professional life. Oil and gas activities in the Atlantic canyons area will harm the Atlantic Ocean environment, its abundant wildlife, and my personal and professional interests. For example, oil and gas activity in the Atlantic canyons area could destroy the deep sea coral colonies and seamount ecosystems by disrupting the seafloor and suspending sediments in the water column. I am also worried that increased vessel traffic from oil and gas activities will increase the risk that sperm whales will be run over and killed by ships. And seismic oil and gas exploration would harm sperm whales and other marine mammals. I know that harm is more acute in the area because intermediate water masses (Slope Water and Labrador Current Water) act as sound channels with smooth sides due to differing water densities of the surface and bottom waters. Sound travel is not slowed by the ocean floor or wavy sea surface. Sperm whales rely on sound to hunt and communicate in this dark environment, so are especially vulnerable to anthropogenic noise, which can compromise their ability to feed or silence the animals over great distances. Oil and gas activity in the Atlantic canyons area will also inhibit my ability to continue working with citizen-scientists to study sperm whales without the disturbance these activities would cause. And an oil spill would kill or

harm marine life in the area, with potentially devastating consequences for the populations that depend on these seascapes.

13.    Conversely, protecting these unique, biologically rich areas from offshore oil and gas activity will ensure these practices do not destroy the unique assemblages of marine life living deep in the ocean on seamounts and in canyons, or the sperm whales, and other marine life they help support. Protecting these areas from oil and gas activities will also enable me to continue bringing people to discover and study the areas, learning how sperm whales may help reduce the impacts of climate change, documenting the diversity of marine life, the ebb and flow of populations, continuing my citizen-scientist projects, and with many eyes on distant ocean places strengthening national security.

14.    In addition to my work to protect the Atlantic Ocean and its wildlife, I also work to protect species that live in the Arctic. For example, I was part of a campaign to protect black guillemots that nest on Cooper Island in the Beaufort Sea. As part of this work, I traveled to Barrow, Alaska and took a boat trip in the Beaufort Sea out to Cooper Island. On this trip we saw many species of birds, including greater yellow-billed loons, horned puffins, Barrow's goldeneye, common eider, parasitic jaeger, snowy owls and sea ducks. I hope to return to the area to see these animals and others.

15.    Cooper Island is the first record of black guillemots breeding in the Beaufort Sea. It is a very fragile ecosystem and sensitive to human disturbance, particularly now in the face of climate change. Unlike other birds, this black guillemot population stays in the Arctic Ocean for the year and depend on ice floes for feeding on fish.

16.    I worry that any additional oil and gas activity in the Arctic Ocean will harm black guillemots and other birds by causing oil spills that could kill the birds and their prey.

Protecting the Arctic Ocean from further oil and gas activity will help protect these animals and my personal and professional interests in them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ~~May 3 in 2017~~.

Rob Moir

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants.* | ) | |
| | ) | |

**DECLARATION OF DAN RITZMAN**

I, Dan Ritzman, hereby declare as follows:

1.     I live in Seattle, Washington.

2.     I am the Director of the Lands, Water, Wildlife Campaign for the Sierra Club. I have worked for Sierra Club since April of 2007. I am also a member of the Sierra Club, and have been a member for eleven years, and I am a member of Greenpeace USA, and have been a member for twenty-one years. As a member of the Sierra Club and Greenpeace, I rely on them to represent my interests in Alaska conservation issues.

3.     In my current role with the Sierra Club, I direct four campaign staff and I serve as the primary Sierra Club policy and advocacy contact for issues related to Alaska, including the Alaska Arctic. As part of my daily work, I advocate for the protection and conservation of Alaska's Arctic, including the Beaufort and Chukchi Seas. I have worked on issues related to the Alaska's Arctic for 25 years. In that time not only have I developed what I consider to be a deep knowledge of the issues but also a great appreciation for the landscape – for the flora and fauna that it supports and the people who live and subsist off of the land and the waters.

4.     Sierra Club is a national non-profit organization of over 3,200,000 members and supporters dedicated to exploring, enjoying and protecting the wild places of the earth; practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, wilderness, public lands and waters protection, and the protection of clean air and water resources. Sierra Club members seek out wilderness for its scenery, wildlife, and solitude.

5.      The Alaska Chapter of Sierra Club has over 1,400 members. The Alaska Chapter includes three all-volunteer groups, whose members work to preserve and protect Alaska's resources, including the unique wilderness and wildlife resources of the Alaskan Arctic.

6.      Sierra Club members have visited and will continue to visit various parts of the Arctic Coast for recreation in natural and wilderness settings, and they rely on the Sierra Club to protect their interests in the Chukchi and Beaufort Sea regions. Oil and gas exploration drilling activities in the Chukchi and Beaufort Seas threaten these uses. Sierra Club is concerned that oil and gas exploration and development activities will reduce the amount of undisturbed public lands, and this will in turn cause direct and irreparable harm to Sierra Club members whose opportunities to experience undisturbed land, wilderness, wilderness travel, and recreation in a natural landscape will be reduced.

7.      The Chukchi and Beaufort Seas are home to America's entire population of threatened polar bears as well as endangered bowhead whales, beluga and gray whales, Pacific walrus, seals, and numerous species of migratory birds including threatened spectacled and Steller's eiders. The coastlines of Arctic Alaska are also important habitat for many other species such as caribou, grizzly bears, and numerous shore birds. Sierra Club and its members are dedicated to the protection of healthy wildlife populations, including those that depend on the Chukchi and Beaufort Seas and nearby coastal areas. Many Sierra Club members recreate in natural and wilderness settings for the opportunity to observe healthy, intact wildlife populations. If these opportunities are compromised by oil and gas exploration and development activities, Sierra Club and our members will be negatively affected.  President Trump's executive order lifting protections from expanded Arctic Ocean drilling greatly increases the threat of this industrial activity and its negative effects on the environment, Sierra Club, and its members.

8.     Sierra Club members would be negatively affected by seismic surveying activities associated with oil and gas leasing and development in the Beaufort and Chukchi Seas. Seismic surveying involves a tremendous amount of motor vessel activity coupled with sonar activity that creates major under-water noise pollution that likely would cause harm and displacement to marine mammals, migratory birds, and fish. These activities could negatively impact our members' ability to see and experience these migratory animals both in the Arctic and in other coastal areas if these animals are killed or injured and unable to migrate. Additionally, Sierra Club members are concerned that displacement and injury to these animals would inhibit the ability of local Alaska Native communities to subsistence hunt.

9.     Sierra Club has been actively involved in the protection of the unique wilderness and wildlife values of the Alaskan Arctic, including the Arctic Ocean and the adjacent onshore areas of the Arctic National Wildlife Refuge and the National Petroleum Reserve-Alaska. Sierra Club has invested significant organizational resources in public outreach, earned media, research, publications, and advocacy focusing on the threats to the fragile Arctic ecosystems from oil and gas leasing, exploration, and development activities.

10.     Sierra Club's outer continental shelf (OCS) campaigns involve both the Chukchi and Beaufort Sea regions, where offshore oil and gas activities, including seismic surveys, would threaten sensitive marine and coastal ecosystems and wildlife with oil spills, underwater noise, air pollution, and other disturbances, and would adversely affect subsistence resources and the associated local economies and communities. The Sierra Club works to educate people regarding the effects of oil spills on the Arctic marine environment, including disturbances to wildlife and environmental effects of spill response techniques.

11.     Oil and gas development offshore will also add stress to a rapidly changing environment hammered by global warming and record summer sea-ice loss. This area is being hit hardest by global warming. The Sierra Club and our members are very concerned about the impacts of climate change on the Arctic ecosystem. The Arctic is warming faster than any other part of the planet. These impacts are harming the Arctic's unique wildlife. The Sierra Club has been successfully working to protect wildlife in the Arctic for decades and climate change threatens to undo that work.

12.     Sierra Club has actively participated in numerous public processes relating to oil and gas exploration and development in the Chukchi and Beaufort Seas. Sierra Club, along with other groups, submitted comments on the environmental impact statements for Chukchi Sea Lease Sale 193, the multi-sale Beaufort Sea environmental impact statement (Lease Sales 186, 195, and 202), the environmental assessments for Lease Sales 195 and 202, and the calls for information for the proposed Chukchi Sea Lease Sale 237, Beaufort Sea Lease Sale 242. Sierra Club has also commented on the 2010-15 draft proposed OCS Oil and Gas Leasing Program, the 2012-17 draft proposed OCS Oil and Gas Leasing Program and environmental impact statement, the 2017-22 draft proposed OCS Oil and Gas Leasing Program and environmental impact statement, and the environmental impact statement examining the effects of oil and gas activities, in particular seismic surveys, on the Arctic Ocean. Sierra Club has also commented on proposed authorizations for geotechnical companies to conduct seismic surveys in the Beaufort and Chukchi seas, and on the Environmental Protection Agency's general permit that authorized wastewater discharges from oil and gas geotechnical surveys in the Beaufort and Chukchi seas. More recently Sierra Club has submitted comments on the 2019-2024 draft proposed OCS Oil and Gas Leasing Program and scoping comments on a programmatic environmental impact

statement in support of the program advocating for the exclusion of the Arctic Ocean from the program.  Sierra Club also has submitted comments on the call for information for the Beaufort Sea lease sale currently proposed for 2019 under the proposed plan.

13.     From 2007 to 2015, Sierra Club was actively engaged in administrative advocacy related to Shell Oil's Beaufort and Chukchi seas drilling programs, including commenting on the numerous permits and authorizations required for the oil giant to explore for oil. The Sierra Club was very concerned that Shell's exploration activities in the Beaufort and Chukchi would have negative impacts on the bird and marine life that rely on a clean, noise-free Arctic Ocean for their survival.  The Sierra Club has also participated in administrative advocacy related to Hilcorp's Liberty Project, a proposed oil and gas development and production project, and Eni's exploration plan for its Nikaitchuq North Project, both located in the Beaufort Sea.

14.     Along with other groups, Sierra Club was a plaintiff in *Native Village of Point Hope et al. v. Salazar*, No. 1:08-cv-00004-RRB (D. Alaska), challenging the Department of Interior's decision to offer approximately 30 million acres of the Chukchi Sea OCS to oil and gas leasing. Sierra Club has also joined lawsuits challenging Department of Interior and Environmental Protection Agency decisions to authorize Shell's oil and gas exploration activities in the Beaufort and Chukchi Seas. *See e.g. Alaska Wilderness League et al., v. Kempthorne et al.*, 571 F.3d 859 (9th Cir. 2009); *Native Village of Point Hope et al. v. Salazar et al.*, Nos. 09-79342 and 10-70166 (9th Cir.); *Native Village of Point Hope et al. v. Salazar, et al.* Nos. 11-72891 and 12-70459 (9th Cir.); *Resisting Environmental Destruction on Indigenous Lands (REDOIL) et al. v. EPA*, No. 12-70518 (9th Cir.); *In re: Shell Gulf of Mexico Inc.*, IBLA 2016-48. Sierra Club has also been a plaintiff in other lawsuits challenging offshore oil and gas activities in the region. *See, e.g.*, *Trustees v. DNR*, 795 P.2d 805 (Alaska 1990) (challenging State of Alaska lease sale in

the Beaufort Sea); *Trustees v. DNR*, 865 P.2d 745 (Alaska 1993) (same). Sierra Club has also participated in lawsuits to protect the Arctic Ocean's marine mammals. *See, e.g., Alaska Wilderness League et al. v. Jewell et al.*, No. 3:15-cv-00067-SLG (challenge to U.S. Fish and Wildlife Service regulation for the incidental take of polar bears and Pacific walrus from oil and gas activities in the Chukchi Sea.)

15.     Sierra Club has also participated in the federal decision-making process concerning whether to list the polar bear as a threatened or endangered species under the Endangered Species Act. Sierra Club supports this listing, has informed its members and the general public about the issues surrounding the polar bear, and encouraged their participation in the administrative decision-making process.

16.     The Sierra Club participated in the U.S. Fish and Wildlife Service's Comprehensive Conservation Plan planning process for the Arctic National Wildlife Refuge. The Sierra Club and our members submitted comments during the scoping and draft phase of the process. We alerted our members to public hearings, and staff and members testified at public hearings in Washington, DC, Anchorage, Fairbanks, and Kaktovik. We are currently participating in the administrative processes related to the Trump administration's efforts to hold oil and gas lease sales in the Refuge, which Sierra Club opposes.

17.     The Sierra Club participated in the Bureau of Land Management's Integrated Activity Plan planning process for the National Petroleum Reserve-Alaska. The Sierra Club and its members submitted comments during the scoping process, the draft phase of the process, and in support of the preferred Alternative. We alerted our members to public hearings and staff and members testified at public hearings in Anchorage, Fairbanks, Barrow, Anuktuvuk Pass, and Nuiqsut. In addition, Sierra Club also actively participated in the planning and decision-making

processes for the Northwest Planning Area of the National Petroleum Reserve-Alaska. Sierra Club submitted comments on both the draft and final environmental impact statements. Sierra Club alerted our members to the scheduled public hearings, our staff and members testified at public hearings, and we subsequently joined in a lawsuit challenging the Secretary of Interior's final decision to lease the entire Northwest Planning Area. Most recently, the Sierra Club has commented on BLM's 2016 and 2017 oil and gas lease sales in the Reserve, and on the agency's consideration of the Greater Mooses Tooth 2 development project.

18.     Sierra Club educates its members on issues related to oil and gas exploration and development in the Arctic through our National Sierra Club website, *Sierra*, the Sierra Club magazine, and in *The Alaska Report*, a publication of Sierra Club's Alaska Task Force. Together these publications are distributed to approximately 750,000 Sierra Club members. In addition, we send email alerts to our membership through our activist lists, which reach tens of thousands of households across the country, including Alaska. Sierra Club members rely on the Sierra Club to provide information on the potential impacts of seismic surveys, marine noise, and air and water pollution associated with oil and gas activities. The Sierra Club has regularly alerted our members to potential industrial activities and government actions that could potentially harm Chukchi and Beaufort seas ecosystems and the wildlife that rely upon them and has provided opportunities for our members to become engaged and voice their concerns.

19.     In sum, Sierra Club has a strong organizational interest in the Chukchi and Beaufort Seas, the adjoining coastlines, and the species like bowhead and other whales, Pacific walrus, polar bears, and ice seals that depend on the region. The Sierra Club and our members have a long history of advocating for the protection of landscapes that are critical to the conservation of Arctic wildlife including the bowhead whale, Pacific walrus, polar bear, and ice seal. In

advocating its interests in this region, Sierra Club represents itself and its members, who use and enjoy the Chukchi and Beaufort Seas region, its resources and other values, and whose interests would be harmed by oil and gas activities that disturb this sensitive area and its wildlife.

20.      In addition to working on issues related to the Arctic for the Sierra Club, I have also traveled to the Arctic both professionally as a wilderness guide and recreationally. I have been to the American Arctic, the area north of the Brooks Range, at least once each summer for the last approximately 30 years. Some of the summers I have been there more than twice, and I estimate my total number of trips to the Arctic region to be forty-two. During these trips I have camped on the gravel barrier islands along the north coast of the Beaufort Sea at least a dozen times and have also camped along the shores of the Chukchi Sea.

21.      I have spent time travelling to the western Arctic, including the Brooks Range, Cape Lisburne, and the Chukchi Sea coast, and I have enjoyed viewing Pacific walrus, beluga whales, and many species of sea birds during my visits. The opportunity to potentially view walrus and sea birds has been the primary purpose of my visits.

22.      I have witnessed small numbers of walrus hauled out on the coast in the area of Point Lay, and I have seen large numbers of walrus hauled out on the sea ice in the Chukchi Sea during my trips to the area in 1998, 1999 and 2009. To be able to see these animals in their natural environment has been among the highlights of my many years traveling in the wilderness. Walruses are incredibly unique animals with interesting adaptations to survive life in the Arctic and it was very special to be able to see them in their natural habitat.

23.      During my trips to the Chukchi Sea in 1998 and 1999, in addition to the walrus, I also witnessed humpback whales out in the waters. I had recently traveled to Hawaii where I had gone whale watching and had seen humpbacks. When I saw them again in the Chukchi Sea, I

remember thinking how amazing it was that these animals could make this incredible journey from the warm waters of Hawaii to the icy seas of the Arctic. The thought that these animals that travel these amazing distances could be harmed by oil drilling in the Chukchi or Beaufort Sea is very disturbing to me.

24.     I have also witnessed seals hauled out on the ice along the shore of the Chukchi and I worry that these animals would also be harmed by oil development and an oil spill.

25.     In the summer of 1998, I spent over a month visiting the villages along the Chukchi Sea. I spent at least two nights each in the communities of Point Lay, Point Hope, Wainwright, and Barrow. During that trip I traveled both on land and on sea with local residents and I enjoyed viewing walrus, beluga whales, and many species of sea birds, including puffins. The walruses were hauled out on the floes of sea ice and I was in awe of their size and physical presence. I was also able to view walrus in the water swimming and diving for food. In mid-July, we were traveling near Kasegaluk Lagoon and I witnessed numerous beluga whales in the lagoon. We did not go too close for fear of harassing the whales, but as I watched from a distance I could see them surfacing. I had seen beluga whales before in the Cook Inlet, but I had not seen so many in such a large concentration. This experience was very special and ranks as a top experience during my decades traveling in the Arctic.

26.     Since 1998, I have spent time in the coastal villages along the Chukchi and Beaufort Seas, including Nuiqsut, Kaktovik, Barrow, Point Lay, Point Hope, and Wainwright where I have visited and traveled with local hunters and elders. I value these interactions and the opportunity they have afforded me for understanding the subsistence culture of the people of the Arctic. I have maintained relationships with a number of people that I met during these trips and

I will continue to take every opportunity I have to spend time with the people in the villages of the Arctic coast.

27.    In the summer of 1999, I traveled for two months in the Chukchi Sea and, in the winter of 1999, I traveled across the frozen Arctic Ocean by snow machine for four weeks in areas north and west of the Prudhoe Bay oil complex.

28.    I returned to the western Arctic in 2006, when I floated the Kokolik River in the northwestern Brooks Range, and visited Point Lay. Again, I witnessed an abundance of sea birds. In 2010 and 2012, I traveled to Cape Lisburne and to the Native Village of Point Hope. The opportunity to potentially view walrus and sea birds was again the primary purpose of these visits. I also enjoyed the solitude and wild quality of the Chukchi Sea coast.

29.    In addition to the Chukchi Sea, I have a personal connection to the Beaufort Sea. I have been to the coastal plain of the Arctic Refuge at least once each summer for the last 30 years. Some of the summers I have been there more than twice. In June of 2016, I traveled to the Hulahula River and floated from the Brooks Range Mountains all the way out through the river delta and across the coastal lagoon to Arey Island, a barrier island in the Beaufort Sea. While in the Hulahula delta, in the lagoon, and on Arey Island, I witnessed numerous waterfowl, caribou, and ice seals. Waterfowl viewing on the coast of the Arctic Ocean is one of my favorite activities; eiders and long tailed ducks are among my favorite species of birds.

30.    In July of 2016, I floated the Canning River starting at Plunge Creek in the Brooks Range and floating all the way out to the Beaufort Sea. While camping on the edge of the Arctic Ocean I spent two days exploring the coastline. Traveling through the delta and along the Beaufort coast I witnessed musk ox, herds of thousands of caribou, arctic fox, and numerous species of waterfowl and shore birds. From the Canning River, I was able to see the infrastructure

supporting ExxonMobil's natural gas development and production at Point Thomson. Being able to view the Exxon's development facilities greatly impacted my wilderness experience. I had gone through great effort to find solitude and to experience undisturbed wildlife, and I am concerned that the presence of Exxon's development and production activities will impact the behavior of the wildlife and perhaps drive them away. The Canning is a river I float often and I am worried that the Point Thompson development will have a negative impact on my future trips. The Canning River delta is an area that is incredibly rich in wildlife, with some of the best opportunities on the North Slope to reliably see caribou, wolves, bears, and a wide variety of waterfowl on a float trip, and I believe the presence of a large industrial development in the region will have a negative effect on my enjoyment of the river and delta, and my chances to view wildlife in the area.

31.      In June of 2015, I floated the Kongakut River from the Brooks Range to Icy Reef. While on Icy Reef I was able to view eiders, loons and longtailed ducks. This landscape on the edge of the ocean is my favorite landscape in the Arctic. The barrier islands, coastal lagoons and nearshore environments team with life. While traveling in this region I have encountered the greatest diversity of mammals and birdlife in all of my Arctic travels. This is what keeps me coming back to the Arctic, and what I am most afraid of losing from oil and gas development in the offshore. Development brings the risk of oil spills which would have disastrous effects on the biodiversity of the ocean and the nearshore environment, and the noise and toxic pollution that comes with exploration and development will also greatly diminish the biodiversity of the area.

32.      In July of 2015, I spent four days in Kaktovik where I spent time visiting with the residents and learning about their history and connections to the land. I enjoy the opportunity to

learn about the history of Alaska Native people, and worry that oil and gas exploration and development will negatively impact their subsistence lifestyle and cultural traditions.

33.     In June of 2014, I floated the Aichilik River from the Brooks Range to the Beaufort Sea and Icy Reef. In the Aichilik Delta and out on Icy Reef, I witnessed a buff-breasted sandpiper, a very rare bird and the only one I have ever seen, along with snowy owls, caribou and grizzly bears. It was a lifetime experience to see the buff-breasted sandpiper, and I worry the oil development in the Arctic Ocean could negatively impact my opportunity to continue to have opportunities to see such wildlife and birds.

34.     In   the fall of 2011, I spent a day on Barter Island just off the northern coast of the Arctic National Wildlife Refuge observing polar bears. I spent six hours watching polar bears on the gravel islands and the frozen ice of the lagoon. I was able to observe 19 bears on that day. The opportunity to view polar bears, other marine mammals and sea birds are what keep bringing me back up to the coasts of the Arctic Ocean.

35.     In late August of 2010, I undertook an eight-day backpacking trip with my wife and four other family friends. We hiked from the Sadlerochit Mountains to the mouth of Marsh Creek on the edge of the Beaufort Sea. This was an important opportunity for me to introduce my wife to the wonders of the Arctic. We were able to witness aurora borealis, caribou in the Marsh Creek delta, a variety of birds foraging in the delta and a seal swimming of the coast at Marsh Creek in Camden Bay (the site of Shell Oil's proposed Beaufort Sea drilling operations). We were picked up by a boat and as we traveled back to Barter Island we were able to see five polar bears on the gravel barrier islands.

36.     In the summer of 2009, I spent two days on Barter Island. During those two days I traveled by motorboat twice into the Beaufort Sea to observe the bears. We traveled maybe as far

three miles outside of the barrier islands and as far west as Camden Bay and roughly 15 miles east of Barter Island. I would estimate that I observed over a dozen individual bears in that time. In the summer of 2008, I spent three days on Barter Island again observing polar bears. At one time during my stay I was able to count over 20 bears in view.

37.     In July 2007, I traveled to the Arctic Refuge to raft the Kongukut River. On July 31st, we reached the coast and paddled across the lagoon to make camp on Icy Reef, an island across from the mouth of the Kongukat River's main stem. That evening I saw a whale spout about a quarter mile off of the island. I watched for about 10 minutes and saw five spouts. I continued to periodically check the ocean for more whale activity. While scanning the ocean, I saw a splash about a mile or two off the shore and, using binoculars, I was able to see that it was a whale breaching. Given its thick-bodied, club shape, it appeared to me to be a bowhead whale. I watched the area of the ocean for at least half an hour, and in that time I saw at least six breachings. At one point, in less than a minute, I saw four flukes slapping at the water. Because of the short time frame and relative location of the flukes, I believe that there were at least three whales involved.

38.     I have also spent time in Deadhorse, where I have seen firsthand the impacts of industrial oil development. I have witnessed the expansive web of pipelines and roads. I have seen the dust come off the roads as the trucks travel on them. I have seen black smoke emitted and gas flaring. I was very pleased when President Obama used section 12a of the Outer Continental Shelf Lands Act to withdraw a majority of the Chukchi and Beaufort Seas from potential oil and gas leasing and development. I felt that President Obama's action protected the natural values of the Arctic Ocean which is the principle reason I work to protect it and take the effort to visit and experience it. I am very concerned that the Trump Administration has attempted to reverse this decision and

allow industrial oil and gas activities to spread into the offshore areas of the Chukchi and Beaufort Seas.

39.    I am particularly concerned about the possibility of an oil spill occurring if oil and gas exploration drilling resumes under the Trump Administration. In my professional capacity I am well aware of the risks associated with drilling and the chances of oil spills. In 1998 as part of my work responsibilities, I was invited to witness an oil spill clean-up drill conducted by Alaska Clean Seas off of the Prudhoe Bay oil fields. This drill took place in broken ice conditions but in calm seas. Despite their best efforts, the crews were unable to properly deploy their equipment and the test was not a success. I am not aware of any advances in technology in this area. When I think about what would happen in the event of a real oil spill in the Chukchi or Beaufort Sea, I am very concerned about the fate of the marine mammals and sea birds that rely on this area. I am concerned about the impacts this would have on the coastal lagoons and shoreline. I have witnessed the lingering effects of the Exxon Valdez Oil Spill in Prince William Sound where a number of affected species have still to recover and where I have dug down into the gravel to find the oil still in the environment. I am very concerned that similar impacts along the Chukchi and Beaufort coasts will ruin my opportunity to enjoy this area for its wilderness quality and wildlife populations in the future.

40.    I am also concerned that noise impacts from drilling, development, and production activities will drive away wildlife from the coastal areas and significantly decrease or completely erase my opportunity to enjoy wildlife viewing on my future trips to the Chukchi and Beaufort coastal areas. What draws me to the Arctic is the vast wilderness and the opportunity to see wildlife and birds in their natural environment relatively free from the impact of industrial activity. Industrial oil and gas exploration and development would negatively impact these

experiences. I have experienced firsthand the noise and disturbance caused by industrial oil and gas activities in the Arctic, including offshore exploration. I have watched barges, seismic ships, helicopters, and airplanes travel through Alaska's Arctic in support of oil exploration. Due to the flat topography of the coastal plain, you can see oil and gas activities from a great distance. In 1996, I floated the Hulahula River. For the last 30 miles of the river trip and while camping on Arey Island, a barrier island in the Beaufort Sea, I was able to see an oil drilling rig, the CIDS, that was anchored in the nearby Camden Bay. When I compare this trip to other times I have floated the Hulahula and not observed the signs of oil exploration and development, I can say that the sight of this drill rig greatly diminished my experience.

41.     I am not just concerned about the effects of oil and gas drilling, I am also very concerned about the potential impacts from seismic surveying in the Arctic Ocean. In the summer of 2000, I witnessed seismic exploration on the Beaufort Sea in an area near Point Barrow. I witnessed and heard the noises created by the blasting and other activities. I am very concerned that level of noise pollution would have very damaging impacts on the marine mammals, birds, and other ocean life. I worry that these activities will potentially drive these animals away and could cause them harm and even death. If the birds and wildlife are driven away, my opportunity to enjoy experiencing them would be deeply harmed. At the very least, seismic surveying would cause the wildlife and birds to change their behavior or be driven away, and at worst to be killed  Just knowing that marine mammals, birds, and other ocean life may suffer from seismic activities would cause me harm, even if I were not up in the Arctic at the time to witness them. If the wildlife and bird populations were diminished or their behavior changed from seismic, it is likely that I would choose to no longer visit the Arctic.

42.     I am concerned about the impacts of oil and gas exploration activities on Pacific walruses. I have closely studied the natural history of the Pacific walrus in the Chukchi Sea and understand the importance of the floating ice pack for resting and foraging. I have also learned about the effects of climate change on Arctic sea ice and, consequently, on walrus. I have become alarmed at the increased dependence of walrus on terrestrial haul-outs along the Chukchi coast, where they are subject to various stresses, including higher mortality from predation and stampedes. I worry that the increased stress from seismic surveys and offshore oil exploration and development might be more than the walrus can take. Impacts to walrus will cause me harm because my ability to witness and experience these animals in person may be diminished. Additionally, I will be harmed knowing that any decline in walrus numbers will affect the Alaska Native communities and community members who I count as friends and who rely on these animals as part of their subsistence culture.

43.     I am concerned that seismic surveys along with oil and gas exploration and development would have negative effects on other marine mammals like polar bears and the ice seals. These animals are already feeling the stress from climate change, and I worry that additional stress might severely decrease their populations.

44.     Oil and gas exploration drilling and production activities in the Arctic Ocean would greatly decrease my enjoyment in traveling to the Arctic Refuge, the Beaufort Sea, and the Chukchi Sea coast. The arctic landscape and coastline and its interface with the Arctic Ocean are the wildest places that I have ever been. This wildness is incredibly important to me. I enjoy the opportunity to view the wildlife and birds that exist in undisturbed ecosystems. Oil and gas activities, including its industrial infrastructure, increased vessel and air traffic, and associated air, water, and noise pollution, will ruin the wild character of the area. In the event of an oil spill,

the level of industrial activity required to manage a spill would increase dramatically which would further decrease my ability to explore and enjoy this area. In addition these impacts would linger for decades, possibly much longer, and decrease the ability for future generations to experience this area.

45.     As a professional wilderness guide, I routinely bring people to the Arctic to experience the wilderness quality of these areas. Oil and gas activities in the Chukchi and/or Beaufort Seas would greatly affect our guiding business and would limit the desire of our clients to visit the area. Our clients pay large amounts of money to travel to the Arctic because they want to experience the wildest area in the country. If they are confronted with signs of industrial development, or even worse, oil washing up on the beaches and killing wildlife, their experience will be greatly harmed. My clients would also be harmed by seismic exploration activities both directly from the boat traffic and potential noise and also if this activity were to harm or drive away the wildlife that they have come so far to see.

46.     I am on the Board of Directors of the non-profit Friends of Cooper Island which supports the study of black guillemots on Cooper Island in the Beaufort Sea. I enjoy being part of this board and supporting this important scientific work. Black guillemots are an ice-dependent species that forages for food at the sea ice edge. Black guillemots' reliance on the Arctic marine environment also make them an ideal indicator of the effects of climate change in the Arctic. The study on Cooper Island is looking at the  survival rates of black guillemot young related to the distance the ice edge is from the shore. This is a unique long-term study with nearly four decades of continual observation and data-collection. I am worried that oil and gas exploration and development may cause harm to these birds, by scaring them from their nesting sites on Cooper Island or affecting their ability to find food, and consequently negatively affect this study.

Disruption of this study would have a negative impact on scientific understanding of black guillemot behavior and of the effects of global warming in the Arctic.

47.     In my three decades of travel throughout the American Arctic, I have witnessed firsthand the impacts that the region is facing due to climate change. The three most noticeable impacts have been the melting sea ice, the changes in terrestrial vegetation, and the melting permafrost. My first trip to the Arctic Ocean was in late July and early August of 1992, and that year I found the sea ice right up to the Beaufort Sea shoreline in places like Arey Island and Icy Reef. That was the case until 2007. Starting in 2007, when I visited the Arctic coast in August, there was no sign of sea ice and the Arctic Ocean had waves washing up on the barrier islands. This was a new occurrence to me. Now every summer I am amazed by the changes that I see from one year to the next as the waves are washing away the barrier islands and the coast. I also view the satellite images of the Arctic sea ice throughout the summer and have witnessed how much and how fast it melts out of the Chukchi Sea every year. These changes are very concerning to me as they change the nature of my experience on the coast. It makes it more difficult for me to travel along the coast, to view and experience whales, polar bears, Pacific walrus and other wildlife, like ice seals, and birds, like eiders. I believe that black carbon and $CO_2$ emissions from oil and gas activities will accelerate and exacerbate global warming. I am particularly concerned that these emissions will accelerate the changes that I have seen onshore and off and which have a very negative impact on the flora and fauna.

48.     I have been a longtime fan of the Arctic. This is the part of the world that I most closely identify with and I am personally moved by the beauty of the landscape. I find it very disturbing that in my lifetime climate change could make it harder for me to enjoy this landscape.

