**No. 19-35460**
**(Consolidated with Nos. 19-35461 and 19-35462)**

_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

_____

LEAGUE OF CONSERVATION VOTERS, et al.,

*Plaintiffs/Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the
United States, et al.,

*Defendants/Appellants*,

v.

AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA

*Intervenors/Defendants/Appellants*.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA, ANCHORAGE DIVISION
No. 3:17-cv-00101 Hon. Sharon L. Gleason

_____

**INTERVENOR STATE OF ALASKA'S OPENING BRIEF**

_____

KEVIN G. CLARKSON
ATTORNEY GENERAL
Kathryn R. Vogel
Mark D. Tyler
*Assistant Attorneys General*
1031 W. 4th Ave, Ste. 200
(907) 269-5275
kathryn.vogel@alaska.gov
*Attorneys for Intervenor/Defendant/Appellant*
STATE OF ALASKA

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................................... 3

STATUTORY AUTHORITIES ............................................................................... 3

ISSUE PRESENTED .............................................................................................. 3

STATEMENT OF THE CASE ................................................................................ 4

SUMMARY OF THE ARGUMENT ....................................................................... 4

STANDARD OF REVIEW ..................................................................................... 5

ARGUMENT ......................................................................................................... 5

I.  The text of Section 12(a) authorizes the President to revoke withdrawals. .... 5

    A.  The inclusion of "from time to time" in the phrase, "may, from time to time, withdraw" unambiguously gives the President flexibility to alter or end withdrawals. .............................................................................. 6

    B.  Withdrawals are subject to change. ..................................................... 14

    C.  When determining whether Section 12(a) is ambiguous, this Court should follow the lead of past Presidents who interpreted Section 12(a) to permit modification and termination. .................................... 21

II.  The district court's interpretation of Section 12(a) would improperly deprive Alaska of the benefits of OCSLA. ................................................................ 23

    A.  Outer Continental Shelf exploration and development promotes job growth and creates revenue for local and state services. .................... 25

    B.  OCS development benefits transportation infrastructure. ................... 26

CONCLUSION ....................................................................................................29

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Fruit Growers v. United States*,
    105 F.2d 722 (9th Cir. 1939) ....................................................................10

*Appeal of Granite State Elec. Co.*,
    435 A.2d 119 (N.H. 1981) ........................................................................9

*Ass'n of Cal. Ins. Cos. v. Jones*,
    386 P.3d 1188 (Cal. 2017) ........................................................................8

*BedRoc Ltd., LLC v. United States*,
    541 U.S. 176 (2000)..................................................................................6

*BP Pipelines (Alaska) Inc. v. State, Dept. of Revenue*,
    327 P.3d 185 (Alaska 2014) ....................................................................26

*BP Pipelines v. State, Dept. of Revenue*,
    325 P.3d 478 (Alaska 2014) ....................................................................27

*Corley v. United States*,
    556 U.S. 303 (2009)..................................................................................6

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*,
    135 S.Ct. 2028 (2015)..............................................................................14

*E.E.O.C. v. Luce, Forward, Hamilton & Scripps*,
    345 F.3d 742 (9th Cir. 2003) ....................................................................5

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000).......................................................................... 18, 19

*Franklin Sugar Refining Co. v. United States*,
    1 U.S. Cust. App. 242 (Ct. Cust. App. 1911) ..............................................10

*Gorbach v. Reno*,
    219 F.3d 1087 (9th Cir. 2000) (en banc) ..................................................19

*Grisar v. McDowell*,
    73 U.S. 363 (1867)..................................................................................16

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000)......................................................................................6

*Hewitt v. Schultz*,
    180 U.S. 139 (1901)................................................................................15

*Holsclaw v. Perkins*,
    268 S.W.3d 376 (Ky. Ct. App. 2008) ........................................................17

*Horton v. Botts*,
 164 S.W. 352 (Ky. 1914).................................................................17

*Illinois Cent. R.R. Co. v. United States*,
 1858 WL 4672 (Ct. Cl. 1858)..........................................................15

*In the Matter of Flint Hills Resources Alaska, LLC*,
 136 FERC P 61021 (F.E.R.C.), 2011 WL 2661397, *2 (2011) ...................27

*International Refugee Assistance Project v. Trump*,
 883 F.3d 233 (4th Cir. 2018) ..........................................................22

*Ketcham v. Lehner*,
 542 A.2d 290 (Vt. 1988)...................................................................9

*Marshall Field & Co. v. Clark*,
 143 U.S. 649 (1892).......................................................................12

*N.L.R.B. v. Noel Canning*,
 573 U.S. 513 (2014)........................................................................22

*Rubin v. Islamic Republic of Iran*,
 138 S.Ct. 816 (2018).......................................................................6

*Scott v. Carew*,
 196 U.S. 100 (1905).......................................................................15

*Shurtleff v. United States*,
 189 U.S. 311 (1903).................................................................. 18, 19

*Sioux Tribe of Indians v. United States*,
 316 U.S. 317, (1942)......................................................................16

*Skinner & Eddy Corp. v. United States*,
 249 U.S. 557 (1919)...................................................................9, 10

*Slingerland v. Norton*,
 61 N.W. 322 (Minn. 1894) .............................................................17

*State v. McBride*,
 70 P. 25 (Wash. 1902) ...................................................................11

*Stevens v. Bd. of Elections of Henry Cty.*,
 160 N.E.2d 366 (Ohio Ct. App. 1957) ............................................17

*Tokyo Kikai Seisakusho, Ltd. v. United States*,
 529 F.3d 1352 (Fed. Cir. 2008) ......................................................20

*Trujillo v. Gen. Elec. Co.*,
 621 F.2d 1084 (10th Cir. 1980) .................................................. 19, 20

*Trump v. International Refugee Assistance Project*,
 138 S.Ct. 2710 (2018)....................................................................22

*United States v. Lillard*,
 934 F.3d 827 (9th Cir. 2019) .........................................................5, 6

*United States v. Little Lake Misere Land Co., Inc.*,
   412 U.S. 580 (1973)...................................................................8

*United States v. Midwest Oil Co.*,
   236 U.S. 459 (1915)........................................................... 16, 22

