No. 19-35460
(Consolidated with Nos. 19-35461 and 19-35462)

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

LEAGUE OF CONSERVATION VOTERS, *et al.*,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Alaska
No. 3:17-cv-00101 (Hon. Sharon L. Gleason)

**ANSWERING BRIEF FOR PLAINTIFFS-APPELLEES
LEAGUE OF CONSERVATION VOTERS, ET AL.**

Erik Grafe
Earthjustice
441 West 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102
E: egrafe@earthjustice.org

Eric P. Jorgensen
Earthjustice
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Katherine Desormeau
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
T: 415.875.6100
E: kdesormeau@nrdc.org

*Counsel for Plaintiffs-Appellees
League of Conservation Voters et al.*

*Additional counsel for Plaintiffs-Appellees League of Conservation Voters et al.*:

Jacqueline M. Iwata
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
T: 202.289.2377
E: jiwata@nrdc.org

Nancy S. Marks
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
T: 212.727.2700
E: nmarks@nrdc.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellees

League of Conservation Voters, Natural Resources Defense Council, Sierra Club,

Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental

Center, Resisting Environmental Destruction on Indigenous Lands, Center for

Biological Diversity, Greenpeace, Inc., and the Wilderness Society submit that

they have no parent corporations and no publicly issued stock shares or securities.

No publicly held corporation holds stock in any of the Plaintiffs-Appellees.

February 13, 2020                    /s/ *Nathaniel S.W. Lawrence*
                                         Nathaniel S.W. Lawrence

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................v

INTRODUCTION ..........................................................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES PRESENTED ......................................................................2

STATEMENT OF THE CASE .............................................................3

I.    Statutory background .............................................................3

II.   Factual and procedural history ............................................7

SUMMARY OF ARGUMENT ...........................................................11

ARGUMENT ..............................................................................12

I.    The League's claims are justiciable.......................................12

    A.    The League has standing to bring this case.......................12

        1.    The League has established injury-in-fact ................13

            a.    Harm to the League's members is concrete and particularized .............................13

            b.    Harm to the League's members is imminent .......................................................19

        2.    The League satisfies the other elements of standing .................................................24

    B.    This case is constitutionally and prudentially ripe ............26

C.    Sovereign immunity poses no bar to the League's claims..................................................................30

    1.    President Trump's Order is ultra vires......................................31

    2.    Sovereign immunity does not shield constitutional violations from review ........................................34

D.    The League does not need a congressionally bestowed right of action to seek equitable relief for ultra vires and unconstitutional executive acts.............................36

II.    Congress gave the President no power to revoke withdrawals ....................44

    A.    Section 12(a) authorizes the President to "withdraw" portions of the outer continental shelf from disposition, but not to revoke withdrawals and put protected areas back in play ..............................................45

        1.    Section 12(a) reflects Congress's deliberate choice to confer one-way withdrawal authority on the President.........................................................45

        2.    Statutory context and legislative history confirm that Section 12(a) delegates only protective authority ...................................................49

        3.    There is no basis for reading into Section 12(a) an unspoken presidential authority to reverse withdrawals ..............................................................57

            a.    The phrase "from time to time" says nothing about revocability.............................57

            b.    Whether Section 12(a) authorizes time-limited withdrawals is irrelevant............................62

c.  The term "withdraw" does not confer
revocation power ..............................................................64

d.  One-way withdrawals are consistent
with OCSLA's purposes.................................................68

B.  Extrinsic evidence does not create the revocation
power that President Trump claims.....................................71

1.  Congress has not acquiesced in any presidential
assertion of revocation authority.................................71

2.  There is no basis for the Government's proffered
presumptions in favor of revocation authority.........................77

a.  "National security" and other Article II
considerations do not justify deviating
from the statutory text......................................................78

b.  Cases involving administrative
adjudication do not justify deviating
from the statute's text .....................................................83

III.  The Government's challenge to the district court's narrow
remedy is without merit................................................................85

CONCLUSION.................................................................................90

STATEMENT OF RELATED CASES .................................................91

ADDENDUM

iv

# TABLE OF AUTHORITIES

## Cases

*Alabama v. Texas*,
347 U.S. 272 (1954) (per curiam) ................................................ 79

*Albertson v. FCC*,
182 F.2d 397 (D.C. Cir. 1950) ................................................ 84, 85

*Alcoa S.S. Co. v. Fed. Mar. Comm'n*,
348 F.2d 756 (D.C. Cir. 1965) ...................................................... 49

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................ 40, 41

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) ...................................................................... 42

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ........................................................................ 37

*Am. Trucking Ass'ns v. Frisco Transp. Co.*,
358 U.S. 133 (1958) ...................................................................... 83

*Am. Fruit Growers v. United States,*
105 F.2d 722 (9th Cir. 1939) ........................................................ 61

*Appeal of Granite State Elec. Co.,*
435 A.2d 119 (N.H. 1981) ............................................................ 61

*Armstrong v. Bush,*
924 F.2d 282 (D.C. Cir. 1991) ...................................................... 80

*Armstrong v. Exceptional Child Care Ctr.*,
575 U.S. 320 (2015) ................................................ 36, 37, 41, 42

*Ass'n of Cal. Ins. Cos. v. Jones,*
386 P.3d 1188 (Cal. 2017) ............................................................ 61

v

*Atl. City Elec. Co. v. FERC*,
    295 F.3d 1 (D.C. Cir. 2002)............................................................80

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002).................................................................47

*Block v. North Dakota*,
    461 U.S. 273 (1983).................................................................36

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983).................................................................73

*Bowsher v. Synar*,
    478 U.S. 714 (1986).................................................................56

*Bragdon v. Abbott*,
    524 U.S. 624 (1998).................................................................53

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ........................................................23

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017).........................................................19

*Carroll v. Safford*,
    44 U.S. (3 How.) 441 (1845) ........................................................41

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)......................................................49, 54, 72

*Ctr. for Biological Diversity v. Dep't of the Interior*,
    563 F.3d 466 (D.C. Cir. 2009).....................................................28, 29

*Ctr. for Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) .....................................................17, 18

*Chamber of Commerce v. Reich*,
    57 F.3d 1099 (D.C. Cir. 1995) (per curiam)........................................30

vi

*City & Cty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ................................................................39, 88

*City & Cty. San Francisco v. Trump,*
    No. 3:17-cv-00574-WHO (N.D. Cal. Aug. 23, 2019)..................................89

*City of Oakland v. Lynch,*
    798 F.3d 1159 (9th Cir. 2015) ...................................................................23

*Clapper v. Amnesty Int'l*
    568 U.S. 398 (2013)...............................................................................23, 24

*Clark v. City of Seattle,*
    899 F.3d 802 (9th Cir. 2018) .....................................................................26

*Clinton v. City of New York,*
    524 U.S. 417 (1998)...............................................................................48, 81

*Clinton v. Jones,*
    520 U.S. 681 (1997)...............................................................................39, 86

*Cochnower v. United States,*
    248 U.S. 405 (1919), *as modified,* 249 U.S. 588 (1919)..............................48

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
    473 U.S. 788 (1985).....................................................................................39

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981)............................................................35, 71, 73, 75, 76

*Dalton v. Specter,*
    511 U.S. 462 (1994)..............................................................32, 33, 34, 35

*Davis v. Fed. Election Comm'n,*
    554 U.S. 724 (2008).....................................................................................20

*Defs. of Wildlife v. EPA,*
    420 F.3d 946 (9th Cir. 2005) .....................................................................18

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ..................................................................... 19, 22, 23

*Doe 2 v. Trump*,
    319 F. Supp. 3d 539 (D.D.C. 2018) ............................................................ 87

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
    565 U.S. 606 (2012) ................................................................................... 43

*Ecological Rights Found. v. Pac. Lumber Co.*,
    230 F.3d 1141 (9th Cir. 2000) ............................................................. 13, 16

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    135 S. Ct. 2028 (2015) ............................................................................... 47

*E.V. v. Robinson*,
    906 F.3d 1082 (9th Cir. 2018) ......................................................... 32, 34, 35

*Fed. Election Comm'n v. Akins*,
    524 U.S. 11 (1998) ..................................................................................... 16

*Fowler v. Guerin*,
    899 F.3d 1112 (9th Cir. 2018) ................................................................... 26

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................ 34, 39, 86, 87, 88

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ............................................................ 38, 42, 55, 61, 81

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................... 16

*Gorbach v. Reno*,
    219 F.3d 1087 (9th Cir. 2000) (en banc) ............................................... 48, 80

*Grisar v. McDowell*,
    73 U.S. 363 (1867) ..................................................................................... 65

viii

*Grupo Mexicano v. Desarrollo, S.A. v. All. Bond Fund, Inc.*,
 527 U.S. 308 (1999)...................................................41

*Gulf Oil Corp. v. Morton*,
 493 F.2d 141 (9th Cir. 1973) ....................................68

*Harmon v. Brucker*,
 355 U.S. 579 (1958)...................................................37

*Hawaii v. Trump*,
 859 F.3d 741 (9th Cir. 2017), *vacated and remanded*
 *on different grounds*, 138 S. Ct. 377 (2017) (mem.) ...................................30

*Hughes v. Trustees of Morden College*,
 1 Vesey 188 (Ch. 1748)...............................................41

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977).....................................................13

*Ill. Cent. R.R. v. United States*,
 196 1858 WL 4672 (Ct. Cl. 1858)...............................66

*In re Zappos.com, Inc.*,
 888 F.3d 1020 (9th Cir. 2018) ...................................20

*Jama v. ICE*,
 543 U.S. 335 (2005)...................................................73

*Jewel v. Nat'l Sec. Agency*,
 673 F.3d 902 (9th Cir. 2011) .....................................16

*Kent v. Dulles*,
 357 U.S. 116 (1958)...............................................73, 77

*Krottner v. Starbucks Corp.*,
 628 F.3d 1139 (9th Cir. 2010) ...................................19

*Larson v. Domestic & Foreign Commerce Corp*.,
    337 U.S. 682 (1949)................................................. 30, 31, 33, 34, 35, 37, 42

*Light v. United States*,
    220 U.S. 523 (1911)............................................................................46

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................13, 20, 24, 26, 42

*Macktal v. Chao*,
    286 F.3d 822 (5th Cir. 2002) .........................................................84

*Mashiri v. Dep't of Educ*.,
    724 F.3d 1028 (9th Cir. 2013) (per curiam) .................................34

*Matter of Reyes*,
    910 F.2d 611 (9th Cir. 1990) .........................................................88

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994).......................................................................52

*Medellín v. Texas*,
    552 U.S. 491 (2008).........................................................39, 71, 72

*Mich. Corrs. Org. v. Mich. Dep't of Corrs.*,
    774 F.3d 895 (6th Cir. 2014) .........................................................43

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999).......................................................................39

*Mistretta v. United States*,
    488 U.S. 361 (1989).......................................................................72

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).......................................................................89

*Myers v. United States*,
    272 U.S. 52 (1926)....................................................................81, 82

*Nat'l Inst. of Family & Life Advocates v. Harris*,
839 F.3d 823 (9th Cir. 2016), *rev'd on other grounds
sub nom. Nat'l Inst. of Family & Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018)......................................................................27

*Nat'l Mining Ass'n v. Zinke*,
877 F.3d 845 (9th Cir. 2017) ..............................................................6

*Nat. Res. Def. Council v. EPA*,
542 F.3d 1235 (9th Cir. 2008) ...........................................................26

*Nat. Res. Def. Council v. EPA*,
755 F.3d 1010 (D.C. Cir. 2014).........................................................19

*Newdow v. Bush*,
355 F. Supp. 2d 265 (D.D.C. 2005)....................................................87

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)...........................................................................72

*NLRB v. SW Gen., Inc.*,
137 S. Ct. 929 (2017)...................................................................74, 77

*Noble v. Union River Logging R.R. Co.*,
147 U.S. 165 (1893)...........................................................................33

*Noriega-Perez v. United States*,
179 F.3d 1166 (9th Cir. 1999) ...........................................................45

*North Dakota v. United States*,
460 U.S. 300 (1983)...........................................................................47

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998).....................................................................27, 28

*Renee v. Duncan*,
686 F.3d 1002 (9th Cir. 2012) ...........................................................26

*Rotkiske v. Klemm*,
  140 S. Ct. 355 (2019)....................................................................47, 48, 49, 53

*Rubin v. Islamic Republic of Iran*,
  138 S. Ct. 816 (2018)....................................................................56

*S. Utah Wilderness All. v. Bureau of Land Mgmt. (SUWA)*,
  425 F.3d 735 (10th Cir. 2005) ...................................................66, 67

*Sebelius v. Cloer*,
  569 U.S. 369 (2013).......................................................................45

*Sioux Tribe of Indians v. United States*,
  316 U.S. 317 (1942)................................................................3, 44, 65

*Skinner & Eddy Corp. v. United States,*
  249 U.S. 557 (1919).......................................................................61

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001).......................................................................72

*Stark v. Wickard*,
  321 U.S. 288 (1944).......................................................................34

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp*.,
  559 U.S. 662 (2010).......................................................................27

*Sturgeon v. Frost*,
  136 S. Ct. 1061 (2016)...................................................................54

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009).......................................................................18

*Swan v. Clinton*
  100 F.3d 973 (D.C. Cir. 1996).......................................................87

*Tokyo Kikai Seisakusho, Ltd. v. United States*,
  529 F.3d 1352 (Fed. Cir. 2008) ....................................................83

xii

*Trujillo v. Gen. Elec. Co.*,
  621 F.2d 1084 (10th Cir. 1980) ..................................................................84

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)..............................................................................37

*Trump v. Sierra Club*,
  140 S. Ct. 1 (2019)....................................................................................38

*United States v. California*,
  332 U.S. 27 (1947), *as supplemented*, 332 U.S. 804 (1947)..................44, 79

*United States v. LaBonte*,
  520 U.S. 751 (1997)...................................................................................54

*United States v. Louisiana*,
  363 U.S. 1 (1960).......................................................................................79

*United States v. Midwest Oil Co.*,
  236 U.S. 459 (1915).................................................. 5, 6, 65, 66, 72, 73, 76

*United States v. S. Pac. Transp. Co.*,
  543 F.2d 676 (9th Cir. 1976) .....................................................................65

*United States v. R.R. Bridge Co.*,
  27 F. Cas. 686 (C.C.N.D. Ill. 1855)............................................................66

*United States v. Seatrain Lines, Inc.*,
  329 U.S. 424 (1947)..............................................................................48, 83

*United States v. Yakima Tribal Court*,
  806 F.2d 853 (9th Cir. 1986) ................................................................32, 34

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013)...................................................................................47

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002)...................................................................................38

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)................................................ 39, 44, 78, 82, 86, 87, 88

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017)....................................................................43

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  135 S. Ct. 2076 (2015)....................................................................78

*Zuber v. Allen*,
  396 U.S. 168 (1969)...................................................................72, 75

## Constitutional Provisions

U.S. Const. art. I, § 7................................................................81

U.S. Const. art. II, § 1 ..............................................................78

U.S. Const. art. II, § 2 ..............................................................81

U.S. Const. art. IV, § 3, cl. 2.................................................3, 44

## Statutes

5 U.S.C. § 551(5) ...................................................................84

42 U.S.C. § 6241(a) ...............................................................70

42 U.S.C. § 6241(d) ...............................................................70

43 U.S.C. §§ 1331 et seq..........................................................6

43 U.S.C. § 1335(a)(1).............................................................59

43 U.S.C. § 1337 ....................................................................55

43 U.S.C. §§ 1337-1340 ............................................................7

43 U.S.C. § 1341 ..................................................................3, 67

43 U.S.C. § 1341(a) ...................................................................7, 45, 53

43 U.S.C. § 1341(b) ...........................................................................70

43 U.S.C. § 1344(a)(1) .......................................................................69

43 U.S.C. § 1344(a)(3) .......................................................................69

43 U.S.C. § 1347(c) ............................................................................60

43 U.S.C. § 1351(h)(3).........................................................................60

43 U.S.C. §§ 1701-1782 .......................................................................6

43 U.S.C. § 1702(j) .............................................................................46

43 U.S.C. § 1714(a) ............................................................................50

43 U.S.C. § 1714(e) ............................................................................50

43 U.S.C. § 1782 ................................................................................51

54 U.S.C. § 320301(a) .....................................................................5, 50

54 U.S.C. § 320301(b) .....................................................................5, 50

Further Consolidated Appropriations Act, 2020,
    Pub. L. No. 116-94, 133 Stat. 2534 (2019) ...................................71

Continuing Appropriations Act, 2009,
    Pub. L. No. 110–329, 122 Stat. 3574 (2008)..................................74

Tax Relief and Health Care Act of 2006,
    Pub. L. No. 109-432, 120 Stat 2922 (2006) ...................................74

Department of the Interior, Environment, and Related Agencies
    Appropriations Act, 2006,
    Pub. L. No. 109-54, 119 Stat. 499 (2005) .....................................74

Outer Continental Shelf Lands Act Amendments of 1978,
    Pub. L. No. 95-372, 92 Stat. 629 (1978) ........................................7

Federal Land Policy and Management Act (FLPMA),
    Pub. L. No. 94-579, 90 Stat. 2743 (1976) ................................6, 66