49.     Over the past 20 years I have developed close personal relationships with residents of the Arctic coast from Point Hope in the west all the way across to Kaktovik in the east. I have regularly spent time visiting and traveling with people living along the Arctic coast and they have told me about the changes they have seen in their lifetime -- reduced sea ice that makes it difficult to hunt for seals and changes in the landscape that makes it difficult for terrestrial food gathering. Again I am very disturbed by the possibility that one of America's last subsistence cultures could be gone because of the impacts industrial activity and a warming Arctic.

50.     I teach my son about the amazing plants and wildlife that are found in the Arctic. I have shown him pictures from my trips viewing walrus and talked about their natural history and how they use the Arctic sea ice as a platform to forage from and for resting. We have also talked about the news stories on the massive haul-outs of walrus along the Chukchi coast and what impacts that has on the walrus populations. In addition to walrus I have shared my photos of polar bears, and sea ducks. We have talked about the unique adaptations these animals have to living in the Arctic, from the furry feet of the polar bear to the unique way the spectacled eiders over-winter in the open water polynyas in the Bering Sea. My son and I both worry about the harm oil development and climate change will cause to these unique creatures. In the future I look forward to sharing my experiences traveling along the Arctic coast with my son. I hope to show him the wildlife that relies on the sea ice including polar bears, walrus, ice seals, and sea birds. I also hope to be able to introduce him to my friends in the Arctic coastal villages and have him learn about their subsistence cultures. If warming and the resulting changes to sea ice, permafrost, and terrestrial vegetation continue, I fear that I will lose these opportunities for my son.

51.     As in the past, I returned to the Arctic Ocean this past summer. In June of 2017, I floated the Aichilik River, paddled across the lagoon and camped for one night on Icy Reef. This trip reaffirmed my appreciation for the coastal and nearshore environment. While the rest of the whole of the Aichilik River is great, my favorite part of the trip is the river delta and barrier island region. This is the area where I witness the most wildlife. The bird life of the delta is amazing with loons, eiders, swans and scoters being very prominent. While on Icy Reef I also witnessed seals, likely Bearded seals, in the Arctic Ocean. If I had been confronted with the effects of oil exploration and development, including infrastructure, industrial noise, water pollution, oil spill pollution, or excessive boat and plane traffic, it would have greatly diminished my experience and made it unlikely that I would consider returning to the Aichilik River delta or Icy Reef again.

52.     In 2018 I am planning to return to the Arey Island and the edge of the Beaufort Sea. I will be floating down the Hulahula River from the Brooks Range to the Beaufort. Again the main purpose of this trip will be to experience the incredible abundance of birds and wildlife found in the shoreline environment of the Arctic Ocean.

53.     I believe increased noise from seismic exploration activities, drilling rigs and support vessels may deflect bowhead whales farther offshore and away from their migratory route in the Chukchi and Beaufort Seas.  An oil spill may have devastating impacts upon the marine mammals, seabirds, and fish of the Arctic Ocean from which they may not recover.  Increased air traffic from helicopters flying from on-land hubs to offshore drill sites may disturb caribou, migratory birds nesting along the coastal plain, and other land-based mammals. I am also concerned about the potential impacts from the infrastructure needed to facilitate oil production including pipelines and production facilities. To the extent that oil and gas activities harm the

wildlife and birds of the Chukchi and Beaufort seas and their coastal regions, I believe I will not be able to experience the sights of whales, polar bears, walrus, seals, caribou, and migratory birds on my return trips to the western Arctic, and the Chukchi coast. This will seriously diminish my wilderness experiences in the Arctic.

I hereby declare under penalty of perjury that the foregoing declaration is true and correct.

Dated:          June 2, 2018          By:

                                                Dan Ritzman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

LEAGUE OF CONSERVATION VOTERS *et al.*,        )
                                                )
            *Plaintiffs*,                       )
                                                )
                    v.                          )    No. 3:17-cv-00101-SLG
                                                )
DONALD J. TRUMP *et al.*,                       )
                                                )
            *Defendants*,                       )
                                                )
AMERICAN PETROLEUM INSTITUTE and STATE          )
OF ALASKA,                                      )
                                                )
            *Intervenor-Defendants.*            )
                                                )

**DECLARATION OF MICHAEL SENATORE**

**227**

I, Michael Senatore, declare as follows:

1.     I am the Vice President for Conservation Law at Defenders of Wildlife ("Defenders"). I am also a member of Defenders. Through my employment at Defenders over more than 15 years, I am familiar with nearly all aspects of its activities and organizational interests.

2.     The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would testify competently thereto under oath.

3.     Founded in 1947, Defenders is a non-profit membership organization with more than 1.8 million members and supporters dedicated to protecting native animals and plants in their natural communities. Defenders is headquartered in Washington, D.C., with field offices in Alaska, California, Colorado, Florida, North Carolina, Idaho, Montana, New Mexico, Oregon, Washington, and Mexico.

4.     Defenders counts among its top priorities protecting and restoring imperiled North American wildlife species that function in flagship, umbrella or keystone roles, and ensuring the conservation of wildlife, habitat, and ecosystems in the face of climate change. Defenders accomplishes its goals with partners at local, state, regional and national scales through demonstrated on-the-ground conservation, research, policy development, advocacy, and, when necessary, litigation. Defenders advocates sound, scientifically-based approaches to wildlife conservation that are geared to restoring imperiled species and preventing others from becoming threatened or endangered.

5.     Defenders has a long history of advocating for the conservation of marine wildlife and coastal ecosystems on behalf of its members and supporters nationwide. Defenders has devoted substantial organizational resources to promoting the protection of marine wildlife under

**228**

federal statutes such as the Endangered Species Act, the Marine Mammal Protection Act, the National Environmental Policy Act, and similar laws.

6.      In the organization's ten-year strategic plan for 2013–2023, sharks, sea turtles, sea otters, manatees, polar bears, manatees, migratory shorebirds, and whales are identified as key species that play functional ecological roles in their ecosystems and serve as ambassadors of ecosystem health and environmental quality. The health and vitality of these marine wildlife species is dependent on the health of the marine environment in which they exist.

7.      Many of Defenders' members and supporters live in coastal states along the Atlantic Ocean or visit these states to engage in recreation or scientific study or other professional endeavors on the coasts and in the oceans. These members and supporters have aesthetic, scientific, recreational, professional, spiritual, and other interests in the marine wildlife that inhabits the Atlantic Ocean along the eastern seaboard.

8.      Defenders also has members who live near or visit the Arctic Ocean to engage in recreation or scientific study or other professional endeavors. These members and supporters have aesthetic, scientific, recreational, professional, spiritual, and other interests in the Arctic environment and the marine wildlife that inhabits this unique ecosystem.

9.      With respect to the Atlantic Coast, Defenders holds appointed seats on four separate take reduction teams, stakeholder groups convened under the auspices of the Marine Mammal Protection Act to reduce take of marine mammals in fisheries: Atlantic Large Whale, Harbor Porpoise, Bottlenose Dolphin, and Pilot Whale.

10.     Defenders has engaged in significant policy and advocacy work under the Endangered Species Act to ensure that imperiled Atlantic marine wildlife species, including

loggerhead and green sea turtles as well as a number of shark, ray, and whale species, receive the full measure of protections to which that statute entitles them.

11.     The critically endangered North Atlantic right whale is a species of particular concern to Defenders and its members. Defenders has been deeply engaged in right whale conservation advocacy and litigation efforts for many years. For example, Defenders petitioned the National Marine Fisheries Service to expand designated critical habitat for the right whale, and engaged in two separate rounds of litigation to set deadlines for the agency to act on this petition. Defenders has both litigated and engaged in the Atlantic Large Whale Take Reduction Team and the MMPA rulemaking processes to obtain regulations to reduce the threats of entanglement in fishing gear to this species. Defenders has also worked for many years to secure permanent regulatory measures to reduce the risks to right whales of ship strikes from vessel traffic along the eastern seaboard.

12.     Due to its long engagement in marine mammal conservation efforts, Defenders is aware of the detrimental impacts of high intensity noise in the marine environment on cetaceans. High intensity noise can injure and kill marine mammals and disrupt behaviors critical for survival, including breeding, nursing, foraging, and communication. Defenders' concerns over the impacts of anthropogenic noise on the North Atlantic right whale led it to litigate the U.S. Navy's decision to site its Undersea Warfare Training Range in the species' only known calving and nursing habitat in southeastern U.S. waters.

13.     Defenders also submitted comments to the Bureau of Ocean Energy Management on May 2, 2014, on an environmental assessment for a proposal to lease blocks of ocean offshore of Georgia for alternative energy development. These comments highlighted the agency's failure adequately to address the potential impacts of noise resulting from the construction and operation

of a meteorological tower and buoys to the right whales that use these areas for birthing and nursing their calves.

14.    On April 26, 2016, Defenders joined a host of national, regional, state, and local conservation organizations urging the Bureau of Ocean Energy Management to deny pending permit applications for geological and geophysical exploration for mineral resources on the outer continental shelf. These exploration permits would have allowed seismic air gun blasting in the Atlantic that would cause large-scale harm to the environment, including to the critically endangered right whale.

15.    On May 2, 2016, Defenders joined another letter prepared by the Southern Environmental Law Center commenting on the Bureau of Ocean Energy Management's (BOEM) Draft Programmatic Environmental Impact Statement for the Outer Continental Shelf Oil and Gas Leasing Program for 2017 – 2022. At the time, we found that BOEM's impact assessment of direct, indirect, and cumulative effects from oil and gas leasing in the Atlantic Program Area was adequately supported, and agreed with BOEM's assessment that Alternative B(5)(a), which does not allow oil and gas leasing in the Atlantic Program Area, was appropriately protective of the Atlantic OCS.

16.    On July 21, 2017, Defenders also joined with a coalition of groups to express serious concern over the National Marine Fisheries Service's proposal to authorize five industrial seismic surveys off the east coast of the United States. 82 Fed. Reg. 26,244 (June 6, 2017).

17.    Our concerns are not limited to oil and gas development. Defenders has joined with partners in commenting on the siting and operation of off-shore wind development as well, most recently in April 30, 2018, comments to the Bureau of Ocean Energy Management on an Environmental Impact Statement for the Construction and Operations Plan of Vineyard Wind,

4

LLC's proposed wind energy facility offshore Massachusetts. *See* 83 Fed. Reg. 13,777 (Mar. 30, 2018). On April 9, 2018, Defenders submitted comments on the selection of a procurement mechanism to support the deployment of offshore wind power off New York. Previously, Defenders also submitted comments on off-shore wind development activities in the Pacific Ocean.

18.     Our work in Alaska to protect marine wildlife and the Arctic ecosystem is equally robust. Our Alaska office focuses on Alaska marine and climate change issues, with a special emphasis on marine mammals and their habitat including polar bears, ice dependent seals, Pacific walrus, and Cook Inlet beluga whales. To help support the resiliency and continued survival of these vulnerable species in the face of Alaska's rapidly changing climate, our work includes significant efforts to reduce the cumulative impacts of human activities on these species, including those from offshore oil and gas development. Our Alaska office also works to reduce human-wildlife conflicts, especially for polar bears, and other large marine predators.

19.     Defenders was a strong supporter of the listing of the polar bear under the ESA and supported designation of critical habitat for the species. We submitted multiple comments to the Department of the Interior, testified on these issues before Congress, and successfully litigated in defense of both the listing of the polar bear and the subsequent designation of its critical habitat.

20.     As the U.S. FWS's 2009 proposal to designate approximately 200,000 square miles of the waters and shores of the Beaufort and Chukchi seas as critical habitat for the polar bear found, increasing offshore oil and gas exploration, development, and production activities in Alaska and adjacent waters "increase the potential for disturbance of polar bears and their near shore sea-ice habitat and the relatively pristine barrier islands used for refuge, denning, and

movements. The greatest threat of future oil and gas development is the potential effect of an oil spill or discharges in the marine environment on polar bears or their habitat." 74 Fed. Reg. 56058, 56070 (Oct. 29, 2009). Defenders and over 17,000 of its individual members and supporters spoke out in support of that designation.

21. In 2010, Defenders published and distributed the report *Sea Bear Under Siege*, a comprehensive review and status report Alaska's polar bears that details threats to the species and a set of recommendations for action. The report notes the risks to polar bears from significant oil spills, routine pollution, and the indirect effects of oil and gas drilling in frightening off polar bear prey.

22. In addition to specifically polar bear focused work, Defenders also actively participates in scientific, policy, legal, and other fora regarding the causes of global climate change and the unique threat climate change poses for wildlife and the habitats on which they depend. Changes from a warming climate are being felt first in the Arctic, and Defenders is working actively to protect Arctic species and habitats. These efforts include policy and legal advocacy to mitigate the effects of climate change through the reduction of greenhouse gases, and to help vulnerable wildlife and ecosystems adapt to climate change, including managing for resiliency of these species and habitats by minimizing and mitigating other non-climate threats.

23. At the national level, in 2007, Defenders published "Navigating the Arctic Meltdown," a series of ten publications focused on Arctic wildlife threatened by global warming, including the spectacled eider, the walrus, the orange-crowned warbler, caribou, Kittlitz's murrelets, Arctic cod, the Arctic loon, the wolverine, the ivory gull, and the polar bear. Defenders also hosted a symposium in September 2007 entitled "Reducing the Impact of Global Warming on Wildlife," in which conservation and policy leaders from across the country joined

6

**233**

together to talk about the critical need for wildlife adaptation and active management in the face of a warming world.

24.     Defenders works to address the threats of traditional fossil fuel extraction and combustion both because of their direct impacts on wildlife and because of their contributions to global climate change. Oil and gas activities, like those proposed in Shell Offshore Inc.'s exploration drilling plans for the Beaufort and Chukchi Seas in the summer 2012, which we opposed, directly contribute to climate change through the emission of greenhouse gases. In addition, the noise, pollution, and other effects associated with oil and gas activities are likely to increase the stress on ecosystems and wildlife resulting from a changing climate.

25.     Defenders works to combat the environmental impacts of oil and gas drilling throughout the United States, including in Alaska's fragile Arctic waters. Defenders has provided extensive comments to the BOEM regarding our concerns about oil and gas leasing and exploration in this area. Our members and supporters have submitted tens of thousands of comments encouraging the federal government to roll back its expansion of planned drilling in the waters off Alaska, due in large part to the impact of drilling and of global warming on marine wildlife. We have also participated in previous litigation challenging BOEM's failure to comply with federal law in its decision to reject such comments and concerns and proceed with approvals for leasing and drilling in this fragile environment.

26.     Defenders regularly testifies at the state, local, and national levels on matters related to offshore oil drilling. For example, in August 2009, Defenders submitted written testimony at the Anchorage public hearing of the White House Interagency Ocean Policy Task Force, highlighting the threats of offshore oil drilling in Alaska's highly productive yet fragile marine waters. These threats are especially severe in the Arctic waters of the Beaufort and

Chukchi Seas as there is no proven clean up technology currently available to adequately or effectively address oil spills in the broken sea ice and extreme meteorological conditions found in these areas.

27.    More recently, Defenders has submitted comments on a host of issues related to the development of fossil fuels in the Arctic, including in the Beaufort and Chukchi Seas and the Arctic National Wildlife Refuge. For example, Defenders submitted comments on August 17, 2017, responsive to the Department of the Interior's request for information on a new five-year OCS plan. On June 23, 2017, Defenders joined comments on BOEM's consideration of Eni's Initial Outer Continental Shelf Lease Exploration Plan for Beaufort Sea, Alaska (March 2017). On May 22, 2017, Defenders joined comments in support of S. 985, a bill to prohibit the Secretary of the Interior from revising the approved oil and gas leasing program for fiscal years 2017 through 2022. In September 2016, Defenders commented on the Draft Environmental Impact Statement for the Cook Inlet Outer Continental Shelf Oil and Gas Lease Sale 244 (81 Fed. Reg. 47,819 (July 22, 2016).

28.    Oil exploration and drilling on the outer continental shelf of Alaska is likely to harm Defenders' members' use and enjoyment of the Arctic lands and waters and the wildlife that reside there. Increased noise and pollution threaten bowhead, gray, humpback, and beluga whales, various ice-dependent seals, Pacific walrus, and polar bears. In addition, an oil spill could have devastating effects on Arctic wildlife populations and their habitat. If spilled oil reached the coast it would impact not just marine mammals but numerous sensitive coastal birds and other wildlife. To underscore the point, after the Deepwater Horizon oil spill Defenders prepared a fact sheet on the possible impacts of a similar disaster in the Arctic. *See* Wildlife and

Offshore Drilling: The 2010 Gulf of Mexico Disaster: Implications for the Arctic, *available at* https://defenders.org/publications/wildlife_and_offshore_drilling_arctic.pdf

29.     Defenders specifically advocated for the withdrawal of the both the Arctic and the Atlantic Ocean from the Outer Continental Shelf Leasing Program. In September 2016, Defenders helped to prepare a national conservation group letter to President Obama urging him to "exercise[e] your statutory authority to withdraw the U.S. Arctic and Atlantic oceans permanently from all future oil and gas leasing." *See* National Conservation Group Letter to President Barack Obama, Sept. 20, 2016, a*vailable at* https://www.nrdc.org/sites/default/files/public-arctic-and-atlantic-ceo-withdrawal-letter-20160920.pdf. President Obama's decision to do so was a historically significant victory for the conservation of these regions.

30.     These are just a few examples of actions Defenders has taken to protect our coasts from the impacts of energy development. The potential development of oil and gas in the sensitive waters of the Arctic and the coastal areas of the Atlantic is an issue of great concern to Defenders institutionally and to our members.

31.     Defenders' organizational interests and its members' interests in the conservation of marine species, from polar bears in the Arctic to the North Atlantic right whale and other cetacean species in the Atlantic, as well as healthy ocean ecosystems generally, will be injured if the Trump Administration succeeds in promoting leasing and drilling off our fragile coasts.

32.     Defenders brings this case to vindicate its organizational interests and its members' interests in protecting marine wildlife species and coastal ecosystems from the enormously harmful impacts of oil and gas development and associated activities, including high

intensity noise pollution resulting from seismic surveys, drilling, and the possibility of catastrophic spills.

33.     My interests, along with the interests of Defenders and its members around the country, would be remedied if this court ruled in favor of Plaintiffs in this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: 6/1/18

MICHAEL P. SENATORE

**237**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants*. | ) | |
| | ) | |

**DECLARATION OF ROBERT THOMPSON**

I, Robert Thompson, hereby declare as follows:

1.      I am a founding member and Chairman of Resisting Environmental Destruction on Indigenous Lands (REDOIL), operating as a non-profit educational organization with 501(c)(3) status.  I am familiar with REDOIL's organizational interests and activities.  I am also a current member of Alaska Wilderness League (AWL) and Northern Alaska Environmental Center (NAEC).  I rely on REDOIL, AWL, and NAEC to represent my interests in the Arctic Ocean.

2.      In June 2002, a group of Alaska Natives came together in Cordova to share knowledge, experience and strategies for addressing the detrimental impacts of fossil fuel development in Alaska.  The meeting in Cordova resulted in the formation of an Alaska network, which is Resisting Environmental Destruction on Indigenous Lands, or REDOIL. The REDOIL network consists of grassroots Alaska Natives of the Inupiat, Yupik, Aleut, Tlingit, Gwich'in, Eyak and Denaiana Athabascan tribes.  The REDOIL network has approximately 30 affiliates, some of which are individuals, tribes, and native organizations.  The REDOIL network addresses the human and ecological health impacts of the unsustainable development practices of the fossil fuel industry in Alaska.  REDOIL strongly supports the self-determination rights of tribes in Alaska, a just transition from fossil fuel and mineral development, and the implementation of tribal options for sustainable development.  REDOIL addresses the fossil fuel and mineral issues based on these primary pillars: 1) Sovereignty/Subsistence, 2) Human and Ecological Health and 3) Global Warming/Climate Justice.

3.      Subsistence is one of the primary pillars of REDOIL's organizing work.  This issue is of critical importance to Alaska Native tribes.  Subsistence is our identity, our culture, our spirituality, our social structure and our physical sustenance.  To Alaska Natives, subsistence

is our way of life.  Our physical nourishment is provided by our subsistence lifestyles which we have lived for millennia.  Subsistence defines our livelihood which has been passed down generation to generation.  An essential element to our subsistence culture is passing our ancestral traditions on to the next generation.  Subsistence cannot be narrowly defined, it is more than hunting, fishing and gathering.  It is about our connection to our homelands, including the oceans, and our values as Indigenous peoples.  REDOIL aims to protect our inherent fundamental human right to live our way of life.

4.     REDOIL has members throughout Alaska's North Slope who primarily live a subsistence way of life which is dependent upon the Chukchi and Beaufort seas ecosystems, including the adjoining coastal and onshore areas, for physical, cultural, spiritual, social and economic sustenance.

5.     REDOIL affiliates that live on the North Slope rely on REDOIL to share information on any fossil fuel related activities and issues which may adversely affect their subsistence livelihood.  We maintain information sharing with our affiliates through teleconferences, email, and in-person meetings at least once a year.  We also travel to the North Slope communities to meet with the leadership and discuss their needs or concerns.  We are sometimes called upon to assist with public relations, as well as being a liaison between communities and the conservation community.  REDOIL strives to bring the community members to the forefront of the debate on fossil fuel issues as well since it is their lives that will be directly affected.  In sum, our members rely upon REDOIL to keep them informed about government and industry fossil fuel activities that may affect them and to advocate on their behalf with regard to their interest in a clean, healthy environment and their interest in subsistence activities.

6.    REDOIL and its member affiliates in the North Slope of Alaska are seriously concerned about oil and gas activities in the Chukchi and Beaufort seas. These activities will result in noise, traffic, oil spills, air and water pollution, and industrial infrastructure that do not belong in the ocean or the land. REDOIL and its members are particularly concerned about the effects that oil and gas activities could have on subsistence species, especially marine mammals. REDOIL affiliates' lives are closely connected to the marine animals in the Chukchi and Beaufort seas, including bowhead whales, ice seals, and walruses. Offshore oil and gas exploration and development activities, such as seismic surveying and drilling activities, introduce industrial noises and other disturbances into our environment—from seismic air guns, drilling rigs, helicopter and airplane flights, icebreaking, and other vessel traffic—that can directly or indirectly harm the animals or change their behavior and thus adversely affect our affiliates' traditional way of life. Similarly, an oil spill—including one that could potentially go unabated all winter long—can kill, harm, or scare away these animals, destroy their sensitive Arctic habitats, and damage the Arctic Ocean ecosystem as a whole and thereby adversely affect our affiliates.

7.    REDOIL and its affiliates also fear that oil and gas exploration and development activities will add to the effects of climate change that are already affecting us, including our ability to engage in traditional subsistence activities. Melting sea ice is causing coastal erosion, stronger storms, and more dangerous hunting and whaling conditions. These effects are threatening our affiliates' lives, communities, and culture.

8.    REDOIL affiliates have consistently spoken out on the record at public hearings held on the North Slope regarding proposed offshore oil and gas activities in the Chukchi and Beaufort seas. REDOIL has submitted comments on various proposals, including Shell's

Chukchi and Beaufort Sea Exploration Plans, Shell's 2011 Chukchi and Beaufort Sea Spill

Plans, Shell's notices of intent for coverage under the Arctic NPDES General Permit, National

Marine Fisheries Service's proposed Beaufort Sea Incidental Harassment Authorization,

Environmental Protection Agency's proposed air permit applications for Shell's *Kulluk and*

*Discoverer* drill ships, and various other oil and gas permitting and planning decisions.

9.    REDOIL aligns itself with the observations of the Inupiat people, since they are

experts in the ecosystems of the Chukchi and Beaufort seas.  Their expertise is based on

traditional ecological knowledge passed down generations.  REDOIL strongly feels that

exploration and drilling activities in the Chukchi and Beaufort seas will have serious

implications to the subsistence resources and lifestyle of the Inupiat who depend upon the area

and, thereby, permanently harm REDOIL and its affiliates' interests in the region.

10.    In sum, REDOIL has a strong organizational interest in the Chukchi and Beaufort

seas, including areas affected by the Trump Administration's April 28, 2017 executive order

trying to undo the permanent protections put in place by the previous Administration.  REDOIL

members rely upon the Chukchi and Beaufort seas and the adjoining coastal and onshore areas

for their livelihood, including subsistence way of life.  Those members also rely upon REDOIL

to inform them of government and industry activities that harm their interests in these areas.

They rely on REDOIL to advocate for their interests.  The Trump Administration's decision to

make the Chukchi and Beaufort seas again available for oil and gas leasing, exploration and

development harms REDOIL and its affiliates' interests in the Arctic Ocean.  The decision

threatens important subsistence resources, including marine mammals, and the integrity of the

Beaufort and Chukchi sea ecosystem, the very fabric that supports the region's Indigenous

peoples, cultures, and their subsistence ways of life.

11.      REDOIL makes all of the above statements based on the serious concerns we
have with the disproportionate social, cultural, spiritual, economic, and climate impacts of the
fossil fuel industry on Alaska Natives within the State of Alaska.  We strongly contend that the
fossil fuel industry is seriously harming Alaska Native peoples that are in close proximity to any
fossil fuel exploration and development project and this is unacceptable.

12.      I am a resident of Kaktovik, located along the Beaufort Sea.  I have lived in
Kaktovik for approximately thirty years and plan to continue to live here into the future.  I am
Inupiaq.  Inupiat have lived in Northern Alaska for thousands of years.  My family name is
Aveoganna.  My mother was originally from Wainwright, Alaska, and moved to Fairbanks,
Alaska, where I was born.  I came to the North Slope in 1970 to learn about my heritage and to
get to know my relatives.

13.      After I married Jane Akootchook, who is from Kaktovik, we began to travel to
Kaktovik frequently.  We first traveled to Kaktovik together in 1972 and returned many times
after that to visit our families and to participate in Inupiat cultural activities.  In 1988, I made
Kaktovik my home.

14.      Our culture is based on hunting activities.  These activities have happened for
thousands of years.  I have hunted marine animals such as bowhead whales, polar bears and
seals, land animals including musk-ox, Dall sheep, brown bears and caribou, and waterfowl
along the coast.  The activities we participate in are communal activities, it is much more than
just acquiring meat, it is an interaction with other people and a tie to the past.

15.      One of the bedrocks of Inupiat culture is the bowhead whale.  During the
spring of 1970, I was on the whaling crew of my uncle, Winfred Ahvakana, at Point Barrow.  We
hunted bowhead whales in a very traditional way, using an umiat, a traditional boat made from

bearded seal skins, and using paddles to pursue the whale. We succeeded in catching a bowhead whale using this traditional equipment. This experience caused me to realize the importance of whaling to our culture. All of the activities related to whaling give our people purpose. Whaling involves many members of the community who participate in different ways: crew members go out in the boat; nearly everyone participates in the butchering of a whale; many women cook the meat; people in the community, including myself, use baleen from the whale to make model boats or other crafts. Whale meat is shared amongst everyone in the community. Many parts of our culture are related to whaling. Were it not for the whales, other marine life, and birds, I feel that our ancestors could not have lived in the Arctic.

16.     I have been a member of whaling crews for many years and have participated in many successful hunts for bowhead whales. I still participate in bowhead whale hunting activities and intend to continue into the future. I feel very fortunate to be a part of these hunts, as our people have engaged in whaling for thousands of years and it defines us as a people. Whaling and other hunting activities gives us a connection to our culture and to the past. Should anything harm these whales or prevent us from whaling, my interests in this food source and cultural tradition would be harmed.

17.     The Kaktovik fall whale hunt typically begins on Labor Day weekend, in early September, and continues until the village has met its harvest quota—typically through September and sometimes into October. Whaling crews leave from the northeast side of Barter Island, and typically head north in search of whales. The crew and I prefer to stay within 10 miles of shore during the whale hunt and the farthest out we have ever been is about 23 miles from shore. I was frightened to be so far out, vulnerable to a change in weather and too far out to see the coast. Now that climate change is happening, there is several hundred miles of open

water for wind to act upon.  The farther out we hunt, the farther we have to tow a whale after it is caught.  At least twice, some of the meat in whales caught by Kaktovik whalers spoiled before the whales could be brought to shore and butchered.

18.    I believe that aspects of modern western culture, such as the requirement to attend schools, have caused the loss of many parts of our traditional Inupiaq culture; however, whaling and hunting continue to be the central part of our culture.  Each part of the year has unique activities that we look forward to, such as spring is the time to hunt waterfowl, eider ducks, geese, and ducks along the coast.  I sincerely wish to pass on the enjoyment of these activities to our future generations.

19.    I am also a wilderness guide for visitors to the Arctic.  I primarily take people to view polar bears.

20.    Even though I live in Kaktovik, I am closely connected to the Chukchi Sea.  In fact, I do not see a divide between the Chukchi and Beaufort seas; the boundary between the two seas is a recent designation.  Both seas are part of the bigger Arctic ecosystem, and many animals, including marine mammals, fish, and birds, migrate through both seas.  Many of the animals we utilize in the Beaufort Sea travel through the Chukchi Sea to get to us.  I am concerned that oil and gas activities in the Chukchi Sea will harm the animals, birds, and fish so that they no longer travel to the Beaufort Sea.  Then I will no longer be able to hunt them.  My usual area to pursue subsistence activities is in proximity to Kaktovik, but I do occasionally travel to areas by the Chukchi Sea, including in Wainwright, to visit and to hunt with my relatives.  It is part of our culture to share food items with our relatives.  My family has always received our native foods from our relatives, even before I set foot on the North Slope.  This tradition prevails to this day.  We Inupiat are all tied together by our cultural activities.

21.        I also enjoy carving ivory from walruses, though I am not a professional carver.  In the past, my relatives from the Chukchi Sea coast have given me walrus ivory to carve.  Recently, though, there has been less and less ivory because it is getting harder to hunt walruses because of the loss of sea ice.  Nevertheless, I would like to continue to carve ivory and partake in walrus meat going forward.

22.        I am very concerned and deeply frustrated about the Trump Administration's decision to reopen the Arctic Ocean to oil and gas leasing, exploration, and development.  When the Obama Administration withdrew the Arctic Ocean from future offshore oil and gas activities in 2016, it was a major relief to me.  Our ocean, the animals, and our way of life were finally protected.  But with President Trump's decision, we are once again faced with these harmful activities in our waters, activities which include seismic surveying, icebreaking, drilling, traffic from support vessels, helicopters and other aircraft.  These activities will generate noise, pollution, risk of oil spills and other changes in our environment that could have a devastating impact on our culture and our way of life.  Several years ago, I looked out the window of my house and saw a large seismic ship out on the Beaufort Sea.  This caused me great stress.  I felt as if my home was being invaded by an enemy.

23.        I am concerned that oil and gas exploration activities, including seismic surveying, will introduce very loud noises and other disturbances into our ocean that can hurt or scare away marine mammals, including whales, seals, polar bear, and walrus.  Such activities have the potential to divert bowhead whales beyond where we can hunt them by our traditional means, affecting my ability to engage in and pass on subsistence traditions.  In 1987, when exploratory drilling was done in the Beaufort Sea in proximity of Kaktovik, we did not get a whale.  Seismic activities also have the potential to harm bowhead whales over time due to

repeated exposure along the whales' migratory path.  If we are not able to hunt bowhead whales because the industry's activities deflect or harm the health of the whales, a central aspect of our culture, which has been in existence for thousands of years, would be lost.  I value our culture highly, and I would be severely adversely affected if our culture were damaged in this way.  It pains me to think that our culture could be displaced by the actions of oil corporations or a single President.

24.        I also worry that walruses will be similarly affected by exploration activities. Walrus are mainly in the Chukchi, but they also come to the Beaufort side, especially near Barrow.  In Kaktovik, we see individual or small groups of walruses every few years.  They usually come with the ice.  Every once in a while, someone in town will get one of these walruses.  In 2013, I saw a walrus while leading a trip of people looking for polar bears.  The group took a lot of pictures of the animals.  Like other animals, I see walrus as connected to the rest of the Arctic ecosystem, and their health is connected to the health of the whole.  Therefore, if something happens to the walrus in the Chukchi Sea, the effects will reverberate through the ecosystem.