*United States v. R.R. Bridge Co.*,
   27 F. Cas. 686 (C.C.N.D. Ill. 1855) (No. 16,114).......................15

*United States v. Richardson*,
   418 U.S. 166 (1974)...................................................................11

*Weber v. Dep't of Veterans Affairs*,
   521 F.3d 1061 (9th Cir. 2008)...................................................5

*Wilbur v. United States ex rel. Kadrie*,
   281 U.S. 206 (1930)..................................................................20

*Willan v. Richardson*,
   98 N.E. 1094 (Ind. App. 1912)................................................17

## Constitutional Provisions

U.S. Const. art. I, § 5, cl. 3 .......................................................11

U.S. Const. art. I, § 9, cl. 7 .......................................................11

U.S. Const. art. II, § 3 ..............................................................11

U.S. Const. art. III, § 1 .............................................................11

## Statutes

43 U.S.C. § 1331 *et seq.*............................................................1

43 U.S.C. § 1332(4) ...................................................................23

43 U.S.C. § 1335(a)(1) ...............................................................13

43 U.S.C. § 1341(a) ............................................................ passim

43 U.S.C. § 1347(c) ...................................................................13

43 U.S.C. § 1351(h)(3) ...............................................................13

Cal. Ins. Code § 790.10..............................................................8

Judicial Code of 1911, Pub. L. 61–475, 36 Stat. 1087 (March 3, 1911)................11

Pub. L. 94-579, § 704 (a), 90 Stat. 2743 (1976) .........................17

## Other Authorities

2 F. Stroud, *The Judicial Dictionary*, 781 (1903)....................7

Brief of Appellees/Cross-Appellants/Cross-Appellees, *BP Pipelines (Alaska) Inc. v. State, Dept. of Revenue*, 2013 1097493 (2013) .........................................27

Bureau of Ocean Energy Management 2017-064, *2016 Assessment of Oil and Gas Resources: Alaska Outer Continental Shelf Region* (2017). .........................24

Joseph Story, *Commentaries on the Constitution of the United States*, § 1634 ......11

*New Shorter Oxford English Dictionary* (1993)........................................................7

Northern Economics, *Economic Analysis of Future Offshore Oil and Gas Development: Beaufort Sea, Chukchi Sea, and North Aleutian Basin* (March 2009), *available at* https://northerneconomics.com/wp-content/uploads/2015/04/Shell-OCS-report-final-web.pdf (last visited October 29, 2019) ................................................................................. 25, 26

Petition for Writ of Certiorari, *Alaska Oil and Gas Association et al v. Jewell*, 2016 WL 6577257 (2016) ......................................................................................27

*The Coastline of the United States*, U.S. Department of Commerce, NOAA (1975), (https://shoreline.noaa.gov/_pdf/Coastline_of_the_US_1975.pdf)................1

*United States v. S. Pac. Transp. Co.*, 543 F.2d 676 (9th Cir. 1976)........................17

Victor Fischer, *Alaska's Constitutional Convention* (1975).....................................1

**INTRODUCTION**

Enactment of the Outer Continental Shelf Lands Act (OCSLA) marked an important milestone for energy independence for the United States and provided a roadmap for future resource development that would have particularly profound impacts on the State of Alaska. 43 U.S.C. § 1331 *et seq.* Alaska contains as much coastline as the rest of the nation combined,[1] and the desire for responsible development of the territory's substantial natural resources was one of the primary motivators for statehood among Alaskans. *See* Victor Fischer, *Alaska's Constitutional Convention* 6-7 (1975). While Congress has established that the submerged lands of the outer continental shelf belong to the federal government rather than individual states, the development of such lands has recognized, reverberating effects on adjacent state land. In the case of Alaska, these effects include the chance to make a sustaining impact on the economy of the State for decades to come. But the district court decision threatens to gut the promises of OCSLA.

Section 12(a) of the Act provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the

_____

[1] The United States contains 12,833 statute miles of coastline, of which Alaska contains 6,640. *The Coastline of the United States*, U.S. Department of Commerce, NOAA (1975), https://shoreline.noaa.gov/_pdf/Coastline_of_the_US_1975.pdf .

outer Continental Shelf." 43 U.S.C. § 1341(a). This gives every president discretion to consider what withdrawals are appropriate and the power to start or stop withdrawals. But the district court interpreted that flexible authorization to mean its opposite: that a single President may withdraw all lands from disposition for all time such that future presidents will be powerless to act.

Here, President Obama, in the waning days of his administration, withdrew huge resource-rich sections of outer continental shelf adjacent to Alaska for a time "without specific expiration." President Trump subsequently exercised his withdrawal power to rollback the Obama-era withdrawals, renewing the possibility that such lands could be leased without an act of Congress. But following suit from The League of Conservation Voters and other plaintiffs (collectively, the League), the district court determined that President Trump lacked the authority to modify President Obama's withdrawals. The court determined that President Obama's withdrawal from leasing of outer continental shelf land is unalterable by future presidents (even though President Obama and his three predecessors each altered prior withdrawals or made withdrawals that were temporary in nature). This is contrary to the plain meaning of section 12(a), the purposes of the Act, and the promises it contains. Because the district court's decision distorts the meaning of the withdrawal provision of the Outer Continental Shelf Lands Act and effectively

allows a single president to nullify the Act and vitiate the Act's promises for the State of Alaska, Alaska appeals.

In an effort to minimize redundancy and preserve judicial resources, the State has endeavored not to duplicate the arguments of the federal defendants, and herein adopts them by reference. The Court should reverse the district court's determination that President Trump lacked the authority to modify the withdrawals made by President Obama.

## JURISDICTIONAL STATEMENT

The State of Alaska adopts the jurisdictional statement of the federal defendants.

## STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## ISSUE PRESENTED

Section 12(a) of the Outer Continental Shelf Lands Act provides that "The President of the United States may, from time to time, withdraw from disposition any unleased lands of the outer Continental Shelf." After President Obama withdrew large sections of outer continental shelf for a time period "without specific expiration," President Trump's Executive Order 13795 modified the Obama withdrawals by reducing their scope. Does the President exceed the

authority embedded within the plain language of "may, from time to time, withdraw" when he sets a time limit or otherwise alters past withdrawals?