Outer Continental Shelf Lands Act (OCSLA),
    Pub. L. No. 83-212, 67 Stat. 462 (1953) .....................6, 55, 59, 67

Act of August 20, 1935, Pub. L. No. 74-286, 49 Stat. 661 (1935).........................50

Act of March 1, 1933, Pub. L. No. 72-403, 47 Stat. 1418 (1933)...........................67

Federal Water Power Act, Pub. L. No. 66-280, 41 Stat. 1063 (1920)....................67

Pickett Act of 1910, Pub. L. No. 61-303, 36 Stat. 847 (1910) .....................5, 49, 66

Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388 (1902) ..................4, 49

Organic Act of 1897, 55 Cong. Ch. 2, 30 Stat. 11 (1897) ..................................4, 50

Act of March 3, 1891, 51 Cong. Ch. 562, 26 Stat. 1095 (1891) ........................4, 50

General Mining Act of 1872, 17 Stat. 91 (1872)..............................................4

Homestead Act, Pub. L. No. 37-64, 12 Stat. 392 (1862)..........................................4

## Executive Orders and Proclamations

18 Fed. Reg. 405 (Jan. 16, 1953) ..................................................................6

10 Fed. Reg. 12,305 (Sept. 28, 1945) ...........................................................6

10 Fed. Reg. 12,303 (Sept. 28, 1945) ...........................................................6

## Other Authorities

40 U.S. Op. Att'y Gen. 73 (1941)........................................................6, 52

xvi

39 U.S. Op. Att'y Gen. 185 (1938) .......................................... 5, 52, 64, 68

37 U.S. Op. Att'y Gen. 431 (1934) .............................................. 52, 68

36 U.S. Op. Att'y Gen. 75 (1929) ............................................ 5, 52, 68

28 U.S. Op. Att'y Gen. 143 (1910) ................................................. 52

21 U.S. Op. Att'y Gen. 120 (1895) ................................................. 52

17 U.S. Op. Att'y Gen. 168 (1881) ................................................. 52

16 U.S. Op. Att'y Gen. 121 (1878) ................................................. 52

10 U.S. Op. Att'y Gen. 359 (1862) ............................................ 5, 52, 66

U.S. Dep't of Justice, Off. of Legal Counsel, Presidential
    Authority Over Wilderness Areas Under FLPMA,
    6 Op. O.L.C. 63 (1982) .................................................... 51

H.R. Rep. No. 94-1163 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6175 ................. 51

S. Rep. No. 85-857 (1957), *reprinted in* 1958 U.S.C.C.A.N. 2227 ................. 44, 67

S. Rep. No. 83-411 (1953) ................................................... 53, 69

29 Cong. Rec. 2677 (Mar. 2, 1897) ............................................... 4

V. Kesavan & J. G. Sidak, *The Legislator-In-Chief*,
    44 Wm. & Mary L. Rev. 1 (2002) ............................................. 61

Elena Kagan, *Presidential Administration*,
    114 Harv. L. Rev. 2245 (2001) .............................................. 59

Charles F. Wheatley, Jr., *Study of Withdrawals & Reservations
    of Public Domain Lands* (1969) ............................................. 67

Webster's New Int'l Dictionary of the English Language
    (2d ed. 1957) ...................................................................................................46

**INTRODUCTION**

Plaintiffs-Appellees the League of Conservation Voters et al. ask this Court to affirm the district court's conclusion that President Trump acted without statutory or constitutional authority when he ordered 128 million acres of permanently protected, public lands in the Arctic and Atlantic Oceans to be opened to expedited, private industrial oil and gas development. The lands had been permanently withdrawn from industrial exploitation by President Obama to end threats to their unique ecological and economic values: they host endangered marine mammals, varied fish populations, and unparalleled marine habitats. Oil and gas activities in these fragile and biologically rich ocean areas pose imminent threats to the League's members, including subsistence hunters, recreational fishermen, scientific researchers, tourists, and photographers.

The law here is straightforward and well established. Under the Constitution, the President has power over the disposition of public lands only to the extent Congress delegates that power. Through the Outer Continental Shelf Lands Act (OCSLA), Congress granted the President power to withdraw lands from industrial development, but—in contrast to its explicit authorizations in other statutes—it did not grant the power to revoke such withdrawals. The clear direction of the Act's text is buttressed by contextual and historical indicia of

1

congressional intent. Only Congress has the authority to make permanently withdrawn lands available again for mineral exploitation.

When presidents overstep their statutory and constitutional bounds, courts have the power and responsibility to review and remedy those unlawful actions. Here, the district court found—after close analysis of OCSLA's language, context, and purpose—that President Trump's order usurped Congress's exclusive authority over the disposition of the withdrawn lands. The district court properly invalidated Section 5 of the Order; this Court should affirm.

## JURISDICTIONAL STATEMENT

(a)     The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because the claims arose under the Constitution and the federal Outer Continental Shelf Lands Act. Excerpts of Record (ER) 5 (district court order); ER311, 331-32 (complaint).

(b)     The League agrees with Federal Appellants' (the Government's) statement of finality and this Court's jurisdiction.

(c)     The League agrees with the Government's statement of timeliness.

## ISSUES PRESENTED

1.     Whether the President acted without constitutional or statutory authority by revoking a prior President's permanent withdrawals of land under the Outer Continental Shelf Lands Act.

2

2.     Whether the district court correctly found that the League has standing and its claims are ripe based on imminent threats to its members' interests from seismic surveying in the Arctic and Atlantic Oceans.

3.     Whether the federal courts may decide if a President acted without statutory or constitutional authority.

4.     Whether the district court erred in vacating a section of an executive order found to exceed the President's constitutional and statutory authority.

## STATEMENT OF THE CASE

### I.     Statutory background

The Property Clause of the Constitution gives Congress the "exclusive[]" power to manage the United States' lands and associated resources. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942); *see* U.S. Const. art. IV, § 3, cl. 2.  Through OCSLA, Congress shared with the Executive Branch a discrete part of its exclusive constitutional authority over federal lands and waters.  Authority for President Obama's withdrawals came from Section 12(a) of OCSLA, which reads in full:  "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."  43 U.S.C. § 1341.

In creating and delineating this protective role for the President, Congress acted against the backdrop of decades of affirmative legislation delegating to the

Executive Branch defined aspects of its Property Clause authority over public lands. A number of these statutes authorized the Executive Branch to withdraw and protect lands from the operation of general laws, *see, e.g.*, Homestead Act, Pub. L. No. 37-64, 12 Stat. 392 (1862); General Mining Act of 1872, 17 Stat. 91 (1872), that presumptively opened public lands to private acquisition and exploitation.

These delegations relating to withdrawal power sometimes contained language authorizing the Executive both to create protections and to reverse them; other times they contained language authorizing only one-way protection. For example, in 1891, Congress authorized the President to "declare the establishment of forest reserves." 51 Cong. Ch. 562, 26 Stat. 1095, 1103 (1891). Six years later, in the 1897 Organic Act, Congress amended its delegation to add authority for the President "at any time to modify any Executive order … establishing any forest reserve, … or [to] vacate altogether any order creating such reserve." 55 Cong. Ch. 2, 30 Stat. 11, 36 (1897); *see also* 29 Cong. Rec. 2677 (Mar. 2, 1897) (Statement of Sen. Lacey, recognizing need for express delegation of revocation and modification authority). The Reclamation Act of 1902 authorized the Interior Secretary to "withdraw" lands for irrigation works, and further required him to "restore to public entry any of the lands so withdrawn when, in his judgement, such lands are not required for the purposes of this Act." Pub. L. No. 57-161, § 3,

4

32 Stat. 388 (1902).  In the Antiquities Act, Congress authorized the President to create national monuments and "reserve" land to protect "objects of historic or scientific interest," but included no authority for revocation.  Pub. L. No. 59-209, § 2, 34 Stat. 225 (1906), *codified at* 54 U.S.C. § 320301(a), (b).  And in the Pickett Act, Congress authorized the President to "temporarily withdraw" lands for a variety of purposes, and separately empowered the President to "revoke[]" those withdrawals.  Pub. L. No. 61-303, § 1, 36 Stat. 847 (1910).

In enacting these statutes, Congress displaced the Executive Branch's implied authority for public land withdrawals and revocations in the absence of a statutory delegation, recognized in *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915) (finding that an implied delegation of power flowed from Congress's previous acquiescence in the long-continued executive practice of closing federal uplands to private occupation or exploitation, despite the lack of statutory authorization).  Importantly, numerous administrations acknowledged before and after *Midwest Oil* that where Congress *had* delegated authority by statute, the terms of its delegation controlled and thus preempted any implied power.  *See, e.g.*, 39 U.S. Op. Att'y Gen. 185, 186-87 (1938) (observing that "if public lands are reserved by the President for a particular purpose under express authority of an act of Congress, the President is thereafter without authority to abolish such reservation"); *accord* 36 U.S. Op. Att'y Gen. 75, 79 (1929); 10 U.S. Op. Att'y

Gen. 359, 363-64 (1862); 40 U.S. Op. Att'y Gen. 73, 80 (1941) (status of

withdrawn lands "was fixed by the terms" of the statute).[1]

It was against this backdrop that, when President Truman asserted the

United States' authority over outer continental shelf (OCS) lands, *see* Proclamation

No. 2667, 10 Fed. Reg. 12,303 (Sept. 28, 1945), he simultaneously acknowledged

that he could administer those lands only "pending the enactment of legislation,"

Exec. Order No. 9633, 10 Fed. Reg. 12,305 (Sept. 28, 1945). When Congress still

had not enacted legislation several years later, President Truman on his own set

aside the entire OCS as a "Naval Petroleum Reserve." Exec. Order No. 10,426, 18

Fed. Reg. 405 (Jan. 16, 1953).

Congress swiftly thereafter enacted OCSLA, conclusively delineating the

Executive Branch's leasing and withdrawal authority in this area. *See* Pub. L. No.

83-212, 67 Stat. 462 (1953), *codified as amended at* 43 U.S.C. §§ 1331 et seq.

OCSLA "revoke[d]" President Truman's OCS withdrawal, *id*. § 13, and created a

comprehensive regime governing the disposition of rights to OCS minerals,

delegating to the Secretary of the Interior discretion to issue leases there, subject to

---

[1] In 1976, Congress enacted the Federal Land Policy and Management Act
(FLPMA), consolidating a patchwork of public land laws that applied onshore.
Pub. L. No. 94-579, 90 Stat. 2743 (1976), *codified at* 43 U.S.C. §§ 1701-1782.
Among other things, FLPMA expressly eliminated the last vestiges of implied
authority under *Midwest Oil*. *Id.* § 704(a), 90 Stat. at 2792; *see also Nat'l Mining
Ass'n v. Zinke*, 877 F.3d 845, 856 (9th Cir. 2017).

6

certain conditions, *id*. §§ 8-11, 43 U.S.C. §§ 1337-1340. OCSLA also specified that the President may "withdraw" unleased lands from leasing eligibility, thereby returning to Congress the prerogative of determining their use, eligibility for leasing, or other disposition. *Id*. § 12(a), 43 U.S.C. § 1341(a). It included no provision, however, for presidential revocation of withdrawals, thereby differentiating it from the Pickett Act and other statutes that explicitly included such power. *See id.*

President Eisenhower signed OCSLA into law, and in 1960 became the first President to exercise Section 12(a) authority when he established the Key Largo Coral Reef Preserve to "protect and preserve this natural wonder for the benefit of future generations." ER308. In 1978, Congress amended OCSLA, further structuring the leasing process and bolstering environmental consideration, but leaving Section 12(a) as is. *See* OCSLA Amendments of 1978, Pub. L. No. 95-372 § 208, 92 Stat. 629, 649-70.

## II. Factual and procedural history

Pursuant to Section 12(a), President Obama in 2015 and 2016 conferred permanent protection from oil and gas development on the U.S. Arctic Ocean (except 2.8 million nearshore acres in the Beaufort Sea) and on a series of deepwater canyons in the U.S. Atlantic Ocean.

7

In 2015, the President withdrew from leasing several Arctic Ocean areas with particularly high ecological and cultural subsistence values. ER296 (2015 Arctic Withdrawal). Then, in 2016, the President made two further withdrawals: one withdrawing additional parts of the Chukchi and Beaufort Seas in the Arctic Ocean, ER289 (2016 Arctic Withdrawal), and the other withdrawing areas around 26 major canyons and canyon complexes in the Atlantic Ocean, ER290 (2016 Atlantic Withdrawal).

As President Obama explained, he withdrew these areas from disposition by leasing to "ensure" that their "unique resources" will "remain available for future generations." ER290; *accord* ER296; *see also* ER289 (describing "important, irreplaceable values" to be safeguarded). Accompanying White House materials explained that these withdrawn areas are biological hotspots, and uniquely vulnerable to oil spills. Appellees' Supplemental Excerpts of Record (SER) 1-12.

The Arctic is home to "iconic and culturally valuable species … upon which many Alaska Native communities rely for subsistence use and cultural traditions." SER1. Oil spills in the Arctic would be particularly difficult to clean up given the region's remoteness, limited winter daylight, and ice cover during much of the year, which would exacerbate harm to sensitive species. SER6-7. For example, "[a]n oil spill during periods of restricted open water could have severe effects, as whales such as the bowhead and beluga use open water areas in the ice during their

8

migrations and would concentrate within these areas in the spring." *Id.* The Obama Administration also cited such practical considerations as the harsh conditions, inherent risks, and enormous lead times as reasons why these seas' oil and gas would or should remain undeveloped. SER1, 10, 12.

The canyons and seamounts of the Atlantic are also "hotspots of biodiversity, biologically unique, and ecologically and economically valuable for fisheries." SER9. This biodiversity "play[s] an important role in climate stability" by "provid[ing] important shelf and slope habitat heterogeneity that could offer refuge for species potentially impacted by climate change." SER11-12. Because many of the species in the canyons and seamounts "have low reproductive rates, grow slowly, and rely on the habitats provided by canyon features throughout their lifespans," oil spills could be particularly disruptive. SER10. "The withdrawal of these canyons from mineral leasing will help protect habitats, preserve critical ecological hot spots, conserve economically valuable fisheries, afford long-term opportunity for research and exploration, and help ensure that species dependent on the habitats of the canyons are protected." SER12.

Despite the vulnerability of these natural resources and President Obama's conferral of permanent protection, in 2017, President Trump issued an Executive Order that among other things attempted, purportedly to "[m]odif[y]," but in fact to revoke, President Obama's withdrawals. ER286 (Executive Order 13,795, § 5, 82

9

Fed. Reg. 20,815, 20,816 (Apr. 28, 2017) (the Order)). Section 5 of President

Trump's Order thereby ostensibly opened approximately 128 million acres of

previously withdrawn OCS lands to oil and gas disposition. *Id.* The Order

explained that its purpose was to "encourage energy exploration and production,

including on the Outer Continental Shelf, in order to maintain the Nation's position

as a global energy leader." ER285. In addition, the Order directed the Secretary of

the Interior to consider revising the existing offshore leasing program to include

"annual lease sales, to the maximum extent permitted by law" in, among other

places, the Chukchi, Beaufort, Mid-Atlantic, and South Atlantic planning areas.

*Id.* It also directed the Secretary to "develop and implement … to the maximum

extent permitted by law, a streamlined permitting approach for privately funded

seismic data research and collection aimed at expeditiously determining the

offshore energy resource potential of the United States within the Planning Areas."

*Id.*

The League challenged Section 5 of President Trump's Order as ultra vires

and a violation of separation of powers, and sought an order declaring that section

unlawful and enjoining its implementation by the responsible agencies. ER331-33.

The Government moved to dismiss on jurisdictional grounds, which the district

court denied. ER33-61. The parties cross-moved for summary judgment, and the

district court granted the League's motion and vacated the operative section of President Trump's order. ER32. This appeal ensued.

## SUMMARY OF ARGUMENT

1.    The League has cleared every threshold hurdle argued by the Government. This Court may review the League's claims.

*First*, the League has standing and its claims are ripe. Its members, who use and enjoy the resources of the Arctic and Atlantic OCS lands from which President Trump purported to strip protection, face imminent threats from industrial activity to their well-documented interests in marine mammals, fish, and other OCS treasures. The Order has the purpose and effect of promoting and expediting damaging seismic surveying that may long precede any agency leasing plans and that will inflict harm even if properly permitted. The questions for review are purely legal and can be resolved now.

*Second*, sovereign immunity poses no bar to the League's claims because the President acted wholly outside the scope of statutory authority and tried to usurp a power that the Constitution assigns solely to Congress.

*Third*, this Court has traditional equitable authority to remedy the President's ultra vires and unconstitutional action.

2.    Section 12(a) of OCSLA does not permit the President to revoke his predecessor's permanent withdrawals of OCS lands. Based on the plain text of the

11

provision, its statutory and historical context, and the purposes of the law, the district court correctly held that the President had no power to issue Section 5 of the Order.

3.      The district court's narrow remedy, which did not include an injunction against any executive officer, let alone the President himself, was proper.