25.        My family and I also hunt for bearded and ringed seals every year in the Beaufort Sea.  The seals provide us food and oil.  Bearded seals provide a lot of oil.  We use the oil for dipping sauce for frozen fish and dried meat.  I have never seen a bearded seal on top of the ice.  I assume that the bearded seals move into this area from somewhere else, because I rarely see them in this area in the spring, when the ice is still around.  They begin to show up around Kaktovik in July and August.  I have also seen bearded seals in the area in September, while we are whaling.  I often see seals in the waters around Kaktovik during the summer and early fall.  I also frequently see ringed seals and bearded seals in the lagoons, inside the barrier

islands around Kaktovik.  I have seen many ringed and bearded seals in coastal waters of the Beaufort Sea from the waters around Flaxman Island and the mouth of the Canning River to the waters a few miles to the east of Kaktovik.  I have hunted for and gotten seals many times in these waters.  I hunt seals in open water from boats.  I hunt for seals July through September, often in conjunction with trips when I go camping and caribou hunting.  I have also usually done some fishing during these trips as well.  Almost every year, I or one of my family members have gotten a bearded or ringed seal during these months.  If we are not able to get a bearded seal, others in the village often share their bearded seal meat and oil with us.  If seals were to be adversely affected by oil and gas activities in the Arctic Ocean, this could in turn harm all our family and cultural traditions associated with seals.  Also, any harm to seals could also affect polar bears that depend on seals for food.  If so, this would also hurt me and my guiding business.

26.     I am also worried about oil spills and the government and oil companies' inability to prevent and clean up oil in our waters.  I followed the Gulf oil spill closely.  I read about the amount of resources, thousands of people and vessels, which were mobilized there.  I don't understand how they can claim that they will have better success with clean-up with fewer resources and in a much harsher environment.  If an oil spill happens, I worry about the oil reaching the shore and harming fish, birds, and other animals and contaminating our food.  Even a bigger concern to me is all the oil that ends up floating in the ocean and through the water column.  That is where the walruses, whales, seals, fish and other marine animals are and they cannot get out of the water to escape the oil.  An oil spill could prevent us from going whaling or hunting.  I don't know if we would try to get a whale or a seal that had potentially been in contact with oil.  And oil spill could also adversely affect my guiding business.

27.    I have read Marla Cone's "Silent Snow" that documents the problems that persistent toxic pollutants are having on the Arctic.  These toxins are accumulating in the bodies of many Arctic mammals, including humans, with grave consequences.  I worry that introducing new sources of pollutants, such as oil, into the Arctic environment will just make things worse.  I feel lucky that whales and walruses and other marine mammals are still relatively free of industrial pollutants.  I want to keep our animals that way.  And, instead of introducing new sources of pollution to the Arctic, we should focus on reducing them.

28.    I've seen many changes in the Arctic Ocean since I first moved there in the 1970s.  During summers, I used to be able to see pack ice from Kaktovik but now all we see is open water.  In 2016, the ocean in front of my house was ice free by June 1.  With more open water, we are experiencing bigger storms and bigger waves that affect our coastline.  The loss of summer sea ice is also threatening polar bears that depend on sea ice for hunting.  I am concerned that any future oil and gas development in the Arctic Ocean will contribute to greenhouse gas emissions and worsen the changes we are already experiencing due to changing climate.

29.    I plan to continue to fish and hunt for seals in the waters of the Beaufort Sea between Flaxman Island and Kaktovik this summer and for the rest of my life.  This year, from early August until September, I plan to go camping and hunting along the Beaufort coast between the Canning River and Kaktovik.  I will have my boat and plan to travel along the coastal waters of the Beaufort and hope to catch a seal during these travels, as I have done many times in years past.  As usual, I also hope to catch some fish and hunt for waterfowl during this trip.  I will also help with the bowhead whale hunt in the fall.  I also hope to share the food I hunt

with family and to receive shared foods from them, including perhaps walrus and walrus ivory to carve. I also plan to return to visit family along the Chukchi Sea coast and continue to engage in sharing our traditions with them. I intend to continue all these activities as long as I live and pass them to the younger generation.

30.     Our culture depends on a clean environment and the health of the animals that live in that environment. The ocean has sustained Inupiaq people for thousands of years, and I wish to pass that along to future generations to enjoy as I have. I fear that if oil exploration and drilling activities are allowed to proceed in the Arctic Ocean, our culture and the ocean that it depends upon could be seriously harmed.

31.     I personally depend upon a healthy Arctic environment and the animals of the Arctic Ocean, such as bowhead whales, polar bears, and seals, not only for my own subsistence hunting and cultural well-being, but also professionally for my wilderness guiding business. Thus, any harm to these animals caused by oil activities will directly affect my ability to carry on my guiding activities, as well as my ability to conduct subsistence hunting that is important to me.

32.     I am concerned that the animals of the Arctic are already stressed by climate change, and that all of the industrial activities associated with oil exploration will only increase the stress that these animals have to endure.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated:  June 5, 2018

Robert Thompson

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD J. TRUMP *et al.*, | )    Case No. 3:17-cv-00101-SLG |
| | ) |
| *Defendants* | ) |
| | ) |
| AMERICAN PETROLEUM INSTITUTE and STATE OF | ) |
| ALASKA, | ) |
| | ) |
| *Intervenor-Defendants.* | ) |
| | ) |

**DECLARATION OF GINA TRUJILLO**

I, Gina Trujillo, declare as follows:

1.      I am the Director of Membership for the Natural Resources Defense Council (NRDC). I have been employed by NRDC for over twenty-five years. My duties as Director of Membership include supervising the maintenance and updating of NRDC's membership database, which is a listing of people who are members of NRDC. I have personal knowledge of the matters stated herein.

2.      NRDC is a membership organization incorporated under the laws of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

3.      NRDC currently has several hundred thousand members nationwide, including over 1000 members in Alaska and many tens of thousands in Atlantic coastal states.

4. When an individual becomes a member of NRDC, he or she authorizes NRDC to take legal action on his or her behalf to promote the member's environmental interests, including interests in protecting threatened wildlife and habitat.

5. NRDC's mission statement declares that the organization "works to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends." This includes protecting the ocean and the marine life that it sustains, and for over forty years, NRDC staff members have worked to protect coastal areas and the outer continental shelf from the effects of oil and gas activities.

6. In the Arctic and Atlantic Oceans, in particular, NRDC staff members have a long history of advocacy on behalf of marine ecosystems, coastal resources, marine mammals and other wildlife and fish species, and the people who use, work in, and rely on healthy, natural ocean settings and coastlines free from impacts associated with oil and gas exploration and other harmful development. Our staff members do public education, publish scientific reports, give testimony, organize comment drives, provide input into agency processes, advocate for marine protected areas, oppose oil and gas drilling and seismic exploration, and when needed go to court to protect these public resources.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: 6/4/18                    By: _Gina Trujillo_
                                      Gina Trujillo

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | Case No. 3:17-cv-00101-SLG |
| | ) | |
| *Defendants* | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants.* | ) | |
| | ) | |

**DECLARATION OF MICHAEL WALD**

I, Michael Wald, declare as follows:

1.      I am currently a member of the Natural Resources Defense Council, and have been for many years.

2.      I live in Haines, Alaska.  I have lived in Alaska since 1995.  I moved to Alaska to be close to the natural beauty and bounty of the Arctic.

3.      I am a co-owner and managing partner of Arctic Wild LLC, an Alaska-based business specializing in adventure and nature tours in Arctic Alaska.  In addition to administrative duties, I serve as a guide and a naturalist for our trips.  My livelihood depends on the wild character of the Alaskan Arctic, including the Arctic Ocean, and the health of marine mammal populations, that both I and my clients hope to observe on guided trips.

4.      I have a strong personal interest in natural history and science.  In addition to guiding, I have worked as a high school science teacher and have conducted field research for the National Park Service and for the North Slope Borough in the American Arctic.

5.      I have visited various parts of the Alaskan Arctic since 1991.  As detailed below, I have taken multiple personal and professional trips to observe marine mammals—including in the Chukchi and Bering Seas, as well as adjacent coastal areas.  I have experienced these regions from the water, land, ice, and air.  Through my experiences, I have learned to value, respect, and love the Arctic and its natural and cultural treasures.

6.      In the past, Arctic Wild has operated trips to the Arctic Ocean during summer months to view marine mammals.  For example, in August 2008 I personally guided a trip to the Chukchi Sea specifically for the purpose of observing walruses.  We also led tours to observe beluga whales on the Chukchi Coast in 2015.

7.      In 2018 and 2019, Arctic Wild has numerous trips scheduled that will start or finish along the Arctic Ocean coast, including a trip in 2018 that is specifically designed to observe seals, belugas, and other whales along the Chukchi Sea coast.

8.      On account of my personal and professional interests, I have serious concerns about the effect oil and gas exploration activities in the Chukchi and Beaufort Seas would have on marine mammals throughout the Arctic.  My concerns include oil spills, increased ocean noise, disturbances caused by vessel and air traffic, climate change, and consequently, negative impacts on marine mammals, on my enjoyment of wildlife populations, and on my livelihood.

9.      While I am concerned about disturbance impacts to marine and coastal wildlife from any oil and gas exploration or development of the U.S. Arctic Ocean, I especially worry about the risks that an oil spill would pose to Pacific walruses, ringed seals, polar bears, and other Arctic marine mammals.  Oil spills are a common occurrence in arctic Alaska. To my knowledge spill response tests in the Arctic Ocean have been spectacular failures and the industry showed its total lack of preparation for drilling in the Chukchi during 2012 with a string

of embarrassing failures, including groundings of ships and 8 felony counts against drilling contractors. I try to imagine how an oil spill clean-up effort would work even during summer when the weather is relatively benign. What would the combination of oil, dispersants, and traffic—a beehive of activity and toxicity—do to the marine mammals that rely on the area for their summer habitat? The Arctic summer is short and unforgiving and marine mammals have certain places that they need to be at certain times of the year. I fear that an unmitigated or poorly mitigated oil spill in the Chukchi Sea could have devastating impacts on the wildlife, the Arctic's overall ecological integrity, and my interests there.

10.     My livelihood as a tour guide depends in part on the continued viability of marine mammals. As a result, I am concerned that oil and gas exploration activities in the Beaufort or Chukchi Seas will adversely affect my livelihood through impacts to mammals raised there that are observed by Arctic Wild-led tour groups. Arctic Wild's clients sign up for costly, week-long expeditions in part because I can tell them with confidence that they are likely to see good numbers of marine mammals.

11.     My concerns regarding oil and gas exploration in the Chukchi Sea extends beyond observed changes to perceived changes as well. Obviously I am concerned about the realities of the exploration activities and the potential for huge ecological damage to the Chukchi Sea and the marine mammal populations that rely on it. But the mere presence of oil and gas exploration can also be detrimental to my business. If people think that a place is tainted by oil and gas development, they will be less likely to want to visit or recreate in the area. Perceptions like that can stick with and affect people for a long time.

12.     My concerns about oil and gas exploration in the Arctic Ocean are also deeply personal. While I do not live year-round on the Arctic coast, the Chukchi and Beaufort Seas and

their marine wildlife are indeed part of my daily life. Whenever we receive traditional foods from our friends up north, we serve them with great pride. Artwork and pictures from the region fill our home. Even my young sons talk about whales and ask to hear a recording I have from hydrophones suspended in the Chukchi Sea. I regularly talk with friends along the Arctic coast and always we discuss the ice and the animals which live on and below it. To us these are not abstractions of wilderness or simply study subjects. The life and health of the Arctic is part of the very fabric of my life, intellectually, professionally, and emotionally. The ocean there and its wildlife may seem very remote and perhaps irrelevant to most but they could not be more relevant to me.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: _6/4/18_          By: _____
                              Michael Wald

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants*. | ) | |
| | ) | |

**DECLARATION OF NICOLE WHITTINGTON-EVANS**

I, Nicole Whittington-Evans, hereby declare as follows:

1.      I reside in Palmer, Alaska, and I am a member in good standing of The Wilderness Society.

2.      I have a long-standing personal and professional interest in the Alaskan Arctic including but not limited to the Arctic National Wildlife Refuge, the National Petroleum Reserve-Alaska, and the Chukchi and Beaufort seas.  I have visited the Arctic many times since 1991 and intend to return next week and in the coming years.  Recent examples of trips that I have taken to the Arctic include: representing The Wilderness Society at an environmental justice conference held by the Inupiat Community of the Arctic Slope in Utqiagvik, Alaska in January, 2011; visiting and helping at a Wildlife Conservation Society bird field research camp on the Ikpikpuk River in the National Petroleum Reserve-Alaska (NPR-A) in June, 2011; spending a number of days at a cabin on Teshekpuk Lake and visiting Utqiagvik and Deadhorse with other organizational staff members in August, 2012; rafting the Marsh Fork of the Canning River in the Arctic National Wildlife Refuge in August, 2013 with members of The Wilderness Society's Governing Council and staff; and rafting on the Hulahula River in the Arctic National Wildlife Refuge in June, 2014 and June, 2015, to obtain video footage to promote the values of the Arctic Refuge on The Wilderness Society's web site and to bring Governing Council members and supporters to the Arctic Refuge.  In 2015 and 2016, I visited Nuiqsut to meet with members of the Native Village of Nuiqsut and for Bureau of Land Management (BLM) Regional Mitigation Strategy meetings, and Army Corps of Engineers and other meetings. In 2015, from Nuiqsut I and another TWS colleague traveled to Utqiagvik, to attend meetings held by the BLM on the development of their Regional Mitigation Strategy, and by the NPR-A Working Group which was established in 2013 with the final Record of Decision for the NPR-A Integrated

Activity Plan. During this Regional Mitigation Strategy visit, I and other TWS staff in attendance were fortunate to be present when Utqiagvik whalers landed three whales, and we watched the community land, process and divide the whales on the Utqiagvik Spit. I have plans to return to the Arctic National Wildlife Refuge coastal plain on June 10, 2018.

3.        I am The Wilderness Society's Alaska Regional Director.  In that capacity, I am familiar with all aspects of The Wilderness Society's activities and organizational interests related to the Arctic, including the Chukchi and Beaufort seas, and Alaska in general.  I have worked for The Wilderness Society for over twenty years and throughout my tenure with the organization I have followed and engaged in Arctic conservation issues.  I work with our staff to analyze federal and, to a lesser extent, state actions affecting public lands in the Arctic and across the state, as well as with other organizations, to advance The Wilderness Society's goal of wildlife and habitat protection in the Arctic primarily through federal administrative actions, scientific research, public education, collaboration with residents, local governments, and tribes whenever possible, and the judicial process.

4.        I am offering this declaration on behalf of The Wilderness Society.  Founded in 1935, The Wilderness Society is a national non-profit membership organization with more than a million members and supporters nationwide, including members who live in Alaska.  The Wilderness Society is devoted to the conservation of nationally and internationally significant fish and wildlife populations and their habitats in Alaska, including in the waters of the Arctic Ocean and on the surrounding public lands.  Members of our staff have traveled to Arctic and sub-arctic communities and lands many times over the years for meetings and gatherings in villages with tribes, tribal members and/or federal agencies, such as Utquiagvik, Nuiqsut, Kaktovik, Arctic Village, Venetie, Fort Yukon, Beaver and Chalkyitsik, and to accompany

media, do research, explore and to film and photograph, among other activities. The mission of The Wilderness Society is to protect wilderness and inspire Americans to care for our wild places. The organization works to ensure that future generations will enjoy, as we do today, the undeveloped, diverse complex of globally significant and interdependent terrestrial and marine ecosystems of the Arctic. These ecosystems provide clean air and water, wildlife, quiet, and beauty, as well as opportunities for recreation, subsistence, research, and renewal that are important characteristics of pristine and intact ecosystems.

5.     The Wilderness Society has had a longstanding interest in addressing the impacts of oil and gas development, both offshore and onshore. In the Arctic region, the Chukchi and Beaufort seas ecosystems are poorly understood and changing rapidly due to sea ice melt and on Arctic lands, wildlife habitat is altering rapidly due to climate change. The Wilderness Society engages in a number of collaborative efforts focused on the Arctic, including the North Slope Science Initiative and the Western Arctic Caribou Herd Working Group. The Wilderness Society provides advice and recommendations in these collaborative planning efforts regarding priority needs for management decisions across the North Slope of Alaska. The priority needs include recommendations on inventory, mitigation, monitoring and research activities that lead to informed land management decisions.

6.     After the BP Gulf spill, The Wilderness Society's Arctic Program Director and Alaska-licensed engineer Lois Epstein served as a public representative on the fifteen-member Ocean Energy Safety Advisory Committee, a federal advisory committee organized after the BP Gulf spill to ensure improvements in offshore oil and gas operations. The Wilderness Society participated on several subcommittees including the Arctic subcommittee which produced a consensus recommendation to develop Arctic-specific offshore oil development regulations that

later were issued by the Department of the Interior during the Obama administration; these regulations potentially will undergo revisions during the Trump administration and The Wilderness Society's Arctic Program Director will weigh in on the revisions. The Wilderness Society's Arctic Program Director also served on a National Academy of Sciences committee during 2016-2017 on Designing Safety Regulations for High-Hazard Industries which utilized case studies from the pipeline and the offshore oil and gas sectors. To advocate for improvements in offshore and onshore oil and gas operations, The Wilderness Society's Arctic Program Director has delivered Arctic and technology-related presentations at conferences and hearings including to the Inupiat Community of the Arctic Slope Environmental Justice Conference in Utqiagvik in January, 2011, a U.S. Senate Energy and Natural Resources Committee in May, 2011, the Alaska Oil and Gas Conservation Commission in September, 2011, the U.S. military in Anchorage in April, 2012, a Greenpeace International conference primarily for indigenous Arctic residents participating in the Arctic Council ministerial meeting in Kiruna, Sweden in 2013, the University of Texas Energy Week conference in Austin in February 2015, and the multi-stakeholder Arctic Encounter conference in January, 2016. Most recently, The Wilderness Society's Arctic Program Director testified at a November, 2017 U.S. Senate Energy and Natural Resources Committee hearing regarding oil and gas development in the Arctic National Wildlife Refuge prior to passage of the 2017 tax act which included language allowing such development.

7.      The Wilderness Society attends public meetings on offshore and onshore issues held in Arctic communities in order to understand local concerns and reflect those concerns as much as possible in our comments on oil and gas development projects in federal waters and lands.

8.      The Wilderness Society has invested significant organizational resources in the planning, policy development, and decision-making processes related to offshore oil and gas planning, leasing, exploration, production and development activities in the Arctic Ocean. The Wilderness Society has written organizational, or assisted in the writing of multi-organizational, comments on the federal offshore five year lease sale program as it applies to the Arctic Ocean, individual Arctic Ocean lease sales, and exploration and production permitting for Chukchi and Beaufort sea projects including nearshore, island-based projects in the Beaufort. Additionally, The Wilderness Society has supported the work of other conservation organizations – including in traditional and social media – that have taken the lead in advocating that President Obama withdraw most of the Chukchi and Beaufort seas from future leasing. Most recently, The Wilderness Society joined other organizations in comments on the proposed 2019 Beaufort Sea lease sale. The Wilderness Society also recently provided comments on the draft proposed 2019-2024 Outer Continental Shelf Oil and Gas Leasing program, as well as scoping comments for the programmatic environmental impact statement.  In the past, The Wilderness Society provided comments on the 2002-2007, 2007-2012, and 2012-2017, and 2017-2022 Outer Continental Shelf Oil and Gas Leasing Programs. Additionally The Wilderness Society wrote or joined others' comments on Shell's offshore activities in the Chukchi and Beaufort seas, on Hilcorp's activities in the nearshore Beaufort Sea, and on Eni's Nikaitchuq activities in the Beaufort Sea.

9.      The Wilderness Society and its members advocate both in Congress and to the executive branch for policies and practices that protect the Chukchi and Beaufort seas' marine and coastal environments and their unique wildlife and subsistence/cultural resources.  These resources include bowhead and beluga whales, polar bears, Pacific walrus, bearded and other seals, caribou, and birds including spectacled and Steller's eiders.  Our members rely on the

Arctic Ocean, the adjacent coastal areas, and portions of the watershed including the National Petroleum Reserve-Alaska and the Arctic National Wildlife Refuge for recreational, educational, scientific, wildlife-viewing, economic, and other purposes. In addition, because the Chukchi and Beaufort seas are important breeding, feeding, and staging habitat for numerous migratory species, including whales and birds, any impacts to these species or their habitats in the Chukchi and Beaufort seas also threaten the interests of The Wilderness Society and its members elsewhere in these species' ranges.

10.     The Wilderness Society invests significantly in public education efforts regarding the impacts of oil and gas activities directly on the Arctic through educational materials. The Wilderness Society has produced both textual and graphic information about Alaska's North Slope and the adjoining Arctic Ocean in various publications including in newsletters, action alerts, fact sheets, maps, the annual report, policy briefs, and on our website. In 2013 through May, 2018, we educated members of the public with alerts, blogs, social media, and in TV, newspaper, and radio interviews. Most of these educational efforts involved offshore and onshore oil and gas operations and planning decisions. During these years, we have urged the public to submit tens-of-thousands of comments pertaining to Arctic Ocean offshore oil and gas development plans. In September 2009, our organization released a revised version of the publication, "Broken Promises," which documents the impacts of oil and gas activities in America's Arctic and later added an insert with new spill data. The noise, pollution, water use and other effects associated with oil and gas activities on the North Slope have altered hundreds of square miles of habitat – an industrial complex visible from space – and may be harming ecosystems, species, and people already under stress from a changing climate.

11.     The Arctic is changing rapidly because of a warming climate largely due to the world's burning of fossil fuels.  The Wilderness Society is working actively to gain a better understanding of those changes and to bring public attention to them.  We have forged strong working partnerships with climate change scientists at the University of Alaska Fairbanks Scenarios Network for Alaska Planning (UAF-SNAP) as well as with other North Slope scientists at the U.S. Fish and Wildlife Service (USFWS), the Bureau of Land Management, the Alaska Department of Fish and Game, the North Slope Borough and other entities in order to ensure our work is based on the latest and most accurate information available.  To help address the effects of climate change, The Wilderness Society strives to educate the public, encourages research and monitoring, and supports appropriate policy changes including protecting and helping ensure resilient ecosystems.  In June 2018, for example, The Wilderness Society submitted comments to the State of Alaska on the Draft Alaska Climate Change Policy and plan.  Additionally, The Wilderness Society includes climate change-related calculations and comments in our submittals to federal agencies on lease sales.

12.     Protecting America's Arctic, and particularly what is now the Arctic National Wildlife Refuge which abuts the Beaufort Sea, has been a priority and an integral part of the fabric of The Wilderness Society since our founders first joined in the effort to protect wilderness and establish our organization eighty-three years ago.  Early organizational leaders, such as Bob Marshall and Olaus and Margaret Murie, spent time exploring, researching and documenting the extraordinary values of the Arctic, and it was their vision, among that of others, to protect what is now the Arctic National Wildlife Refuge.  They advocated for this area to be established in order to preserve its wilderness character.  First established as the Arctic National Wildlife Range in 1960 by the Eisenhower Administration (Public Land Order 2214), our

organization has continued to advocate for permanent protection for this area. In 1980, the Arctic Range was expanded and renamed the Arctic National Wildlife Refuge and Congress also designated wilderness in the Refuge with the passage of the Alaska National Interest Lands Conservation Act (ANILCA). In the over three decades since ANILCA was passed, The Wilderness Society has continued to work to designate the coastal plain of the Arctic National Wildlife Refuge as wilderness to protect it from oil and gas development. Our organization has been involved in administrative planning processes, policy development and decision-making processes regarding the Arctic Refuge through written comments, meetings with agency and administration officials, and educating our members and the public about opportunities to engage in these processes. We have also mounted campaigns and fought industry and congressional efforts to allow oil and gas development in the coastal plain throughout the decades and advocated to protect this piece of the refuge including its coastal lagoons and barrier islands, which as of 2005 are now part of a Beaufort sea marine protected area that is managed to protect its wild character. The Wilderness Society engaged in the USFWS' revision of its overall management plan – the Comprehensive Conservation Plan (CCP) – for the Arctic Refuge and submitted substantive, technical comments throughout the revision process, as well as contributed to and signed on to joint substantive comments regarding the Arctic Refuge CCP revision. Additionally, several of our Alaska staff testified at a September 2011 hearing in Anchorage on the draft revised CCP. Our staff has also participated in and organized many other meetings since early 2010 regarding the development of this revised plan, including many with the USFWS. Staff from our Alaska office have testified at scoping hearings regarding Arctic Refuge planning in Anchorage in 2010 and 2018, and our national organization President testified at a May 2010 scoping hearing in D.C. and will be testifying again at a scoping hearing

on June 15, 2018 in Washington DC. Over the years our organization has written many blogs and alerts to our members and supporters regarding Arctic issues which have resulted in tens-of-thousands of comments to the Administration regarding protecting the Arctic Refuge.

13.    The noise from seismic activities, drilling and associated ship and helicopter traffic can impair members' ability to observe and enjoy marine mammals, birds, and other wildlife that pass through these areas, and would eliminate the natural quiet members seek in a non-developed area. Seismic activities, drilling and transportation-related noise could injure or otherwise harm bowhead, gray, humpback, and beluga whales, various seals, Pacific walrus, and polar bears, thereby harming members' interests in these species. An oil spill from a well blowout or other industry-related failure in this region could have devastating effects on wildlife populations and habitats. If spilled oil reached the coast, it would affect not just marine mammals, but numerous sensitive birds and other wildlife. Dispersant use to respond to a major spill could adversely impact marine organisms, as could the air pollution associated with in-situ burning of spilled oil. Water pollution associated with drilling activities could harm marine life including fish, and air pollution from motors and generators could affect air quality near the drilling operations.

14.    In sum, The Wilderness Society has a strong organizational interest in the Chukchi and Beaufort seas and their associated species, habitats, and ecosystems. In advocating for these interests, The Wilderness Society represents itself and its members who use and enjoy the Chukchi and Beaufort sea region for recreational, aesthetic, scientific, educational, and other purposes and intend to use and enjoy these areas in the future. Members rely on The Wilderness Society to represent their interests with regard to advocacy on behalf of these areas and the species and other values they possess. Exploration and/or production activities in the currently

**266**

withdrawn portions of the Chukchi and Beaufort seas would adversely affect the interests of The Wilderness Society and its members.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: June 6, 2018                      By:

_____
Nicole Whittington-Evans

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

|   |   |
|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v, | ) ) |
| DONALD J. TRUMP *et al.*, | ) ) |
| *Defendants,* | ) ) |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) ) ) |
| *Intervenor-Defendants.* | ) ) ) |

Civil No. 3:17-cv-00101-SLG

## DECLARATION OF KILIII YUYAN

I, Kiliii Yuyan, declare as follows:

1. I am currently a member of Defenders of Wildlife.

2. I have lived in the Pacific Northwest for 12 years and am a frequent visitor to the Arctic. For many years, I have spent the majority of my time above the Arctic Circle, as my specialized work takes place in this region.

3. As an indigenous photographer and filmmaker (Nanai), my work is dedicated to both documenting and conserving Native cultures and natural histories. I use photography to tell the stories of the voiceless– people, wilderness, and the changing climate.

4. I have specifically worked alongside Iñupiaq whalers in the Arctic, Yup'ik caribou hunters in NW Alaska, and Inari Sami reindeer-herders in Finland as a photographer and



1

indigenous advocate. In addition, I am also a traditional kayak-builder, and frequently teach Arctic indigenous youth the traditional skills of kayak-building.

5.     My work has been awarded by Communication Arts, PDN, and Sony World Photo. My clients have included National Geographic Traveler, The Nature Conservancy and Outside Magazine.

6.     I am a descendant of the Han Chinese and the indigenous Nanai/Hezhe people of Siberia. I grew up in the United States at a distance from my culture's traditions, but remained connected through my Nanai grandmother. Her stories fueled a desire to reclaim my indigenous identity by learning to live close to the natural world.

7.     To that end, I have spent the last 15 years exploring the traditional skills of Nanai and other Native cultures, including wilderness subsistence and traditional kayak-building. It has led me to documenting the stories of modern indigenous peoples around the world, from urban communities to remote villages in the Arctic. Those communities have shown me what it is to see the land through indigenous eyes.

8.     In that time, I have taken 11 trips to the Arctic, both European and North American, and intend to continue living and working in this region for years to come. My relationships with the people and communities of the Arctic are invaluable both personally and professionally.

9.     In my work as a documentary photographer, I spend my time boating, kayaking, hiking, and observing the interactions of the land, water, wildlife, and the people who depend on them. My work requires me to immerse myself in the culture of the people living in the farthest reaches of the Arctic. My work has taken me to the North Slope of Alaska, the Canadian Arctic, Norway, Sweden and Finland's Lapland regions, as well as North Iceland.

**269**

10.     My recent award-winning film project, *Tuvaq – An Inupiat Spring on the Sea Ice*, tells the story of the Iñupiaq people, who for 2000 years have hunted from edge of the sea ice. It tells a story about both indigenous whaling and the tragedy of climate change in the Arctic.

11.     Bowhead whales were once thought to be a threatened species due to excessive international whaling in the 1800s. However, by the 1980s, Iñupiat whalers had proven that their own understanding of the bowhead whale population was far more accurate than scientists once believed. Today, Iñupiaq communities manage hunting quotas of bowhead whales themselves. Unlike whaling in much of the world, the subsistence practices of the Iñupiaq people maintain the bowhead whale as an unthreatened species — just as they have done for thousands of years.

12.     Bowhead whaling is a cultural cornerstone of Iñupiaq identity and a primary source of food on the Arctic Slope, where the cost of living is nearly three times that of mainland US. I have participated in the Iñupiaq spring whaling for 8 months over four years, 2015-2018, lived and breathed as a member of the whaling crew, slept on the sea ice and shared polar bear guard duty. As an indigenous person, I wanted to understand and document their subsistence life in the Arctic, where the danger of cultural death is just as imminent as an attack from a polar bear. In 2017, the spring whaling by traditional boat, umiaq, has resulted in zero landed whales due to ice conditions. It may be the first year on record this has ever happened.

13.     In addition to the motion picture, I have additionally worked on a project entitled *People of the Whale* near the village of Utqiagviq, on the North Slope of Alaska, intertwined with the film *Tuvaq*. This project also documents indigenous subsistence hunting of whales, seals, and walrus and the importance of these species to their way of life. My work illustrates the challenges of maintaining traditional ways in an era of climate change and diminishing sea ice.

KIY

3

14.     Polar bears are an ever-present danger to whalers when out on the ice. Attracted to the scent of fresh blubber, they prowl the edges of camp but are usually scared off by rifle shots and noisemakers. During whale butchering many people stand guard against the bears circling nearby and keep children close to camp. In a single day during this time, we saw thirteen polar bears. One day an eight foot bear entered the whaling camp starving and desperate just 15 yards away from where I and members of the crew were sitting. After it was shot in self-defense, we found the bear to have been starving, a likely result of the declining sea ice conditions making it difficult for them to hunt.

15.     I photograph polar bears, walruses, snowy owls, bowhead and beluga whales, and many other species unique to the Arctic. I also shoot their changing habitat. What I see concerns me greatly. In 2016, the average surface air temperature in the Arctic was the highest ever recorded. Sea ice is disappearing, and nowhere is that more evident that on a whaling crew. Every Iñupiat hunter I have spoken to understands the changes in the ice conditions, and many have lamented to me that the death of their traditional culture is coming along with the demise of the sea ice.

16.     As our modern needs make increasing demands on the land and its resources, indigenous knowledge is ever more important to understanding ecology. These communities have balanced competing human needs with the preservation of wildlife for thousands of years. There's an urgency to cultural collaboration—each day, indigenous cultures come under threat from loss of language, identity, land, and hunting rights. As we lose their stories, we lose the knowledge that gives all human beings a chance to shape a future on this amazing planet.