## STATEMENT OF THE CASE

The State adopts the statement of the case of the federal defendants.

## SUMMARY OF THE ARGUMENT

Section 12(a) of OCSLA is unambiguous. The statutory text allows the President to modify past withdrawals. First, the phrase "from time to time" designates a power that cannot be exhausted with a single use. Rather, orders issued "from time to time" are plastic. The President's power under the statute is flexible, discretionary, and can be exercised when necessary. This interpretation of "from time to time" avoids rendering the words "from time to time" as mere surplusage and is consistent with the way courts routinely interpret "from time to time." Second, the power to withdraw includes the power to end withdrawals and belongs to a class of executive decision-making that encompasses reconsideration. Third, since 1998, Presidents have interpreted Section 12(a) to allow modification and termination of orders. The plain meaning of Section 12(a), as understood by prior administrations, permits the President to alter withdrawal orders.

Understanding Section 12(a) to permit each President to retain full withdrawal power is necessary to fulfill the purpose of the Act and the promises it

implicitly contains for the State of Alaska. The Act was designed to encourage responsible development of the nation's resources. The development of those resources is crucial for the State of Alaska.

## STANDARD OF REVIEW

A district court's decision to grant or deny summary judgment is reviewed *de novo*. *Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008). The motions for summary judgment raised no issues of material fact, and so the only question here is "whether the district court correctly applied the relevant substantive law." *E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 746 (9th Cir. 2003).

## ARGUMENT

### I.    The text of Section 12(a) authorizes the President to revoke withdrawals.

This Court's "interpretation of a statutory provision must begin with the plain meaning of its language." *United States v. Lillard*, 934 F.3d 827, 833 (9th Cir. 2019). And "[t]o determine plain meaning, '[the court] examine[s] not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy.'" *Id.* (quoting *Children's Hosp. & Health Center v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999)). Where statutory "language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Hartford*

*Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). Thus, a court "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2000). "If the statutory language lacks a plain meaning, [the Court] may 'employ other tools, such as legislative history, to construe the meaning of ambiguous terms.'" *Lillard*, 934 F.3d at 834 (quoting *Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111, 1118 (9th Cir. 2015)).

A. **The inclusion of "from time to time" in the phrase, "may, from time to time, withdraw" unambiguously gives the President flexibility to alter or end withdrawals.**

The words "may, from time to time, withdraw" allow the President to make serial orders, including ones that end prior withdrawals. In Section 12(a), "from time to time" is an adverb phrase that modifies both a modal verb ("may") and infinitive ("withdraw"). In the course of statutory interpretation, a court should give effect "to all [of a statute's] provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 138 S.Ct. 816, 824 (2018) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). In order to give the words "from time to time" meaning, Section 12(a) must mean something beyond the simpler statement that the President "may withdraw" unleased lands. If Section 12(a) read, "the President may withdraw," the text would allow each President the discretion to issue successive withdrawals. The additional

6

meaning provided by "from time to time" is two-fold. First, it indicates that the power of the President is not something that can be exhausted in its first use or done only once because "from time to time" explicitly permits repeated actions. Second, "from time to time" describes an action that is amendable or non-permanent in nature.

This plain meaning of "from time to time" comports with common parlance. For example, if an employer informed an employee that she could work remotely "from time to time," the employee would immediately understand that the ability to work remotely was not a one-time-only opportunity, and simultaneously that episodes of working remotely would be temporary in nature. So too with Section 12(a): each president retains the authority to make withdrawals because the power has not been exhausted by a prior single use of the authority, and the president may amend or end withdrawals when appropriate because the withdrawals may be temporary in nature.

This common parlance is supported by definitions found in dictionaries both judicial and lay. More than a century ago *The Judicial Dictionary* defined "from time to time" to mean "that after once acting, the donee of the power may act again;–and either independently of, or by adding to, or taking from, or reversing altogether, his previous act." 2 F. Stroud, *The Judicial Dictionary*, 781 (1903) (citations omitted). The New Shorter Oxford English Dictionary also points out the

two facets of the term, defining "from time to time" as "occasionally, intermittently." At 1032 (1993 ed.); *see also* Fed. Op. Br. at 47 (citing several dictionary definitions contemporaneous to the 1953 enactment of the Act). "Occasionally" encompasses the ability to act again and "intermittently" reveals that the actions may have starting and stopping points.

Courts interpreting analogous "from time to time" directives have likewise found that the power to act is not exhausted once performed. For example, in *Association of California Insurance Companies v. Jones*, 386 P.3d 1188 (Cal. 2017), insurers challenged a commissioner's power to issue new regulations under Cal. Ins. Code § 790.10. The court ruled that "from time to time" permitted multiple rounds of rulemaking: "whatever else 'from time to time' means, it cannot conceivably mean the opposite of 'from time to time': that the agency's regulatory authority . . . is a single-admission ticket that can be punched only once." *Ass'n of Cal. Ins. Cos.*, 386 P.3d at 1200; *see also United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 598 (1973) (observing that Migratory Bird Conservation Act was amended to omit "from time to time" power because it was too subject to change). It would be semantically perverse to read "from time to time" as rendering a single exercise of power exhaustive. One withdrawal cannot punch the statutory ticket and prevent a future President from deciding anew what withdrawals are appropriate.

Courts have likewise recognized that "from time to time" does not mean "for all time." In cases where litigants have contested a statutory authority to alter property interests, courts read "from time to time" to represent flexibility, not permanency. *See, e.g.*, *Ketcham v. Lehner*, 542 A.2d 290 (Vt. 1988) (from time to time means "as circumstances may require"), *Appeal of Granite State Elec. Co.*, 435 A.2d 119, 122 (N.H. 1981) (from time to time "clearly precludes [public utility commission] from establishing . . . permanent rate[s]").