## ARGUMENT

### I.      The League's claims are justiciable

#### A.      The League has standing to bring this case

The League has standing to bring this case on behalf of its members. The purpose and intended effect of President Trump's Order are to open the withdrawn areas to oil and gas leasing and—critically here—to promote rapid seismic exploration. Because seismic exploration for oil and gas is costly and pointless in permanently withdrawn areas, the predictable consequence of the Order is to encourage seismic surveying where it would not otherwise occur. On the Government's own account, seismic surveying regularly precedes leasing by years, well before areas are included in five-year leasing programs. Seismic surveys are conducted over vast distances, generating shock waves that travel for miles in every direction and remain intense enough to harm marine wildlife dozens of miles away from the vessels. This harm to wildlife threatens the interests of the

League's members—who use the Arctic and Atlantic Oceans for subsistence, recreation, and aesthetic purposes—over a correspondingly large area.[2]

### 1. The League has established injury-in-fact

To establish injury-in-fact, the League must show an invasion of a legally protected interest that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted). As "'set forth' by affidavit [and] other evidence," *id.* at 561, the League satisfies this test.

#### a. *Harm to the League's members is concrete and particularized*

President Trump's Order will predictably lead to a variety of oil and gas activities that will cause concrete injury to the League's members by harming the "particular place[s]" and "species" they use and enjoy. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (citing cases). Seismic

---

[2] The Government does not challenge any other elements of the League's associational standing, *see* Gov't Br. 13-25, and the League readily meets them, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Safeguarding the Arctic and the Atlantic Oceans from harmful offshore oil and gas activities is "germane" to the League's organizational purposes. *Id.* at 343; *see* ER122-52, 157-67, 226-51, 257-66, 273-82. The League's members need not participate in this litigation because none of the claims asserted or the relief sought requires individualized proof. *Hunt*, 432 U.S. at 343.

surveying is an immediate threat to those interests, and, as the district court held, the harm from this activity alone is sufficient to establish the League's standing.

Seismic surveying is a method of prospecting for oil and gas in which vessels traverse the ocean, repeatedly firing sound cannons called "air guns" into the water to map the subsurface geology by interpreting the way the shock waves penetrate and refract from the ocean bottom. SER68-75. Seismic surveying operations can fire air guns as often as every 10 seconds, day and night, often for months at a time, and they crisscross the ocean, travelling thousands of miles per project. *E.g.*, SER19 (describing survey with 4,458-mile grid), 27, 36, 126.

Seismic surveying—even when lawfully permitted—harms marine mammals. A 2016 Government Final Environmental Impact Statement (EIS) prepared to assess the effects of seismic surveying and exploration activities in the Beaufort and Chukchi Seas (which are among the areas affected by President Trump's Order) confirms the harm caused by such intense and prolonged blasting. *See* SER67-79, 108-23. Chronic higher background noise levels such as those caused by seismic surveying can "limit the ability of marine species to detect and interpret important acoustic cues" and "ha[ve] the potential to decrease the value of habitat and can lead to consequent chronic effects." SER124; SER124-33 (describing ample evidence that decreases in listening and communication space can negatively affect aquatic animals).

14

There is no dispute that harm from seismic surveying is widespread and can degrade large swaths of ocean habitat. Seismic vessels travel vast distances. *See supra* 14. Their air guns send sound shocks over even larger areas. According to the 2016 EIS, blasts from some surveys are loud enough to harass marine mammals up to 100 kilometers from the survey vessels. *See* SER133-37, 141-43, 98-99 (showing acoustic footprints of seismic survey systems in Beaufort and Chukchi Seas); *see also* SER101-05 (describing areas ensonified to different levels under various activity scenarios if Arctic Ocean were open to leasing); SER136 (describing potential effects to bowhead whales as "regional in nature").

Because of the large geographic scope and the intensity of the blasts, seismic surveys can harm immense numbers of marine mammals. *See, e.g.*, SER43 (National Marine Fisheries Service permit for a single two-month-long seismic survey in 2012 in the Arctic Ocean authorizing disturbance of over 60,000 ringed seals and 4,200 beluga whales). The 2016 EIS predicted that if the Beaufort and Chukchi Seas remained open for leasing, the number could surpass a hundred thousand for some species. SER89-93 (showing estimates for different activity scenarios, estimating up to 118,000 ringed seals disturbed); SER135, 148-49 (concluding that seismic surveying could disturb "large numbers of bowhead[]" whales, a species protected under the Endangered Species Act, pushing them off critical summer feeding habitat, with potential for "long-term duration" effects on

15

a "regional geographic scale"); SER164, 170-73 (estimating hundreds of thousands of disturbances to marine mammals from proposed south- and mid-Atlantic seismic activities). Because many of these animals travel over large distances, SER142, and the League's members view, study, and enjoy them at different points along their travels, the harm will reverberate over an even broader geographic area than the already-vast areas traversed by the seismic vessels themselves. *See, e.g.*, ER105-07, 242-47, 141, 144, 155.

The League's members' interests are threatened in a personal and particularized way by this far-reaching harm. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'") (citation omitted); *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 909 (9th Cir. 2011) (similar). As the district court correctly found, the League's members' personal use and enjoyment of the affected areas and the wildlife that depends on them would be harmed by seismic surveying. ER8-9 & n.33; *see Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (plaintiffs are personally injured when they use the affected area and "are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity") (citation omitted); *accord Ecological Rights Found.*, 230 F.3d at 1147.

16

For example, Rosemary Ahtuangaruk and Robert Thompson, residents of Arctic coastal villages, describe the cultural importance of harvesting Arctic Ocean bowhead whales, seals, and fish, and how seismic surveying harms these resources. ER105-07; ER242-47. Robert Moir and Dr. Leslie Kaufman describe observing wildlife, such as whales in the Atlantic canyons affected by the Order, and the ways seismic surveying would harm these species and their ability to continue enjoying them. ER198-202; ER154-55. John Hocevar describes his experiences observing and studying marine mammals from ships in the Arctic Ocean and how seismic surveying would diminish his experience and close off future advances in scientific research. ER140-41, 144, 147. Michael Wald, an Arctic guide, describes the importance to his business of being able reliably to view marine mammals in the Arctic Ocean. ER253-55.

This is exactly the sort of evidence required to establish a concrete injury, as this Court held in *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009). The Court found plaintiffs had standing to challenge a regulation governing the "take" of polar bears across the entire Beaufort Sea and neighboring coastal areas, with no need to identify the overlap of specific projects with specific areas plaintiffs used, because the effects of the regulation extended—and were felt by plaintiffs—across a broad geographic area (everywhere polar bears roam). *Id.*

17

at 707-08.[3]  Likewise, the League here adduced uncontroverted evidence connecting the predictable harm from the Order to particular areas and species its members use and enjoy.

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009), cited at Gov't Br. 17, is not to the contrary.  In *Summers*, the impacts of the challenged decision—a regulation exempting small post-fire timber-salvage projects from certain public notice and appeal procedures—were confined to relatively small, defined geographic areas, and plaintiffs who did not establish their use of those particular areas lacked standing.  *Id.* at 498-500.  Not so here, where the effects of each seismic survey impair thousands of miles of ocean and propagate further as the range of injured animals extends beyond the surveyed area.  *Defenders of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005), cited at Gov't Br. 24-25, also supports standing here.  Like the plaintiffs in that case, the League has provided evidence of its members' past and future intended use of specific areas and species that are

---

[3] The Government tries to distinguish *Kempthorne* on the ground that the League's injury from seismic surveying is "too speculative" because it depends on permit approvals.  Gov't Br. 23-24.  But in *Kempthorne* as well, individual operators required letters of authorization from the Fish and Wildlife Service before engaging in oil and gas activities.  *Kempthorne*, 588 F.3d at 705.  The Court rejected the Government's ripeness argument that plaintiffs must wait to challenge any specific authorizations granted under the regulations.  *Id.* at 708.

now vulnerable to seismic surveying. That the areas affected by the Order are large does not undermine the concreteness of these injuries.

### b. *Harm to the League's members is imminent*

The League's undisputed evidence further establishes that its members face "a credible threat of real and immediate harm" sufficient to meet the injury-in-fact imminence requirement. *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) ("future injuries" may be "imminent" "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur") (quotation marks and citation omitted); ER49-52. The imminence inquiry is a practical one, guided by common sense. *See, e.g.*, *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (applying "[c]ommon sense and basic economics" to find standing); *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) (deeming it "a hardly-speculative exercise in naked capitalism to predict that facilities would take advantage of" a challenged rule loosening regulatory restrictions) (quotation marks omitted). Courts may consider, for example, actors' motivation and past conduct. *See, e.g.*, *Dep't of Commerce*, 139 S. Ct. at 2566 (citing evidence of past behavior to establish injury-in-fact). Here, the Order itself, industry statements issued immediately following the Order and prior to the

19

complaint,[4] and past industry conduct all demonstrate that, with the withdrawals lifted, companies can be expected to conduct seismic surveying in the areas subject to the Order.

First, as the district court explained, the Order "itself demonstrates that oil and gas exploration activities are intended to be imminent." ER50. By its terms, it revokes protections barring oil and gas activities in the Arctic and Atlantic Oceans. ER286. It directs agency officials to consider revising their offshore oil and gas program to include multiple annual lease sales in the Arctic and Atlantic Oceans, ER285, thereby immediately incentivizing seismic exploration. And, critically, it requires the Secretaries of the Interior and Commerce to "expedite" seismic survey permits. ER287.

Second, industry has expressed interest in conducting seismic surveying in the areas opened by the Order. Immediately following the Order, a leading offshore seismic industry group issued a press release praising the Order and calling for seismic surveying in the Atlantic and other frontier areas "without delay." SER159-60. The Government and Intervenors themselves acknowledge

---

[4] The relevant time period for assessing the League's standing, including the imminence of its members' injury, is the time "when the complaint [wa]s filed." *Lujan*, 504 U.S. at 571 n.4; *accord In re Zappos.com, Inc*., 888 F.3d 1020, 1028 n.10 (9th Cir. 2018). The "injury required for standing need not be actualized" for standing to exist. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734-35 (2008).

20

the interest. *See* SER200 ("API admits that some companies in the oil and gas industry remain interested in oil and gas development … in the Arctic Ocean."); SER201-02 (similar, in Atlantic); SER184 ("Defendants admit that some companies in the oil and gas industry remain interested in oil and gas development, in the Arctic Ocean."); SER184-85 (similar, in Atlantic). Indeed, at the time the League filed its complaint, the Department of the Interior was evaluating seismic survey applications submitted by multiple companies in the Atlantic, including in areas subject to the Order, Gov't Br. 18 n.1, and the Department of Commerce was proposing to permit applicants to take marine mammals incidental to seismic surveying activities, SER201, 184-85. And, as the district court correctly concluded, "although third parties must obtain permits before seismic surveying and other activities may occur, there is no indication that the government will not promptly grant such permits." ER49. In fact, the Order mandates an expedited permitting process. ER287.

Third, past practice confirms the immediacy of the threat: companies do not wait for lease sale certainty before investing in seismic surveying. In the Atlantic, companies sought approval to conduct seismic surveys even when lease sales were not included in any existing or proposed leasing program and thus were not anticipated for at least five years. SER184-85 ("[A]t least six companies have applied to the Bureau of Ocean Energy Management for permits to authorize deep-

21

penetration seismic surveys in the Atlantic."); SER14 (leasing schedule demonstrating no lease sales scheduled in the Atlantic through 2017); SER13 (leasing schedule demonstrating no lease sales scheduled in the Atlantic through 2022). In the Arctic Ocean, past seismic surveying often preceded oil and gas lease sales by several years. *See* SER202 ("API … admits that geological and geophysical activities may occur prior to lease sales."); SER185 ("Defendants admit that seismic surveys are sometimes conducted prior to lease sales as an exploration tool to identify prospective resources."); SER16-17 (showing multiple seismic survey programs completed in the four years prior to a 2003 lease sale in the Beaufort Sea); SER15 (showing lease sale dates).

Contrary to the Government's argument, Gov't Br. 18, 19, 20, 23, the fact that harm from seismic surveying depends on third-party action does not make it unlikely or otherwise defeat imminence. It is predictable that industry will seek, and the Government will permit, seismic surveying because of President Trump's Order. This sort of "predictable effect of Government action on the decisions of third parties" readily meets the imminence test for injury-in-fact. *Dep't of Commerce*, 139 S. Ct. at 2566. In *Department of Commerce*, states and other plaintiffs challenged the Secretary of Commerce's addition of a citizenship question to the census questionnaire. Their injuries depended on "their expectation that reinstating a citizenship question will depress the census response rate and

22

lead to an inaccurate population count." *Id.* at 2565. A depressed census response, in turn, depended on "the independent action of third parties choosing to violate their legal duty to respond to the census," which was itself motivated by "fears that the Federal Government will itself break the law by using noncitizens' answers against them for law enforcement purposes." *Id.* at 2565-66. Applying a common-sense approach, the Supreme Court concluded that the plaintiffs had established imminence by showing that "third parties will likely react in predictable ways." *Id.*

Similarly, this Court recently held that states challenging rules allowing employers to restrict employee contraception coverage had demonstrated an imminent injury-in-fact. This Court explained it was "reasonably probable that women in the plaintiff states will lose some or all employer-sponsored contraceptive coverage due to the" rules, and that some of them would seek contraceptive services in state-run or funded clinics, making it "reasonably probable that loss of coverage will inflict economic harm to the states." *California v. Azar*, 911 F.3d 558, 571-72 (9th Cir. 2018); *see also City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (city established imminent injury where its harm—lost tax revenue from a marijuana dispensary subject to foreclosure—depended on a series of actions by multiple layers of third parties).

This case is therefore readily distinguishable from *Clapper v. Amnesty International*, on which the Government relies, Gov't Br. 19, where plaintiffs'

23

harm depended on a "highly attenuated chain" of uncertain future events, 568 U.S. 398, 410 (2013). In *Clapper*, the plaintiffs, lawyers representing foreign nationals, would suffer harm only if the Government sought to surveil one of their clients and requested authorization to do so under the specific statutory provision plaintiffs challenged; a court approved the request; the target had a privileged conversation with the plaintiff lawyers; and the Government intercepted the communication. *Id.* at 411-14.

Here, in contrast, all that is required for the harm to occur is for industry to apply for seismic permits and the Government to grant them. Because industry actors have applied for such permits in the past, and have said they intend to apply for such permits in the future, *see supra* 20-22, and because the President has ordered the agencies to "expedite" their processing of such permit applications, ER287, that harm is imminent.

### 2. The League satisfies the other elements of standing

The harms to the League's members' interests in the Arctic and Atlantic Oceans are fairly traceable to the President's Order and redressable by the relief the League seeks. *See Lujan*, 504 U.S. at 560-61.

The League's injury is traceable to the Order because opening areas to leasing that were formerly permanently off-limits directly increases the likelihood of oil and gas activities there. That is the express purpose of the Order. ER285,

24

287 (declaring it "the policy of the United States to encourage energy exploration and production" and directing agencies to "expedite" seismic survey permits); *see also* SER57 ("Leasing moratoria … decrease exploration activity."); SER63, 65 (agency documents describing the absence of oil and gas activities in withdrawn areas of the OCS); SER72 (assuming Arctic Ocean is open to leasing, "[the National Marine Fisheries Service] expects to receive applications [for] … exploration activities"); SER74-79 (describing reasonably expected activity scenarios with multiple large-scale seismic and drilling activities occurring each year).

That the Government previously issued two permits for large-scale, area-wide seismic surveying in the Gulf of Mexico that allowed operators to stray into the withdrawn area of a national marine sanctuary, Gov't Br. 20 & n.2, does not undercut the obvious link between the President's Order and the likelihood of seismic surveying in areas the President has opened to oil and gas activities. As the district court correctly concluded, "[a]lthough seismic surveying can go forward regardless of the legality of the challenged Executive Order, there would be no apparent incentive for the industry to conduct seismic surveying in areas closed off from drilling." ER51 n.90. As the Government acknowledges, "[e]nergy exploration is a speculative, time-consuming, and resource-intensive endeavor," Gov't Br. 20, making it unlikely that industry would invest such efforts

25

in surveying an area permanently withdrawn from disposition. The President's Order dramatically altered the incentives, as an offshore seismic industry group acknowledged. SER159.

Further, and for the same reasons, the relief the League sought would "likely" redress the harms to its members' interests, *Lujan*, 504 U.S. at 561, by effectively reinstating President Obama's permanent withdrawals and removing industry's incentive to conduct seismic surveys there. *See Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) ("Plaintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision.") (quotation marks and citation omitted); *Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, 1245-46 (9th Cir. 2008) (similar). The League therefore has standing.

## B. This case is constitutionally and prudentially ripe

There is no dispute that this case is constitutionally ripe, so long as the League demonstrates standing. *See* Gov't Br. 25-26 (acknowledging the inquiries are often coextensive). As discussed above, the League has standing, so it satisfies the constitutional component of ripeness. The Court should reject the Government's additional invitation to decline jurisdiction under the separate doctrine of prudential ripeness. *Id.* at 25. Prudential ripeness is a discretionary, "disfavored" doctrine. *Fowler v. Guerin*, 899 F.3d 1112, 1116 n.1 (9th Cir. 2018); *see also Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018) (noting

26

"some tension with … the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging") (quotation marks and citation omitted).

Should the Court decide to consider prudential ripeness, it tests two factors—"the fitness of the issues for judicial decision and the hardship of withholding court consideration"—both of which are readily satisfied here. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (quotation marks and citation omitted).