KTY

4

17.     Aside from documentary photography work, I am additionally a public speaker and guest educator in indigenous communities. I have also spoken at lectured and spoken at public events in Seattle, Portland and Milwaukee about indigenous issues.

18.     I was very pleased when I learned that President Obama had withdrawn much of the Arctic Ocean from the prospect of oil and gas leasing. This sensitive ecological area cannot survive the pressures of oil exploration. The Iñupiat talk of disturbed marine mammal migration patterns and many fear that drilling would greatly affect hunting across the Chukchi and Beaufort Seas. Similarly, the Sami of Lapland worry that spills would destroy their salmon runs.

19.     These areas are essential for wildlife and native people and that is why I was so dismayed by President Trump's decision to issue an executive order that attempts to reverse the Arctic and Atlantic Ocean withdrawals. Oil and gas development will destroy the ecology and culture of this region.

20.     Pre-lease activities, seismic testing, and exploratory drilling will disturb and injure marine life and put at risk traditional whaling and other practices.

21.     The risk of a spill – which would be nearly impossible to clean up in that difficult environment – would be ever present and disastrous if it did happen. Black carbon emitted from oil operations will accelerate loss of sea ice. For those that live outside of the Arctic, I cannot understate the importance of the inland ice and sea ice to people living there. Inland ice conditions are the fall-spring road systems in regions that have no other transportation. The sea ice conditions absolutely determine the success or failure of subsistence hunting, and whether parents can provide high-quality food to their children. The melting permafrost is already destroying the majority of peoples' ice cellars in the Arctic, and switching to freezers to the Arctic is both absurd and impractical, from energy usage and capacity to reliability.

22.      I am also concerned about climate change and believe we must transition swiftly to alternative energy. Doubling down on fossil fuels is the wrong approach, especially in a region like this where the impacts of oil and gas drilling could be catastrophic for marine life and native cultures.

23.      My concerns will be addressed if this court were to determine that President Trump acted without legal authority and the ban on oil and gas drilling in the Arctic were to remain in place. If offshore drilling begins and in the catastrophic event of a spill, it would affect my personal interests, as marine life would be impacted greatly, and many indigenous subsistence practices would disappear. Over time, the cultures of Native peoples would also lose identity and tradition, and that is the thing that I fear the most. The cultural diversity of the Arctic is paramount to my work and interests.


I declare under penalty of perjury that the foregoing is true and correct.


_____            5/23/2018
                                     _____
Kiliii Yuyan                         Date

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants.* | ) | |
| | ) | |

**DECLARATION OF BRENDAN CUMMINGS**

I, Brendan Cummings, hereby declare as follows.

1.      I am a member of the Center for Biological Diversity ("the Center"). I have also been on staff at the Center for more than 20 years and currently serve as Conservation Director of the organization. The Center's members and staff, including myself, rely on the Center to represent our interests in the preservation of imperiled species and habitats such as those in the Arctic and Atlantic Oceans.

2.      I work with our legal and scientific staff and other organizations to advance the Center's goal of wildlife and habitat protection through administrative actions and reform, scientific research and the judicial process. In my capacity at the Center, I am familiar with all aspects of the Center's activities and organizational interests related to Alaska in general and the Beaufort and Chukchi Seas in particular. I am also familiar with all aspects of the Center's activities and organizational interests related to the Atlantic Ocean.

3.      The Center is a nonprofit corporation incorporated in the State of California. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats throughout the United States and abroad.

4.      The Center has more than 63,000 active members. Center members reside throughout the United States, including in Alaska and along the Eastern seaboard, as well as in other countries. The Center works to ensure the long-term health and viability of animal and plant communities across the United States and elsewhere, and to protect the habitat these species need to survive. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.

5.     As part of its mission, the Center provides oversight of governmental programs, policies, and activities that affect wildlife and endangered species. The Center has been at the forefront of efforts to hold the government accountable for its obligations under the Endangered Species Act (ESA), Marine Mammal Protection Act (MMPA), National Environmental Policy Act (NEPA), and other laws protecting wildlife and its habitat. The Center regularly engages in protection efforts and campaigns to ensure that our nation's environmental laws are enforced with respect to wildlife and its habitat.

6.     The Center actively develops and disseminates to its members; policymakers; local, state, federal and international governmental officials; non-profit organizations; and interested members of the general public a wide array of educational and informational materials concerning the status of and threats to wildlife species, including threatened and endangered species and their habitats.

7.     The Center has been actively involved in protecting Alaska's wildlife since the early 1990s. Our involvement has included submitting ESA listing petitions for the Queen Charlotte goshawk, Alexander Archipelago wolf, Cook Inlet beluga whale, Aleutian sea otter, yellow-billed loon, Kittlitz's murrelet, polar bear, bearded, ringed, ribbon and spotted seals, Pacific walruses, cold water corals and Lake Iliamna seals. We have also submitted petitions seeking critical habitat designations for bowhead whales and Pacific right whales. Additionally, we have submitted petitions seeking "depleted" designation under the MMPA for Alaskan sea otters and the AT1 stock of killer whales.

8.     Besides our administrative petitions, the Center has also engaged in numerous other activities related to the protection of biodiversity and habitat in Alaska such as comments, appeals and/or litigation regarding forest plans, timber sales, oil and gas leasing, fisheries

management, and other environmentally damaging activities. In sum, the Center has a significant history of advocacy and involvement in environmental issues affecting Alaska species. Our current involvement with regard to issues affecting the Alaska's Arctic Ocean falls squarely within our organizational interests and mission.

9.      Specifically, with regard to the Arctic Ocean, the Center has been working to protect polar bears since 2001. Oil and gas development threaten to disrupt this species. Moreover, the largest threat to the species is loss of its sea ice habitat from global warming, which will be exacerbated by development and use of fossil fuels such as the oil and gas in Alaska's Arctic. In 2005 the Center petitioned the U.S. Fish and Wildlife Service (FWS) to list the polar bear as a threatened species under the ESA, and, after the Center sued, the polar bear was listed in 2008. Center advocacy led to the designation of critical habitat for the polar bear in the Arctic, and the Center has intervened in several lawsuits to help FWS defend protections for polar bears. The Center continues to fight for greater protections for the polar bear in the U.S. and abroad.

10.      The Center has been actively involved in attempting to protect other unique Arctic wildlife resources. For example, in February 2000, the Center filed a petition to designate critical habitat for the Bering-Chukchi-Beaufort Sea Stock of the bowhead whale under the ESA. Bowheads migrate through these waters, and development there would pose risks to the bowhead from onshore oil spills that reach the marine environment, and from marine vessels transporting materials or equipment to onshore operations.

11.      Additionally, the Center has been very involved in attempting to protect the Pacific walrus under the ESA. In 2008, the Center filed a petition to list the Pacific walrus under the ESA, and subsequent lawsuits challenging the agency's failure to respond to the petition. The

Center is currently litigating the FWS's recent decision that protecting the walrus under the ESA was not warranted. The Chukchi Sea provides vitally important habitat for the Pacific walrus. Walruses rely on sea ice in the Chukchi Sea to rest, rear their calves, avoid predators, and reach their feeding grounds. Oil development there would exacerbate the effects of climate change already melting the species' sea ice habitat and pose risks to the animals from oil spills and noise pollution.

12.     The Center has also been actively involved in protecting wildlife in the Atlantic Ocean for several years. For example, the Center submitted a petition and filed lawsuits to help protect more than 39,000 square miles of ocean as critical habitat for North Atlantic right whales. The Center also successfully petitioned the federal government to require ships to slow down at certain areas at certain times of year to protect the whales from getting run over by large ships. And the Center is actively involved in litigation to prevent North Atlantic right whales from getting tangled up in fishing gear, and has worked for years to reduce the entanglement risk of these whales. Despite these protections, the species is in decline and scientists predict the species could be functionally extinct within 20 years. Adding the additional stressors of seismic exploration for oil and gas n or oil development in the Atlantic could drive the species to extinction.

13.     In addition to its work protecting North Atlantic right whales, the Center has also petitioned for protection of Atlantic bluefin tuna and filed a lawsuit to prevent overfishing of the species. The Center has also petitioned for ESA protection for loggerhead sea turtles and black-capped petrel and has filed lawsuits to help secure these protections.

14.     The Center has also invested substantial resources into ongoing research and public education regarding the plight of species that reside in and use the Arctic and Atlantic

Oceans. The Center maintains an active website and quarterly newsletter in which we have highlighted to our members and the public on numerous occasions our concerns regarding development across Alaska's Arctic, including the Beaufort and Chukchi Seas and threats to wildlife living in the Atlantic Ocean and along its shores.

15.     In order to protect its significant interests in the species and habitats of these areas, the Center has put a great deal of resources into preventing harmful seismic activity and oil drilling. Among other things, the Center challenged Shell Oil's plans to drill in the Arctic Ocean, and submitted extensive comments to the federal government opposing its plan to allow seismic oil and gas exploration in the Atlantic Ocean.

16.     In sum, the Center has a strong organizational interest in the species and habitats of the Beaufort and Chukchi Seas, and the Atlantic Ocean, and the proper and lawful management of these public waters. In advocating for these interests, the Center represents itself and its members. Center members have visited and will continue to visit the Beaufort and Chukchi Seas, the Atlantic Ocean, and their shores for recreational, aesthetic and educational purposes including hiking, wildlife watching, and photography. Center members rely on the Center to represent their interests with regard to advocacy on behalf of the species and habitats of these areas.

17.     Seismic exploration and oil and gas development in the Beaufort and Chukchi Seas and in the Atlantic Ocean would irreversibly harm the Center's members' use and enjoyment of the area and the species that rely on the area. Center members' interests in viewing wildlife and enjoying untrammeled landscapes would be harmed by seismic exploration and oil and gas development in these areas. Such activities would destroy important habitat and disturb species such as the polar bear that are already imperiled by global warming and offshore oil

development, and the North Atlantic right whale already struggling with survival due to entanglement in fishing gear and other threats. The Center's efforts to protect polar bears, walrus, bowhead whales, and other Arctic species, as well right whales, bluefin tuna, sea turtles and other Atlantic species could all be for naught in the event of a large oil spill.

18.     I also have a long-running personal interest in the species and landscapes in Alaska generally, and in the Arctic in particular. My interests in these areas will be irreversibly harmed by opening these areas to oil development.

19.     My first visit to Alaska was in 1987 when I served as crew on a conservation vessel documenting the impacts of drift-gillnets on marine mammals and seabirds. As part of that trip I visited Dutch Harbor, various Aleutian Islands, and the Pribilof Islands. We saw innumerable marine mammals, including thousands of fur seals, Steller sea lions, sea otters, harbor and Dall's porpoise, killer whales, humpback whales, gray whales, several beaked whales, and other species. As a result of that voyage I developed a strong interest in Alaska wildlife, particularly the marine mammals and seabirds of the Bering Sea and Arctic. I have subsequently visited Alaska more than a dozen times, in each case, at least in part, to view wildlife.

20.     In 1999 I visited the Alaskan Arctic for the first time. I helped organize, and participated in, a 3-week raft trip down the Colville River. We started near the confluence with the Kiligwa River and explored approximately 250 miles of the river and adjacent areas between the put-in and our take-out at Umiat. Along the way I was fortunate to observe numerous different wildlife species, including mammals such as grizzly, caribou, weasels, and lemmings, raptors such as peregrine falcons, gyrfalcons and rough-legged hawks, and waterbirds such as red-throated and yellow-billed loons and brant. At several places, such as along the Killik River

and near Umiat, I went on extensive hikes looking for wildlife, as well as rare flowers, bryophytes, and fungi..

21.     My enjoyment of Alaska's Arctic on this trip was not only of the wildlife, but also of the sense of isolation, wilderness, quiet, and the "unspoilt" nature of the place. Over the course of three weeks on the river, we saw no other people until we reached Umiat. We only saw one plane fly overhead. While the primary experience was of an area seemingly untouched by industry, in a few places we saw the debris and damage of previous oil exploration and related human activities: old ice roads, piles of abandoned 55-gallon drums, and of course the development and detritus of Umiat. Seeing such things is, I fear, but a taste of the much greater devastation and impact that further oil development in the Arctic Ocean would bring.

22.     I visited the Arctic National Wildlife Refuge in 2000. On this trip I was fortunate to see wolves, musk-ox, caribou, long-tailed ducks, common eiders, Pacific brant, and numerous other species of wildlife. This trip reaffirmed my interest in the Alaskan Arctic, the species that inhabit it, and the wilderness values the area maintains. On that trip we reached the Beaufort Sea coast and paddled out to a barrier island. I also ventured out onto the sea ice and observed a bearded seal. I spent many hours scanning the sea ice and open water leads looking for polar bears, seals and other marine life. At the end of that trip we flew along the Beaufort Sea coast to Kaktovik, during which time I was able to observe and enjoy the beauty and wildness of the region.

23.     While my 2000 trip to the Beaufort Sea provided me with the opportunity to observe and enjoy the wildlife of the region, it also allowed me to view firsthand the threats to the region from oil and gas exploration activities. For the last several days of our trip, during certain atmospheric conditions, the Warthog exploration rig would loom into view over the

horizon. My understanding is that it was used a couple years earlier but had yet to be removed from the area. Each time in became visible, the experience of being in an unspoiled wilderness area abruptly transitioned into being in an area threatened and tarnished by industrial development, greatly diminishing my experience. I fear that the activities flowing from the state's oil and gas development plans will have a similar effect on a broad region of Alaska's Arctic.

24.     Another trip to Alaska's Arctic was in April 2008 when I visited the Beaufort and Chukchi Seas. Based out of Barrow, I paid multiple visits to these frozen seas, walking and driving along the coast, and traveling by foot and snow machine on the sea ice itself, always looking for wildlife. The highlight of this trip was a snow machine trip several miles onto the ice of the Chukchi Sea, reaching the area where the shore-fast ice ends and the first major lead in the ice begins. In this area I looked for polar bears, seals, birds and whales. I saw a ringed seal, king eiders and black guillemots. The bowhead whale migration past that area was just getting underway, so seeing bowheads was a real possibility, which greatly added to my experience. Unfortunately, I did not see any bowheads on that trip. Nevertheless, the fact that seeing these incredible animals was possible was a primary motivation for traveling that far out on the ice. I certainly intend to return to the area an attempt to observe and appreciate bowhead whales. Anything that made that more difficult, such as industrial noise that drove these whales further from the coast, would hinder those efforts.

25.     Given my particular interest in polar bears, I have visited the Arctic over a half-dozen times with the specific intent to see the species, and have been fortunate enough to see polar bears on most of these trips. My next such trip is set for November or this year.  I also

intend to visit the Arctic Refuge, including the Beaufort Sea coast and Kaktovik in late summer 2019.

26.     In sum, I have been to the Beaufort and Chukchi Seas specifically and the Arctic generally many times over the years and intend to continue to do so.  I have derived a great deal of personal fulfillment from these trips. My visits there rendered my interests in Arctic wildlife into a concrete interest in the species present in and dependent upon the unspoiled habitats of the region. President Trump's executive order purporting to reverse protections that barred new oil and gas leasing in the Chukchi Sea and most of the Beaufort Sea threaten to gravely harm the species and habitats of the Arctic Ocean, and consequently, my interest in them.


I declare under penalty of perjury that the foregoing is true and correct.


Dated:___6/6/18_____          _____

                                                                    Brendan Cummings

Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (admitted *pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Nancy S. Marks (N.Y. Bar No. 2121820) (admitted *pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street, 11th Floor
New York, NY 10011
T: 212.727.4414 / F: 415.795.4799
E: nmarks@nrdc.org

*Attorneys for Plaintiffs League of Conservation Voters et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants*. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS

of a five-year leasing program through an extensive public planning process.  API
Motion to Dismiss, Dkt. 25 at 13-16.  API also describes the statutorily prescribed
means and fora for legal challenges to the agency's decisions at each of those
stages.  *Id.* at 17-19.  Plaintiffs agree.  Were Plaintiffs challenging one of those
statutorily described Interior Department decisions, they would be required to do
so in accordance with 43 U.S.C. § 1349, OCSLA's citizen suit provision.  This
case, however, is a challenge to a different decision, one outside of and prior to the
four stages, that was made by presidential order rather than an agency
administrative process, and that is thus not subject to the restrictions section 1349
imposes on challenges to those agency decisions.[1]

Ignoring the plain language of the statute, API argues that section 1349(c)
requires that cases like this be brought only in the D.C. Circuit Court of Appeals.
Dkt. 25 at 17.  The closest API comes to a rationale linked to this case is the
assertion that the challenge to President Trump's order is the same "type of
challenge" as one to a five-year program decision made by the Secretary of the
Interior, which could be brought only under section 1349(c) and in the D.C.
Circuit.  *Id.* at 22 (describing this as a case about "whether areas of the [outer

---

[1]Likewise, because Plaintiffs do not raise a "challenge to the procedure of an
agency action" covered by OCSLA's citizen suit provision, Dkt. 25 at 20, API's
citation to cases addressing procedural challenges to decisions subject to venue
provisions, *id.* at 20-21, is also misplaced.

Federal Register

Vol. 82, No. 84

Wednesday, May 3, 2017

# Presidential Documents

Executive Order 13795 of April 28, 2017

## Implementing an America-First Offshore Energy Strategy

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Outer Continental Shelf Lands Act, 43 U.S.C. 1331 *et seq.,* and in order to maintain global leadership in energy innovation, exploration, and production, it is hereby ordered as follows:

**Section 1**. *Findings.* America must put the energy needs of American families and businesses first and continue implementing a plan that ensures energy security and economic vitality for decades to come. The energy and minerals produced from lands and waters under Federal management are important to a vibrant economy and to our national security. Increased domestic energy production on Federal lands and waters strengthens the Nation's security and reduces reliance on imported energy. Moreover, low energy prices, driven by an increased American energy supply, will benefit American families and help reinvigorate American manufacturing and job growth. Finally, because the Department of Defense is one of the largest consumers of energy in the United States, domestic energy production also improves our Nation's military readiness.

**Sec. 2**. *Policy.* It shall be the policy of the United States to encourage energy exploration and production, including on the Outer Continental Shelf, in order to maintain the Nation's position as a global energy leader and foster energy security and resilience for the benefit of the American people, while ensuring that any such activity is safe and environmentally responsible.

**Sec. 3**. *Implementing an America-First Offshore Energy Strategy.* To carry out the policy set forth in section 2 of this order, the Secretary of the Interior shall:

(a) as appropriate and consistent with applicable law, including the procedures set forth in section 1344 of title 43, United States Code, in consultation with the Secretary of Defense, give full consideration to revising the schedule of proposed oil and gas lease sales, as described in that section, so that it includes, but is not limited to, annual lease sales, to the maximum extent permitted by law, in each of the following Outer Continental Shelf Planning Areas, as designated by the Bureau of Ocean Energy Management (BOEM) (Planning Areas): Western Gulf of Mexico, Central Gulf of Mexico, Chukchi Sea, Beaufort Sea, Cook Inlet, Mid-Atlantic, and South Atlantic;

(b) ensure that any revisions made pursuant to subsection (a) of this section do not hinder or affect ongoing lease sales currently scheduled as part of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program, as published on November 18, 2016; and

(c) develop and implement, in coordination with the Secretary of Commerce and to the maximum extent permitted by law, a streamlined permitting approach for privately funded seismic data research and collection aimed at expeditiously determining the offshore energy resource potential of the United States within the Planning Areas.

**Sec. 4**. *Responsible Planning for Future Offshore Energy Potential.* (a) The Secretary of Commerce shall, unless expressly required otherwise, refrain from designating or expanding any National Marine Sanctuary under the National Marine Sanctuaries Act, 16 U.S.C. 1431 *et seq.,* unless the sanctuary designation or expansion proposal includes a timely, full accounting from the Department of the Interior of any energy or mineral resource potential

within the designated area—including offshore energy from wind, oil, natural gas, methane hydrates, and any other sources that the Secretary of Commerce deems appropriate—and the potential impact the proposed designation or expansion will have on the development of those resources. The Secretary of the Interior shall provide any such accounting within 60 days of receiving a notification of intent to propose any such National Marine Sanctuary designation or expansion from the Secretary of Commerce.

(b) The Secretary of Commerce, in consultation with the Secretary of Defense, the Secretary of the Interior, and the Secretary of Homeland Security, shall conduct a review of all designations and expansions of National Marine Sanctuaries, and of all designations and expansions of Marine National Monuments under the Antiquities Act of 1906, recently recodified at sections 320301 to 320303 of title 54, United States Code, designated or expanded within the 10-year period prior to the date of this order.

(i) The review under this subsection shall include:

(A) an analysis of the acreage affected and an analysis of the budgetary impacts of the costs of managing each National Marine Sanctuary or Marine National Monument designation or expansion;

(B) an analysis of the adequacy of any required Federal, State, and tribal consultations conducted before the designations or expansions; and

(C) the opportunity costs associated with potential energy and mineral exploration and production from the Outer Continental Shelf, in addition to any impacts on production in the adjacent region.

(ii) Within 180 days of the date of this order, the Secretary of Commerce, in consultation with the Secretary of Defense and the Secretary of the Interior, shall report the results of the review under this subsection to the Director of the Office of Management and Budget, the Chairman of the Council on Environmental Quality, and the Assistant to the President for Economic Policy.

(c) To further streamline existing regulatory authorities, Executive Order 13754 of December 9, 2016 (Northern Bering Sea Climate Resilience), is hereby revoked.

**Sec. 5.** *Modification of the Withdrawal of Areas of the Outer Continental Shelf from Leasing Disposition.* The body text in each of the memoranda of withdrawal from disposition by leasing of the United States Outer Continental Shelf issued on December 20, 2016, January 27, 2015, and July 14, 2008, is modified to read, in its entirety, as follows:

"Under the authority vested in me as President of the United States, including section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing, for a time period without specific expiration, those areas of the Outer Continental Shelf designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 *et seq.*"

Nothing in the withdrawal under this section affects any rights under existing leases in the affected areas.

**Sec. 6.** *Reconsideration of Notice to Lessees and Financial Assurance Regulatory Review.* The Secretary of the Interior shall direct the Director of BOEM to take all necessary steps consistent with law to review BOEM's Notice to Lessees No. 2016–N01 of September 12, 2016 (Notice to Lessees and Operators of Federal Oil and Gas, and Sulfur Leases, and Holders of Pipeline Right-of-Way and Right-of-Use and Easement Grants in the Outer Continental Shelf), and determine whether modifications are necessary, and if so, to what extent, to ensure operator compliance with lease terms while minimizing unnecessary regulatory burdens. The Secretary of the Interior shall also review BOEM's financial assurance regulatory policy to determine the extent to which additional regulation is necessary.

**Sec. 7.** *Reconsideration of Well Control Rule.* The Secretary of the Interior shall review the Final Rule of the Bureau of Safety and Environmental

Enforcement (BSEE) entitled ''Oil and Gas and Sulfur Operations in the Outer Continental Shelf-Blowout Preventer Systems and Well Control,'' 81 *Fed. Reg.* 25888 (April 29, 2016), for consistency with the policy set forth in section 2 of this order, and shall publish for notice and comment a proposed rule revising that rule, if appropriate and as consistent with law. The Secretary of the Interior shall also take all appropriate action to lawfully revise any related rules and guidance for consistency with the policy set forth in section 2 of this order. Additionally, the Secretary of the Interior shall review BSEE's regulatory regime for offshore operators to determine the extent to which additional regulation is necessary.

**Sec. 8.** *Reconsideration of Proposed Offshore Air Rule.* The Secretary of the Interior shall take all steps necessary to review BOEM's Proposed Rule entitled ''Air Quality Control, Reporting, and Compliance,'' 81 *Fed. Reg.* 19718 (April 5, 2016), along with any related rules and guidance, and, if appropriate, shall, as soon as practicable and consistent with law, consider whether the proposed rule, and any related rules and guidance, should be revised or withdrawn.

**Sec. 9.** *Expedited Consideration of Incidental Harassment Authorizations, Incidental-Take, and Seismic Survey Permits.* The Secretary of the Interior and the Secretary of Commerce shall, to the maximum extent permitted by law, expedite all stages of consideration of Incidental Take Authorization requests, including Incidental Harassment Authorizations and Letters of Authorization, and Seismic Survey permit applications under the Outer Continental Shelf Lands Act, 43 U.S.C. 1331 *et seq.,* and the Marine Mammal Protection Act, 16 U.S.C. 1361 *et seq.*

**Sec. 10.** *Review of National Oceanic and Atmospheric Administration (NOAA) Technical Memorandum NMFS–OPR–55.* The Secretary of Commerce shall review NOAA's Technical Memorandum NMFS–OPR–55 of July 2016 (Technical Guidance for Assessing the Effects of Anthropogenic Sound on Marine Mammal Hearing) for consistency with the policy set forth in section 2 of this order and, after consultation with the appropriate Federal agencies, take all steps permitted by law to rescind or revise that guidance, if appropriate.

**Sec. 11.** *Review of Offshore Arctic Drilling Rule.* The Secretary of the Interior shall immediately take all steps necessary to review the Final Rule entitled ''Oil and Gas and Sulfur Operations on the Outer Continental Shelf—Requirements for Exploratory Drilling on the Arctic Outer Continental Shelf,'' 81 *Fed. Reg.* 46478 (July 15, 2016), and, if appropriate, shall, as soon as practicable and consistent with law, publish for notice and comment a proposed rule suspending, revising, or rescinding this rule.

**Sec. 12.** *Definition.* As used in this order, ''Outer Continental Shelf Planning Areas, as designated by the Bureau of Ocean Energy Management'' means those areas delineated in the diagrams on pages S–5 and S–8 of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Draft Proposed Program, as published by the BOEM in January 2015, with the exception of any buffer zones included in such planning documents.

**Sec. 13.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*April 28, 2017.*

[FR Doc. 2017–09087
Filed 5–2–17; 11:15 am]
Billing code 3295–F7–P

*Administration of Barack Obama, 2016*

## Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing
*December 20, 2016*

*Memorandum for the Secretary of the Interior*

*Subject:* Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf from Mineral Leasing

Consistent with principles of responsible public stewardship entrusted to this office, with due consideration of (1) the important, irreplaceable values of the Chukchi Sea and portions of the Beaufort Sea for marine mammals, other wildlife, wildlife habitat, scientific research, and Alaska Native subsistence use; (2) the vulnerability of these ecosystems to an oil spill; and (3) the unique logistical, operational, safety, and scientific challenges and risks of oil extraction and spill response in these Arctic waters, as described in the report of the Arctic Executive Steering Committee Task Force on oil spill response, chaired by the U.S. Coast Guard, I hereby direct as follows:

Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing for a time period without specific expiration the following areas of the Outer Continental Shelf: (1) the area designated by the Bureau of Ocean Energy Management as the Chukchi Sea Planning Area that is not currently withdrawn; and (2) the area designated by the Bureau of Ocean Energy Management as the Beaufort Sea Planning Area that is not currently withdrawn except for those Outer Continental Shelf nearshore lease blocks identified in the attached table. The boundaries of the withdrawn areas are more specifically delineated in the attached map, excepting only the Outer Continental Shelf lease blocks in the Beaufort Sea Planning Area listed as "not withdrawn" in the accompanying table. Both the map and table form a part of this memorandum, with the lease blocks in the table governing the boundaries of the area not included in the withdrawal of the Beaufort Sea Planning Area. The withdrawal directed by this memorandum prevents consideration of withdrawn areas for any mineral leasing for purposes of exploration, development, or production.

Nothing in this withdrawal affects rights under existing leases in the withdrawn areas.

Barack Obama

*Categories:* Communications to Federal Agencies : U.S. Arctic Outer Continental Shelf, mineral leasing, memorandum on withdrawal.

*Subjects:* Arctic : Conservation efforts; Energy : Offshore oil and gas drilling; U.S. Outer Continental Shelf, Arctic and Atlantic Oceans, withdrawal from mineral leasing.

*DCPD Number:* DCPD201600860.

*Administration of Barack Obama, 2016*

## Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf From Mineral Leasing

*December 20, 2016*

*Memorandum for the Secretary of the Interior*

*Subject:* Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing

Consistent with principles of responsible public stewardship entrusted to this office, with due consideration of the critical importance of canyons along the edge of the Atlantic continental shelf for marine mammals, deep water corals, other wildlife, and wildlife habitat, and to ensure that the unique resources associated with these canyons remain available for future generations, I hereby direct as follows:

Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing for a time period without specific expiration the areas of the Outer Continental Shelf (OCS) associated with 26 major canyons and canyon complexes offshore the Atlantic coast lying within areas currently designated by the Bureau of Ocean Energy Management as the North Atlantic and Mid-Atlantic Planning Areas. The boundaries are delineated in the attached map and accompanying table of OCS blocks. Both the map and the table form a part of this memorandum. This withdrawal prevents consideration of this area for any future mineral leasing for purposes of exploration, development, or production.

Nothing in this withdrawal affects rights under existing leases in the withdrawn areas.

BARACK OBAMA

*Categories:* Communications to Federal Agencies : U.S. Atlantic Outer Continental Shelf, mineral leasing, memorandum on withdrawal.

*Subjects:* Energy : Offshore oil and gas drilling; Environment : Conservation :: Wildlife preservation, strengthening efforts; U.S. Outer Continental Shelf, Arctic and Atlantic Oceans, withdrawal from mineral leasing.

*DCPD Number:* DCPD201600861.

*Administration of Barack Obama, 2016*

**Executive Order 13754—Northern Bering Sea Climate Resilience**
*December 9, 2016*

By the authority vested in me as the President by the Constitution and the laws of the United States of America, including the Outer Continental Shelf Lands Act, 43 U.S.C. 1331 *et seq.*, it is hereby ordered as follows:

*Section 1. Purpose.* As recognized in Executive Order 13689 of January 21, 2015, (Enhancing Coordination of National Efforts in the Arctic), Arctic environmental stewardship is in the national interest. In furtherance of this principle, and as articulated in the March 10, 2016, U.S.-Canada Joint Statement on Climate, Energy, and Arctic Leadership, the United States has resolved to confront the challenges of a changing Arctic by working to conserve Arctic biodiversity; support and engage Alaska Native tribes; incorporate traditional knowledge into decisionmaking; and build a sustainable Arctic economy that relies on the highest safety and environmental standards, including adherence to national climate goals. The United States is committed to achieving these goals in partnership with indigenous communities and through science-based decisionmaking. This order carries forth that vision in the northern Bering Sea region.

The Bering Sea and Bering Strait are home to numerous subsistence communities, rich indigenous cultures, and unique marine ecosystems, each of which plays an important role in maintaining regional resilience. The changing climate and rising average temperatures are reducing the occurrence of sea ice; changing the conditions for fishing, hunting, and subsistence whaling; and opening new navigable routes to increased ship traffic. The preservation of a healthy and resilient Bering ecosystem, including its migratory pathways, habitat, and breeding grounds, is essential for the survival of marine mammals, fish, seabirds, other wildlife, and the subsistence communities that depend on them. These communities possess a unique understanding of the Arctic ecosystem, and their traditional knowledge should serve as an important resource to inform Federal decisionmaking.

*Sec. 2. Policy.* It shall be the policy of the United States to enhance the resilience of the northern Bering Sea region by conserving the region's ecosystem, including those natural resources that provide important cultural and subsistence value and services to the people of the region. For the purpose of carrying out the specific directives provided herein, this order delineates an area hereafter referred to as the "Northern Bering Sea Climate Resilience Area," in which the exercise of relevant authorities shall be coordinated among all executive departments and agencies (agencies). All agencies charged with regulating, overseeing, or conducting activities in the Northern Bering Sea Climate Resilience Area shall do so with attention to the rights, needs, and knowledge of Alaska Native tribes; the delicate and unique ecosystem; the protection of marine mammals, fish, seabirds, and other wildlife; and with appropriate coordination with the State of Alaska.