The Supreme Court addressed the phrase in *Skinner & Eddy Corp. v. United States*, 249 U.S. 557 (1919). The controlling statute contained two statements about the legality of increasing railroad rates after a prior reduction in rates: a general prohibition that the Interstate Commerce Commission could not approve post-reduction increases to protect competition, and a discretionary exception stating "[t]he commission may from time to time prescribe the extent to which [a] carrier may be relieved from [the section]." *Id.* at 568 (quoting the Act to Regulate Commerce). The Court interpreted the "from time to time" language to mean that "the leave granted is not for all time." *Id.* Justice Brandeis explained, "It is revocable at any time, either because it was improvidently granted or because new conditions have arisen which make its continuance inequitable." *Id.* Like in *Skinner*, here "from time to time" means that the executive can reverse course. The district court's attempt to distinguish *Skinner* on grounds that the statute concerned

cargo rates, which are an authority "by nature, subject to change," is unconvincing. [ER 17] Withdrawals, like rates, can be changed. The district court's distinction is circular because it assumes that withdrawals "from time to time" are not subject to change and thus outside the *Skinner* framework, while the *Skinner* framework indicates that a power "from time to time" is subject to change.

The theory that "from time to time" designates an impermanent power open to revision is supported by persuasive authority. This Court, interpreting a Secretary of Agriculture's order to determine citrus shipments "from time to time," decided that "the purpose of the order was to permit flexibility so that . . . the pro-rate base might be adjusted." *American Fruit Growers v. United States*, 105 F.2d 722, 726 (9th Cir. 1939). The United States Court of Customs Appeals, considering an act granting the Secretary of the Treasury power to "from time to time ascertain[], determine[], and declare[]" export bounties, explained that the act "contemplates . . . changes in the foreign law, or that further information may lead to a modification of the orders." *Franklin Sugar Refining Co. v. United States*, 1 U.S. Cust. App. 242, 245 (Ct. Cust. App. 1911). What these cases have in common despite disparate subject matter is that "from time to time" is consistently interpreted as making a government action subject to future change. As conditions vary, so will the action.

The use of "from time to time" in the Constitution also supports the theory that a President can revisit withdrawals at his discretion. The drafters employed "from time to time" in four places to give the government enough flexibility to take action when necessary.[2] Under the power granted in the Judicial Vesting Clause, which provides the judicial power shall be vested "in such inferior courts as the Congress may from time to time ordain and establish," Congress can create or destroy when necessary, as demonstrated by abolition of the circuit courts. *See* Judicial Code of 1911, Pub. L. 61–475, 36 Stat. 1087 (March 3, 1911).[3] The act of establishing and then removing a court is analogous to establishing a withdrawal and then removing its effect. James Madison advocated inserting the clause into the Receipts and Expenditures Clause—"a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time"—instead of a less discretionary adverb "because it was thought that requiring publication at fixed intervals might lead to no publication at all." *United States v. Richardson*, 418 U.S. 166, 199 (1974) (Douglas, J., dissenting). Likewise,

---

[2] The President shall *from time to time* give the State of the Union, art. II, § 3; Congress shall *from time to time* publish a journal of proceedings, art. I, § 5, cl. 3; shall *from time to time* publish receipts and expenditures, art. I, § 9, cl. 7; and may *from time to time* ordain and establish inferior courts, art. III, § 1.

[3] Justice Story remarked, "It has been determined that a power to ordain and establish, from time to time, carries with it a discretionary power to discontinue or demolish." Joseph Story, *Commentaries on the Constitution of the United States*, § 1634. *Cf. State v. McBride*, 70 P. 25, 27 (Wash. 1902) (holding "from time to time" in state constitution authorizing increased number of judges "cannot be held to mean that the legislature may not decrease . . . judges").

the Journal Clause, including the language "from time to time," leaves "the particular mode in which . . . [proceedings] shall be kept . . . to the discretion of [Congress]." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 670–71 (1892). "From time to time" in Section 12(a) should be interpreted to provide the same discretion as it does in the Constitution.

The district court's interpretation of "from time to time" gets this analysis only partly right. The court explained, "the phrase 'from time to time' appears to clarify the President's withdrawal authority to withdraw lands at any time and for discrete periods." [ER 11] But "may withdraw" alone would allow the President to withdraw at any time. The court failed to recognize the added temporal meaning of "from time to time" is that *because* the president may repeatedly act the power to act cannot be extinguished with a single use. This carries with it the ability to revisit a past withdrawal. Meanwhile, the court's acknowledgement that withdrawals can be "for discrete periods" is more significant than the court recognized. Because withdrawals can be for discrete periods, a president has the power to both start and stop a withdrawal, by, for example, withdrawing lands for a particular period of time. But the district court's reasoning attempts to draw a distinction between allowing a president to create a time limit for a withdrawal when first announcing the withdrawal but then somehow depriving the president of

the power to achieve the exact same "discrete" withdrawal by separately creating

and then ending the withdrawal. The statute does not support this distinction.

Similarly, this interpretation of "from time to time" is consistent with uses of

the phrase elsewhere in OCSLA. The district court concluded that from time to

time allows modification of past decisions in two other places in the Act, but

interpreted those contexts to explicitly reference activities subject to change, like

modification of regulations and review of plans.[4] [ER 12 n. 40] But this logic again

begs the question by presuming that withdrawals are not subject to change—a

contention rebutted below in section I.B.

In sum, "from time to time" has a specific role: it imports temporal *flexibility*

to the permissive "may," allowing the President to act at will to transform

withdrawals as circumstances require. And in so doing it clarifies that the

withdrawal power cannot be used up by one president but is revisitable by future

_____

[4]      43 U.S.C. § 1347(c) (permitting the Secretary to "from time to time modify any regulations, interim or final, dealing with hazardous working conditions"); 43 U.S.C. § 1351(h)(3) (proving the "Secretary shall, from time to time, review each plan approved under this section"). The court concluded that the third use of the phrase, in 43 U.S.C. § 1335(a)(1) was less flexible. That section requires that a lessee file a lease with the Secretary "within . . . periods . . . as may be fixed from time to time by the Secretary," *id.*, and the court found the statute "did not explicitly authorize the Secretary to revoke a fixed filing date." [ER 12 n.40] But the stronger reading is that this example, too, allows for reconsideration of fixed filing dates because it is unclear how the Secretary could ever change any fixed filing date if the last one remained in effect.

presidents and permits withdrawals that have an end date. In other words, the continued power to withdraw includes the power to cease withdrawing.