First, the League's claims are unquestionably fit for judicial review. "[A] claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823, 833 (9th Cir. 2016) (quotation marks and citation omitted), *rev'd on other grounds sub nom. Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018). President Trump's Order is final, and resolution of the League's claims turns on purely legal issues: whether that Order was ultra vires of his statutory and constitutional authority. ER 331-32 (Complaint ¶¶ 60, 65). The Government identifies no "further factual development" that would aid the Court's resolution of those legal questions. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *contra* Gov't Br. 27. How agency officials might make subsequent permitting and leasing decisions in

27

areas covered by the Order will not clarify the legal question of whether the Order exceeded the President's authority. *Cf. Ohio Forestry,* 523 U.S. at 736-37.

The hardship factor also favors the exercise of jurisdiction. The League's demonstration of injury-in-fact illuminates the hardship of delaying adjudication. As described above, the League is most immediately injured by the increased risk of near-term oil and gas activities caused by the President's action. The Government's analogy to pre-enforcement review of agency regulations, Gov't Br. 26, is inapt, because the League's members face imminent harm from seismic activities prior to the finalization of a leasing plan or the issuance of leases. *See supra* 19-24. Review at this stage will not impose hardship on the Government or "inappropriately interfere with further administrative action." *Ohio Forestry,* 523 U.S. at 733. To the contrary, all parties benefit from resolution of whether the President's Order was lawful, before harmful and costly exploratory activities are allowed to proceed and public resources are expended in deciding whether to schedule lease sales for the areas at issue.

The Government spills much ink arguing that the multi-stage nature of oil and gas development under OCSLA renders the claims unripe, relying in part on a D.C. Circuit decision addressing a five-year leasing schedule challenge, *Center for Biological Diversity v. Department of the Interior (CBD)*, 563 F.3d 466 (D.C. Cir. 2009). Gov't Br. 28. But again, the League's threatened injuries derive most

28

immediately from seismic surveys, which occur outside that framework and may precede leasing by years. Indeed, to the extent it is persuasive here, *CBD* compels the conclusion that the League's claims are ripe. The *CBD* plaintiffs challenged Interior's compliance with OCSLA and the National Environmental Policy Act (NEPA) when it promulgated a five-year leasing program. Reasoning that no NEPA violation had yet occurred at the time of the agency's decision, the court held the NEPA challenge unripe. *CBD*, 563 F.3d at 481-82. By contrast, the court concluded that the *OCSLA-based* claims *were* ripe because the legal violations underlying them—Interior's failure to abide by OCSLA's prescriptions—"are implicated at the initial stage of a leasing program." *Id.* at 484. The same is true here. The violations underlying the League's claims—the President's action outside of his constitutional and statutory authority—have already occurred, and no subsequent actions will change the fact that the Order immediately increases the likelihood of seismic exploration of the previously withdrawn areas.

That the League may separately challenge future leasing or permitting decisions does not render its challenge to the Order unripe. Gov't Br. 28-29. The League seeks to avoid harm from even lawful pre-leasing activities in areas affected by the Order, because the activities would not likely occur absent the Order's reopening those areas to exploration and development. *See supra* 24-26. Thus, the League's challenge to the Order is ripe for adjudication now. *See, e.g.*,

29

*Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (per curiam) (challenge to executive order was prudentially ripe where "the mere existence of the Order alter[ed] the balance of bargaining power" in a way that harmed plaintiffs); *see also Hawaii v. Trump*, 859 F.3d 741, 767-68 (9th Cir. 2017) (challenge to executive order restricting immigration was prudentially ripe, although it had not yet been applied to specific individuals), *vacated and remanded on different grounds*, 138 S. Ct. 377 (2017) (mem.).

### C.      Sovereign immunity poses no bar to the League's claims

Sovereign immunity does not shield the President's action from judicial review.  The Government takes the extraordinary position that plaintiffs may never seek equitable remedies for ultra vires or unconstitutional executive action unless they first identify an express *statutory* waiver of sovereign immunity.  Gov't Br. 31.  That is not the law.

Where sovereign immunity applies, it bars actions against the sovereign for money damages or specific relief unless Congress waives that immunity.  But as the Supreme Court explained decades ago in *Larson v. Domestic & Foreign Commerce Corp.*, there are "two types" of claims for specific relief against federal officials where no waiver is needed.  337 U.S. 682, 690 (1949).  The first is "where the officer's powers are limited by statute" and he acts wholly "beyond those limitations" such that "[h]is actions are *ultra vires* his authority."  *Id*. at 689.  The

30

second is where an officer "take[s] action in the sovereign's name" that is "claimed to be unconstitutional." *Id.* at 690. In both types of cases, "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* Sovereign immunity need not be *waived* because it never attached to the challenged action in the first place. Therefore, as the Supreme Court had already "frequently … recognized" by the time it decided *Larson*, "a restraint may be obtained against the conduct of Government officials" without implicating sovereign immunity. *Id.* Because the President's Order here is ultra vires and unconstitutional, the League's claims fit within both *Larson* categories, and sovereign immunity does not shield the Order from review.

### 1. President Trump's Order is ultra vires

First, the Order is ultra vires. Its only asserted source of statutory authority is Section 12(a), and Section 12(a) confers no authority on the President whatsoever to revoke existing withdrawals. *See infra* Section II.A. Thus, the League's claim is not that the President made an "error in the exercise of [delegated] power," but rather that he acted *without any* "delegated power." *Larson*, 337 U.S. at 690. The League does not complain of the wisdom or error of any presidential withdrawal decision; instead, the League's claim is that the President took a type of action—revoking an existing withdrawal and reopening lands to disposition—that the statute categorically does not authorize. The

31

League's claim fits squarely within the ultra vires exception to sovereign immunity.

The cases the Government cites, Gov't Br. 36, are not to the contrary. They illustrate the settled distinction between challenging an "incorrect" decision by an official "pursuing his *authorized* duties" (sovereign immunity unless waived) and challenging an action "completely outside his governmental authority" (no sovereign immunity). *United States v. Yakima Tribal Court*, 806 F.2d 853, 859-60 (9th Cir. 1986) (emphasis added); *see also E.V. v. Robinson*, 906 F.3d 1082, 1097 (9th Cir. 2018) (judge's erroneous evidentiary rulings were "simple mistakes of fact or law, rather than actions in conflict with the terms of [his] delegated authority to resolve evidentiary issues") (quotation marks, citation, and brackets omitted). This is not a case involving alleged error in an official's discharge of his statutorily authorized duties.

Similarly unavailing is the Government's invocation of *Dalton v. Specter*, which held judicial review is "not available when the statute in question commits the [challenged] decision to the discretion of the President." 511 U.S. 462, 474 (1994). In *Dalton*, plaintiffs challenged the President's approval of the recommended closure of a shipyard under a statute authorizing the President to "approv[e] or disapprov[e]" such base closure recommendations "for whatever reason he sees fit." *Id.* at 476. Because the plaintiffs' claim "concern[ed] not a

32

want of Presidential power, but a mere excess or abuse of discretion in exerting a power given," *id*. at 474 (quotation marks and brackets omitted), and because the statute did "not at all limit the President's discretion," *id.* at 476, *Dalton* held there was no role for the courts to play in deciding whether the President's choice was the right one.

Here, in contrast, the League's claims concern "a want of Presidential power," not a mere "abuse of discretion." *Id.* at 474. The statute the President contends authorized his action—Section 12(a)—categorically does not authorize the revocation of existing withdrawals. In cases like this, the issue for judicial resolution is not "the correctness or incorrectness" of the decision, "but simply the power of the official, under the statute, to make a decision at all." *Larson*, 337 U.S. at 691 n.12 (favorably citing *Noble v. Union River Logging R.R. Co*., 147 U.S. 165 (1893), in which "it was held that the officer being sued lacked power to refuse delivery [of a right-of-way] because, under the statutory scheme, his predecessor's determination that the plaintiff was entitled to delivery was binding"*)*. *Dalton* presents no bar to review.

The Government asserts that so long as it is "debatable" whether the President's action "conflict[ed] with the terms of his valid statutory authority," sovereign immunity attaches, and the Court has no power to decide whether the statute authorized his action. Gov't Br. 36 (quoting *Larson*, 337 U.S. at 695).

33

*Larson* does not stand for that proposition. On the contrary, *Larson* recognized that determining whether immunity applies often requires courts to consider the merits of an ultra vires claim. *See Larson*, 337 U.S. at 690 ("jurisdiction of the court to hear the case may depend … upon the decision which it ultimately reaches on the merits"); *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1032 (9th Cir. 2013) (per curiam) (similar). It is, of course, the federal judiciary's role to "determin[e] the limits of statutory grants of authority." *Stark v. Wickard*, 321 U.S. 288, 310 (1944). The President cannot derail that judicial function merely by *claiming* authority under an inapplicable statute.

### 2. Sovereign immunity does not shield constitutional violations from review

Second, because President Trump's action is "claimed to be unconstitutional," sovereign immunity does not apply. *Larson*, 337 U.S. at 690. Sovereign immunity is "per se" inapplicable to "alleged constitutional violations." *Robinson*, 906 F.3d at 1098 (quoting *Yakima Tribal Court*, 806 F.2d at 859, in parenthetical).

The Government recognizes, as it must, that "courts may review the President's actions for constitutionality." Gov't Br. 36 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992)). The Government protests that "executive actions in excess of statutory authority" are not "ipso facto unconstitutional," *Dalton*, 511 U.S. at 472, but that is irrelevant here. The League

34

is not asserting a mere "excess or abuse of discretion" granted by a statute, *id.* at

474 (quotation marks omitted), nor is it "repackaging" such a theory as a

constitutional claim, Gov't Br. 37.  Instead, the League claims that the President

acted wholly outside the scope of statutory authority and arrogated to himself a

power that the Constitution committed to Congress, and that Congress kept for

itself.  ER331-32.  Had the President merely *erroneously* applied his Section 12(a)

withdrawal power, *Dalton* shows that action could violate the statute without also

necessarily violating separation of powers.[5]  That is not what President Trump did.

Instead, he assumed Congress's own power to revoke an existing withdrawal, in

violation of the separation of powers.  It is well settled that the courts may review

such claims.  *See infra* 37-40.

The passage of time has not vitiated *Larson*'s controlling effect.  *Contra*

Gov't Br. 34.  This Court has "applied the *Larson* framework" in "a long line of

cases," most recently two years ago in *Robinson*, 906 F.3d at 1095; *see id.* at 1097-

98, 1098-99.  The Government may disagree with *Larson*, *see* Gov't Br. 35 n.5,

but it is the law, and it is fatal to the sovereign immunity defense asserted here.

---

[5] Moreover, even where there is no separation-of-powers violation, *Dalton* "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA."  511 U.S. at 474 (citing *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981)).

The rest of the Government's arguments are specious. It argues in passing that "OCSLA represents a 'precisely drawn, detailed statute' that … overrides the general remedy afforded by the *Larson* exceptions," Gov't Br. 35 n.5 (quoting *Block v. North Dakota*, 461 U.S. 273, 275 n.1, 284-85 (1983)), but this again misapprehends the League's claim. The League challenges not the erroneous application of a federal official's authority under OCSLA, but rather an action taken without any statutory authorization. It is no surprise that OCSLA is silent on the availability of judicial remedies for wholly unauthorized actions taken *outside* OCSLA's delegations. *Contra* Gov't Br. 31-32.

In sum, because the League challenges an executive action taken without statutory or constitutional authority, sovereign immunity never attached, and there is no question of a statutory waiver.

### D. The League does not need a congressionally bestowed right of action to seek equitable relief for ultra vires and unconstitutional executive acts

The Government asserts that the League has no recourse to challenge the President's ultra vires and unconstitutional action in court without an express, congressionally bestowed cause of action, but its argument runs counter to a long line of Supreme Court opinions. As the Supreme Court recently reaffirmed, it is well settled that federal courts have traditional equitable authority to remedy "violations of federal law by federal officials." *Armstrong v. Exceptional Child*

36

*Care Ctr.*, 575 U.S. 320, 326-27 (2015) (favorably citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).

This is true for actions claimed to be unconstitutional: "The ability to sue to enjoin unconstitutional actions by ... federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* at 327. It is also true for ultra vires actions: "Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958); *see also Larson*, 337 U.S. at 689 ("[W]here [an] officer's powers are limited by statute, his actions beyond those limitations … are ultra vires his authority and therefore may be made the object of specific relief."). Congress may act to "foreclose equitable relief" in specific areas, *Armstrong*, 575 U.S. at 328 (quotation marks omitted), but if it does not, the federal courts remain open to shield a plaintiff from an unconstitutional or ultra vires "injurious act by a public officer," *id.* at 327 (quotation marks omitted).

Consistent with this "long history of judicial review of illegal executive action," *id.*, the Supreme Court routinely entertains claims for equitable relief to remedy constitutional violations and ultra vires executive acts without looking for any specific statutory cause of action, so long as Congress has not foreclosed relief. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2416-17 (2018) (entertaining

37

constitutional challenge to a presidential proclamation restricting the entry of certain foreign nationals into the United States, despite absence of statutory cause of action); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,* 561 U.S. 477, 489-91 (2010) (entertaining petitioners' constitutional challenge to the formation of oversight board, despite absence of a statutory cause of action); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642-43 (2002) (entertaining petitioner's preemption claim against state officials for violation of federal statute, even though "the Act does not create a private cause of action").[6]

For example, in *Free Enterprise Fund*, petitioners, like plaintiffs here, sued over harm to their interests stemming from a separation-of-powers violation. 561 U.S. at 487. As here, the Government argued that the petitioners had no cause of action. *Id.* at 491 n.2. Notwithstanding congressional silence, the Court found the plaintiffs had as much "a right to relief as a general matter" as for any other constitutional claim. *Id.* The Supreme Court has never held that plaintiffs must show a congressionally bestowed cause of action to challenge ultra vires or unconstitutional acts by the Executive Branch, as the Government now insists.

---

[6] The Supreme Court's stay order in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019), is not to the contrary. The Government's main contention there was that plaintiffs were not within the "zone of interests" of the Defense Appropriations Act and therefore had no "cause of action" to enforce it. *See* Application for Stay at 22, *Trump v. Sierra Club*, No. 19A60 (July 12, 2019). Here, in contrast, the Government has never raised a "zone of interests" objection.

That the League's injury is attributable to an act of the President does nothing to diminish the availability of judicial review. The Supreme Court "ha[s] long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see also Franklin*, 505 U.S. at 802 (plurality op.) (acknowledging that "injunctive relief against executive officials like the Secretary of Commerce" who are charged with carrying out the President's order "is within the courts' power" (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952))).

For example, in *Youngstown*, the Supreme Court invalidated President Truman's executive order directing the seizure of steel mills. 343 U.S. at 587-89. Similarly, in *Cornelius v. NAACP Legal Defense & Education Fund, Inc*., 473 U.S. 788 (1985), the Court entertained a First Amendment challenge to an executive order relating to federal workplace charity drives. *Id.* at 795, 808-13; s*ee also, e.g.*, *Medellín v. Texas*, 552 U.S. 491, 525-30 (2008) (evaluating constitutionality of presidential memorandum); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 189-90 (1999) (holding that presidential order terminating Chippewa treaty rights lacked "constitutional or statutory authorization"); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1233-35 (9th Cir. 2018) (evaluating constitutional challenge to executive order that withheld federal grants from

39

sanctuary jurisdictions where Congress "ha[d] not delegated authority to the Executive" to do so).

As in these other cases, the League seeks to protect itself from injurious action that the Executive has no power to take. It is not seeking to *enforce* any substantive, statutorily created entitlement against other parties, governmental or otherwise. For that reason, the Government errs in its reliance on cases holding that when Congress creates new substantive rights by statute, it must make its intent clear before individuals may sue to enforce those rights against other parties. Gov't Br. 38-39. In *Alexander v. Sandoval*, the plaintiffs claimed the governing statute provided them with a substantive right to enforce disparate-impact regulations against state officials. 532 U.S. 275, 278-79 (2001). The Court disagreed, concluding that Congress evinced no intention of making the regulations privately enforceable. *Id.* at 285-93. Plaintiffs' right to be free from disparate-impact treatment came only from the regulation implementing the statute, so they could enforce that substantive rule in court only if the statute allowed it—and it did not.

Here, by crucial contrast, the League does not seek a statutory remedy for the violation of any statutorily created substantive right. Rather, it seeks an equitable remedy—one deeply embedded in our federal system—for harms caused by wholly unauthorized and unconstitutional executive overreach. The

40

"prerequisites for obtaining an equitable remedy," unlike a statutorily created one, "depend on traditional principles of equity jurisdiction." *Grupo Mexicano v. Desarrollo, S.A. v. All. Bond Fund, Inc*., 527 U.S. 308, 318-19 (1999) (quotation marks omitted). Thus, the question is "whether the relief [Plaintiffs] requested … was traditionally accorded by courts of equity." *Id*. at 319. It was. *See supra* 36-37 (citing *Armstrong*, 575 U.S. at 326-27). The Government argues for limiting equity jurisdiction to the remedies traditionally available from the English Court of Chancery, Gov't Br. 41, but even those included prospective relief against public officials, *see Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845) (recognizing "relief may be given in a court of equity" to "prevent an injurious act by a public officer"); *see also, e.g.*, *Hughes v. Trustees of Morden College,* 1 Vesey 188 (Ch. 1748) (suit in English High Court of Chancery against commissioners to prevent digging on plaintiff's land).