The boundary of the Northern Bering Sea Climate Resilience Area includes waters within the U.S. Exclusive Economic Zone bounded to the north by the seaward boundary of the Bering Straits Native Corporation established pursuant to the Alaska Native Claims Settlement Act; to the south by the southern boundaries of the Northern Bering Sea Research Area, the St. Matthew Habitat Conservation Area, and the Nunivak-Kuskokwim Habitat Conservation Area; and to the west by the maritime boundary delimited by the Agreement Between the

United States of America and the Union of Soviet Socialist Republics on the Maritime Boundary, signed at Washington, June 1, 1990.

*Sec. 3. Withdrawal.* Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing for a time period without specific expiration the following areas of the Outer Continental Shelf: (1) the area currently designated by the Bureau of Ocean Energy Management as the Norton Basin Planning Area; and (2) the Outer Continental Shelf lease blocks within the Bureau of Ocean Energy Management's St. Matthew-Hall Planning Area lying within 25 nautical miles of St. Lawrence Island. The boundaries of the withdrawn areas are more specifically delineated in the attached map and, with respect to the St. Matthew-Hall Planning Area, the accompanying table of withdrawn Outer Continental Shelf lease blocks. Both the map and table form a part of this order, with the table governing the withdrawal and withdrawal boundaries within the St. Matthew-Hall Planning Area. This withdrawal prevents consideration of these areas for future oil or gas leasing for purposes of exploration, development, or production. This withdrawal furthers the principles of responsible public stewardship entrusted to this office and takes due consideration of the importance of the withdrawn area to Alaska Native tribes, wildlife, and wildlife habitat, and the need for regional resiliency in the face of climate change. Nothing in this withdrawal affects rights under existing leases in the withdrawn areas.

*Sec. 4. Task Force on the Northern Bering Sea Climate Resilience Area.* (a) There is established a Task Force on the Northern Bering Sea Climate Resilience Area (Bering Task Force), under the Arctic Executive Steering Committee (AESC) established in Executive Order 13689, to be co-chaired by an office of the Department of the Interior, the National Oceanic and Atmospheric Administration, and the U.S. Coast Guard.

(b) The membership of the Bering Task Force (member agencies) shall include, in addition to the Co-Chairs, designated senior-level representatives from:

> (i) the Department of State;

> (ii) the Department of Defense;

> (iii) the Department of Transportation;

> (iv) the Environmental Protection Agency;

> (v) the U.S. Army Corps of Engineers;

> (vi) the U.S. Arctic Research Commission;

> (vii) the National Science Foundation; and

> (viii) such agencies and offices as the Co-Chairs may designate.

(c) Consistent with the authorities and responsibilities of its member agencies, the Bering Task Force, with the purpose of advancing the United States policy in the Northern Bering Sea Climate Resilience Area as set forth in section 2 of this order, shall:

> (i) Establish and provide regular opportunities to consult with the Bering Intergovernmental Tribal Advisory Council as described in section 5 of this order;

> (ii) Coordinate activities of member agencies, including regulatory, policy, and research activities, affecting the Northern Bering Sea Climate Resilience Area and its value for subsistence and cultural purposes;

(iii) Consider the need for additional actions or strategies to advance the policies established in section 2 of this order and provide recommendations as appropriate to the President through the AESC;

(iv) Consider and make recommendations with respect to the impacts of shipping on the Northern Bering Sea Climate Resilience Area including those described in sections 7 and 8 of this order; and

(v) In developing and implementing recommendations, coordinate or consult as appropriate with existing AESC working groups, the State of Alaska, regional and local governments, Alaska Native tribal governments, Alaska Native corporations and organizations, the private sector, other relevant organizations, and academia.

*Sec. 5. The Bering Intergovernmental Tribal Advisory Council.* (a) The Bering Task Force, within 6 months of the date of this order, and after considering recommendations from Alaska Native tribal governments, shall, in accordance with existing law, establish a Bering Intergovernmental Tribal Advisory Council, for the purpose of providing input to the Bering Task Force and facilitating effective consultation with Alaska Native tribal governments.

(b) The Bering Intergovernmental Tribal Advisory Council shall be charged with providing input and recommendations on activities, regulations, guidance, or policy that may affect actions or conditions in the Northern Bering Sea Climate Resilience Area, with attention given to climate resilience; the rights, needs, and knowledge of Alaska Native tribes; the delicate and unique ecosystem; and the protection of marine mammals and other wildlife.

(c) The Bering Intergovernmental Tribal Advisory Council should include between 9 and 11 elected officials or their designees representing Alaska Native tribal governments with a breadth of interests in the Northern Bering Sea Climate Resilience Area, and may include such additional Federal officials and State and local government elected officials as the Bering Task Force deems appropriate. The Bering Intergovernmental Tribal Advisory Council will adopt such procedures as it deems necessary to govern its activities.

*Sec. 6. Traditional Knowledge in Decisionmaking.* It shall be the policy of the United States to recognize and value the participation of Alaska Native tribal governments in decisions affecting the Northern Bering Sea Climate Resilience Area and for all agencies to consider traditional knowledge in decisions affecting the Northern Bering Sea Climate Resilience Area. Specifically, all agencies shall consider applicable information from the Bering Intergovernmental Tribal Advisory Council in the exercise of existing agency authorities. Such input may be received through existing agency procedures and consultation processes.

*Sec. 7. Pollution from Vessels.* The Bering Task Force, within 9 months of the date of this order and after coordination as needed with existing working groups within the AESC, shall provide the AESC with recommendations on:

(a) Actions to ensure or support implementation of the International Code for Ships Operating in Polar Waters, as adopted by the International Maritime Organization, especially with respect to limitations on discharges from vessels in the Northern Bering Sea Climate Resilience Area; and

(b) Any additional measures necessary to achieve the policies established in section 2 of this order, such as the potential identification of zero-discharge zones, assessments of the pollution risks posed by increased vessel traffic, or noise reduction measures associated with sensitive ecological and cultural areas within the Northern Bering Sea Climate Resilience Area.

*Sec. 8. Shipping Routing Measures.* (a) In recognition of the United States commitment to reduce the impact of shipping within the Bering Sea and the Bering Strait and the many environmental factors in the Northern Bering Sea Climate Resilience Area that inform the best routes for navigation, safety, and the marine environment, the U.S. Coast Guard should conclude its ongoing port access route study for the Chukchi Sea, Bering Strait, and Bering Sea (Bering Sea PARS) pursuant to the Ports and Waterways Safety Act, 33 U.S.C. 1221 *et seq*.

(b) In designation of routes and any areas to be avoided, and consistent with existing authorities, consideration should be given to the Northern Bering Sea Climate Resilience Area, including the effects of shipping and vessel pollution on the marine environment, fishery resources, the seabed and subsoil of the Outer Continental Shelf, marine mammal migratory pathways and other biologically important areas, and subsistence whaling, hunting, and fishing.

(c) In recognition of the value of participation of Alaska Native tribal governments in decisions affecting the Northern Bering Sea Climate Resilience Area, the U.S. Coast Guard should consider traditional knowledge, including with respect to marine mammal, waterfowl, and seabird migratory pathways and feeding and breeding grounds, in the development of the Bering Sea PARS, establishment of routing measures and any areas to be avoided, and subsequent rulemaking and management decisions.

(d) No later than December 30, 2016, the U.S. Coast Guard shall publish preliminary findings for the Bering Sea PARS in the *Federal Register*, including information related to its status, potential routing measures, and its projected schedule. The U.S. Coast Guard should also consider using this opportunity to provide notice of any new information or proposed measures resulting from its ongoing consultation process.

(e) Upon completion of the Bering Sea PARS, the U.S. Coast Guard shall promptly issue a notice of proposed rulemaking for any designation contemplated on the basis of the study. The U.S. Coast Guard shall coordinate as appropriate with the Department of State and other coastal nations and submit any proposed routing measures to the International Maritime Organization by 2018 for the purpose of their adoption and implementation.

*Sec. 9. Oil Spill Preparedness.* The U.S. Coast Guard, in coordination with all relevant agencies and the State of Alaska, shall update the Area Contingency plans, the Subarea Response Plans, and the Geographic Response Strategies relevant to the Northern Bering Sea Climate Resilience Area. These plans and strategies shall be consistent with the National Contingency Plan, and shall include appropriate measures to improve local response capacity and preparedness such as spill response training opportunities for local communities, including Hazardous Waste Operations and Emergency Response training for Village Public Safety Officers and other first responders.

*Sec. 10. Continuity of Existing Habitat Protection.* The area included in the Northern Bering Sea Climate Resilience Area is currently closed to commercial non-pelagic trawl gear under rules implementing the Fishery Management Plans of the Bering Sea and Aleutian Islands Management Area and the Arctic Management Area. Consistent with existing law, the National Oceanic and Atmospheric Administration, in coordination with the North Pacific Fishery Management Council, shall take such actions as are necessary to support the policy set forth in section 2 of this order, including actions to maintain the existing prohibitions on the use of commercial non-pelagic trawl gear.

*Sec. 11. General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(1) the authority granted by law to a department, agency, or the head thereof; or

(2) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistently with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The policies set forth in this order are consistent with existing U.S. obligations under international law and nothing in this order shall be construed to derogate from obligations under applicable international law.

BARACK OBAMA

The White House,
December 9, 2016.

[Filed with the Office of the Federal Register, 11:15 a.m., December 13, 2016]

NOTE: This Executive order and its attached annex were published in the *Federal Register* on December 14.

*Categories:* Executive Orders : Northern Bering Sea, climate resilience.

*Subjects:* Environment : Climate change; Northern Bering Sea.

*DCPD Number:* DCPD201600836.

*Administration of Barack Obama, 2015*

## Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska From Leasing Disposition
*January 27, 2015*

*Memorandum for the Secretary of the Interior*

*Subject:* Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska from Leasing Disposition

Consistent with principles of responsible public stewardship entrusted to this office, with due consideration of the critical importance of certain areas within the Beaufort and Chukchi Seas to subsistence use by Alaska Natives as well as for marine mammals, other wildlife, and wildlife habitat, and to ensure that the unique resources of these areas remain available for future generations, I hereby direct as follows:

Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing for a time period without specific expiration (1) the areas of the Outer Continental Shelf (OCS) currently designated by the Bureau of Ocean Energy Management as leasing deferral areas within the Chukchi Sea Planning Area and the Beaufort Sea Planning Area in the 5-year oil and gas leasing program for 2012–2017; and (2) the Hanna Shoal region of the Chukchi Sea Planning Area lying within the contours of the 40-meter isobath. The boundaries of the withdrawn areas are more specifically delineated in the attached maps and accompanying table of OCS blocks. Both the maps and table form a part of this memorandum. This withdrawal prevents consideration of these areas for any future oil or gas leasing for purposes of exploration, development, or production.

Nothing in this withdrawal affects the rights under existing leases in the withdrawn areas.

BARACK OBAMA

*Categories:* Communications to Federal Agencies : U.S. Outer Continental Shelf, withdrawal of areas from leasing disposition, memorandum.

*Subjects:* Alaska : Outer Continental Shelf, withdrawal of areas from leasing disposition; Energy : Domestic sources; Energy : Offshore oil and gas drilling; Environment : Conservation :: Wildlife preservation, strengthening efforts.

*DCPD Number:* DCPD201500059.

*Administration of Barack Obama, 2014*

## Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf From Leasing Disposition
*December 16, 2014*

*Memorandum for the Secretary of the Interior*

*Subject:* Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition

Consistent with principles of responsible public stewardship entrusted to this office, with due consideration of the importance of Bristol Bay and the North Aleutian Basin Planning Area to subsistence use by Alaska Natives, wildlife, wildlife habitat, and sustainable commercial and recreational fisheries, and to ensure that the unique resources of Bristol Bay remain available for future generations, I hereby revoke my memorandum of March 31, 2010 (Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition), and direct as follows:

Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing for a time period without specific expiration the area of the Outer Continental Shelf currently designated by the Bureau of Ocean Energy Management as the North Aleutian Basin Planning Area (Area), including Bristol Bay, offshore Alaska. This withdrawal prevents consideration of this Area for any oil or gas leasing for purposes of exploration, development, or production.

Nothing in this withdrawal affects the rights under existing leases in this Area.

Barack Obama

*Categories:* Communications to Federal Agencies : United States Outer Continental Shelf, withdrawal of certain areas from leasing disposition, memorandum.

*Subjects:* American Indians and Alaska Natives : Tribal nations, relations with Federal Government; Energy : Domestic sources; Energy : Offshore oil and gas drilling; Environment : Conservation :: Wildlife preservation, strengthening efforts.

*DCPD Number:* DCPD201400934.

*Administration of Barack H. Obama, 2010*

**Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf From Leasing Disposition**
*March 31, 2010*

*Memorandum for the Secretary of the Interior*

*Subject:* Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition

Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing through June 30, 2017, the Bristol Bay area of the North Aleutian Basin in Alaska. This withdrawal prevents consideration of Bristol Bay for leasing for any oil or gas development in the Outer Continental Shelf, whether for exploratory or production purposes.

Nothing in this withdrawal affects the rights under existing leases in this area.

BARACK OBAMA

*Categories:* Communications to Federal Agencies : United States Outer Continental Shelf, withdrawal of certain areas from leasing disposition, memorandum.

*Subjects:* Energy : Domestic sources; Energy : Offshore oil and gas drilling.

*DCPD Number:* DCPD201000214.

FBI Day. I call upon all Americans to recognize the 100th anniversary of the Federal Bureau of Investigation.

**In Witness Whereof,** I have hereunto set my hand this fourteenth day of July, in the year of our Lord two thousand eight, and of the Independence of the United States of America the two hundred and thirty-third.

**George W. Bush**

[Filed with the Office of the Federal Register, 12:03 p.m., July 16, 2008]

NOTE: This proclamation was published in the *Federal Register* on July 17.

## Memorandum on Modification of the Withdrawal of Areas of the United States Outer Continental Shelf From Leasing Disposition

*July 14, 2008*

*Memorandum for the Secretary of the Interior*

*Subject:* Modification of the Withdrawal of Areas of the United States Outer Continental Shelf from Leasing Disposition

Under the authority vested in me as President of the United States, including section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby modify the prior memoranda of withdrawals from disposition by leasing of the United States Outer Continental Shelf issued on August 4, 1992, and June 12, 1998, as modified on January 9, 2007, to read only as follows:

Under the authority vested in me as President of the United States, including section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing, for a time period without specific expiration, those areas of the Outer Continental Shelf designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 *et seq*.

Nothing in this withdrawal affects the rights under existing leases in these areas.

**George W. Bush**

## The President's News Conference

*July 15, 2008*

*The President.* Good morning. It's been a difficult time for many American families who are coping with declining housing values and high gasoline prices. This week, my administration took steps to help address both these challenges.

To help address challenges in the housing and financial markets, we announced temporary steps to help stabilize them and increase confidence in Fannie Mae and Freddie Mac. These two enterprises play a central role in our housing finance system, so Treasury Paulson has worked with the Federal Reserve Chairman, Bernanke, so that the companies and the Government regulators—put the companies and the Government regulators on a plan to strengthen these enterprises. We must ensure they can continue providing access to mortgage credit during this time of financial stress.

I appreciate the positive reaction this plan has received from many Members of Congress. I urge Members to move quickly to enact the plan in its entirety, along with the good oversight legislation that we have recommended for both Fannie Mae and Freddie Mac. This is a part of a—should be part of the housing package that is moving its way through the Congress. And I hope they move quickly. The newly proposed authorities will be temporary and used only if needed. And as we work to maintain the health of Fannie Mae and Freddie Mac, we'll work to ensure that they remain shareholder-owned companies.

To help address the pressure on gasoline prices, my administration took action this week to clear the way for offshore exploration on the Outer Continental Shelf. It's what's called OCS. Congress has restricted access to key parts of the OCS since the early 1980s. I've called on Congress to remove the ban. There was also an executive prohibition on

law and the cause of justice, earning a reputation as a talented lawyer dedicated to excellence. Harriet possesses a tireless work ethic and a strong commitment to serving others. Laura and I are deeply grateful for Harriet's dedication and for her friendship. We wish her the very best in the next chapter of her life.

## Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States Outer Continental Shelf From Leasing Disposition

*January 9, 2007*

*Memorandum for the Secretary of the Interior*

*Subject:* Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition

Under the authority vested in me as President of the United States, including section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby modify the first sentence of the withdrawal of June 12, 1998, of certain areas of the United States Outer Continental Shelf from leasing disposition to read as follows:

Under the authority granted in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing through June 30, 2012, (1) those areas under moratoria pursuant to sections 104 and 106 of Public Law 109–54, and (2) those areas under moratoria pursuant to section 105 of Public Law 109–54, excluding that portion of the Central Gulf of Mexico planning area defined as the "181 South Area" in section 102(2) of title I ("Gulf of Mexico Energy Security") in Division C of Public Law 109–432, the Tax Relief and Health Care Act of 2006.

**George W. Bush**

## Address to the Nation on the War on Terror in Iraq

*January 10, 2007*

Good evening. Tonight in Iraq, the Armed Forces of the United States are engaged in a struggle that will determine the direction of the global war on terror and our safety here at home. The new strategy I outline tonight will change America's course in Iraq and help us succeed in the fight against terror.

When I addressed you just over a year ago, nearly 12 million Iraqis had cast their ballots for a unified and democratic nation. The elections of 2005 were a stunning achievement. We thought that these elections would bring the Iraqis together and that as we trained Iraqi security forces, we could accomplish our mission with fewer American troops.

But in 2006, the opposite happened. The violence in Iraq, particularly in Baghdad, overwhelmed the political gains the Iraqis had made. Al Qaida terrorists and Sunni insurgents recognized the mortal danger that Iraq's elections posed for their cause, and they responded with outrageous acts of murder aimed at innocent Iraqis. They blew up one of the holiest shrines in Shi'a Islam, the Golden Mosque of Samarra, in a calculated effort to provoke Iraq's Shi'a population to retaliate. Their strategy worked. Radical Shi'a elements, some supported by Iran, formed death squads. And the result was a vicious cycle of sectarian violence that continues today.

The situation in Iraq is unacceptable to the American people, and it is unacceptable to me. Our troops in Iraq have fought bravely. They have done everything we have asked them to do. Where mistakes have been made, the responsibility rests with me.

It is clear that we need to change our strategy in Iraq. So my national security team, military commanders, and diplomats conducted a comprehensive review. We consulted Members of Congress from both parties, our allies abroad, and distinguished outside experts. We benefited from the thoughtful recommendations of the Iraq Study

oceanographer Jean-Michel Cousteau; Tony Coelho, U.S. Commissioner General, 1998 World Exposition in Lisbon, Portugal; Lt. Gov. Gray Davis of California; and graduate students Nancy Eufemia and Raphael Sagarin, researchers, Hopkins Marine Station. Dr. Earle, Messrs. Talbot and Cousteau, and the staff, faculty, and graduate students of Moss Marine Laboratories were awarded the National Oceanic and Atmospheric Administration's Environmental Hero Award. This item was not received in time for publication in the appropriate issue.

## Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition

*June 12, 1998*

*Memorandum for the Secretary of the Interior*

*Subject:* Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition

Under the authority granted in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition by leasing through June 30, 2012, those areas of the Outer Continental Shelf currently under moratoria pursuant to sections 108–111 of Public Law 105–83.

I further withdraw from disposition by leasing for a time period without specific expiration those areas of the Outer Continental Shelf currently designated Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 *et seq.*

Nothing in this withdrawal affects the rights under existing leases in these areas. Each of these withdrawals is subject to revocation by the President in the interest of national security.

**William J. Clinton**

NOTE: This item was not received in time for publication in the appropriate issue.

## Remarks at a Reception for Senator Barbara Boxer in San Francisco, California

*June 12, 1998*

*The President.* Thank you very much. First, let me say that I'm not sure it evidences good judgment to try to follow Barbara and Hillary to the microphone. [*Laughter*] But they certainly did a good job, and I enjoyed listening to them. Let me also thank, before I go too far, the San Raphael High School Advanced Jazz Band. They did a great job, and thank you all for playing.

I thank our State Democratic chair, Art Torres, for being here, and all the candidates and officeholders who have come to support Barbara. When I was listening to Senator Boxer and the First Lady talk, and I was watching you listen to them talk, I said to myself, "Well, all these people are for her anyway." [*Laughter*] "So what should I say that would help them get other people to be for her?" And that's what Hillary was trying to do.

Why should a farmer in the San Joaquin Valley vote for this not very tall sparkplug from Northern California who is supposed to be so liberal? [*Laughter*] Why should a businessman in the Silicon Valley? Why should a woman running a small tourist inn in the redwood forest? Why should someone struggling to make ends meet in Los Angeles? Why should someone in San Diego worried about whether there's too much pollution or illegal immigration or whatever on the border? Why should everybody else vote for her, people that aren't here today? That's the case you have to make, you know.

And if you think about the nature of our political debates and the nature of the way the political parties behave in Washington and what our administration has tried to do, I think it really comes down to whether you want progress or politics to dominate the national arena.

Barbara said some of this, and at the risk of being self-serving—I don't want to be—but I want to read this to you, because when I came to you in California in 1991 and '92, I said, "Look, you guys are having a tough time out here, and I know this is the biggest

302

THE WHITE HOUSE

WASHINGTON

August 4, 1992

MEMORANDUM FOR THE SECRETARY OF THE INTERIOR

SUBJECT:        Outer Continental Shelf (OCS) Oil and
                Gas Program for 1992-1997

In the documentation of your decision on the 5-year Outer
Continental Shelf Oil and Gas Program for 1992-1997, you
asserted that my statement on June 26, 1990, concerning
putting certain areas off limits to leasing until after the
year 2000, was made under the authority of section 12(a) of
the Outer Shelf Lands Act, 43 U.S.C. 1341(a).  I hereby confirm
my withdrawal from disposition by leasing of those areas of the
outer Continental Shelf, through December 31, 2000, subject to
revocation should the President determine the scheduling of a
lease sale to be required in the interest of national security.

I further withdraw the remaining 87 tracts in the Southern
California Planning Area pending the completion of additional
studies in response to the report of the National Academy of
Sciences pursuant to the guiding principles I announced June 26,
1990, which satisfactorily address concerns relating to these
tracts.

Since 1988 Mr. Skol has served as Deputy Assistant Secretary of State for the Bureau of Inter-American Affairs. Prior to this, he served as Director of the Office of Andean Affairs, 1987–1988; Minister-Counselor for the U.S. Embassy in Bogota, Colombia, 1985–1987; Deputy Director of the Bureau of Inter-American Affairs in the Office of Policy Planning and Coordination at the State Department, 1982–1985. In addition, Mr. Skol has served as Political Counselor in San José, Costa Rica, 1978–1982; commercial attaché in Rome, 1976–1978; economic/commercial officer in Naples, 1975–1976; and commercial attaché in Santo Domingo, Dominican Republic, 1972–1975. He also served as a desk officer at the State Department Bureau of Inter-American Affairs for Paraguay and Uruguay, 1971–1972, and Costa Rica, 1970–1971; a political officer in Saigon, Vietnam, 1967–1968; and a political officer in Buenos Aires, Argentina, 1966–1967. Mr. Skol entered the Foreign Service in 1965 and became a member of the Senior Foreign Service in 1984.

Mr. Skol graduated from Yale University (B.A., 1964). He was born October 15, 1942, in Chicago, IL. Mr. Skol is married and resides in Washington, DC.

## Statement on Outer Continental Shelf Oil and Gas Development
*June 26, 1990*

I have often stated my belief that development of oil and gas on the outer continental shelf (OCS) should occur in an environmentally sound manner.

I have received the report of the interagency OCS Task Force on Leasing and Development off the coasts of Florida and California and have accepted its recommendation that further steps to protect the environment are needed.

Today I am announcing my support for a moratorium on oil and gas leasing and development in Sale Area 116, Part II, off the coast of Florida; Sale Area 91, off the coast of northern California; Sale Area 119, off the coast of central California; and the vast majority of Sale Area 95, off the coast of southern California, until after the year

2000. The combined effect of these decisions is that the coast of southwest Florida and more than 99 percent of the California coast will be off limits to oil and gas leasing and development until after the year 2000.

Only those areas which are in close proximity to existing oil and gas development in Federal and State waters, comprising less than 1 percent of the tracts off the California coast, *may* be available before then. These areas, concentrated in the Santa Maria Basin and the Santa Barbara Channel, will not be available for leasing in any event until 1996, and then only if the further studies for which I am calling in response to the report of the National Academy of Sciences satisfactorily address concerns related to these tracts.

I am also approving a proposal that would establish a National Marine Sanctuary in California's Monterey Bay and provide for a *permanent* ban on oil and gas development in the sanctuary, and I am asking the Secretary of the Interior to begin a process that may lead to the buyback and cancellation of *existing* leases in Sale Area 116, Part II, off southwest Florida.

In addition, I am directing the Secretary of the Interior to delay leasing and development in several other areas where questions have been raised about the resource potential and the environmental implications of development. For Sale Area 132, off the coasts of Washington and Oregon, I am accepting the recommendation of the Secretary that further leasing and development activity be deferred until a series of environmental studies are completed, and directing that no such activity take place until after the year 2000. I am also canceling Lease Sale 96, in the Georges Bank area of the North Atlantic, and directing that no leasing and development activity take place in this area until after the year 2000. This will allow time for additional studies to determine the resource potential of the area and address the environmental and scientific concerns which have been raised.

Finally, I am today directing the Secretary to take several steps to improve the OCS program and respond to several of the concerns expressed by the task force. My goal is to create a much more carefully targeted OCS program, one that is responsive

to local concerns, to environmental concerns, *and* to the need to develop prudently our nation's domestic energy resources. Although I have today taken these strong steps to protect our environment, I continue to believe that there are significant offshore areas where we can and must go forward with resource development.

While I believe that a leaner OCS program will ultimately be more effective, Americans must recognize that the OCS program is a vital source of fuel for our growing economy. My desire is to achieve a *balance* between the need to provide energy for the American people and the need to protect unique and sensitive coastal and marine environments.

*Note: On the same day the Office of the Press Secretary also released a fact sheet entitled "Presidential Decisions Concerning Oil and Gas Development on the Outer Continental Shelf." Excerpts from that fact sheet follow:*

### Guiding Principles

The President's decisions were based on the following principles:

(1) *Adequate Information and Analysis.* Adequate scientific and technical information regarding the resource potential of each area considered for leasing and the environmental, social, and economic effects of oil and gas activity must be available and subjected to rigorous scrutiny before decisions are made. No new leasing should take place without such information and analysis.

(2) *Environmental Sensitivity.* Certain areas off our coasts represent unique natural resources. In those areas, even the small risks posed by oil and gas development may be too great. In other areas, where science and experience and new recovery technologies show development may be safe, development will be considered.

(3) *Resource Potential.* Priority for development should be given to those areas with the greatest resource potential. Given the inexact nature of resource estimation, particularly offshore, priority should be given to those areas where earlier development has proven the existence of economically recoverable reserves.

(4) *Energy Requirements.* The requirements of our nation's economy for energy and the overall costs and benefits of various sources of energy must be considered in deciding whether to develop oil and gas offshore. The level of petroleum imports, which has been steadily increasing, is a critical factor in this assessment.

(5) *National Security Requirements.* External events, such as supply disruptions, might require a reevaluation of the OCS program. All decisions regarding OCS development are subject to a national security exemption. If the President determines that national security requires development in the areas of these three lease sales or in other areas, he has the ability to direct the Interior Department to open the areas for development.

### General OCS Decisions

The President also decided that:

(1) Air quality controls for oil and gas development offshore California should be substantially the same as those applied onshore.

(2) Immediate steps should be taken to improve the ability of industry and the Federal Government to respond to oilspills offshore, regardless of their source.

(3) Federal agencies should develop a plan to reduce the possibility of oilspills offshore from whatever source, including and especially from tanker traffic. This plan should include moving tanker routes further away from sensitive areas near the Florida Keys and the Everglades.

### Restructuring the OCS Program

The President directed Interior Secretary Lujan to take three actions to improve the overall OCS program:

(1) Improve the information needed to make decisions on OCS development by conducting the studies identified by the National Academy of Sciences and studies to explore new technologies for alleviating the risks of oilspills from OCS platforms and new oil and gas drilling technologies, such as subsea completion technology.

(2) Target proposed sale areas in future OCS 5-year plans to give highest priority to areas with high resource potential and low environmental risk. This will result in offer-

1007

ing much smaller and more carefully selected blocks of tracts.

(3) Prepare a legislative initiative that will provide coastal communities directly affected by OCS development with a greater share of the financial benefits of new development and with a larger voice in decision-making.

*Lease Sale 96 in the North Atlantic*

The President also directed Interior Secretary Lujan to consult with the Governors of the States whose residents would be affected by future development of oil and gas in the North Atlantic.

## Message to the Congress Reporting Budget Deferrals
*June 26, 1990*

*To the Congress of the United States:*

In accordance with the Impoundment Control Act of 1974, I herewith report two revised deferrals of budget authority now totalling $2,547,688,227.

The deferrals affect programs in International Security Assistance and the Department of State. The details of the deferrals are contained in the attached report.

                                   George Bush

The White House,
June 26, 1990.

*Note: The attachment detailing the proposed deferrals will be printed in the "Federal Register."*

## Statement by Press Secretary Fitzwater on the President's Meeting With Thorvald Stoltenberg, United Nations High Commissioner for Refugees
*June 26, 1990*

President Bush met June 26 at the White House with the United Nations High Commissioner for Refugees, Thorvald Stoltenberg. The President expressed his apprecia-

tion and U.S. support for the important worldwide humanitarian work of UNHCR.

President Bush and High Commissioner Stoltenberg discussed the issue of Vietnamese boat people and the overall issue of potential population movements in the coming years. The President restated the U.S. position in support of first asylum in Southeast Asia and against involuntary repatriation to Vietnam under current conditions there. It was agreed that the United States would continue to be in touch with the High Commissioner on the issue of preserving first asylum in Southeast Asia.

## Remarks at the Congressional Barbecue
*June 26, 1990*

*The President.* Glen, thank you. Thank you all very much. You really turned it on tonight.

Let me just say to everybody how pleased—I think I speak for all of you—we are to have Glen here—40 albums, 4 gold singles, and 4 special awards, one of the great musical talents in our country and a friend to everybody out here. And we are very, very pleased, Glen. Thank you for that marvelous, lively performance.

*Mr. Campbell.* You are quite welcome, sir. Thank you, everybody.

*The President.* And all this wonderful band of yours. We're delighted to have you all here. And let me say to the Members of the Congress that Barbara and I are delighted that you came down here—a good, relaxed evening and a beautiful night at the White House. We've got a lot of work ahead, but I think at least as far as we're concerned from this end of Pennsylvania Avenue it's been a joy. We're delighted you were here. Now, make yourselves at home, and thank you once again, Glen Campbell. Thank you so much.

*Mr. Campbell.* Thank you, Mr. President. Thank you a lot.

*Note: The President spoke at 8 p.m. on the South Lawn at the White House.*

1008

overpayments of salary; and to clarify the delegation of authority to that officer to adjust certain claims of postmasters.

Accordingly, in § 812.9 *Authority for remission of fines, penalties, forfeitures, claims; and for Post Office Department fund transfers,* amend paragraph (a) to read as follows:

§ 812.9 Authority for remission of fines, penalties, forfeitures, claims; and Post Office Department fund transfers.

(a) *Delegation.* Pursuant to 39 U.S.C., Sec. 309, "Delegation of Authority" which states:

The Postmaster General may delegate to any officer, employee, or agency of the Department such of the functions vested by law in him or in any other officer or employee of the Department as he deems appropriate.

authority is delegated to the Assistant Postmaster General, Bureau of Finance and Administration, to take final action, in his own name, with respect to all matters covered by the following:

(1) *5 U.S.C., sec. 5584.* Claims for overpayment of pay (Title 4 CFR Parts 201–203).

(2) *31 U.S.C., sec. 82a–1.* Relief of accountable officers of liability for loss.