**B.     Withdrawals are subject to change.**

The district court's conclusion that Section 12(a) is ambiguous relied on the mistaken premise that the infinitive "withdraw" must exclude the concept of modifying or ending a withdrawal. [ER 11 ("Congress appears to have expressed one concept—withdrawal—and excluded the converse—revocation.")] But the court's concurrent conclusion that "from time to time" allows discrete time-limited withdrawals [ER 11] logically means that the withdrawal power includes the power to start and stop a withdrawal. Because the withdrawal authority is part of a general class of executive activity subject to change, this Court should find Section 12(a) unambiguously allows a future president to rescind or limit a prior withdrawal.

To "withdraw" is a general power to change the status quo, including prior withdrawals. Where it is used as a transitive verb, as in Section 12(a), withdraw means "draw back or remove (a thing) from its place or position." *New Shorter Oxford English Dictionary* 3704 (1993). Nothing in the verb itself suggests that to withdraw a thing means that the thing is fixed in its new status. *Cf. E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) ("[M]ost incorrect interpretations of statutes . . . ask[] us to add words to the law to produce what is thought to be a desirable result."). Plaintiff's interpretation would add the word

"permanently" before withdraw, but that word is not found either in the statute or in the ordinary meaning of withdraw. *See Hewitt v. Schultz*, 180 U.S. 139, 162 (1901) (Brewer, J., dissenting) ("[T]he power which could order a withdrawal could revoke such order whenever in its judgment the appropriate time therefor had arrived."). Justice McLean articulated this principle while riding circuit in *United States v. R.R. Bridge Co.*, 27 F. Cas. 686 (C.C.N.D. Ill. 1855) (No. 16,114). There, the government argued that a statute authorizing the President to reserve lands for military works did not authorize their sale. The court disagreed, characterizing the President's statutory authority as a "general power" under which he "selected a part of the land . . . for a military site" and "[had] a right to abandon it" to let "the reserve . . . fall[] back into . . . public lands[.]" *Id.* at 690. *Accord Illinois Cent. R.R. Co. v. United States*, 1858 WL 4672 at *1 (Ct. Cl. 1858); *cf. Scott v. Carew*, 196 U.S. 100, 114 (1905) ("permanence" of post established by War Department "depend[ed] largely on the developments of the future"). Similarly, "withdraw" in Section 12(a) is a term of general power signaling capacity to remove land from disposition and later open it to the possibility of leasing.

The power to modify a withdrawal is contained within and identical to meaning of "withdraw." The fungibility of both "withdraw" and the related term

"reservation" (which appears in the title of Section 12)[5] is long-settled in Supreme Court jurisprudence. For example, in 1850, President Filmore withdrew land around San Francisco bay for military purposes, and a year later, divided the withdrawal into segments. As the Supreme Court announced in *Grisar v. McDowell*, 73 U.S. 363, 371 (1867), President Filmore "possessed the same authority . . . to modify the reservation . . . by enlarging or reducing it, that he possessed to make the reservation in the first instance." The Court in *United States v. Midwest Oil Co.*, 236 U.S. 459, 476 (1915) relied on the *Grisar* decision and noted further that "the power to make permanent reservations included the power to make temporary withdrawals" because "the character of the power exerted is the same in both cases." And in *Sioux Tribe of Indians v. United States*, , the Court linked the general withdrawal power to "[the] common practice during the period in which reservations were created by executive order for the President simply to terminate the existence of a reservation by cancelling or revoking the order establishing it." 316 U.S. 317, 324-25, 330 (1942). These cases suggest that "to withdraw" and "to modify withdrawal" are variations of the same power. Section

---

[5]     The title of Section 12 is entitled "Reservations of lands and rights."

12(a) does not authorize a concept and exclude its converse because modifying a withdrawal is packaged into the word "withdraw."[6]

Where the word "withdraw" is not expressly limited, it contains the inherent power to revoke. Section 12(a) places no restrictions on using the withdrawal power to modify withdrawals. When Congress wants to limit the intrinsically comprehensive power to withdraw, it can and does do so. *See United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 689 (9th Cir. 1976) (discussing Congressional limit on executive power to modify reservations for railroad right-of-ways). For instance, following decades of Supreme Court precedent establishing the President's power to unilaterally modify executive order reservations, Congress passed a statute explicitly cabining the President's authority to modify reservations like those sanctioned by the *Midwest Oil* doctrine. Federal Land Policy and Management Act of 1976, Pub. L. 94-579, § 704(a), 90 Stat. 2743 (1976).

_____

[6] The *Grisar* account of an intrinsically comprehensive withdrawal power also surfaces in cases about individuals revoking a withdrawal of their names from election petitions. *See Horton v. Botts*, 164 S.W. 352, 355 (Ky. 1914) (reasoning that it is "equally logical" for a person "allowed to withdraw his name . . . [to] be permitted to revoke such withdrawal" before it takes effect), *Slingerland v. Norton*, 61 N.W. 322 (Minn. 1894) ("[P]etitioners have the same power to recall their withdrawals that they have to withdraw their signatures[.]"), *Stevens v. Bd. of Elections of Henry Cty.*, 160 N.E.2d 366, 368 (Ohio Ct. App. 1957) (holding "4 electors had the right to revoke the withdrawal of their signatures and reinstate their signatures on the referendum petition"), *Willan v. Richardson*, 98 N.E. 1094, 1096 (Ind. App. 1912) ("[A] revocation will be effective at any time when a withdrawal would be effective."). *But see Holsclaw v. Perkins*, 268 S.W.3d 376, 377 (Ky. Ct. App. 2008) (opposite result when candidate for election "rescind[s] an otherwise valid notice of withdrawal").

Similarly in *Shurtleff v. United States*, 189 U.S. 311 (1903), the Court concluded that with respect to an individual removed from office, the President's "right of removal . . . inheres in the right to appoint, unless limited by constitution or statute. It requires plain language to take it away." *Id.* at 316. The statute there did not exclude a general removal power. *Id.* Similarly, Section 12(a) gives the president the discretionary power of withdrawal and it does not include any language preventing the modification or reconsideration of a prior withdrawal.