Because the League does not look to Section 12(a) as a source of private substantive rights, *see* ER331-32, it is irrelevant whether OCSLA contains "rights-creating language," *Sandoval*, 532 U.S. at 288. *Contra* Gov't Br. 39. Section 12(a) is relevant here only because the President asserts—wrongly—that it authorized his Order. Gov't Br. 36; *see also* ER285-86. It did not. This case therefore fits squarely in the long line of cases—affirmed in *McAnnulty*, *Youngstown*, *Armstrong*, and others—recognizing the availability of equitable

41

remedies to prevent harm from unauthorized executive action. No court has held that *Sandoval* silently abrogated this venerable line of authority, as the Government now contends. *Cf. Armstrong*, 575 U.S. at 328 (quoting *Sandoval* as itself involving a claim to "enforc[e] a substantive rule").

The Government's citation to *Larson*, Gov't Br. 39-40, is equally beside the point. That cited passage distinguishes between what is axiomatically required for any cause of action, whether statutory or equitable—an "invasion of [plaintiff's] recognized legal rights"—and the additional showing needed to overcome sovereign immunity "in a suit against an agency of the sovereign." 337 U.S. at 693. Here, as discussed above, the League and its members undeniably have legally protected interests in the enjoyment of public lands and the wildlife inhabiting them. *See supra* 16-17; *see also Lujan*, 504 U.S. at 560, 562-63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest…."); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (equitable remedies often appropriate to protect plaintiffs' environmental interests).

The Government argues, citing an unpublished Fifth Circuit opinion, that this Court ought not recognize a "new equitable cause of action" for constitutional violations. Gov't Br. 41. Certainly, at least as to the principal of separation of powers, that ship has sailed. *See Free Enter. Fund*, 561 U.S. at 491 n.2. And

while the Government appeals to *Ziglar v. Abbasi*, Gov't Br. 41, that case has

nothing to do with equitable remedies; it warns against finding a new implied

*damages* remedy under *Bivens*, 137 S. Ct. 1843, 1857 (2017); *see also id.* at 1865

(explaining that "there might have been alternative remedies available here,"

including "equitable relief").

Nor can the Government draw support from two inapposite opinions—one

from a different Circuit, the other a dissent—discussing how *Ex parte Young*

allows anticipatory defenses against threatened state enforcement actions. Gov't

Br. 42. The quoted language from the Sixth Circuit case does not—as the

Government would have it—sweep in equitable claims broadly; it simply explains

one specific type of equitable relief encompassed by *Ex parte Young*. *Mich. Corrs.*

*Org. v. Mich. Dep't of Corrs.*, 774 F.3d 895, 906 (6th Cir. 2014). Chief Justice

Roberts's cited dissent simply noted the absence in that case of the sort of

enforcement threat that normally supports an *Ex parte Young* case. *See Douglas v.*

*Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J.,

dissenting). Neither has any bearing on the quite different, well-settled form of

equitable remedy at issue here.

In short, equitable redress has long been available to prevent harms—like

those the League asserts—from Government acts taken without authority. The

Government points to no authority, nor is there any, abrogating the federal

judiciary's historical equity jurisdiction to address ultra vires or unconstitutional acts of the Executive Branch.

## II. Congress gave the President no power to revoke withdrawals

"The President's power … must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The Property Clause of the Constitution gives Congress the exclusive power to manage the United States' lands and associated resources. U.S. Const. art. IV, § 3, cl. 2; *see also Sioux Tribe*, 316 U.S. at 326 (Property Clause power is exclusive to Congress). "[T]he constitutional power of Congress in this respect is without limitation." *United States v. California*, 332 U.S. 19, 27 (1947), *as supplemented*, 332 U.S. 804 (1947); *see also* S. Rep. No. 85-857, at 10 (1957), *reprinted in* 1958 U.S.C.C.A.N. 2227, 2235 ("[T]hat Congress has the final authority for the making of public land withdrawals or reservations cannot be doubted.").

With the enactment of OCSLA, Congress established a framework for managing OCS resources, including oil and gas, and delegated discrete aspects of its Property Clause power to the President and the Secretary of the Interior. *See supra* 3-7. The President's power in this arena is only what Congress has chosen to delegate to him. Any action by the President that exceeds a delegation by Congress is not only unlawful for being beyond statutory authorization, and thus

ultra vires, but also is in derogation of the doctrine of separation of powers, and thus unconstitutional.

The Framers built the separation of powers principle into the Constitution to contain, and protect the citizenry from, abuses of power by an overreaching branch of government. "On its most fundamental plane, the separation of powers doctrine protects the whole constitutional structure by requiring that each branch retain its essential powers and independence." *Noriega-Perez v. United States*, 179 F.3d 1166, 1174 (9th Cir. 1999) (citation omitted). President Trump's Order attempting to revoke permanent withdrawals for the Arctic and Atlantic Oceans is both unconstitutional, in derogation of separation of powers, and ultra vires, exceeding Congress's careful delineation of delegated authority. The statutory language, context, structure, history, and purpose all indicate clearly that Congress did not delegate to the President the power to revoke withdrawals under Section 12(a).

**A.  Section 12(a) authorizes the President to "withdraw" portions of the outer continental shelf from disposition, but not to revoke withdrawals and put protected areas back in play**

> 1.  Section 12(a) reflects Congress's deliberate choice to confer one-way withdrawal authority on the President

In determining the scope of Congress's delegation, the Court's analysis "start[s], of course, with the statutory text." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). Section 12(a) says, in its entirety: "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the

outer Continental Shelf." 43 U.S.C. § 1341(a). And that is all that Section 12(a) authorizes.

The phrase "withdraw [lands] from disposition" means, simply, to make lands unavailable for leasing, sale, or other disposition. *See* Webster's New Int'l Dictionary of the English Language 2940 (2d ed. 1957) (defining "withdraw" to mean, inter alia, "[t]o take back or away"; "[t]o recall or retract"; "to set outside of a category"; "[t]o hold back"; "to withhold"); *see also, e.g.*, Pub. L. No. 94-579, § 103(j), 90 Stat. 2744, 2745 (1976), *codified at* 43 U.S.C. § 1702(j) (defining "withdrawal" as "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program").

The power to withdraw federal land from disposition—like the opposite power to put it back in play—belongs in the first instance to Congress. *Light v. United States*, 220 U.S. 523, 536 (1911) (Congress "can prohibit absolutely or fix the terms on which its property may be used. As it can with[h]old or reserve the land, it can do so indefinitely."). In Section 12(a), Congress delegated a portion of its withdrawal authority to the President. When the President acts under Section 12(a) to "withdraw" a portion of the OCS from mineral disposition, then, to that specific extent, he stands in Congress's shoes and protects that area's resources

46

from future leasing—by current or future Secretaries—unless and until Congress says otherwise.

Section 12(a) does no more than that. Had Congress also intended to give Presidents the opposite power to *undo* withdrawals—unilaterally putting those parcels back at the Secretary's disposal—it would have said so. As the Supreme Court has held time and again, it is "a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360-61 (2019) (quotation marks and brackets omitted); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) (courts do not "add words to [a statute] to produce what is thought to be a desirable result"); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("[I]t would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope."); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (quotation marks omitted).

Thus, when interpreting the scope of a statutory delegation of Congress's authority, courts take Congress at its word, and generally do not assume that the express conferral of one power silently includes its opposite. *See, e.g., North Dakota v. United States*, 460 U.S. 300, 313-14 (1983) (where statute authorized federal acquisition of lands with state approval, but did not expressly authorize

47

states to "withdraw[] … approval previously given," no such authority existed); *United States v. Seatrain Lines, Inc.*, 329 U.S. 424, 432-33 (1947) (agency's grant of certificate "is not subject to revocation in whole or in part except as specifically authorized by Congress"); *Cochnower v. United States*, 248 U.S. 405, 406, 408 (1919), *as modified*, 249 U.S. 588 (1919) (statute delegating authority to "increase and fix" compensation did not impliedly delegate the "opposite power" to decrease compensation; had Congress intended to confer two-way authority, "it would have been at equal pains to have explicitly declared it"); *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) (rejecting Attorney General's argument that "the power to denaturalize is 'inherent'" in statutory grant of "the power to naturalize"); *cf. Clinton v. City of New York*, 524 U.S. 417, 439 (1998) (where "the Constitution expressly authorizes the President to play a role in the process of enacting statutes, [but] is silent on the subject of unilateral Presidential action that either repeals or amends parts of duly enacted statutes," such unilateral action to repeal or amend is "prohibit[ed]").

Applying this "fundamental principle of statutory interpretation" here compels taking Congress at its word. *Rotkiske*, 140 S. Ct. at 360. Congress said what it meant: the language of Section 12(a) confers on the President only the authority to make withdrawals, not the authority to revoke them.

48

2. <u>Statutory context and legislative history confirm that Section 12(a) delegates only protective authority</u>

Taking Congress at its word makes particular sense in the Property Clause context because Congress has consistently "shown that it knows how" to expressly delegate revocation authority when it wants to do so. *Rotkiske*, 140 S. Ct. at 361; *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176-77 (1994) (surveying statutes and concluding "Congress knew how to impose aiding and abetting liability when it chose to do so"); *Alcoa S.S. Co. v. Fed. Mar. Comm'n*, 348 F.2d 756, 758 (D.C. Cir. 1965) ("Where Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power."). Over the course of decades— both before and after OCSLA's passage—Congress has demonstrated that when it delegates aspects of its Property Clause power to the Executive Branch, it does so precisely and expressly.

In particular, in public lands statutes, Congress sometimes included the power to revoke withdrawals or reservations and other times did not. Thus, as noted above, *see supra* 5, the Pickett Act of 1910 authorized the President to make temporary withdrawals of public lands and expressly provided that they "shall remain in force until *revoked* by him or by an Act of Congress." Pub. L. No. 61-303, § 1, 36 Stat. at 847 (emphasis added). The Reclamation Act of 1902 similarly authorized the Interior Secretary both to withdraw from public entry lands required

49

for irrigation works, and later to "*restore*" them "when, in his judgment, such lands are not required for the purposes of this Act." Pub. L. No. 57-161, § 3, 32 Stat. at 388 (emphasis added).

Congress used a similar formulation in a 1935 statute authorizing the President "to withdraw from sale, public entry or disposal of such public lands of the United States as he may find to be necessary" to carry out a study of water use in the Rio Grande River, "[p]rovided, [t]hat any such withdrawal may subsequently be *revoked* by the President." Pub. L. No. 74-286, § 4(c), 49 Stat. at 661 (1935) (emphasis added). Likewise, in 1976, when Congress enacted FLPMA, it authorized the Secretary of the Interior not only to "make" certain types of "withdrawals," but also to "*modify*, extend, or *revoke*" those withdrawals, subject to certain conditions. Pub. L. No. 94-579, § 204, 90 Stat. at 2751, *codified at* 43 U.S.C. § 1714(a), (e) (emphases added).

By contrast, other statutes did not confer revocation authority. For example, when Congress in 1891 authorized the President to "declare the establishment of" forest reserves, it did not include authority to undo reserves. 26 Stat. at 1103. Only later, in another statute, did Congress grant the President authority to "modify" or "vacate" forest reserve orders. 30 Stat. at 36. In the Antiquities Act, Congress authorized the President to create national monuments to protect "objects of historic or scientific interest," and included no authority to revoke them. 54

50

U.S.C. § 320301(a), (b); *see also* H.R. Rep. No. 94-1163, at 9, *reprinted in* 1976

U.S.C.C.A.N. 6175, 6183 (1976) (explaining that "Congress [reserved] the

authority to modify and revoke withdrawals for national monuments created under

the Antiquities Act").  Similarly, in FLPMA Congress directed the President to

make recommendations to Congress about which public lands to classify as

"wilderness," and required the Executive Branch to manage those lands to preserve

their wilderness characteristics "until Congress has determined otherwise."  43

U.S.C. § 1782; *see also* U.S. Dep't of Justice, Off. of Legal Counsel, Presidential

Authority Over Wilderness Areas Under FLPMA, 6 Op. O.L.C. 63, 65 (1982)

(concluding that once the President recommended wilderness study areas to

Congress, "the President does not have the authority to return [those] lands to

multiple use management without congressional action").

A series of Attorney General opinions, stretching from the mid-nineteenth

century to shortly before OCSLA's passage, confirms that Congress's omission of

revocation power in a statute delegating withdrawal authority withheld that power

from the Executive Branch.  Considering the Antiquities Act, the Attorney General

in 1938 concluded that the President had no authority to abolish a monument once

established, reasoning that a "duty properly performed by the Executive under

statutory authority has the validity and sanctity which belong to the statute itself,

and, unless it be within the terms of the power conferred by that statute, the

51

Executive can no more destroy his own authorized work, without some other legislative sanction, than any other person can." 39 U.S. Op. Att'y Gen. 185, 187 (1938) (quoting 10 U.S. Op. Att'y Gen. 359 (1862));[7] *see also* 36 U.S. Op. Att'y Gen. 75, 79 (1929); 28 U.S. Op. Att'y Gen. 143, 144 (1910); 21 U.S. Op. Att'y Gen. 120, 120-21 (1895); 17 U.S. Op. Att'y Gen. 168, 168-69 (1881); 16 U.S. Op. Att'y Gen. 121, 123 (1878).[8] Congress is presumed to be aware of such Executive

---

[7] The Government tries to turn the 1938 Attorney General's opinion to its advantage, seizing upon the observation in dictum that the President "from time to time has diminished the area of national monuments." Gov't Br. 73 (quoting 39 U.S. Op. Atty Gen. at 188). But the Attorney General did not analyze the legality of those diminishments, and in fact, the logic of his opinion compels the conclusion that they were unlawful. That is because, once a President reserves land under the Antiquities Act, "the power conferred by the act [i]s exhausted," and the President has "no … authority to recall that reservation," whether in whole or in part. 39 U.S. Op. Att'y Gen. at 187-88 (quotation marks omitted). In any event, even assuming presidents could modify monuments, that does not help the Government here. President Trump's Order revoked President Obama's withdrawals in their *entirety*. *See* Gov't Br. 8 (acknowledging President Trump's Order "terminated President Obama's 2015 and 2016 withdrawals"). President Trump could call his action a "[m]odification," ER286, "only because there is a figure of speech called understatement and a literary device known as sarcasm," *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994).

[8] Attorney General opinions cited by the Government, Gov't Br. 74, are wholly consistent with this well-established understanding. They address only the President's impliedly delegated power in the absence of statutory authority. *See* 37 U.S. Op. Att'y Gen. 431, 432 (1934) ("if no statutory authority existed"); 40 U.S. Op. Att'y Gen. 73, 74 (1941) (executive order expressly did not rely on a statute). Where a statute delegated authority, its terms controlled. *Id*. at 80 ("[T]he status of lands which would be temporarily withdrawn after the [Pickett Act] for purposes coming within its provisions was fixed by the terms of that act.").

Branch interpretations and, when it uses the interpreted terms in a statute, to incorporate that usage. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

It is telling, then, that Congress omitted revocation language from Section 12(a).[9] Section 12(a) confers the authority to "withdraw" land, but it says not a word about the power to "modify" or "revoke" existing withdrawals. 43 U.S.C. § 1341(a). Reading those absent terms into the statute would be "particularly inappropriate" given that "Congress has shown that it knows how to adopt the omitted language." *Rotkiske*, 140 S. Ct. at 361. Unlike some statutes with revocation language, in Section 12(a), Congress followed the example of other statutes omitting that power.

The legislative history of Section 12(a), though limited, confirms that when Congress made its choice in Section 12(a), it was aware of this body of public land laws in which revocation is authorized expressly or not at all. Amending Section 12(a) to remove earlier language that would have "limited" withdrawals to those necessary for "security requirements," the Senate Committee Report explained that "[t]he [withdrawal] authority vested in the President by the amended section is comparable to that which is vested in him with respect to federally owned lands on

---

[9] Congress was certainly aware of revocation when it enacted OCSLA; Section 13 itself revoked President Truman's 1953 withdrawal of the OCS. Pub. L. No. 83-212, 67 Stat. 470.

the uplands." S. Rep. No. 83-411, at 26 (1953). The Government speculates—
with no support—that this reference to "uplands" authority "[m]ost likely …
refers" only to the Pickett Act and its "express authority to revoke prior
presidential withdrawals." Gov't Br. 76. In fact, there is no reason to think the
Senate Report was referring to anything but the full suite of withdrawal statutes on
the uplands, which either conferred revocation authority expressly or not at all, *see
supra* 4-6, 49-51, and that Congress modeled OCSLA accordingly.[10] But even the
Pickett Act alone shows that if Congress had wanted to grant "express authority to
revoke" in Section 12(a), Gov't Br. 76, it "would have used the words," *Cent. Bank
of Denver*, 511 U.S. at 177. "But it did not." *Id.*

Considering Section 12(a) in light of OCSLA's other provisions further
confirms that Congress "said what it meant." *United States v. LaBonte*, 520 U.S.
751, 757 (1997); *see also Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) ("[T]he
words of a statute must be read in their context."). Like other land statutes,
OCSLA strikes a balance: enabling resource extraction while also providing for
resource conservation and preservation. *See infra* 68-69. Section 12(a) plays a
distinct role within that statutory scheme: it is a protective complement to the

---

[10] Certainly, Congress was not thinking that Section 12(a) would confer *Midwest
Oil* authority, which by its nature was implied, not express.

simultaneously enacted Section 8, by which Congress delegated leasing discretion to the Executive Branch.