(3) *31 U.S.C. sec. 82a–2.* Relief of accountable officers of liability for illegal, improper, or incorrect payments.

(4) *31 U.S.C. sec. 82c.* Certifying officers; bond; accountability; relief by Comptroller General.

(5) *39 U.S.C. 2202(a).* Deposit to and withdrawal from Post Office Department Fund.

(6) *39 U.S.C. 2401.* Collection of debts due the Department with the exception of those falling under the jurisdiction of the Chief Postal Inspector or the General Counsel. This redelegation includes the settlement of debts not exceeding $20,000 that may be compromised, terminated, suspended, or referred pursuant to the provisions of Public Law 89–508, with concurrence by General Counsel in cases involving doubtful questions of law or fact.

(7) *39 U.S.C. 2403.* Adjustment of claims of postmasters and armed forces postal clerks, including the loss of funds or valuable papers from their official custody resulting from burglary, fire, or unavoidable casualty, with concurrence by General Counsel in cases involving doubtful questions of law or fact.

NOTE: The corresponding Postal Manual section is 812.91.

(5. U.S.C. 301, 39 U.S.C. 309, 501)

DAVID A. NELSON,
*General Counsel.*

MARCH 21, 1969.

[F.R. Doc. 69–3561; Filed, Mar. 25, 1969; 8:49 a.m.]

# Title 41—PUBLIC CONTRACTS AND PROPERTY MANAGEMENT

## Chapter I—Federal Procurement Regulations

### PART 1–12—LABOR

### Labor Standards; Miscellaneous Amendments

Miscellaneous amendments hereunder with respect to Part 1–12 involve (1) the expiration of a variance regarding the administration of the Contract Work Hours Standards Act and the implementation of a new procedure established by the Department of Labor (see 34 F.R. 555, Jan. 15, 1969) to apply in the event a contracting agency fails to give timely notice to the Department of an intention to enter into a service contract.

### Subpart 1–12.3—Contract Work Hours Standards Act (Other Than Construction Contracts)

1. Section 1–12.302(d) is amended as follows:

§ 1–12.302 Applicability.

* * * * *

(d) Contracts under which work is to be performed solely within a foreign country or within a territory under the jurisdiction of the United States other than a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Outer Continental Shelf Lands defined in the Outer Continental Shelf Lands Act (43 U.S.C. 1331), American Samoa, Guam, Wake Island, Eniwetok Atoll, Kwajalein Atoll, Johnston Island, and the Canal Zone.

* * * * *

2. Section 1–12.304 is revised as follows:

§ 1–12.304 Variations and tolerances.

Variations and tolerances from the provisions of this subpart which are granted under section 105 of the Contract Work Hours Standards Act by the Secretary of Labor in the case of any contract work for which such variations and tolerances have been provided (29 CFR 5.14) shall be deemed to satisfy the requirements of § 1–1.009.

### Subpart 1–12.9—Service Contract Act of 1965

Section 1–12.905–4 is revised as follows:

§ 1–12.905–4 Use of minimum wage terminations and fringe benefit specifications.

(a) *General procedures.* Invitations for bids and requests for proposals which may result in contracts in excess of $2,500 and contracts in excess of $2,500 (including any transaction for an indefinite amount, unless the contracting agency has knowledge that it will not exceed $2,500) shall contain an attachment setting forth the minimum wages and

fringe benefits specified in any applicable, currently effective, determination. The attachment shall also include any determinations expressed in any communication from the Administrator, Wage and Hour and Public Contracts Divisions, Department of Labor, responsive to the notice required by § 1–12.905–3(a), or any revision of the register of wages and fringe benefits prior to the award of the contract or contracts. However, revisions received by the Federal agency later than 10 days before the opening of bids, in the case of contracts entered into pursuant to competitive bidding procedures, shall not be effective except where the Federal agency finds that a reasonable time is available in which to notify bidders of the revision. (See § 1–12.905–10 regarding the absence of wage and fringe benefit determinations)

(b) *Special procedure.* If the notice of intention required by § 1–12.905–3(a) is not filed within the time provided in § 1–12.905–3(b), the contracting agency shall exercise any and all of its power that may be needed (including, where necessary, its power to negotiate, its power to pay any necessary additional costs, and its power under any provision of the contract authorizing changes) to include in the contract any determinations communicated to it within 30 days of the filing of such notice or of the discovery by the Wage and Hour and Public Contracts Divisions, U.S. Department of Labor, of such omission.

(Sec. 205(c), 63 Stat. 390; 40 U.S.C. 486(c))

Effective date: This amendment is effective upon publication in the FEDERAL REGISTER.

Dated: March 18, 1969.

ROBERT L. KUNZIG,
*Administrator of General Services.*

[F.R. Doc. 69–3521; Filed, Mar. 25, 1969; 8:49 a.m.]

# Title 43—PUBLIC LANDS: INTERIOR

## Chapter II—Bureau of Land Management, Department of the Interior

APPENDIX—PUBLIC LAND ORDERS

[Public Land Order 4587]

### OUTER CONTINENTAL SHELF OFF CALIFORNIA

### Establishment of Santa Barbara Channel Ecological Preserve

By virtue of the authority vested in the President by the Outer Continental Shelf Lands Act (67 Stat. 462, 469; 43 U.S.C. 1341), and pursuant to Executive Order No. 10355 of May 26, 1952 (17 F.R. 4831), it is ordered as follows:

Subject to valid existing rights, the following described lands of the Outer Continental Shelf are hereby withdrawn from all forms of disposition, including

**5656**                    **RULES AND REGULATIONS**

mineral leasing, and reserved for use for scientific, recreational, and other similar uses as an ecological preserve.

The area is shown on official Outer Continental Shelf Leasing Map, Channel Islands Area Map No. 6B, approved August 8, 1966, and revised July 24, 1967, as:

CALIFORNIA

Official Leasing Map, Channel Islands Area Map No. 6B.

| Block | Description |
|---|---|
| 51 N. 65 W_____ | NW¼NW¼. |
| 51 N. 66 W_____ | N½. |
| 51 N. 67 W_____ | Do. |
| 51 N. 68 W_____ | N½N½. |
| 52 N. 64 W_____ | All Federal portions thereof. |
| 52 N. 65 W_____ | Do. |
| 52 N. 66 W_____ | Do. |
| 52 N. 67 W_____ | Do. |
| 52 N. 68 W_____ | Do. |
| 52 N. 69 W_____ | Do. |

The following described lands of the Outer Continental Shelf will be withheld from leasing as an adjunct to the Ecological Preserve.

The area is shown on official Outer Continental Shelf Leasing Map, Channel Islands Area Map No. 6B, referred to above, as:

CALIFORNIA

Official Leasing Map, Channel Islands Area Map No. 6B.

| Block | Description |
|---|---|
| 50 N. 66 W_____ | All. |
| 50 N. 67 W_____ | Do. |
| 51 N. 66 W_____ | S½. |
| 51 N. 67 W_____ | Do. |
| 51 N. 68 W_____ | S½ and S½N½. |
| 51 N. 69 W_____ | All. |
| 51 N. 70 W_____ | E½ and E½W½. |
| 52 N. 70 W_____ | All Federal portions of E½ and E½W½. |

All persons, and particularly those engaged in commercial and sports fishing and other similar or related activities, are called upon to conduct their activities in the areas described above in a manner which will help to protect and preserve the values of this area for scientific study, recreation, and other similar uses for the benefit and enjoyment of this and future generations.

WALTER J. HICKEL,
*Secretary of the Interior.*

MARCH 21, 1969.

[F.R. Doc. 69–3548; Filed, Mar. 25, 1969; 8:48 a.m.]

# Title 47—TELECOMMUNICATION

## Chapter I—Federal Communications Commission

### PART 0—COMMISSION ORGANIZATION

#### Address of Engineer in Charge of Certain Radio Districts

1. The Commission has before it the desirability of making certain editorial changes in § 0.121 of its rules showing the location of the Field Engineering Bureau's field offices and monitoring stations.

2. Authority for the amendments is contained in section 4(i), 5(d)(1), and 303(r) of the Communications Act of 1934, as amended, and § 0.261(a) of the Commission's rules. Because the amendments are editorial in nature, the prior notice and effective date provisions of section 4 of the Administrative Procedure Act, 5 U.S.C. 553, do not apply.

3. *It is ordered,* That Part 0 of the rules and regulations is amended as set forth below, effective March 26, 1969.

Adopted: March 20, 1969.

Released: March 21, 1969.

FEDERAL COMMUNICATIONS
COMMISSION,
[SEAL]            BEN F. WAPLE,
*Secretary.*

In § 0.121(a) the addresses of the Engineer in Charge for Radio Districts 5, 11, 13, 14, and 16 are amended to read as follows:

§ 0.121  Location of field offices and monitoring stations.

(a) * * *

| Radio district | Address of Engineer in Charge |
|---|---|
| 5_____ | Room 400, Federal Building, Norfolk, Va. 23510. |
| Suboffice____ | Post Office Box 8004, Room 238, Post Office Building, Savannah, Ga. 31402. |
| 11_____ | Room 1758, U.S. Courthouse, 312 North Spring Street, Los Angeles, Calif. 90012. |
| 13_____ | 314 Multnomah Building, 319 Southwest Pine Street, Portland, Oreg. 97204. |
| 14_____ | 8012 Federal Office Building, First Avenue and Marion, Seattle, Wash. 9810: |
| 16_____ | 691 Federal Building and U.S. Courthouse, Fourth and Robert Streets, St. Paul, Minn., 55101. |

[F.R. Doc. 69–3534; Filed, Mar. 25, 1969; 8:47 a.m.]

[Docket No. 18398; FCC 69–257]

## PART 2—FREQUENCY ALLOCATIONS AND RADIO TREATY MATTERS; GENERAL RULES AND REGULATIONS

## PART 87—AVIATION SERVICES

### Improvement of Capability of the Civil Air Patrol (CAP) To Participate in Search and Rescue (SAR) Operations

1. The Commission, on December 12, 1968, adopted a notice of proposed rule making in the above entitled matter (FCC 68–1177) which made provision for filing comments. The notice was published in the FEDERAL REGISTER on December 21, 1968 (33 F.R. 19084). The time for filing comments and reply comments has passed, and none were filed.

2. The notice proposed rule changes that were requested by the Civil Air Patrol (CAP) and would apply to the operation, by the CAP and others, of all Search and Rescue (SAR) stations. The requested changes would make a frequency available to SAR stations for

training purposes and would relax our requirements somewhat concerning SAR land station locations and points of communication. In general, the CAP requested the changes to permit them to participate more fully and effectively in SAR operations, and we agreed, for the reasons explained in detail in our notice, that the changes would achieve the desired result.

3. In addition to the rule changes proposed in our notice, we are making editorial changes in § 87.183(h), 87.401(c), and 87.431 of our rules to delete the protection afforded the frequency 121.6 Mc/s when this frequency, was available for SAR station use on a shared basis.

4. In view of the foregoing: *It is ordered,* That pursuant to authority contained in section 4(i) and 303(r) of the Communications Act of 1934, as amended, Parts 2 and 87 of the Commission's rules are amended, effective April 28, 1969, as set forth below.

5. *It is further ordered,* That this proceeding is terminated.

(Secs. 4, 303, 48 Stat., as amended 1066, 1082; 47 U.S.C. 154, 303)

Adopted: March 19, 1969.

Released: March 21, 1969.

FEDERAL COMMUNICATIONS
COMMISSION,[1]
BEN F. WAPLE,
*Secretary.*

I. Part 2, Frequency Allocations and Radio Treaty Matters; General Rules and Regulations, is amended as follows:

In section 2.1 the definition of an Aeronautical search and rescue mobile station is deleted, and a new definition for an aeronautical search and rescue station is added, as follows:

§ 2.1  Definitions.

* * * *

*Aeronautical search and rescue station.* A land or mobile station in the aeronautical mobile service- used for communication with aircraft and other aeronautical search and rescue stations pertaining to search and rescue activities with aircraft.

* * * *

II. Part 87, Aviation Services is amended as follows:

1. In § 87.5 the definition for an Aeronautical search and rescue mobile station is deleted, and a new definition for an aeronautical search and rescue station is added, as follows:

§ 87.5  Definition of terms.

* * * *

*Aeronautical search and rescue station.* A land or mobile station in the aeronautical mobile service used for communication with aircraft and other aeronautical search and rescue stations pertaining to search and rescue activities with aircraft.

* * * *

2. Section 87.183 (g) and (h) are amended to read as follows:

---

[1] Commissioner Johnson concurring in the result.

2352                          THE PRESIDENT

of the United States of America to be affixed.

DONE at the City of Washington this fifteenth day of March in the year of our Lord nineteen hundred and [SEAL] sixty, and of the Independence of the United States of America the one hundred and eighty-fourth.

DWIGHT D. EISENHOWER

By the President:

CHRISTIAN A. HERTER,
*Secretary of State.*

[F.R. Doc. 60-2543; Filed, Mar. 17, 1960; 2:49 p.m.]

## Proclamation 3339

### ESTABLISHING THE KEY LARGO CORAL REEF PRESERVE

**By the President of the United States of America**

**A Proclamation**

WHEREAS there is situated seaward from the coast of Key Largo, Florida, an undersea coral reef formation which is part of the only living coral reef formation along the coast of North America; and

WHEREAS this unique coral formation and its associated marine life are of great scientific interest and value to students of the sea; and

WHEREAS this coral reef is considered to be one of the most beautiful formations of its kind in the world; and

WHEREAS the reef is being subjected to commercial exploitation and is in danger of destruction; and

WHEREAS it is in the public interest to preserve this formation of great scientific and esthetic importance for the benefit and enjoyment of the people; and

WHEREAS a portion of this reef lies inside the three-mile limit in the area relinquished to the State of Florida by the United States through the Submerged Lands Act, approved May 22, 1953 (67 Stat. 29; 43 U.S.C. 1301 *et seq.*), and the remainder lies on the sea bed of the outer Continental Shelf outside the seaward boundary of the State of Florida and appertains to the United

States, as declared by the Outer Continental Shelf Lands Act, approved August 7, 1953 (67 Stat. 462; 43 U.S.C. 1331 *et seq.*) ; and

WHEREAS the United States and the State of Florida are desirous of cooperating for the purpose of preserving the scenic and scientific values of this area unimpaired for the benefit of future generations; and

WHEREAS by the terms of the Outer Continental Shelf Lands Act the United States has jurisdiction over the lands of the outer Continental Shelf and has the exclusive right to dispose of the natural resources of the sea bed and subsoil thereof; and

WHEREAS section 12(a) of the Outer Continental Shelf Lands Act authorizes the President to withdraw from disposition any of the unleased lands of the outer Continental Shelf; and

WHEREAS section 5 of the Outer Continental Shelf Lands Act authorizes the Secretary of the Interior to prescribe rules and regulations for the conservation of the natural resources of the outer Continental Shelf and to cooperate with the conservation agencies of adjacent States in the enforcement of conservation laws, rules, and regulations:

NOW, THEREFORE, I, DWIGHT D. EISENHOWER, President of the United States of America, acting under and by virtue of the authority vested in me by the Constitution and the statutes of the United States, particularly section 12(a) of the Outer Continental Shelf Lands Act, do proclaim that, subject to valid existing rights, the following-described area is designated as the Key Largo Coral Reef Preserve, and so much thereof as lies on the outer Continental Shelf is *withdrawn from disposition:*

That portion of the outer Continental Shelf situated seaward of a line three geographic miles from Key Largo, Monroe County, Florida, lying and being within the following described area:

BEGINNING at a point on the 60-foot depth curve (10-fathom line) as delineated on Coast and Geodetic Survey Chart 1249 (approximate Latitude 25°17'36'' N., Longitude 80°10'00'' W.), 200 yards southeast of Flashing White Light—Whistle Buoy "2"; thence northwesterly approximately 7,000 yards through Whistle Buoy "2" to Can Buoy

"21" (approximate Latitude 25°20'06'' N., Longitude 80°12'36'' W.) southeast of Old Rhodes Key; thence southwesterly about 6,000 yards to Can Buoy "25"; thence southwesterly approximately 5,600 yards to Can Buoy "27"; thence southwesterly approximately 5,000 yards to Flashing Green Light "31BH" in Hawk Channel southeast of Point Elizabeth; thence southwesterly approximately 10,650 yards to Black Day Beacon "33" in Hawk Channel east of Point Willie; thence southwesterly approximately 9,800 yards to Flashing White Light "35" on Mosquito Bank east of Point Charles; thence southwesterly approximately 5,400 yards to Black Day Beacon "37" (approximate Latitude 25°02'25'' N., Longitude 80°25'36'' W.), southeast of Rodriguez Key; thence southeasterly approximately 7,100 yards (pass 600 yards Southwest of Flashing Light "2" at Molasses Reef) to the 60-foot depth curve (10-fathom line) 800 yards due South of said light at Molasses Reef (approximate Latitude 25°00'18'' N., Longitude 80°22'30'' W.); thence northeasterly with the 60-foot depth curve and 10-fathom line (passing easterly of French Reef, Dixie Shoal, The Elbow, and Carysfort Reef) approximately 21 miles to the point of beginning.

I call upon all persons to join in the effort to protect and preserve this natural wonder for the benefit of future generations.

The Secretary of the Interior is requested to prescribe rules and regulations governing the protection and conservation of the coral and other mineral resources in this area and to cooperate with the State of Florida and its conservation agencies in the preservation of the reef.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the Seal of the United States of America to be affixed.

DONE at the City of Washington this fifteenth day of March in the year of our Lord nineteen hundred and [SEAL] sixty, and of the Independence of the United States of America the one hundred and eighty-fourth.

DWIGHT D. EISENHOWER

By the President:

CHRISTIAN A. HERTER,
*Secretary of State.*

[F.R. Doc. 60-2544; Filed, Mar. 17, 1960; 2:49 p.m.]

Case: 19-35460, 11/07/2019, ID: 11493294, DktEntry: 13-2, Page 252 of 297

## CONTENTS—Continued

| | Page |
|---|---|
| WAR PRODUCTION BOARD—Con. | |
| Priorities system, regulations applicable to operation—Continued. | |
| Service equipment, MRO ratings invalidated (PR 3, Dir. 11) | 12383 |
| Split ratings (PR 3, revocation of Dir. 8) | 12382 |
| Textile machinery accessories, (PR 3, revocation of Dir. 9) | 12383 |
| Programs, M-328B (Schedules C, D, J, and K), special rules for 4th quarter 1945 (M-328B, Dir. 6) | 12386 |
| Steel: | |
| Distributors (M-21, revocation of Dir. 3) | 12387 |
| Products for disaster relief (M-21, revocation of Dir. 4) | 12387 |
| Suits, children's snow, and mackinaw, peacoat and cossack jacket programs (M-328B, Dir. 8) | 12387 |
| Suspension order, Entwistle Mfg. Co., Inc. | 12384 |

## CODIFICATION GUIDE

A numerical list of the parts of the Code of Federal Regulations amended or added by documents published in this issue. Documents carried in the Cumulative Supplement by uncodified tabulation only are not included within the purview of this list.

| TITLE 3—THE PRESIDENT: | Page |
|---|---|
| Chapter I—Proclamations: | |
| 2665 | 12301 |
| 2666 | 12301 |
| 2667 | 12303 |
| 2668 | 12304 |
| Chapter II—Executive orders: | |
| 9629 | 12304 |
| 9631 | 12304 |
| 9632 | 12304 |
| 9633 | 12305 |
| 9644 | 12305 |
| TITLE 7—AGRICULTURE: | |
| Subtitle A—Office of Secretary of Agriculture | 12305 |
| Chapter VII—Production and Marketing Administration (Agricultural Adjustment): | |
| Part 726—Fire-cured and dark air-cured tobacco (2 documents) | 12305 |
| TITLE 10—ARMY: WAR DEPARTMENT: | |
| Chapter V—Military reservations and national cemeteries: | |
| Part 502—Regulations affecting military reservations | 12306 |
| TITLE 12—BANKS AND BANKING: | |
| Chapter II—Board of Governors of Federal Reserve System: | |
| Part 222—Consumer credit | 12379 |
| TITLE 14—CIVIL AVIATION: | |
| Chapter II—Administrator of Civil Aeronautics: | |
| Part 600—Designation of civil airways | 12306 |
| Part 601—Designation of airway traffic control areas, airport approach zones and radio fixes | 12306 |
| TITLE 19—CUSTOMS DUTIES: | |
| Chapter I—Bureau of Customs: | |
| Part 12—Special classes of merchandise | 12306 |

## CODIFICATION GUIDE—Continued

| TITLE 26—INTERNAL REVENUE: | Page |
|---|---|
| Chapter I—Bureau of Internal Revenue: | |
| Part 178—Wine | 12307 |
| TITLE 32—NATIONAL DEFENSE: | |
| Chapter IX—War Production Board: | |
| Part 944—Regulations applicable to operation of priorities system (20 documents) | 12381, 12382, 12383, 12384 |
| Chapter XXIII—Surplus Property Board: | |
| Part 8306—Sale of government-owned plant equipment in contractors plants | 12408 |
| TITLE 46—SHIPPING: | |
| Chapter I—Coast Guard: Inspection and Navigation: | |
| Part 37—Specifications for lifesaving appliances | 12408 |
| TITLE 49—TRANSPORTATION AND RAILROADS: | |
| Chapter II—Office of Defense Transportation: | |
| Part 500—Conservation of real equipment | 12409 |

year ending June 30, 1946, and for each fiscal year thereafter, have been determined in accordance with the law to be, and shall be, as follows:

| | |
|---|---|
| Austria | 1,413 |
| Germany | 25,957 |

The immigration quotas assigned to Austria and Germany are designed solely for purposes of compliance with the pertinent provisions of the Immigration Act of 1924 and are not to be regarded as having any significance extraneous to this object.

This proclamation shall take effect immediately, and shall have the effect of amending Proclamation 2283 of April 28, 1938.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States of America to be affixed.

DONE at the city of Washington this 28th day of September, in the year of our Lord nineteen hundred and [SEAL] forty-five, and of the Independence of the United States of America the one hundred and seventieth.

HARRY S. TRUMAN

By the President:
DEAN ACHESON,
*Acting Secretary of State.*

[F. R. Doc. 45-18174; Filed, Oct. 1, 1945; 11:10 a. m.]

---

## PROCLAMATION 2667

POLICY OF THE UNITED STATES WITH RESPECT TO THE NATURAL RESOURCES OF THE SUBSOIL AND SEA BED OF THE CONTINENTAL SHELF [1]

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

WHEREAS the Government of the United States of America, aware of the long range world-wide need for new sources of petroleum and other minerals, holds the view that efforts to discover and make available new supplies of these resources should be encouraged; and

WHEREAS its competent experts are of the opinion that such resources underlie many parts of the continental shelf off the coasts of the United States of America, and that with modern technological progress their utilization is already practicable or will become so at an early date; and

WHEREAS recognized jurisdiction over these resources is required in the interest of their conservation and prudent utilization when and as development is undertaken; and

WHEREAS it is the view of the Government of the United States that the exercise of jurisdiction over the natural resources of the subsoil and sea bed of the continental shelf by the contiguous nation is reasonable and just, since the effectiveness of measures to utilize or conserve these resources would be contingent upon cooperation and protection from the shore, since the continental shelf may be regarded as an extension of the land-mass of the coastal nation and thus naturally appurtenant to it, since these resources frequently form a seaward extension of a pool or deposit lying within the territory, and since self-protection compels the coastal nation to keep close watch over activities off its shores which are of the nature necessary for utilization of these resources;

NOW, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, do hereby proclaim the following policy of the United States of America with respect to the natural resources of the subsoil and sea bed of the continental shelf.

Having concern for the urgency of conserving and prudently utilizing its natural resources, the Government of the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control. In cases where the continental shelf extends to the shores of another State, or is shared with an adjacent State, the boundary shall be determined by the United States and the State concerned in accordance with equitable principles. The character as high seas of the waters above the continental shelf and the right to their free and unimpeded navigation are in no way thus affected.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States of America to be affixed.

DONE at the City of Washington this 28th day of September, in the year of our Lord nineteen hundred and [SEAL] forty-five, and of the Independence of the United States of America the one hundred and seventieth.

HARRY S. TRUMAN

By the President:
DEAN ACHESON,
*Acting Secretary of State.*

[F. R. Doc. 45-18176; Filed, Oct. 1, 1945; 11:11 a. m.]

[1] See Executive Order 9633, *infra.*

Case 3:17-cv-00101-SLG   Document 13-2   Filed 06/30/17   Page 2 of 2

Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Nancy S. Marks (N.Y. Bar No. 2121820) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
11th Floor
New York, NY 10011
T: 212.727.2700 / F: 415.795.4799
E: nmarks@nrdc.org

*Attorneys for Plaintiffs League of Conservation Voters et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; ALASKA WILDERNESS LEAGUE; DEFENDERS OF WILDLIFE; NORTHERN ALASKA ENVIRONMENTAL CENTER; RESISTING ENVIRONMENTAL DESTRUCTION ON INDIGENOUS LANDS; CENTER FOR BIOLOGICAL DIVERSITY; GREENPEACE, INC.; and THE WILDERNESS SOCIETY; <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; RYAN ZINKE, in his official capacity as Secretary of the Interior; and WILBUR ROSS, in his official capacity as Secretary of Commerce; <br><br> *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## SUMMARY

1.     This action arises from President Trump's unlawful attempt to undo permanent

protections for the vast majority of the U.S. Arctic Ocean and dozens of underwater canyons in

the Atlantic Ocean, put in place on December 20, 2016, and January 27, 2015, by President

Obama.  Citing the dangers to communities and wildlife of offshore oil and gas exploration and

development, the sensitivity of marine resources in the regions, the need to address climate

change, the adequacy of energy sources near existing infrastructure elsewhere, and various

barriers to development of the Arctic and Atlantic areas in question, President Obama withdrew

them from future oil and gas leasing.  He made the withdrawals pursuant to his authority under

Section 12(a) of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1341(a).  Section

12(a) authorizes Presidents to withdraw unleased public lands on the outer continental shelf from

disposition, including through leasing.  Neither OCSLA nor any other provision of law

authorizes Presidents to undo such withdrawals.  Nonetheless, on April 28, 2017, President

Trump issued an executive order purporting to reverse the Arctic and Atlantic Ocean

withdrawals by eliminating all protections they provided.  In this respect, President Trump's

order exceeds his constitutional authority and his statutory authority under OCSLA, and is

therefore *ultra vires* and unlawful.  Plaintiffs seek declaratory, injunctive, and mandamus relief

to prevent injury to the interests of their members that are threatened by the President's action.

## JURISDICTION

2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1361.

3.     The Court may issue declaratory and injunctive relief pursuant to 28 U.S.C.

§§ 2201-2202.  Pursuant to 28 U.S.C. § 1361, the Court may issue a writ of mandamus

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                                    1

prohibiting executive officials' reliance on the reversal and compelling their compliance with President Obama's withdrawal orders.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) as this civil action is brought against officers of the United States acting in their official capacities and under color of legal authority, and a substantial part of property that is the subject of the action is situated, and some Plaintiffs reside, in this judicial district.

## PLAINTIFFS

5. Plaintiff League of Conservation Voters is a non-profit environmental advocacy organization with more than two million members throughout the United States that advocates for sound environmental law and policies, holds elected officials accountable for their votes and actions, and works to elect pro-environment candidates who will champion clean energy, air, and water issues irrespective of party affiliation. It has a long history of educating its members, the general public, and policymakers about the risks that offshore drilling in the Arctic and Atlantic Oceans poses to marine life, coastal economies and ways of life, and our climate, and advocating for protection of the Arctic and Atlantic Oceans from oil development.

6. Plaintiff Natural Resources Defense Council (NRDC) is a non-profit environmental advocacy organization with more than two million members and online activists. It has a longstanding and active involvement in the protection of the Arctic and Atlantic Oceans from oil and gas exploration and development, including working for their permanent protection from expanded oil and gas leasing. With its nationwide membership and a staff of lawyers, scientists, communications specialists, and other environmental professionals, NRDC gathers, analyzes, and uses information about federal government proposals to shape its

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                        2

advocacy and inform its members on a diverse range of land and wildlife management and resource development issues, including those associated with climate change.

7.     The Sierra Club is a national non-profit organization of approximately 740,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth, to practicing and promoting the responsible use of the Earth's ecosystems and resources, to educating and enlisting humanity to protect and restore the quality of the natural and human environment, and to using all lawful means to carry out these objectives.  The Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, public lands and waters, endangered species, clean water, and clean air.  The Sierra Club has long been active in issues relating to the impacts of oil and gas exploration and development in America's Arctic and Atlantic Oceans and has pushed for their protection from the risks of offshore drilling.

8.     Plaintiff Alaska Wilderness League is a non-profit organization with approximately 100,000 members and activists.  Alaska Wilderness League was founded in 1993 to advocate for protection of Alaska's public lands and waters that are threatened with environmental degradation.  Since its inception, it has taken, and continues to take, an active role on issues related to oil and gas exploration and development in Alaska, consistently advocating for protecting the Arctic, its wildlife, and communities from the risks and harms associated with offshore drilling.  Its Alaska office employs four full-time employees and houses its Arctic Environmental Justice Program.  Through advocacy and education, Alaska Wilderness League's Arctic Environmental Justice Program works closely with communities in the Arctic affected by development.  Alaska Wilderness League is committed to honoring the human rights and

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    3
Case 3:17-cv-00101-SLG   Document 1   Filed 05/03/17   Page 4 of 24

traditional values of the people of the Arctic, and the shared interest in protecting critical areas for future generations.

9.      Plaintiff Defenders of Wildlife is a non-profit conservation organization founded in 1947 and based in Washington, D.C., with offices across the country, including Alaska. Defenders of Wildlife is dedicated to protecting and restoring all native wild animals and plants in their natural communities. Defenders of Wildlife's Alaska Office, in particular, counts among its top priorities protecting imperiled marine species and addressing the impacts of climate change in Alaska. To this end, Defenders of Wildlife is actively involved in advocating for the protection of Arctic marine species and their habitats, including in the Chukchi Sea, from the cumulative impacts of oil and gas development, risks from increased vessel traffic, and climate change. It has also opposed both seismic testing and oil and gas drilling in the Atlantic Ocean and advocated for permanent protection of the Arctic and Atlantic Oceans from expanded oil and gas leasing.

10.      Plaintiff Northern Alaska Environmental Center is an Alaska non-profit environmental advocacy and educational organization with approximately 1,400 members. It has empowered citizens to take an active role in protecting natural habitats and wild places in Arctic and interior Alaska since 1971. It advocates for Arctic wilderness, wildlife, and traditional ways of life; transportation and infrastructure alternatives that minimize impacts on wild lands; and clean water and wild rivers to protect health, fish, and recreational opportunities. It has been actively involved in efforts to protect the key values of public lands in the Arctic, including in the Arctic Ocean, from the threats of oil and gas exploration and development.

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                            4

11.     Plaintiff Resisting Environmental Destruction on Indigenous Lands (REDOIL) is a network of grassroots Alaska Natives of the Inupiat, Yupik, Aleut, Tlingit, Gwich'in, Eyak, and Dena'ina Athabascan tribes, including residents of Arctic Ocean coastal communities, operating as a non-profit educational organization. REDOIL takes an active role in addressing the human and ecological health impacts of the unsustainable development practices of the fossil fuel industry in Alaska. It advocates for the preservation of subsistence rights for Alaska Natives, self-determination rights of tribes in Alaska, a just transition from fossil fuel development, and the implementation of tribal options for sustainable development. It opposes expansion of offshore oil drilling in the Arctic and has worked for years to stop it.

12.     Plaintiff Center for Biological Diversity (the Center) is a non-profit organization with offices in Alaska, Arizona, California, Florida, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Virginia, and Washington, D.C. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has more than 1.3 million members and online activists. The Center is actively involved in species and habitat protection issues throughout the United States, including protection of Arctic and Atlantic wildlife threatened by oil and gas exploration and development. It has long advocated keeping the Arctic and Atlantic Oceans off-limits to oil drilling.