Moreover, even without the lengthy history of cases specifically interpreting withdrawal power to include the power to modify withdrawals, "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude" must guide the Court's interpretation of the delegation of power. *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). In this case, the word "withdraw" delegates an important policy decision to the President. Common sense dictates that "withdraw" should not be interpreted to convey a power less than its full textual meaning. Otherwise, Congress would have authorized a loophole large enough to allow any president to unilaterally repeal OCSLA, because a large "withdrawal" would be forever irreversible absent sufficient consensus in the legislative branch.

The Ninth Circuit has recognized the need to consider practicality when considering whether Congress has given the power to reverse a delegated policy

decision. On en banc review, the Court in dicta suggested that while the Attorney General did not have "[a] power to denaturalize . . . 'inherent' in the power to naturalize[,] . . . [i]f practicality required that the power to undo naturalization reside[d] in the same agency as the power to naturalize, . . . [the court] might infer that Congress intended to give that power to the Attorney General." *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc). "Withdraw" in Section 12(a) meets the implicit *Gorbach* standards. Whereas the statute in *Gorbach* included an effective denaturalization procedure, *id*. at 1094, Section 12(a) does not include a separate modification procedure. Denaturalization undoes the most fundamental Constitutional rights of a person, but modifying a withdrawal undoes a set of transient property interests and furthers the purpose of the Act. Without an equivalent "established and carefully constructed scheme" to modify withdrawals, *id*., this Court should follow the guidance of *Gorbach*, *Brown & Williamson*, and *Shurtleff* and read the power to modify as inherent to the power to withdraw.

Furthermore, "withdraw" belongs to a class of executive decision-making that can be revised. For the President to exercise the Section 12(a) power, he must decide to withdraw. Authorizing executive decision-making includes authorizing the executive to decide again. In *Trujillo v. General Electric Company*, 621 F.2d 1084 (10th Cir. 1980), the Tenth Circuit considered reversals made by an Equal Employment Opportunity Commission Director about a plaintiff's right to sue. The

court found that so long as the activity resembled decision-making, the officer had "inherent authority" to reverse because "the power to decide . . . carries with it the power to reconsider." *Id.* at 1086. Correspondingly, the word "withdraw" in Section 12(a) gives the President the power to decide and to reconsider. The President does not step outside the statute when he makes a new decision. *See Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008) ("The prohibition against doing something *not* authorized by statute is altogether different from the power to reconsider something that is authorized by statute."). Rather, Section 12(a) initiates an ongoing, inexhaustible process of deciding withdrawals. *See Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 217 (1930) (upholding Secretary of the Interior's "power to reconsider and revoke" predecessor's decision about tribal annuities because "[t]hat authority was neither exhausted nor terminated by its exertion . . . but was in its nature continuing"). The statute is unambiguous: to "withdraw" is a decision that can be reconsidered and revisited from time to time.

This more fulsome meaning of the withdrawal power unequivocally authorized President Trump (like four predecessors before him) to end and modify withdrawals. A cabined and uni-directional meaning of the withdrawal power was the reason that the district court declined to give "may, from time to time, withdraw" the same revisable interpretation that other uses of "from time to time"

result in. [ER 11-12] Because this meaning of withdraw is unsupported, the plain meaning of the phrase, taken as a whole is clear: President Trump's modification of a prior withdrawal was authorized.

### C. When determining whether Section 12(a) is ambiguous, this Court should follow the lead of past Presidents who interpreted Section 12(a) to permit modification and termination.

President Trump's Executive Order aligns with past Presidential exercise of the "may, from time to time, withdraw" power. In 1990 President George H.W. Bush withdrew large areas of the OCS "until after the year 2000." [ER 303-05] This act of both announcing a withdrawal and its end date means that President Bush was asserting the power to start as well as end a withdrawal. In 1998, President Clinton used Section 12(a) to extend until 2012 a withdrawal made in 1990 by President George H.W. Bush. [ER 301] Although President Clinton withdrew small areas designated as marine sanctuaries "for a time period without specific expiration" his other withdrawals ended on a date certain in 2012. [ER 301] With these actions President Clinton was both exercising a power to end withdrawals and asserting a power to modify prior withdrawals. Next, in 2008, President George W. Bush terminated portions of President Clinton's withdrawal four years before it expired. [ER 299] This is strikingly analogous to President Trump's challenged modification here. And President Obama himself used the power in a flexible manner. In 2010 he withdrew the Bristol Bay, Alaska OCS area

"through June 30, 2017." [ER 298] This asserted the ability to set an end date for a withdrawal. In 2014 he asserted the power to modify a withdrawal by "revok[ing]" his 2010 withdrawal and establishing a new withdrawal for the same area for a "time period without specific expiration." [ER 297] And then in 2015 and 2016, President Obama made four additional withdrawals, three of which were offshore of Alaska. [ER 289-96] Even the wording of the withdrawals without a set end date for a "time period without specific expiration" sets an indefinite rather than permanent withdrawal. By its own terms it is subject to another exercise of power to specify the expiration.

Therefore, unlike in *International Refugee Assistance Project v. Trump*, 883 F.3d 233, 289 (4th Cir. 2018) (Gregory, J., concurring), vacated by *Trump v. International Refugee Assistance Project*, 138 S.Ct. 2710 (2018), President Trump did not "interpret[] the [statute] in a way that no other administration [had] in [its] sixty-five year existence." On the contrary, the current administration is in good company. Presidents George H.W. Bush, Clinton, George W. Bush, and Obama have already defined what the statutory delegation means; it is a "wise and quieting rule," *Midwest Oil*, 236 U.S. at 473, that this Court should not find ambiguity where multiple Executives have found clarity. *Cf. N.L.R.B. v. Noel Canning*, 573 U.S. 513, 514 (2014) (holding courts "must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have

reached"). This Court should not upset the prevailing interpretation employed by past Presidents.

In sum, the plain meaning of Section 12(a) unambiguously includes the power to end withdrawals and modify prior withdrawals. Accordingly, the district court's decision should be reversed.