OCSLA Section 8 authorizes the Secretary of the Interior to decide whether *or not* to make OCS parcels available for leasing. *See* Pub. L. No. 83-212, § 8, 67 Stat. at 468, *codified as amended at* 43 U.S.C. § 1337. There is no doubt the President could direct Secretaries present and future not to offer a given area for leasing when carrying out their Section 8 duties; just as surely, the same or a successor President could later direct the Secretary to put that area back in play. *See generally Free Enter. Fund*, 561 U.S. at 492 (describing the President's "general administrative control of those executing the laws"). Section 12(a) does something different: it allows the President to protect a portion of the OCS and transfer back to Congress authority over its disposition. Because that is an entirely different function with very different effects, Congress needed a separate mechanism for it in the statute—hence, Section 12(a).

If the Government were correct that Section 12(a) allowed the President not only to withdraw areas from leasing, but also to reverse that decision at any time, Section 12(a) would be superfluous. It would do nothing more than restate a given: that the President may direct that a specific parcel not be leased pursuant to Section 8 until further notice. The Government's reading of Section 12(a) thus violates yet one more "basic interpretive canon[]": "that a statute should be

construed so that effect is given to all its provisions, so that no part will be …
superfluous." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018)
(brackets omitted).

Reading Section 12(a) as it is written—authorizing the Executive Branch to
make withdrawals, while preserving for Congress the prerogative to decide
whether (if ever) to undo them—makes sense given the nature of the interests at
stake. Although the Government suggests one-way protective authority is
anomalous, the decision to *lease* a parcel of land to a private party for mineral
exploration and development is not easily reversed. Once development begins,
future presidents cannot protect any resources destroyed or depleted as a result of
that leasing decision.

Section 12(a) therefore allows the President to confer protections on federal
offshore resources, while ensuring that the decision to lift those protections, if ever,
remains in the hands of Congress—and thus, that any loss of protections will occur
only after a "full, vigorous, and open debate" by a deliberative, multimember body.
*Bowsher v. Synar*, 478 U.S. 714, 722 (1986). This statutory scheme, in which the
President has no authority to wrest control back from Congress and unilaterally
revoke existing withdrawals, yields stability that industry, coastal states, and the
public can count on, absent further legislative process.

56

3.  There is no basis for reading into Section 12(a) an unspoken presidential authority to reverse withdrawals

The Government is wrong that the President's discretion to withdraw OCS areas "necessarily includes … the power to modify, undo, and reconsider those withdrawals." Gov't Br. 46. Searching for textual support, the Government argues that both the phrase permitting withdrawal "from time to time" and the word "withdraw" reveal congressional intent to convey the opposite power from withdrawing. As explained below, nothing about either choice of wording shows any such hidden, contrary meaning. The Government's assertion that withdrawals can be time-limited is neither helpful to the Government nor relevant here. And finally, one-way withdrawal authority does not undermine OCSLA's purpose.

a.  *The phrase "from time to time" says nothing about revocability*

The Government's interpretation of the statute rests heavily on the untenable claim that Congress's use of the terms "may," "any," and "from time to time" in Section 12(a) confers "sweeping discretionary authority" to create temporary withdrawals and "to modify, undo, and otherwise reconsider withdrawals to respond to changing circumstances." Gov't Br. 46-47. Although those terms vest the President with discretion about the frequency of withdrawals, nothing about them adds any power to revoke or modify withdrawals.

57

Congress's use of the phrase "from time to time" aligns with the phrase's plainest meaning:  to make clear that the delegated authority would be exercised occasionally or intermittently, as the delegee thought needed.  On its face, it indicates the frequency with which the President may take the authorized action: not just once, not at set intervals, not in connection with some other determination or responsibility, but intermittently, at will, from time to time.  It does not make the actions taken "from time to time" either temporary or reversible.

The Government does not disagree with this plain meaning.  Its own dictionary definitions state that "from time to time" means "occasionally" or "now and again."  Gov't Br. 47.  Yet it makes the unsupported leap that "occasionally" means "revocable" or "temporary," assuming wrongly that a power to be exercised multiple times necessarily is revocable or impermanent.  *See id.* at 50-51.  But starting with the initial use of Section 12(a), presidents have disproved that by repeatedly making withdrawals of discrete areas that, barring congressional override, were of a permanent character.  *See, e.g.*, ER306, 308.

The Government posits that "from time to time" must signal impermanence lest a President be able to block successors' withdrawal power and "nullify" OCSLA by withdrawing the entire outer continental shelf.  Gov't Br. 51.  Congress understood that might happen and that it might have then to intervene, because when enacting OCSLA it overturned just such an OCS-wide withdrawal.  OCSLA

Section 13, Pub. L. No. 83-212, § 13, 67 Stat. at 470 (revoking President Truman's withdrawal). Rather than drafting Section 12(a) to preclude that, Congress appropriately assigned Section 12(a)'s consequential power to the President, not a subordinate Executive Branch official as with OCSLA's other provisions. *See* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2335 (2001) ("[B]ecause the President has a national constituency, he is likely to consider … the preferences of the general public, rather than merely parochial interests."). *Contra* Gov't Br. 64.

Where Congress used the phrase "from time to time" elsewhere in OCSLA, both contemporaneously with Section 12(a) and in subsequent amendments, it always did so in this ordinary meaning of intermittently or at will, and never to indicate reversibility. Section 6 authorized the continuation of mineral leases issued by states prior to OCSLA's enactment if, inter alia, they were "filed with the Secretary … within ninety days from August 7, 1953, or within such further period or periods … as may be fixed from time to time by the Secretary." 43 U.S.C. § 1335(a)(1). If the Government's reading were right, the phrase "from time to time" in Section 6 would have empowered the Secretary to fix a filing period and then pull the rug out from under lease-holders by subsequently eliminating it. That is nonsensical. The phrase simply means that one or more filing periods could be "fixed" at will. While it plainly authorized second, third, and subsequent filing

59

periods, it did not obliquely authorize the Secretary to revoke filing periods once fixed.

Likewise, when it amended OCSLA, Congress provided that the Coast Guard "shall promulgate regulations or standards applying to unregulated hazardous working conditions … [and] may from time to time modify any regulations, interim or final, dealing with hazardous working conditions on the outer Continental Shelf." *Id*. § 1347(c). "From time to time" conveys discretion as to frequency; it means "at will." But it equally plainly was not used to confer the power to reverse, which is done instead by the word "modify." *Id*.

OCSLA Section 25 similarly provides that, for development and production plans on the OCS, "[t]he Secretary shall, from time to time, review each plan approved under this section … [and] [i]f the review indicates that the plan should be revised …, the Secretary shall require such revision." *Id*. § 1351(h)(3). Here, too, "from time to time" cannot sensibly mean anything but intermittently or at will. It certainly does not convey revocability. Indeed, if "from time to time" itself conferred modification authority, there would be no need for Congress to separately confer the power to "revis[e]." *Id*.

Appellant-Intervenors' examples just indicate that "from time to time" means "occasionally." *See* Alaska Br. 7-8; API Br. 21. Most of the examples address power that is inherently impermanent, because it can be exercised

60

repeatedly only if prior uses are altered or revoked—and the authorizing law may well indicate as much. This is so for rulemaking authority. *See Ass'n of Cal. Ins. Cos. v. Jones*, 386 P.3d 1188, 1195 (Cal. 2017) (legislature provided authority for regulations as well as "amendments and additions thereto"). Setting of rates and allowances is analogous. *See Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 564 (1919) (statute granted power "to fix rates or to increase or to reduce them"); *Appeal of Granite State Elec. Co.*, 435 A.2d 119, 122 (N.H. 1981) (rates necessarily alterable because legislature, "was cognizant of the nature of rates"); *Am. Fruit Growers, Inc. v. United States*, 105 F.2d 722, 726 (9th Cir. 1939) (shipping allotments set based on "current" factors). And for appointment and judicial vesting powers, license to change is inherent even without the phrase "from time to time." *See Free Enter. Fund*, 561 U.S. at 509 ("[R]emoval is incident to the power of appointment."). What these cases all share is that inclusion of "from time to time" indicates frequency, but does not dictate impermanence.[11]

In short, in OCSLA, "from time to time" refers only to the frequency with which withdrawal power may be exercised. It says nothing about the revocability

---

[11] Thus, in the U.S. Constitution, the phrase is simply used "to delineate the frequency of a legislative" duty or power. V. Kesavan & J.G. Sidak, *The Legislator-In-Chief*, 44 Wm. & Mary L. Rev. 1, 13-14 (2002).

of those withdrawals. The Court should decline the Government's invitation to read that phrase as an obscure circumlocution for "and may later revoke such action."

> b. *Whether Section 12(a) authorizes time-limited withdrawals is irrelevant*

Whether the President may ever, under Section 12(a), make a time-limited withdrawal—a point the Government presses in multiple places, *see* Gov't Br. 46-47, 49-50—is irrelevant to this case for two reasons.

First, the withdrawals at issue in this case by their terms do not expire unless Congress so specifies. President Obama expressly prohibited "*any* future oil or gas leasing," with no end-date, making the withdrawals—as far as executive action is concerned—permanent. ER296 (emphasis added); *see id.* (withdrawing parcels "from disposition by leasing for a time period without specific expiration" to "*ensure* that the unique resources" of these areas "remain available for *future generations*" (emphasis added)); ER290 (same); ER289 (similarly withdrawing parcels in light of "important, irreplaceable" marine values, and thereby "prevent[ing] consideration of withdrawn areas for *any* mineral leasing" (emphasis added)).

The Government is wrong to read the phrase "without specific expiration" as indicating that these withdrawals "may expire at any time." Gov't Br. 48. That unsupported interpretation cannot be reconciled with the repeated indications of

permanence in President Obama's withdrawals and supporting explanatory materials. *See supra* 8-9. And it overlooks the harmonious reading that any specifying of expiration dates would be up to Congress.

In short, whether President Obama *could* have specified end-dates in the withdrawals themselves—and whether that would have any effect on President Trump's authority to terminate such withdrawals before their specified end-dates— are questions not before the Court.

Second, the permissible or intended duration of a withdrawal says nothing about who holds the power to rescind it. The Government points to no authority establishing that "temporary" necessarily means "revocable"; in fact, duration and permanence are distinct concepts. Inarguably, the President would have no power to terminate before its end-date a congressionally adopted or mandated time-limited OCS withdrawal. Yet that is the untenable upshot of the Government's argument here: that a time-limited withdrawal is, by definition, inherently revocable without express congressional authorization. Thus, even assuming the Government is correct that Section 12(a) authorizes presidents to issue time-limited withdrawals, it does not follow that presidents may unilaterally revoke existing withdrawals.

At root, whatever kind of withdrawals or reservations Congress authorizes, a President exercising that delegated authority is "without power to revoke or rescind

the reservation" absent explicit congressional authorization. 39 U.S. Op. Att'y Gen. at 187 (explaining that "[t]he grant of a power to execute a trust, even discretionally, by no means implies the further power to undo it"). Here, there was no such authorization.

> c.  *The term "withdraw" does not confer revocation power*

The Government's argument from the "plain meaning" of the word "withdraw" founders on its own evidence. True, in ordinary parlance, the word meant to take back or away, to retract, to withhold, and so on. *See* Gov't Br. 52; *see also supra* 46. Where the Government goes wrong is finding it significant that "[n]one of these definitions establishes that a 'withdrawal' is permanent." Gov't Br. 52. None establishes that withdrawals must be temporary, either. More to the point, the issue in this case is whether presidents can un-withdraw—and therefore, what matters about these definitions is that none establishes that withdrawals are inherently revocable. The Government is thus stuck making the untenable proposition that Congress, by *omitting* the word "permanently," should be read as tacitly *including* the phrase "and may revoke such withdrawals." Congress, though, included neither the word nor the phrase, but said only "withdraw." Hence, per the plain meaning, presidents may take away, retract, withhold, or keep apart portions of the OCS, but nothing more.

The Government's grab-bag of examples is not compelling. Gov't Br. 52-53; *see also* Alaska Br. 14-15. An army may indeed withdraw from a battlefield only to return later. But crucially, both here and on the battlefield, a commander's authorization to withdraw troops does not inherently—or tacitly—convey the authority to return the troops to battle. The Government's banking example assumes the answer. The owner of a bank account has the authority both to deposit and withdraw. A more relevant question here is whether anyone else with authority to do one can also do the other, which would depend entirely on the language of the authorization.

The Government is also flatly mistaken that public land law understands—or in 1953 understood—withdrawals to be inherently temporary. *See* Gov't Br. 54. As noted above, *see supra* 62-64, whether Section 12(a) withdrawals can *ever* be time-limited is a red herring. No consistent view exists in public lands law—nor did exist in the years preceding OCSLA—that withdrawals are necessarily temporary.[12] Were that the understanding, Congress would have had no reason, for

---

[12] Alaska takes a handful of cases out of context to argue that the power to withdraw also includes the power to modify withdrawals. *See* Alaska Br. 16-17. All these cases, however, involved the President's making withdrawals without a statutory basis, and thus have no bearing on what authority Congress intended to convey when it used "withdraw" in a *statute*. *See Sioux Tribe*, 316 U.S. at 324-25; *Midwest Oil*, 236 U.S. at 469; *Grisar v. McDowell*, 73 U.S. 363, 381 (1867); *see also United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 689 (9th Cir. 1976) (acknowledging Congress may limit *Midwest Oil* withdrawals). Alaska's other

example, to specify that the withdrawals governed by the Pickett Act were "temporar[y]" ones. *See supra* 5 (quoting Pub. L. No. 61-303, § 1, 36 Stat. at 847).

While the Tenth Circuit once said in dictum that a withdrawal "temporarily suspends the operation of some or all of the public land laws," Gov't Br. 53, that court's concern was not the duration of the withdrawal, but whether the land was dedicated to a specific public purpose and hence "reserved." *S. Utah Wilderness All. v. Bureau of Land Mgmt. (SUWA)*, 425 F.3d 735, 785 (10th Cir. 2005). The definition of withdrawal advanced in *SUWA* has nothing to do with duration: "withdrawal makes land unavailable for certain kinds of private appropriation under the public land laws." *Id.* at 784. Nor was there, by the time of OCSLA's passage, any consistent distinction left between "withdrawals" and "reservations" as posited in *SUWA*. The Supreme Court noted in 1915 that, as to underlying power, "there is no distinction in principle." *Midwest Oil*, 236 U.S. at 476. And in

---

cases are not persuasive. *United States v. Railroad Bridge Co.*, 27 F. Cas. 686 (C.C.N.D. Ill. 1855) (No. 16,114), is an opinion the Attorney General described as "[i]n conflict with [an] almost unbroken current of legislative and executive action and opinion." 10 U.S. Op. Att'y Gen. 359, 370 (1862). *Illinois Central Railroad v. United States*, 196 1858 WL 4672 (Ct. Cl. 1858), assumed *Railroad Bridge* was correctly decided, and concluded in dictum that even if reservations were implicitly revocable, no revocation occurred. And Alaska's characterization of Section 704(a) of FLPMA misses the mark, Alaska Br. 17, because Congress repealed the Executive's authority to "make" any withdrawals without an express delegation. Pub. L. No. 94-579, § 704(a), 90 Stat. at 2792.

OCSLA itself, while Congress used the term "withdraw" in Section 12(a), it titled the entire Section 12 "Reservations." Pub. L. No. 83-212, § 12(a), 67 Stat. 462, 469 (1953), *codified at* 43 U.S.C. § 1341.[13] It may once have been useful to treat "withdraw" as a specific term for staving off unilateral private acquisition of federal land interests. But in the OCS, no land rush is possible, no purpose would be served by such specialized usage, and nothing turns on whether something is called a withdrawal or a reservation.

The same problems undo the Government's closely related argument that there is a supposed difference between temporary withdrawals for a *purpose* and permanent ones for a specific *use*. Gov't Br. 55-56 (arguing that because Section 12(a) does not authorize designations for a use, withdrawals must be temporary). This is simply the Government's mistaken distinction between withdrawals (for a purpose) and reservations (for a use), half-dressed up in different cloth. And like

---

[13] Other twentieth century statutes and authorities similarly reflect this interchangeable usage. For example, the Federal Water Power Act defined "reservations" as including "lands … withdrawn, reserved, or withheld from private appropriation and disposal." Pub. L. No. 66-280, § 3, 41 Stat. 1063, 1063-64 (1920); *see also* Pub. L. No. 72-403, 47 Stat. 1418 (1933) ("permanently withdrawing" land for Navajo reservation); S. Rep. No. 85-857, at 7 (1957) (Conf. Rep.) (report on statute limiting defense withdrawals noting that "[t]he term 'withdraw' is used interchangeably with the term 'reserve'"). Indeed, a study cited in *SUWA*, 425 F.3d at 784, notes that the Pickett Act's "use of the term 'withdrawal' to embrace 'reservation' … established the present interchangeable usage of these words." Charles F. Wheatley, Jr., *Study of Withdrawals & Reservations of Public Domain Lands* A-4 (1969).

its kin, the Government's proffered purpose-use distinction does not comport with historical practice, including by Attorneys General, who used the terms "purpose" and "use" interchangeably. *See, e.g.*, 36 U.S. Op. Att'y Gen. 75, 76 (1929) (referring to "territories set apart as reservations for various purposes"); 39 U.S. Op. Att'y Gen. 185, 186 (1938) ("public lands … reserved by the President for a particular purpose"); 37 U.S. Op. Att'y Gen. 431, 432 (1934) (President could "withdraw the same land for new uses").