13.     Plaintiff Greenpeace, Inc., is a non-profit corporation organized under the laws of the State of California, with its principal place of business in Washington, D.C. Its mission is to promote the protection and preservation of the environment. Greenpeace is an independent campaigning organization that uses peaceful, creative confrontation to expose global environmental problems and to force solutions that are essential for a green and peaceful future.

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                          5

Greenpeace has over 840,000 active supporters in the United States. For more than a decade Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to pressure for serious cuts in greenhouse gas emissions through local, national and global action. In the United States, Greenpeace has run campaigns aimed at stopping global warming by phasing out fossil fuel use and promoting renewable energy systems. As a part of these efforts Greenpeace has actively worked to protect the outer continental shelf, including the Arctic and Atlantic Oceans, from the harmful effects of offshore oil and gas activities.

14.     Plaintiff The Wilderness Society, founded in 1935, is a national, non-profit membership organization devoted to preserving wilderness and wildlife; protecting America's prime forests, parks, rivers, deserts and shorelines; and fostering an American land ethic. It has more than 1 million members and supporters, including in Alaska, and has a longstanding involvement with efforts to reduce or eliminate the impacts of oil and gas exploration and development on public lands and waters, including in Alaska's Arctic Ocean.

15.     Members of the Plaintiff organizations visit or otherwise use and enjoy the Atlantic Ocean, including near deepwater canyons, the Chukchi and Beaufort Seas, and coastal regions adjacent to these waters for cultural and subsistence purposes, recreation, wildlife viewing, education, research, photography, aesthetic and spiritual enjoyment, or their professions or livelihoods, or they enjoy or use wildlife that utilizes these areas. The members' use and enjoyment of these areas and wildlife are affected by the condition of the areas and health of individual wildlife and populations and their habitat in the wild. Any activities, such as oil and gas exploration or development, including seismic surveying, that destroy, degrade, or diminish the wild and natural state of these areas, or that kill, injure, harm, harass, or displace wildlife,

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                              6

also interfere with Plaintiffs' members' use and enjoyment of the areas and associated wildlife. As such, these activities directly and irreparably injure the interests of Plaintiffs' members.

16.     Plaintiffs and their members are harmed by the reversal in President Trump's order of the Arctic and Atlantic Ocean withdrawals.  The order purports to reverse protections that barred oil and gas leasing and drilling in approximately 128 million acres of federally owned portions of the Arctic and Atlantic Oceans.  It also mandates consideration of revising the federal government's offshore oil and gas program so that it includes annual lease sales in the Arctic and Atlantic Oceans and requires the Secretaries of Interior and Commerce to expedite seismic surveying.  The purpose and likely result of the order are oil and gas exploration and development in the regions affected by the reversals, activities that will degrade Arctic and Atlantic Ocean and coastal environments and harm wildlife, their habitats, and the interests of Plaintiffs and their members.  Among those activities is seismic surveying, which often precedes oil and gas lease sales by several years and which poses imminent risks to the affected regions and wildlife.

17.     The President's violation of law threatens imminent, irreparable harm to the interests of Plaintiffs and their members.  These injuries will continue unless this Court grants the requested relief.

**DEFENDANTS**

18.     Defendant Donald J. Trump is the President of the United States and took the action challenged in this Complaint.  Plaintiffs sue President Trump in his official capacity.

19.     Defendant Ryan Zinke, United States Secretary of the Interior, is the highest ranking official within the Department of the Interior (Interior) and, in that capacity, has ultimate responsibility for administration and implementation of OCSLA, the Marine Mammal Protection

Act (MMPA), and the Endangered Species Act (ESA), including issuance of permits required for seismic surveying, offshore drilling, and production of oil and gas in areas withdrawn by President Obama, and for compliance with all other federal laws applicable to Interior. He is sued in his official capacity.

20.     Defendant Wilbur Ross, United States Secretary of Commerce, is the highest ranking official within the Department of the Commerce and, in that capacity, has ultimate responsibility for administration and implementation of the MMPA and the ESA, including issuance of permits required for seismic surveying, offshore drilling, and production of oil and gas in areas withdrawn by President Obama, and for compliance with all other federal laws applicable to the Department of Commerce. He is sued in his official capacity.

## BACKGROUND

### I.     The Chukchi and Beaufort Seas and Atlantic Ocean

21.     The Chukchi and Beaufort Seas constitute America's Arctic Ocean. With their federal waters still essentially undeveloped, they border sensitive federal lands and provide habitat to a rich array of unique wildlife species including polar bears, walruses, whales, seals, and numerous other mammals, birds, and fish, some of them classified as threatened or endangered. Some of these animals also support thriving indigenous Alaska Native cultural and subsistence activities. Several Arctic mammals, including polar bears and bearded seals, have been listed under the ESA because of global warming threats to sea ice on which they rely for crucial life functions such as foraging and raising young; they and numerous other imperiled species are also protected under the MMPA. Many Arctic species of birds, which migrate to and from the region's waters annually in the millions, are also threatened by global warming.

22.     The region is remote and foreboding. In winter, the seas are covered in ice and

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                           8

shrouded in darkness. Even in summer, ice can encroach with little notice, and the seas are prone to storms and fog. There is little infrastructure in the region to support industrial activity. The coastal region contains only eight small communities, unconnected to one another by roads. It mostly lacks jet runways, has no deepwater ports, and is hundreds of miles from the nearest Coast Guard station.

23.     Federal waters in the Atlantic Ocean are also home to important and sensitive marine species and constitute a marine environment very largely still unmarked by industrial development. They contain highly diverse habitats and harbor important fish and shellfish populations. The waters of the Atlantic continental shelf furnish nurseries, feeding grounds, and transit routes for marine animals. Among their unique and outstanding geological features are dozens of undersea canyons, some of them 100 miles long and deeper than the Grand Canyon, rich in marine life. Incised into the continental shelf, these canyons support cold-water corals hundreds of years old, multitudes of whale species, swordfish, bluefin tuna, sea turtles, seabirds, crustaceans, and methane-dependent organisms known only from such canyons. The surrounding seafloor and continental slope break comprise a vast biodiversity hotspot, a mixing zone of currents and sharp temperature gradients, and underlie an internationally known whale migration corridor that connects feeding grounds in the Gulf of Maine to calving areas offshore Florida.

24.     Businesses along the U.S. Atlantic coast—including fishing, tourism, and recreation industries—that are heavily dependent on the health of this ocean ecosystem are major contributors to the region's economy. In 2012 alone, the Mid-Atlantic tourism industry generated over 500,000 jobs and 27 billion dollars; in 2014, commercial fisheries along the Atlantic Coast landed 1.3 billion pounds of seafood, much of it supporting local processing jobs.

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                        9

Reflecting the ocean's economic importance to the region, groups representing over 35,000 businesses petitioned President Obama to bar oil and gas development and/or seismic surveying permanently, throughout federal waters of the Atlantic Ocean.

25.    Even without oil and gas development, both the Arctic and the Atlantic Oceans are greatly threatened by climate change.  The Arctic region is warming rapidly—at twice the average global rate—driving profound changes for the species that are adapted to its unique conditions.  The average surface air temperature there in 2016 was the highest ever recorded, contributing to sea ice loss and seawater acidification to which the Arctic Ocean is especially vulnerable.  For its part, the northeast Atlantic is predicted to warm three times as rapidly as the oceans at large, threatening the continued viability of the majority of fish species in the region.

## II.    Threats from Offshore Exploration and Development

26.    All stages of oil and gas development can harm marine mammals, birds, and fish. The deafening sounds generated by pre-lease and on-lease seismic surveys and drilling activities disturb and injure marine animals.  The heightened risk of oil spills from exploratory and development drilling puts marine life—and human activities dependent on it—at risk.  Vessels, fixed-winged aircraft, and helicopters used in oil and gas activities also adversely affect ocean species, sometimes fatally.  In the Arctic, loss of sea ice owing to black carbon, including that emitted from oil operations, reduces essential habitat.

27.    Seismic surveying associated with oil and gas activities uses very loud, frequent sound pulses from airgun arrays to map the geology of the sea floor and identify potential oil and gas deposits.  Seismic surveying generally occurs from ships that can operate over long distances and cover large areas of the ocean during their operations.  Combined with the long-distance propagation through water of sound from seismic airguns, this means that seismic

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    10

surveying can "ensonify" very large areas of the ocean to dangerous levels.

28.     Noise from seismic operations harms marine mammals.  If animals are exposed to high enough levels of sound, such as exist close to some seismic airguns, they can suffer shifts in hearing thresholds and hearing loss that may result in mortality.  Noise at lower levels also causes many marine mammal species to alter their natural behavior in ways that interfere with vital activities, including avoiding feeding areas, diverting their migratory paths, separating mothers and young, and impeding communication among individuals.  The National Marine Fisheries Service (NMFS), an agency within the Department of Commerce, estimated that a single two-month-long seismic survey in 2012 in the Arctic Ocean would disturb over 60,000 ringed seals and 4,600 beluga whales.  In July 2014, when an Interior agency issued a Record of Decision that opened most federal waters in the Mid- and South Atlantic to seismic oil and gas exploration, it estimated that these activities could result in as many as 138,000 injuries and 13.4 million disturbances of marine mammals, including disruptions in vital behaviors such as feeding and mating, over the first nine years.

29.     Seismic surveys also harm commercially important fish and shellfish.  The intense sound pressures produced by the industry's airguns can injure or kill fish with swim bladders or other gas-filled chambers, and the particle motion of the powerful sound through the water can damage the hearing and sensory capabilities of both fish and invertebrates.  At lower intensities, the same sounds can also produce a physical stress response.  Over time, this stress response to seismic sound can degrade health and fitness, and increase mortality.  Seismic airgun disruption to fish behavior over large areas of ocean is associated with dramatic reductions in documented catch rates of commercially important fish.  Depression of catch rates can persist well after a seismic survey has ended.

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                          11

30.    Exploration and production drilling also involves loud underwater sounds from drill rigs, vessels and aircraft, ice breaking, and other associated activities. These sounds can likewise injure or interfere with the vital behavior of marine mammals, fish, and invertebrates.

31.    Offshore oil and gas exploration and development threaten, in addition, oil spills that irreparably damage the marine ecosystem and its wildlife. Interior has concluded that if just one major lease sale in the Arctic's Chukchi Sea were developed, there would be a 75 percent chance of an oil spill of greater than 1,000 barrels in this sensitive region. No response technologies reliably result in recovery or containment of even half of the oil from a large offshore spill in any region. The three primary oil spill response methods—mechanical containment and recovery, in situ burning, and dispersants—would likely be particularly ineffective and damaging in the Arctic. In the Atlantic, a spill equivalent to the BP Gulf oil disaster could coat beaches stretching from Savannah to Boston.

32.    Oil and gas development of the Arctic and Atlantic Oceans would, in addition, contribute significant amounts of greenhouse gas emissions that would in turn lead to further dangerous warming and acidification. Exploiting oil and gas reserves in the U.S. Arctic Ocean has the potential to release as much as 15.8 billion tons of carbon dioxide into the atmosphere when burned—approximately equivalent to the emissions from all U.S. transportation modes over a nine-year time period. Drilling in the Arctic and Atlantic would trigger carbon "lock-in" that promotes fossil fuel use far beyond levels many scientists conclude must be avoided to prevent catastrophic warming. Lock-in occurs when an industry has major sunk costs in an enterprise giving it strong incentives to keep operating in pursuit of even marginal income. This investment lock-in effect is particularly strong for offshore oil and gas in undeveloped areas such as the Arctic and Atlantic because of the huge new infrastructure costs required for

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                12

exploration and production.

### III.    The Outer Continental Shelf Lands Act

33.    Congress enacted OCSLA to create a framework for the executive branch's disposition and management of potential oil and gas resources on the outer continental shelf and to provide for protection of the environment.  In particular, OCSLA directs that offshore development shall be "subject to environmental safeguards," consistent with "national needs," and operations should be conducted so as to "prevent or minimize … damage to the environment."  43 U.S.C. § 1332(3), (6).  Under this framework, OCSLA Section 12(a), provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."  *Id.* § 1341(a).  For areas not so withdrawn and otherwise open to disposition of federal mineral rights, OCSLA establishes distinct stages for oil and gas development activities:  (1) the development of a five-year leasing program, (2) issuance of oil and gas leases, (3) approval of lessees' exploration plans, and (4) approval of lessees' development and production plans.  *Id.* §§ 1331 *et seq.* Certain exploration activities, such as seismic exploration, can occur at any time before or during these stages in accordance with regulations established pursuant to, *inter alia*, the Secretary of the Interior's OCSLA rulemaking authority.  *Id.* §§ 1334(a), 1340(a), (b), (g); *see also* 30 C.F.R. Parts 550, 551.

### IV.    Oil and Gas Activities in the Arctic and Atlantic Oceans

34.    Over the past decade, the federal government has considered, proposed, decided on, and/or authorized substantial industrial oil and gas activities in the Arctic and Atlantic Oceans pursuant to the OCSLA scheme described above.

35.    The current five-year outer continental shelf leasing program included lease sales

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                                        13

in both the Arctic and the Atlantic at the draft stage and in the Arctic at the proposal stage, though none in the final program as adopted. The previous three programs all scheduled Arctic Ocean lease sales. While some were ultimately cancelled, Interior held four area-wide lease sales under these plans, which together placed almost 1.3 million acres of the Beaufort outer continental shelf under lease. In February 2008, Interior also held a sale in the Chukchi, which resulted in 487 leases covering almost 2.8 million acres. The 2007-2012 five-year leasing program also included a lease sale in the Atlantic, first as initially adopted and then as resubmitted following litigation.

36. One oil company, Shell Oil, was particularly active in the Arctic Ocean. In 2012, it undertook a large-scale plan to conduct exploration drilling on its leases in the Beaufort and Chukchi Seas, leading to a series of well-documented problems, mistakes, and violations of environmental laws. During testing in the placid waters of Puget Sound, Shell destroyed its oil spill containment dome, a required component of its plan to respond to oil spills in harsh Arctic conditions. On its way north, Shell's drillship, the *Noble Discoverer*, dragged its anchor and nearly ran aground while moored near an Alaskan island. Once on the drillsite in the Chukchi Sea, Shell undertook an emergency maneuver to relocate the *Noble Discoverer* from the exploration site to avoid a large ice floe. On its way back from a drillsite in the Beaufort Sea, Shell lost control of its drilling vessel, the *Kulluk*, which ran aground in the Gulf of Alaska in severe weather while being towed to Seattle and had to be scrapped. Shell's other drillship, the *Noble Discoverer*, experienced engine troubles and safety violations on its return from the drillsite and was eventually scrapped as well. The U.S. Coast Guard cited the *Noble Discoverer* for numerous deficiencies after the drilling season. The Environmental Protection Agency determined Shell violated its Clean Air Act permits during the drilling effort and fined the

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                   14

company 1.1 million dollars.  Shell's drilling contractor, Noble Drilling, pled guilty to eight felony offenses relating to environmental pollution and safety in connection with the 2012 campaign, agreeing to pay 12.2 million dollars in fines.

37.     Shell returned to the Chukchi Sea in 2015, drilled a single test well, and thereafter relinquished all but one of its Chukchi Sea leases and most of its Beaufort Sea leases. Other companies also relinquished most of their leases in both seas.

38.     In addition to Shell's drilling activities, the oil industry in the past decade has conducted large-scale seismic surveying covering tens of thousands of square miles across much of the Arctic Ocean.

39.     Notwithstanding the recent lease relinquishments, there is industry interest in oil and gas activities in the Arctic Ocean.  Industry groups have submitted comments over the past year on the most recent five-year leasing program, seeking inclusion of Arctic Ocean lease sales.  Industry groups representing seismic operators have issued public statements expressing interest in conducting seismic surveys of the Arctic and Atlantic outer continental shelf. Following President Trump's April 28, 2017, executive order, one seismic industry trade group called for seismic surveying in the Atlantic and other frontier areas to proceed "without delay" in order to "allow for informed decisions as a new five-year lease plan is developed."  NMFS has predicted that, assuming the Arctic Ocean is open for leasing, there could be multiple seismic surveying operations every year in federal waters.  Currently, an Italian oil major, Eni, has plans to conduct exploration drilling on its existing federal leases in the Beaufort Sea, and a seismic operator, SAExploration, has sought federal authorizations to conduct 3-D seismic exploration in the Beaufort Sea nearshore area.

40.     In the Atlantic, at least six seismic operation companies have applied to the

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                              15

Bureau of Ocean Energy Management (BOEM), an agency within Interior, for permits to conduct "deep-penetration seismic surveys," deploying large airgun arrays to prospect for oil and gas deposits miles beneath the seafloor. Concurrently, several seismic firms have applied to NMFS for authorization under the MMPA to injure and harass marine mammals during their activities.

41.     The proposed surveys would cover many of the same ocean areas, repeatedly exposing the same wildlife populations to disruptive high-intensity sound. Collectively, the four companies with applications now pending before NMFS have proposed to run more than 126,000 linear kilometers of airgun surveys during the first year of exploration activity in the region. At least three of these surveys would traverse deepwater canyons in the Mid-Atlantic.

42.     On January 5, 2017, following adoption of a five-year program with no leases scheduled in the Atlantic, BOEM Director Abigail Ross Hopper directed her agency to deny all pending applications to conduct seismic airgun surveys in the Mid-Atlantic and South Atlantic Planning Areas. In doing so, the Director cited the impacts airgun surveys could have on the environment, including on endangered whales and other species. All permit applicants, however, have appealed the denials administratively, joined by an industry group that has issued public statements anticipating the new Administration's support for seismic exploration in the Atlantic and the reversal of BOEM's denials. Pursuant to notices issued on January 13, 2017, NMFS has only temporarily suspended processing of the seismic industry's MMPA authorizations while the permit decision is resolved.

43.     Seismic surveying is often conducted two to four years prior to lease sales to identify areas with promising oil and gas prospects, although companies also have sought approval to conduct seismic surveys even when lease sales are more than four years away and

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                16

not included in an existing or proposed five-year program.  As technology advances, companies frequently conduct surveying in areas already subjected to previous surveying.

### V. Presidential Withdrawals

44.    There is a long history of presidential withdrawals from oil and gas leasing under OCSLA, both permanent and time-limited, dating back to 1960, when President Eisenhower withdrew areas of the Key Largo Coral Reef Preserve, now part of Florida Keys National Marine Sanctuary.  Since Eisenhower first utilized Section 12(a), Presidents Nixon (through his Secretary of the Interior), George H.W. Bush, Clinton, and Obama have all issued withdrawals. Some of these covered large areas:  President Clinton's withdrawals covered 300 million acres. Presidents have also used their withdrawal power in protected areas, such as marine sanctuaries, to permanently bar oil and gas leasing.

45.    No president has ever undone or reversed a withdrawal of outer continental shelf areas, other than one with an express end date, prior to the action challenged here.

46.    On January 27, 2015, President Obama permanently withdrew coastal areas in the Arctic's Beaufort and Chukchi Seas and the Hanna Shoal region in the Chukchi Sea from oil and gas leasing.  The President acted pursuant to the authority vested in him by Congress through Section 12(a).  The President cited the critical importance of these areas to subsistence use by Alaska Natives as well as for marine mammals, other wildlife, and wildlife habitat.  He stated his intention to ensure that the unique resources of these areas remain available for future generations.

47.    On December 20, 2016, President Obama permanently withdrew the vast majority of the U.S. Arctic Ocean and large areas in the Atlantic Ocean from future oil and gas leasing

and any resulting exploration and development. The President acted pursuant to the authority vested in him by Congress through Section 12(a).

48.     In the Arctic Ocean, the President withdrew all unleased portions of the area designated by BOEM as the Chukchi Sea Planning Area that were not already withdrawn. The President also withdrew all unleased portions of the area designated as the Beaufort Sea Planning Area that were not already withdrawn except for certain nearshore outer continental shelf lease blocks. In total, these Beaufort and Chukchi Sea withdrawals protected an additional 115 million acres of ocean from leasing and its resulting threats to wildlife and subsistence, which, together with the January 27, 2015, withdrawal, constitutes approximately 98 percent of the Arctic outer continental shelf.

49.     As described by then-Secretary of the Interior Sally Jewell, the withdrawal will provide protection for the Arctic Ocean's vibrant and fragile offshore ecosystems, which are home to marine mammals and other important ecological resources and marine species on which many Alaska Native communities rely for subsistence and cultural traditions. Then-BOEM Director Abigail Ross Hopper, stated that "[r]isks associated with oil and gas activity in the remote, harsh and undeveloped Arctic are not worth taking when the nation has ample energy sources near existing infrastructure." She explained that "[o]il spill response and clean-up raises unique challenges in the Arctic and a spill could have substantial impacts on the region, particularly given the ecosystem fragility and limited available resources to respond to a spill."

50.     The White House released a fact sheet detailing numerous factual and scientific bases for the Arctic withdrawal. The fact sheet describes a unique, vibrant, vulnerable, and interconnected ecosystem that contains species relying on and migrating through large areas. It notes the increased stress on species in the Arctic Ocean caused by climate change, including

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                          18

harm to polar bears, seals, and walruses from loss of sea ice. The fact sheet cites the significant

risks from oil spills likely to result from offshore drilling in this remote and treacherous region.

It notes the imperative to transition from fossil fuels to renewable sources of energy to address

climate change, citing our nation's needs and international commitments. It finds that "risks

associated with oil and gas activity in remote and harsh Arctic environments are not worth taking

when the United States has ample energy sources near existing infrastructure elsewhere." The

fact sheet explains technical and financial barriers to successful exploitation of the areas'

offshore resources. And it points out that 2.8 million acres with high oil and gas potential closest

to existing infrastructure would still be available for inclusion in future five-year programs, a

decision that reflects consultation with the State of Alaska, which advocated for the exclusion of

these areas from the withdrawal.

51.     In the Atlantic, President Obama withdrew from all future oil and gas leasing 26

massive offshore canyons and canyon complexes, carved initially by rivers and runoff when they

were above the ocean's surface and now repositories of extraordinary biological and geological

resources. Together these protected canyons comprise 3.8 million acres and represent all major

deepwater canyons off the Atlantic coast not otherwise protected. In protecting them, the

President cited their critical importance along the edge of the continent for marine mammals,

deepwater corals, other wildlife, wildlife habitat, and unique resources, and the need to ensure

they remain for future generations.

52.     The White House fact sheet accompanying his proclamation describes at-risk

species, commercially valuable fish populations, and habitat for protected sea turtles and marine

mammals, including migratory whales found in the canyons. It cites research that established the

canyons as biological hotspots, contributors to climate stability, and sources of economic

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    19

benefits.  And it explains threats to the canyons from climate change and from oil and gas-related activities, as well as technical and operational risks associated with exploring and developing them for oil.

### VII.  President Trump's Executive Order

53.     On April 28, 2017, President Trump issued an executive order entitled "Implementing an America-First Offshore Energy Strategy."  Section 5 of the order purports to reverse President Obama's January 27, 2015, and December 20, 2016, withdrawals in the Arctic and Atlantic Oceans.  The order also states that it is the policy of the United States to encourage energy exploration and production on the outer continental shelf.  To that end, it mandates consideration of revising the five-year program so that it includes annual lease sales in the Arctic and Atlantic Oceans; seeks to encourage expeditious seismic surveying to determine offshore resource potential; mandates expedited seismic permitting; and directs a review and reconsideration of various offshore safety and pollution-control regulations and guidance documents, including noise-limitation guidance for seismic and other activities, for consistency with the order's directive to encourage energy exploration and development.

54.     On the first business day following President Trump's issuance of his executive order, the Secretary of the Interior issued an order implementing it.  The secretarial order calls for expedited consideration of seismic permitting applications for the Atlantic Ocean, establishment, in cooperation with NMFS, of a plan for expedited consideration of MMPA permits for seismic surveying, and development and implementation of a streamlined permitting approach for privately-funded seismic data research and collection aimed at expeditiously determining the offshore energy resource potential of the United States.  It also calls for

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                        20

immediate development of a new five-year program with full consideration of leasing in the Arctic and Atlantic Oceans.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Constitutional Violation)

55.     Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

56.     Plaintiffs have a right of action to seek redress for official actions by the President that violate the Constitution.

57.     The Property Clause of the U.S. Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."  U.S. Const. art. IV, § 3, cl. 2.  The President has the authority to regulate such property only to the limited extent that Congress has delegated that authority to the President.

58.     OCSLA Section 12(a), 43 U.S.C. § 1341(a), authorizes the President to withdraw unleased lands of the outer continental shelf from disposition.  It does not authorize the President to re-open withdrawn areas to disposition.

59.     There is no other source of authority that permits the President to reverse or undo a Section 12(a) withdrawal.

60.     In reversing President Obama's Arctic and Atlantic Ocean withdrawals, President Trump acted in excess of his authority under Article II of the U.S. Constitution and intruded on Congress's non-delegated exclusive power under the Property Clause, in violation of the doctrine of separation of powers.

61.     Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury flowing from President Trump's unlawful action.

## SECOND CLAIM FOR RELIEF
### (Statutorily *ultra vires* action)

62.     Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

63.     Plaintiffs have a right of action to redress unlawful official action by the President that exceeds his statutory authority.

64.     The President lacks authority to reverse or undo Section 12(a) withdrawals. OCSLA Section 12(a), 43 U.S.C. § 1341(a), authorizes the President to withdraw unleased lands of the outer continental shelf from disposition.  Neither OCSLA nor any other statute authorizes the President to re-open for disposition areas withdrawn under OCSLA Section 12(a).

65.     In reversing President Obama's Arctic and Atlantic Ocean withdrawals, President Trump acted in excess of his statutory authority.

66.     Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury flowing from President Trump's unlawful action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment providing the following relief:

1.     Declare that Section 5 of President Trump's April 28, 2017, executive order, which purports to reverse the January 27, 2015, and December 20, 2016, withdrawals of portions of the Arctic and Atlantic Oceans from oil and gas leasing, is in excess of his statutory powers, in excess of his powers under, and therefore in violation of, the United States Constitution, not otherwise in accordance with law, and invalid;

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                                     22

2.     Declare that Defendants cannot lawfully implement Section 5 of President Trump's April 28, 2017, executive order;

3.     Enjoin Defendants from complying with or relying in any way on Section 5 of President Trump's April 28, 2017, executive order in the discharge of their official duties;

4.     Issue a writ of mandamus compelling Defendants Zinke and Ross to comply with the January 27, 2015, and December 20, 2016, withdrawals of portions of the Arctic and Atlantic Oceans from oil and gas leasing;

5.     Award Plaintiffs their costs in this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or as otherwise appropriate; and

6.     Grant such other relief as the Court deems just and proper.


Respectfully submitted this 3rd day of May, 2017.

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*s/ Eric P. Jorgensen*
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice pending*)
Nancy S. Marks (N.Y. Bar No. 2121820) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiffs League of Conservation Voters; Natural Resources Defense Council; Sierra Club; Alaska Wilderness League; Defenders of Wildlife; Northern Alaska Environmental Center; Resisting Environmental Destruction on Indigenous Lands; Center for Biological Diversity; Greenpeace, Inc.; and The Wilderness Society*

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                          23

APPEAL,CLOSED

# U.S. District Court
## District of Alaska (Anchorage)
## CIVIL DOCKET FOR CASE #: 3:17-cv-00101-SLG

League of Conservation Voters et al v. Trump et al
Assigned to: Sharon L. Gleason
Case in other court:  9CCA, 19-35460
                      9CCA, 19-35461
                      9CCA, 19-35462
Cause: 28:1331 Fed. Question

Date Filed: 05/03/2017
Date Terminated: 04/01/2019
Jury Demand: None
Nature of Suit: 893 Environmental
Matters
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**League of Conservation Voters**          represented by   **Eric P. Jorgensen**
                                                            EARTHJUSTICE (Juneau)
                                                            325 Fourth Street
                                                            Juneau, AK 99801
                                                            907-586-2751
                                                            Fax: 907-463-5891
                                                            Email: ejorgensen@earthjustice.org
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Erik Clifford Grafe**
                                                            EARTHJUSTICE (Anch)
                                                            441 W Fifth Avenue, Suite 301
                                                            Anchorage, AK 99501-2340
                                                            907-277-2500
                                                            Fax: 907-277-1390
                                                            Email: egrafe@earthjustice.org
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jacqueline Miya Iwata**
                                                            Natural Resources Defense Council
                                                            (DC)
                                                            1152 15th Street NW, Suite 300
                                                            Washington, DC 20005
                                                            202-289-2377
                                                            Fax: 415-795-4799
                                                            Email: jiwata@nrdc.org
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Nancy S. Marks**

Natural Resources Defense Council
(NY)
40 West 20th Street, 11th Floor
New York, NY 10011
212-727-2700
Email: nmarks@nrdc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
Natural Resources Defense Council
(WA)
3723 Holiday Drive, SE
Olympia, WA 98501
360-534-9900
Fax: 360-534-9909
Email: nlawrence@nrdc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Natural Resources Defense Council**     represented by   **Eric P. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik Clifford Grafe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sierra Club**                          represented by **Eric P. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik Clifford Grafe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alaska Wilderness League**             represented by **Eric P. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik Clifford Grafe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Defenders of Wildlife**       represented by **Eric P. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik Clifford Grafe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Northern Alaska Environmental Center**       represented by **Eric P. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik Clifford Grafe**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Resisting Environmental Destruction      represented by   Eric P. Jorgensen**
**on Indigenous Lands**                                     (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Erik Clifford Grafe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Center for Biological Diversity**          represented by   **Eric P. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik Clifford Grafe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Greenpeace, Inc.**                         represented by   **Eric P. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik Clifford Grafe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*

Case: 19-35460, 11/07/2019, ID: 11493294, DktEntry: 13-2, Page 283 of 297

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **The Wilderness Society** | represented by | **Eric P. Jorgensen**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Erik Clifford Grafe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Miya Iwata**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy S. Marks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel S.W. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Donald J. Trump**<br>*in his official capacity as President of*<br>*the United States* | represented by | **Eric Grant**<br>U.S. Department of Justice/ ENRD/<br>EES<br>950 Pennsylvania Ave., NW. Room<br>2611<br>Washington, DC 20530<br>202-514-0943 |

Fax: 202-514-0557
Email: eric.grant@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Dale Himmelhoch**
U.S. Department of Justice/ ENRD/
EES
PO Box 7611 Ben Franklin Station
Washington, DC 20044-7611
202-514-0180
Fax: 202-514-4180
Email: sarah.himmelhoch@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ryan Zinke**                          represented by   **Eric Grant**
*in his official capacity as Secretary of*              (See above for address)
*the Interior*                                          *LEAD ATTORNEY*
*TERMINATED: 07/31/2019*                                *ATTORNEY TO BE NOTICED*

                                                        **Sarah Dale Himmelhoch**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Wilbur Ross**                          represented by   **Eric Grant**
*in his official capacity as Secretary of*              (See above for address)
*Commerce*                                              *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Sarah Dale Himmelhoch**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**David Bernhardt**                      represented by   **Eric Grant**
*Secretary of the U.S. Department of*                   (See above for address)
*Interior*                                              *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Sarah Dale Himmelhoch**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**American Petroleum Institute**            represented by    **Bradley Keith Ervin**
Covington & Burling LLP
1201 Pennslvania Avenue, N.W.
Washington, DC 20004
202-662-5860
Fax: 202-778-5860
Email: bervin@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James D. Linxwiler**
Guess & Rudd P.C.
1029 W. 3rd Avenue, Suite 400
Anchorage, AK 99501
907-793-2200
Fax: 907-793-2299
Email: jlinxwiler@guessrudd.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Joseph Rosenbaum**
Covington & Burling LLP
1201 Pennslvania Avenue, N.W.
Washington, DC 20004
202-662-5568
Fax: 202-778-5568
Email: srosenbaum@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina A. Rankin**
Guess & Rudd P.C.
1029 W. 3rd Avenue, Suite 400
Anchorage, AK 99501
907-793-2200
Fax: 907-793-2299
Email: crankin@guessrudd.com
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**State of Alaska**                        represented by    **Bradley Edward Meyen**
State of Alaska, Office of the Attorney
General (Anch 4th)
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501