## II. The district court's interpretation of Section 12(a) would improperly deprive Alaska of the benefits of OCSLA.

As the district court recognized, OCSLA was enacted both "to provide for the jurisdiction of the United States over" outer continental shelf lands, and "to authorize the Secretary of the Interior to lease such lands for certain purposes." Pub. L. No. 83-212, 67 Stat. 464, 462 (1953); ER 26. But what the court failed to acknowledge is that in settling ownership over the outer continental shelf (to the detriment of coastal states), Congress also recognized that states have an interest in, and are "entitled to an opportunity to participate" in the planning, development, and production of minerals in the OCS. 43 U.S.C. § 1332(4)(C). Congress admitted that exploration, development, and production of the minerals would have "significant impacts on coastal and non-coastal areas of the coastal States." 43 U.S.C. § 1332(4). This is particularly true in Alaska, where the Congressionally-enacted policy of responsible development has the potential to make a difference in the lives of every citizen.

The oil and gas sector is the largest non-governmental industry in the State

of Alaska and provided approximately 72 percent of the state's general revenues in

fiscal year 2016. [Alaska SER 7] The boundary for the OCS was determined on a

uniform basis and does not map to differences in underground resources. The State

has an abiding interest in the exploration and further development of the OCS

regions of the Beaufort and Chukchi Seas. The Bureau of Ocean Energy

Management (BOEM), the agency officially "charged with the management and

development of energy and mineral resources on the Outer Continental Shelf

(OCS) of the United States in an environmentally and economically responsible

way" has quantified the amount of oil and gas at stake. BOEM 2017-064, *2016*

*Assessment of Oil and Gas Resources: Alaska Outer Continental Shelf Region,* 1

(2017).  In 2016 the agency estimated that 15.38 billion barrels (Bbbl) of oil and

76.77 trillion cubic feet (Tcf) of natural gas in the Chukchi Sea Planning Area and

another 8.22 Bbbl of oil and 27.64 Tcf of natural gas in the Beaufort Sea Planning

Area are recoverable with available technology.[7] *Id.* at 6. Opening both planning

areas to exploration and development will directly benefit the State of Alaska and

---

[7]     The oil estimates are the mean with a range of 9.30 Bbbl on the low end and
a high of 23.08 Bbbl in the Chukchi Sea and 4.11 Bbbl on the low end and a high
of 13.72 Bbbl in the Beaufort sea. The natural gas estimates are the mean with a
range of 48.88 Tcf in the Chukchi Sea and 13.92 Tcf in the Beaufort Sea on the
low end and a high of 111.44 Tcf and 43.78 Tcf respectively.

its citizens, while a permanent withdrawal would hamper the State's ability to access its own resources that are in the same vicinity.

### A. Outer Continental Shelf exploration and development promotes job growth and creates revenue for local and state services.

Alaska has a strong economic stake in the executive's ability to effectuate the purpose of the Act: to authorize the leasing of the OCS. An economic analysis conducted in 2009 by Northern Economics in conjunction with the University of Alaska, Anchorage estimated that exploration and development in Chukchi and Beaufort would result in 5,300 jobs directly related to the production of oil, and an additional 24,650 indirect and induced jobs. Northern Economics, *Economic Analysis of Future Offshore Oil and Gas Development: Beaufort Sea, Chukchi Sea, and North Aleutian Basin*, ES-9 – ES-10, 53 – 55 (March 2009).[8] Additionally, the report estimated that 3,315 of the direct jobs would be "high paying year-round jobs" and that at the time of the report, the "average annual wage in the oil and gas sector [was] $108,538." *Id.* at ES-9.

The report further explains how OCS exploration and development will directly impact the State fiscally:

---

[8]    *Available at* https://northerneconomics.com/wp-content/uploads/2015/04/Shell-OCS-report-final-web.pdf (last visited October 29, 2019).

OCS Development will generate state revenues in three ways. A share of state revenues will come directly from property and corporate income taxes on OCS activity as well as from the sharing of lease revenues with the federal government. The state will also receive revenues from the taxes and fees paid by the households of those working directly on OCS-related jobs as well as those working in other businesses providing goods and services to the petroleum industry and to Alaska households. Finally, because the development of the OCS will reduce the cost of business for the petroleum industry in the state and facilitate the development of additional oil and gas through the addition of new petroleum related infrastructure, state revenues from non-OCS petroleum activity will increase.

*Id.* at 108. Of particular importance to the State are "the synergies between the development of adjacent state and federal lands." [Alaska SER 8] "Where successful oil and gas production occurs on federal lands, adjacent state lands with hydrocarbon production potential become more economic to develop given infrastructure investments made to accommodate federal lands production." *Economic Analysis* at 108. Without such development available on federal lands, the economic potential on adjacent state lands significantly decreases. *Id.*

**B.      OCS development benefits transportation infrastructure.**

Additionally, OCS oil production could create much-needed efficiencies in Alaska's Trans-Alaska Pipeline System (TAPS) which would effectuate the Act's goal of responsible resource development. TAPS stretches 800 miles from the oil fields of the North Slope to a terminal in the City of Valdez. *BP Pipelines (Alaska) Inc. v. State, Dept. of Revenue*, 327 P.3d 185, 187 (Alaska 2014). OCS oil from the Beaufort Sea Planning Area, and potentially from the Chukchi Sea Planning Area

as well, would likely flow through TAPS if developed. The amount of oil flowing through TAPS matters. As throughput on TAPS declines from its peak of 2 million barrels per day to the current 500,000 per day, oil travels along the pipeline much more slowly. *In the Matter of Flint Hills Resources Alaska, LLC*, 136 FERC P 61021, 2011 WL 2661397, \*2 (2011); *see* Petition for Writ of Certiorari, *Alaska Oil and Gas Association et al v. Jewell*, 2016 WL 6577257, \*27-28 (2016). Problems can arise with slower oil because it cools, which in turn creates freezing and corrosion that cost money to address. *Id.*; *see also BP Pipelines v. State, Dept. of Revenue*, 325 P.3d 478, 494 (Alaska 2014) (excess capacity on TAPS equates to significant cost).

In 2005, TAPS owners prepared the "Very Low Flow Study" in order to study the low flow issues that were becoming an increasing concern as pipeline throughput continued to decline. Research is ongoing – but there is a theoretical point at which TAPS could no longer operate. According to the Study, TAPS, as it is present configured, would cease to exist when flow dropped below 135,000 bbls/day. *See* Brief of Appellees/Cross-Appellants/Cross-Appellees, *BP Pipelines (Alaska) Inc. v. State, Dept. of Revenue*, 2013 1097493, \*43 (2013). The State believes one way to extend the life of TAPS and make it run as efficiently as possible is to increase throughput from responsible exploration and development of North Slope and OCS oil. TAPS throughput is important to the State for a second

reason – more barrels through TAPS lowers shipping costs per barrel. [*See* Alaska

SER 2-3, 9] Additional production from both the Beaufort and Chukchi Sea can

lower the tariff sufficiently to increase State revenues by $8 billion over a 20 year

period.[9] [SER 2-3]

These impacts on TAPS demonstrate that the State's ability to responsibly

develop state-owned lands is at stake when the district court interprets President

Obama's withdrawal decision as a permanent withdrawal not subject to revision by

future presidents. This was not what Congress intended in claiming the outer

continental shelf and creating a plan for responsible development. Alaska therefore

requests this Court reverse the district court's decision as contrary to both the plain

meaning and the purpose of OCSLA.

---

[9]     State royalties and taxes are based on the value of oil taken within Alaska, net of the cost of transportation to market (a "netback" value). Accordingly, reduced transportation costs increase State revenues. [SER 9]

**CONCLUSION**

The State asks this Court to reverse the district court's grant of summary judgment to plaintiffs and grant summary judgment to defendants.

Date: November 22, 2019

KEVIN G. CLARKSON
ATTORNEY GENERAL

*/s/ Kathryn R. Vogel*
Kathryn R. Vogel
Mark D. Tyler

*Attorneys for Appellant/Intervenor/Defendant*
*State of Alaska*

**STATEMENT OF RELATED CASES**

This brief concerns three consolidated cases in this court: Nos. 193560, 19-35461, and 19-35462. *See* Order, Dkt. Entry 10 in No. 19-35460 (Sept. 3, 2019) (granting motion to consolidate). Each of the three cases are appeals by distinct parties from the same final judgment entered by the district court in No. 3:17-cv-00101-SLG (D. Alaska). Counsel is aware of no other related cases pending in this Court.

Date: November 22, 2019

KEVIN G. CLARKSON
ATTORNEY GENERAL

*/s/ Kathryn R. Vogel*
Kathryn R. Vogel

*Attorney for Appellant/Intervenor/Defendant*
*State of Alaska*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6846 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This complies with the length limit designated by court order dated September 3, 2019 (Case No. 19-35460, Dkt. Entry 10).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Date: November 22, 2019

> KEVIN G. CLARKSON
> ATTORNEY GENERAL
>
> */s/ Kathryn R. Vogel*
> Kathryn R. Vogel
>
> *Attorney for Appellant/Intervenor/Defendant*
> *State of Alaska*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2019, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of Appeals for

the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.


Date: November 22, 2019

                                            KEVIN G. CLARKSON
                                            ATTORNEY GENERAL

                                            */s/ Kathryn R. Vogel*
                                            Kathryn R. Vogel

                                            *Attorney for Appellant/Intervenor/Defendant*
                                            *State of Alaska*

# ADDENDUM

Except for the following, all applicable statutes and provisions are contained in the addendum of the Federal Defendants.

## 43 U.S.C. § 1332 Congressional declaration of policy.

It is hereby declared to be the policy of the United States that--

(**1**) the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter;

(**2**) this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected;

(**3**) the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs;

(**4**) since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments--

(**A**) such States and their affected local governments may require assistance in protecting their coastal zones and other affected areas from any temporary or permanent adverse effects of such impacts;

(**B**) the distribution of a portion of the receipts from the leasing of mineral resources of the outer Continental Shelf adjacent to State lands, as provided under section 1337(g) of this title, will provide affected coastal States and localities with funds which may be used for the mitigation of adverse economic and environmental effects related to the development of such resources; and

(**C**) such States, and through such States, affected local governments, are entitled to an opportunity to participate, to the extent consistent with the national interest, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf.[1]

(**5**) the rights and responsibilities of all States and, where appropriate, local governments, to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized; and

(**6**) operations in the outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health.

## 43 U.S.C. § 1341. Reservation of lands and rights.

### (a) Withdrawal of unleased lands by President

The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf.

### (b) First refusal of mineral purchases

In time of war, or when the President shall so prescribe, the United States shall have the right of first refusal to purchase at the market price all or any portion of any mineral produced from the outer Continental Shelf.

### (c) National security clause

All leases issued under this subchapter, and leases, the maintenance and operation of which are authorized under this subchapter, shall contain or be construed to contain a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States after August 7, 1953, to suspend operations under any lease; and all such leases shall contain or be construed to contain provisions for the payment of just compensation to the lessee whose operations are thus suspended.

### (d) National defense areas; suspension of operations; extension of leases

The United States reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on any part of the surface of such area except with the concurrence of the Secretary of Defense; and if operations or production under any lease theretofore issued on lands within any such restricted area shall be suspended, any payment of rentals, minimum royalty, and royalty prescribed by such lease likewise shall be suspended during such period of suspension of operation and production, and the term of such lease shall be extended by adding thereto any such suspension period, and the United States shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

### (e) Source materials essential to production of fissionable materials

All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable material, contained, in whatever concentration, in deposits in the subsoil or seabed of the outer Continental Shelf are reserved for the use of the United States.

### (f) Helium ownership; rules and regulations governing extraction

The United States reserves and retains the ownership of and the right to extract all helium, under such rules and regulations as shall be prescribed by the Secretary, contained in gas produced from any portion of the outer Continental Shelf which may be subject to any lease maintained or granted pursuant to this subchapter, but the helium shall be extracted from such gas so as to cause no substantial delay in the delivery of gas produced to the purchaser of such gas.