> d. *One-way withdrawals are consistent with OCSLA's purposes*

The Government seeks to buttress its atextual interpretation of Section 12(a) by insisting that Section 12(a) cannot mean what it says because, if so, that would temper OCSLA's pro-development purpose. Gov't Br. 61-69; *see also* API Br. 27-29. In fact, however, that tempering is the point.

Like most statutes, OCSLA seeks to balance a variety of purposes. As the district court noted, "[a]lthough Congress clearly sought more leasing" when it enacted OCSLA, "it did not seek unbridled leasing." ER26 (citation omitted); *see also Gulf Oil Corp. v. Morton*, 493 F.2d 141, 145 (9th Cir. 1973) ("[T]he Act speaks of 'conservation of the natural resources of the outer Continental Shelf,' not just of conservation of oil, gas, sulphur and other mineral resources."). And Congress's subsequent amendments to OCSLA added significant procedural checks on leasing to take into account "environmental values" and to "obtain a

68

proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." Pub. L. No. 95-372, § 208, 92 Stat. at 645-70, *codified at* 43 U.S.C. § 1344(a)(1), (3). Section 12(a)'s delegation of one-way protective authority both gives Section 12(a) meaning independent from Section 8, *see supra* 55, and gives effect to Congress's interest in balancing resource extraction and conservation.

The Government's attempt to erase any protective purpose from Section 12(a) ignores its legislative history and contemporaneous interpretations. During OCSLA's drafting, the Senate specifically deleted language that would have limited presidential withdrawals to national security purposes after receiving a letter from President Eisenhower's Department of Justice stating its view that a national security limitation on withdrawals was "undesirable." Letter from J. Lee Rankin, Asst. Att'y Gen., Office of Legal Counsel, *reprinted in* S. Rep. No. 83-411, at 39; *see supra* 53-54. Congress agreed, ultimately enacting Section 12(a) without that limitation. Consistent with this intention, the first time President Eisenhower exercised his Section 12(a) authority was for a purely conservation-related purpose: to "protect and preserve [a] natural wonder"—coral reefs off Florida's coast—"for the benefit of future generations." ER308.

The Government is also incorrect that because the President might withdraw parts of the OCS to serve as strategic reserves, revocation must be necessary so

that the President may respond to changing energy needs. *See* Gov't Br. 66-68. If a President wants less-permanent conservation of strategic reserves to respond to changing energy needs, Section 8 serves that distinct purpose. *See supra* 55. On the other hand, if a President makes a strategic withdrawal under Section 12(a), that action starts an inter-branch dialogue between Congress and the Executive about the best use of the withdrawn area.

The Government's citations to other statutory provisions relating to energy production only underscore the precision of Congress's delegations. *See* Gov't Br. 67-68. The fact that Congress in Section 12(b) granted the Executive Branch during times of war the right of first refusal to any mineral produced on the shelf shows that Congress envisioned the Executive Branch using *existing* leases to meet emergency needs (rather than new leases on withdrawn areas). 43 U.S.C. § 1341(b). The Government also cites the Strategic Petroleum Reserve, Gov't Br. 67, as an example of the President's authority to increase energy production during emergencies, but the drawdown of that reserve is governed by a carefully circumscribed statutory regime, *see* 42 U.S.C. § 6241(a), (d) (stating the reserve may be drawn down only if the President has made certain findings and "only in accordance with the provisions of this section"). To the extent the Government implies that taking Congress at its word is inconvenient, Congress has shown itself more than capable of acting by statute if its narrow delegations are insufficient.

*See, e.g.*, Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94 § 306, 133 Stat. 2534, 2671 (2019) (authorizing drawdown of the National Petroleum Reserve for this fiscal year only under circumstances not generally authorized by the existing statute).

In short, Section 12(a)'s conferral of one-way protective authority furthers Congress's intention of providing the Executive Branch with complementary tools to balance resource extraction and conservation.

### B.   Extrinsic evidence does not create the revocation power that President Trump claims

#### 1.   Congress has not impliedly conferred revocation authority through acquiescence

Congress has never acquiesced in any presidential assertion of authority to revoke Section 12(a) withdrawals.  It is axiomatic that "[p]ast practice does not, by itself, create power."  *Medellín*, 552 U.S. at 532 (quoting *Dames & Moore*, 453 U.S. at 686).  The President cannot expand the bounds of his statutory authority merely by overstepping those bounds, even repeatedly.  And here, the Government—though it claims otherwise—has managed to find only two occasions over the statute's sixty-seven-year history on which any prior president purported to revoke an existing withdrawal, as President Trump did.  Congress's inaction in the face of such infrequent examples of presidential overreach provides no justification for expanding the statute beyond its text.

71

As an initial matter, the Government's starting proposition that the "practice of the government can inform a court's determination of what the law is," Gov't Br. 69 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 514 (2014)) (quotation marks omitted), is not uniformly true. Past practice can be a useful aid when interpreting the interplay between branches of government in the *absence* of a statute, *see Medellín*, 552 U.S. at 524; *see also Midwest Oil*, 236 U.S. at 471, or when "interpret[ing] … constitutional provisions," *Noel Canning*, 573 U.S. at 524; *see also Mistretta v. United States*, 488 U.S. 361, 401 (1989). But when interpreting a *statute*—like Section 12(a)—the Executive Branch's post-enactment practice is often a poor indicator of Congress's intent. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001) ("Although we have recognized congressional acquiescence to administrative interpretations of a statute in *some* situations, we have done so with extreme care." (emphasis added)); *Zuber v. Allen*, 396 U.S. 168, 185 (1969) ("Legislative silence is a poor beacon to follow in discerning the proper statutory route.").

The general rule is simply put: "Congressional inaction cannot amend a duly enacted statute." *Cent. Bank of Denver*, 511 U.S. at 186 (quotation marks omitted). Congress's failure to correct an executive interpretation of a statute does not ratify that interpretation unless context strongly suggests that Congress's

inaction is informed and deliberate.[14]  Because this case turns on a question of

statutory interpretation, post-enactment executive practice is a poor guide.

Regardless, the Government's submissions here fall well short of the bar for

acquiescence in any context.  When evaluating a claim of acquiescence, courts

look for "a systematic, unbroken, executive practice, long pursued to the

knowledge of the Congress and never before questioned."  *Dames & Moore*, 453

U.S. at 686 (quoting *Youngstown*, 343 U.S. at 610-11); *see also Kent v. Dulles*, 357

U.S. 116, 128 (1958) (declining to "impute to Congress" endorsement of executive

practice that did not evince a "consistent[] … pattern"); *Midwest Oil*, 236 U.S. at

471 (finding acquiescence in light of Executive Branch's "long-continued practice,

known to and acquiesced by Congress," including "at least 252 executive orders

making reservations").  There is nothing remotely like a "systematic, unbroken,"

"long-continued practice" of presidential revocations here.  *Dames & Moore*, 453

U.S. at 686 (quotation marks omitted).

---

[14] *See Bob Jones Univ. v. United States*, 461 U.S. 574, 600-01 (1983)
(acknowledging "[n]on-action by Congress is not often a useful guide," but finding
acquiescence where Congress had "prolonged and acute awareness" of the
agency's policy and "affirmatively manifested its acquiescence" in that policy by
amending the statute in a way that both House and Senate committee reports
confirmed was meant to ratify the agency's policy); *cf. Jama v. ICE*, 543 U.S. 335,
349 (2005) (finding no congressional ratification of judicial interpretation of
statute because "the supposed judicial consensus [was not] so broad and
unquestioned that we must presume Congress knew of and endorsed it").

On the contrary, the Government has identified *only two occasions* since 1953 when a president—other than President Trump—has revoked a Section 12(a) withdrawal. *See* Gov't Br. 70. The first was President George W. Bush's 2007 "[m]odification" of President Clinton's 1998 withdrawal of certain areas of the outer continental shelf. ER300. The second was the same President Bush's 2008 "[m]odification" of additional withdrawn areas. ER299.

No court ever approved of President Bush's modifications. Nor were they supported by any formal Executive Branch opinion deeming them legal. *Cf. NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) (declining to find acquiescence based in part on Executive Branch guidance documents making "conclusory statements about [the statute], with no analysis"). Congress also had no reason to take corrective action "just to make a point about compliance with the statute," *id.*, when its own leasing policies were shifting and happened to align with the President's. *Compare* ER300 (removing North Aleutian Basin planning area and 181 South Area from withdrawal), *and* ER299 (revoking remaining withdrawals), *with* Pub. L. No. 109-54, §§ 104-06, 119 Stat. 499, 521-22 (2005) (not placing North Aleutian Basin planning area under moratoria), *and* Pub. L. No. 109-432 § 103(b), 120 Stat 2922 (2006) (requiring leasing in 181 South Area), *and* Continuing Appropriations Act of 2009, Pub. L. No. 110–329, § 152(a), 122 Stat. 3574, 3581 (2008) (not renewing moratoria). Two isolated assertions—taken by a

74

single president, more than half a century after Section 12(a) was enacted—fall far short of the sort of "systematic, unbroken" practice in which Congress might be deemed to have acquiesced. *Dames & Moore*, 453 U.S. at 686.[15]

The Government tries to pad the numbers, citing President Obama's 2014 memorandum extending his earlier withdrawal of Bristol Bay and calling it a third example of a presidential "revocation." Gov't Br. 49 (citing ER297); *see also* Gov't Br. 72 (claiming to have found "3" presidential modifications in total). It is nothing of the sort. President Obama's 2014 memorandum superseded his earlier, time-limited withdrawal of Bristol Bay, *see* ER 298 (withdrawing Bristol Bay "through June 30, 2017"), and replaced it with a permanent withdrawal, *see* ER297 ("I hereby revoke my memorandum of March 31, 2010" and, in its place, "hereby withdraw from disposition by leasing for a time period without specific expiration … the North Aleutian Basin Planning Area [Bristol Bay]"). Thus, quite unlike President Trump's Order, President Obama's 2014 memorandum did not reopen a single withdrawn acre to leasing. On the contrary, it vindicated Congress's

---

[15] Nor does it matter that Congress amended *other* sections of OCSLA a few years after President Bush's modifications, in 2010 and 2013, while leaving Section 12(a) untouched. *Contra* Gov't Br. 71. "Where, as in the case before us, there is no indication that a subsequent Congress has addressed itself to the particular problem" of presidential withdrawals or revocations, there is no reason to think "that silence is tantamount to acquiescence." *Zuber*, 396 U.S. at 185 n.21.

intention that Section 12(a) withdrawals would remain in place until Congress says otherwise.  President Obama's 2014 memorandum offers no support for President Trump's revocation order here.

Looking even further afield, the Government observes that President George H.W. Bush and President Clinton thrice *described* their own withdrawals as "subject to revocation" in "the interest of national security."  Gov't Br. 48 (citing ER301-05); *see id.* at 70.  Critically, however, neither those presidents nor any others ever made such revocations.  For purposes of deciding whether Congress has acquiesced in a "systematic, unbroken, executive *practice*," *Dames & Moore*, 453 U.S. at 686 (citation omitted) (emphasis added), what matters is what the Executive has *done*—not stray verbiage on which the Executive has never acted. And because, as noted above, a "time-limited" withdrawal is not the same thing as a revocable withdrawal, *see supra* 62-63, the handful of occasions on which presidents have made purportedly time-limited withdrawals under Section 12(a) do not help the Government establish a practice of presidential *revocations*—let alone a systematic, unbroken one.

In sum, the Government has identified only two occasions over the statute's sixty-seven-year history on which a president has purported to undo a withdrawal. The Government cannot cite a single case where Congress has been deemed to have silently acquiesced in so few instances of executive overreach.  *Cf. Midwest*

76

*Oil*, 236 U.S. at 469-70 (finding acquiescence based on the "extent of the practice," including 252 executive orders). Conceding that "the number of express modifications" of Section 12(a) withdrawals is "small," the Government nevertheless contends that it represents "a substantial *fraction* of the total number of withdrawals" made since 1953. Gov't Br. 72 (emphasis added). That misses the point of the acquiescence inquiry. Courts look to the frequency and consistency of executive practice not because an illegal action somehow becomes less illegal the more it is repeated, but because frequency and consistency indicate Congress's awareness and serve as a proxy for its approval—and those are the touchstones of the acquiescence inquiry. *See, e.g.*, *SW Gen.*, 137 S. Ct. at 943; *Kent*, 357 U.S. at 128. The two isolated instances of Executive Branch overreach on which the Government relies here are plainly insufficient to support a finding of acquiescence.

2.    There is no basis for the Government's proffered presumptions in favor of revocation authority

To avoid the conclusion compelled by applying the usual canons of statutory interpretation, the Government urges the Court to apply a variety of extra-textual presumptions in favor of revocation authority. Gov't Br. 57-61; *see also* API Br. 23. But these presumptions do not exist.

77

a. *"National security" and other Article II considerations do not justify deviating from the statutory text*

Although the Government gestures at national security and the President's Vesting Clause power, *see* U.S. Const. art. II, § 1, it never seriously argues that the President has any inherent Article II authority to revoke a Section 12(a) withdrawal. *See* Gov't Br. 57-61. Only API appears to make such an argument, invoking *Youngstown*'s tripartite framework, but failing to identify any specific Article II power authorizing the President's action. *See* API Br. 38 (arguing that "the President's power is at its apex where Congress's express or implied delegation of authority … converges with the President's own constitutional authority").

In fact, to the extent *Youngstown*'s framework applies, the President's action falls under *Youngstown* tier III: presidential revocations are not authorized by Section 12(a) and are therefore "incompatible with the express or implied will of Congress." 343 U.S. at 637 (Jackson, J., concurring). For the President "[t]o succeed in this third category," his "asserted power must be both 'exclusive' and 'conclusive' on the issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2084 (2015) (quoting *Youngstown*, 343 U.S. at 637-38). But here, the President has *no* independent authority. As explained above, the Property Clause commits exclusive control over the management and disposition of the OCS to Congress. *See supra* 3, 44-45.

78

Certainly, the United States' decision to *claim* lands off its coast vis-à-vis other nations has foreign policy implications. *See United States v. Louisiana*, 363 U.S. 1, 35-36 (1960) (describing foreign policy implications of United States claiming the continental shelf); *California*, 332 U.S. at 27 (describing foreign policy implications of claiming lands directly offshore for the United States). Nonetheless, the Supreme Court has made clear that the power to manage or dispose of those lands, once claimed, falls within Congress's Property Clause authority "without limitation." *Alabama v. Texas*, 347 U.S. 272, 273-74 (1954) (per curiam). Thus, whatever foreign affairs power the President has in this area, it does not include power over the *disposition* of land or resources, which belongs solely to Congress. *See California*, 332 U.S. at 27 ("[N]either the courts nor the executive agencies[] [can] proceed contrary to an Act of Congress in this congressional area of national power.").

The Government does not attempt to dispute those bedrock principles. Yet it tries indirectly to subvert them, urging the Court to presume that when Congress "restrict[s] or regulat[es] presidential action, it must make its intent clear," and that silence must be construed in the President's favor. Gov't Br. 58. There is no basis for such a presumption.

Most fundamentally, this case is about the scope of *delegated* authority. There is no doubt that Congress has the power to make a one-way delegation of its

79

own authority if it so chooses. Courts, though, do not presume that Congress, having delegated a specific power, must also have delegated its opposite. *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) ("[W]e will not presume a delegation of power based solely on the fact that there is not an express withholding of such power."). Simply put, the scope of a delegation is whatever Congress says it is. *See Gorbach*, 219 F.3d at 1095 ("Whether the Attorney General can undo what she has the power to do, naturalize citizens, depends on whether Congress said she could.").

Because Congress has complete discretion over whether and to what extent it delegates its Property Clause power, its decision to retain control over the revocation of withdrawals is not properly characterized as a limitation on *presidential* action, as the Government would have it, Gov't Br. 58, but as a limitation on the delegation of *Congress's* own authority. The Government therefore errs in its reliance on *Armstrong v. Bush*, in which the D.C. Circuit explained why the APA did not authorize judicial review of the President's compliance with the Presidential Records Act. 924 F.2d 282, 289 (D.C. Cir. 1991). It was in this context that the court held Congress "must make its intent clear" when "enact[ing] legislation restricting or regulating presidential action." *Id. Armstrong* said nothing about how to interpret Congress's *delegation* of its *own* power to the Executive Branch.

Moreover, even when acting pursuant to their own Article II authority, there is nothing anomalous about presidents taking actions that bind their successors. *Contra* Gov't Br. 59. The President has the "power to decide" whether to pardon someone; he has no power to "unpardon" someone if he later changes his mind. *See* U.S. Const. art. II, § 2. The President has the "power to decide" whether to sign legislation passed by Congress; he does not have the power to reconsider that choice or to recall and veto a law that has already been signed. *See* U.S. Const. art. I, § 7; *Clinton v. City of New York*, 524 U.S. at 439 (President has no power to repeal duly enacted statute). The Government thus overstates its case when it posits a general "reconsideration power, like the power to remove executive officers … intrinsic in the 'executive Power' vested by Article II, Section 1, Clause 1." Gov't Br. 60. The appointment and removal of inferior officers is a constitutionally conferred executive power, and caselaw interpreting its scope does not suggest any freestanding general reconsideration authority. As the Supreme Court has explained, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter. Fund*, 561 U.S. at 492 (quotation marks omitted).[16]

---

[16] API selectively quotes *Myers v. United States* to argue that revocation authority must be presumed "as a rule of constitutional and statutory construction," API Br. 23 (quoting *Myers v. United States*, 272 U.S. 52, 119 (1926)), but the Supreme

A tangential relationship to "[national] security and foreign relations" does not change the analysis, or support the presumption that Congress must have intended for the President to have "maximum flexibility." Gov't Br. 57. In *Youngstown*, the Supreme Court rejected the Government's arguments in a context not unlike this one: Congress had authorized the President to seize certain types of property "under certain conditions," but President Truman, invoking national security concerns, ordered the seizure of steel mills in the absence of such conditions. *Youngstown*, 343 U.S. at 585-86. Under the Government's reasoning here, President Truman's seizure order would have been lawful because Congress had not *expressly* forbidden the President's action, and the President had a national security rationale. The Supreme Court, of course, found that the President's "seizure order cannot stand." *Id*. at 589. Applying no presumption in favor of flexibility, the Court concluded that Congress meant what it said and limited seizures to those authorized by statute. *See id.* at 585-88; *see also id.* at 639 (Jackson, J., concurring) (explaining Congress did not "le[ave] seizure of private property an open field but has covered it by three statutory policies inconsistent with [President Truman's] seizure"). The same is true here.

---

Court was referring only to the specific context of "the power of removal of executive officers … incident to the power of appointment," *Myers*, 272 U.S. at 119. The Court did not announce a general principle of presidential authority.

        b.     *Cases involving administrative adjudication do not
              justify deviating from the statute's text*

Nor is there any basis for the Government's contention that whenever

Congress delegates authority to do something, it "presum[ptively]" delegates

revocation authority too. Gov't Br. 55; *see id.* at 54-55, 61; API Br. 23-24. For

support, the Government looks to the context of agency adjudications, where

courts have held—guided by the competing considerations of due process and legal

repose—that executive agencies tasked with adjudicative functions generally may

correct ministerial errors in their decisions within a short time unless Congress

specifies otherwise.

President Trump's Order was not, of course, an agency adjudication, or

anything like it. But even where this principle does apply, it authorizes agencies

only to correct errors—not to re-do past decisions based on changed policy

priorities. *See Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360,

1362 (Fed. Cir. 2008) (reconsideration based on "newly revealed information of

[party's] fraudulent conduct, which raised questions about the integrity of the

original proceedings"). As the Supreme Court has explained, any "power to

correct inadvertent ministerial errors may not be used as a guise for changing

previous decisions because the wisdom of those decisions appears doubtful in light

of changing policies." *Am. Trucking Ass'ns v. Frisco Transp. Co*., 358 U.S. 133,

145-46 (1958); *see also Seatrain Lines*, 329 U.S. at 428-29 (agency could not

83

appeal to any inherent reconsideration authority where "the proceedings apparently were not reopened to correct a mere clerical error but were more likely an effort to revoke or modify substantially Seatrain's original certificate under the [agency's] new policy"). And a change in "policy" priorities—not the desire to correct ministerial errors—was precisely the reason for President Trump's Order here. *See* ER285 (announcing new "policy" of "encourag[ing] energy exploration and production").[17]

Moreover, even where this principle applies, it allows for error correction only within a short time, typically measured in days or weeks. The Government cites no support for the proposition that an agency could re-open an adjudication long after the fact. *Cf. Macktal v. Chao*, 286 F.3d 822, 826 (5th Cir. 2002) (reconsideration within roughly one month of original determination); *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980) (reconsideration "well within 90 days" of original determination). The Government cites *Albertson v. FCC* for the proposition that the "power to reconsider is inherent in the power to decide," Gov't Br. 54 (quoting *Albertson*, 182 F.2d 397, 399 (D.C. Cir. 1950)), but omits the holding being explained: "the authority of the Commission to hear and

---

[17] Notably, while it is true that executive agencies may, based on policy choices properly explained, modify or repeal rules promulgated under the APA, that is because, in passing the APA, Congress expressly defined rulemaking to include "formulating, *amending*, or *repealing* a rule." 5 U.S.C. § 551(5) (emphasis added).

determine matters … carries with it by implication the authority to reconsider … within the twenty days allowed for appeal." *Albertson*, 182 F.2d at 399.  None of the out-of-circuit agency adjudication cases on which the Government relies provides support for President Trump's Order here.

In sum, Congress deliberately chose to limit the President's withdrawal authority to a one-way power.  The plain language of Section 12(a), the provision's context within the statute and history of land law, and OCSLA's purpose all point to the same result.  Examining these indications of Congress's intent, the district court correctly held that the President acted without statutory or constitutional authority when he revoked the permanent protections for the Arctic and Atlantic OCS.

## III.  The Government's challenge to the district court's narrow remedy is without merit

The district court did not issue an injunction, either against the President (which the League did not seek) or against the agency heads responsible for implementing his Order.  Having found Section 5 of the Order to be "unlawful, as it exceeded the President's authority under Section 12(a) of OCSLA," ER30, the district court properly vacated it, ER32.  The Government's challenge to the district court's remedy is without merit.

Vacatur of an executive order is not "essentially the equivalent of" an injunction "against the President," as the Government asserts.  Gov't Br. 43.

85

Consistent with the League's requested remedy, *see* ER332-33, the district court did not order that the *President personally* take or refrain from taking any action at all. And the district court's own statement that "injunctive relief is not warranted at this time" against any party shows that it did not grant such relief. ER31.

Instead, vacatur here functions as a narrowly targeted remedy, affecting only agency officials' implementation of a portion of an executive order that has been found unlawful. It neither bars, nor directs, nor otherwise affects prospective action by the President any more than declaratory relief does. The Supreme Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law" and to issue appropriate relief. *Clinton v. Jones*, 520 U.S. at 703 (citing, inter alia, *Youngstown*, 343 U.S. at 579); *see supra* 39-40.

The cases on which the Government relies, Gov't Br. 43-44, are consistent with the conclusion that relief like the vacatur order here, affecting only the Order's implementation by inferior officials, is appropriate. Indeed, in many of these cases, the courts went further and approved of granting injunctive relief binding government officials. The Supreme Court plurality in *Franklin* acknowledged that issuing "injunctive relief against executive officials" charged with carrying out a presidential order "is within the courts' power." 505 U.S. at 802 (citing *Youngstown*, 343 U.S. at 579); *accord id.* at 828 (Scalia, J., concurring

86

in part and concurring in the judgment) (agreeing that "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive"). *Swan v. Clinton* likewise confirmed that "it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments," and that "[i]n most cases … the injury at issue can be rectified by injunctive relief against subordinate officials." 100 F.3d 973, 978 (D.C. Cir. 1996) (citing *Franklin*, 505 U.S. at 803). Similarly, in *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 540-41 (D.D.C. 2018), the court declined to grant relief "directly against the President" and dismissed him as a party, *id.*, because it found that the plaintiffs could still "obtain all of the relief they seek from other Defendants," *id.* at 542.[18] And in *Youngstown*, while the steel mills named only the Secretary of Commerce as a defendant, the heart of their claim was that "the orders of the President and Secretary [were] invalid." 343 U.S. at 583-84. The Court agreed, *id.* at 587, and affirmed the district court's issuance of a preliminary injunction against the Secretary, *id.* at 584.

---

[18] *Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005), *see* Gov't Br. 43, cannot be read broadly to provide presidential immunity from declaratory relief. The district court's refusal to issue a declaratory judgment against the President in that case followed from its conclusion that, in the context of a motion for preliminary injunction, a declaratory judgment would not provide meaningful relief. *Id.* at 281.

Here, the district court did not go so far as to grant the League's request for an injunction against the Secretaries. It counted on the invalidation of Section 5 of the Order as sufficient to protect the League's interests. ER31 ("injunctive relief is not warranted at this time"). Its decision to invalidate the President's order is akin to the Supreme Court's determination in *Youngstown* that "this seizure order cannot stand," 343 U.S. at 589, and less intrusive than the injunction *Youngstown* upheld.

There is nothing about such a vacatur of an illegal executive order that should "raise[] judicial eyebrows." *Franklin*, 505 U.S. at 802 (plurality op.). Accordingly, this Court has previously struck down executive orders as impermissible exercises of presidential power. *See Matter of Reyes*, 910 F.2d 611, 614 (9th Cir. 1990) (affirming district court's judgment "striking" an executive order that exceeded the President's statutory authority). And in *San Francisco v. Trump*, this Court held "unconstitutional" an executive order directing executive officials "in the absence of congressional authorization" to withhold federal funds from sanctuary jurisdictions, and "agree[d] that the [plaintiffs] are entitled to an injunction" operating against agency officials charged with implementing that order. *San Francisco*, 897 F.3d at 1245. The Court disagreed only as to the "nationwide" scope of the district court's injunction, and it remanded on that basis. *Id.* On remand, the Government stipulated that "[t]he enforcement of Section 9 [of

the executive order] within the State of California is hereby enjoined." Stipulation and Final Judgment and Order ¶ 3, ECF No. 206, *City & Cty. of San Francisco v. Trump*, No. 3:17-cv-00574-WHO (N.D. Cal. Aug. 23, 2019). If that relief—of which this Court approved, and to which the Government acceded—presented no separation of powers concerns, then neither does the district court's more limited vacatur here.

The district court, citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010), chose vacatur as a remedy specifically because it is less intrusive than injunctive relief and should be sufficient to redress the League's injury. ER31 n.99. While *Monsanto* involved agency action under the APA, Gov't Br. 44-45, the Court's conclusion that vacatur is less drastic than injunctive relief, *Monsanto*, 561 U.S. at 165-66, should apply equally in the context of an executive order.

Should this Court have any concern about the propriety of vacatur in this case, a declaratory judgment and an injunction against the Secretaries would likely be sufficient, too. But there is no merit whatsoever to the Government's objection that vacatur "violated the separation of powers." Gov't Br. 45. The district court did not, either in form or in effect, issue relief against the President personally. Its decision simply to vacate Section 5 of the Order was entirely within its power.

89

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.

February 13, 2020

Respectfully submitted,

/s/ Nathaniel S.W. Lawrence

| | |
|---|---|
| Erik Grafe | Nathaniel S.W. Lawrence |
| Earthjustice | Natural Resources Defense Council |
| 441 West 5th Avenue, Suite 301 | 3723 Holiday Drive, SE |
| Anchorage, AK 99501 | Olympia, WA 98501 |
| T: 907.792.7102 | T: 360.534.9900 |
| E: egrafe@earthjustice.org | E: nlawrence@nrdc.org |
| | |
| Eric P. Jorgensen | Katherine Desormeau |
| Earthjustice | Natural Resources Defense Council |
| 325 Fourth Street | 111 Sutter Street, 21st Floor |
| Juneau, AK 99801 | San Francisco, CA 94104 |
| T: 907.586.2751 | T: 415.875.6100 |
| E: ejorgensen@earthjustice.org | E: kdesormeau@nrdc.org |
| | |
| Nancy S. Marks | Jacqueline M. Iwata |
| Natural Resources Defense Council | Natural Resources Defense Council |
| 40 West 20th Street, 11th Floor | 1152 15th Street, NW, Suite 300 |
| New York, NY 10011 | Washington, DC 20005 |
| T: 212.727.2700 | T: 202.289.2377 |
| E: nmarks@nrdc.org | E: jiwata@nrdc.org |

*Counsel for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees are not aware of any cases in this Court that are related within the meaning of Circuit Rule 28-2.6.

February 13, 2020          /s/ *Nathaniel S.W. Lawrence*
                                        Nathaniel S.W. Lawrence

# STATUTORY ADDENDUM

## Statutory Addendum

Except for the following, all applicable statutes and constitutional provisions are contained in the briefs and addenda of Federal Appellants and Intervenor-Appellants.

## Table of Contents

Outer Continental Shelf Lands Act (OCSLA) Section 8,
    Pub. L. 83-212, § 8, 67 Stat. 462, 468 (1953) ...................................... ADD 1

Outer Continental Shelf Lands Act (OCSLA) Section 13,
    Pub. L. 83-212, § 13, 67 Stat. 462, 470 (1953) .................................... ADD 3

**OCSLA, Pub. L. 83-212, § 8, 67 Stat. 462, 468 (1953)**

   **Sec. 8. LEASING OF OUTER CONTINENTAL SHELF.—** (a) In order to
meet the urgent need for further exploration and development of the oil and gas
deposits of the submerged lands of the outer Continental Shelf, the Secretary is
authorized to grant to the highest responsible qualified bidder by competitive
bidding under regulations promulgated in advance, oil and gas leases on
submerged lands of the outer Continental Shelf which are not covered by leases
meeting the requirements of subsection (a) of section 6 of this Act. The bidding
shall be (1) by sealed bids, and (2) at the discretion of the Secretary, on the basis of
a cash bonus with a royalty fixed by the Secretary at not less than 12y2 per centum
in amount or value of the production saved, removed or sold, or on the basis of
royalty, but at not less than the per centum above mentioned, with a cash bonus
fixed by the Secretary.

   (b) An oil and gas lease issued by the Secretary pursuant to this section shall (1)
cover a compact area not exceeding five thousand seven hundred and sixty acres,
as the Secretary may determine, (2) be for a period of five years and as long
thereafter as oil or gas may be produced from the area in paying quantities, or
drilling or well reworking operations as approved by the Secretary are conducted
thereon, (3) require the payment of a royalty of not less than 121/2 per centum, in
the amount or value of the production saved, removed, or sold from the lease, and
(4) contain such rental provisions and such other terms and provisions as the
Secretary may prescribe at the time of offering the area for lease.

   (c) In order to meet the urgent need for further exploration and development of
the sulphur deposits in the submerged lands of the outer Continental Shelf, the
Secretary is authorized to grant to the qualified persons offering the highest cash
bonuses on a basis of competitive bidding sulphur leases on submerged lands of
the outer Continental Shelf, which are not covered by leases which include sulphur
and meet the requirements of subsection (a) of section 6 of this Act, and which
sulphur leases shall be offered for bid by sealed bids and granted on separate leases
from oil and gas leases, and for a separate consideration, and without priority or
preference accorded to oil and gas lessees on the same area.

   (d) A sulphur lease issued by the Secretary pursuant to this section shall (1)
cover an area of such size and dimensions as the Secretary may determine, (2) be
for a period of not more than ten years and so long thereafter as sulphur may be
produced from the area in paying quantities or drilling, well reworking, plant
construction, or other operations for the production of sulphur, as approved by the

Secretary, are conducted thereon, (3) require the payment to the United States of such royalty as may be specified in the lease but not less than 5 per centum of the gross production or value of the sulphur at the wellhead, and (4) contain such rental provisions and such other terms and provisions as the Secretary may by regulation prescribe at the time of offering the area for lease.

(e) The Secretary is authorized to grant to the qualified persons offering the highest cash bonuses on a basis of competitive bidding leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf not then under lease for such mineral upon such royalty, rental, and other terms and conditions as the Secretary may prescribe at the time of offering the area for lease.

(f) Notice of sale of leases, and the terms of bidding, authorized by this section shall be published at least thirty days before the date of sale in accordance with rules and regulations promulgated by the Secretary.

(g) All moneys paid to the Secretary for or under leases granted pursuant to this section shall be deposited in the Treasury in accordance with section 9 of this Act.

(h) The issuance of any lease by the Secretary pursuant to this Act, or the making of any interim arrangements by the Secretary pursuant to section 7 of this Act shall not prejudice the ultimate settlement or adjudication of the question as to whether or not the area involved is in the outer Continental Shelf.

(i) The Secretary may cancel any lease obtained by fraud or mis- cancellation, representation.

(j) Any person complaining of a cancellation of a lease by the Secretary may have the Secretary's action reviewed in the United States District Court for the District of Columbia by filing a petition for review within sixty days after the Secretary takes such action.

ADD 2

**OCSLA, Pub. L. 83-212, § 13, 67 Stat. 462, 470 (1953)**

    **Sec. 13. NAVAL PETROLEUM RESERVE EXECUTIVE ORDER REPEALED.**—Executive Order Numbered 10426, dated January 16, 1953, entitled "Setting Aside Submerged Lands of the Continental Shelf as a Naval Petroleum Reserve", [*sic*] is hereby revoked.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 19-35460, 19-35461, and 19-35462

I am the attorney or self-represented party.

**This brief contains 20,968 words,** excluding the items exempted by Fed. R. App. P. 32(f) and Circuit Rule 28-2.6. The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[x] complies with the length limit designated by court order dated September 3, 2019.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ Nathaniel S.W. Lawrence_ **Date:** February 13, 2020
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                       *Rev. 12/01/18*