907-269-5283
Fax: 907-279-8644
Email: Brad.Meyen@alaska.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Ellen Douglas**
Department of Interior
1849 C St NW Room 8421
Washington, DC 20240
202-208-4583
Email: jennydouglas2015@gmail.com
*TERMINATED: 02/13/2019*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/03/2017 | 1 | COMPLAINT *for Declaratory and Injunctive* against Wilbur Ross, Donald J. Trump, Ryan Zinke ( Filing fee $ 400 receipt number 097--2326692.), filed by Natural Resources Defense Council, Sierra Club, Defenders of Wildlife, Center for Biological Diversity, Northern Alaska Environmental Center, Greenpeace, Inc., League of Conservation Voters, The Wilderness Society, Alaska Wilderness League, Resisting Environmental Destruction on indigenous Lands. (Grafe, Erik) (Entered: 05/03/2017) |
| 05/03/2017 | 2 | Civil Cover Sheet. (Grafe, Erik) (Entered: 05/03/2017) |
| 05/03/2017 | 3 | Corporate Disclosure Statement by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on indigenous Lands, Sierra Club, The Wilderness Society. (Grafe, Erik) (Entered: 05/03/2017) |
| 05/03/2017 | 4 | Unissued summons re Defendant Donald J. Trump, (Attachments: # 1 Unissued Summons re Defendant Ryan Zinke, # 2 Unissued Summons re Defendant Wilbur Ross, # 3 Unissued Summons re Defendant Acting U.S. Attorney, # 4 Unissued Summons re Defendant U.S. Attorney General)(PXS, COURT STAFF) (Entered: 05/03/2017) |
| 05/03/2017 |  | Summons Issued as to Wilbur Ross, Donald J. Trump, Ryan Zinke, U.S. Attorney and U.S. Attorney General. (PXS, COURT STAFF) (Entered: 05/03/2017) |
| 05/03/2017 | 5 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Nathaniel S.W. Lawrence. ( Pro Hac Vice Admission fee $150.00 paid. Receipt number 097--2326761.) by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on indigenous Lands, Sierra Club, The Wilderness Society.(Lawrence, Nathaniel) (Entered: 05/03/2017) |
| 05/03/2017 | 6 | |

| | | |
|---|---|---|
| | | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Nancy S. Marks. ( Pro Hac Vice Admission fee $150.00 paid. Receipt number 097--2326794.) by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on indigenous Lands, Sierra Club, The Wilderness Society.(Marks, Nancy) (Entered: 05/03/2017) |
| 05/04/2017 | 7 | **ORDER:** granting Nathaniel S. W. Lawrence's Motion and Application of Non-Eligible Attorney for Permission to Appear and Participate in the United States District Court for the District of Alaska 5 . Signed by Judge Sharon L. Gleason on 05/04/2017. (AEM, CHAMBERS STAFF) (Entered: 05/04/2017) |
| 05/04/2017 | 8 | **ORDER:** granting Nancy S. Marks' Motion and Application of Non-Eligible Attorney for Permission to Appear and Participate in the United States District Court for the District of Alaska 6 . Signed by Judge Sharon L. Gleason on 05/04/2017. (AEM, CHAMBERS STAFF) (Entered: 05/04/2017) |
| 05/18/2017 | 9 | **ORDER** advising counsel of procedures to follow prior to filing a motion to dismiss. Signed by Judge Sharon L. Gleason on 05/18/2017. (CME, COURT STAFF) (Entered: 05/18/2017) |
| 06/09/2017 | 10 | AFFIDAVIT of Service for Complaint and Summons served on Donald J. Trump, Ryan Zinke, Wilbur Ross, Jeff Sessions, and Civil Process Clerk on 05/03/2017, filed by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society. (Attachments: # 1 Affidavit of Service, # 2 Exhibit 1, # 3 Exhibit 2)(Grafe, Erik) (Entered: 06/09/2017) |
| 06/26/2017 | 11 | NOTICE *of Affidavit of Service* by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society re 9 Order (Attachments: # 1 Affidavit of Service)(Grafe, Erik) (Entered: 06/26/2017) |
| 06/30/2017 | 12 | MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* by Wilbur Ross, Donald J. Trump, Ryan Zinke. (Attachments: # 1 Proposed Order) (Himmelhoch, Sarah) (Entered: 06/30/2017) |
| 06/30/2017 | 13 | MEMORANDUM *in Support of Defendant's Motion to Dismiss* by Wilbur Ross, Donald J. Trump, Ryan Zinke 12 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* filed by Wilbur Ross, Ryan Zinke, Donald J. Trump. (Attachments: # 1 Ex. 1, # 2 Ex. 2, # 3 Ex. 3, # 4 Ex. 4, # 5 Ex. 5, # 6 Ex. 6, # 7 Ex. 7, # 8 Ex. 8, # 9 Ex. 9, # 10 Ex. 10, # 11 Ex. 11, # 12 Ex. 12, # 13 Ex. 13, # 14 Ex. 14, # 15 Ex. 15, # 16 Ex. 16, # 17 Ex. 17, # 18 Ex. 18)(Himmelhoch, Sarah) (Entered: 06/30/2017) |
| 06/30/2017 | 14 | |

| | | |
|---|---|---|
| | | MOTION to Intervene *As A Defendant* by American Petroleum Institute. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Order)(Linxwiler, James) (Entered: 06/30/2017) |
| 06/30/2017 | 15 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Bradley K. Ervin. by American Petroleum Institute.(Linxwiler, James) (Entered: 06/30/2017) |
| 06/30/2017 | 16 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Steven J. Rosenbaum. by American Petroleum Institute.(Linxwiler, James) (Entered: 06/30/2017) |
| 06/30/2017 | 17 | Receipt of $300 non-resident attorney payment for Bradley K. Ervin, Steven J. Rosenbaum as to Intervenor Defendant American Petroleum Institute. re 16 MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Steven J. Rosenbaum., 15 MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Bradley K. Ervin. (PXS, COURT STAFF) (Entered: 06/30/2017) |
| 06/30/2017 | | Docket Annotation re 14 Motion to Intervene as Defendant: The parties are advised that the role of the proposed Intervenor Defendant has been changed from Intervenor Defendant to Movant until the Motion to Intervene has been decided. (CME, COURT STAFF) (Entered: 07/03/2017) |
| 06/30/2017 | 18 | CLERK'S NOTICE re 16 , 15 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Bradley K. Ervin and Steven J. Rosenbaum, at docket 16 , 15 , is authorized under D.Ak. LR 83.1(d). (CME, COURT STAFF) (Entered: 07/03/2017) |
| 07/12/2017 | 19 | RESPONSE to Motion (Non-Opposition) re 14 MOTION to Intervene *As A Defendant stating Defendants' Do Not Object* filed by Wilbur Ross, Donald J. Trump, Ryan Zinke. (Himmelhoch, Sarah) (Entered: 07/12/2017) |
| 07/12/2017 | 20 | NOTICE of Appearance by Christina A. Rankin on behalf of American Petroleum Institute (Rankin, Christina) (Entered: 07/12/2017) |
| 07/20/2017 | 21 | Joint MOTION for Extension of Time to File Response/Reply as to 12 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society. (Attachments: # 1 Proposed Order)(Grafe, Erik) (Entered: 07/20/2017) |
| 07/21/2017 | 22 | **ORDER:** granting the Motion of the American Petroleum Institute for Leave to Intervene as a Defendant 14 (see order for full details). Signed by Judge Sharon L. Gleason on 07/21/2017. (AEM, CHAMBERS STAFF) (Entered: 07/21/2017) |
| 07/21/2017 | 23 | **ORDER:** granting the parties' Joint Motion for Extension of Time 21 to file responses to Motion to Dismiss 12 . Responses are due by August 25, 2017 and Replies are due by September 18, 2017. Signed by Judge Sharon L. Gleason on 07/21/2017. (AEM, CHAMBERS STAFF) (Entered: 07/21/2017) |
| 07/21/2017 | 24 | |

|  |  | **INITIAL CASE STATUS REPORT/CASE SCHEDULING AND PLANNING ORDER:** Counsel for plaintiff shall serve and file the Rule 26 Meeting Report within 28 days of service of this order. Signed by Judge Sharon L. Gleason on 07/21/2017. (Attachments: # 1 Scheduling and Conference Planning Report)(AEM, CHAMBERS STAFF) (Entered: 07/21/2017) |
|---|---|---|
| 07/28/2017 | 25 | MOTION to Dismiss by American Petroleum Institute.(Linxwiler, James) (Entered: 07/28/2017) |
| 07/28/2017 | 26 | ANSWER to 1 Complaint, by American Petroleum Institute.(Linxwiler, James) (Entered: 07/28/2017) |
| 08/18/2017 | 27 | REPORT of Rule 26(f) Planning Meeting. (Grafe, Erik) (Entered: 08/18/2017) |
| 08/18/2017 | 28 | Joint MOTION for Extension of Time to File Response/Reply as to 25 MOTION to Dismiss , 12 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society. (Attachments: # 1 Proposed Order)(Grafe, Erik) (Entered: 08/18/2017) |
| 08/21/2017 | 29 | **ORDER GRANTING JOINT MOTION FOR EXTENSION OF TIME**: RE 28 Motion for Extension of Time to File Response/Reply re 25 MOTION to Dismiss Responses due by 9/8/2017 Replies due by 10/2/2017. Signed by Judge Sharon L. Gleason on 08/21/2017. (CME, COURT STAFF) (Entered: 08/21/2017) |
| 08/31/2017 | 30 | MOTION to Intervene *Unopposed* by State of Alaska. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Proposed Answer, # 3 Proposed Order Proposed Order) (Meyen, Bradley) (Entered: 08/31/2017) |
| 08/31/2017 | 31 | DECLARATION of *Chantal Walsh* re 30 MOTION to Intervene *Unopposed* by State of Alaska. (Meyen, Bradley) (Entered: 08/31/2017) |
| 09/01/2017 | 32 | **ORDER:** granting the State of Alaska's Motion to Intervene 30 (see order for full details). Signed by Judge Sharon L. Gleason on 09/01/2017. (AEM, CHAMBERS STAFF) (Entered: 09/01/2017) |
| 09/05/2017 | 33 | *Defendant-Intervenor State of Alaska's* ANSWER to 1 Complaint, by State of Alaska.(Meyen, Bradley) (Entered: 09/05/2017) |
| 09/05/2017 | 34 | MOTION to Dismiss by State of Alaska. (Attachments: # 1 Proposed Order) (Meyen, Bradley) (Entered: 09/05/2017) |
| 09/06/2017 | 35 | **ORDER:** re Joint Schedule Proposal 27 re Initial Case Status Report Order 24 . Signed by Judge Sharon L. Gleason on 09/06/2017. (AEM, CHAMBERS STAFF) (Entered: 09/06/2017) |
| 09/08/2017 | 36 | RESPONSE in Opposition re 25 MOTION to Dismiss , 34 MOTION to Dismiss , 12 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* filed by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, |

| | | Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society. (Grafe, Erik) (Entered: 09/08/2017) |
|---|---|---|
| 09/27/2017 | 37 | NOTICE of Appearance by Jennifer Ellen Douglas on behalf of State of Alaska (Douglas, Jennifer) (Entered: 09/27/2017) |
| 10/02/2017 | 38 | REPLY to Response to Motion re 12 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* filed by Wilbur Ross, Donald J. Trump, Ryan Zinke. (Himmelhoch, Sarah) (Entered: 10/02/2017) |
| 10/02/2017 | 39 | REPLY to Response to Motion re 25 MOTION to Dismiss filed by American Petroleum Institute. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H) (Linxwiler, James) (Entered: 10/02/2017) |
| 10/02/2017 | 40 | MOTION for Hearing re 25 MOTION to Dismiss , 36 Response in Opposition to Motion,, 39 Reply to Response to Motion, *Request for Oral Argument* by American Petroleum Institute.(Linxwiler, James) (Entered: 10/02/2017) |
| 10/04/2017 | 41 | **ORDER**: re 40 MOTION for Hearing is GRANTED. Oral Argument re pending motions set for 11/8/2017 10:00 AM in Anchorage Courtroom 3 before Sharon L. Gleason. (See Order for details). Signed by Judge Sharon L. Gleason on 10/04/2017. (CME, COURT STAFF) (Entered: 10/04/2017) |
| 10/04/2017 | 42 | NOTICE *of Errata* by Wilbur Ross, Donald J. Trump, Ryan Zinke re 38 Reply to Response to Motion (Himmelhoch, Sarah) (Entered: 10/04/2017) |
| 10/16/2017 | 43 | NOTICE of Appearance by Sarah Dale Himmelhoch on behalf of Wilbur Ross, Donald J. Trump, Ryan Zinke (Himmelhoch, Sarah) (Entered: 10/16/2017) |
| 11/08/2017 | 44 | Minute Entry for proceedings held before Judge Sharon L. Gleason: Oral Argument on Pending Moitons at Dockets 12, 25, and 34 held at 10:00 a.m. to 11:02 a.m. on 11/8/2017. Oral arguments heard, court heard Motion to Dismiss at Docket 25 ; Motion to Dismiss at Docket 34 ; and Motion to Dismiss at Docket 12 are UNDER ADVISEMENT, written ruling to issue. APPEARANCES: Erik Clifford Grafe, Nathaniel S. W. Lawrence, Steven Joseph Rosenbaum, Christina A. Rankin, Bradley Edward Meyen, Jennifer Ellen Douglas, Eric Grant; Sonya L. Reeves, Official Court Reporter. (CME, COURT STAFF) (Entered: 11/08/2017) |
| 03/19/2018 | 45 | **ORDER:** re Motions to Dismiss 12 ; 25 ; and 34 . Within 14 days from the date of this order, the parties shall file a proposed schedule for summary judgment briefing (see order for full details). Signed by Judge Sharon L. Gleason on 03/19/2018. (AEM, CHAMBERS STAFF) (Entered: 03/19/2018) |
| 03/23/2018 | 46 | NOTICE *to the Court* by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society (Attachments: # 1 Exhibit 1)(Grafe, Erik) (Entered: 03/23/2018) |
| 04/02/2018 | 47 | |

| | | |
|---|---|---|
| | | NOTICE *Joint Proposed Summary Judgment Briefing Schedule* by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society (Grafe, Erik) (Entered: 04/02/2018) |
| 04/03/2018 | 48 | **ORDER:** approving the parties' Joint Proposed Summary Judgment Briefing Schedule 47 (see order for full details). Signed by Judge Sharon L. Gleason on 04/03/2018. (AEM, CHAMBERS STAFF) (Entered: 04/03/2018) |
| 05/11/2018 | 49 | ANSWER to 1 Complaint, by Wilbur Ross, Donald J. Trump, Ryan Zinke. (Himmelhoch, Sarah) (Entered: 05/11/2018) |
| 06/08/2018 | 50 | MOTION for Summary Judgment by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society.(Grafe, Erik) (Entered: 06/08/2018) |
| 06/08/2018 | 51 | MEMORANDUM *in support of Motion for Summary Judgment* by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society 50 MOTION for Summary Judgment filed by League of Conservation Voters, Greenpeace, Inc., Natural Resources Defense Council, Alaska Wilderness League, The Wilderness Society, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, Northern Alaska Environmental Center, Center for Biological Diversity, Defenders of Wildlife. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39)(Grafe, Erik) (Entered: 06/08/2018) |
| 06/08/2018 | 52 | MOTION for Judicial Notice re 51 Memorandum,,,,, by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society. (Attachments: # 1 Proposed Order)(Grafe, Erik) (Entered: 06/08/2018) |
| 06/11/2018 | 53 | Notice to Counsel re 51 Memorandum, and 50 MOTION for Summary Judgment. A review of the documents submitted at dkts 50-52 confirms that they are over 25 pages in length. If a CHAMBERS copy of the document has not been forwarded to the Court, counsel is reminded that, pursuant to D.Ak.LR 10.1(b) and the Administrative Policies and Procedures, you are required to |

| | | |
|---|---|---|
| | | provide the court with a CHAMBERS copy of your filing at dkt 50-52. The CHAMBERS copy must be attached to a copy of the Notice of Electronic Filing and must be printed with the ECF pdf footer on each page. (BJK, COURT STAFF) (Entered: 06/11/2018) |
| 07/11/2018 | 54 | **ORDER RE MOTION FOR JUDICIAL NOTICE**: Plaintiffs' Motion for Judicial Notice at Docket 52 is GRANTED. (See Order for details). Signed by Judge Sharon L. Gleason on 07/10/2018. (CME, COURT STAFF) (Entered: 07/11/2018) |
| 07/18/2018 | 55 | MOTION for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment by Wilbur Ross, Donald J. Trump, Ryan Zinke. (Attachments: # 1 Proposed Order)(Himmelhoch, Sarah) Modified on 7/19/2018 to clarify document type and create relationship to document #50 . (BJK, COURT STAFF). (Entered: 07/18/2018) |
| 07/18/2018 | 56 | Defendants' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment re 55 MOTION for Summary Judgment and 50 MOTION for Summary Judgment filed by Wilbur Ross, State of Alaska, Donald J. Trump, Ryan Zinke. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Himmelhoch, Sarah) Modified on 7/19/2018 to clarify document type. (BJK, COURT STAFF). (Entered: 07/18/2018) |
| 08/02/2018 | 57 | RESPONSE in Opposition re 50 MOTION for Summary Judgment filed by American Petroleum Institute. (Linxwiler, James) (Entered: 08/02/2018) |
| 08/02/2018 | 58 | Cross MOTION for Summary Judgment by American Petroleum Institute. (Linxwiler, James) (Entered: 08/02/2018) |
| 08/02/2018 | 59 | MEMORANDUM *IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT* by American Petroleum Institute 58 Cross MOTION for Summary Judgment filed by American Petroleum Institute. (Linxwiler, James) (Entered: 08/02/2018) |
| 08/02/2018 | 60 | Cross MOTION for Summary Judgment *Intervenor-Defendant State of Alaska's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment* by State of Alaska. (Attachments: # 1 Proposed Order) (Meyen, Bradley) (Entered: 08/02/2018) |
| 08/02/2018 | 61 | MEMORANDUM *Intervenor-Defendant State of Alaska's Memorandum in Support of its Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment* by State of Alaska 60 Cross MOTION for Summary Judgment *Intervenor-Defendant State of Alaska's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment* filed by State of Alaska. (Meyen, Bradley) (Entered: 08/02/2018) |
| 09/14/2018 | 62 | REPLY to Response to Motion re 55 MOTION for Summary Judgment , 50 MOTION for Summary Judgment , 58 Cross MOTION for Summary Judgment , 60 Cross MOTION for Summary Judgment *Intervenor-Defendant State of Alaska's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment* filed by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of |

Case: 19-35460, 11/07/2019, ID: 11493294, DktEntry: 13-2, Page 293 of 297

**350**

| | | |
|---|---|---|
| | | Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society. (Grafe, Erik) (Entered: 09/14/2018) |
| 10/05/2018 | 63 | REPLY to Response to Motion re 55 MOTION for Summary Judgment , 50 MOTION for Summary Judgment , 60 Cross MOTION for Summary Judgment *Intervenor-Defendant State of Alaska's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment* filed by Wilbur Ross, Donald J. Trump, Ryan Zinke. (Himmelhoch, Sarah) (Entered: 10/05/2018) |
| 10/09/2018 | 64 | ERRATA *correcting Table of Contents for Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment* by Wilbur Ross, Donald J. Trump, Ryan Zinke 63 Reply to Response to Motion, filed by Wilbur Ross, Ryan Zinke, Donald J. Trump. (Himmelhoch, Sarah) (Entered: 10/09/2018) |
| 10/12/2018 | 65 | REPLY to Response to Motion re 58 Cross MOTION for Summary Judgment filed by American Petroleum Institute. (Linxwiler, James) (Entered: 10/12/2018) |
| 10/12/2018 | 66 | MOTION for Hearing re 55 MOTION for Summary Judgment , 50 MOTION for Summary Judgment , 58 Cross MOTION for Summary Judgment , 60 Cross MOTION for Summary Judgment *Intervenor-Defendant State of Alaska's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment* by American Petroleum Institute.(Linxwiler, James) (Entered: 10/12/2018) |
| 10/12/2018 | 67 | REPLY to Response to Motion re 60 Cross MOTION for Summary Judgment *Intervenor-Defendant State of Alaska's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment* filed by State of Alaska. (Douglas, Jennifer) (Entered: 10/12/2018) |
| 10/12/2018 | 68 | RESPONSE in Support re 66 MOTION for Hearing re 55 MOTION for Summary Judgment , 50 MOTION for Summary Judgment , 58 Cross MOTION for Summary Judgment , 60 Cross MOTION for Summary Judgment *Intervenor-Defendant State of Alaska's filed by Wilbur Ross, Donald J. Trump, Ryan Zinke. (Himmelhoch, Sarah) (Entered: 10/12/2018)* |
| 10/15/2018 | 69 | **SLG TEXT ORDER**:Oral argument on the pending cross-motions for summary judgment shall be held on **Friday, November 9, 2018 at 2:00 p.m.** in Anchorage Courtroom 3. Each side shall be accorded up to 30 minutes for argument. The Federal Defendants, API and the State of Alaska may divided that time amongst themselves as they may agree. If they cannot agree, then each entity will be accorded up to 10 minutes for its argument. (CME, COURT STAFF) (Entered: 10/15/2018) |
| 10/23/2018 | 70 | NOTICE of Appearance by Sarah Dale Himmelhoch on behalf of Wilbur Ross, Donald J. Trump, Ryan Zinke (Himmelhoch, Sarah) (Entered: 10/23/2018) |
| 10/23/2018 | 71 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Jacqueline M. Iwata. ( Pro Hac Vice Admission fee $150.00 paid. Receipt number 097--2599301.) by Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental |

| | | |
|---|---|---|
| | | Center, Resisting Environmental Destruction on Indigenous Lands, Sierra Club, The Wilderness Society.(Iwata, Jacqueline) (Entered: 10/23/2018) |
| 10/24/2018 | 72 | CLERK'S NOTICE re 71 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Jacqueline M. Iwata, at docket 71 , is authorized under D.Ak. LR 83.1(d). (CME, COURT STAFF) (Entered: 10/24/2018) |
| 10/26/2018 | 73 | MOTION for Hearing re 69 Order,, Set Motion and R&R Deadlines/Hearings, *Unopposed Motion for Scheduling November 9, 2018 Oral Argument* by American Petroleum Institute. (Attachments: # 1 Proposed Order)(Linxwiler, James) (Entered: 10/26/2018) |
| 10/29/2018 | 74 | **SLG TEXT ORDER:** The Unopposed Motion for Scheduling November 9, 2018 Oral Argument, at docket 73 , is hereby GRANTED. The Oral Argument on the pending cross-motions for summary judgment set for 11/9/18 at 2:00 PM is vacated and rescheduled to **11/9/18 at 10:00 AM** in Anchorage Courtroom 3 before Sharon L. Gleason. (JLH, COURT STAFF) (Entered: 10/29/2018) |
| 11/09/2018 | 75 | Minute Entry for proceedings held before Judge Sharon L. Gleason: Oral argument on pending motions at dockets 50, 55, 58, and 60 held 10:03 a.m. to 11:02 a.m. on 11/9/2018. Oral arguments heard. MATTERS TAKEN UNDER ADVISEMENT. Written rulings to issue. APPEARANCES: Erik Clifford Grafe, for plaintiffs; Nathaniel S. W. Lawrence, for plaintiffs; Jacqueline M. Iwata, for plaintiffs; Steven Joseph Rosenbaum, for American Petroleum Institute; Jennifer Ellen Douglas, for State of Alaska; Jeff Wood, for U.S. Department of Justice. (RMC, COURT STAFF) (Entered: 11/13/2018) |
| 01/18/2019 | 76 | TRANSCRIPT REQUEST by Natural Resources Defense Council. (Iwata, Jacqueline) (Entered: 01/18/2019) |
| 02/13/2019 | 77 | MOTION to Withdraw as Attorney by State of Alaska.(Douglas, Jennifer) (Entered: 02/13/2019) |
| 02/28/2019 | 78 | ERRATA by Wilbur Ross, Donald J. Trump, Ryan Zinke 38 Reply to Response to Motion filed by Wilbur Ross, Ryan Zinke, Donald J. Trump. (Himmelhoch, Sarah) (Entered: 02/28/2019) |
| 03/15/2019 | 79 | TRANSCRIPT of Proceedings ; Oral Argument held on November 9, 2018 before Judge Sharon L. Gleason. Realtime Court Reporter: Sonja L. Reeves, RMR-CRR. <br><br> Any party needing a copy of the transcript to review for redaction purposes may purchase a copy by calling Realtime Court Reporter, Sonja L. Reeves, RMR-CRR (907) 677-6136. Transcript may be viewed at the court public terminal or purchased through the Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <br><br> The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after Release of Transcript Restriction deadline of 6/13/2019. Ordered by: Nancy Marks (SLR) (Entered: 03/15/2019) |
| | | |

| 03/29/2019 | 80 | **ORDER RE MOTIONS FOR SUMMARY JUDGMENT**: IT IS ORDERED that: Plaintiffs motion for summary judgment at Docket 50 is GRANTED. Federal Defendants motion, APIs cross-motion, and Alaskas motion for summary judgment at Dockets 55 , 58 , and 60 , respectively, are DENIED. Section 5 of Executive Order 13795 is hereby VACATED. Plaintiffs additional request for injunctive relief is DENIED. (See Order for details). Signed by Judge Sharon L. Gleason on 03/29/2019. (CME, COURT STAFF) (Entered: 03/29/2019) |
|---|---|---|
| 04/01/2019 | 81 | **JUDGMENT**: IT IS ORDERED AND ADJUDGED: That Plaintiffs motion for summary judgment at Docket 50 is GRANTED. Federal Defendants motion, APIs cross-motion, and Alaskas motion for summary judgment at Dockets 55 , 58 and 60 , respectively, are DENIED. Section 5 of Executive Order 13795 is hereby VACATED. Plaintiffs additional request for injunctive relief is DENIED. Signed by Judge Sharon L. Gleason on 04/01/2019. (CME, COURT STAFF) (Entered: 04/01/2019) |
| 05/28/2019 | 82 | NOTICE OF APPEAL as to 80 Order on Motion for Summary Judgment,,,,,,, 81 Judgment, 45 Order on Motion to Dismiss,,,, Order on Motion to Dismiss/Lack of Jurisdiction, by Wilbur Ross, Donald J. Trump, Ryan Zinke. Filing fee $ 505. (Attachments: # 1 Appendix Statement of Representation)(Himmelhoch, Sarah) (Entered: 05/28/2019) |
| 05/28/2019 | 83 | NOTICE OF APPEAL as to 80 Order on Motion for Summary Judgment,,,,,,, 81 Judgment, 45 Order on Motion to Dismiss,,,, Order on Motion to Dismiss/Lack of Jurisdiction, by American Petroleum Institute. Filing fee $ 505, receipt number 097--2705588. (Linxwiler, James) (Entered: 05/28/2019) |
| 05/28/2019 | 84 | NOTICE OF APPEAL as to 80 Order on Motion for Summary Judgment,,,,,,, 81 Judgment, by State of Alaska. Filing fee $ 505, receipt number 097--2705687. (Meyen, Bradley) (Entered: 05/28/2019) |
| 05/29/2019 | 85 | USCA Case Number 19-35460 for 82 Notice of Appeal, filed by Wilbur Ross, Ryan Zinke, Donald J. Trump. (Attachments: # 1 USCA Mediation Letter)(BJK, COURT STAFF) (Entered: 05/29/2019) |
| 05/29/2019 | 86 | USCA Scheduling Order as to 82 Notice of Appeal, filed by Wilbur Ross, Ryan Zinke, Donald J. Trump. Mediation Questionnaire due on 06/05/2019. Transcript ordered by 06/27/2019. Transcript due 07/29/2019. Appellants David Bernhardt, Wilbur Ross and Donald J. Trump opening brief due 09/05/2019. Appellees Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction On Indigenous Lands, Sierra Club and The Wilderness Society answering brief due 10/07/2019. Appellant's optional reply brief is due 21 days after service of the answering brief. (BJK, COURT STAFF) (Entered: 05/29/2019) |
| 05/29/2019 | 87 | USCA Case Number 19-35461 for 83 Notice of Appeal, filed by American Petroleum Institute. (Attachments: # 1 USCA Mediation Letter)(BJK, COURT STAFF) (Entered: 05/29/2019) |
| | | |

| | | |
|---|---|---|
| 05/29/2019 | 88 | USCA Scheduling Order as to 83 Notice of Appeal, filed by American Petroleum Institute. Mediation Questionnaire due on 06/05/2019. Transcript ordered by 06/27/2019. Transcript due 07/29/2019. Appellant American Petroleum Institute opening brief due 09/05/2019. Appellees Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction On Indigenous Lands, Sierra Club and The Wilderness Society answering brief due 10/07/2019. Appellant's optional reply brief is due 21 days after service of the answering brief. (BJK, COURT STAFF) (Entered: 05/29/2019) |
| 05/29/2019 | 89 | USCA Case Number 19-35462 for 84 Notice of Appeal filed by State of Alaska. (Attachments: # 1 USCA Mediation Letter)(BJK, COURT STAFF) (Entered: 05/29/2019) |
| 05/29/2019 | 90 | USCA Scheduling Order as to 84 Notice of Appeal filed by State of Alaska. Mediation Questionnaire due on 06/05/2019. Transcript ordered by 06/27/2019. Transcript due 07/29/2019. Appellant State of Alaska opening brief due 09/05/2019. Appellees Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc., League of Conservation Voters, Natural Resources Defense Council, Northern Alaska Environmental Center, Resisting Environmental Destruction On Indigenous Lands, Sierra Club and The Wilderness Society answering brief due 10/07/2019. Appellant's optional reply brief is due 21 days after service of the answering brief. (BJK, COURT STAFF) (Entered: 05/29/2019) |
| 06/27/2019 | 91 | DESIGNATION of Record on Appeal by American Petroleum Institute re 83 Notice of Appeal, (Rankin, Christina) (Entered: 06/27/2019) |
| 06/27/2019 | 92 | TRANSCRIPT REQUEST by American Petroleum Institute re 91 Designation of Record on Appeal, 83 Notice of Appeal, (Rankin, Christina) (Entered: 06/27/2019) |
| 07/31/2019 | 93 | TRANSCRIPT of Proceedings ; Oral Argument held on November 8, 2017 before Judge Sharon L. Gleason. Realtime Court Reporter: Sonja L. Reeves, RMR-CRR.<br><br>Any party needing a copy of the transcript to review for redaction purposes may purchase a copy by calling Realtime Court Reporter, Sonja L. Reeves, RMR-CRR (907) 677-6136. Transcript may be viewed at the court public terminal or purchased through the Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be remotely made electronically available to the public without redaction after Release of Transcript Restriction deadline of 10/29/2019. Ordered by: Christina Rankin (SLR) (Entered: 07/31/2019) |
| 07/31/2019 | | Docket Annotation: David Bernhardt, substituted for Ryan Zinke (in his official capacity as Secretary of the Interior) pursuant to FRCvP 25(d) (CME, COURT STAFF) (Entered: 07/31/2019) |

| 09/03/2019 | 94 | ORDER of USCA as to 84 Notice of Appeal filed by State of Alaska, 82 Notice of Appeal, filed by Wilbur Ross, Ryan Zinke, Donald J. Trump, 83 Notice of Appeal, filed by American Petroleum Institute: (SEE PDF for full details). (BJK, COURT STAFF) (Entered: 09/03/2019) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/05/2019 17:38:12 | | | |
| **PACER Login:** | jheminger2594:4067846:4299065 | **Client Code:** | United States |
| **Description:** | Docket Report | **Search Criteria:** | 3:17-cv-00101-SLG |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |