**No. 19-35460**
**(Consolidated with Nos. 19-35461 and 19-35462)**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

LEAGUE OF CONSERVATION VOTERS, *et al.*,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Alaska
No. 3:17-cv-00101 (Hon. Sharon L. Gleason)

**SUPPLEMENTAL EXCERPTS OF RECORD FOR**
**PLAINTIFFS-APPELLEES**
**LEAGUE OF CONSERVATION VOTERS, ET AL.**

Erik Grafe
Earthjustice
441 West 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102
E: egrafe@earthjustice.org

Eric P. Jorgensen
Earthjustice
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Katherine Desormeau
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
T: 415.875.6100
E: kdesormeau@nrdc.org

*Counsel for Plaintiffs-Appellees*
*League of Conservation Voters et al.*

***Additional counsel for Plaintiffs-Appellees League of Conservation Voters et al.*:**

Jacqueline M. Iwata
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
T: 202.289.2377
E: jiwata@nrdc.org

Nancy S. Marks
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
T: 212.727.2700
E: nmarks@nrdc.org

## INDEX

| Filing Date | ECF | Document | Page |
|---|---|---|---|
| 6/08/2018 | 51-5 | The White House, Fact Sheet: President Obama Protects 125 Million Acres of the Arctic Ocean (Dec. 20, 2016). | 1 |
| 6/08/2018 | 51-6 | The White House, Fact Sheet: Unique Atlantic Canyons Protected from Oil and Gas Activity (Dec. 20, 2016). | 9 |
| 6/08/2018 | 51-8 | Bureau of Ocean Energy Management (BOEM), 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program Lease Sale Schedule. | 13 |
| 6/08/2018 | 51-9 | BOEM, 2012-2017 Outer Continental Shelf Oil and Gas Leasing Program Lease Sale Schedule. | 14 |
| 6/08/2018 | 51-10 | BOEM, Alaska Lease Sales. | 15 |
| 6/08/2018 | 51-11 | BOEM, Alaska Geologic & Geophysical Exploration Permits. | 16 |
| 6/08/2018 | 51-15 | National Marine Fisheries Service (NMFS), Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Marine Seismic Survey in the Beaufort and Chukchi Seas, Alaska, Notice and Issuance of an Incidental Take Authorization (Oct. 24, 2012). | 18 |
| 6/08/2018 | 51-17 | G. Dellagiarino *et al.*, Geological & Geophysical Data Acquisition: Outer Continental Shelf Through 2004-2005, OCS Report MMS 2007-049 (2007). | 50 |
| 6/08/2018 | 51-18 | K. Ray & P. Godfriaux, Geological & Geophysical Data Acquisition: Outer Continental Shelf Through 2016, OCS Report BOEM 2017-02 (2017). | 59 |
| 6/08/2018 | 51-19 | NMFS, Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement (Oct. 2016). | 67 |

| 6/08/2018 | 51-20 | International Association of Geophysical Contractors, News Release, IAGC Applauds Administration's First Step to Expand Offshore Exploration, Streamline Seismic (Apr. 28, 2017). | 159 |
|---|---|---|---|
| 6/08/2018 | 51-38 | BOEM, Atlantic OCS Proposed Geological and Geophysical Activities, Mid-Atlantic and South Atlantic Planning Areas, Final Programmatic Environmental Impact Statement, OCS EIS/EA BOEM 2014-001 (2014). | 161 |
| 5/11/2018 | 49 | Federal Defendants' Answer to Plaintiffs' Complaint for Declaratory and Injunctive Relief. | 174 |
| 7/28/2017 | 26 | API Answer to Plaintiffs' Complaint for Declaratory and Injunctive Relief. | 191 |

**FACT SHEET: President Obama Protects 125 Million Acres of the Arctic Ocean**

Today, President Obama designated portions of the United States' Arctic Ocean as indefinitely off limits for future oil and gas leasing. The new withdrawal – which encompasses the entire U.S. Chukchi Sea and the vast majority of the U.S. Beaufort Sea – will provide critical protection for the unique and vibrant Arctic ecosystem which is home to marine mammals and other important ecological resources and marine species, and upon which many Alaska Native communities depend. Including this action, nearly 125 million acres in the Arctic have been protected from future oil and gas activity since 2015.

Today's action comes in conjunction with Canada's announcement that it will freeze offshore oil and gas leasing in its Arctic waters, to be reviewed every five years through a climate and marine science-based assessment .

**Presidential Arctic Outer Continental Shelf Withdrawal**

Using his authority under the Outer Continental Shelf Lands Act – an authority used by Presidents of both parties to withdraw areas from oil and gas leasing, exploration, and development – the President has made the Chukchi Sea Planning Area and the vast majority of the Beaufort Sea Planning Area off limits to future oil and gas leasing to protect the fragile ecosystem of this area. This action, as recommended by Secretary Jewell, is based on several factors, each of which separately would be sufficient to support the action:

- The U.S. Arctic is a unique, vibrant, and vulnerable ecosystem that is home to several Federally listed and candidate species under the Endangered Species Act, including iconic and culturally valuable species, and upon which many Alaska Native communities rely for subsistence use and cultural traditions;
- Even recognizing the substantial steps taken by this Administration to improve the safety of potential Arctic exploration and development, there would still be significant risks associated with offshore drilling operations given that the U.S. Arctic is characterized by harsh environmental conditions, geographic remoteness, and a relative lack of fixed infrastructure and existing oil and gas operations. The consequences of an oil spill in this region could be substantially detrimental to the ecosystem;

Considering these factors, the risks associated with oil and gas activity in remote and harsh Arctic environments are not worth taking when the United States has ample energy sources near existing infrastructure elsewhere. Furthermore, while the withdrawal area does contain oil and gas resources, if oil prices remain at current levels, production of these resources would be cost-prohibitive and would not take place. Even if oil prices were more than 200 percent above their current level, production of these resources would not take place for 10-50 years because of the lead time associated with exploration and development activities.

This action is consistent with the steps the United States and the international community will take in the coming decades to transition energy systems away from fossil fuels – particularly because any potential significant Arctic offshore production would only occur around the middle

of this century, a timeline that is incongruous with our nation's need and international commitments to reduce carbon emissions.

The withdrawal would not affect a nearshore area of the Beaufort Sea, totaling 2.8 million acres, that has high oil and gas resource potential and is adjacent to existing state oil and gas activity and infrastructure. While there are significant concerns about oil and gas activity occurring in this area, it will be subject to additional evaluation and study to determine if new leasing could be appropriate at some point in the future. The five year leasing program for 2017-2022 issued by the Department of the Interior does not include lease sales in the Arctic.

## Ecological Value and Fragility of the United States' Arctic

The U.S. Arctic Ocean possesses unique physical and ecological characteristics. The movement and presence of sea ice is a dominant feature of the Arctic seascape and impacts the physical, biological, and cultural aspects of life in the area. Seasonal pack ice moves south into the region during the winter months when it is dark from mid-November to mid-January. Sea ice covers the Beaufort Shelf for about nine months of the year and reaches its maximum extent in March. Landfast ice (ice that forms adjacent to and extends from the land) starts to form in October and can extend up to 25 miles from shore. The pack ice retreats during the summer, reaching its minimum extent in September. The Arctic OCS is known for its ice-associated animals, including several species of seals, Pacific walrus, polar bears, and more than 98 species of fish. Other marine mammal species, including a number of whale species, occur in the area. Many bird species are found on the shore and in the waters above the Arctic OCS, including waterfowl (e.g., eiders, long-tailed duck, and geese) and shorebirds such as the red-necked phalarope. The Beaufort and Chukchi Seas are home to several Federally listed and candidate species under the Endangered Species Act, including the bowhead whale, fin whale, Pacific walrus, polar bear, spectacled eider, and Steller's eider.[1] These two seas include extensive polar bear critical habitat designated under the Endangered Species Act.[2] Designated critical habitat for the threatened spectacled eider occurs on the Chukchi Sea coast of Alaska. In addition, the U.S. Fish and Wildlife Service (FWS) has designated portions of the Hanna Shoal region in the Chukchi Sea as a core use area for Pacific walrus (a candidate species for listing), known as the Hanna Shoal Walrus Use Area.[3] Many of these species, including bowhead, beluga and gray whales, walrus and polar bears use large portions of the withdrawn area for feeding, resting, and migration.[4]

---

[1] U.S. Fish and Wildlife Service. 2014. Endangered, Threatened, Proposed, Candidate, and Delisted Species in Alaska (Updated May 13, 2014). Available online at: https://www.fws.gov/alaska/fisheries/endangered/pdf/consultation_guide/4_species_list.pdf. Accessed December 9, 2016.

[2] 75 FR 76086. Endangered and threatened wildlife and plants; designation of critical habitat for the polar bear (*Ursus maritimus*) in the United States. Available online at https://www.regulations.gov/contentStreamer?documentId=FWS-R7-ES-2009-0042-0252&disposition=attachment&contentType=pdf. Accessed December 9, 2016.
U.S. Fish and Wildlife Service. Marine Mammals Management. Polar bear information and maps available online at https://www.fws.gov/alaska/fisheries/mmm/polarbear/esa.htm. Accessed December 9, 2016.

[3] 78 FR 35364. Marine mammals; incidental take during specified activities. Available online at https://www.fws.gov/alaska/fisheries/mmm/polarbear/pdf/78_FR_35364_%20June_12_2013.pdf. Accessed December 9, 2016.
U.S. Fish and Wildlife Service information and map of Hanna Shoal Walrus Use Area available online at https://www.fws.gov/alaska/fisheries/mmm/polarbear/mmm/itr_chukchi.htm. Accessed December 9, 2016.
Jay, C.V., A.S. Fischbach, and A.A Kochnev. 2012. Walrus areas of use in the Chukchi Sea during sparse sea ice cover. Marine Ecology Progress Series 468:1-13.
MacCracken, J.G. 2012. Pacific walrus and climate change: observations and predictions. Ecology and Evolution 2(8): 2072-20890.

[4] Clarke, J.T., M.C. Ferguson, C. Curtice, and J. Harrison. 2015. Biologically important areas for cetaceans within U.S. waters – Arctic Region. Aquatic Mammals 41(1): 94-103. DOI:10.1578/AM.41.1.2015.94.

The land areas adjacent to the Arctic OCS are sparsely populated, but Alaska Native communities of the North Slope depend largely on the natural environment, especially the marine environment, for food and materials. The environment is integrally linked with the cultural and spiritual values of these communities. Each year, Native communities across northern Alaska participate in a bowhead whale hunt that is central to their cultural tradition and vital for subsistence.

The recently completed 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program and accompanying Programmatic Environmental Impact Statement (PEIS) both highlight the unique nature of the entirety of the U.S. Arctic, while also identifying and analyzing Environmentally Important Areas (EIAs). The EIAs, developed during the analysis process for the 2017-2022 Oil and Gas Leasing Program, represent regions of especially important environmental value where there is potential for conflict between ecologically important or sensitive habitats; maintenance of social, cultural, and economic resources; and possible oil and gas development. The identification and analysis of two EIAs in the Chukchi Sea and four in the Beaufort Sea demonstrate the interconnectedness of this ecosystem, as the ecologically significant resources within the EIAs could be dramatically impacted by activities outside of those areas. The potential for broad scale impacts to the region is especially true in the case of an oil spill where the scale of impact will be enhanced due to the uniqueness of the environment and difficulties associated with spill response, mitigation, and restoration in the remote Arctic environment. Finally, many of the species and ecosystem components are not limited to the EIAs themselves, which, while examples of valuable habitat, cannot account for species migrations and potential long term shifts in species' behaviors and locations associated with climate change. Thus, although the EIAs identify and assess regions of especially important environmental value with ecologically important or sensitive habitats and/or subsistence and cultural value for the local communities, the resources within those areas are vulnerable to activities that occur outside of them and these resources exist broadly across the area being identified for withdrawal. Comprehensive protection of the area is warranted, as limiting protection to the EIAs would fail to protect ecosystem function and services critical to the region. Additionally, a larger footprint is appropriate to account for the way in which oil could spread, if a spill were to occur, as the EIAs themselves will not adequately protect important species.[5] A brief description of the ecologically significant characteristics of the areas proposed to be withdrawn is provided below.

In addition, climate change-induced temperature increases are occurring fastest in polar regions, including the U.S. Arctic, resulting in a disproportionate amount of changes to the physical, biological, and chemical environments, such as alteration of species distribution, reduction in seasonal ice cover, and loss of permafrost. Loss of sea ice coverage reduces the available habitat

U.S. Fish and Wildlife Service. 2014. Pacific Walrus (*Odobenus rosmarus divergens*): Alaska Stock. Stock Assessment Report, revised April 2014. Available online at https://www.fws.gov/alaska/fisheries/mmm/stock/Revised_April_2014_Pacific_Walrus_SAR.pdf.

U.S. Fish and Wildlife. 2015. Polar Bear (*Ursus maritimus*) Conservation Management Plan, Draft. U.S. Fish and Wildlife, Region 7, Anchorage, Alaska. 59 pp.

[5] Payne, J.R., G.D. McNabb Jr., and J.R. Clayton Jr. 1991. Oil weathering behavior in Arctic environments. Pp. 631-662 IN: Sakshaug, E., C.C.E. Hopkins, and N.A. Britsland (eds.): Proceedings of the Pro Mare Symposium on Polar Marine Ecology. Trondheim. 12-16 May 1990. Polar Research IO(2).

Buist, I., R. Belore, D. Dickins, D. Hackenberg, A. Guarino and Z. Wang. 2008. Empirical Weathering Properties of Oil in Ice and Snow. Anchorage, Alaska. OCS Study MMS 2008-033. 154 pp.

Bureau of Ocean Energy Management. 2016. Final Programmatic Environmental Impact Statement, Outer Continental Shelf Oil and Gas Leasing Program: 2017-2022. OCS EIS/EA BOEM 2016-060. BOEM, Headquarters, Sterling, VA.

for ice-dependent species such as seals, polar bears, and Pacific walrus. Such conditions and stressors may increase the vulnerability of these species and habitat and reduce their resilience to impacts of oil and gas activities.

*Chukchi Sea*

The Chukchi Sea Planning Area includes important habitat for marine mammals, birds, fish, and other animals. The coastal region of this area is covered in sea ice from winter through early summer; breaks and openings in this ice provide habitat for whales migrating from the Bering Sea up into the Chukchi and Beaufort Seas during the spring and summer and back south in the fall. Walrus and ice seals use this area and are taken by Native Alaska subsistence hunters as a source of food and materials. Many species of birds follow this system of ice north from the Bering Sea into the Arctic waters and inland to habitats along the North Slope. During the summer, walrus use the coastal and offshore areas of the Chukchi Sea extensively as they move between the coast and the areas where they feed in the vicinity of the existing Hanna Shoal Presidential Withdrawal area. There are areas of designated "essential fish habitat" within the Chukchi Sea Planning Area and large portions of the Chukchi have been designated as critical habitat for the polar bear under the Endangered Species Act.

Two EIAs were identified in the 2017-2022 Five Year Program PEIS, the Walrus Foraging Area and the Walrus Movement Corridor. The Walrus Foraging Area EIA surrounds the current Hanna Shoal Presidential Withdrawal and includes the FWS-designated Hanna Shoal Walrus Use Area (HSWUA); the Walrus Movement Corridor EIA includes an area between the Hanna Shoal Presidential Withdrawal and the existing Chukchi Corridor Presidential Withdrawal and captures portions of the area walruses use to transit from nearshore and onshore haul out areas and feeding areas in and around the existing Hanna Shoal Presidential Withdrawal. The FWS HSWUA designation is based on walrus tagging studies conducted by the U.S. Geological Survey that have tracked walrus movements and identified foraging and resting habitat. The Foraging Area includes habitat that is critical for the Pacific walrus, including areas of high benthic biomass within shallow waters where sea ice persists into the summer. Walruses forage in this area from June to October and can occur in high numbers. This area also includes areas of high biological productivity that serve the foraging needs of other marine mammals. [6] These EIAs underscore the vulnerability of the Chukchi Sea Planning Area and while withdrawing these areas alone would help protect some ecological resources, it would not reduce all risks to these important areas. Fully protecting these areas, the migration pathways between them, and accounting for long term shifts as a result of climate change will ensure that the EIAs, the previous Chukchi Sea Presidential Withdrawal, and areas critical to essential marine life and subsistence activities will be protected from risks associated with mineral leasing.[7]

---

[6] Jay, C.V., et al. 2014:1-13.

[7] Bureau of Ocean Energy Management. 2016. Final Programmatic Environmental Impact Statement, Outer Continental Shelf Oil and Gas Leasing Program: 2017-2022. OCS EIS/EA BOEM 2016-060. BOEM, Headquarters, Sterling, VA. Chapter four.

Nuka Research and Planning Group, LLC and Pearson Consulting. 2010. Oil spill prevention and response in the U.S. Arctic Ocean: Unexamined risks, unacceptable consequences. Report to Pew Environment Group. Available online at http://www.pewtrusts.org/~/media/legacy/oceans_north_legacy/page_attachments/oil-spill-prevention.pdf. Accessed December 9, 2016.

Robertson, T.L., Campbell, L. K., Pearson, L., and Higman, B. 2013. Oil spill occurrence rates for Alaska North Slope crude and refined oil spills. Prepared by Nuka Research & Planning Group, LLC. OCS Study, BOEM 2013-205. Seldovia, AK: USDOI, BOEM Alaska OCS Region.

*Beaufort Sea*

The Beaufort Sea Planning Area encompasses habitat for many of the same species found in the Chukchi Sea. Bowhead and beluga whales use the shelf and shelf break waters of the Beaufort extensively throughout the year. Ice seals and polar bear use nearshore and offshore habitats as they rest, feed, and reproduce, often following the movement of the ice as it expands in the winter and retreats during the summer. A variety of bird species use the Beaufort Sea year-round, including seabirds that forage offshore and shorebirds that "stage" here as they begin their fall migration. Large portions of the Beaufort Sea Planning Area and adjacent waters are designated critical habitat for polar bears. There is also designated "essential fish habitat" throughout the area. Subsistence hunting takes place in many communities along the Beaufort coast, from Kaktovik in the east to Barrow, Alaska.

The Barrow Canyon EIA is an important migration and foraging area for beluga whales, bowhead whales, gray whales, and many species of birds.[8] Several studies show that beluga and bowhead whales use this area preferentially, particularly in the fall; bowhead whales have high relative residence times in the area during their westward migration.[9] The southern portions of the Barrow Canyon EIA encompass relatively high densities of birds during summer (June to September), including brant geese and king eider.[10] The EIA encompasses areas of high benthic biomass and high productivity, likely driving the associated occurrence of marine mammals and birds. The Barrow Canyon EIA lies offshore to the east of Point Barrow at the nexus of the Chukchi and Beaufort Seas. The presence of marine mammals in this area makes it important for subsistence hunting.

The Camden Bay EIA is important ecologically and for subsistence use.[11] The Camden Bay area is important to bowhead whales, beluga whales, and for seal feeding, and is also an important bowhead whale hunting area in the fall.[12] This area was shown to be a "hotspot" for both marine mammals and seabirds.[13]

---

[8] Stafford, K.M., et al. 2016.

Clarke, J.T., et al. 2015.

Kuletz, J., et al. 2015. Hauser, D. D., K. L. Laidre, R. S. Suydam, and P. R. Richard. 2014. Population-specific home ranges and migration timing of Pacific Arctic beluga whales (*Delphinapterus leucas*). Polar Biology: 1-13.

Wong, S.N.P., C. Gjerdrum, K.H. Morgan, and M.L. Mallory. 2014. Hotspots in cold seas: The composition, distribution, and abundance of marine birds in the North American Arctic. Journal of Geophysical Research Oceans 119:1691-1705.

[9] Stafford, K.M., et al. 2016.

Citta, J.J., L.T. Quakenbush, S.R. Okkonen, M.L. Druckenmiller, W. Maslowski, J. ClementKinney, J.C. George, H. Brower, R.J. Small, C.J. Ashjian, L.A. Harwood, and M.P. Heide-Jørgensen. 2015. Ecological characteristics of core-use areas used by Bering-Chukchi Beaufort (BDB) bowhead whales, 2006-2012. Progress in Oceanography 136: 201-222.

Clarke, J.T., et al. 2015.

Kuletz, J., et al. 2015. Hauser, D. D., K. L. Laidre, R. S. Suydam, and P. R. Richard. 2014. Population-specific home ranges and migration timing of Pacific Arctic beluga whales (*Delphinapterus leucas*). Polar Biology: 1-13.

[10] Drew, G. F. and J. Piatt. 2013. North Pacific Pelagic Seabird Database (NPPSD) v2. US Geological Survey Alaska Science Center & US Fish and Wildlife Service, Anchorage, AK. Available online at http://alaska.usgs.gov/science/biology/nppsd/index.php. Accessed December 9, 2016.

Walker, N. J. and M. A. Smith. 2014. Alaska Waterbird Database v1. Audubon Alaska, Anchorage, AK.

Kuletz, J., et al. 2015.

USFWS. 2016. At-Sea Surveys of Seabirds from Ships of Opportunity. USFWS, Anchorage, AK.

[11] Huntington, Henry P. 2013. Traditional Knowledge Regarding Bowhead Whales and Camden Bay, Beaufort Sea, Alaska. August 5, 2013.

[12] Wolfe, R.J. 2013. Sensitive tribal areas on the Arctic slope: An update of areas, issues, and actions in four communities. Prepared by R.J. Wolfe for the Inupiat Community of the Arctic Slope, Barrow, AK.

[13] Kuletz, J., et al. 2015.

The Kaktovik EIA captures areas of important habitat for bowhead whales during their fall migration when they are travelling near shore; the eastern portion of the EIA overlaps with marine mammal "hotspots". [14] The EIA overlaps areas where subsistence hunters target bowhead whales in the fall. The portion of this EIA that lies to the west of the existing Presidential Withdrawal is important habitat for brant geese, while the eastern side captures habitat for red-throated loon. Both of these areas show persistent, long-term, high density of bird occurrence. [15] Many polar bear dens have been identified in this area over the past century, and this area of the Beaufort Sea coast is expected to remain important denning and feeding habitat areas for polar bears during the winter as the sea ice extent continues to change. [16]

The fourth EIA analyzed in the 2017-2022 Program is Cross Island. The portion of the Cross Island EIA that does not overlap with the high resource potential area and is not in close proximity to existing infrastructure is being withdrawn.

The proposed withdrawal areas in the Beaufort Sea will serve as a refuge for the animals that use the waters of the Arctic OCS and protect the interconnected components of this ecosystem, including the EIAs and migration pathways between them as well as accounting for potential shifts in critical habitat as the ecosystem continues to shift in the face of climate change.

**Oil Spill Risks**

The U.S. Arctic is ice-covered for eight to nine months of the year, with almost complete darkness for nearly three months. The nearest U.S. Coast Guard air base in Kodiak, Alaska and the nearest major port in Dutch Harbor, Alaska are both approximately 1,000 miles away.

Oil spill response and clean-up raises unique challenges in the Arctic. While there is a substantial knowledge base on oil spill response gained from experiments, research, and practical experience responding to spills, much of the work has been done in temperate climates.[17] Lower water temperatures or sea ice will slow down or eliminate the processes that control oil weathering, such as evaporation and natural dispersion. A large spill occurring on or under ice would be trapped and persist until the ice melted, allowing trapped oil to disperse. Volatile components of the oil would be more likely to freeze into the ice rather than dissolve or disperse into the water column. In addition, seasonally limited daylight can be a major issue for oil spill response during freeze up, and over the winter. The impacts could be major to subsistence uses, birds, mammals, and other sea life. An oil spill during periods of restricted open water could have severe effects,

---

[14] Clarke, J.T., M.C. Ferguson, C. Curtice, and J. Harrison. 2015. Biologically important areas for cetaceans within U.S. waters – Arctic Region. Aquatic Mammals 41(1): 94-103. DOI:10.1578/AM.41.1.2015.94.

Kuletz, J., et al. 2015.

[15] Drew, G. F. et al. 2013.

Audubon Alaska. 2014. Important Bird Areas by Type. Available online at http://docs.audubon.org/ sites/default/files/documents/alaska_ibas_type_20aug2014.pdf. Accessed August 18, 2016.

Walker, N. J., et al. 2014.

[16] Durner, G. M., D. C. Douglas, R. M. Nielson, S. C. Amstrup, T. L. McDonald, I. Stirling, M. Mauritzen, E. W. Born, O. Wiig, E. DeWeaver, M. C. Serreze, S. E. Belikov, M. M. Holland, J. Maslanik, J. Aars, D. C. Bailey, and A. E. Derocher. 2009. Predicting 21st century polar bear habitat distribution from global climate models. Ecological Monographs 79:107-120.

Durner, G.M., Fischbach, A.S., Amstrup, S.C., and Douglas, D.C. 2010. Catalogue of polar bear (*Ursus maritimus*) maternal den locations in the Beaufort Sea and neighboring regions, Alaska, 1910–2010: U.S. Geological Survey Data Series 568, 14 p.

[17] "Responding to Oil Spills in the U.S. Arctic Marine Environment," Committee on Responding to Oil Spills in the U.S. Arctic Marine Environment, The National Research Council of the National Academies, 2014.

as whales such as the bowhead and beluga use open water areas in the ice during their migrations and would concentrate within these areas in the spring. An oil spill in the Arctic creates substantial challenges for clean up and current techniques have not been proven when oil is mixed with ice or trapped under ice. Additionally, unlike the Gulf of Mexico, logistical support in the Arctic region is very limited and is expected to remain limited given the remote location.

While regulatory improvement, such as the requirements for exploratory drilling in the Arctic and other business practices, have decreased the probability of an oil spill, offshore exploration and development continue to pose risks. In its analysis for the most recent lease sale in the Chukchi Sea, the Department of the Interior estimated that over the course of the 77 year life of the development scenario analyzed, there was a 75 percent chance of one or more large spills (1,000 barrels) occurring. The most recent analysis in the 2017-2022 Five Year Program PEIS found some accidental spills to be reasonably foreseeable and assumed, based on historical data and the harsh nature of Arctic conditions, that there could be up to one large spill (3,282 barrels) in each of the Chukchi and Beaufort Seas from a platform and up to four spills from pipelines (3,750 barrels) in each sea based on estimates of production volume. A substantially greater number of smaller spills, between 1 and 1,000 barrels, could also occur based on production estimates analyzed in that document. These spills could have substantial impacts on the region, particularly given the ecosystem fragility and limited available resources to respond to a spill.


**Limited Oil and Gas History and Interest**

While the withdrawal area does contain oil and gas resources, if oil prices remain at current levels, production of these resources would be cost-prohibitive and would not take place.  Even if oil prices were more than 200 percent above their current level, production of these resources would not take place for 10-50 years because of the lead time associated with exploration and development activities.

There is a history of some lease sales in the withdrawn areas, but there has been very limited activity and industry has demonstrated its declining interest in the Arctic waters:

- Over the past 37 years, only 43 wells – six exploration wells in the Chukchi Sea and 30 exploration and seven development wells in the Beaufort Sea – have been drilled.
- The only existing offshore Federal production is from the Northstar Field in the Beaufort Sea.
- Federal offshore Arctic leases declined over 90 percent this year due primarily to relinquishments by leaseholders, from 527 in February 2016 to only 43 as of October 2016, with most of these expected to expire in 2017.

Taken together, the acreage under lease amounts to approximately 205,000 acres out of a total acreage of approximately 128 million acres in the two Planning Areas.

The withdrawal will not affect the rights of existing leases.

**Lengthy Production Timeline**

It is also important to note that this action is consistent with the steps the United States and the international community will take in the coming decades to reduce carbon pollution. In contrast, if lease sales were to occur and production take place, it would be at a time when the scientific realities of climate change dictate that the United States and the international community must be transitioning its energy systems away from fossil fuels.

- Even at substantially higher oil prices, production would not begin for at least 10 years following a lease sale, which could occur in the mid-to late 2030's at the earliest, and last up to 75 years.
- No infrastructure or production exists in the Chukchi Sea.
- In the Chukchi Sea, production could require 190 separate onshore pipeline miles each for oil and gas and 300 separate onshore pipeline miles for both oil and gas, requiring substantial and enormously expensive new infrastructure in sensitive places.

These timelines would only bring significant new oil and gas resources into the market at a time when the United States and its international partners must be transitioning to alternative energy sources to reduce emissions. While many agree that, during the transition to cleaner energy sources, the United States will continue to rely on oil and gas resources for some period of time, there is ample supply for that purpose in mature areas such as the Gulf of Mexico.

**Building on Administration's Past Efforts**

This action builds on past steps the President has taken to protect fragile ecosystems, build resilience in the face of climate change, and incorporate traditional knowledge into Arctic decision making, including:

- Creation of the Northern Bering Sea Climate Resilience Area to protect the health of the marine ecosystems of the Northern Bering Sea and Bering Strait, including making 40,300 square miles off limits from oil and gas leasing.
- Designation of areas of the Chukchi and Beaufort Seas as off limits from oil and gas leasing based on their ecological value and importance to Alaska Native subsistence users.
- Designation of the waters of Bristol Bay, known for its world-class fisheries and stunning beauty, as off limits to oil and gas activity.
- Convening of the White House Arctic Science Ministerial, including hosting more than 30 Alaska Native leaders and representatives from five Indigenous organizations from across the Arctic to share their concerns and priorities on how to respond to Arctic-science challenges; strengthen Arctic observations and data-sharing; expand regional resilience; and incorporate Arctic science in science, technology, engineering, and mathematics (STEM) education.

**Fact Sheet: Unique Atlantic Canyons Protected from Oil and Gas Activity**

Today, the President designated 31 Atlantic canyons off limits to oil and gas exploration and development activity due to their critical and irreplaceable ecological value. The Atlantic canyons themselves, majestic geologic features carved by glacial runoff or by rivers that once flowed overland and were submerged by rising seas after the last ice age, have incredible ecological importance. The massive underwater canyons are home to many species and have been the subject of scientific exploration and discovery since the 1970s.

This action builds on the President's creation of the Northeast Canyons and Seamounts Marine National Monument, which protects 4,913 square miles of marine ecosystems located 130 miles southeast of Cape Cod. Today's action withdraws from oil and gas leasing, exploration, and development the remaining 31 major Atlantic canyons that are not already protected by the National Monument, ensuring these unique biological and geological resources will not be impacted by any future oil and gas activities in this area. The canyons are located in U.S. waters along the Atlantic continental shelf break running from Heezen Canyon offshore New England to Norfolk Canyon offshore the Chesapeake Bay. The withdrawn area totals 5,990 square miles (or 3.8 million acres).

Ocean temperatures in the Northeast U.S. are projected to increase three times faster than the global average, according to a study released earlier this year by the National Oceanic Atmospheric Administration (NOAA). Additionally, the first of several assessments to analyze the impacts of climate change on fish stocks and fishing-dependent communities found that warming oceans are threatening the majority of fish species in the region including salmon, lobster, and scallops. Today's designation will help safeguard the resilience of that unique ecosystem, ensure a refuge for at-risk species, and protect these natural laboratories for scientists to monitor and explore the impacts of climate change.

- Today's action recognizes the unique marine environment in the Atlantic and fishing's critical role in the region's economy and culture. Specifically, the withdrawal includes areas that support habitat important to commercial and recreational fisheries. The withdrawal does not impact ocean uses beyond mineral exploration and development.

The canyons are a defining characteristic of the Atlantic continental margin offshore the east coast of the United States. The canyons were formed when sea level was lower and rivers flowed to the margin of the continental shelf before the canyons were flooded by the sea when ice melted after the last glacial maximum some 25,000 years ago. The largest canyon is Hudson Canyon, which reaches depths in excess of 10,000 feet and is comparable in scale to the Grand Canyon, which is 6,093 feet at its deepest.

The canyons are widely recognized as hotspots of biodiversity, biologically unique, and ecologically and economically valuable for fisheries. The protected areas provide:

- Habitat for endemic and numerous other species, including deep-water corals, deep diving beaked whales, commercially valuable fishes, and significant numbers of habitat-forming soft and hard corals, sponges, and crabs;

- Important biological areas for many species of fish managed collectively in the Atlantic under the designation 'Highly Migratory Species', including numerous large, commercially valuable species such as marlin, sailfish, swordfish, tunas, and sharks; and
- Habitat for protected species such as sea turtles and marine mammals, including endangered sperm, fin, and sei whales and Kemp's ridley turtles.

Research demonstrates that the canyons provide valuable ecosystem services and economic benefits in addition to being places of refuge for species. Many of these species live many years, have low reproductive rates, grow slowly, and rely on the habitats provided by canyon features throughout their lifespans.

There are several examples of species or species groups that rely heavily upon canyon ecosystems. Marine mammal density data for a number of species clearly demonstrates an affinity with the continental shelf margin where the canyons are located. Species such as tuna and swordfish have been associated with canyons, particularly Hudson, Baltimore, and Norfolk Canyons. Golden tilefish, a large and long-lived species, occupies habitat in a relatively restricted band crossing the canyons. Norfolk Canyon is a Habitat Area of Particular Concern (a designation under the Magnuson-Stevens Fishery Conservation and Management Act) for this species. Deep-water and canyon ecosystems are also important to the deep-sea red crab at all stages of its life cycle.

A number of Atlantic canyon studies have been conducted on the region. One recent effort was undertaken by the Bureau of Ocean Energy Management (BOEM) and the U.S. Geological Survey (USGS), within the Department of the Interior (Interior), and the National Oceanic and Atmospheric Administration (NOAA) within the Department of Commerce. Utilizing remotely operated vehicles (ROVs), substantial densities of deep-water corals were observed in both Norfolk and Baltimore Canyons. Some species were observed for the first time in these areas, including the important structure-forming species *Lophelia pertusa*.[1] Four other research efforts were conducted between 2012 and 2014, targeting nine mid-Atlantic canyons. The canyons investigated proved to be biodiversity hotspots, hosting many different species of coral, numerous fish species, several squids and octopus, and various sea stars, sea urchins, and sea cucumbers. These canyons were generally characterized by downslope areas of soft sediment leading up to steep walls with abundant biological communities under overhangs.

Some of the Atlantic canyon studies have shown that the diversity of habitat types creates a higher density of benthic species within canyons than at similar depths outside of canyons.[2] The presence of canyons can also influence fishery production by concentrating organic matter and enhancing local productivity, providing habitat and prey species, and concentrating species in a

---

[1] Brooke, S., and Ross, S.W. 2014. First observations of the cold-water coral *Lophelia pertusa* in mid-Atlantic canyons of the USA. Deep-Sea Res. II. 104:245-251.

[2] Hecker, B., G. Blechschmidt and P. Gibson. 1980. Epifaunal Zonation and community structure in three mid- and north Atlantic canyons. Final report for the Canyon Assessment Study in the Mid-and North Atlantic Areas of the U.S. Outer Continental Shelf. Prepared for Bureau of Land Management, Department of the Interior. Contract BLM AA551-CT8-49. 139 pp + Appendices. Available from http://1.usa.gov/1JNwrHk.

NEFMC (New England Fishery Management Council). 2012. DRAFT Essential Fish Habitat (EFH) omnibus amendment. Deep-sea corals of the Northeast Region: Species, habitats and proposed coral zones, and vulnerability to fishing impacts. NEFMC: Newburyport, MA. Accessed 14 May 2015. Available from http://bit.ly/1d3vq3F.

Vetter, E.W., C.R. Smith, and F.C. De Leo. 2010. Hawaiian hotspots: Enhanced megafaunal abundance and diversity in submarine canyons on the oceanic islands of Hawaii. Marine Ecology 31:183-199. doi:10.1111/j.1439-0485.2009.00351.

discrete area.[3] Early studies, now confirmed by recent extensive work by BOEM and others, focused on the mid-Atlantic canyons and demonstrated that the canyons in this area can include unique biological communities associated with hard substrate exposed in and near the canyon features. These communities can include significant numbers of habitat-forming soft and hard corals, sponges, crabs, and fish species such as summer flounder, black sea bass, and tilefish.

Deep-water assemblages of hard (scleractinian) corals are a particularly significant community type in the deep-sea due to their ability to create complex habitat within the structure formed by the coral itself. Although significant colonies of well-known scleractinian corals such as *Lophelia* are rare within canyons, other corals including antipatharians (black corals) and gorgonians (e.g., sea fans) add significant community structure and potential for high community diversity. Studies world-wide have shown that cold-water corals support high biodiversity but are long-lived and slow-growing, making them susceptible to physical disturbance by human activities. Such studies have also highlighted the importance of cold-water corals as habitat for deep-water fishes, indicators of past ocean climate regimes, and sources of novel biological compounds. Deep-water corals, particularly gorgonians, have been observed in most all of the canyons where hard substrate is exposed.

The abundance and distribution of bottom fish species are different within and outside of canyons. Bottom fish are more abundant within the canyons compared to habitats at the same depth outside of canyon features. In addition, the species composition within canyons differs from that of open water habitats at the same depth. Canyons provide a more complex habitat and may serve to trap and concentrate prey species. Atlantic canyons are also important biological areas for many of fish managed collectively in the Atlantic under the designation 'Highly Migratory Species' (HMS) which include numerous large, commercially valuable species such as marlin, sailfish, swordfish, tunas, and sharks. These species and some other fishes are known to travel great distances to reach the canyons.[4]

Studies of individual canyons along the Atlantic coast of the U.S. and Canada have shown that certain species of marine mammals have a high affinity to canyon ecosystems. This is especially true for deep diving whales, including beaked whales and sperm whales.

In addition, and of great importance, the canyons are regions of enhanced biodiversity and play an important role in climate stability. The northwestern Atlantic is expected to be heavily

[3] Yoklavich, M.M., H.G. Greene, G.M. Cailliet, D.E. Sullivan, R.N. Lea, and M.S. Love. 2000. Habitat associations of deep-water rockfishes in a submarine canyon: An example of a natural refuge. Fishery Bulletin 98:625-641.

Tudela, S., F. Sardá, F. Maynou, and M. Demestre. 2003. Influence of submarine canyons on the distribution of the deep-water shrimp, *Aristeus antennatus* (Risso, 1816) in the new Mediterranean. Crustaceana 76(2):217-225.

Brodeur, R.D. 2001. Habitat-specific distribution of Pacific ocean perch (*Sebastes alutus*) in Pribilof Canyon, Bering Sea. Continental Shelf Research 21:207-224.

Flexas, M.M., D.L. Boyer, M. Espino, J. Puigdefàbregas, and A. Rubio. 2008. Circulation over a submarine canyon in the NW Mediterranean. Journal of Geophysical Research 113:C12002, doi: 10.1029/2006JC003998.

[4] NMFS. 2006. Final Consolidated Atlantic Highly Migratory Species Fishery Management Plan. National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Office of Sustainable Fisheries, Highly Migratory Species Management Division, Silver Spring, MD. Public Document. pp. 1600.

NOAA FIsheries. 2016. DRAFT Amendment 10 to the 2006 Consolidated Atlantic Highly Migratory Species Fishery Management Plan: Essential Fish Habitat and Environmental Assessment. NOAA Fisheries Office of Sustainable Fisheries Atlantic Highly Migratory Species Management Division. September 2016. Available online at http://www.nmfs.noaa.gov/sfa/hms/documents/fmp/am10/draft_maps/hms_efh_amendment_10_draft_ea_0648_xd990_final_090716.pdf.

Sedberry, G. and J. Loefer. 2001. Satellite telemetry tracking of swordfish, *Xiphias gladius*, off the eastern United States. Marine Biology 139(2): 355-360.

impacted by climate change. The canyons provide important shelf and slope habitat heterogeneity that could offer refuge for species potentially impacted by climate change.

Oil and gas activities have the potential to impact the seafloor wherever these activities occur. This includes discharge of oil, drilling muds, cuttings, and other debris that could affect seafloor habitats in the immediate vicinity of a well. Bottom disturbance associated with drilling, infrastructure emplacement, pipeline trenching, and removal of structures could also affect the seafloor. The withdrawal of these canyons from mineral leasing will help protect habitats, preserve critical ecological hot spots, conserve economically valuable fisheries, afford long-term opportunity for research and exploration, and help ensure that species dependent on the habitats of the canyons are protected.

The effect of a Presidential withdrawal is to indefinitely exclude the withdrawn area from leasing for mineral exploration and development. The President previously used this authority in December 2014 and January 2015 when he withdrew from leasing the Bristol Bay off of Alaska, home to world-class fisheries and stunning beauty, and certain areas of the Beaufort and Chukchi Seas because of their critical ecological and cultural values.

The Atlantic canyon region has a very limited oil and gas history, with no active leases since the mid-1990s and no production of oil and gas. The potential impact on hydrocarbon resources is estimated to be minimal. Oil and exploration and development would also be challenging due to technical and operational risks related to the canyon geology.



Home | Oil & Gas Energy | Leasing

# 2017 - 2022 Lease Sale Schedule

|  | Sale Number | Area | Year |
|---|---|---|---|
| **1.** | 249 | Gulf of Mexico Region | 2017 |
| **2.** | 250 | Gulf of Mexico Region | 2018 |
| **3.** | 251 | Gulf of Mexico Region | 2018 |
| **4.** | 252 | Gulf of Mexico Region | 2019 |
| **5.** | 253 | Gulf of Mexico Region | 2019 |
| **6.** | 254 | Gulf of Mexico Region | 2020 |
| **7.** | 256 | Gulf of Mexico Region | 2020 |
| **8.** | 257 | Gulf of Mexico Region | 2021 |
| **9.** | 258 | Cook Inlet | 2021 |
| **10.** | 259 | Gulf of Mexico Region | 2021 |
| **11.** | 261 | Gulf of Mexico Region | 2022 |

## 2017-2022 Quicklinks

2017-2022 Proposed Final Program

2017-2022 Lease Sale Schedule

2017-2022 Maps

2017-2022 Supplemental Documents

Frequently Asked Questions


     

Home

# 2012 - 2017 Lease Sale Schedule

| Sale Number[1] | Area | Year |
|---|---|---|
| 229 | Western Gulf of Mexico | 2012 |
| 227 | Central Gulf of Mexico | 2013 |
| 233 | Western Gulf of Mexico | 2013 |
| 225 | Eastern Gulf of Mexico[2] | 2014 |
| 231 | Central Gulf of Mexico | 2014 |
| 238 | Western Gulf of Mexico | 2014 |
| 235 | Central Gulf of Mexico | 2015 |
| 246 | Western Gulf of Mexico | 2015 |
| 226 | Eastern Gulf of Mexico | 2016 |
| 241 | Central Gulf of Mexico | 2016 |
| 237 | Chukchi Sea[3] | cancelled |
| 248 | Western Gulf of Mexico | 2016 |
| 244 | Cook Inlet | 2017 |
| 247 | Central Gulf of Mexico | 2017 |
| 242 | Beaufort Sea[3] | cancelled |

Alaska Lease Sales
Gulf of Mexico Lease Sales

[1] As in the PP, the sales are not in numerical order for various reasons.  As the 2009 DPP encompassed the 2010-2015 time period, many of the sales listed in that document were carryovers from the latter part of the Five Year Program for 2007-2012 announced in June 2007.  These sales were either held, deleted in the December 2010 Revised Program for 2007-2012, or cancelled under the pre-sale process.  Those numbers are no longer available for use in this program.  Other sales included in the 2009 DPP are no longer being considered for leasing in this PFP and those sale numbers also are not available.

[2] Sales in the Eastern GOM would only include those areas that are not currently subject to moratorium under GOMESA.

[3] Sales cancelled in 2015, see press release.

## Quicklinks

Five Year Program

Comment on the Request for Information for the Development of the 2017-2022 Program

Approved Program (2012-2017)

Annual Progress Report

Programmatic EIS (2012-2017)

Lease Sale Schedule (2012-2017)

Mitigation/Program Tracking Table (2012-2017)

Interactive Maps (2012-2017)

Fact Sheets and Press Releases (2012-2017)

Proposed Final Program (PFP) decision document (2012-2017)

Case: 19-35460, 02/13/2020, ID: 11597380, DktEntry: 40, Page 19 of 214

**15**



     

Home | Oil & Gas Energy

# Alaska Lease Sales

Chronological Alaska Lease Sale Summary Table

Beaufort Sea Lease Sale 186. **Held in 2003.**
Cook Inlet Lease Sale 191. **Held May 19, 2004. No bids received.**
Chukchi Sea Oil and Gas Lease Sale 193. **Held in February 2008.**
Beaufort Sea Lease Sale 195. **Held in 2003.**
Beaufort Sea Lease Sale 202. **Held in 2005.**
Cook Inlet Oil and Gas Lease Sale 211. **Cancelled in 2009 due to lack of industry interest.**
North Aleutian Basin Lease Sale 214. **On March 31, 2010, the North Aleutian Basin was withdrawn from disposition for leasing through 2017, and this sale was canceled.**
Cook Inlet Oil and Gas Lease Sale 219. **Cancelled in 2011 due to lack of industry interest.**

Case 3:17-cv-00101-SLG    Document 51-10    Filed 06/08/18    Page 1 of 1
Exhibit 10, page 1 of 1

6/5/2018                                    Alaska G&G Permits | BOEM



Home | Regions

# Alaska G&G Permits

**Notes:**

• The linked maps depict the maximum area that the permittee may occupy during the course of the survey. The actual survey will occupy a much smaller area.

• Permit applications and action letters earlier than 2005 are available upon request. Contact BOEM Alaska's Resource Evaluation Office at (907) 334-5320.

• Scroll to the bottom for a statistical summary of historical G&G permitting activities in Alaska.

| Permit No. | Area | Permittee | Type of Survey | Permit Issued | Status | Valid Permit Dates |
|---|---|---|---|---|---|---|
| 18-02 | Beaufort | TGS-NOPEC | 3D OBN Seismic | -- | Pending | -- |
| 18-01 | Cook Inlet | Hilcorp Alaska LLC | Aerogravity and Magnetics | -- | Pending | -- |
| 17-01 | Beaufort | SAE | 3D OBN Marine | -- | Withdrawn | |
| 15-02 | Beaufort | SAE | 3D OBN Marine | 08/11/15 | Canceled | 8/11/15-10/15/15 |
| 15-01 | Cook Inlet | SAE | 3D OBN Marine | 03/06/15 | No OCS Activity | 03/06/15- 10/14/15 |
| 14-05 | Chukchi | TGS | 2D Marine | -- | Withdrawn | -- |
| 14-04 | Cook Inlet | SAE | 3D OBN Marine | -- | Deferred to 2015 | -- |
| 14-03 | Beaufort | BPXA | 3D OBN Marine | 05/12/14 | Completed | 06/01/14- 09/30/14 |
| 14-02 | Beaufort | SAExploration | 3D OBN Marine | 07/18/14 | No OCS Activity | 07/18/14-10/15/14 |
| 14-01 | Beaufort | SAExploration | 3D on ice | 02/24/14 | Completed | 02/24/14 - 05/31/14 |
| 13-03 | Beaufort | SAExploration | 3D OBN marine | N/A | Withdrawn | N/A |
| 13-02 | Chukchi | TGS | 2D marine | 08/05/13 | Completed | 08/05/13 - 10/31/13 |
| 13-01 | Beaufort | BPXA | 3D OBC marine | N/A | Withdrawn | N/A |
| 12-02 | Norton | AuruMar Alaska | High Resolution | 08/31/12 | Completed | 08/31/12-12/31/12 |
| 12-01 | Beaufort | ION Geophysical | 2D seismic | 10/12/12 | Completed | 10/12/12-12/15/12 |
| 11-01 | Beaufort | ION Geophysical | 2D Seismic | -- | Withdrawn | -- |
| 10-03 | Beaufort | ION Geophysical | 2D Seismic | 09/13/10 | Canceled | 09/25/10-12/15/10 |
| 10-02 | Chukchi | TGS-NOPEC Geophysical Company | 2D Seismic | -- | Withdrawn | -- |
| 10-01 | Chukchi | Statoil USA E&P Inc. | 3D Seismic | 08/05/10 | Completed | 08/05/10-11/30/10 |
| 09-01 | Beaufort | CGG Veritas | 3D Seismic Over Ice | 01/09/09 | Canceled | 01/19/09-05/31/09 |
| 08-05 | Beaufort | BP Exploration (Alaska), Inc. | 3D Seismic | 03/13/08 | Completed | 03/13/08-11/01/08 |
| 08-04 | Beaufort | Shell Offshore Inc. | 3D Seismic | 02/15/08 | Completed | 02/15/08-11/15/08 |
| 08-03 | Chukchi | Shell Offshore Inc. | 3D Seismic | 02/15/08 | Completed | 2/15/08-11/30/08 |
| 08-02 | Beaufort | Shell Offshore Inc. | 3D Seismic Over Ice | 12/07/07 | Canceled | 03/01/08-05/31/08 |
| 08-01 | Chukchi | GX Technology Corp. | 2D Seismic | -- | Withdrawn | -- |

**17**

| 07-09 | Beaufort | Shell Offshore Inc. | HRD | 07/13/07 | Completed | 07/13/07-11/30/07 |
|---|---|---|---|---|---|---|
| 07-08 | Cook Inlet | Hemis Corporation | Geologic-Prospecting | 06/12/07 | Completed | 06/12/07-09/30/07 |
| 07-07 | Chukchi | GX Technology Corp. | 2D Seismic | -- | Deferred to 2008 | -- |
| 07-06 | Beaufort | ConocoPhillips | 3D Seismic | -- | Withdrawn | -- |
| 07-05 | Chukchi | ConocoPhillips | 3D Seismic | -- | Withdrawn | -- |
| 07-04 | Beaufort | Shell Offshore Inc. | 3D Seismic | 07/13/07 | Completed | 07/13/07-11/30/07 |
| 07-03 | Chukchi | Shell Offshore Inc. | 3D Seismic | 07/13/07 | Completed | 07/13/07-11/30/07 |
| 07-02 | Beaufort | Shell Offshore Inc. | 3D Seismic Over Ice | 02/06/07 | Completed | 03/10/07-05/10/07 |
| 07-01 | Chukchi | TGS-NOPEC Geophysical | 2D Seismic, Gravity | -- | Withdrawn | -- |
| 06-04 | Chukchi | GX Technology Corporation | 2D Seismic, Gravity, Magnetics | 06/20/06 | Completed | 06/20/06-11/30/06 |
| 06-03 | Beaufort | Shell Offshore, Inc. | 3D Seismic | 06/29/06 | Canceled | 06/29/06-11/15/06 |
| 06-02 | Chukchi | Shell Offshore, Inc. | 3D Seismic | 06/20/06 | Completed | 06/20/06-11/15/06 |
| 06-01 | Chukchi | ConocoPhillips Alaska, Inc. | CDP-3D | 06/20/06 | Completed | 6/20/06-11/30/06 |
| 05-01 | Cook Inlet | Veritas DGC Cosmopolitan Project | 3D Seismic | 07/21/05 | Completed | 07/21/05-11/15/05 |
| 04-01 | Beaufort | Veritas DGC | 3D Seismic Over Ice | 04/02/04 | Canceled | 04/02/04-05/31/04 |
| 03-01 | Beaufort | Fairweather Geophysical/Veritas DGC | CDP-3D Over Ice | 12/06/02 | Canceled | 12/06/02-05/31/03 |
| 01-02 | Beaufort | WGC | CDP-3D | 06/15/01 | Canceled | 06/15/01-10/31/01 |
| 01-01 | Beaufort | Fairweather Geophysical, LLC | CDP-3D Over Ice | 03/06/01 | Canceled | 03/06/01-05/31/01 |
| 00-02 | Beaufort | WGC | CDP-3D | 06/27/00 | Completed | 06/27/00-10/31/00 |
| 00-01 | Beaufort | WGC | CDP-2D/3D Over Ice | 10/25/99 | Completed | 10/25/99-5/31/00 |
| 99-02 | Beaufort | WGC | CDP-3D (OBC) | 06/14/99 | Completed | 06/14/99-11/30/99 |
| 99-01 | Beaufort | WGC | CDP-3D Over Ice | 12/02/98 | Canceled | 12/2/98-05/31/99 |
| 98-05 | Beaufort | WAI | CDP-3D (OBC) | 07/21/98 | Completed | 07/21/98-11/30/98 |
| 98-03 | Beaufort | WAI/ Anadarko | CDP Over Ice | 12/08/97 | Canceled | 12/08/97-05/31/98 |
| 98-02 | Beaufort | ARCO | CDP-3D Over Ice | 10/09/97 | Completed | 10/09/97-05/31/98 |
| 98-01 | Beaufort | ARCO | CDP-3D Over Ice | 10/09/97 | Canceled | 10/09/97-05/15/98 |

**Exhibit 10, page 2 of 2**



# FEDERAL REGISTER

| | |
|---|---|
| Vol. 77 | Wednesday, |
| No. 206 | October 24, 2012 |

Part II

## Department of Commerce

National Oceanic and Atmospheric Administration

Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Marine Seismic Survey in the Beaufort and Chukchi Seas, Alaska; Notice

## DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

RIN 0648–XC091

**Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Marine Seismic Survey in the Beaufort and Chukchi Seas, Alaska**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice; issuance of an incidental take authorization.

**SUMMARY:** In accordance with the Marine Mammal Protection Act (MMPA) regulations, notification is hereby given that NMFS has issued an Incidental Harassment Authorization (IHA) to ION Geophysical (ION) to take, by harassment, small numbers of nine species of marine mammals incidental to in-ice marine seismic surveys in the Beaufort and Chukchi Seas, Alaska, during the fall and winter of 2012.

**DATES:** Effective October 17, 2011, through December 15, 2012.

**ADDRESSES:** Requests for information on the incidental take authorization should be addressed to P. Michael Payne, Chief, Permits and Conservation Division, Office of Protected Resources, National Marine Fisheries Service, 1315 East-West Highway, Silver Spring, MD 20910. A copy of the application containing a list of the references used in this document, NMFS' Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and the IHA may be obtained by writing to the address specified above or visiting the Internet at: *http:// www.nmfs.noaa.gov/pr/permits/ incidental.htm#applications*.

Documents cited in this notice may be viewed, by appointment, during regular business hours, at the aforementioned address.

**FOR FURTHER INFORMATION CONTACT:** Shane Guan, Office of Protected Resources, NMFS, (301) 427–8401 or Brad Smith, NMFS, Alaska Region, (907) 271–3023.

**SUPPLEMENTARY INFORMATION:**

### Background

Sections 101(a)(5)(A) and (D) of the MMPA (16 U.S.C. 1361 *et seq.*) direct the Secretary of Commerce (Secretary) to allow, upon request, the incidental, but not intentional taking of marine mammals by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region if certain findings are made and regulations are issued or, if the taking is limited to harassment, a notice of a proposed authorization is provided to the public for review.

Authorization shall be granted if NMFS finds that the taking will have a negligible impact on the species or stock(s), will not have an unmitigable adverse impact on the availability of the species or stock(s) for subsistence uses (where relevant), and if the permissible methods of taking and requirements pertaining to the mitigation, monitoring and reporting of such taking are set forth.

NMFS has defined "negligible impact" in 50 CFR 216.103 as "* * * an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."

Section 101(a)(5)(D) of the MMPA established an expedited process by which citizens of the U.S. can apply for an authorization to incidentally take small numbers of marine mammals by harassment. Except with respect to certain activities not pertinent here, the MMPA defines "harassment" as: any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild [Level A harassment]; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering [Level B harassment].

Section 101(a)(5)(D) establishes a 45-day time limit for NMFS review of an application followed by a 30-day public notice and comment period on any proposed authorizations for the incidental harassment of marine mammals. Within 45 days of the close of the comment period, NMFS must either issue or deny issuance of the authorization.

### Summary of Request

NMFS received an application on March 1, 2012, from ION for the taking, by harassment, of marine mammals incidental to a marine seismic survey in ice in the Beaufort and Chukchi Seas, Alaska, during October through December 15, 2012. After addressing comments from NMFS, ION modified its application and submitted a revised application on June 11, 2012.

### Description of the Specified Activity

ION's activities consist of a geophysical in-ice (seismic reflection/refraction) survey and related vessel operations to be conducted primarily in the Alaskan Beaufort and Chukchi seas from October to December 15, 2012. The primary survey area extends from the U.S.–Canadian border in the east to Point Barrow in the west. Two survey lines extend west of Point Barrow into the northern Chukchi Sea, and three short tracks are proposed near the U.S.–Russian border (see Figure 1 of ION's IHA application). The bathymetry of the proposed survey area ranges from shallow (<20 m [66 ft]) to relatively deep (>3,500 m [11,483 ft]) water over the continental shelf, the continental slope, and the abyssal plain.

The survey will be conducted from the seismic vessel *Geo Arctic* escorted by the *Polar Prince,* a medium class (100A) icebreaker. The survey grid consists of ~7,175 km (4,458 mi) of transect line, not including transits when the airguns are not operating. There may be small amounts of additional seismic operations associated with airgun testing, start up, and repeat coverage of any areas where initial data quality is sub-standard. The seismic source towed by the *Geo Arctic* would be an airgun array consisting of 26 active Sercel G-gun airguns with a total volume of 4,450 in$^3$. A single hydrophone streamer 4.5–9 km (2.8–5.6 mi) in length, depending on ice conditions, would be towed by the *Geo Arctic* to record the returning seismic signals.

The survey vessels arrived in the survey area from Canadian waters in early October and plan to begin data collection on or after October 15, 2012. After completion of the survey, or when ice and weather conditions dictate, the vessels will exit to the south, transiting through the Chukchi and Bering Seas. The *Polar Prince* may be used to perform an at-sea refueling (bunkering) operation to supply as much as 500 metric tons of Arctic diesel to the *Geo Arctic.* The *Polar Prince* will carry that fuel onboard at the start of the operation, and it will be transferred to the *Geo Arctic* if/when necessary. Depending on its own fuel consumption, the *Polar Prince* may then transit to Tuktoyuktuk, Canada to take on additional fuel for itself. Once the *Polar Prince* returns to the *Geo Arctic* the survey would continue. The entire refueling operation will therefore involve one fuel transfer and potentially one transit to and from Tuktoyuktuk. The refueling operation will likely take place in late October, at which time the

*Geo Arctic* will likely be in the eastern or east-central Alaskan Beaufort Sea.

ION's geophysical survey has been designed and scheduled to minimize potential effects on marine mammals, bowhead whales in particular, and subsistence users. For mitigation and operational reasons, the survey area has been bisected by a line that runs from 70.5° N. 150.5° W. to 73° N. 148° W. (see Figure 1 of ION's IHA application). Weather and ice permitting, ION plans to begin survey operations east of the line described above (eastern survey area) and in offshore waters (>1,000 m [3,281 ft]) where bowheads are expected to be least abundant in early October. This operational plan is based on the fact that only ~2% of bowhead whales observed by Bureau of Ocean Energy Management's (BOEM) aerial surveys from 1979–2007 occurred in areas of water depth >1,000 m (3,281 ft) (MMS, 2010), and on average ~97% of bowheads have passed through the eastern U.S. Beaufort Sea by October 15 (Miller *et al.,* 2002). The survey will then progress to shallower waters in the eastern survey area before moving to the western survey area in late October or early November 2012.

Ice conditions are expected to range from open water to 10/10 ice cover. However, the survey cannot take place in thick multi-year ice as both the icebreaker and seismic vessel must make continuous forward progress at 3–4 kts. In order for the survey to proceed, areas of high ice concentration can only consist of mostly newly forming juvenile first year ice or young first year ice less than 0.5 m (1.6 ft) thick. Sounds generated by the icebreaker and seismic vessel moving through these relatively light ice conditions are expected to be far below the high sound levels often attributed to icebreaking. These high sound levels (≤200 dB re 1 µPa [rms]) have been recorded from icebreakers during backing and ramming operations in very heavy ice conditions and are created by cavitation of the propellers as the vessel is slowed by the ice or reverses direction (Erbe and Farmer, 1998; Roth and Schmidt, 2010).

*Acoustic Sources*

(1) Seismic Airgun Array

The seismic source used during the project would be an airgun array consisting of 28 Sercel G-gun airguns, of which 26 would be active and have a total discharge volume of 4,450 in³. The 28 airguns would be distributed in two sub-arrays with 14 airguns per sub-array. Individual airgun sizes range from 70 to 380 in³. Airguns will be operated at 2,000 psi. The seismic array and a single hydrophone streamer 4.5–9 km (2.8–5.6 mi) in length would be towed behind the *Geo Arctic.* Additional specifications of the airgun array are provided in Appendix B of ION's IHA application.

(2) Echo Sounders

Both vessels will operate industry standard echo sounder/fathometer instruments for continuous measurements of water depth while underway. These instruments are used by all large vessels to provide routine water depth information to the vessel crew. Navigation echo sounders send a single, narrowly focused, high frequency acoustic signal directly downward to the sea floor. The sound energy reflected off the sea floor returns to the vessel where it is detected by the instrument, and the depth is calculated and displayed to the user. Source levels of navigational echo sounders of this type are typically in the 180–200 dB re 1 µPA-m (Richardson *et al.* 1995a).

The *Geo Arctic* will use one navigational echo sounder during the project. The downward facing single-beam Simrad EA600 operates at frequencies ranging from 38 to 200 kHz with an output power of 100–2000 Watts. Pulse durations are between 0.064 and 4.096 milliseconds, and the pulse repetition frequency (PRF or ping rate) depends on the depth range. The highest PRF at shallow depths is about 40 pings per second. It can be used for water depths up to 4,000 m (13,123 ft) and provides up to 1 cm (0.4 in) resolution.

The *Polar Prince* will use one echo sounder, an ELAC LAZ–72. The LAZ–72 has an operating frequency of 30 kHz. The ping rate depends on the water depth and the fastest rate, which occurs in shallow depths, is about 5 pings per second.

*Dates, Duration, and Region of Activity*

The proposed geophysical survey would be conducted for ~76 days from approximately October 15 to December 15, 2012. Both the *Geo Arctic* and the *Polar Prince* entered the Alaskan Beaufort Sea from Canadian waters in early October. The survey area will be bounded approximately by 138° to 169° W. longitude and 70° to 73° N. latitude in water depths ranging from <20 to >3,500 m (66 to 11,483 ft) (see Figure 1 of ION's IHA application). For mitigation and operational reasons the survey area has been bisected by a line that runs from 70.5° N, 150.5° W to 73° N, 148° W. Weather and ice permitting, ION plans to begin survey operations east of the line (eastern survey area) in offshore waters (≤1,000 m [3,281 ft]) where bowheads are expected to be least abundant in early October. The survey will then progress to shallower waters in the eastern survey area before moving to the west survey area in late October or early November. The vessels will depart the region to the south via the Chukchi and Bering Seas and arrive in Dutch Harbor in mid- to late December.

**Comments and Responses**

A notice of NMFS' proposal to issue an IHA to ION was published in the **Federal Register** on August 17, 2012 (77 FR 49922). That notice described, in detail, ION's proposed activity, the marine mammal species that may be affected by the activity, and the anticipated effects on marine mammals and the availability of marine mammals for subsistence uses. During the 30-day public comment period, NMFS received comments from the following organizations: the Marine Mammal Commission (Commission), the North Slope Borough (NSB), Oceana, Ocean Conservation Research, Ocean Conservancy, PEW Environment Group (PEW), and a group joined by the Alaska Wilderness League, Audubon Alaska, Center for Biological Diversity, EarthJustice, Natural Resources Defense Council, Northern Alaska Environmental Center, Ocean Conservation Research, Pacific Environment, Sierra Club, and World Wildlife Fund (AWL *et al.*).

Any comments specific to ION's application that address the statutory and regulatory requirements or findings NMFS must make to issue an IHA are addressed in this section of the **Federal Register** notice.

*General MMPA Issues and Impact Analyses*

*Comment 1:* The Commission recommends that NMFS continue to include proposed incidental harassment authorization language, including the total number of estimated takes by Level A and Level B harassment, at the end of **Federal Register** notices but ensure that the language is consistent with that referenced in the main body of the corresponding notice.

*Response:* NMFS agrees with the Commission's recommendation and will, to the extent practicable, include proposed incidental harassment authorization language at the end of **Federal Register** notices. In addition, NMFS agrees that the language should be consistent with that referenced in the main body of the corresponding notice and will make every effort to ensure consistency. However, the total number of estimated takes by Level A and Level B harassment is presented in tables

**65062** **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

within the subsection *Estimated Takes by Harassment* of the **Federal Register** notice, and it would be redundant to repeat this information within the proposed incidental harassment authorization language elsewhere in the same **Federal Register** notice.

*Comment 2:* The Commission recommends that NMFS propose to issue regulations under section 101(a)(5)(A) of the MMPA and a letter of authorization, rather than an incidental harassment authorization, for any proposed activities expected to cause a permanent threshold shift (PTS).

*Response:* The legal requirements and underlying analysis for the issuance of an IHA concerning take do not require the issuance of regulations and a letter of authorization in this particular case. In order to issue an authorization pursuant to Section 101(a)(5)(D) of the MMPA, NMFS must determine that the taking by harassment of small numbers of marine mammal species or stocks will have a negligible impact on affected species or stocks, and will not have an unmitigable adverse impact on the availability of affected species or stocks for taking for subsistence uses. If there were a potential for serious injury or mortality, NMFS could not issue an IHA. Instead, any incidental take authorization would need to be processed under Section 101(a)(5)(A) of the MMPA.

As described here and in previous FR notices, PTS is considered to be injury (Level A Harassment). However, an animal would need to stay very close to the sound source for an extended amount of time to incur a serious degree of PTS, which could increase the probability of mortality. In this case, it would be highly unlikely for this scenario to unfold given the nature of any anticipated acoustic exposures that could potentially result from a mobile marine mammal that is generally expected to avoid loud sounds swimming in the vicinity of an airgun array moving at 3–4 knots. Therefore, it is appropriate to issue an incidental take authorization under 101(a)(5)(D), as we have made the necessary findings (described elsewhere in this document) under that Section of the MMPA.

*Comment 3:* The Ocean Conservancy, Ocean Conservation Research, Oceana, and AWL *et al.* state the proposed seismic survey would result in harassment takes of a large number of marine mammals, specifically 250 bowhead whales, 4,300 beluga whales, and 60,000 ringed seals, all of which would be exposed to received levels above 160 dB (rms). Thus, the commenters assert that NMFS cannot

satisfy MMPA's small number and negligible impact provisions.

*Response:* NMFS disagrees with the commenters' assessment. First, as mentioned in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012) and earlier in this document, the estimated takes of marine mammals are based on summer/ fall marine mammal densities. With most marine mammals moving out of the proposed seismic area as winter approaches, the density would be lower and the actual numbers of takes would be far fewer than those calculated based on fall densities. As described in the Negligible Impact and Small Numbers Analysis and Determination section of this document, NMFS considers the number of authorized takes small.

As discussed in detail in the Negligible Impact and Small Numbers Analysis and Determination section of this document, most of the takes from ION's proposed in-ice seismic surveys are expected to be Level B behavioral harassment, in the form of startle behavior or vacating the area for the short duration of time when the seismic airgun is firing in the area. Animals could also change their behavior patterns during this short duration, butare expected to resume their normal activities and reoccupy the area as soon as the vessels move away. Additionally, since the proposed icebreaking seismic survey is planned outside the time when ice seals are giving birth and after approximately 97% of the bowhead population is expected to have moved through the area, no impacts on pups or calves are expected, and nor are there any orther areas of particular importance for reproduction or feeding that could be impacted. Therefore, any behavioral effects to ringed seals, bowheads, or other species are not expected to have significant impacts to individual fitness or the population. In addition, the mitigation and monitoring measures (described previously in this document) included in the IHA are expected to further reduce any potential disturbance to marine mammals. Last, a small number of takes in the form of PTS are being authorized, however, if incurred, they would be expected to be minor in degree (low intensity—a few dBs of loss at certain frequencies), and they are not expected because of a combination of mitigation and likely avoidance of high source levels. Mortality is neither authorized nor anticipated.

Therefore, NMFS believes that the take, by harassment, from ION's in-ice seismic survey will have a negligible impacton the affected species or stocks.

*Comment 4:* The Ocean Conservancy, Ocean Conservation Research, and AWL *et al.* claims that NMFS failed to consider cumulative impacts adequately. In addition, AWL *et al.* states that it is essential for NMFS to consider ION's proposed survey along with the impacts of Shell's exploratory drilling program in Beaufort and Chukchi Seas.

*Response:* Section 101(a)(5)(D) of the MMPA requires NMFS to make a determination that the harassment incidental to a specified activity will have a negligible impact on the affected species or stocks of marine mammals, and will not result in an unmitigable adverse impact on the availability of marine mammals for taking for subsistence uses. Neither the MMPA nor NMFS' implementing regulations specify how to consider other activities and their impacts on the same populations. However, consistent with the 1989 preamble for NMFS' implementing regulations (54 FR 40338, September 29, 1989), the impacts from other past and ongoing anthropogenic activities are incorporated into the negligible impact analysis via their impacts on the environmental baseline (*e.g.*, as reflected in the density/ distribution and status of the species, population size and growth rate, and ambient noise).

In addition, cumulative effects were addressed in the Environmental Assessment and biological opinion prepared for this action, both of which NMFS indicated would be completed prior to the issuance of an IHA (77 FR 49922; August 17, 2012). The Environmental Assessment's cumulative effects analysis included consideration of (among other things): BP Exploration (Alasks), Inc.'s ocean-bottom-cable seismic surveys in the Simpson Lagoon area of the Beaufort Sea; BPXA's proposed Northstar oil production activity in the Beaufort Sea; and Shell Offshore Inc.'s (Shell) proposed exploratory drilling activities in the Beaufort and Chukchi Seas, Arctic warming, subsistence hunting, and noise contribution from vessel traffic.

These documents, as well as the Alaska Marine Stock Assessments and the most recent abundance estimates for the affected species, are part of NMFS' Administrative Record for this action, and provided the decision maker with information regarding other activities in the action area that affect marine mammals, an analysis of cumulative impacts, and other information relevant to the determination made under the MMPA.

*Comment 5:* AWL *et al.* states that in determining whether to proceed with

ION's request, NMFS must also consider the extent of missing information as to both the environmental baseline in the Arctic and marine mammal responses to noise in general.

*Response:* NMFS has been conducting such analyses in both aspects since 2010 when it first received ION's IHA application.

Regarding the environmental baseline, as described in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012), where the marine mammal distribution and density data for fall and winter seasons in the Beaufort and Chukchi Seas were not available, NMFS used the summer and fall density data. This data is an appropriate proxy for this analysis because it is for the same species and because we assume it is an overestimate since animals are known to move out of the area in the winter (Allen and Angliss 2011).

Separately, regarding marine mammal responses to noise in general and as described in the *Potential Effects of the Specified Activity on Marine Mammals* section of the proposed IHA, while there are not data indicating the responses of every species to every specific sound source type, we believe that the large body of available information across multiple species and sound types allows us to reasonably anticipate likely responses to the proposed seismic airgun and icebreaking and make the findings necessary for issuance of this IHA.

*Density Calculation and Take Estimate*

*Comment 6:* PEW states that NMFS did not use the best available data for impact analysis, as most survey data NMFS were collected during the open water season that usually conclude by October.

*Response:* NMFS does not agree with PEW's statement that we did not use the best available data for impact analysis. As it was discussed in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012), the reason for using the fall marine mammal densities for take calculation is because the lack of marine mammal density data in the winter season. Nevertheless, the fall marine mammal density data NMFS and ION used are the best available data. In addition, during the initial impact analysis, NMFS Office of Protected Resources and ION consulted with NMFS National Marine Mammal Laboratory (NMML) to make sure that the marine mammal density data used for impact analysis are the best available data. Using marine mammal summer/fall density data results in over-estimates as the overwhelming majority

marine mammals will have likely departed the Beaufort and Chukchi Seas by the start of winter (Mate *et al.* 2000; Miller *et al.* 2002; Frost *et al.* 2004; Suydam *et al.* 2005; Cameron and Boveng, 2009; Christie *et al.* 2010; Allen and Angliss 2011).

*Comment 7:* AWL *et al.* states that using density is unsuited for determining bowhead take during the fall migration. AWL *et al.* further argues that the bowhead whales would pass through the Beaufort and Chukchi Sea in the fall during their migration within a migratory corridor. AWL *et al.* then points out that it was not clear NMFS has adequately considered the migration of beluga whales in the Beaufort Sea as well. AWL *et al.* predicts that when taking the bowhead migration into account could dramatically increase the estimate of harassed whales.

*Response:* NMFS does not agree AWL *et al.'s* assessment. ION's in-ice seismic survey would only occur after the majority of bowhead and beluga whales have migrated out of the Beaufort Sea. In addition, as noted in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012), ION would start its seismic survey from the east and proceed westward, thereby overlapping with the fewest possible number of marine mammals later in the season. Therefore, using summer/fall marine mammal density to calculate takes in the Arctic when most animals have left the area is a reasonable and scientifically supportable approach, although, as stated it will result in an over-estimate of takes.

*Comment 8:* The Commission requests NMFS require ION to (1) consult with NMFS National Marine Mammal Laboratory (NMML) and other researchers and revise its expected density estimates for gray whales and bearded seals to reflect new information from passive acoustic recordings, and (2) include, as appropriate, an estimate of takes by Level A harassment for those species. Citing Stafford *et al.* (2007), Wang and Overland (2009), Shelden and Mocklin (2012), the Commission points out that acoustic data show that these species are present throughout the winter months. The NSB also expresses its concern that bowhead and gray whales may remain in the area much longer than previously thought. Oceana is also concerned that there could be Level A takes of bearded seals, though it recognizes that much of the bearded seal population will have already migrated into the Bering Sea.

*Response:* NMFS' Office of Protected Resources and ION worked extensively with NMFS' NMML on density estimates for all marine mammals (gray

whales and bearded seals included) that could occur in the proposed survey area. The approaches took into account the best available scientific data on the abundance of marine mammals (gray whales and bearded seals included) that could potentially occur through the winter season, as well as estimates erred on the overestimation. NMFS and ION conducted a thorough review of acoustic recordings data pertaining to overwintering marine mammals (*e.g.,* Stafford *et al.* 2007; Roth 2008; MacIntyre and Stafford 2011; Shelden and Mocklin 2012). We concluded that although some marine mammals were detected in the Beaufort and Chukchi Seas during this time, none of the studies allowed us to identify specific density estimates. In addition, many studies show that marine mammal calling rates dropped significantly during the winter months (Roth 2008; MacIntyre and Stafford 2011), which is consistent with our prediction based on tagging research (Cameron and Boveng 2009; Harwood *et al.* 2012). The notion is also shared by Oceana as it stated in its comment that much of the population of bearded seals will have already migrated into the Bering Sea. These reviews support our initial analyses and the basis for marine mammal take estimates. Therefore, we do not believe it is necessary, nor is it feasible, to revise density estimates or to include gray whales and bearded seals in the Level A take estimates.

Finally, we acknowledge that bowhead and gray whales may remain in the Beaufort and Chukchi Seas during the timeframe of ION's proposed survey. To account for this possibility, NMFS relied on summer/fall data to estimate potential abundance of these species, which resulted in an over-estimate of take.

*Comment 9:* The Commission requests NMFS require ION to recalculate expected densities for bowhead whales based on (1) the corrected decrease in abundance of bowhead whales reported by Miller *et al.* (2002) for early and late October (*i.e.,* 78 percent) and (2) any additional information from more recent surveys, including acoustical surveys, conducted by NMFS' NMML and other researchers to assess the distribution and relative abundance of bowhead whales in the survey area from October through December.

*Response:* Through the process of analyzing the potential impacts of ION's in-ice seismic survey in the Beaufort and Chukchi Seas, NMFS' Office of Protected Resources and ION worked extensively with NMFS' NMML on marine mammal density estimates, including distribution and densities of

**65064** **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

**23**

bowhead whales. The early October (October 1–15) bowhead abundance of 0.55 bowheads/100 km and the late October (October 15–31) abundance of 0.12 bowheads/100 km reported in Miller *et al.* (2002) were both calculated as overall averages across the four survey regions and all water depth strata. The reference density to which the 90% decrease from early October to late October adjustment was applied was based only on bowhead sightings in less than 200 m of water. Thus, data in table Appendix 9.1 in Miller *et al.* (2002), which excludes water depths >200 m, were used for the calculation. In that table, the mean number of bowheads/100 km seen from October 1–15 was 0.618 and the mean for October 16–31 was 0.089. This represents an 86% decrease from early to late October, which was rounded to 90%.

If the percentage decrease were left unrounded the average density for water depths <200 m in the Eastern Beaufort Sea in Table 2 of the ION's IHA application would become 0.0132 bowheads/km². Using this value the take calculations would be 282, instead of the 201 stated in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012).

NMFS and ION by focused on bowhead whale aerial surveys that were conducted in the spring of 2011 and 2012. We ultimately agreed that the aerial survey data being used for density calculations was the most appropriate and that any newer data (*i.e.* from 2011 surveys) was of no added value. More recent aerial survey data were not used for the direct calculation of densities in late October as there have been very few surveys conducted at that time of year in the eastern U.S. Beaufort in recent years. Although acoustic data can be useful in assessing distribution, and to a limited extent, relative abundance, however, as with acoustic data for other marine mammals, none of them provides a basis for density estimates.

*Comment 10:* The Commission requests NMFS provide stronger assurance that the actual number of takes would be negligible by (1) estimating the expected number of takes plus some measure of uncertainty in that estimate, (2) using maximum estimated densities of the marine mammals in the survey area to estimate takes, or (3) using some comparable approach that accounts for uncertainty and provides a high level of assurance that the actual taking would, in fact, be negligible. In addition, the Commission requests NMFS require ION to account for all sources of uncertainty in its estimation approach, including animals that may be present but not observed.

Oceana and the NSB also express their concerns regarding the uncertainty of the impacts to marine mammals from ION's in-ice seismic survey during the winter season.

*Response:* NMFS believes that the analyses provided in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012) has already provided a well-founded assurance that the impacts from even the overestimated takes, which were based on summer-fall marine mammal density, would be negligible to marine mammal species and stocks in ION's in-ice seismic survey areas in the Beaufort and Chukchi Seas, and that the take would not have unmitigable impacts to subsistence use of these species and stocks. These analyses already took uncertainties of marine mammal winter distribution and densities into account and erred on the side of caution.

The determination regarding whether the total taking would have a negligible impact on the species or stocks is based on the species-specific average density, or based on allotted number from past chance occurrence, as described above and in the proposed **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012). More importantly, the negligible impact analysis is not simply an assessment of the number of takes, but rather includes consideration of the nature, context, and likely severity of the takes, as well as the anticipated effectiveness of the mitigation measures. As described later in this document, our analysis allowed us to determine that the total taking would have a negligible impact on the affected species.

Regarding the requirement for ION to account for all sources of uncertainty in its estimation approach, including animals that may be present but not observed, NMFS believes that all population survey studies, as well as density estimates, take into account for marine mammals not observed during the survey.

*Acoustic Impacts*

*Comment 11:* PEW states that NMFS needs to ensure that best science is used when considering permitting an IHA to authorize Level A harassment of marine mammals, since this is the first time Level A take is being proposed.

*Response:* NMFS has relied on the best available scientific information to support the issuance of ION's authorization. In the case of authorizing Level A harassment, NMFS has estimated that no more than 1 bowhead whale, 3 beluga whales, and 4 ringed seals could, although unlikely, experience minor permanent threshold

shifts of hearing sensitivity (PTS). The available data and analyses, as described more fully in the proposed IHA, include extrapolation results of many studies on marine mammal noise-induced temporary threshold shifts of hearing sensitivities (TTS) (Kryter 1985; Richardson *et al.* 1995; Kastak *et al.* 1999; Schlundt *et al.* 2000; Finneran *et al.* 2002; 2005; Nachtigall *et al.* 2003; 2004; Kastak *et al.* 2004; 2005; Southall *et al.* 2007; Mooney *et al.* 2009a; 2009b; Finneran *et al.* 2010a; 2010b). An extensive review of TTS studies and experiments prompted NMFS to conclude that possibility of minor PTS in the form of slight upward shift of hearing threshold at certain frequency bands by a few individuals of marine mammals is extremely low, but not unlikely.

*Comment 12:* Citing NMFS' 1995 **Federal Register** notice (60 FR 28379), AWL *et al.* argues that since the proposed seismic survey has the potential to cause permanent hearing loss in marine mammals, the impact must constitute "serious injury." Ocean Conservancy also states that PTS equals "serious injury". AWL *et al.* further states that marine mammals enter the 180/190 dB re 1 μPa exclusion zones have at least the potential to suffer serious injury, and thus AWL *et al.* assumes that at least 23 beluga whales, 6 bowhead whales, and 277 ringed seals could potentially suffer serious injury as a result of the survey. Oceana also expresses its concern that serious injury could occur to marine mammals.

*Response:* Our understanding of noise-induced impacts on marine mammals has evolved over the past two decades and we no longer believe, based on the best available data, that PTS equals "serious injury." As described in detail in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012), the potential Level A takes would be limited to minor degrees of PTS by 1 bowhead whale, 3 beluga whales, and 4 ringed seals. This level of injury is different from "serious injury," which is defined as "any injury that will likely result in mortality" (50 CFR 229.2).

Noise-induced threshold shifts (TS, include PTS) are defined as increases in the threshold of audibility (*i.e.*, the sound has to be louder to be detected) of the ear at a certain frequency or range of frequencies (ANSI 1995; Yost 2000). Several important factors relate to the magnitude of TS, such as level, duration, spectral content (frequency range), and temporal pattern (continuous, intermittent) of exposure (Yost 2000; Henderson *et al.* 2008). TS occurs in terms of frequency range

**Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

(hertz [Hz] or kHz), hearing threshold level (dB), or both frequency and hearing threshold level (CDC 2004).

In addition, there are different degrees of PTS: Ranging from slight/mild to moderate and from severe to profound (Clark 1981). Profound PTS or the complete loss of the ability to hear in one or both ears is commonly referred to as deafness (CDC 2004; WHO 2006). High-frequency PTS, presumably as a normal process of aging that occurs in humans and other terrestrial mammals, has also been demonstrated in captive cetaceans (Ridgway and Carder 1997; Yuen *et al.* 2005; Finneran *et al.* 2005a; Houser and Finneran 2006; Finneran *et al.* 2007a; Schlundt *et al.* 2011) and in stranded individuals (Mann *et al.* 2010).

In terms of what is analyzed for the potential PTS (Level A harassment) in marine mammals as a result of ION's in-ice seismic survey, if it occurs, NMFS has determined that the levels would be slight/mild because research shows that most cetaceans (and particularly Arctic cetaceans) show relatively high levels of avoidance when received sound pulse levels exceed 160 dB re 1 µPa (rms) (review in Richardson *et al.* 1995; Southall *et al.* 2007), and it is uncommon to sight Arctic cetaceans within the 180 dB radius, especially for prolonged duration. Results from monitoring programs associated with seismic activities in the Arctic have shown significant responses by cetaceans at levels much lower than 180 dB. These results have been used by agencies to support monitoring requirements within distances where received levels fall below 160 dB and even 120 dB. Thus, very few animals would be exposed to sound levels of 180 dB re 1 µPa (rms) regardless of detectability by protected species observers. Avoidance varies among individuals and depends on their activities or reasons for being in the area, and occasionally a few individual Arctic cetaceans will tolerate sound levels above 160 dB. Tolerance of levels above 180 dB is infrequent, regardless of the circumstances. Therefore, a calculation of the number of cetaceans potentially exposed to >180 dB that is based simply on density would be a gross overestimate of the actual numbers exposed to 180 dB. Such calculations would be misleading unless avoidance response behaviors were taken into account to estimate what fraction of those originally present within the soon-to-be ensonified to >180 dB zone (as estimated from density) would still be there by the time levels reach 180 dB.

*Comment 13:* The Ocean Conservancy and AWL *et al.* state that NMFS' analysis underestimated the impact of stress and the effects of airguns on bowhead whales.

*Response:* NMFS does not agree with the assessment. The **Federal Register** for the proposed IHA (77 FR 49922; August 17, 2012) provided an analysis of the potential stress response to marine mammals (bowhead included) that could result from ION's in-ice seismic survey. However, almost no information is available on sound-induced stress in marine mammals, or on its potential (alone or in combination with other stressors) to affect the long-term well-being or reproductive success of marine mammals (Fair and Becker 2000; Hildebrand 2005; Wright *et al.* 2007a, 2007b). Nevertheless, extrapolation of information regarding stress responses in other species is applicable because the responses are highly consistent among all species in which they have been examined to date, especially considering that marine mammals will likely respond in a manner consistent with other species studied (Wright *et al.* 2007a). In the section discussing non-auditory effects, NMFS summarized that a range of issues may arise from an extended stress response from noise exposure, which include suppression of reproduction (physiologically and behaviorally), accelerated aging and sickness-like symptoms. Such long-term effects, if they occur, would be mainly associated with chronic noise exposure, which is characteristic of some seismic surveys and exposure situations (McCauley *et al.* 2000b; Nieukirk *et al.* 2009) but not of some others. As described in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012), ION's in-ice seismic survey would be performed in a limited area for a short duration (a total 76 days). In addition, the source vessel would be in constant movement as it acquires seismic data and [would not overlap with individuals for a substantial period of time]. Therefore, we have concluded that marine mammals would not suffer from chronic and long-term, noise exposure.

In addition, NMFS provided more detailed analyses on noise-induced stress in its EA for the issuance of an IHA to ION (NMFS 2012), which also included three specific studies concerning marine mammals (Thomas *et al.* 1990; Romano *et al.* 2004; Rolland *et al.* 2012). These studies point out that short-term noise exposure, such as those animals being tested for TTS, only induced stress-immune system change during intense noise exposure (Romano *et al.* 2004), while during playbacks of recorded drilling noise to four captive beluga whales showed no changes in blood levels of stress-related hormones (Thomas *et al.* 1990).

*Comment 14:* Citing Lucke *et al.* (2009) TTS experiment on a harbor porpoise, the AWL *et al.* points out that a harbor porpoise experienced TTS when exposed to airgun noise at 164 dB, a significantly lower level than what NMFS predicts.

*Response:* NMFS does not agree with AWL *et al.*'s assessment. AWL *et al.* erroneously interpreted the results of the TTS-induced sound exposure level (SEL) in Lucke *et al.* (2009) to be sound pressure level (SPL) that NMFS uses for the threshold of PTS. In their paper, Lucke *et al.* (2009) found a threshold shift (TS) of a harbor porpoise after exposing it to airgun noise with peak-to-peak (pk-pk) received SPL at 200.2 $dB_{pk-pk}$ re 1 µPa, which according to the authors, corresponds to SEL of 164.5 dB re 1 µPa$^2$s after integrating exposure. It is important to understand that SPL and SEL are two very different ways to express the relative sound intensity. NMFS currently uses root-mean-square (rms) of received SPL at 180 dB and 190 dB re 1 µPa as the threshold above which PTS could occur for cetaceans and pinnipeds, respectively, and that TTS is thought to occur below these levels. However, TTS experiments so far have shown that in almost all cases TTS would occur at levels much higher than the 180 and 190 dB re 1 µPa thresholds. It is difficult to determine the equivalent of rms SPL from the reported pk-pk SPL in Lucke *et al.* (2009) because the airgun noise is a broadband impulse. Although it is a standard practice to subtract 9 dB from pk-pk SPL of a sinusoidal signal to convert it to rms SPL, for boardband signal from seismic surveys, the difference could be as large as 16 dB (Harris *et al.* 2001; McCauley *et al.* 2000). If we applied the 16 dB difference and convert the pk-pk reported in Lucke *et al.* (2009), the rms SPL for harbor porpoise to experience TTS would be 184 dB re 1 µPa, and the received levels associated with PTS (Level A harassment) would be higher than that. This is still above NMFS 180 $dB_{rms}$ re 1 µPa threshold for injury.

Nevertheless, NMFS recognizes that the TTS threshold of harbor porpoise is lower that other cetacean species (bottlenose dolphin and beluga whale) tested (*e.g.*, Finneran *et al.* 2002), and is discussed in the **Federal Register** notice of the proposed IHA (77 FR 49922; August 17, 2012), as well as the EA for the issuance of the IHA to ION (NMFS 2012).

*Comment 15:* Citing Kastak *et al.* (2008) and Jujawa and Liberman (2009), AWL *et al.* states that anthropogenic sound can induce PTS at lower levels

65066 **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

than anticipated. In addition, AWL states that new data indicate that mid-frequency cetaceans, such as bottlenose dolphins and beluga whales have greater sensitivity to sounds within their best hearing range than was supposed at the time Southall *et al.* (2007) was published.

*Response:* NMFS agrees that PTS could occur at relatively lower levels, such as at levels normally would only cause TTS, if the animal experiences repeated exposures at very close distances to the sound source. These long term effects are well known in terrestrial mammals (Yost 2000; Henderson *et al.* 2008) and is acknowledged in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012) that repeated exposure to elevated noise that causes TTS could eventually result in PTS. However, as mentioned in detailed in the proposed IHA, ION's in-ice seismic survey would be performed in a limited area for a short duration of a total 76 days. In addition, the source vessel would be in constant movement as it acquires seismic data and any overlap between the vessel and affected species would be minimal and short-lived. Therefore, NMFS considers it highly unlikely many animals would be repeatedly exposed to received levels that would cause TTS.

As far as the hearing sensitivity of mid-frequency cetaceans is concerned, it is well known that mid-frequency cetaceans have greater sensitivity to sounds within their best hearing ranges, which are typically between 10–100 kHz (Johnson 1967; Hall and Johnson 1972; White *et al.* 1978; Awbrey *et al.* 1988; Johnson *et al.* 1989; Ridgway *et al.* 2001). Further TTS research on a bottlenose dolphin exposed to pure tones suggests that mid-frequency cetacean tends to be more vulnerable (in terms of TTS occurrence) at their most sensitive hearing range (Finneran *et al.* 2010). However, the majority of acoustic energy from a seismic airgun, vessel and icebreaking noise is under 1 kHz (Richardson *et al.* 1995), which is expected to have less impact on the most sensitive hearing ranges of these cetaceans.

*Comment 16:* AWL *et al.* argues that NMFS' justifications for the use of a correction factor of only counting 10% marine mammals being exposure to received levels at Level A would show no avoidance and thus subject to PTS and that exposure will only be brief are both flawed and unsupported by survey data and scientific evidence. Citing Arctic seismic survey monitoring and mitigation reports from previous years, AWL *et al.* states that marine mammals,

especially ice seals, do not always avoid loud noises, and that marine mammals routinely stray too close to the airguns, even during daylight hours. The Commission also requests NMFS require ION provide a scientific basis for any conclusions about the animals' responses to the airguns. The Commission further requests NMFS require ION to revise the estimated number of Level A harassment takes to include all marine mammals that may be exposed to source levels greater than or equal to 180 and 190 dB re 1 µPa for cetaceans and pinnipeds, respectively.

*Response:* NMFS does not agree with AWL *et al.'s* assessment. As discussed earlier in the response to Comment 13, NMFS' current Level A take threshold of 180 dB re 1 µPa for cetaceans is appropriate. Marine mammals found in these zones are not expected to experience TTS (a form of Level B Harassment), much less PTS (Level A Harassment) even if they are exposed to a few seismic impulses. On the other hand, almost all marine mammals that underwent TTS experiments showed strong aversive behavioral reactions when the received noise levels approached to levels that could cause TTS (*e.g.,* Nachtigall *et al.* 2004; Fineran and Schlundt 2004; Lucke *et al.* 2009), despite the fact that these animals are trained and food-reinforced to participate the studies. Simply because previous seismic survey monitoring reports reveal that marine mammals were observed in the exclusion zones does not mean the animals necessarily experienced TTS, much less PTS..

The 10% correction factor used by NMFS is appropriate for estimating likely Level A Harassment takes, since there is evidence suggesting that most, if not all, marine mammals would avoid the noise levels that could cause immediate PTS (as described in the Estimated Take section below).

NMFS does not agree with the Commission's recommendation. Again, there is a difference between potential TTS (Level B Harassment), potential PTS (Level A Harassment) and serious injury. As described in detail in the response to Comment 13, the 180/190 dB re 1 µPa are the current standards used to prevent marine mammals from experiencing injury, which is equated with PTS, not TTS, which occurs at substantively lower received levels than PTS. In fact, all studies on marine mammal TTS have pointed out that TTS occurs at a received levels higher than NMFS current 180/190 dB re 1 µPa threshold (*e.g.,* Finneran *et al.* 2000; 2002; Lucke *et al.* 2009). Even if the animal is exposed multiple times at levels higher than the 180/190 dB re 1

µPa threshold and receives TTS, it is not considered physical injury. TTS, which is also referred to as auditory fatigue, is a reversible hearing threshold shift and it often recovers within minutes to hours (Ward 1997; Finneran *et al.* 2000; 2002). The numbers AWL *et al.* cited in their comment are the estimates of marine mammals that could occur within NMFS 180/190 dB re 1 µPa exclusion zones, which do not represent the number of animals that would receive TTS, not to mention PTS. In fact, NMFS considers in most cases all animals would avoid staying within the zones long enough to receive TTS. Therefore, most marine mammals will not experience TTS, which means the occurrence of PTS would be even lower.

Finally, even if the animal receives PTS, this does not equate to serious injury. As stated earlier in response to Comment 13, NMFS defines injury as "any injury that will likely result in mortality" (50 CFR 229.2), which, based on the best available science and NMFS' judgment, does not include PTS. .

*Comment 17:* The AWL *et al.* states that the current NMFS 160-dB re 1 µPa threshold for Level B harassment is arbitrary and non-conservative. Citing papers by Clark and Gagnon (2006), Risch *et al.* (2012), Bain and Williams (2006), Miller *et al.* (1999; 2005), the AWL *et al.* argues that in many cases marine mammals respond to much lower noise levels.

*Response:* NMFS does not agree with AWL *et al.'s* assessment, as the papers AWL cited do not necessarily indicate that the animals exposed under the certain received levels constitute a "take" as defined under the MMPA. Clark and Gagnon (2006) reported that fin whales (*Balaenoptera physalus*) in the northeast Pacific Ocean went silent for an extended period starting soon after the onset of a seismic survey in the area, and Risch *et al.* (2012) reported that humpback whale (*Megaptera novaeangliae*) song in the Stellwagen Bank National Marine Sanctuary was reduced, concurrent with transmissions of an Ocean Acoustic Waveguide Remote Sensing experiment that produced series of frequency modulated pulses approximately 200 km away in the Gulf of Maine. Although Miller *et al.* (1999) reported that bowhead whale deflection may occur about 35 km (21.7 mi) to the east of the seismic operations, no SPL measurement to that distance was provided, except noting that received levels at 30 km (18.6 mi) were about 107–126 dB re 1 µPa rms, depending on propagation. In addition, Miller *et al.* (2005) and Bain and Williams (2006) observed that marine mammal densities were generally lower

**26**
**65067**

Federal Register / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

during seismic surveys and were seen moving away from seismic sources, even in areas where received levels were far below 160 dB re 1 µPa. Nevertheless, Miller *et al.* (2005) noted that bowhead whales have been sighted within the "safety radius" without any observed behavioral responses.

To address these observations, it is important to understand that the vocal behaviors shown by fin and humpback whales, as reported by Clark and Gagnon (2006) and Risch *et al.* (2012), are considered to be related to mating activities, which do not apply to bowhead whales and other marine mammal species in the Beaufort and Chukchi Seas during ION's in-ice seismic survey. Second, as stated in the past, NMFS does not believe that minor course corrections during a migration or temporarily moving away from seismic source, as observed by Miller *et al.* (1999; 2005) and Bain and Williams (2005) equate to "take" under the MMPA. This conclusion is based on controlled exposure experiments conducted on migrating gray whales exposed to the U.S. Navy's low frequency sonar (LFA) sources (Tyack 2009). When the source was placed in the middle of the migratory corridor, the whales were observed deflecting around the source during their migration. However, such minor deflection is considered not to be biologically significant. To show the contextual nature of this minor behavioral modification, recent monitoring studies of Canadian seismic operations indicate that when not migrating, but involved in feeding, bowhead whales do not move away from a noise source at an SPL of 160 dB. Therefore, while bowheads may avoid an area of 20 km (12.4 mi) around a noise source, when that determination requires a post-survey computer analysis to find that bowheads have made a 1 or 2 degree course change, NMFS believes that does not rise to a level of a "take." NMFS therefore continues to estimate "takings" under the MMPA from impulse noises, such as seismic, as being at a distance of 160 dB re 1 µPa. Although it is possible that marine mammals could react to any sound levels detectable above the ambient noise level within the animals' respective frequency response range, this does not mean that such animals would react in a biologically significant way. According to experts on marine mammal behavior, the degree of reaction which constitutes a "take," *i.e.,* a reaction that could potentially disrupt the migration, breathing, nursing, breeding, feeding, or sheltering, etc., of a marine mammal is complex and

context specific, and it depends on several variables in addition to the received level of the sound by the animals. These additional variables include, but are not limited to, other source characteristics (such as frequency range, duty cycle, continuous vs. impulse vs. intermittent sounds, duration, moving vs. stationary sources, etc.); specific species, populations, and/ or stocks; prior experience of the animals (naive vs. previously exposed); habituation or sensitization of the sound by the animals; and behavior context (whether the animal perceives the sound as predatory or simply annoyance), etc. (Southall *et al.* 2007).

Based on the information and data summarized in Southall *et al.* (2007), and on information from various studies, NMFS believes that the onset for behavioral harassment is largely context dependent, and there are many studies showing marine mammals do not show behavioral responses when exposed to multiple pulses at received levels above 160 dB re 1 µPa (*e.g.,* Malme *et al.* 1983; Malme *et al.* 1984; Richardson *et al.* 1986; Akamatsu *et al.* 1993; Madsen and Møhl 2000; Harris *et al.* 2001; Miller *et al.* 2005). Therefore, although using a uniform SPL of 160-dB for the onset of behavioral harassment for impulse noises may not capture all of the nuances of different marine mammal reactions to sound, it is an appropriate way to manage and regulate anthropogenic noise impacts on marine mammals. Therefore, unless and until an improved approach is developed and peer-reviewed, NMFS will continue to use the 160–dB threshold for determining the level of take of marine mammals by Level B harassment for impulse noise (such as from airguns).

*Comment 18:* Citing the Expert Panel Review of Statoil and ION's 2011 monitoring plans, the AWL *et al.* states that the noise from seismic airgun arrays as "a mixed impulsive/continuous noise source" and that "NMFS should evaluate its impacts on that basis."

*Response:* NMFS does not agree with the AWL *et al.*'s statement. First, nowhere in the Expert Panel's report did it states that airgun sound is "a mixed impulsive/continuous noise source". It has been well understood that the source characteristics from a seismic airgun (or airgun array) are impulsive, with no continuous acoustic components (Richardson *et al.* 1995). What the Expert Panel stated in its report is that "seismic airgun signals should not be treated as truly impulsive when received at ranges where sound propagation is known to remove the impulsive nature of these signals", which means that the signals become

"stretched" at very large distance due to reverberation and multipath propagation. Furthermore, the Expert Panel stated that "[o]ver very short ranges where potential hearing loss (temporary or permanent) can occur, airgun impulses retain their impulsive features and should be considered as impulses."

Although it has been known that at long distances an impulse acoustic signal will lose its pulse feature by stretching its duration due to multipath propagation, these signals (or noises) are still fundamentally different from other non-impulse noise sources such as those from vibratory pile driving, drilling, and dredging based on the following characteristics:

First, the elongated pulse signals from the airgun array at far distances are caused by multipath propagation in a reverberant environment (Greene and Richardson 1988; Richardson *et al.* 1995; Madsen *et al.* 2002; Lurton 2002), which is different from other non-pulse signals at closer distances, which is composed of mostly direct sound. The reverberation part of the sound in the ocean behaves differently compared to the direct sound and early surface and bottom reflections from the perspective of the receiver. The direct sound and early reflections follow the inverse square law, with the addition of absorption effects in the case of early reflections, and so their amplitude varies with distance. However the reverberant part of the sound remains relatively constant up to a large distance with the position of the receiver. Therefore, as distance increases from the source, the component of reverberant sounds increases against the direct sound. In addition, the reverberant energy is less directional and is distributed more uniformly around the ambient environment of the animal. As shown in human psychoacoustics, these characteristics in a reverberant field provide distance cues to the listener as to how far away the source is located (Howard and Angus 2006). Therefore, at a distance where the airgun signals have been "stretched" to non-pulse, the receiving animals would be able to correctly perceive that these sounds are coming from far away, and would thus be less likely to be affected behaviorally as behavior responses are not solely dependent on received levels. Other factors such as distance to the source, movement of the source, source characteristics, and the receiver's (*i.e.,* animal's) age, sex, motivation states, and prior experience, etc. probably play more significant roles in determining the responses of the animals that are

**65068** **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

being exposed to lower levels of noises than solely the received sound level.

Second, even though during horizontal propagation, the initial short pulse could be "stretched" from milliseconds when emitted to about 0.25–0.5 second long at a few kilometers in shallow water (Richardson *et al.* 1995), the noise duration is still very short when compared to those "conventional" non-pulse noise sources (vibratory pile driving, drilling, and dredging, etc.) for which NMFS applies a 120 dB threshold for assessing behavioral harassment. The empirical measurements of a 3,000 in3 airgun array received signal characteristics showed that its pulse duration was stretched to 0.2 second at approximately 1.3 km (0.8 mi), to 0.5 second at approximately 10 km (6.2 mi), and to about 1.8 seconds at 80 km (50 mi) from the source (O'Neill *et al.* 2011). Based on the airgun array's firing rate of 0.1 Hz (1 shot every 10 seconds), the duty cycle was only 18% for the signal at 80 km (50 mi) (1.8 seconds on for every 10 seconds). Conversely, the "conventional" non-pulse noises from vibratory pile driving, drilling, and dredging typically last much longer (minutes to hours) with very brief (seconds for vibratory pile driving) intervals.

Therefore, NMFS does not agree that it is appropriate to treat elongated airgun pulses at long distances as a "conventional" non-pulse signal and apply the 120 dB behavioral response threshold to that received sound.

*Comment 19:* Citing Madsen (2005), the AWL *et al.* states that "the threshold's basis in the root mean square ("RMS") of sound pressure, rather than in peak pressure, is non-conservative." The AWL *et al.* further claims that studies have criticized the use of RMS for seismic sound because of the degree to which pulsed sounds must be "stretched," resulting in significant potential underestimates of marine mammal take. The AWL *et al.* predicts that if NMFS would modify its threshold estimates to use the peak pressure level instead of RMS, the estimated number of marine mammal takes could be significantly higher than the number of takes NMFS intends to authorize in for this survey.

*Response:* NMFS does not agree with the AWL *et al.*'s statement. First, there is no scientific basis that the use of root-mean-square (rms) for sound pressure is less conservative than using peak pressure (which includes zero-peak pressure and peak-peak pressure). All of these are valid terms to express acoustic pressure and other physical oscillations (*e.g.*, alternating electrical current).

NMFS chooses to use rms because it was first established to regulate underwater noise impacts to marine mammals and that rms uses the product mean of acoustic pressures, which provides a more consistent result when dealing with multiple impulses such as pile driving. For a sinusoidal signal, the relationship between rms level and peak pressure level is that the rms level of a given sinusoidal signal is always 3 dB lower than the zero-peak level, and 9 dB lower than the peak-peak level. Therefore, for example, if the peak levels would be used to set the threshold for marine mammal disturbance, it would be 163 dB re 1 µPa (0-peak) or 169 dB re 1 µPa (peak-peak), instead of the current 160 dB re 1 µPa (rms).

Second, it is not true that the use of rms for calculating the levels of seismic impulse, or any other acoustic impulse, the pulsed sound "must be stretched". The concern raised by Madsen (2005) was the perceived lack of a standardized window for calculating the rms levels during averaging. Citing a 2003 **Federal Register** notice (68 FR 9991; March 3, 2003), Madsen (2005) stated "[t]he rms measure critically relies upon choosing the size of averaging window for the squared pressures. Derivation of this window is not standardized, which can lead to 2–12 dB differences in rms sound pressure for the same wave form." However, NMFS actually uses a standard 90% energy window when performing rms calculation for impulse sounds.

*Comment 20:* The Ocean Conservation Research is concerned that acoustic impacts on the habitat, especially other marine organisms were not analyzed. In addition, citing Roth *et al.* (2012), the Ocean Conservation Research points out that the overall ambient noise levels could increase by 8 dB as a result of the seismic survey.

*Response:* NMFS does not agree with the Ocean Conservation Research's assessment. The **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012) provided an analysis on the potential impacts of marine mammal habitat. The acoustic impacts on other marine organisms in the context of their value in marine mammal habitat, including planktonic species, invertebrates, and fish species are further analyzed in detail in the Environmental Assessment for the issuance of the IHA. Regarding the Ocean Conservation Research's concern of the raising ambient noise due to seismic survey in the Arctic, NMFS agrees that such concerns are valid, as was reported by Roth *et al.* (2012) that the average ambient noise in the

Chukchi and Beaufort Seas increased by 2–8 dB in September and early October in all years between 2006 and 2009. However, ION's in-ice seismic survey is short in duration, will be confined to a limited area, and will occur from mid-to late-October through December, outside the time period of concern. The overall impact to the Beaufort and Chukchi Sea ecosystem, including marine mammal habitat, is not expected to be significant.

*Monitoring and Mitigation Issues*

*Comment 21:* PEW states that NMFS should exclude important habitat from the survey area and institute time- and place-based restriction before permitting activities. Especially, PEW requested NMFS consider excluding Hanna and Herald Shoals, the Barrow Canyon, and the Chukchi Sea ice lead system.

*Response:* Although the Hanna Shoals are located in the U.S. EEZ, the majority of the Herald Shoals are located in the Russian EEZ. Nevertheless, both areas are outside ION's seismic survey area. Although Barrow Canyon, which is on the edge of the proposed in-ice seismic survey boundary, is considered as an important feeding area for bowhead whales primarily due to its high productivity, it is only important to marine mammals during the open water summer and early fall seasons, which ends in September (Suydam *et al.* 2005; Ashjian *et al.* 2010; Moore *et al.* 2010). The Chukchi Sea ice lead system along the entire Alaskan coastline serves as an important corridor for migrating marine mammals such as bowhead whales, especially during the spring (Braham *et al.* 1980). PEW even acknowledged in its comments to NMFS on the draft *Environmental Impact Statement (EIS) on the Effects of Oil and Gas Activities in the Arctic Ocean* (NMFS 2012a) that the bowhead whale population "travels along the Chukchi Sea coast during spring months, from March through June." In addition, it is well known that bowhead whale fall migration does not necessarily follow the lead system (Huntington and Quakenbush 2009; Quakenbush *et al.* 2010; Allen and Angliss 2011). Considering that ION's in-ice seismic survey is designed specifically to avoid encountering large numbers of marine mammals after the majority of the animals have migrated out of the Beaufort and Chukchi Seas, NMFS does not believe that time and area restrictions are scientifically supportable or would provide any meaningful benefit to marine mammals.

*Comment 22:* AWL *et al.* claims that NMFS did not fully consider the impacts of ION's survey on migrating bowhead whale mother and calf pairs,

**Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

**28**
**65069**

as cows and calves are known to favor the tail end of the spring and fall migrations. Citing NMFS 2008 and 2011 Biological Opinions, AWL *et al.* states that females with young bowhead whales are more responsive to noise and human disturbance than other and that cow/calf pairs typically migrate through the area later in the season (*i.e.*, late September/October). AWL *et al.* points out that in 2006 NMFS required a 120-dB exclusion zone for four or more cow-calf pairs to reduce impacts on mother-calf pairs. In addition, the Commission also recommends NMFS require ION to establish and monitor adequately both a 160- and 120-dB re 1 µPa disturbance zone around all sound sources and to not initiate or continue an activity if (1) an aggregation of bowhead whales or gray whales (12 or more whales of any age/sex class that appear to be engaged in a non-migratory, significant biological behavior (*e.g.*, feeding, socializing)) is observed within the 160-dB re 1 µPa, or (2) a female-calf pair is observed within the 120-dB re 1 µPa zone.

*Response:* NMFS recognizes that bowhead cow and calf pairs are more prone to human disturbance than other individuals, and that they normally follow the tail-end of the migration. However, as discussed in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012), ION's in-ice seismic survey will occur in the very latter part of the bowhead whale season (beginning after mid-October) and we expect very few responses. Research indicates that on average about 97% of the bowhead whales would have passed through eastern of the Beaufort Sea by October 15 (Miller *et al.* 2002), and that all studies point that majority of the bowhead whales will be out of the Beaufort and Chukchi Seas (Allen and Angliss 2011). More importantly, ION plans to conduct its survey in an east to west fashion (the fall migration of bowhead whales occurs in an east to west direction), which would further reduce the potential takes of the few remaining whales. In addition, as discussed in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012) and in the Environmental Assessment, daylight hours during ION's in-ice seismic survey would be very limited, which makes aerial surveys unfeasible. Therefore, based on our knowledge of bowhead whale migration and the practicability in carry out the monitoring and mitigation measures, NMFS will not require ION implement the 120-dB exclusion zone for cow-calf pairs nor the 160-dB exclusion zone for

an aggregation of 12 or more whales, and concludes that the potential impacts to bowhead whale cow-calf pairs are extremely unlikely.

*Comment 23:* AWL *et al.* states that NMFS should require ION provide additional clarification about the location and timing of its surveying. AWL *et al.* points out that the proposed IHA describes the surveying as beginning in deeper water (>1,000 m) in the eastern half of the survey area before moving to the west in late October or early November. AWL *et al.* states that bowhead migration has the potential to extend into late October and even November. AWL *et al.* further states that NMFS must specify the earliest date at which ION may survey in more shallow waters near the migration corridor, and include the specific timing of ION's operation in its conclusions and recommendations.

*Response:* NMFS believes that ION's survey plan is adequately described in its application and the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012). ION entered the U.S. Beaufort Sea survey area from Canadian waters in early October and plans to begin data collection in mid-October 2012. Therefore, the actual seismic survey would not start until after mid-October due to logistical delays. Weather and ice permitting, ION plans to begin survey operations east of the Beaufort Sea and in offshore waters (>1,000 m [3,281 ft]) where bowheads are expected to be least abundant in mid-October. This operational plan is based on the fact that only ~2% of the bowhead whales observed by Bureau of Ocean Energy Management's (BOEM) aerial surveys from 1979–2007 occurred in areas of water depth >1,000 m (3,281 ft) (MMS 2010), and on average ~97% of bowheads have passed through the eastern U.S. Beaufort Sea by October 15 (Miller *et al.* 2002). The survey would then progress to shallower waters in the eastern survey area before moving to the western survey area in late October or early November 2012. NMFS has conducted thorough analysis on potential disturbances of bowhead whales and other marine mammals in the entire Beaufort and Chukchi Seas for the period of ION's in-ice seismic survey and reached a negligible determination. Finally, at this point it is clear that the delay of ION's in-ice seismic survey into mid- to late October would further reduce impacts to marine mammals in the action area.

*Comment 24:* The Commission requests that NMFS require ION to (1) record, analyze, and report (within five days of collecting the data) the results of measurements of vessel sounds,

including the icebreaking vessel and (2) adjust the size of the 120–dB re 1 µPa harassment zone and revise the estimated number of animals expected to be taken by Level B harassment for all icebreaking activities, as necessary.

*Response:* NMFS worked with ION on its sound source verification (SSV) measures when it first submitted its IHA application in 2010 and has continued to do so for the 2012 application. Due to the unique situation of the in-ice seismic survey, the traditional method of SSV test using bottom mounted hydrophone would not work. NMFS and ION have agreed to use the SSV measurements that ION collected in the ice-free Canadian Beaufort Sea, coupling with the in-situ sound velocity profile measurements in the seismic survey areas in the Beaufort and Chukchi Seas, to model the exclusion zones (180 and 190 dB re 1 µPa for cetaceans and pinnipeds, respectively) and behavioral harassment zones (160 and 120 dB re 1 µPa for seismic airgun array and icebreaking activity, respectively). However, after NMFS published its proposed IHA, ION informed NMFS that direct SSV measurements of airgun would be possible in the U.S. Beaufort Sea based on ice condition prediction. Therefore, ION will be conducting traditional SSV tests on its airgun array prior to conducting seismic surveys and submit the results within five days of collecting the data. ION will also adjust the size of the take zones based on the SSV tests. Nevertheless, NMFS does not believe direct SSV test in open water would be a good indicator for measuring icebreaking noise, since this would be an underestimate of noise produced during actual icebreaking activities. Therefore, for icebreaking activities, ION would use its seismic survey streamer to measure its noise during actual icebreaking, which is described in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012). In addition, overwintering buoys deployed by ION and its partner would also provide better estimates of noise levels from icebreaking activities. However, these are no SSV measurements as these measurements could not be carried out under controlled test setting. Nevertheless, NMFS believes that the 160–dB re 1 µPa harassment zone from the seismic airgun array would surpass the 120–dB re 1 µPa harassment zone from icebreaking activity based on acoustic modeling. Therefore, the 160–dB re 1 µPa received level from the airgun array would determine the numbers of marine mammals being taken.

*Comment 25:* The NSB is concerned that ION's in-ice seismic survey would

**65070** **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

be conducted during the time when visibility would be poor most of the time. The Commission and NSB request that NMFS require ION to use active acoustic monitoring, whenever practicable, to supplement visual monitoring during the implementation of its mitigation measures for all activities that generate sound. The NSB further recommends ION deploy their own acoustic recorders and collect the acoustic data.

*Response:* As noted, NMFS' analyses on the potential impacts on marine mammals likely overestimates the number of animals taken and our analysis of the nature, context, and severity of those takes allowed to conclude that the taking will have a negligible impact on affected species or stocks. Further, NMFS has concluded that acoustic monitoring for ION's in-ice seismic survey is not necessary or practicable. In the Environmental Assessment prepared by NMFS, NMFS considered requiring ION to employ a near real-time passive acoustic monitoring (PAM) and active acoustic monitoring (AAM) program. These measures would supplement visual observation that is already required for ION. However, we determined these technologies should not be utilized in this particular instance because (1) the technologies are still being developed and thus, the efficacy of these measures for ION's survey would be questionable; and (2) the use of PAM, in particular, would require an additional icebreaker to serve as a PAM platform. After consulting with ION, we determined that a second icebreaker would not be practicable from an operational and economic perspective and could also result in additional environmental impacts such as additional noise being introduced into the water and disturbed habitat by additional icebreaking activities. Although NMFS has required the use of PAM in past IHAs (*e.g.,* Houser *et al.* 2008; McPherson *et al.* 2012) and it has shown to be able to detect marine mammals beyond visual observation, as explained previously, we do not believe PAM is an appropriate mitigation tool for ION's project.

Nevertheless, NMFS requires ION to work with other oil and gas companies in the Arctic to deploy overwintering acoustic sensors to assess the impacts of its in-ice seismic survey and provide a baseline of the acoustic environment and marine mammal distribution during the winter season.

*Comment 26:* The Commission requests that NMFS specify reduced vessel speeds of 9 knots or less when in

transit and 5 knots or less when weather conditions or darkness reduce visibility.

*Response:* NMFS does not agree with the Commission's recommendation of specifying vessel speeds of 9 knots or less when in transit and 5 knots or less when weather conditions or darkness reduce visibility. As NMFS discussed with ION, stipulating vessel speed during transit would severely hamper its proposed seismic survey activity, and would not be practicable. In any event, ION has indicated that its seismic vessel and icebreaker would normally move at a speed of 9–12 knots during transit and 4–5 knots during seismic survey.

*NEPA and Miscellaneous Issues*

*Comment 27:* Noting that NMFS is still working on the Arctic EIS, AWL *et al.* and Oceana state that NEPA regulations makes clear that agencies should not proceed with authorizations for individual projects like the ION proposal until an ongoing programmatic EIS is complete.

*Response:* NMFS does not agree with AWL *et al.* and Oceana's statement. While the Final EIS is still being developed, NMFS conducted a thorough analysis of the affected environment and environmental consequences from ION's in-ice seismic survey in the Beaufort and Chukchi Seas in 2012 and prepared an EA specific to the seismic survey program proposed to be conducted by ION. The analysis contained in that EA warranted a finding of no significant impact.

The analysis contained in the Final EIS will apply more broadly to multiple Arctic oil and gas operations over an extended period. NMFS' issuance of the IHA to ION for the taking of several species of marine mammals incidental to conducting its in-ice seismic survey in the Beaufort and Chukchi Seas in 2012, as analyzed in the EA, is not expected to significantly affect the quality of the human environment. Additionally, the EA contained a full analysis of cumulative impacts.

*Comment 28:* PEW states that traditional knowledge needs to be better incorporated into NMFS' analyses.

*Response:* NMFS agrees that traditional knowledge (TK) is generally useful in understanding the potential environmental and subsistence impacts from activities such as ION's in-ice seismic survey. In fact, TK has been an important factor during NMFS analyses and review process of ION's in-ice seismic survey project, especially for the environmental analysis under the National Environmental Policy Act (NMFS 2012b). For instance, part of the analysis on bowhead whale westbound

migration that does not depend on the Chukchi Sea ice lead system is from TK as described in Huntington and Quakenbush (2009).

**Description of Marine Mammals in the Area of the Specified Activity**

The marine mammal species under NMFS jurisdiction most likely to occur in the seismic survey area include two cetacean species, beluga (*Delphinapterus leucas*) and bowhead whales (*Balaena mysticetus*), and two pinniped species, ringed (*Phoca hispida*) and bearded (*Erignathus barbatus*) seals

Three additional cetacean species and two pinniped species: Harbor porpoise (*Phocoena phocoena*), gray whale (*Eschrichtius robustus*), and minke whale (*Balaenoptera acutorostrata*); and spotted (*P. largha*) and ribbon seals (*Histriophoca fasciata*) could also occur in the project area.

The bowhead whale is listed as "endangered" under the Endangered Species Act (ESA) and as depleted under the MMPA. Certain stocks or populations of gray and beluga whales and spotted seals are listed as endangered or proposed for listing under the ESA; however, none of those stocks or populations occur in the proposed activity area. The ESA-listed western North Pacific gray whale population occurs in the West Pacific, and the ESA-listed Cook Inlet beluga population resides in Cook Inlet, Alaska. The southern distinct population segment of spotted seal that is listed under the ESA is found in Liaodong Bay, China, and Peter the Great Bay, Russia. Additionally, the ribbon seal is considered a "species of concern", meaning that NMFS has some concerns regarding status and threats to this species, but for which insufficient information is available to indicate a need to list the species under the ESA. Bearded and ringed seals are "candidate species" under the ESA, meaning they are currently being considered for listing.

ION's application contains information on the status, distribution, seasonal distribution, and abundance of each of the species under NMFS' jurisdiction mentioned. Please refer to the application for that information (see **ADDRESSES**). Additional information can also be found in the NMFS Stock Assessment Reports (SAR). The Alaska 2011 SAR is available at: *http://www.nmfs.noaa.gov/pr/pdfs/sars/ak2011.pdf*.

**Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

**65071**

*Potential Effects of the Specified Activity on Marine Mammals*

Operating active acoustic sources such as airgun arrays and icebreaking activities have the potential for adverse effects on marine mammals.

*Potential Effects of Airgun Sounds on Marine Mammals*

The effects of sounds from airgun pulses might include one or more of the following: Tolerance, masking of natural sounds, behavioral disturbance, and temporary or permanent hearing impairment or non-auditory effects (Richardson *et al.* 1995). As outlined in previous NMFS documents, the effects of noise on marine mammals are highly variable. The Notice of Proposed IHA (77 FR 49922; August 17, 2012) included a discussion of the effects of airguns on marine mammals, which is not repeated here. That discussion did not take into consideration the monitoring and mitigation measures proposed by ION and those that will be required by NMFS. No instances of serious injury or mortality are expected as a result of ION's activities given the strong likelihood that marine mammals (especially migrating bowheads) would avoid the approaching airguns (or vessel) before being exposed to levels high enough for them to be seriously injured or killed.

*Potential Effects From Icebreaking on Marine Mammals*

Icebreaking would be carried out for the ION's proposed in-ice seismic survey activities in the Beaufort and Chukchi Seas. Acoustic source modeling and propagation of the icebreaker were provided in the Notice of Proposed IHA (77 FR 49922; August 17, 2012). The source levels of the icebreaker are much lower than those of the airguns. Although they are non-impulse sounds and are treated differently from airgun pulses when the Level B behavioral harassment is considered, the 120 dB re 1 µPa radii from icebreaking activities are still smaller than the 160 dB re 1 µPa radii. Therefore, the zone of influence from the airgun arrays essentially covers the area that would be ensonified by icebreaking activities during the survey, except for vessel transiting. The potential effects of icebreaking to marine mammals are discussed in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012) and are not repeated here.

**Anticipated Effects on Habitat**

The primary potential impacts to marine mammals and other marine species are associated with elevated sound levels produced by airguns and other active acoustic sources, noise generated from icebreaking, and breaking of ice during the seismic survey. However, other potential impacts to the surrounding habitat from physical disturbance are also possible. Major anticipated effects on habitat from ION's proposed in-ice seismic survey include impacts on prey species (fish and other marine species that serve as marine mammal food) and physical environment (the destroy of ice layers) and are discussed in detail in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012) and are not repeated here.

**Potential Impacts on Availability of Affected Species or Stock for Taking for Subsistence Uses**

NMFS has defined "unmitigable adverse impact" in 50 CFR 216.103 as: " * * * an impact resulting from the specified activity: (1) That is likely to reduce the availability of the species to a level insufficient for a harvest to meet subsistence needs by: (i) Causing the marine mammals to abandon or avoid hunting areas; (ii) Directly displacing subsistence users; or (iii) Placing physical barriers between the marine mammals and the subsistence hunters; and (2) That cannot be sufficiently mitigated by other measures to increase the availability of marine mammals to allow subsistence needs to be met."

Seismic surveys and associated icebreaking operations have the potential to impact marine mammals hunted by Native Alaskans. In the case of cetaceans, the most common reaction to anthropogenic sounds (as noted previously in this document) is avoidance of the ensonified area. In the case of bowhead whales, this often means that the animals could divert from their normal migratory path by up to several kilometers. Additionally, general vessel presence in the vicinity of traditional hunting areas could negatively impact a hunt.

In the case of subsistence hunts for bowhead whales in the Beaufort and Chukchi Seas, there could be an adverse impact on the hunt if the whales were deflected seaward (further from shore) in traditional hunting areas. The impact would be that whaling crews would have to travel greater distances to intercept westward migrating whales, thereby creating a safety hazard for whaling crews and/or limiting chances of successfully striking and landing bowheads. Native knowledge indicates that bowhead whales become increasingly "skittish" in the presence of seismic noise. Whales are more wary around the hunters and tend to expose a much smaller portion of their back when surfacing (which makes harvesting more difficult). Additionally, natives report that bowheads exhibit angry behaviors in the presence of seismic, such as tail-slapping, which translate to danger for nearby subsistence harvesters.

However, due to its proposed time and location, ION's proposed in-ice seismic survey in the Beaufort and Chukchi Seas would be unlikely to result in the aforementioned impacts. As discussed in detail in the **Federal Register** for the proposed IHA (77 FR 49922; August 17, 2012), the only potential impacts on subsistence use of marine mammals from ION's proposed icebreaking seismic survey during October—December period are the fall bowhead hunt and ringed seal harvest. Nevertheless, the proposed seismic survey is expected to occur in waters far offshore from the regular seal hunting areas, and ION indicates it would elect to operate at the eastern end of the survey area until fall whaling in the Beaufort Sea near Barrow is finished, thus reducing the likelihood of interfering with subsistence use of marine mammals in the vicinity of the project area.

Finally, ION has signed a Conflict Avoidance Agreement (CAA), and prepared a Plan of Cooperation (POC) under 50 CFR 216.104 to address potential impacts on subsistence hunting activities. The CAA identifies those measures will be taken to minimize adverse impacts of the planned activities on subsistence harvesting. ION met with the AEWC and communities' Whaling Captains' Associations as part of the CAA development, and established avoidance guidelines and other mitigation measures to be followed where the activities may have an impact on subsistence.

**Mitigation Measures**

Any incidental take authorization (ITA) under Section 101(a)(5)(D) of the MMPA, must prescribe where applicable, the permissible methods of taking pursuant to such activity, and other means of effecting the least practicable impact on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stock for taking for certain subsistence uses.

For ION's in-ice seismic survey in the Beaufort and Chukchi Seas, NMFS is requiring ION to implement the following mitigation measures to minimize the potential impacts to marine mammals in the project vicinity

**65072**     **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

as a result of the marine seismic survey activities.

The mitigation measures are divided into the following major groups: (1) Establishing exclusion and disturbance zones, (2) Vessel speed or course alteration, (3) Ramp up procedures (4) Power down procedures, and (5) Shutdown procedures. The primary purpose of these mitigation measures is to detect marine mammals within, or about to enter designated exclusion zones and to initiate immediate shutdown or power down of the airgun(s).

*(1) Exclusion Zones*

Under current NMFS guidelines, "exclusion zones" for marine mammals around industrial sound sources are customarily defined as the distances within which received sound levels are ≥180 dB re 1 μPa (rms) for cetaceans and ≥190 dB re 1 μPa (rms) for pinnipeds. These criteria are based on an assumption that sound energy at lower received levels will not injure these animals or impair their hearing abilities but that higher received levels might have some such effects. Disturbance or

behavioral effects to marine mammals from underwater sound may occur after exposure to sound at distances greater than the exclusion zone (Richardson *et al.,* 1995).

Received sound levels were modeled for the full 26 airgun, 4,450 in³ array in relation to distance and direction from the source (Zykov *et al.,* 2010). Based on the model results, Table 1 in this document shows the distances from the airguns where ION predicts that received sound levels will drop below 190, 180, and 160 dB re 1 μPa (rms). A single 70-in³ airgun would be used during turns or if a power down of the full array is necessary due to the presence of a marine mammal within or about to enter the applicable exclusion zone of the full airgun array. To model the source level of the 70-in³ airgun, ION used the measurements of a 30-in³ airgun. Underwater sound propagation of a 30-in³ airgun was measured in <100 m (328 ft) of water near Harrison Bay in 2007, and results were reported in Funk *et al.* (2008). The constant term of the resulting equation was increased by 2.45 dB based on the difference between the volume of the two airguns [2.45 =

20Log(70/30) − (⅓)]. The 190 and 180 dB (rms) distances for the 70-in³ airgun from the adjusted equation, 19 m (62 ft) and 86 m (282 ft) respectively, would be used as the exclusion zones around the single 70 in³ airgun in all water depths until results from field measurements are available.

An acoustics contractor would perform the direct measurements of the received levels of underwater sound versus distance and direction from the energy source arrays using calibrated hydrophones (see below "Sound Source Verification" in the "Monitoring and Reporting Measures" section). The acoustic data would be analyzed as quickly and as reasonably practicable in the field and used to verify (and if necessary adjust) the size of the exclusion zones. The field report will be made available to NMFS and the Protected Species Observers (PSOs) within 120 hrs of completing the measurements. The mitigation measures to be implemented at the 190 and 180 dB (rms) sound levels would include power downs and shut downs as described below.

TABLE 1—MARINE MAMMAL EXCLUSION ZONES FROM THE 26 AIRGUN, 4,450-IN³ ARRAY, FOR SPECIFIC CATEGORIES BASED ON THE WATER DEPTH

| rms (dB re. 1 μPa) | Exclusion and disturbance zones (meters) | | |
|---|---|---|---|
| | Depth less than 100 m | Depth 100 m– 1,000 m | Depth more than 1,000 m |
| 190 | 600 | 180 | 180 |
| 180 | 2,850 | 660 | 580 |
| 160 | 27,800 | 42,200 | 31,600 |

*(2) Speed or Course Alteration*

If a marine mammal (in water) is detected outside the exclusion zone and, based on its position and the relative motion, is likely to enter the exclusion zone, the vessel's speed and/ or direct course shall be changed in a manner that also minimizes the effect on the planned objectives when such a maneuver is safe.

Another measure proposes to avoid concentrations or groups of whales by all vessels in transit under the direction of ION. Operators of vessels should, at all times, conduct their activities at the maximum distance possible from such concentrations of whales.

All vessels during transit shall be operated at speeds necessary to ensure no physical contact with whales occurs. If any barge or transit vessel approaches within 1.6 km (1 mi) of observed bowhead whales, the vessel operator shall take reasonable precautions to avoid potential interaction with the

bowhead whales by taking one or more of the following actions, as appropriate:

(A) Reducing vessel speed to less than 5 knots within 300 yards (900 feet or 274 m) of the whale(s);

(B) Steering around the whale(s) if possible;

(C) Operating the vessel(s) in such a way as to avoid separating members of a group of whales from other members of the group;

(D) Operating the vessel(s) to avoid causing a whale to make multiple changes in direction; and

(E) Checking the waters immediately adjacent to the vessel(s) to ensure that no whales will be injured when the propellers are engaged.

When weather conditions require, such as when visibility drops, adjust vessel speed accordingly to avoid the likelihood of injury to whales.

In the event that aircraft (such as helicopters) are used to support the planned survey, the proposed mitigation measures below would apply:

(A) Under no circumstances, other than an emergency, shall aircraft be operated at an altitude lower than 1,000 feet above sea level (ASL) when within 0.3 mile (0.5 km) of groups of whales.

(B) Helicopters shall not hover or circle above or within 0.3 mile (0.5 km) of groups of whales.

*(3) Ramp Ups*

A ramp up of an airgun array provides a gradual increase in sound levels and involves a step-wise increase in the number and total volume of airguns firing until the full volume is achieved. The purpose of a ramp up is to "warn" marine mammals in the vicinity of the airguns and to provide the time for them to leave the area and thus avoid any potential injury or impairment of their hearing abilities.

During the proposed seismic survey program, the seismic operator will ramp up the airgun arrays slowly. Full ramp ups (*i.e.,* from a cold start after a shut down or when no airguns have been

**Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

firing) will begin by firing a single airgun in the array. A full ramp up, following a cold start, can be applied if the exclusion zone has been free of marine mammals for a consecutive 30-minute period. The entire exclusion zone must have been visible during these 30 minutes. If the entire exclusion zone is not visible, then ramp up from a cold start cannot begin.

Ramp up procedures from a cold start shall be delayed if a marine mammal is sighted within the exclusion zone during the 30-minute period prior to the ramp up. The delay shall last until the marine mammal(s) has been observed to leave the exclusion zone or until the animal(s) is not sighted for at least 15 or 30 minutes. The 15 minutes applies to small odontocetes and pinnipeds, while a 30 minute observation period applies to baleen whales and large toothed whales.

A ramp up, following a shutdown, can be initiated if the marine mammal(s) for which the shutdown occurred has been observed to leave the exclusion zone or until the animal(s) is not sighted for at least 15 minutes (small odontocetes and pinnipeds) or 30 minutes (baleen whales and large toothed whales).

If, for any reason, electrical power to the airgun array has been discontinued for a period of 10 minutes or more, ramp-up procedures shall be implemented. Only if the PSO watch has been suspended, a 30-minute clearance of the exclusion zone is required prior to commencing ramp-up. Discontinuation of airgun activity for less than 10 minutes does not require a ramp-up.

The seismic operator and PSOs shall maintain records of the times when ramp-ups start and when the airgun arrays reach full power.

During turns and transit between seismic transects, the 70 in³ mitigation gun will remain operational. The ramp up procedure will still be followed when increasing the source levels from one airgun to the full array. PSOs will be on duty whenever the airguns are firing during daylight and during the 30 minute periods prior to full ramp ups. Daylight will occur for ~11 hours/day at the start of the survey in mid-October diminishing to ~3 hours/day in mid-November.

### (4) Power Down Procedures

A power down involves decreasing the number of airguns in use such that the radii of the 190 and 180 dB re 1 μPa (rms) zones are decreased to the extent that observed marine mammals are not in the applicable exclusion zone. A power down may also occur when the

vessel is moving from one seismic line to another. During a power down, only one airgun is operated. The continued operation of one airgun is intended to (a) alert marine mammals to the presence of the seismic vessel in the area, and (b) retain the option of initiating a ramp up to full array under poor visibility conditions. In contrast, a shutdown is when all airgun activity is suspended (see next section).

If a marine mammal is detected outside the exclusion zone but is likely to enter the exclusion zone, and if the vessel's speed and/or course cannot be changed to avoid having the mammal enter the exclusion zone, the airguns may (as an alternative to a complete shutdown) be powered down before the mammal is within the exclusion zone. Likewise, if a mammal is already within the exclusion zone when first detected, the airguns will be powered down immediately if this is a reasonable alternative to a complete shutdown. During a power down of the array, the number of guns operating will be reduced to a single 70 in³ airgun. The pre-season estimates of the 190 dB re 1 μPa (rms) and 180 dB re 1 μPa (rms) exclusion zones around the power down source are 19 m (62 ft) and 86 m (282 ft), respectively. The 70 in³ airgun power down source will be measured during acoustic sound source measurements conducted at the start of seismic operations. If a marine mammal is detected within or near the applicable exclusion zone around the single 70 in³ airgun, it too will be deactivated, resulting in a complete shutdown (see next subsection).

Marine mammals hauled out on ice may enter the water when approached closely by a vessel. If a marine mammal on ice is detected by PSOs within the exclusion zones, it will be watched carefully in case it enters the water. In the event the animal does enter the water and is within an applicable exclusion zone of the airguns during seismic operations, a power down or shut-down will immediately be initiated. If the animal does not enter the water, it will not be exposed to sounds at received levels for which mitigation is required; therefore, no mitigation measures will be implemented.

Following a power down, operation of the full airgun array will not resume until the marine mammal has cleared the exclusion zone. The animal will be considered to have cleared the exclusion zone if it:

- Is visually observed to have left the exclusion zone, or
- Has not been seen within the zone for 15 min in the case of pinnipeds

(excluding walruses) or small odontocetes, or

- Has not been seen within the zone for 30 min in the case of mysticetes or large odontocetes.

### (5) Shutdown Procedures

The operating airgun(s) will be shut down completely if a marine mammal approaches or enters the then-applicable exclusion zone and a power down is not practical or adequate to reduce exposure to less than 190 or 180 dB re 1 μPa (rms). The operating airgun(s) will also be shut down completely if a marine mammal approaches or enters the estimated exclusion zone around the reduced source (one 70 in³ airgun) that will be used during a power down.

Airgun activity will not resume until the marine mammal has cleared the exclusion zone. The animal will be considered to have cleared the exclusion zone if it is visually observed to have left the exclusion zone, or if it has not been seen within the zone for 15 min (pinnipeds and small odontocetes) or 30 min (mysticetes and large odontocetes). Ramp up procedures will be followed during resumption of full seismic operations after a shutdown of the airgun array.

In addition, a single airgun (also referred to as the "mitigation gun" in past IHAs) shall not be kept firing for long periods of time during darkness or other periods of poor visibility when seismic surveys are not ongoing, with the exception of turns when starting a new trackline, or short transits or maintenance with a duration of less than one hour.

Finally, if a pinniped is sighted hauled out on ice within the underwater exclusion zone (received level 190 dB re 1 μPa (rms)), it will be watched carefully by the PSOs. Even though the pinniped may not be exposed to in-air noise levels that could be considered a take, the presence of the seismic vessel could prompt the animal to slip into the water, and thus be exposed to a high intensity sound field as a result. Therefore, the airgun should be powered down or shutdown immediately if the pinniped enters the water.

### Mitigation Measures for Subsistence Activities

### (1) Subsistence Mitigation Measures

Since ION's proposed October—December in-ice seismic survey in the Beaufort and Chukchi Seas is unlikely to result in adverse impacts to subsistence users due to its proposed time and location, no specific mitigation measures are proposed other than those general mitigation measures discussed above.

(2) Plan of Cooperation (POC) and Conflict Avoidance Agreement (CAA)

Regulations at 50 CFR 216.104(a)(12) require IHA applicants for activities that take place in Arctic waters to provide a POC or information that identifies what measures have been taken and/or will be taken to minimize adverse effects on the availability of marine mammals for subsistence purposes.

ION has signed a Conflict Avoidance Agreement (CAA) with the Alaska Eskimo Whaling Commission (AEWC) and communities' Whaling Captains' Associations for the proposed 2012 in-ice seismic survey. The main purpose of the CAA is to provide (1) equipment and procedures for communications between subsistence participants and industry participants; (2) avoidance guidelines and other mitigation measures to be followed by the industry participants working in or transiting in the vicinity of active subsistence hunters, in areas where subsistence hunters anticipate hunting, or in areas that are in sufficient proximity to areas expected to be used for subsistence hunting that the planned activities could potentially adversely affect the subsistence bowhead whale hunt through effects on bowhead whales; and (3) measures to be taken in the event of an emergency occurring during the term of the CAA.

The CAA states that all vessels (operated by ION) shall report to the appropriate Communication Center (Com-Center) at least once every six hours commencing with a call at approximately 06:00 hours. The appropriate Com-Center shall be notified if there is any significant change in plans, such as an unannounced start-up of operations or significant deviations from announced course, and such Com-Center shall notify all whalers of such changes.

The CAA further states that each Com-Center shall have an Inupiat operator ("Com-Center operator") on duty 24 hours per day during the 2012 subsistence bowhead whale hunt.

In addition, ION has developed a "Plan of Cooperation" (POC) for the 2012 seismic survey in the Beaufort and Chukchi Seas in consultation with representatives of Barrow, Nuiqsut, Kaktovik, and Wainwright and subsistence users within these communities. NMFS received the final POC on August 13, 2012. The final POC is posted on NMFS Web site at *http://www.nmfs.noaa.gov/pr/permits/incidental.htm#applications.*

Mitigation Conclusions

NMFS has carefully evaluated these mitigation measures and considered a range of other measures in the context of ensuring that NMFS prescribes the means of effecting the least practicable impact on the affected marine mammal species and stocks and their habitat. Our evaluation of potential measures included consideration of the following factors in relation to one another:

• The manner in which, and the degree to which, the successful implementation of the measure is expected to minimize adverse impacts to marine mammals;

• The proven or likely efficacy of the specific measure to minimize adverse impacts as planned; and

• The practicability of the measure for applicant implementation.

Based on our evaluation of the applicant's proposed measures, as well as other measures considered by NMFS and proposed by the independent peer review panel, NMFS has determined that the proposed mitigation measures provide the means of effecting the least practicable impact on marine mammal species or stocks and their habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance.

Monitoring and Reporting Measures

Any ITA issued under Section 101(a)(5)(D) of the MMPA is required to prescribe, where applicable, "requirements pertaining to the monitoring and reporting of such taking." The MMPA implementing regulations at 50 CFR 216.104(a)(13) state that requests for ITAs must include the suggested means of accomplishing the necessary monitoring and reporting that will result in increased knowledge of the species and of the level of taking or impacts on populations of marine mammals that are expected to be present in the proposed action area.

(1) Protected Species Observers (PSOs)

Vessel-based monitoring for marine mammals shall be performed by trained PSOs throughout the period of survey activities, supplemented by the officers on duty, to comply with expected provisions in the IHA. The observers shall monitor the occurrence and behavior of marine mammals near the survey vessels during all daylight periods. PSO duties include watching for and identifying marine mammals; recording their numbers, distances, and reactions to the survey operations; and documenting "take by harassment" as defined by NMFS.

A. Number of Observers

A sufficient number of PSOs shall be required onboard the survey vessel to meet the following criteria:

• 100% monitoring coverage during all periods of survey operations in daylight;

• Maximum of 4 consecutive hours on watch per PSO; and

• Maximum of ~12 hours of watch time per day per PSO.

An experienced field crew leader shall supervise the PSO team onboard the survey vessels. ION's proposed survey will occur in October–December when the number of hours of daylight is significantly reduced, and thus will require fewer PSOs to be aboard the survey vessel than required for surveys conducted during the open water season with nearly 24 hrs of daylight. PSOs aboard the icebreaker operating 0.5–1 km (0.31–0.62 mi) ahead of the survey vessel will provide early detection of marine mammals along the survey track. Three PSOs will be stationed aboard the icebreaker *Polar Prince* to take advantage of this forward operating platform and provide advance notice of marine mammals to the PSO on the survey vessel. Three PSOs will be stationed aboard the survey vessel *Geo Arctic* to monitor the exclusion zones centered on the airguns and to request mitigation actions when necessary.

B. Observer Qualifications and Training

Crew leaders and most other biologists serving as observers shall be individuals with recent experience as observers during one or more seismic monitoring projects in Alaska, the Canadian Beaufort Sea, or other offshore areas.

Biologist-observers shall have previous marine mammal observation experience, and field crew leaders will be highly experienced with previous vessel-based marine mammal monitoring and mitigation projects. Résumés for all individuals shall be provided to NMFS for review and acceptance of their qualifications. Inupiat observers will be experienced in the region, familiar with the marine mammals of the area, and complete an approved observer training course designed to familiarize individuals with monitoring and data collection procedures. A PSO handbook, adapted for the specifics of the planned survey program, will be prepared and distributed beforehand to all PSOs.

Biologist-observers and Inupiat observers shall also complete a two or three-day training and refresher session together on marine mammal monitoring, to be conducted shortly before the anticipated start of the seismic survey. When possible, experienced observers shall be paired with inexperienced observers. The training session(s) shall be conducted by qualified marine

**34**

**65075**

**Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

mammalogists with extensive crew-leader experience during previous vessel-based seismic monitoring programs.

Primary objectives of the training include:

• Review of the marine mammal monitoring plan for this project, including any amendments specified by NMFS in the IHA;

• Review of marine mammal sighting, identification, and distance estimation methods using visual aids;

• Review of operation of specialized equipment (reticle binoculars, night vision devices (NVDs), and GPS system);

• Review of, and classroom practice with, data recording and data entry systems, including procedures for recording data on marine mammal sightings, monitoring operations, environmental conditions, and entry error control. These procedures will be implemented through use of a customized computer database and laptop computers;

• Review of the specific tasks of the Inupiat Communicator; and

• Exam to ensure all observers can correctly identify marine mammals and record sightings.

C. PSO Handbook

A PSOs' Handbook will be prepared for ION's monitoring program. Handbooks contain maps, illustrations, and photographs, as well as text, and are intended to provide guidance and reference information to trained individuals who will participate as PSOs. The following topics will be covered in the PSO Handbook for the ION project:

• Summary overview descriptions of the project, marine mammals and underwater noise, the marine mammal monitoring program (vessel-based, aerial, acoustic measurements), the NMFS' IHA (if issued) and other regulations/permits/agencies, the Marine Mammal Protection Act;

• Monitoring and mitigation objectives and procedures, initial exclusion zones;

• Responsibilities of staff and crew regarding the marine mammal monitoring plan;

• Instructions for ship crew regarding the marine mammal monitoring plan;

• Data recording procedures: codes and coding instructions, common coding mistakes, electronic database; navigational, marine physical, field data sheet;

• List of species that might be encountered: identification cues, natural history information;

• Use of specialized field equipment (reticle binoculars, NVDs, forward-looking infrared (FLIR) system);

• Reticle binocular distance scale;

• Table of wind speed, Beaufort wind force, and sea state codes;

• Data storage and backup procedures;

• Safety precautions while onboard;

• Crew and/or personnel discord; conflict resolution among PSOs and crew;

• Drug and alcohol policy and testing;

• Scheduling of cruises and watches;

• Communication availability and procedures;

• List of field gear that will be provided;

• Suggested list of personal items to pack;

• Suggested literature, or literature cited; and

• Copies of the NMFS IHA and USFWS LOA.

*(2) Monitoring Methodology*

A. General Monitoring Methodology

The observer(s) will watch for marine mammals from the best available vantage point on the survey vessels, typically the bridge. The observer(s) will scan systematically with the unaided eye and 7 × 50 reticle binoculars, supplemented during good visibility conditions with 20 × 60 image-stabilized Zeiss Binoculars or Fujinon 25 × 150 "Big-eye" binoculars, a thermal imaging (FLIR) camera, and night-vision equipment when needed (see below). Personnel on the bridge shall assist the marine mammal observer(s) in watching for marine mammals.

Information to be recorded by observers shall include the same types of information that were recorded during recent monitoring programs associated with Industry activity in the Arctic (*e.g.*, Ireland *et al.*, 2009). When a mammal sighting is made, the following information about the sighting shall be recorded:

• Species, group size, age/size/sex categories (if determinable), behavior when first sighted and after initial sighting, heading (if determinable), bearing and distance from observer, apparent reaction to activities (*e.g.*, none, avoidance, approach, etc.), closest point of approach, and pace;

• Additional details for any unidentified marine mammal or unknown observed;

• Time, location, speed, and activity of the vessel, sea state, ice cover, visibility, and sun glare; and

• The positions of other vessel(s) in the vicinity of the observer location.
The ship's position, speed of the vessel, water depth, sea state, ice cover, visibility, airgun status (ramp up, mitigation gun, or full array), and sun glare shall also be recorded at the start and end of each observation watch, every 30 minutes during a watch, and whenever there is a change in any of those variables.

Distances to nearby marine mammals will be estimated with binoculars containing a reticle to measure the vertical angle of the line of sight to the animal relative to the horizon. Observers may use a laser rangefinder to test and improve their abilities to objects in the water. However, previous experience has shown that a Class 1 eye-safe device was not able to measure distances to seals more than about 70 m (230 ft) away. The device was very useful in improving the distance estimation abilities of the observers at distances up to about 600 m (1,968 ft), the maximum range at which the device could measure distances to highly reflective objects such as other vessels. Humans observing objects of more-or-less known size via a standard observation protocol, in this case from a standard height above water, quickly become able to estimate distances within about ±20% when given immediate feedback about actual distances during training.

When a marine mammal is seen within the exclusion zone applicable to that species, the geophysical crew shall be notified immediately so that mitigation measures required by the IHA (if issued) can be implemented. It is expected that the airgun array will be shut down within several seconds, often before the next shot would be fired, and almost always before more than one additional shot is fired. The protected species observer shall then maintain a watch to determine when the mammal(s) appear to be outside the exclusion zone such that airgun operations can resume.

ION will provide or arrange for the following specialized field equipment for use by the onboard PSOs: 7 × 50 reticle binoculars, Big-eye binoculars or high power image-stabilized binoculars, GPS unit, laptop computers, night vision binoculars, digital still and possibly digital video cameras in addition to the above mentioned FLIR camera system (see below).

B. Monitoring at Night and in Poor Visibility

Night-vision equipment (Generation 3 binocular image intensifiers, or equivalent units) will be available for use when/if needed. Past experience with NVDs in the Beaufort Sea and elsewhere has indicated that NVDs are

**65076**    **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

not nearly as effective as visual observation during daylight hours (*e.g.*, Harris *et al.*, 1997, 1998; Moulton and Lawson, 2002). A FLIR camera system mounted on a high point near the bow of the icebreaker will also be available to assist with detecting the presence of seals and polar bears on ice and, perhaps also in the water, ahead of the airgun array. The FLIR system detects thermal contrasts and its ability to sense these differences is not dependent on daylight.

Additional details regarding the monitoring protocol during NVD and FLIR system use has been developed in order to collect data in a standardized manner such that the effectiveness of the two devices can be analyzed and compared.

## B. (1) FLIR and NVD Monitoring

The infrared system is able to detect differences in the surface temperature of objects making it potentially useful during both daylight and darkness periods. NVDs, or light intensifiers, amplify low levels of ambient light from moonlight or sky glow light in order to provide an image to the user. Both technologies have the potential to improve monitoring and mitigation efforts in darkness. However, they remain relatively unproven in regards to their effectiveness under the conditions and it the manner of use planned for this survey. The protocols for FLIR and NVD use and data collection described below are intended to collect the necessary data in order to evaluate the ability of these technologies to aid in the detection of marine mammals from a vessel.

• All PSOs shall monitor for marine mammals according to the procedures outlined in the PSO handbook.

• One PSO shall be responsible for monitoring the FLIR system (IR–PSO) during most darkness and twilight periods. The on-duty IR–PSO shall monitor the IR display and alternate between the two search methods described below. If a second PSO is on watch, they shall scan the same area as the FLIR using the NVDs for comparison. The two PSOs shall coordinate what area is currently being scanned.

• The IR–PSO should rotate between the search methods (see below) every 30 minutes in the following routine:

    ○ 00:00–00:30: Method I
    ○ 00:30–01:00: Method II, Port side
    ○ 01:00–01:30: Method I
    ○ 01:30–02:00: Method II, Starboard side

## B. (2) FLIR Search Methods

The FLIR system consists of a camera that will be mounted on high point in front of the vessel. The camera is connected to a joystick control unit (JCU) and a display monitor that will be located on the bridge of the vessel. The IR–PSO shall manually control the view that is displayed by adjusting the pan (360° continuous pan) and tilt (+/−90° tilt) settings using the JCU. The FLIR manufacturer has indicated that they have tested the FLIR unit (model M626L) to −25 °C (−13 °F), but expect that it will operate at colder temperatures. During the time of the proposed seismic survey, the average minimum temperatures at Prudhoe Bay in October and November are +10 °F and −10 °F, respectively. Colder temperatures are certainly likely at times, but overall the temperatures should generally be within the operational range of the equipment.

As noted above, two different search methods shall be implemented for FLIR monitoring and results from the two will be compared. The first method involves a back-and-forth panning motion and the second utilizes the FLIR unit focused on a fixed swath ahead and to one side of the vessel track:

Method I: Set the horizontal tilt of the camera to an angle that provides an adequate view out in front of the vessel and also provides good resolution to potential targets (this will likely mean that the lower portion of the view displayed on the monitor is of an area relatively close to the vessel (<100 m [328 ft]) while the middle and upper portions of the view are at greater distances (500–2,000 m [1,640–6,562 ft]). Pan back and forth across the forward 180° of the vessels heading at a slow-scanning rate of approximately 1–2°/sec, as one would with binoculars. This method is intended to replicate the type of observations conducted using binoculars and cover a relatively wider swatch compared to Method II. It should produce sightings data that can be analyzed using line-transect methodologies to estimate marine mammal densities in the survey area.

Method II: Set the horizontal tilt of the camera to an angle that provides an adequate view out in front of the vessel (similar or identical to the above), and then set the camera at a fixed position that creates a swath of view off the bow and to one side of the vessel (see Figure 1 of ION's monitoring plan). This method essentially establishes a fixed-strip width that is intended to produce sightings data that can be analyzed using strip-transect methodologies to estimate marine mammal densities.

## B. (3) NVD Methods

The NVDs are goggles worn by the observer and are to be used in a similar fashion as binoculars. When observing in conjunction with the FLIR system, the objective will be to replicate the monitoring methodology being employed by the FLIR system. Method I requires a full 180° scan (or as large of a range as possible from the observer's location) with the NVDs, and Method II requires a focused scan of the ~60° swath being monitored by the FLIR system.

## C. Field Data-Recording, Verification, Handling, and Security

The observers shall record their observations onto datasheets or directly into handheld computers. During periods between watches and periods when operations are suspended, those data shall be entered into a laptop computer running a custom computer database. The accuracy of the data entry shall be verified in the field by computerized validity checks as the data are entered, and by subsequent manual checking of the database printouts. These procedures will allow initial summaries of data to be prepared during and shortly after the field season, and shall facilitate transfer of the data to statistical, graphical or other programs for further processing. Quality control of the data will be facilitated by (1) the start-of-season training session, (2) subsequent supervision by the onboard field crew leader, and (3) ongoing data checks during the field season.

The data shall be backed up regularly onto CDs and/or USB disks, and stored at separate locations on the vessel. If possible, data sheets will be photocopied daily during the field season. Data shall be secured further by having data sheets and backup data CDs carried back to the Anchorage office during crew rotations.

In addition to routine PSO duties, observers shall use Traditional Knowledge and Natural History datasheets to record observations that are not captured by the sighting or effort data. Copies of these records will be available to observers for reference if they wish to prepare a statement about their observations. If prepared, this statement would be included in the 90-day and final reports documenting the monitoring work.

## D. Effort and Sightings Data Collection Methods

Observation effort data shall be designed to capture the amount of PSO effort itself, environmental conditions

that impact an observer's ability to detect marine mammals, and the equipment and method of monitoring being employed. These data shall be collected every 30 minutes or when an effort variable changes (*e.g.,* change in the equipment or method being used to monitor, on/off-signing PSO, etc.), and shall be linked to sightings data. Effort and sightings data forms are the same forms used during other marine mammal monitoring in the open water season, but additional fields have been included to capture information specific to monitoring in darkness and to more accurately describe the observation conditions. The additional fields include the following.

• Observation Method: FLIR, NVD, spotlight, eye (naked eye or regular binoculars), or multiple methods. This data is collected every 30 minutes with the Observer Effort form and with every sighting.

• Cloud Cover: Percentage. This can impact lighting conditions and reflectivity.

• Precipitation Type: Fog, rain, snow, or none.

• Precipitation Reduced Visibility: Confirms whether or not visibility is reduced due to precipitation. This will be compared to the visibility distance (# km) to determine when visibility is reduced due to lighting conditions versus precipitation.

• Daylight Amount: Daylight, twilight, dark. The addition of the twilight field has been included to record observation periods where the sun has set and observation distances may be reduced due to lack of light.

• Light Intensity: Recorded in footcandles (fc) using an incident light meter. This procedure was added to quantify the available light during twilight and darkness periods and may allow for light-intensity bins to be used during analysis.

Analysis of the sightings data shall include comparisons of nighttime (FLIR and NVD) sighting rates to daylight sighting rates. FLIR and NVD analysis will be independent of each other and according to method (I or II) used. Comparison of NVD and FLIR sighting rates will allow for a comparison of marine mammal detection ability of the two methods. However, results and analyses could be limited if relatively few sightings are recorded during the survey.

*(3) Acoustic Monitoring Plan*

A. Sound Source Measurements

As described above, received sound levels were modeled for the full 26 airgun, 4,450 in³ array in relation to distance and direction from the source (Zykov *et al.,* 2010). These modeled distances will be used as temporary exclusion zones until measurements of the airgun sound source are conducted. The measurements shall be made at the beginning of the field season, and the measured radii shall be used for the remainder of the survey period. An acoustics contractor with experience in the Arctic conducting similar measurements in recent years will use their equipment to record and analyze the underwater sounds and write the summary reports as described below.

The objectives of the sound source measurements planned for 2012 in the Beaufort Sea will be (1) to measure the distances in potentially ice covered waters in the broadside and endfire directions at which broadband received levels reach 190, 180, 170, 160, and 120 dB re 1 µPa (rms) for the energy source array combinations that may be used during the survey activities, and (2) measure the sounds produced by the icebreaker and seismic vessel as they travel through sea ice. Conducting the sound source and vessel measurements in ice-covered waters using bottom founded recorders creates a risk of not being able to retrieve the recorders and analyze the data until the following year. If the acoustic recorders are not deployed or are unable to be recovered because of too much sea ice, ION shall use measurements of the same airgun source taken in the Canadian Beaufort Sea in 2010, along with sound velocity measurements taken in the Alaskan Beaufort Sea at the start of the 2012 survey to update the propagation model and estimate new exclusion zones. These modeled results shall then be used for mitigation purposes during the remainder of the survey.

The airgun configurations measured shall include at least the 26 airgun array and the single 70 in³ mitigation airgun that will be used during power downs. The measurements of airgun array sounds will be made by an acoustics contractor at the beginning of the survey and the distances to the various radii will be reported as soon as possible after recovery of the equipment. The primary area of concern will be the 190 and 180 dB re 1 µPa (rms) exclusion zones for pinnipeds and cetaceans, respectively, and the 160 dB re 1 µPa Level B harassment (for impulsive sources) radii. In addition to reporting the radii of specific regulatory concern, nominal distances to other sound isopleths down to 120 dB re 1 µPa (rms) shall be reported in increments of 10 dB.

Data shall be previewed in the field immediately after download from the hydrophone instruments. An initial sound source analysis will be supplied to NMFS and the airgun operators within 120 hours of completion of the measurements. The report shall indicate the distances to sound levels based on fits of empirical transmission loss formulae to data in the endfire and broadside directions. A more detailed report will be issued to NMFS as part of the 90-day report following completion of the acoustic program.

B. Seismic Hydrophone Streamer Recordings of Vessel Sounds

Although some measurements of icebreaking sounds have previously been reported, acoustic data on vessels traveling through relatively light ice conditions, as will be the case during the proposed survey, are not available. In order to gather additional information on the sounds produced by this type of icebreaking, ION proposes to use the hydrophones in the seismic streamer on a routine basis throughout the survey. Once every hour the airguns would not be fired at 2 consecutive intervals (one seismic pulse interval is typically ~18 seconds, so there will be ~54 seconds between seismic pulses at this time) and instead a period of background sounds would be recorded, including the sounds generated by the vessels. Over the course of the survey this should generate as many as 750 records of vessel sounds traveling through various ice conditions (from open water to 100% cover juvenile first year ice or lighter multi-year ice). The acoustic data during each sampling period from each hydrophone along the 9 km (5.6 mi) streamer would be analyzed and used to estimate the propagation loss of the vessel sounds. The acoustic data received from the hydrophone streamer would be recorded at an effective bandwidth of 0–400 Hz. In order to estimate sound energy over a larger range of frequencies (broadband), results from previous measurements of icebreakers could be generalized and added to the data collected during this project.

C. Over-Winter Acoustic Recorders

In order to collect additional data on the propagation of sounds produced by icebreaking and seismic airguns in ice-covered waters, as well as on vocalizing marine mammals, ION intends to collaborate with other Industry operators to deploy acoustic recorders in the Alaskan Beaufort Sea in fall 2012, to be retrieved during the 2013 open-water season.

During winter 2011–2012, AURAL acoustic recorders were deployed at or near each of the 5 acoustic array sites

65078 **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

established by Shell for monitoring the fall bowhead whale migration through the Beaufort Sea, as well as one site near the shelf break in the central Alaskan Beaufort Sea. These recorders will be retrieved in July 2012, when Shell deploys Directional Autonomous Seafloor Acoustic Recorders (DASARs) at 5 array locations. When the DASAR arrays are retrieved in early October, ION intends to coordinate with Shell to re-deploy the 6 AURAL recorders to the same locations used during the 2011–2012 winter. Redeploying the recorders in the same locations will provide comparable data from a year with little to no offshore industrial activity (2011) to a year with more offshore industrial activity (2012). Acoustic data from the over-winter recorders will be analyzed to address the following objectives:

• Characterize the sounds and propagation distances produced by ION's source vessel, icebreaker, and airguns on and to the edge of the U.S. Beaufort Sea shelf,

• Characterize ambient sounds and marine mammal calls during October and November to assess the relative effect of ION's seismic survey on the background conditions, and to characterize marine mammal calling behavior, and

• Characterize ambient sound and enumerate marine mammal calls through acoustic sampling of the environment form December 2012 through July 2013, when little or no anthropogenic sounds are expected.

Monitoring Plan Peer Review

The MMPA requires that monitoring plans be independently peer reviewed "where the proposed activity may affect the availability of a species or stock for taking for subsistence uses" (16 U.S.C. 1371(a)(5)(D)(ii)(III)). Regarding this requirement, NMFS' implementing regulations state, "Upon receipt of a complete monitoring plan, and at its discretion, [NMFS] will either submit the plan to members of a peer review panel for review or within 60 days of receipt of the proposed monitoring plan, schedule a workshop to review the plan" (50 CFR 216.108(d)).

NMFS convened independent peer review panels to review ION's mitigation and monitoring plan in its IHA applications submitted in 2010 and 2011 for taking marine mammals incidental to the proposed seismic survey in the Beaufort and Chukchi Seas, during 2010 and 2011. The panels met on March 25 and 26, 2010, and on March 9, 2011, and provided their final report to NMFS on April 22, 2010 and on April 27, 2011, respectively. The full panel reports can be viewed at: *http://*

*www.nmfs.noaa.gov/pr/permits/ incidental.htm#applications.*

ION's proposed 2012 action is essentially the same as described in its 2010 and 2011 IHA applications. NMFS worked with ION in 2010 and 2011 to address the peer review panels' recommendations on its 2010 and 2011 4MPs. Since ION's 2012 4MP addressed all issues raised during the 2010 and 2011 peer reviews and incorporated all of NMFS' requested changes, NMFS decided it was not necessary to conduct a peer-review of ION's 2012 4MP. All actions based on the 2010 and 2011 panel review are discussed in the **Federal Register** notice for the proposed IHA (77 FR 49922; August 17, 2012), and is not repeated here.

Reporting Measures

(1) SSV Report

A report on the preliminary results of the acoustic verification measurements, including as a minimum the nearest 190-, 180-, 160-, and 120-dB re 1 µPa (rms) radii of the airgun arrays shall be submitted within 120 hr after collection and analysis of those measurements at the start of the field season. This report shall specify the distances of the exclusion zones that were adopted for the marine survey activities.

(2) Field Reports

Throughout the survey program, the observers shall prepare a report each day or at such other intervals as the IHA may specify (if issued), or ION may require summarizing the recent results of the monitoring program. The field reports shall summarize the species and numbers of marine mammals sighted. These reports shall be provided to NMFS and to the survey operators.

(3) Technical Reports

The results of the vessel-based monitoring, including estimates of "take by harassment", shall be presented in the 90-day and final technical reports. Reporting shall address the requirements established by NMFS in the IHA. The technical report shall include:

(a) Summaries of monitoring effort: total hours, total distances, and distribution of marine mammals through the study period accounting for sea state and other factors affecting visibility and detectability of marine mammals;

(b) Methods, results, and interpretation pertaining to all acoustic characterization work and vessel-based monitoring;

(c) Analyses of the effects of various factors influencing detectability of

marine mammals including sea state, number of observers, and fog/glare;

(d) Species composition, occurrence, and distribution of marine mammal sightings including date, water depth, numbers, age/size/gender categories, group sizes, and ice cover; and

(e) Analyses of the effects of survey operations:

• Sighting rates of marine mammals during periods with and without airgun activities (and other variables that could affect detectability);

• Initial sighting distances versus airgun activity state;

• Closest point of approach versus airgun activity state;

• Observed behaviors and types of movements versus airgun activity state;

• Numbers of sightings/individuals seen versus airgun activity state;

• Distribution around the survey vessel versus airgun activity state; and

• Estimates of "take by harassment".

(4) Notification of Injured or Dead Marine Mammals

In addition to the reporting measures proposed by ION, NMFS will require that ION notify NMFS' Office of Protected Resources and NMFS' Stranding Network of sighting an injured or dead marine mammal in the vicinity of marine survey operations. Depending on the circumstance of the incident, ION shall take one of the following reporting protocols when an injured or dead marine mammal is discovered in the vicinity of the action area.

(a) In the unanticipated event that survey operations clearly cause the take of a marine mammal in a manner prohibited by this Authorization, such as an injury, serious injury or mortality (*e.g.,* ship-strike, gear interaction, and/or entanglement), ION shall immediately cease survey operations and immediately report the incident to the Supervisor of Incidental Take Program, Permits and Conservation Division, Office of Protected Resources, NMFS, and the Alaska Regional Stranding Coordinators. The report must include the following information:

(i) Time, date, and location (latitude/longitude) of the incident;

(ii) The name and type of vessel involved;

(iii) The vessel's speed during and leading up to the incident;

(iv) Description of the incident;

(v) Status of all sound source use in the 24 hours preceding the incident;

(vi) Water depth;

(vii) Environmental conditions (*e.g.,* wind speed and direction, Beaufort sea state, cloud cover, and visibility);

**Federal Register**/Vol. 77, No. 206/Wednesday, October 24, 2012/Notices

(viii) Description of marine mammal observations in the 24 hours preceding the incident;

(ix) Species identification or description of the animal(s) involved;

(x) The fate of the animal(s); and

(xi) Photographs or video footage of the animal (if equipment is available).

Activities shall not resume until NMFS is able to review the circumstances of the prohibited take. NMFS shall work with ION to determine what is necessary to minimize the likelihood of further prohibited take and ensure MMPA compliance. ION may not resume their activities until notified by NMFS via letter, email, or telephone.

(b) In the event that ION discovers an injured or dead marine mammal, and the lead PSO determines that the cause of the injury or death is unknown and the death is relatively recent (*i.e.,* in less than a moderate state of decomposition as described in the next paragraph), ION will immediately report the incident to the Supervisor of the Incidental Take Program, Permits and Conservation Division, Office of Protected Resources, NMFS, and the Alaska Regional Stranding Coordinators. The report must include the same information identified above. Activities may continue while NMFS reviews the circumstances of the incident. NMFS will work with ION to determine whether modifications in the activities are appropriate.

(c) In the event that ION discovers an injured or dead marine mammal, and the lead PSO determines that the injury or death is not associated with or related to the activities authorized in the IHA (if issued) (*e.g.,* previously wounded animal, carcass with moderate to advanced decomposition, or scavenger damage), ION shall report the incident to the Supervisor of the Incidental Take Program, Permits and Conservation Division, Office of Protected Resources, NMFS, and the Alaska Regional Stranding Coordinators, within 24 hours of the discovery. ION shall provide photographs or video footage (if available) or other documentation of the stranded animal sighting to NMFS and the Marine Mammal Stranding Network. ION can continue its operations under such a case.

## Estimated Take by Incidental Harassment

Except with respect to certain activities not pertinent here (military readiness activities), the MMPA defines "harassment" as: any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild [Level A harassment]; or (ii) has the potential

to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering [Level B harassment]. For the most part, only take by Level B behavioral harassment is anticipated as a result of the proposed marine seismic survey. However, NMFS has determined that Level A takes of a few individuals of marine mammals could occur if the animals are unable to bedetered within the exclusion zones for a prolonged period of time. Although NMFS believes this is not likely, NMFS is proposing to authorize limited takes from Level A harassment. Anticipated impacts to marine mammals are associated with noise propagation from the seismic airgun(s) and the icebreaking used during the seismic survey.

The full suite of potential impacts to marine mammals was described in detail in the "Potential Effects of the Specified Activity on Marine Mammals" section found earlier in this document. The potential effects of sound from the proposed marine survey programs might include one or more of the following: tolerance; masking of natural sounds; behavioral disturbance; non-auditory physical effects; and, at least in theory, temporary or permanent hearing impairment (Richardson *et al.* 1995). As discussed earlier in this document, the most common impact will likely be from behavioral disturbance, including avoidance of the ensonified area or changes in speed, direction, and/or diving profile of the animal.

NMFS uses the 160 dB and 120 dB re 1 µPa (rms) isopleths to indicate the onset of Level B harassment by seismic airgun impulses and by icebreaking noises, respectively. ION provided calculations for the 160-dB and 120-dB isopleths produced by these active acoustic sources and then used those isopleths to estimate takes by harassment. NMFS used the calculations to make preliminary findings under the MMPA. ION provided a full description of the methodology used to estimate takes by harassment in its IHA application (see **ADDRESSES**), which is also described in the following sections.

ION has requested an authorization to take ten marine mammal species by Level B harassment. These ten marine mammal species are: beluga whale, harbor porpoise, bowhead whale, gray whale, humpback whale, minke whale, bearded seal, ringed seal, spotted seal, and ribbon seal. However, NMFS does not anticipate that humpback whales are likely to be encountered during the season of ION's icebreaking seismic

survey. Therefore, NMFS determined that only nine of the species could be affected and potentially taken by harassment. In addition, although unlikely, NMFS determined that Level A takes of beluga whales, bowhead whales, and ringed seals could also occur, as the proposed monitoring and mitigation measures may not be 100% effective due to ice coverage and extended periods of darkness. Regardless, our analysis has led us to conclude that marine mammals will likely avoid the sound source thereby minimizing the probability of exposure at a level that would equate to Level A harassment.

### Basis for Estimating "Take by Harassment"

As stated previously, it is current NMFS practice to estimate take by Level A harassment for received levels above 180 dB re 1 µPa (rms) for cetaceans and 190 dB re 1 µPa (rms) for pinnipeds, and take by Level B harassment for all marine mammals under NMFS jurisdiction by impulse sounds at a received level above 160 dB re 1 µPa (rms) and by non-impulse sounds at a received level above 120 dB re 1 µPa (rms). However, not all animals are equally affected by the same received noise levels and, as described earlier, in most cases marine mammals are not likely to be taken by Level A harassment (injury) when exposed to received levels higher than 180 dB for a brief period of time.

For behavioral harassment, marine mammals will likely not show strong reactions (and in some cases any reaction) until sounds are much stronger than 160 or 120 dB (for impulse and continuous sounds, respectively). Southall *et al.* (2007) provide a severity scale for ranking observed behavioral responses of both free-ranging marine mammals and laboratory subjects to various types of anthropogenic sound (see Table 4 in Southall *et al.* (2007)). Tables 7, 9, and 11 in Southall *et al.* (2007) outline the numbers of low-frequency cetaceans, mid-frequency cetaceans, and pinnipeds in water, respectively, reported as having behavioral responses to multi-pulses in 10-dB received level increments. These tables illustrate that the more severe reactions did not occur until sounds were much higher than 160 dB re 1 µPa (rms).

Anticipated takes would include "takes by harassment" involving temporary changes in behavior (Level B harassment) and TTS (Level B harassment). NMFS does not consider injury (Level A harassment) to be likely, however, due to the limited

**39**

effectiveness of monitoring and mitigation measures for animals undetected under the ice and/or during the long periods of darkness, a small amount of Level A harassment takes are also proposed to be authorized. The sections below describe methods used to estimate "take by harassment" and present estimates of the numbers of marine mammals that might be affected during the proposed seismic survey in the U.S. Beaufort Sea. The estimates are based on data obtained during marine mammal surveys in the Beaufort Sea and on estimates of the sizes of the areas where effects could potentially occur. In some cases, these estimates were made from data collected from regions and habitats that differed from the proposed project area. Adjustments to reported population or density estimates were made on a case by case basis to account for differences between the source data and the available information on the distribution and abundance of the species in the project area. This section provides estimates of the number of potential "exposures" to impulsive sound levels ≥160 dB re 1 µPa (rms), non-pulse sound levels ≥120 dB (rms) from icebreaking, and also includes estimates of exposures to ≥180 dB (rms) for cetaceans and ≥190 dB (rms) for seals.

Although several systematic surveys of marine mammals have been conducted in the southern Beaufort Sea during spring and summer, few data (systematic or otherwise) are available on the distribution and numbers of marine mammals during the early winter period of this survey, particularly in the northern Beaufort Sea. The main sources of distributional and numerical data used in deriving the estimates are described in the next subsection. There is some uncertainty about how representative those data are and the assumptions used below to estimate the potential "take by harassment". However, the approach used here is accepted by NMFS as the best available at this time. That is, we calculated the estimated take by multiplying the ensonified area by the density of marine mammals. The following estimates are based on a consideration of the number of marine mammals that might be disturbed appreciably by ~7,250 line kilometers (4,505 line miles) of seismic surveys across the Beaufort Sea and, to a lesser extent, the northern Chukchi Sea.

*Marine Mammal Density Estimates*

This section describes the estimated densities of marine mammals that may occur in the survey area. The area of water that may be ensonified to various levels is described below. Although a marine mammal may be exposed to icebreaking sounds ≥120 dB (rms) or airgun sounds ≥160 dB (rms), this does not mean that every individual exposed at these levels will *actually* exhibit a disruption of behavioral patterns in response to the sound source. Not all animals react to sounds at this low level, and many will not show strong reactions (and in some cases any reaction) until sounds are much stronger. There are several variables that determine whether or not an individual animal will exhibit a response to the sound, such as the age of the animal, previous exposure to this type of anthropogenic sound, habituation, etc.

The survey has been designed to minimize interactions with marine mammals by planning to conduct the work at times and in areas where the relative density of marine mammals is expected to be quite low. The survey will begin in offshore waters (>1,000 m [3,281 ft] deep) of the eastern U.S. Beaufort Sea (east survey area) in mid-October. Weather and ice permitting, the waters <1,000 m (3,281 ft) deep will not be surveyed until mid-October and thereafter, in order to avoid migrating bowhead whales. The western U.S. Beaufort Sea and north-eastern Chukchi Sea (west survey area) is not expected to be surveyed until late October through December.

Separate densities were calculated for habitats specific to cetaceans and pinnipeds. For cetaceans, densities were estimated for areas of water depth <200 m (656 ft), 200–1,000 m (656–3,281 ft), and >1,000 m (3,281 ft), which approximately correspond to the continental shelf, the continental slope, and the abyssal plain, respectively. Separate densities of both cetacean and pinnipeds were also estimated for the east and west survey areas within each water depth category. However, pinniped densities in the west survey area and <200 m (656 ft) water depth category were further sub-divided into <35 m (115 ft) and 35–200 m (115–656 ft) depth categories. This was done because the west survey area is not expected to be surveyed until November–December, and based on historic sea ice data (NOAA National Ice Center, available online at *www.natice.noaa.gov*), it is expected that substantial amounts of sea ice, including shorefast ice, will be present in the west survey area at that time. Past studies have found that seal densities in ice-covered areas of the Beaufort Sea are different where water depths are <35 m (115 ft) and >35 m (Moulton *et al.,* 2002; Frost *et al.,* 2004); therefore, densities were calculated separately for these

water depths. The north-eastern Chukchi Sea is composed of mostly continental shelf waters between 30 m (98 ft) and 200 m (656 ft) in depth, so only a single density estimate for each marine mammal species was used in that area. Since most marine mammals will be continuing their southerly migration in November and early December, the same density estimates for continental shelf waters in the west survey area of the Beaufort Sea were used in the Chukchi Sea. When the seismic survey area is on the edge of the range of a species at this time of year, it is assumed that the average density along the seismic trackline will be 10% (0.10x) the density determined from available survey data within the main range. Density estimates for the Chukchi Sea during the period of November–December were taken from the west survey density estimates at the appropriate depth.

Detectability bias, quantified in part by f(0), is associated with diminishing sightability with increasing lateral distance from the survey trackline. Availability bias, g(0), refers to the fact that there is <100% probability of sighting an animal that is present along the survey trackline. Some sources used below took account of one or both of these correction factors in reporting densities. When these factors had not been accounted for, the best available correction factors from similar studies and/or species were applied to reported results. Details regarding the application of correction factors are provided below for each species.

**(1) Cetaceans**

*Beluga Whales:* Beluga density estimates were calculated based on aerial survey data collected in October in the eastern Alaskan Beaufort Sea by the NMML (as part of the Bowhead Whale Aerial Survey Project (BWASP) program funded by BOEM) in 2007–2010. They reported 31 sightings of 66 individual whales during 1,597 km (992 mi) of on-transect effort over waters 200–2,000 m (656–6,562 ft) deep. An f(0) value of 2.326 was applied and it was calculated using beluga whale sightings data collected in the Canadian Beaufort Sea (Innes *et al.* 2002). A g(0) value of 0.419 was used that represents a combination of ga(0) = 0.55 (Innes *et al.,* 2002) and gd(0) = 0.762 (Harwood *et al.,* 1996). The resulting density estimate (0.1169 individuals/km²; Table 2 in this document) was applied to areas of 200–1,000 m (656 –3,281 ft). There were 3 sightings of 4 individual beluga whales during 7,482 km (4,649 mi) of on-transect effort over waters 0–200 m (0–656 ft) deep during this same time

**Federal Register**/Vol. 77, No. 206/Wednesday, October 24, 2012/Notices

period. Using the same f(0) and g(0) values from above, the resulting density estimate for continental shelf waters (0–200 m deep) is 0.0015 individuals/km² (Table 2 in this document). The density estimate for waters >1000 m (3,281 ft) deep was estimated as 40% of the 200–1,000 m (656–3,281 ft) density based on the relative number of sightings in the two water depth categories. For all water depth and survey area categories, the maximum beluga density estimates represent the mean estimates multiplied by four to allow for chance encounters with unexpected large groups of animals or overall higher densities than expected.

Beluga density estimates for the west survey area, which is planned to be surveyed beginning in November, represent the east survey area estimates multiplied by 0.1 because the Beaufort Sea and north-eastern Chukchi Sea is believed to be at the edge of the species' range in November–December. Belugas typically migrate into the Bering Sea for the winter (Allen and Angliss, 2011) and are not expected to be present in the study area in high numbers in November–December. Satellite tagging data support this and indicate belugas migrate out of the Beaufort Sea in the October–November period (Suydam *et al.,* 2005).

*Bowhead Whales:* Bowhead whale density estimates were calculated based on aerial survey data collected in the Beaufort Sea as part of the BWASP program funded by BOEM. The average density estimate was based on surveys in October 2007–2010 and the maximum density estimate was based on surveys conducted in October 1997–2004. The earlier data were used to calculate the maximum estimate because they include some years of unusually high numbers of bowhead sightings in the western Alaskan Beaufort Sea at that time of year. The 2007–2010 data included 25 on-transect sightings collected during 7,482 km (4,649 mi) of effort over waters 0–200 m (0–656 ft) deep in the eastern Alaskan Beaufort Sea. The 1997–2004 data included 147 on-transect sightings of 472 individual whales collected during 20,340 km (12,639 mi) of effort over waters 0–200 m (0–656 ft) deep in the eastern Alaskan Beaufort Sea. An f(0) correction factor of 2.33 used in the density calculation was the result of a weighted average of the f(0) values applied to each of the flights (Richardson and Thomson, 2002). The multiplication of ga(0) = 0.144 and gd(0)

= 0.505 correction factors reported in Richardson and Thomson (2002) gave the g(0) value of 0.0727 used in the density calculation. The resulting density estimates (0.0942 whales/km² and 0.3719 whales/km²) represent the average and maximum densities, respectively for October for areas of <200 m (656 ft) water depth, and are referred to below as the reference density for bowhead whales.

Because bowhead whale density is typically higher in continental shelf waters of the Beaufort Sea in early October, the survey has been planned to start in the eastern U.S. Beaufort Sea in waters deeper than 1,000 m (3,281 ft; ice conditions permitting), where bowhead density is expected to be much lower. Survey activity in shallower waters will proceed from east to west starting later in October as bowhead whales migrate west out of the Beaufort Sea. The nearshore lines in the east survey area will be surveyed during late October. Bowhead density in the east survey area in waters <200 m (656 ft) deep was estimated by taking ten percent of the reference density above (Table 2 in this document). This adjustment was based on data from Miller *et al.* (2002) that showed a ~90% decrease in bowhead whale abundance in the eastern Alaskan Beaufort Sea from early to late October.

Bowhead whale densities in intermediate (200–1,000 m [656–3,281 ft]) and deep (>1,000 m [3,281 ft]) water depths in the east survey area are expected to be quite low. Ninety-seven percent of sightings recorded by MMS aerial surveys 1997–2004 occurred in areas of water depth <200 m (656 ft) (Treacy, 1998, 2000, 2002a, 2000b; Monnett and Treacy, 2005). Therefore, density estimates for areas of water depth 200–1,000 m (656–3,281 ft) were estimated to be ~3% of the values for areas with depth <200 m (656 ft). This is further supported by Mate *et al.* (2000), who found that 87% of locations from satellite-tagged bowhead whales occurred in areas of water depth <100 m (328 ft). In areas with water depth >1,000 m (3,281 ft), ~4,225 km (2,625 mi) of aerial survey effort occurred during October 1997–2004; however, no bowhead sightings were recorded. The effort occurred over eight years, so it is unlikely that this result would have been influenced by ice cover or another single environmental variable that might have affected whale distribution in a given year. Therefore, a minimal density estimate (0.0001 whales/km²) was used

for areas with water depth >1,000 m (3,281 ft).

Several sources were used to estimate bowhead whale density in the west survey area, including the north-eastern Chukchi Sea, which is expected to be surveyed beginning in late October or early November. Mate *et al.* (2000) found that satellite-tagged bowhead whales in the Beaufort Sea travelled at an average rate of 88 km (55 mi) per day. At that rate, an individual whale could travel across the extent of the east survey area in four days and across the entire east-west extent of the survey area in ten days, if it did not stop to feed during its migration, as bowhead whales have been observed to do earlier in the year (Christie *et al.,* 2010). Also, Miller *et al.* (2002) presented a 10-day moving average of bowhead whale abundance in the eastern Beaufort Sea using data from 1979–2000 that showed a decrease of ~90% from early to late October. Based on these data, it is expected that almost all whales that had been in the east survey area during early October would likely have migrated beyond the survey areas by November–December. In addition, kernel density estimates and animal tracklines generated from satellite-tagged bowhead whales, along with acoustic monitoring data, suggest that few bowhead whales are present in the proposed survey area in November (near Point Barrow), and no whales were present in December (ADFG, 2010; Moore *et al.,* 2010). Therefore, density estimates for the <200 m (656 ft) and 200–1,000 m (656–3,281 ft) water depth categories in the west survey area were estimated to be one tenth of those estimates for the east survey area. Minimal density estimates (0.0001 whales/km²) were used for areas of water depth >1,000 m (3,281 ft).

*Other Cetaceans:* Other cetacean species are not expected to be present in the area at the time of the planned survey. These species, including humpback and fin whales, typically migrate during autumn and are expected to be south of the proposed survey area by the October–December period. Gray whales have been detected near Point Barrow during the period of the proposed project, and even throughout the winter (Moore *et al.,* 2006; Stafford *et al.,* 2007). Authorization for minimal takes of other cetacean species that are known to occur in the Beaufort Sea during the summer have been requested in case of a chance encounter of a few remaining individuals.

**65082** **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

TABLE 2—EXPECTED DENSITIES OF CETACEANS IN THE ARCTIC OCEAN IN OCTOBER–DECEMBER BY WATER DEPTH AND SURVEY AREA

| Species | <200 m | 200–1,000 m | >1,000 m |
|---|---|---|---|
| *Beaufort East Survey Area* | | | |
| Beluga whale | 0.0015 | 0.1169 | 0.0468 |
| Harbor porpoise | 0.0001 | 0.0001 | 0.0001 |
| Bowhead whale | 0.0094 | 0.0028 | 0.0001 |
| Gray whale | 0.0001 | 0.0001 | 0.0001 |
| Minke whale | 0.0001 | 0.0001 | 0.0001 |
| *Beaufort West Survey Area* | | | |
| Beluga whale | 0.0002 | 0.0117 | 0.0047 |
| Harbor porpoise | 0.0001 | 0.0001 | 0.0001 |
| Bowhead whale | 0.0009 | 0.0003 | 0.0001 |
| Gray whale | 0.0001 | 0.0001 | 0.0001 |
| Minke whale | 0.0001 | 0.0001 | 0.0001 |
| *Chukchi Survey Area* | | | |
| Beluga whale | 0.0002 | ............... | ............... |
| Harbor porpoise | 0.0001 | ............... | ............... |
| Bowhead whale | 0.0009 | ............... | ............... |
| Gray whale | 0.0001 | ............... | ............... |
| Minke whale | 0.0001 | ............... | ............... |

(2) Pinnipeds

In polar regions, most pinnipeds are associated with sea ice, and typical census methods involve counting pinnipeds when they are hauled out on ice. In the Beaufort Sea, surveys typically occur in spring when ringed seals emerge from their lairs (Frost *et al.,* 2004). Depending on the species and study, a correction factor for the proportion of animals hauled out at any one time may or may not have been applied (depending on whether an appropriate correction factor was available for the particular species and area). By applying a correction factor, the total density of the pinniped species in an area can be estimated. Only the animals in water would be exposed to the pulsed sounds from the airguns; however, densities that are presented generally represent either only the animals on the ice or all animals in the area. Therefore, only a fraction of the pinnipeds present in areas where ice is present (and of sufficient thickness to support hauled-out animals) would be exposed to seismic sounds during the proposed seismic survey. Individuals hauled out on ice in close proximity to the vessels are likely to enter the water as a reaction to the passing vessels, and the proportion that remain on the ice will likely increase with distance from the vessels.

*Ringed Seals:* Ringed seal density for the east survey area for waters <1000 m (3,281 ft) deep was estimated using vessel-based data collected in the Beaufort Sea during autumn (Sep–Oct) 2006–2008 and reported by Savarese *et al.* (2010; Table 3 in this document). Correction factors for sightability and availability were used when the authors

calculated the estimates, so no further adjustments were required. For the east survey area for waters >1000 m (3,281 ft) deep, few data on seal distribution are available. Harwood *et al.* (2005) recorded a ringed seal sighting in the Beaufort Sea in an area where water depth was >1,000 m (3,281 ft) in September–October 2002 during an oceanographic cruise. It is therefore possible that ringed seals would occur in those areas, and their presence would likely be associated with ephemeral prey resources. If a relatively warm surface eddy formed that concentrated prey in offshore areas at depths that would be possible for ringed seals to access, it is possible that seals would be attracted to it. A warm eddy was found in the northern Beaufort Sea in October 2002 in an area where water depth was >1,000 m (3,281 ft) (Crawford, 2010), so it is possible that such an oceanographic feature might develop again and attract seals offshore. However, it is unclear whether such a feature would attract many seals, especially since the marine mammal observers present on the ship in 2002 did not observe very many seals associated with the offshore eddy. In the absence of standardized survey data from deep-water areas, but with available data suggesting densities are likely to be quite low, minimal density estimates (0.0001 seals/km²) were used in areas where water depth is >1,000 m (3,281 ft). For all water depth categories in the east survey area, the maximum ringed seal density was assumed to be the mean estimate multiplied by four to allow for chance encounters with unexpected large groups of animals or overall higher densities than expected.

Habitat zones and associated densities were defined differently in the west

survey area, which will be surveyed in November–December, because more ice is expected to be encountered at that time than in October (NOAA National Ice Center: *www.natice.noaa.gov*). The density estimates for the west survey area were calculated using aerial survey data collected by Frost *et al.* (2004) in the Alaskan Beaufort Sea during the spring. A g(0) correction factor of 0.60 from tagging data reported by Bengtson *et al.* (2005) was used to adjust all density estimates from Frost *et al.* (2004) described below. Seal distribution and density in spring, prior to breakup, are thought to reflect distribution patterns established earlier in the year (*i.e.,* during the winter months; Frost *et al.,* 2004). Density estimates were highest (1.00–1.33 seals/ km²) in areas of water depth 3–35 m (10–115 ft), and decreased (0–0.77 seals/ km²) in water >35 m (115 ft) deep. The mean density estimate used for areas with water depth <35 m (Table 4 in this document) was estimated using an average of the pack ice estimates modeled by Frost *et al.* (2004). The maximum estimate for the same area is the maximum observed density for areas of water depth 3–35 m (10–115 ft) in Frost *et al.* (2004). The mean density estimate used for areas with 35–200 m (115–656 ft) water depth is the modeled value for water depth >35 m (115 ft) from Frost *et al.* (2004). The maximum estimate is the maximum observed density for areas with >35 m (115 ft) water depth in Frost *et al.* (2004). Because ringed seal density tends to decrease with increasing water depth (Moulton *et al.,* 2002; Frost *et al.,* 2004), ringed seal density was estimated to be minimal in areas of >200 m (656 ft) water depth.

**Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

**42**
**65083**

In the Chukchi Sea, ringed seal densities were taken from offshore aerial surveys of the pack ice zone conducted in spring 1999 and 2000 (Bengtson *et al.,* 2005). The average density from those two years (weighted by survey effort) was 0.4892 seals/km². This value served as the average density while the highest density from the two years, (0.8100 seals/km² in 1999) was used as the maximum density.

*Other Seal Species:* Other seal species are expected to be less frequent in the study area during the period of this survey. Bearded and spotted seals would be present in the area during summer, and possibly ribbon seals as well, but they generally migrate into the southern Chukchi and Bering seas during fall (Allen and Angliss, 2011). Few satellite-tagging studies have been conducted on these species in the Beaufort Sea, winter surveys have not been conducted, and a few bearded seals have been reported over the continental shelf in spring prior to general breakup. However, three bearded seals tracked in 2009 moved south into the Bering Sea along the continental shelf by November (Cameron and Boveng, 2009). It is possible that some individuals, bearded seals in particular, may be present in the survey area. In the absence of better information from the published literature or other sources that would indicate significant numbers of any of these species might be present, minimal density estimates were used for all areas and water depth categories for these species, with the estimates for bearded seals assumed to be slightly higher than those for spotted and ribbon seals (Tables 3 and 4 in this document).

TABLE 3—EXPECTED DENSITIES (#/KM²) OF PINNIPEDS IN THE EAST SURVEY AREA OF THE U.S. BEAUFORT SEA IN OCTOBER.

| Species | <200 m | 200–1,000 m | >1,000 m |
|---|---|---|---|
| Ringed seal | 0.0840 | 0.0840 | 0.0004 |
| Bearded seal | 0.0004 | 0.0004 | 0.0004 |
| Spotted seal | 0.0001 | 0.0001 | 0.0001 |
| Ribbon seal | 0.0001 | 0.0001 | 0.0001 |

TABLE 4—EXPECTED DENSITIES (#/KM²) OF PINNIPEDS IN THE BEAUFORT WEST AND CHUKCHI SURVEY AREAS OF THE ARCTIC OCEAN IN NOVEMBER-DECEMBER.

| Species | <35 m | 35–200 m | >200 m |
|---|---|---|---|
| *Beaufort West* | | | |
| Ringed seal | 1.9375 | 1.0000 | 0.0004 |
| Bearded seal | 0.0004 | 0.0004 | 0.0004 |
| Spotted seal | 0.0001 | 0.0001 | 0.0001 |
| Ribbon seal | 0.0001 | 0.0001 | 0.0001 |
| *Chukchi Sea* | | | |
| Ringed seal | .................. | 0.4892 | .................. |
| Bearded seal | .................. | 0.0004 | .................. |
| Spotted seal | .................. | 0.0001 | .................. |
| Ribbon seal | .................. | 0.0001 | .................. |

*Potential Number of Takes by Level B Behavioral Harassment*

Numbers of marine mammals that might be present and potentially taken are estimated below based on available data about mammal distribution and densities at different locations and times of the year as described above.

The number of individuals of each species potentially exposed to received levels ≥120 dB re 1 μPa (rms) or ≥160 dB re 1 μPa (rms), depending on the type of activity occurring, within each portion of the survey area (east and west) and water depth category was estimated by multiplying:
• The anticipated area to be ensonified to ≥120 dB re 1 μPa (rms) or ≥160 dB re 1 μPa (rms) in each portion of the survey area (east and west) and water depth category, by
• The expected species density in that time and location.

Some of the animals estimated to be exposed, particularly migrating bowhead whales, might show avoidance reactions before being exposed to ≥160 dB re 1 μPa (rms). Thus, these calculations actually estimate the number of individuals potentially exposed to ≥160 dB (rms) that would occur if there were no avoidance of the area ensonified to that level.

(1) Potential Number of Takes by Seismic Airguns at Received Levels ≥160 dB

The area of water potentially exposed to received levels of airgun sounds ≥160 dB (rms) was calculated by using a GIS to buffer the planned survey tracklines within each water depth category by the associated modeled ≥160 dB (rms) distances. The expected sound propagation from the airgun array was modeled by JASCO Applied Research (Zykov *et al.,* 2010) and is expected to vary with water depth. Survey tracklines falling within the <100 m (328 ft), 100–1,000 m (328–3,281 ft), and >1,000 m (3,281 ft) water depth categories were buffered by distances of 27.8 km (17.3 mi), 42.2 km (26.2 mi), and 31.6 km (19.6 mi), respectively. The total area of water that would be exposed to sound >160 dB (rms) on one or more occasions is estimated to be 209,752 km². A breakdown by water depth classes used in association with density estimates is presented in Table 5 in this document and Figure 2 of the IHA application.

Based on the operational plans and marine mammal densities described above, the estimates of marine mammals potentially exposed to sounds ≥160 dB (rms) are presented in Table 5 in this document. For species likely to be present, the requested numbers are calculated as described above. For less common species, estimates were set to minimal numbers to allow for chance encounters. Discussion of the number of potential exposures is summarized by species in the following subsections.

It is likely that some members of one endangered cetacean species (bowhead whale) will be exposed to received

65084    **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

sound levels ≥160 dB (rms) unless bowheads avoid the survey vessel before the received levels reach 160 dB (rms). However, the late autumn timing and the design of the proposed survey will minimize the number of bowheads and other cetaceans that may be exposed to seismic sounds generated by this survey. The best estimates of the number of whales potentially exposed to ≥160 dB (rms) are 282 and 4,315 for bowheads and belugas, respectively (Table 5).

The ringed seal is the most widespread and abundant pinniped species in ice-covered Arctic waters, and there is a great deal of variation in estimates of population size and distribution of these marine mammals.

Ringed seals account for the vast majority of marine mammals expected to be encountered, and hence exposed to airgun sounds with received levels >160 dB (rms) during the proposed marine survey. Our analysis, based on our use of summer/fall density data, resulted in an overestimation of take of ringed seals (approximately 60,293 ringed seals may be exposed to marine survey sounds with received levels >160 dB (rms)) if they do not avoid the sound source. Other pinniped species are not expected to be present in the proposed survey area in more than minimal numbers in October–December; however, ION is requesting authorization for a small number of

harassment "takes" of species that occur in the area during the summer months in case a few individuals are encountered (Table 5 in this document).

It should be noted that there is no evidence that most seals exposed to airgun pulses with received levels 160 dB re 1 µPa (rms) are disturbed appreciably, and even at a received level of 180 dB (rms) disturbance is not conspicuous (Harris *et al.*, 2001; Moulton and Lawson, 2002). Therefore, for seals, the estimates of numbers exposed to ≥160 dB re 1 µPa (rms) greatly exceed the numbers of seals that will actually be disturbed in any major or (presumably) biologically significant manner.

TABLE 5—ESTIMATES OF THE POSSIBLE NUMBERS OF MARINE MAMMALS EXPOSED TO ≥160 dB 1 µPA (RMS) DURING ION'S PROPOSED SEISMIC PROGRAM IN THE BEAUFORT AND CHUKCHI SEAS, OCTOBER–DECEMBER 2012

| Cetaceans | Water depth | | | Total |
|---|---|---|---|---|
| | <200 m | 200–1,000 m | >1,000 m | |
| Beluga whale | 43 | 1,195 | 3,077 | 4,215 |
| Harbor porpoise | 9 | 2 | 10 | 21 |
| Bowhead whale | 269 | 3 | 10 | 282 |
| Gray whale | 9 | 2 | 10 | 21 |
| Minke whale | 9 | 2 | 10 | 21 |

| Pinnipeds (Beaufort East) | Water depth | | | Total |
|---|---|---|---|---|
| | <35 m | 35–200 m | >200 m | |
| Ringed seal | 1,794 | 805 | 25 | 2,624 |
| Bearded seal | 9 | 4 | 25 | 38 |
| Spotted seal | 2 | 1 | 6 | 9 |
| Ribbon seal | 2 | 1 | 6 | 9 |

| Pinnipeds (Beaufort West & Chukchi Sea) | Water depth | | | Total |
|---|---|---|---|---|
| | <35 m | 35–200 m | >200 m | |
| Ringed seal | 16,969 | 40,682 | 18 | 57,669 |
| Bearded seal | 4 | 25 | 18 | 47 |
| Spotted seal | 1 | 6 | 5 | 12 |
| Ribbon seal | 1 | 6 | 5 | 12 |

(2) Potential Number of Takes by Icebreaking at Received Levels ≥120 dB

As discussed above, based on available information regarding sounds produced by icebreaking in various ice regimes and the expected ice conditions during the proposed survey, vessel sounds generated during ice breaking are likely to have source levels between 175 and 185 dB re 1 µPa-m. As described above, we have assumed that seismic survey activity will occur along all of the planned tracklines shown in Figure 1 of ION's IHA application. Therefore, received levels ≥160 dB radius of 26.7–42.2 km (16.6–26.2 mi; depending on water depth) to each side of all of the survey lines was applied for the calculation. Assuming a source level of 185 dB re 1 µPa-m and using the 15logR for calculating spreading loss of

acoustic intensity, icebreaking sounds may be ≥120 dB out to a maximum distance of ~21.6 km (13.4 mi). Thus, all sounds produced by icebreaking are expected to diminish below 120 dB re 1 µPa within the zone where we assume mammals will be exposed to ≥160 dB (rms) from seismic sounds. Exposures of marine mammals to icebreaking sounds with received levels ≥120 dB would effectively duplicate or "double-count" animals already included in the estimates of exposure to strong (≥160 dB) airgun sounds. The planned survey lines cover a large extent of the U.S. Beaufort Sea, and seismic survey activity along all those lines has been assumed in the estimation of takes. Any non-seismic periods, when only icebreaking might occur, would

therefore result in fewer exposures than estimated from seismic activities.

If refueling of the *Geo Arctic* is required during the survey and the *Polar Prince* transits to and from Canadian waters to acquire additional fuel for itself, an additional ~200 km (124 mi) of transit may occur. Most of this transit would likely occur through ice in offshore waters >200 m (656 ft) in depth. For estimation purposes we have assumed 25% of the transit will occur in 200–1,000 m (656–3,281 ft) of water and the remaining 75% will occur in >1000 m (3,281 ft) of water. This results in an estimated ~2,160 km² of water in areas 200–1,000 m (656–3,281 ft) deep and 6,487 km² in waters >1,000 m (3,281 ft) deep being ensonified to ≥120 dB by icebreaking sounds. Using the density estimates for the east survey

**44**
**Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices
65085

area shown in Tables 2 and 3, the estimated exposures of cetaceans and pinnipeds are shown in Table 6 here.

TABLE 6—ESTIMATES OF THE POSSIBLE NUMBERS OF MARINE MAMMALS EXPOSED TO ≥120 dB re 1 μPa (RMS) DURING ICEBREAKING ACTIVITIES ASSOCIATED WITH THE PREFERRED ALTERNATIVE FOR REFUELING DURING ION'S PROPOSED SEISMIC PROGRAM IN THE BEAUFORT SEA, OCTOBER–DECEMBER 2012

| Species | Water depth | | Total |
|---|---|---|---|
| | 200–1,000 m | >1,000 m | |
| Beluga whale | 253 | 320 | 573 |
| Harbor porpoise | 0 | 1 | 1 |
| Bowhead whale | 1 | 1 | 2 |
| Gray whale | 0 | 1 | 1 |
| Minke whale | 0 | 1 | 1 |
| Ringed seal | 181 | 3 | 184 |
| Bearded seal | 1 | 3 | 4 |
| Spotted seal | 0 | 1 | 1 |
| Ribbon seal | 0 | 1 | 1 |

If the *Polar Prince* cannot return to port via Canadian waters, then a transit of ~600 km (373 mi) from east to west across the U.S. Beaufort would be necessary. It is expected that most of this transit would likely occur in offshore waters >200 m (656 ft) in depth. For estimation purposes we have assumed 25% of the transit will occur in 200–1,000 m (656–3,281 ft) of water and the remaining 75% will occur in >1,000 m (3,281 ft) of water. This results in an estimated ~3,240 km² of water in areas 200–1,000 m (656–3,281 ft) deep and 9,720 km² in waters >1,000 m (3,281 ft) deep being ensonified to ≥120 dB by icebreaking sounds within each half of the U.S. Beaufort Sea, for a total of 25,920 km² ensonified across the entire U.S. Beaufort Sea. Using the density estimates in Tables 2–3, estimated exposures of cetaceans and pinnipeds are shown in Table 7 here.

TABLE 7—ESTIMATES OF THE POSSIBLE NUMBERS OF MARINE MAMMALS EXPOSED TO ≥120 dB re 1 μPa (RMS) DURING ICEBREAKING ACTIVITIES ASSOCIATED WITH THE SECONDARY ALTERNATIVE FOR REFUELING DURING ION'S PROPOSED SEISMIC PROGRAM IN THE BEAUFORT AND CHUKCHI SEAS, OCTOBER–DECEMBER 2012

| Species | Water depth | | Total |
|---|---|---|---|
| | 200–1,000 m | >1,000 m | |
| Beluga whale | 417 | 500 | 917 |
| Harbor porpoise | 0 | 2 | 2 |
| Bowhead whale | 1 | 2 | 3 |
| Gray whale | 0 | 2 | 2 |
| Minke whale | 0 | 2 | 2 |
| Ringed seal | 273 | 8 | 281 |
| Bearded seal | 2 | 8 | 10 |
| Spotted seal | 0 | 2 | 2 |
| Ribbon seal | 0 | 2 | 2 |

*Potential Number of Takes by Level B TTS and Level A Harassment*

In the past, because of the likelihood that individuals will avoid exposure at received levels and lengths of time associated with PTS, and because of the anticipated effectiveness of mitigation in the daytime and in open water, applicants have not requested authorization for Level A harassment of marine mammals. However, as noted previously, due to the more limited effectiveness of monitoring and mitigation measures for animals under ice cover and during long lowlight hours, but still considering the likelihood that most individuals will avoid exposure at higher levels and the lower densities of some species, NMFS is proposing to authorize takes of a small number of marine mammals by PTS (Level A harassment or injury) when exposed to received noise levels above 180 and 190 dB re 1 μPa (rms) for prolonged period, although this is unlikely to occur.

The methods used below for estimating the number of individuals potentially exposed to sounds >180 or >190 dB re 1 μPa (rms), which are based on over-estimated densities and do not consider avoidance or mitigation are therefore corrected to account for avoidance and mitigation to estimate a more reasonable number that could incur PTS (Level A take) although, for reasons described here and further below, NMFS does not anticipate that marine mammals will be injured or harmed by the proposed project.

Only two cetacean species, beluga and bowhead, may be present in the Alaskan Beaufort Sea late in the survey period or where extensive ice cover is present. Gray whale vocalizations have been recorded throughout one winter (2003–2004) in the western Alaskan Beaufort Sea near Pt. Barrow (Moore *et al.* 2006). However, the presence of gray whales in October and November in the Alaskan Beaufort Sea does not appear to be a regular occurrence or involve a significant number of animals when it does occur. NMFS therefore does not anticipate exposures of cetacean species, other than belugas or bowheads, to received sound levels ≥180 dB during periods of ION's in-ice seismic survey.

Beluga whales have shown avoidance of icebreaking sounds at relatively low

**65086** **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

received levels. In the Canadian Arctic, belugas showed initial avoidance of icebreaking sounds at received levels from 94–105 dB in the 20—1,000 Hz band, although some animals returned to the same location within 1–2 days and tolerated noise levels as high as 120 dB in that band (Finley et al., 1990). Playback experiments of icebreaker sounds resulted in 35% of beluga groups showing avoidance at received levels between 78–84 dB in the 1/3-octave band centered at 5,000 Hz, or 8–14 dB above ambient levels (Richardson et al., 1995b). Based on these results, it was estimated that reactions by belugas to an actual icebreaker would likely occur at ~10 km (6.2 mi) under similar conditions. Erbe and Farmer (2000) estimated that zones of disturbance from icebreaking sounds could extend 19–46 km (12–28.6 mi) depending on various factors. Erbe and Farmer (2000) also estimated that a beluga whale would have to remain within 2 km (1.2 mi) of an icebreaker backing and ramming for over 20 min to incur small TTS (4.8 dB), and within 120 m for over 30 min to incur more significant TTS (12–18 dB). Therefore, we expect that the probability of a beluga whale to experience TTS is extremely low.

Aerial and vessel based monitoring of seismic surveys in the central Beaufort Sea showed significant avoidance of active airguns by belugas. Results of the aerial monitoring suggested an area of avoidance out to 10–20 km (6.2–12.4 mi) around an active seismic source with higher than expected sighting rates observed at distances 20–30 km (12.4–18.6 mi) from the source (Miller et al. 1999; 2005). The nearest aerial "transect" beluga sighting during seismic activity was at a distance of 7.8 km (4.8 mi). Only seven beluga sightings were recorded from the survey vessel during the entire study, three of which occurred during seismic activity. Two of the seismic period sightings were made at the beginning of active airgun periods and the other was during seismic testing of a limited number of guns. These sightings occurred at distances between 1.54 km and 2.51 km from the vessel. Similarly, few beluga whales were observed near seismic surveys in the Alaskan Beaufort Sea in 1996–1998 (Richardson 1999), although the beluga migration corridor is typically well offshore of where most of the seismic survey occurred. Observers on seismic and associated support vessels operating in the Alaskan Beaufort Sea during 2006–2008 seasons reported no beluga sightings during seismic or non-seismic periods, suggesting avoidance of both seismic and vessel sounds (Savarese et

al., 2010). No mitigation measures during seismic operations (power down or shut down of airgun arrays) have been required as a result of beluga sightings during surveys in the Chukchi or Beaufort seas in 2006–2009 (Ireland et al., 2007a, 2007b; Patterson et al., 2007, Funk et al., 2008, Ireland et al., 2009b, Reiser et al., 2010).

Based on the reported avoidance of vessel, icebreaking, and seismic sounds by beluga whales, and the low and seasonally decreasing density during the time of the proposed survey, the likelihood of beluga whales occurring within the ≥180 dB zone during the proposed project is extremely low. A cautionary estimate that assumes 10% of belugas will show no avoidance of the 180 dB zone results in an estimate of 23 beluga whales exposed to sounds ≥180 dB (based on the densities described above and the area of water that may be ensonified to ≥180 dB) during the proposed project.

Bowhead whales have shown similar avoidance of vessel and seismic sounds. Less information is available regarding avoidance of icebreaking sounds; however, avoidance of the overall activity was noted during intensive icebreaking around drill sites in the Alaskan Beaufort Sea in 1992. Migrating bowhead whales appeared to avoid the area of drilling and icebreaking by ~25 km (15.5 mi) (Brewer et al., 1993). Also, monitoring of drilling activities in a previous year, during which much less icebreaking occurred, showed avoidance by migrating bowheads out to ~20 km (12.4 mi). Therefore, the relative influence of icebreaking versus drilling sounds is difficult to determine.

Similarly, migrating bowheads avoided the area within ~20 km (12.4 mi) of nearshore seismic surveys, and showed less avoidance extending to ~30 km (18.6 mi) (Miller et al., 1999). Only 1 bowhead was observed from the survey vessel during the three seasons (1996–1998) when seismic surveys continued into September. Bowheads not actively engaged in migration have shown less avoidance of seismic operations. During seismic surveys in the Canadian Beaufort Sea in late August and early September bowhead whales appeared to avoid an area within ~2 km (1.2 mi) of airgun activity (Miller and Davis, 2002) and sightings from the survey vessel itself were common (Miller et al., 2005). Vessel based sightings showed a statistically significant difference of ~600 m (1,969 ft) in the mean sighting distances of bowheads (relative to the survey vessel) between periods with and without airgun activity. This, along with significantly lower sighting rates of

bowhead whales during periods of airgun activity, suggests that bowheads still avoided close approach to the area of seismic operation (Miller and Davis, 2002). Results from vessel-based and aerial monitoring in the Alaskan Beaufort Sea during 2006–2008 were similar to those described above (Funk et al., 2010). Sighting rates from seismic vessels were significantly lower during airgun activity than during non-seismic periods. Support vessels reported 12 sightings of bowhead whales in areas where received levels from seismic were ≥160 dB (Savarese et al., 2010). Aerial surveys reported bowhead whales feeding in areas where received levels of seismic sounds were up to 160 dB. Bowheads were not observed in locations with higher received levels (Christie et al., 2010). Based on four direct approach experiments in northern Alaskan waters, Ljungblad et al. (1988) reported total avoidance of seismic sounds at received sound levels of 152, 165, 178, and 165 dB.

The available information summarized above suggests that bowhead whales are very likely to avoid areas where received levels are ≥180 dB re 1 μPa (rms). Again, making a cautionary assumption that as many as 10% of bowheads may not avoid the 180 dB zone around the airguns, we calculate that 6 individuals could be exposed to ≥180 dB (based on the densities described above and the area of water that may be ensonified to ≥180 dB). During seismic surveys in the Alaskan Beaufort Sea in 2007 and 2008, 5 power downs of the full airgun array were made due to sightings of bowhead or unidentified mysticete whales (8 total individuals) within the ≥180 dB exclusion zone. These sightings occurred during >8000 km (4,971 mi) of survey effort in good conditions plus additional effort in poor conditions (Savarese et al., 2010), resulting in an estimated 0.625 sightings within the 180 dB distance per 1,000 km (620 mi) of seismic activity. Even without allowance for the reduced densities likely to be encountered in October and especially November, or for the fact that observers will be on duty during all daylight hours and will call for mitigation actions if whales are sighted within or near the 180 dB distance, this rate would suggest that fewer than 8 bowheads may occur within the ≥180 dB zone during the proposed survey.

For seals (principally ringed seals), the proportion exhibiting avoidance is lower than for cetaceans, and thus the received level at which avoidance becomes evident is higher. However, some survey results have shown a statistically significant avoidance of the

190 dB re 1 µPa (rms) zone, and an assumption that numbers exposed to ≥190 dB could be calculated from ''non-seismic'' density data is not inappropriate. Using similar reasoning as described above for cetaceans, we have limited these estimates to ringed seals as the presence of other pinniped species is very unlikely during the times and locations when exposures to ≥190 dB may have an increased likelihood of occurrence.

Monitoring work in the Alaskan Beaufort Sea during 1996–2001 provided considerable information regarding the behavior of seals exposed to seismic pulses (Harris *et al.,* 2001; Moulton and Lawson, 2002). The combined results suggest that some seals avoid the immediate area around seismic vessels. In most survey years, ringed seal sightings averaged somewhat farther away from the seismic vessel when the airguns were operating than when they were not (Moulton and Lawson, 2002). Also, seal sighting rates at the water surface were lower during airgun array operations than during no-airgun periods in each survey year except 1997. However, the avoidance movements were relatively small, on the order of 100 m (328 ft) to (at most) a few hundreds of meters, and many seals remained within 100–200 m (328–656 ft) of the trackline as the operating airgun array passed by.

During more recent seismic surveys in the Arctic (2006–2009), Reiser *et al.* (2009) also reported a tendency for localized avoidance of areas immediately around the seismic source vessel along with coincident increased sighting rates at support vessels operating 1–2 km (0.62–1.2 mi) away. However, pinnipeds were sighted within the 190 dB zone around the operating airguns more frequently than were cetaceans within the 180 dB zone. Assuming that 25% of the ringed seals encountered may not avoid the 190 dB zone as the airguns approach, we calculate that ~277 individuals could be exposed to ≥190 dB (based on the densities described above and the area of water that may be ensonified to ≥190 dB). As an alternative estimate, during the same >8,000 km (4,971 mi) of monitoring effort in the Alaskan Beaufort Sea reported above regarding bowhead whales, 42 observations of seals within the 190 dB zone caused power downs of the airguns. This was ~5.25 power downs per 1,000 km (620 mi) of seismic survey effort. Even without allowance for the reduced densities of seals likely to be encountered in October–November or for the fact that observers will be on duty during all daylight hours and will

call for mitigation actions if necessary, this rate would suggest that as many as 38 seals may occur within the ≥190 dB zone during the proposed survey.

However, as stated earlier, in most circumstances marine mammals would avoid areas where intense noise could cause injury, including PTS. Although approximately 23 beluga whales, 8 bowhead whales, and 38 seals (presumably all ringed seals) could theoretically be exposed to received levels above 180 dB re 1 µ Pa (for whales) and 190 dB re 1 µ Pa (for seals), most of them are likely to avoid areas of intense noise and would not incur TTS or PTS (injury). In the unlikely case a small number of individuals animals did not avoid the intense noise, then TTS or even PTS could occur. Assuming that 10% of the individuals that were initially exposed to received levels above 180 dB re 1 µ Pa (for beluga and bowhead whales) and 190 dB re 1 µ Pa (for ringed seals) do not vacate the area, and subsequent exposure leads to some degree of PTS, then approximately 3 beluga whales, 1 bowhead whale, and 4 ringed seals could be taken by Level A harassment. However, NMFS considers this estimate to be very conservative as explained above.

*Estimated Take Conclusions*

Cetaceans—Effects on cetaceans are generally expected to be restricted to avoidance of an area around the seismic survey and short-term changes in behavior, falling within the MMPA definition of ''Level B harassment,'' and possibly mild TTS (Level B harassment), or PTS (Level A harassment), though the latter is not likely.

Using the 160 dB (for pulse) and 120 dB (for non-pulse) criteria, the average estimates of the numbers of individual cetaceans exposed to sounds >160 dB and 120 dB re 1 µ Pa (rms) represent varying proportions of the populations of each species in the Beaufort Sea and adjacent waters. For species listed as ''endangered'' under the ESA, the estimates include approximately 284 bowheads. This number is approximately 1.86% of the Bering-Chukchi-Beaufort population of >15,233 assuming 3.4% annual population growth from the 2001 estimate of >10,545 animals (Zeh and Punt 2005). For other cetaceans that might occur in the vicinity of the marine seismic survey in the Chukchi Sea, they also represent a very small proportion of their respective populations. The average estimates of the number of beluga whales, harbor porpoises, gray whales, and minke whales that might be exposed to >160 dB and 120 dB re 1 µ Pa (rms) are 5,232, 23, 23, and 23, when the

secondary alternative for refueling is being considered. These numbers represent 13.33%, 0.05%, 0.12%, and 1.87% of these species' respective populations in the proposed action area. If ION selects the preferred alternative for refueling, the estimated takes for beluga would be reduced to 4,888 animals, or 12.45% of the population, which are still based on overestimated densities of these animals for the winter season.

Seals—A few seal species are likely to be encountered in the study area, but ringed seal is by far the most abundant in this area. The average estimates of the numbers of individuals exposed to sounds at received levels >160 dB and 120 dB re 1 µ Pa (rms) during the proposed icebreaking seismic survey are as follows: ringed seals (60,574), bearded seals (95), spotted seals (23), and ribbon seals (23), when the secondary alternative for refueling is being considered. These numbers represent 24.33%, 0.04%, 0.04%, and 0.05% of Alaska stocks of ringed, bearded, spotted, and ribbon seals. If ION selects the preferred alternative for refueling, the estimated takes for ringed, bearded, spotted, and ribbon seals would drop to 60,477, 89, 22, and 22, respectively, which in turn represent 24.29%, 0.04%, 0.04%, 0.04% of Alaska stocks of these species, based on overestimated densities of these animals for the winter season.

**Negligible Impact and Small Numbers Analysis and Determination**

NMFS has defined ''negligible impact'' in 50 CFR 216.103 as ''* * *an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival.'' In making a negligible impact determination, NMFS considers a variety of factors, including but not limited to: (1) The number of anticipated mortalities; (2) the number and nature of anticipated injuries; (3) the number, nature, intensity, and duration of Level B harassment; and (4) the context in which the takes occur.

Most of the takes from ION's proposed icebreaking seismic surveys are expected to be Level B harassment, *i.e.,* behavioral disturbance with a slight likelihood of mild TTS. However, it is possible that PTS (Level A harassment) given the lowered effectiveness of monitoring measures are during extensive ice coverage and prolonged periods of darkness. Although it is possible that some individual marine mammals may be exposed to sounds from marine survey activities more than

**65088**    **Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

once, this is not expected to happen extensively since both the animals and the survey vessels will be moving constantly in and out of the survey areas. Therefore, the degree of TTS and PTS, if incurred, is expected to be minor (low intensity—a few dBs of loss at certain frequencies), and the TTS is expected to be brief (minutes to hours) before full recovery. No serious injury or mortality is expected as a result of the proposed seismic survey, and neither is proposed to be authorized.

Of the nine marine mammal species likely to occur in the proposed marine survey area, only the bowhead whale is listed as endangered under the ESA. This species is also designated as "depleted" under the MMPA. Despite these designations, the Bering-Chukchi-Beaufort stock of bowheads has been increasing at a rate of 3.4 percent annually for nearly a decade (Allen and Angliss, 2010). Additionally, during the 2001 census, 121 calves were counted, which was the highest ever recorded. The calf count provides corroborating evidence for a healthy and increasing population (Allen and Angliss, 2010), even in the face of ongoing industrial activity and subsistence harvest. There is no critical habitat designated in the U.S. Arctic for the bowhead whale. Certain stocks or populations of gray and beluga whales and spotted seals are listed as endangered or are proposed for listing under the ESA; however, none of those stocks or populations occur in the proposed activity area. On December 10, 2010, NMFS published a notice of proposed threatened status for subspecies of the ringed seal (75 FR 77476) and a notice of proposed threatened and not warranted status for subspecies and distinct population segments of the bearded seal (75 FR 77496) in the **Federal Register**. Neither of these two ice seal species is currently considered depleted under the MMPA.

*Level B Behavioral Harassment*

Most of the bowhead whales encountered during the summer will likely show overt disturbance (avoidance) only if they receive airgun sounds with levels ≥160 dB re 1 µ Pa (rms). Odontocete reactions to seismic energy pulses are usually assumed to be limited to shorter distances from the airgun(s) than are those of mysticetes, probably in part because odontocete low-frequency hearing is assumed to be less sensitive than that of mysticetes. However, at least when in the Canadian Beaufort Sea in summer, belugas appear to be fairly responsive to seismic energy, with few being sighted within 6–12 mi (10–20 km) of seismic vessels during aerial surveys (Miller *et al.,* 2005). Both

belugas and bowhead whales are expected to occur in much smaller numbers in the vicinity of the proposed seismic survey area during the proposed survey. In addition, due to the constant movement of the seismic survey vessel, the duration of the cetaceans' exposure to noise from seismic impulses would be brief. For the same reason, it is unlikely that any individual animal would be exposed to high received levels multiple times.

Taking into account the mitigation measures that are planned, effects on cetaceans are generally expected to be restricted to avoidance of a limited area around the survey operation and short-term changes in behavior, falling within the MMPA definition of "Level B harassment," with only limited potential occurrences of TTS (Level B harassment) and PTS (Level A harassment).

Furthermore, the estimated numbers of animals potentially exposed to sound levels sufficient to cause appreciable disturbance are small percentages of the population sizes in the Bering-Chukchi-Beaufort seas, as described above.

Finally, as discussed above, since ION is not likely to start its proposed in-ice seismic survey until mid- to late-October when most of the cetaceans (especially bowhead whales) have moved out of the area, the actual take numbers are expected to be much lower.

The many reported cases of apparent tolerance by cetaceans from seismic exploration, vessel traffic, and some other human activities show that co-existence is possible. Mitigation measures such as controlled vessel speed, dedicated PSOs, non-pursuit, and shutdowns or power downs when marine mammals are seen within defined ranges will further reduce short-term reactions and minimize any effects on hearing sensitivity. In all cases, the effects are expected to be short-term, with no lasting biological consequence.

Some individual pinnipeds may be exposed to sound from the proposed marine surveys more than once during the time frame of the project. However, as discussed previously, due to the constant movement of the survey vessel, the probability of an individual pinniped being exposed multiple times is much lower than if the source is stationary. Therefore, NMFS has determined that the pinnipeds' exposure to sounds produced by the proposed marine seismic survey in the Beaufort and Chukchi Seas is mostly expected to result in no more than Level B harassment and is anticipated to have no more than a negligible impact on the animals.

The estimated Level B behavioral takes proposed to be authorized represent up to 12.45% of the Beaufort Sea population of approximately 39,258 beluga whales (Allen and Angliss, 2010), up to 0.04% of Bering Sea stock of approximately 48,215 harbor porpoises, 0.12% of the Eastern North Pacific stock of approximately 19,126 gray whales, 1.86% of the Bering-Chukchi-Beaufort population of 15,233 individuals assuming 3.4 percent annual population growth from the 2001 estimate of 10,545 animals (Zeh and Punt, 2005), and 1.78% of the Alaska stock of approximately 1,233 minke whales. The take estimates presented for ringed, bearded, spotted, and ribbon seals represent up to 24.29, 0.04, 0.04, and 0.04 percent of U.S. Arctic stocks of each species, respectively. These estimates represent the percentage of each species or stock that could be taken by Level B behavioral harassment if each animal is taken only once. Although we have estimated that up to 24.29% of ringed seals could be taken as a result of the proposed seismic survey activity, it is important to note that the population densities for marine mammals within the proposed survey area are overestimates. As explained above, because of the lack of fall/winter data, NMFS and ION had to rely on the summer/fall density data to calculate expected densities of marine mammals and potential take estimates. Our analysis has led us to conclude that in the case of ringed seals (and several other species), the number of ringed seals that would occur in the project area during the proposed survey period is expected to be much lower and thus, far fewer ringed seals are actually expected to be taken as a result of ION's in-ice seismic survey in the Beaufort Sea. Furthermore, it is likely that individual animals could be taken multiple times and be counted as different individuals, thus inflating the percentage of unique individuals that would be affected. Finally, as discussed earlier, the effects to marine mammals that would result from Level B behavioral harassment are expected to be minor and brief, and mostly involve animals temporarily changing their behavior and vacating the proximity of the survey area briefly as the survey vessel and icebreaker approach. Marine mammals are expected to resume their normal activities and reoccupy the area as soon as the vessels move away. Additionally, since the proposed in-ice seismic survey is planned outside the breeding season of marine mammals, no impacts on calves or pups are expected. Further, there is no known marine

**Federal Register** / Vol. 77, No. 206 / Wednesday, October 24, 2012 / Notices

mammal feeding activity during the period of ION's in-ice seismic survey activities. Therefore, any effects to marine mammals are not expected to be biologically significant on either the individual or population level for these species. In addition, the mitigation and monitoring measures (described previously in this document) included in the IHA are expected to further reduce any potential disturbance to marine mammals.

*Hearing Impairment (TTS, Level B Harassment, or PTS, Level A Harassment)*

Most cetaceans (and particularly Arctic cetaceans) show relatively high levels of avoidance when received sound pulse levels exceed 160 dB re 1 µPa (rms), and it is uncommon to sight Arctic cetaceans within the 180 dB radius, especially for prolonged duration. Results from monitoring programs associated with seismic activities in the Arctic indicate that cetaceans respond in different ways to sound levels lower than 180 dB. These results have been used by agencies to support monitoring requirements within distances where received levels fall below 160 dB and even 120 dB. Thus, very few animals would be exposed to sound levels of 180 dB re 1 µPa (rms) regardless of detectability by PSOs. Avoidance varies among individuals and depends on their activities or reasons for being in the area, and occasionally a few individual Arctic cetaceans will tolerate sound levels above 160 dB. Tolerance of levels above 180 dB is infrequent regardless of the circumstances, and marine mammals exposed to levels this high are expected to avoid the source, thereby minimizing the probability of TTS. Therefore, a calculation of the number of cetaceans potentially exposed to >180 dB that is based simply on density would be a gross overestimate of the actual numbers exposed to 180 dB. Such calculations would be misleading unless avoidance response behaviors were taken into account to estimate what fraction of those originally present within the soon-to-be ensonified to >180 dB zone (as estimated from density) would still be there by the time levels reach 180 dB.

It is estimated that up to 1 bowhead whale and 3 beluga whales could be exposed to received noise levels above 180 dB re 1 µPa (rms), and 4 ringed seals could be exposed to received noise levels above 190 dB re 1 µPa (rms) for durations long enough to cause TTS if the animals are not detected in time to have mitigation measures implemented (or even PTS if such exposures occurred repeatedly). None of the other species

are expected to be exposed to received sound levels anticipated to cause TTS or PTS.

Marine mammals that are taken by TTS are expected to receive minor (in the order of several dBs) and brief (minutes to hours) temporary hearing impairment because (1) animals are not likely to remain for prolonged periods within high intensity sound fields, and (2) both the seismic vessel and the animals are constantly moving, and it is unlikely that the animal will be moving along with the vessel during the survey. Although repeated experience to TTS could result in PTS (Level A harassment), for the same reasons discussed above, even if marine mammals experience PTS, the degree of PTS is expected to be mild, resulting in a few dB elevation of hearing threshold. Therefore, even if a few marine mammals receive TTS or PTS, the degree of these effects are expected to be minor and, in the case of TTS, brief, and are not expected to be biologically significant for the population or species.

*Effects on Marine Mammal Habitat*

Potential impacts to marine mammal habitat were discussed previously in this document (see the ''Anticipated Effects on Habitat'' section). Although some disturbance is possible to food sources of marine mammals, the impacts are anticipated to be minor enough as to not affect rates of recruitment or survival of marine mammals in the area. Based on the vast size of the Arctic Ocean where feeding by marine mammals occurs versus the localized area of the marine survey activities, any missed feeding opportunities in the direct project area would be minor based on the fact that other feeding areas exist elsewhere. For bowhead whales, the majority of the population would have migrated past many of the feeding areas of the central Beaufort Sea prior to the initiation of activities by ION.

The effects of icebreaking activity are not expected to result in significant modification to marine mammal habitat. Although it is expected that the ice coverage would be ⁸/₁₀th to ¹⁰/₁₀th, the ice in the proposed project area is loose annual ice during the time of the proposed in-ice seismic survey activity. Therefore, ice floes being broken and pushed aside from the icebreaker are expected to rejoin behind the seismic survey path. In addition, no ice seal lairs are expected during the period of ION's in-ice seismic survey in the Beaufort and Chukchi Seas.

Based on the analysis contained herein of the likely effects of the specified activity on marine mammals

and their habitat, and taking into consideration the implementation of the mitigation and monitoring measures, NMFS finds that ION's 2012 in-ice seismic survey in the Beaufort and Chukchi Seas may result in the incidental take of small numbers of marine mammals, by Level A and Level B harassment only, and that the taking from the seismic surveys will have a negligible impact on the affected species or stocks.

**Unmitigable Adverse Impact Analysis and Determination**

NMFS has determined that ION's 2012 in-ice marine seismic survey in the Beaufort and Chukchi Seas will not have an unmitigable adverse impact on the availability of species or stocks for taking for subsistence uses. This determination is supported by information contained in this document and ION's CAA and POC. ION has adopted a spatial and temporal strategy for its Beaufort and Chukchi Seas in-ice seismic survey operation that is intended to avoid subsistence activities. ION plans to start its seismic survey after the fall bowhead harvests have concluded for the communities of Kaktovik and Nuiqsut, and its seismic survey is expected to occur far offshore from regular ringed seal hunts. Although hunting may still be occurring in Barrow, ION has agreed to work in the eastern part of the survey area first so as not to overlap with areas used by hunters in Barrow. The late November bowhead harvests on St. Lawrence Island should not be affected by ION's vessel transits through the Bering Strait, which would not occur until the conclusion of the survey in early to mid-December. No other subsistence activity is expected to occur during ION's proposed seismic survey period.

Based on the measures described in ION's POC and CAA, the proposed mitigation and monitoring measures (described earlier in this document), and the project design itself, NMFS has determined there will not be an unmitigable adverse impact on subsistence uses from ION's icebreaking marine seismic survey in the Beaufort and Chukchi Seas.

**Endangered Species Act (ESA)**

The bowhead whale is the only marine mammal species currently listed as endangered under the ESA that could occur during ION's proposed in-ice seismic survey period. In addition, there are two marine mammal species that are currently being proposed for listing under the ESA with confirmed occurrence in the proposed project area: ringed and bearded seals. NMFS'

Permits and Conservation Division consulted with NMFS' Alaska Regional Office Division of Protected Resources under section 7 of the ESA on the issuance of an IHA to ION under section 101(a)(5)(D) of the MMPA for this activity. A Biological Opinion was issued on October 17, 2012, which concludes that issuance of the IHA is not likely to jeopardize the continued existence of the ESA-listed marine mammal species and species proposed for ESA-listing. NMFS will issue an Incidental Take Statement under this Biological Opinion which contains reasonable and prudent measures with implementing terms and conditions to minimize the effects of take of listed species.

**National Environmental Policy Act (NEPA)**

NMFS prepared an EA that includes an analysis of potential environmental effects associated with NMFS' issuance of an IHA to ION to take marine mammals incidental to conducting in-ice seismic survey in the Beaufort and Chukchi Seas during fall/winter 2012. NMFS has finalized the EA and prepared a FONSI for this action. Therefore, preparation of an EIS is not necessary.

**Authorization**

As a result of these determinations, NMFS has issued an IHA to ION to take marine mammals incidental to its in-ice seismic survey in the Beaufort and Chukchi Seas, Alaska, provided the previously mentioned mitigation, monitoring, and reporting requirements are incorporated.

Dated: October 17, 2012.

**Helen M. Golde,**

*Acting Director, Office of Protected Resources, National Marine Fisheries Service.*

[FR Doc. 2012–26103 Filed 10–23–12; 8:45 am]

**BILLING CODE 3510–22–P**

**50**

OCS Report
MMS 2007-049

Resource Evaluation
Program Report

# Geological & Geophysical Data Acquisition

## Outer Continental Shelf Through 2004-2005

By George Dellagiarino
    Keith Meekins
    David Zinzer

**MMS**

**U.S. Department of the Interior**
**Minerals Management Service**
**Resource Evaluation Division**

**Herndon, Virginia**
**2007**

## Contents

**Abbreviations** ..................................................................................................v

**Introduction** ...................................................................................................1

**Permits, Data Acquisition, and Reimbursement** ........................................3

**Geophysical Data Surveys** ............................................................................3
    Common Depth Point, 3-D, 4-D, 4-C, AVO, Gravity, and
        Magnetic Surveys.....................................................................................3

**Geological Data Collection** ...........................................................................4
    Bottom Sampling and Shallow Coring ................................................4
    Deep Stratigraphic Tests ......................................................................5

**G&G Data Release** .........................................................................................5

**Analysis of Present MMS Data Coverage on the OCS** ................................5
    Mileage/Blocks .....................................................................................5
    Geological and/or Geophysical Exploration Permits.............................6
    Expenditures .........................................................................................7

**Comparisons to Industry**...............................................................................8

**Bibliography** ................................................................................................16

**Appendix** ....................................................................................................17
    Alaska Tables for Data Acquisitions, Permits, Expenditures ...............19
    Atlantic Tables for Data Acquisitions, Permits, Expenditures .............23
    Gulf of Mexico Tables for Data Acquisitions, Permits, Expenditures ..................27
    Pacific Tables for Data Acquisitions, Permits, Expenditures ...............31

**Glossary** ......................................................................................................35

## Figure

1. Federal Outer Continental Shelf Planning Areas.......................................2

## Tables

1. Summary of Estimates of CDP (2-D) Seismic Miles in the MMS Inventory Through FY 2005 by Planning Area .......................................................................9

2. Summary of 2-D Seismic Data Acquisition for FY 1968-2005 ............................10

3. Summary of 3-D Seismic Data Acquisition for FY 1968-2005 ............................10

4. Summary of Geological and Geophysical Data Acquisition by Data Type and Region, FY 1968-2005 .............................................................................11

5. Total Number of Permits Issued for Geological and Geophysical Exploration .......................................................................................................12

6. Summary of Total Annual Expenditures by the MMS for Geological and Geophysical Data Acquisition by Region, FY 1968-2005 ....................................13

7. Summary of Geological and Geophysical Data Acquisition Expenditures by Data Type and Region, FY 1968-2005 .............................................................14

8. Summary of Average Cost Per Mile by the MMS for 2-D Seismic Data, FY 1968-2005 .............................................................................................15

## Abbreviations

| | |
|---|---|
| AVO | Amplitude Variation with Offset data |
| CDP | Common depth point seismic data |
| CFR | Code of Federal Regulations |
| COST | Continental Offshore Stratigraphic Test |
| CSEM | Controlled Source Electromagnetic survey |
| DOI | Department of the Interior |
| DST | Deep stratigraphic test (well) |
| FY | Fiscal Year |
| G&G | Geological and geophysical |
| GOM | Gulf of Mexico |
| GRAV | Gravity data |
| HRD | High-resolution seismic data |
| MAG | Magnetic data |
| MMS | Minerals Management Service |
| OBS | Ocean Bottom Seismometers |
| OCS | Outer Continental Shelf |
| OCSLA | Outer Continental Shelf Lands Act |
| RE | Resource Evaluation |
| REP | Resource Evaluation Program |
| SEG | Society of Exploration Geophysicists |
| 2-D | Two-dimensional seismic data |
| 3-D | Three-dimensional seismic data |
| 4-D | Four-dimensional seismic data |

## Introduction

This report addresses the general role of the Minerals Management Service (MMS) Resource Evaluation Program (REP) in geological and geophysical (G&G) data acquisition and permitting activities.

The MMS administers the provisions of the Outer Continental Shelf Lands Act (OCSLA) through regulations found at Title 30 of the Code of Federal Regulations (CFR). The regulations govern permitting, data acquisitions and release, leasing, and postlease operations on the Outer Continental Shelf (OCS). The OCS is divided into planning areas for administrative purposes as shown in figure 1.

With regard to the REP, authority has been vested in the Secretary of the Interior under 30 CFR Part 251 to regulate prelease G&G exploration for oil, gas, and sulphur resources on the OCS. Part 251 applies not only to G&G exploration but to scientific research as well. The purpose of these regulations is to prescribe (1) when a permit or the filing of a notice is required to conduct G&G activities on the OCS and (2) operating procedures for conducting exploration, as well as requirements for disclosing data and information, conditions for reimbursing permittees for certain costs, and other conditions under which exploration shall be conducted. Similar regulations addressing prelease prospecting activities for minerals other than oil, gas, or sulphur can be found in 30 CFR Part 280.

In this report, the totals for permits issued, mileage acquired, and expenditures reflect the overall trends of oil and gas pricing, limitations of areas due to offshore moratoria, and the shift of industry emphasis to foreign theatres. Also reflected is the trend among the MMS regions with diminished leasing activity to obtain digital tapes of in-house analog data for data release, which has commenced with the expiration of proprietary terms beginning in 2001 as discussed by Fulton (1998).



**Figure 1.** Federal Outer Continental Shelf Planning Areas

Case: 19-35460, 02/13/2020, ID: 11597380, DktEntry: 40, Page 59 of 214

*Deep Stratigraphic Tests*

A deep stratigraphic test, as defined in 30 CFR 251, means, "drilling that involves the penetration into the sea bottom of more than 500 feet (152 meters)." These wells are known as Continental Offshore Stratigraphic Test (COST) wells and are drilled primarily to gather geological information. Conversely, shallow test drilling, as defined in the same regulations, means, "drilling into the sea bottom to depths less than those specified in the definition of a deep stratigraphic test." Three COST wells have encountered hydrocarbons: the COST B-3 (Atlantic), Point Conception No.1 (California), and the Norton COST No. 2 (Alaska). The proprietary term for a COST well is 25 years or, if a lease sale is held in the area, 60 days after the issuance of a lease within 50 geographic miles of the test. A discussion of the cost well program is described by Dellagiarino (1991).

## G&G Data Release

Regulations, promulgated in 1976, require all prelease G&G information be held proprietary for 25 years, and then be released to the public. Hence, the first data sets were released in 2001. These data sets are in southern Alaska, Southern California through Washington/ Oregon, the North, Mid, and South Atlantic planning areas, and in Eastern, Central, and Western GOM areas. Notices on the availability of these data may be found at the Regional links to the MMS homepage at http://www.mms.gov.

## Analysis of Present MMS Data Coverage on the OCS

*Mileage/Blocks*

A leading indicator of the amount of OCS oil and gas activity is the number and associated mileage of prelease exploration permits that the MMS issues to industry each year. Between 1968 and the early 1990's, industry has shot and recorded approximately 500,000 line miles of CDP data each year on the OCS. Of that data, the MMS has selected and acquired approximately 50,000 line miles of those CDP data each year for the REP.

Since the early 1990s, the MMS, as well as industry, has increased its acquisition of 3-D seismic data in concert with the development and use of interactive workstations. Table 1 shows the CDP (2-D) seismic data coverage, by region and planning area that the MMS has in its inventory. The grid coverage is not uniform over the planning areas. Tables 2, 3, and 4 summarize the MMS data acquisitions through 2003. It should be noted that 3-D seismic information in the MMS inventory is just about equal to the 2-D holdings in that 33,000 blocks of 3-D information equates to about 1.5 million miles of conventional seismic information.

The MMS has not acquired all of the permit data shot and recorded by industry because of budget restrictions on reimbursing the permittees for data reproduction and some processing; the lack of the necessary personnel to manage, interpret, and analyze this large volume of data, as well as the need for media storage capacity; and, primarily, the redundancy of data

shot on the OCS by different companies. However, in some areas in which the MMS has previously obtained 2-D or 3-D seismic information, it will acquire new information that is derived from data acquired more recently with state-of-the-art equipment and methods, such as AVO, or from previously acquired data that are reprocessed using more modern techniques.

The Regions formerly spent funds on prelease high-resolution data (HRD), as these data were acquired under exclusive contract rather than under permit. A change in policy in 1982 altered this situation. Under the previous program, the MMS directly acquired prelease, tract-specific, shallow hazards data. Under the areawide leasing program, the detailed shallow hazards analysis function was shifted to the postsale phase, and the responsibility for site-specific hazards data collection was placed on the lessee as a condition to obtain a drilling permit. If industry chooses to conduct prelease hazards surveys, G&G permits must be obtained from the MMS. Shallow hazards survey data and information are available to the MMS under terms of permit or lease and regulations. This practice has continued under the focused leasing approach adopted in 1984.

### Geological and/or Geophysical Exploration Permits

As mentioned, the number of permits issued by the MMS and the areas for which the permits are issued are leading indicators of oil and gas activity on the OCS. Table 5 presents the statistics of G&G exploration permitting for the OCS since 1960, with a differentiation between geological permits and geophysical permits from 1969 to 2003.

The MMS tracks G&G permits by calendar year. (tables A-2, A-6, A-10, and A-14 show total permits per Region.) They demonstrate that most OCS oil and gas activity has been in the Gulf of Mexico. The GOM has issued 82 percent of all permits and is followed by the Alaska Region with 9 percent. The Pacific Region has issued 7 percent of the permits, followed by the now defunct Atlantic Region with about 2 percent. However, since 1994 activities in the Atlantic have been assigned to the GOM Region. With the addition of these responsibilities, the percentage of total permits for the GOM Region increases to 85 percent. These statistics correlate extremely well with the dominant position of the Central and Western GOM planning areas in OCS oil and gas activities.

It should be noted that since 1969, approximately 95 percent of the permits issued were for geophysical exploration and that geological exploration permits accounted for only 5 percent. While the total number of 3-D permits compared to all permits issued is rather small (8 percent) when compared with the total geophysical permits issued, over the past 10 years, 3-D permits have averaged 49 percent of all geophysical permits. Permits for deep stratigraphic test wells or COST wells account for about 2 percent of the geological permits.

The overall trends in permitting for all the Regions are similar and reflect fluctuations in the price and supply of petroleum. Some regional differences can be detected that are related to leasing moratoria, operating conditions, and hydrocarbon discoveries. Leasing moratoria and adverse weather conditions decrease exploration activity.

*Expenditures*

The MMS records financial and procurement transactions by fiscal year (FY).  All figures and tables involving the MMS data acquisition from permittees are based on a fiscal year that begins on October 1 and extends through the following September 30.

Tables 6 and 7 show the total expenditures for G&G data since 1968 for those data presented in table 4.  Tables 6 and 7 show the distribution of G&G expenditures by Region.  The GOM and Alaska have the largest portion of the expenditures with 39 and 37 percent respectively.  Alaska has over twice the offshore area of the other three Regions combined.  On the other hand, the GOM, with over 95 percent of OCS production, possesses the largest database.

The Atlantic Region (13 percent of the expenditures) and the Pacific (10 percent) are comparable.  The Pacific Region has the smallest slice of the expenditures for G&G data because much of the California OCS and offshore Washington and Oregon have been under moratoria since the 1980s.  Much of the Atlantic Region is also under moratoria and there is no new seismic information being collected that MMS would acquire.  The main difference between the two Regions, according to table 7 is in the acquisition of high-resolution data in the Atlantic.

The GOM Region's dominant role in establishing the offshore industry is apparent by its acquisition of the majority of the data before 1976 and more so since 1990.  Between 1976 and 1989, a significant portion of the MMS geological and geophysical data acquisition budget has been expended by the Alaska Region, which oversees most of the OCS lands.  However, since the 1990s and up through the present, most of the MMS geological and geophysical data acquisition budget has been allocated for data in the GOM.

There were large values for the average cost per mile for data in the Alaska Region from the late 1970s into the 1990s and for the Atlantic Region in the 1980s.  The Alaska Region purchased a great deal of data shot in State waters, where a Federal permit is not applicable.  Thus, the reimbursement did not fall under the provisions of the OCSLA, and the MMS was required to pay full market price for these data.  The price varied from $1,500 to $6,000 per mile and is reflected in the unusually high average cost per mile shown in table 8.

The Atlantic Region contracted for several sets of exclusive high-resolution data that were used for sales and hazards studies.  The high price of exclusive high-resolution data, some well over $450 per mile, increased the average cost per mile in the Atlantic Region that year.

Overall, the early to mid-1980s saw a dramatic increase in expenditures by the MMS as more reprocessed data were acquired to address areawide leasing and a more aggressively proposed 5-year OCS leasing schedule.  However, due to regulatory changes in reimbursement procedures in 1986, the cost per mile has dropped dramatically.  With a less aggressive 5-Year Leasing Schedule and new exploration theatres worldwide, total expenditures have decreased from the 1980s to the present.

OCS Report
BOEM 2017-02

Resource Evaluation Report

# Geological
# & Geophysical
# Data Acquisition

Outer Continental Shelf
Through 2016

By Kumkum Ray
And Paul Godfriaux

A work of this nature requires assistance from numerous sources. The statistics in this report are a result of an agency-wide effort by geoscientists. We would like to thank Chad Vaughn and John Johnson (Gulf of Mexico/Atlantic), Susan Banet (Alaska), and Kevin Smith (Pacific)

U.S. Department of the Interior
Bureau of Ocean Energy Management
Office of Strategic Resources                    Sterling, Virginia
Resource Evaluation Division                     2017

# Contents

**Abbreviations** ................................................................................................... iv

**Introduction** ..........................................................................................................1

**Permits, Data Acquisition, and Reimbursement** ...............................................2

**Geophysical Data Surveys** ..................................................................................3
    Common Depth Point, 3-D, 4-D, 4-C, AVO, Gravity, and
    Magnetic Surveys ..............................................................................................3

**Geological Data Collection** ................................................................................4
    Bottom Sampling and Shallow Coring ..............................................................4
    Deep Stratigraphic .............................................................................................4

**G&G Data Release** ..............................................................................................4

**Analysis of Present BOEM Data Coverage on the OCS** ....................................5
    Mileage/Blocks ..................................................................................................5
    Geological and/or Geophysical Exploration Permits .........................................5
    Expenditures ......................................................................................................6

**Comparisons to Industry** ....................................................................................7

FY2015 Updates ......................................................................................................8

FY 2016 Updates .....................................................................................................9

**Tables** ..................................................................................................................10

**Bibliography** ......................................................................................................17

**Appendix** ............................................................................................................ 18
    Alaska Tables for Data Acquisitions, Permits Expenditures ............................20
    Atlantic Tables for Data Acquisitions, Permits, Expenditures .........................24
    Gulf of Mexico Tables for Data Acquisitions, Permits, Expenditures ..............28
    Pacific Tables for Data Acquisitions, Permits, Expenditures ..........................32

**Glossary** ..............................................................................................................36

# Figure

    Figure 1: Outer Continental Shelf Planning Areas ...........................................2

## Tables

1. Summary of Estimates of CDP (2-D) Seismic Miles in BOEM Inventory Through FY 2016 by Planning Area ................................................................10

2. Summary of 2-D Seismic Data Acquisition for FY 1968-2016 .......................................11

3. Summary of 3-D Seismic Data Acquisition for FY 1968-2016 .......................................11

4. Summary of Geological and Geophysical Data Acquisition by Data Type and Region, FY 1968-2016 .......................................................................12

5. Total Number of Permits Issued for Geological and Geophysical Exploration ................................................................................................13

6. Summary of Total Annual Expenditures by BOEM for Geological and Geophysical Data Acquisition by Region, FY 1968-2016 ................................. 14

7. Summary of Geological and Geophysical Data Acquisition Expenditures by Data Type and Region, FY 1968-2016 .......................................................15

8. Summary of Average Cost Per Mile by BOEM for 2-D Seismic Data, FY 1968-2016 ................................................................................................16

## Abbreviations

| | |
|---|---|
| AVO | Amplitude Variation with Offset data |
| BOEM | Bureau of Ocean Energy Management |
| BSEE | Bureau of Safety and Environmental Enforcement |
| CDP | Common Depth Point Seismic Data |
| CFR | Code of Federal Regulations |
| COST | Continental Offshore Stratigraphic Test |
| CSEM | Controlled Source Electromagnetic survey |
| DOI | Department of the Interior |
| DST | Deep Stratigraphic Test (well) |
| FY | Fiscal Year |
| G&G | Geological and Geophysical |
| GOM | Gulf of Mexico |
| GRAV | Gravity Data |
| HRD | High-Resolution seismic Data |
| MAG | Magnetic Data |
| MMS | Minerals Management Service |
| OBS | Ocean Bottom Seismometers |
| OCS | Outer Continental Shelf |
| OCSLA | Outer Continental Shelf Lands Act |
| RE | Resource Evaluation |
| REP | Resource Evaluation Program |
| SEG | Society of Exploration Geophysicists |
| 4-C | Four Component Seismic Data |
| 2-D | Two-Dimensional Seismic Data |
| 3-D | Three-Dimensional Seismic Data |
| 4-D | Four-Dimensional Seismic Data |

# Introduction

This report addresses the general role of the Bureau of Ocean Energy Management's (BOEM) Resource Evaluation Program (REP) in geological and geophysical (G&G) data acquisition and permitting activities.

With regard to the REP, BOEM's regulations at 30 CFR Part 551 govern the process for prelease G&G exploration for oil, gas, and sulphur resources on the OCS. Part 551 applies not only to G&G exploration but to scientific research as well. The purpose of these regulations is to prescribe (1) when a permit or the filing of a notice is required to conduct G&G activities on the OCS and (2) operating procedures for conducting exploration, as well as requirements for disclosing data and information, conditions for reimbursing permittees for certain costs, and other conditions under which exploration shall be conducted. Similar regulations addressing prelease prospecting activities for minerals other than oil, gas, or sulphur can be found in 30 CFR Part 580.

In this report, the totals for permits issued, mileage acquired, and expenditures may have been influenced by overall trends of oil and gas prices, access limitation for OCS acreage due to legislative and presidential moratoria, and the shift of industry investment to international opportunities.

deep stratigraphic test." Three COST wells have encountered hydrocarbons: the COST B-3 (Atlantic), Point Conception No.1 (California), and the Norton COST No. 2 (Alaska). A discussion of the deep stratigraphic test program is described by Dellagiarino (1991) in OCS Report # MMS-90-0028.

## G&G Data Release

Regulations at 30 CFR § 551.14(b)(1) and § 550.197 provide the release times of proprietary G&G data and information. Prelease geophysical information will not be released to the public for 25 years; raw geophysical data is held for 50 years before it is released to the public. The proprietary term for geological information is 10 years. The first geophysical data sets were released in 2001,which included data sets from southern Alaska, the Arctic, the Bering Sea, Southern California through Washington/ Oregon, the North, Mid, and South Atlantic planning areas, and in Eastern, Central, and Western GOM areas. The proprietary term for a COST well is 25 years or, if a lease sale is held in the area, 60 days after the issuance of a lease within 50 geographic miles of the test. The actual data may be searched for and downloaded at the National Archive of Marine Seismic Surveys (NAMSS) https://walrus.wr.usgs.gov/NAMSS/. Also additional information can be found at the BOEM regional homepage at http://www.boem.gov/BOEM-Regions/.

## Analysis of Present BOEM Data Coverage on the OCS

### *Mileage/Blocks*

A leading indicator of the amount of OCS oil and gas activity is the number and associated mileage of prelease exploration permits that BOEM issues to industry each year. Table 1 shows the 2-D seismic data coverage, by region and planning area that BOEM has in its inventory. The grid coverage is not uniform over the planning areas. Tables 2, 3, and 4 summarize BOEM data acquisitions through 2016. It should be noted that 3-D seismic information, which is reported as coverage of OCS blocks, in the BOEM inventory is comparable to the 2-D holdings in that 308,000 blocks of 3-D information compares favorably to about 3.1 million line miles of conventional 2-D seismic information.

BOEM has not acquired all of the permit data shot and recorded by industry primarily because of the data quality or the redundancy of data shot on the OCS by different companies. Since the early 1990s, BOEM, as well as industry, have increased its acquisition of 3-D seismic data in concert with the development and use of interactive workstations. In some areas in which BOEM has previously obtained 2-D or 3-D seismic information, it continues to acquire new information that is derived from state-of-the-art acquisition methods and equipment or from previously acquired data that are reprocessed using more modern techniques.

BOEM's OCS Regions (GOM, Pacific, Alaska and Atlantic) formerly spent funds on pre-lease high-resolution data (HRD), as these data were acquired under exclusive contract rather

than under permit. A change in policy in 1982 altered this situation. Under the previous program, BOEM directly acquired pre-lease, tract-specific, shallow hazards data. Under the area wide leasing program, the detailed shallow hazards analysis function was shifted to the post sale phase, and the responsibility for site-specific hazards data collection was placed on the lessee as a condition to obtain an approved Exploration or Development Production Plan from BOEM and a drilling permit through the Bureau of Safety and Environmental Enforcement (BSEE). If industry continues to conduct prelease hazards surveys, G&G permits must be obtained from BOEM. Shallow hazards survey data and information are available to BOEM and BSEE under terms of permit or lease and regulations.

### Geological and/or Geophysical Exploration Permits

Another important indicator of OCS oil and gas activity is the number of permits issued and the areas for which the permits are issued. On average, BOEM has issued approximately 220 permits per year. The greatest number for one year was 574 in 1983.

Table 5 presents the statistics of G&G exploration permitting for the OCS since 1960, with a differentiation between geological permits and geophysical permits from 1969 to 2016.

BOEM tracks G&G permits by calendar year. (Tables A-2, A-6, A-10, and A-14 show total permits per Region.) They demonstrate that most OCS oil and gas activity has been in the GOM. The GOM has issued 83 percent of all permits and is followed by the Alaska Region with 8 percent. The Pacific Region has issued 6 percent of the permits, followed by the Atlantic Region with about 2 percent.

It should be noted that since 1969, approximately 94 percent of the permits issued were for geophysical exploration and that geological exploration permits accounted for only 5 percent. While the total number of 3-D permits compared to all permits issued is rather small (11 percent) when compared with the total geophysical permits issued, over the past 10 years, 185 3-D permits have averaged 32 percent of geophysical permits during that period. Permits for deep stratigraphic test wells or COST wells make up about 5 percent of all geological permits.

Permitting for all Regions has declined since the number of permits peaked in 1983. Some regional differences can be detected that are related to leasing moratoria, operating conditions such as hurricanes/arctic ice, and the discovery of new hydrocarbon plays.

### Expenditures

BOEM records financial and procurement transactions by fiscal year (FY). All figures and tables involving the BOEM data acquisition from permittees are based on a fiscal year that begins on October 1 and extends through the following September 30.

Tables 6 and 7 show the total expenditures for G&G data since 1968 for those data presented in Table 4. Tables 6 and 7 show the distribution of G&G expenditures by Region. The GOM and Alaska have the largest portion of the expenditures with 41 and 36 percent

respectively. Alaska has over twice the offshore area of the other three Regions combined. On the other hand, the GOM, with over 95 percent of OCS production, possesses the largest database.

The Atlantic Region (13 percent of the expenditures) and the Pacific (9 percent) are comparable. The Pacific Region has the smallest slice of the expenditures for G&G data because much of the California OCS and offshore Washington and Oregon have been under moratoria since the 1980s. The moratoria expired on September 30, 2008. The main difference between the Atlantic and Pacific Regions, according to Table 7, is the acquisition of high-resolution data in the Atlantic.

The GOM Region's dominant role in establishing the offshore industry is apparent by its acquisition of the majority of the data before 1976 and closer to 100 percent since 1990. Between 1976 and 1989, a significant portion of BOEM's G&G data acquisition budget has been expended by the Alaska Region. However, since the 1990s and up through the present as the level of activity dropped in Alaska, most of the BOEM G&G data acquisition budget has been allocated for data in the GOM.

The average cost per mile for data was high in the Alaska Region from the late 1970s into the 1990s and for the Atlantic Region in the 1980s. The Alaska Region purchased a large amount of data collected in State waters (1979 to 1990), and BOEM was required to pay full market price for this non-OCS dataset. The price varied from $1,500 to $6,000 per mile and is reflected in the unusually high average cost per mile shown in Table 8.

Overall, the early to mid-1980s saw a dramatic increase in expenditures by MMS, a predecessor agency to BOEM, as more reprocessed data were acquired to address area wide leasing and a more aggressive proposed Five-Year OCS leasing schedule. However, due to regulatory changes in reimbursement procedures in 1986, the cost per mile has dropped dramatically. With a moderated Five-Year Leasing Schedule and new exploration theatres worldwide, total expenditures have steadily decreased from the 1980s to the present.

## Comparisons to Industry

While BOEM does not acquire all industry data, it does acquire a vast majority of it. For example, BOEM has acquired approximately 90 percent of the data collected by industry on the Alaska OCS. Alaska remains a large frontier area with limited data coverage by industry, a fact that necessitates BOEM to acquire as much of these data as feasible. In recent years, while BOEM has acquired the data from most 3-D surveys and most large 2-D surveys shot in the GOMR, it has not needed to acquire the volume that industry obtains to reprocess. This is partly due to industry frequently reprocessing portions of the seismic surveys, particularly around their prospective targets.

MMS acquired more data in the Atlantic Region than industry in 1976 and 1983. Before 1976, MMS limited its acquisition of new data because industry had shown very little interest in leasing this frontier area. During the period 1976 to 1984, MMS not only acquired most of

# Effects of Oil and Gas Activities in the Arctic Ocean

## Final Environmental Impact Statement

### Volume 1: Chapters 1-3

**October 2016**

**United States Department of Commerce**
**National Oceanic and Atmospheric Administration**
**National Marine Fisheries Service**
**Office of Protected Resources**



# EXECUTIVE SUMMARY

## 1.0 INTRODUCTION

The U.S. Department of Commerce, National Oceanic and Atmospheric Administration (NOAA), National Marine Fisheries Service (NMFS) has prepared this Environmental Impact Statement (EIS) to describe the effects of offshore oil and gas exploration activities in the U.S. Beaufort and Chukchi seas, Alaska. This EIS analyzes a range of management alternatives to assist NMFS in carrying out their statutory responsibilities to authorize or permit these activities. The U.S. Department of the Interior Bureau of Ocean Energy Management (BOEM) participated in the preparation of this EIS as a cooperating agency.

The agency's statutory responsibilities include BOEM's issuance of permits and authorizations under the Outer Continental Shelf Lands Act (OCSLA) for seismic surveys and concurrence on ancillary activities and NMFS' issuance of incidental take authorizations (ITAs) under Section 101(a)(5) of the Marine Mammal Protection Act (MMPA). A geological and geophysical (G&G) permit must be obtained from BOEM in order to conduct G&G exploration activities for oil, gas, and sulphur resources when operations occur on unleased lands or on lands leased to a third party.

NMFS issues ITAs for oil and gas exploration activities because it is likely that seismic and exploratory drilling activities will result in the disturbance of marine mammals through sound, discharge of pollutants, and/or the physical presence of vessels. Because of the potential for these activities to "take" marine mammals, oil and gas operators may choose to apply for an ITA.

## 1.1 Background

On April 6, 2007, NMFS and the U.S. Minerals Management Service (MMS [now BOEM]) published a Draft Programmatic EIS (DPEIS) that assessed the impacts of MMS' issuance of permits and authorizations for seismic surveys in the Beaufort and Chukchi seas off the coast of Alaska, and NMFS' issuance of ITAs to take marine mammals incidental to conducting those permitted activities. Since the 2007 DPEIS was published, new information that alters the scope, set of alternatives, and analyses in the DPEIS has become available. In addition, NMFS determined that an EIS must also address the potential effects of exploratory drilling, which were not addressed in the 2007 DPEIS. Therefore, MMS and NMFS filed a Notice of Withdrawal of the DPEIS on October 28, 2009, and announced their decision to prepare a new EIS to be called, *Effects of Oil and Gas Activities in the Arctic Ocean,* with BOEM as a cooperating agency.

On December 30, 2011, NMFS published a Notice of Availability for the *Effects of Oil and Gas Activities in the Arctic Ocean Draft Environmental Impact Statement* in the *Federal Register* (76 FR 82275). The public was afforded 60 days to comment on that document. Consistent with comments on the Draft EIS, NMFS and BOEM determined that the environmental analysis would benefit from the inclusion of an additional alternative for analysis that covers a broader range of potential levels of exploratory drilling, including scenarios in the Beaufort and Chukchi seas that are more reflective of the levels of activity that oil and gas companies have indicated may be pursued in the region within the coming years and that some of the alternatives should be slightly altered from the 2011 Draft EIS. The alternatives are based upon the agencies' analysis of additional information, including the comments and information submitted by stakeholders during the Draft EIS public comment period. For this reason, the agencies determined it appropriate to prepare a Supplemental Draft EIS and allow for an additional public comment period before releasing the Final EIS (FEIS) and Record of Decision (ROD). On January 30, 2013, NMFS published an NOI informing the public of its determination to prepare a Supplemental Draft EIS in the *Federal Register* (78 FR 6303).

NMFS made several substantive changes to this FEIS since publication of the 2013 Supplemental EIS. Portions of the EIS where substantive changes have occurred include:

- Alternatives
  - Based on updated data, modified some of the time/area closures, which have been identified as areas in which activities could be limited in order to protect marine mammals during times when key life functions are being performed (e.g., feeding) and subsistence hunting areas from the effects of exploration activities.

- Mitigation Measures
  - Updated the structure and analysis of the mitigation measures contemplated for inclusion under the alternatives.
  - For each measure, outlined activities to which it applies (e.g., just 2D/3D seismic surveys or just exploratory drilling or all activities), the purpose of the measure, the science, support for reduction of impacts to marine mammals or subsistence availability of marine mammals, the likelihood of effectiveness, the history of implementation of the measure, practicability for applicant implementation, and recommendation for how, and if, to apply the measure in future MMPA ITAs.
  - Added a section outlining the mitigation measures that were considered but are no longer carried forward for inclusion in future MMPA ITAs.

- Baseline Information
  - Using data and literature noted by commenters during the previous public comment period, updated information in the affected environment sections to incorporate newer information (mostly for marine mammals and subsistence activities).

- Impact Analyses
  - Revised the impact criteria and analyses of potential impacts to marine mammals to include additional factors that more closely align with analyses conducted under the MMPA.
  - Included information regarding the final acoustic injury thresholds used by NOAA to determine the level at which injury of marine mammals occurs.
  - NMFS conducted a first-order assessment of chronic and cumulative effects of sound on marine mammals in response to public comments on the DEIS and SEIS and report the initial results as they relate to different scenarios addressed across the EIS Alternatives.

NMFS has made several changes to the document based on public comments received on the 2011 Draft EIS and the 2013 Supplemental Draft EIS. A summary of the comments and our responses to those comments can be found in Appendix A of this FEIS.

## 1.2 Process

NMFS, as the lead federal agency, prepared this EIS to evaluate a broad range of reasonably foreseeable levels of exploration activities that may occur. BOEM and the North Slope Borough (NSB) (a local government entity of the State of Alaska) served as formal cooperating agencies; the Environmental Protection Agency (EPA) served as a consulting agency. NMFS also coordinated with the Alaska Eskimo Whaling Commission (AEWC) pursuant to our co-management agreement under the MMPA on the preparation of this EIS. NMFS invited the U.S. Fish and Wildlife Service (USFWS) to join the effort as a cooperating agency, but they declined the request; however, USFWS participated as a "consulting" agency in the preparation of this FEIS. NMFS also shared preliminary drafts of the FEIS with the State of Alaska for their review.

NMFS has published this EIS to disclose the potential impacts associated with their issuance of ITAs. The EIS will allow NMFS and BOEM to comprehensively assess activities that may occur in a given season before receiving applications. This will allow them to issue permits and authorizations more quickly and efficiently.

A brief summary of the agencies' regulatory requirements follows:

## 1.2.1 MMPA Requirements

Sections 101(a)(5)(A) and (D) of the MMPA (16 United States Code [U.S.C.] § 1361 *et seq.*) direct the Secretary of Commerce to allow, upon request, the incidental, but not intentional taking of small numbers of marine mammals by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region, if certain findings are made and either regulations are issued or, if the taking is limited to harassment, a notice of proposed authorization is provided to the public for review. Authorization for incidental takings shall be granted if:

- NMFS finds that the taking will have a negligible impact on the species or stock(s);

- NMFS finds that the taking will not have an unmitigable adverse impact on the availability of the species or stock(s) for subsistence uses (where relevant); and

- the permissible methods of taking and requirements pertaining to the mitigation, monitoring, and reporting of such takings are set forth.

## 1.2.2 Outer Continental Shelf Lands Act Requirements:

The OCSLA, 43 U.S.C. § 1331 et seq. prescribes a four stage process for development of OCS federal oil and gas resources: (1) a 5-year oil and gas leasing program; (2) lease sales; (3) ancillary activities and exploration; and (4) development and production. Environmental reviews are conducted for each of these stages.

The OCSLA directs BOEM and the Bureau of Safety and Environmental Enforcement (BSEE) to oversee the "expeditious and orderly development [of OCS resources] subject to environmental safeguards" (43 U.S.C. §§ 1332(3), (6), 1334(a)(7)). Critical to the potential development of OCS resources is the ability to gather geological and geophysical data on the resource potential of the OCS. BOEM, which has rights to all data collected under the OCSLA and implementing regulations, needs the best available data to ensure that the federal government, i.e., the American people, receives fair market value for leased resources. The OCSLA establishes U.S. Department of Interior authority, delegated to BOEM by regulation, to issue permits for G&G, concur on notices of ancillary activities, and approve exploratory drilling plans for these and related purposes. BOEM's regulations for G&G permits are at 30 CFR Part 551 and for ancillary activities and Exploration Plans are at 30 CFR Part 550. Exploration drilling activities require a permit from BSEE (Application for Permit to Drill under 30 CFR Part 250).

BOEM regulations (30 CFR Part 551) specifically state that such activities cannot:

- interfere with or endanger operations under any lease or right-of-way, easement, right-of-use, Notice, or permit issued or maintained under the OCSLA;

- cause harm or damage to life (including fish and other aquatic life), property, or to the marine, coastal, or human environment;

- cause harm or damage to any mineral resource (in areas leased or not leased);

- cause pollution;

- create hazardous or unsafe conditions;

- disturb archaeological resources; or

- unreasonably interfere with or cause harm to other uses of the area.

Pursuant to 30 CFR Part 551.4, a G&G permit must be obtained from BOEM to conduct G&G exploration for oil, gas, and sulphur resources when operations occur on unleased lands or on lands leased to a third party. Ancillary activities are regulated under 30 CFR Part 550.207 through 550.210, which also states that a notice must be submitted before conducting such activities pursuant to a lease issued or maintained under the OCSLA.

## 1.3    Proposed Action and Project Area

The proposed actions of two federal agencies considered in this EIS are:

- The issuance of ITAs under Section 101(a)(5) of the MMPA, by NMFS, for the incidental taking of marine mammals during G&G permitted activities, ancillary activities, and exploratory drilling activities in the U.S. Beaufort and Chukchi seas, Alaska, and

- The authorization of G&G permits and concurrence on ancillary activities in the U.S. Beaufort and Chukchi seas, Alaska, by BOEM under the OCSLA.

These federal actions are related, but distinct, actions.

This EIS will also evaluate the potential effects to the environment of authorizing takes of marine mammals incidental to such activities occurring in either federal or State of Alaska waters. Activities that could occur in state waters include on-ice and open water seismic surveys, high-resolution site clearance/shallow hazards surveys, and exploratory drilling.

The spatial scope of this EIS is limited to the Arctic from the border between the U.S. and Canada in the Beaufort Sea to Nome in the Bering Sea. This spatial extent includes the areas where seismic surveys, ancillary activities, and exploratory drilling may occur in the U.S. Arctic, as well as vessel transit routes through the Bering Strait and staging and possible resupply ports.

## 1.4    Purpose and Need

### 1.4.1    Purpose

Energy use in the U.S. is expected to continue to increase from present levels through 2040 and beyond (EIA 2015). For example, the U.S. consumption of crude oil and petroleum products has been projected to increase from about 19 million barrels (Mbbl) per day in 2013, to about 19.6 Mbbl per day in 2020, then decline to 19.3 Mbbl per day in 2040 (EIA 2015). Oil and gas reserves in the OCS represent significant sources that currently help meet U.S. energy demands and are expected to continue to do so in the future. The benefits of producing oil and natural gas from the OCS include not only helping to meet this national energy need but also generating money for public use. In this context, the purpose for issuing permits for seismic surveying activities under the OCSLA and issuing authorizations to "take" marine mammals under the MMPA are discussed below.

The federal actions considered in this EIS are the issuance of G&G permits and ancillary activity notice approvals by BOEM for the Beaufort and Chukchi seas and the issuance of ITAs under the MMPA for G&G surveys, ancillary activities, and exploratory drilling activities in the Beaufort and Chukchi seas by NMFS. ITAs could be issued for these activities in either federal or State of Alaska waters. Given the widespread presence of several species of marine mammals in the Beaufort and Chukchi seas and the nature of oil and gas exploration activities, it is likely that some amount of seismic and exploratory drilling activities will result in the disturbance of marine mammals through sound, discharge of

pollutants, and/or the physical presence of vessels. Because of the potential for these activities to "take" marine mammals, oil and gas operators may choose to apply for an ITA.

Sections 101(a)(5)(A) and (D) of the MMPA direct NMFS to allow, upon request, the incidental, but not intentional, taking of small numbers of marine mammals of a species or population stock by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region if certain findings are made and either regulations are issued or, if the taking is limited to harassment, a notice of proposed authorization is provided to the public for review. Authorization for incidental taking shall be granted if NMFS finds that the taking will have a negligible impact on the affected species or stock(s) and will not have an unmitigable adverse impact on the availability of the species or stock(s) for taking for subsistence uses. NMFS must also prescribe: the permissible methods of taking pursuant to the activity; other means of effecting the "least practicable adverse impact" on the affected species or stock and its habitat and on the availability of such species or stock for subsistence uses; and requirements pertaining to the monitoring and reporting of such taking.

NMFS' decision to prepare an EIS should not be construed as an assumption that significant adverse effects would occur from all levels of activities analyzed. Federal agencies may employ the EIS process to aid in their decision-making, whether the contemplated action would have significant effects or not. In this case, the primary reason for preparing an EIS was, that the higher levels of activity predicted by the oil and gas industry to likely occur in the near future could have significant cumulative impacts (we note that predictions of activity levels are likely lower now, in 2016, than they were when the EIS scoping process started in 2010). Based on the industry's prediction of increased activities, NMFS and BOEM wanted to ensure that appropriate NEPA analysis was completed, rather than wait until the first year that anticipated cumulative impacts from industry activities exceed the significance threshold and delay activities while an EIS was written. This EIS was written to prevent permitting delays from causing a future gap in activities.

### 1.4.2 Need

NMFS expects to receive applications to take marine mammals incidental to oil and gas industry exploration activities (i.e., G&G and ancillary surveys and exploratory drilling) pursuant to Sections 101(a)(5)(A) and (D) of the MMPA. This EIS is intended to assist NMFS in its MMPA decision-making process related to projected requests for ITAs by providing a comprehensive understanding of deep penetration geophysical surveys, shallow hazards surveys, and exploratory drilling in the U.S Beaufort and Chukchi seas for future years and may be revised as necessary. NMFS intends to use this EIS as the required NEPA analysis to support the issuance of ITAs for Arctic oil and gas exploration activities. It is the intent of NMFS that the scope of this EIS covers as many actions as possible. However, if necessary, NMFS may need to conduct additional NEPA analysis to support future Arctic MMPA oil and gas permit decisions if such activities fall outside the scope of this EIS. This applies to actions taken under Sections 101(a)(5)(A) and (D) (i.e., issuance of LOAs and IHAs) Please see Chapter 5 (Sections 5.1.2 and 5.1.3) for additional discussions on NEPA compliance related to this EIS.

## 1.5   Public Input Process

### 1.5.1   Scoping

The scoping period for the *Effects of Oil and Gas Activities in the Arctic Ocean EIS* began on February 8, 2010 and ended April 9, 2010. Public scoping meetings were held during February and March 2010 in the communities of Kotzebue, Point Hope, Point Lay, Wainwright, Barrow, Nuiqsut, Kaktovik, and Anchorage. Scoping comments were received verbally and in writing through discussion, testimony, fax, regular mail, and electronic mail.

Of the issues identified during scoping, those that were most commonly raised included:

- Concerns regarding the NEPA process;
- Impacts to marine mammals and habitats;
- Occurrence of oil spills;
- Climate change;
- Protection of subsistence resources and the Iñupiat culture and way of life;
- Availability of research and monitoring data for decision-making;
- Monitoring requirements; and
- Suggestions for, or implementation of, mitigation measures.

For more detail on the issues raised during the scoping process, please refer to Appendix C in the 2011 Draft EIS.

Executive Order 13175 (*Consultation and Coordination with Indian Tribal Governments*), states that the U.S. Government will "*work with Indian tribes on a government-to-government basis to address issues concerning Indian Tribal self-government, trust resources, and Indian Tribal treaty and other rights.*" For government-to-government consultation during the scoping process for this EIS, Tribal governments in each community, with the exception of Anchorage, were notified of the EIS process and invited to participate. The Tribal Organizations that received invitations to participate are listed below. Native Village of Point Hope declined to participate because they received less than one month of prior notification.

- Native Village of Nuiqsut
- Iñupiat Community of the Arctic Slope
- Native Village of Point Hope
- Native Village of Point Lay

- Native Village of Barrow
- Native Village of Wainwright
- Native Village of Kotzebue

## 1.5.1 Draft EIS Public Comment Process

The public comment process for the 2011 Draft EIS began on December 30, 2011. After granting a 15-day extension, the comment period ended on February 28, 2012. Public meetings were held in the communities of Barrow, Wainwright, Kotzebue, Kivalina, Point Hope, and Anchorage. Public comments were received verbally and in writing through discussion, testimony, fax, regular mail, and electronic mail.

Of the issues raised during the 2011 Draft EIS public comment process, many were similar to those mentioned above as raised during the scoping process. Those that were most commonly raised include:

- Concerns related to public participation and review process;
- Compliance with NEPA, the MMPA, and other applicable statutes;
- Inadequacy with the range of alternatives;
- Improper dismissal of alternatives;
- Inadequacy of description and analysis of certain physical, biological, and social resources and failure to include newer data; and
- Insufficient analysis and information related to the effectiveness and implementation of mitigation measures.

## 1.5.2 Supplemental EIS Public Comment Process

The public comment process for the 2013 Supplemental EIS began on March 29, 2013. After granting a 30-day extension, the comment period ended on June 27, 2013. Public meetings were held in the communities of Kotzebue, Barrow, and Anchorage. Public comments were received verbally and in

writing through discussion, testimony, fax, regular mail, and electronic mail. The issues raised during public comment on the 2013 Supplemental EIS did not differ from the issues raised during the scoping process and the public comment period for the 2011 Draft EIS.

## 2.0   ALTERNATIVES

A total of 12 alternatives were initially considered for this FEIS, with the No Action Alternative and five action alternatives carried forward for analysis. The alternatives dismissed and not considered for analysis include: permanent closures of areas, caps on levels of activity and/or noise, duplicative surveys, zero discharge, an alternative that employs adaptive management approaches, activity levels likely to follow a discovery including future lease sales. Some aspects of the dismissed alternatives have been incorporated into the five remaining action alternatives and/or mitigation measures to be considered for analysis.

NMFS and BOEM identified alternatives by:

- Evaluating alternative concepts suggested during the scoping period (such as using alternative technologies to airguns for seismic surveys);

- Reviewing potential alternatives in the context of NMFS and BOEM's regulatory requirements;

- Assessing potential levels of seismic exploration and exploratory drilling activities, and a suite of Standard Mitigation Measures; and

- Identifying a range of potential Additional Mitigation Measures that need further analysis and may be applied to alternatives pursuant to the MMPA ITA process and the BOEM OCSLA permitting process.

Alternatives were developed based on NMFS' desire to proactively analyze both the effects of multiple exploration activities and effectiveness of mitigation measures, and to anticipate regulatory compliance needs over the timeframe of this EIS.

Past ITAs have been issued for individual G&G surveys, ancillary activities, and exploratory drilling projects in the Beaufort and Chukchi seas in the form of Incidental Harassment Authorizations (IHAs) for periods of no more than one year at a time. This EIS analyzes the effects from multiple oil and gas industry exploration activities, the potential effects of authorizing takes from concurrent activities, and whether the standard mitigation and monitoring measures stipulated in the past are appropriate for current and reasonably foreseeable oil and gas activities. The analysis also includes additional mitigation measures suggested by the public or other agencies.

Based upon past lease sales, G&G permits, ancillary activity notices, exploration drilling exploration activities, and requests for ITAs, NMFS and BOEM have determined a reasonable range and level of activities for which permits and authorizations may be requested in the foreseeable future. While the level of activity proposed may vary from one year to the next, the action alternatives represent a reasonable range of exploration activities for which permits and authorizations may be requested.

In this EIS, NMFS and BOEM present and assess a reasonable range of G&G, ancillary, and exploratory drilling activities expected to occur, as well as a reasonable range of mitigation measures, in order to accurately assess the potential consequences of issuing ITAs under the MMPA and permits under the OCSLA.

The six alternatives evaluated are:

- **Alternative 1:**  No Action

- **Alternative 2:**  Authorization for Level 1 Exploration Activity

- **Alternative 3:**  Authorization for Level 2 Exploration Activity

- **Alternative 4:** Authorization for Level 3 Exploration Activity

- **Alternative 5:** Authorization for Level 3 Exploration Activity with Additional Required Time/Area Closures

- **Alternative 6:** Authorization for Level 3 Exploration Activity with Use of Alternative Technologies

Table ES-1 outlines the differences in the alternatives between the 2011 Draft EIS, the 2013 Supplemental Draft EIS, and this FEIS, as well as outlining the differences between the alternatives themselves.

For analysis in this EIS, one "program" entails however many surveys or exploration wells a particular company is planning for that season. Each "program" would use only one source vessel (or two source vessels working in tandem, e.g., ocean-bottom node or cable surveys) or drilling unit (e.g., drillship, jackup rig, SDC) to conduct the program and would not survey multiple sites or drill multiple wells concurrently. Survey vessels and drilling units are generally self-contained, with the crew living aboard the vessel. For surveys and drilling operations in the Beaufort Sea, support operations would likely occur out of West Dock or Oliktok Dock near Prudhoe Bay. Chukchi Sea surveys and drilling operations could be supported either from Wainwright or Nome. Helicopters stationed at either Barrow (for operations in either the Beaufort Sea or Chukchi Sea), Deadhorse (for operations in the Beaufort Sea), or Wainwright (for operations in the Chukchi Sea) would provide emergency or search-and-rescue support, as needed.

Site clearance and shallow hazards survey programs are contemplated in each action alternative and typically also include ice gouge and strudel scour surveys and are often referred to as marine survey programs by oil and gas industry operators. The ice gouge and strudel scour surveys do not involve the use of airguns but do involve the use of smaller, higher-frequency sound sources, such as multibeam echosounders and sub-bottom profilers. The area of a site clearance and shallow hazards survey, which is tied to a lease plan, is typically determined by the number of potential, future drill sites in the area. Table 2.4 outlines the typical types of sound sources used in these programs.

**Table ES-1 Differences in the Alternatives between the December 2011 Draft EIS, the March 2013 SDEIS, and the FEIS**

| Alternative | 2011 Draft EIS | 2013 Supplemental Draft EIS | 2016 FEIS |
|---|---|---|---|
| Alternative 1 (No Action) | NMFS would not issue ITAs under the MMPA, and BOEM would not issue permits and notices under the OCSLA. | Same as in 2011 Draft EIS | Same as in 2011 Draft EIS and 2013 SDEIS |
| Alternative 2 (Preferred Alternative) | Considered up to: <br> • Four 2D/3D seismic or CSEM surveys in the Beaufort Sea and up to three 2D/3D seismic or CSEM surveys in the Chukchi Sea, with up to one of that total number in each done in-ice, if necessary. <br> • Three site clearance and high resolution shallow hazards survey programs in each sea, per year. <br> • One on-ice seismic survey in the Beaufort Sea, per year. <br> • One exploratory drilling program[1] in each sea, per year. <br> Considered inclusion of required standard mitigation measures and additional mitigation measures. | Same as in 2011 Draft EIS | Same as in 2011 Draft EIS and 2013 SDEIS. However, the suite of required standard mitigation measures and additional mitigation measures has been revised based on public comments. |
| Alternative 3 | Considered up to: <br> • Six 2D/3D seismic or CSEM surveys in the Beaufort Sea and up to five 2D/3D seismic or CSEM surveys in the Chukchi Sea, with up to one of that total number in each done in-ice, if necessary. <br> • Five site clearance and high resolution shallow hazards survey programs in each sea, per year. <br> • One on-ice seismic survey in the Beaufort Sea, per year. | Same as in 2011 Draft EIS | Same as in 2011 Draft EIS and 2013 SDEIS. However, the suite of required standard mitigation measures and additional mitigation measures has been revised based on public comments. |

[1] Please see Section 2.4.3 of this FEIS for a discussion of the term "exploratory drilling program."

| Alternative | 2011 Draft EIS | 2013 Supplemental Draft EIS | 2016 FEIS |
|---|---|---|---|
| | • Two exploratory drilling programs in each sea, per year.<br><br>Considered inclusion of required standard mitigation measures and additional mitigation measures. | | |
| Alternative 4 | Considered up to:<br><br>• Six 2D/3D seismic or CSEM surveys in the Beaufort Sea and up to five 2D/3D seismic or CSEM surveys in the Chukchi Sea, with up to one of that total number in each done in-ice, if necessary.<br><br>• Five site clearance and high resolution shallow hazards survey programs in each sea, per year.<br><br>• One on-ice seismic survey in the Beaufort Sea, per year.<br><br>• Two exploratory drilling programs in each sea, per year.<br><br>Considered inclusion of required standard mitigation measures and additional mitigation measures.<br><br>Considered inclusion of required time/area closures for specific areas important to biological productivity, life history functions for specific species of concern, and subsistence activities. Areas considered were:<br><br>• Camden Bay;<br><br>• Barrow Canyon and the Western Beaufort Sea;<br><br>• Shelf Break of the Beaufort Sea;<br><br>• Hanna Shoal; and<br><br>• Kasegaluk Lagoon/Ledyard Bay Critical Habitat Unit. | This alternative differs from Alternative 4 from the 2011 DEIS in the following ways:<br><br>• Considers up to four exploratory drilling programs in each sea, per year.<br><br>• It does not consider inclusion of any required time/area closures.<br><br>Everything else about the alternative remains the same. | This alternative remains the same as the one presented in the 2013 SDEIS with the exception of the changes made to the suite of required standard mitigation measures and additional mitigation measures based on public comments. |

| Alternative | 2011 Draft EIS | 2013 Supplemental Draft EIS | 2016 FEIS |
|---|---|---|---|
| Alternative 5 | Considered up to:<br><br>• Six 2D/3D seismic or CSEM surveys in the Beaufort Sea and up to five 2D/3D seismic or CSEM surveys in the Chukchi Sea, with up to one of that total number in each done in-ice, if necessary.<br><br>• Five site clearance and high resolution shallow hazards survey programs in each sea, per year.<br><br>• One on-ice seismic survey in the Beaufort Sea, per year.<br><br>• Two exploratory drilling programs in each sea per year<br><br>Considered inclusion of required standard mitigation measures and additional mitigation measures.<br><br>Considered including specific additional measures that focus on the use of alternative technologies that have the potential to augment or replace traditional airgun-based seismic exploration activities. | Alternative 5 in this EIS is similar to Alternative 4 from the 2011 Draft EIS with some slight changes:<br><br>• Increase in the maximum level of exploratory drilling programs from up to two in each sea, per year to up to four in each sea, per year.<br><br>• Inclusion of required time/area closures. However, there are changes. Camden Bay was removed from the list of required time/area closures that was considered in the 2011 DEIS. The following are the required time/area closures considered in the 2013 SDEIS:<br><br>  o Kaktovik and Cross Island<br><br>  o Barrow Canyon and the Western Beaufort Sea<br><br>  o Shelf Break of the Beaufort Sea<br><br>  o Hanna Shoal<br><br>  o Kasegaluk Lagoon<br><br>  o Ledyard Bay | This alternative remains the same as the one presented in the 2013 SDEIS. The only changes are the inclusion of one additional required time/area closure: Point Franklin to Barrow and the removal of Hanna Shoal from the list of required time/area closures that was considered in the 2011 DEIS and 2013 SDEIS.<br><br>All other aspects of Alternative 5 are the same as Alternative 5 in the 2013 SDEIS with the exception of the changes made to the suite of required standard mitigation measures and additional mitigation measures based on public comments. |

October 2016

| Alternative | 2011 Draft EIS | 2013 Supplemental Draft EIS | 2016 FEIS |
|---|---|---|---|
| Alternative 6 | There was no Alternative 6 in this version of the EIS. | Alternative 6 in this EIS is similar to Alternative 5 from the 2011 Draft EIS. The only change is the maximum amount of exploratory drilling activities that could potentially occur under this alternative increases from up to two in each sea, per year to up to four in each sea, per year. | Same as in the 2013 SDEIS with the exception of the changes made to the suite of required standard mitigation measures and additional mitigation measures based on public comments. |

# Effects of Oil and Gas Activities in the Arctic Ocean

## Final Environmental Impact Statement

### Volume 2:  Chapters 4-8

### October 2016

**United States Department of Commerce**
**National Oceanic and Atmospheric Administration**
**National Marine Fisheries Service**
**Office of Protected Resources**



somewhat larger, and the amount of time that multiple activities are co-occurring (and the number of activities that are co-occurring) either within or across the Beaufort and Chukchi seas is somewhat greater. For these reasons, these figures support the general suggestion that conducting the level of activity proposed for Alternative 4 could result in both impacts to more individual marine mammals, as well as impacts of a likely more intense nature (from the combined exposure to more activities in time and space), than conducting the level of activity proposed for Alternatives 2 and 3. However, the difference in the level of direct impacts between Alternative 4 and Alternative 3 is not expected to be as large as the difference between Alternative 3 and Alternative 2.

## 4.2.6 Estimating Take of Marine Mammals

### 4.2.6.1 Background

The MMPA prohibits the taking of marine mammals with certain exceptions, one of which is MMPA incidental take authorizations. Incidental take authorizations (ITA) allow for the take of small numbers of marine mammals if NMFS finds that the activity will have a negligible impact[2] on the affected marine mammal species and will not have an unmitigable adverse impact[3] on subsistence uses, and provided mitigation and monitoring requirements are set forth. Applicants for these authorizations are required by the MMPA implementing regulations to estimate (in advance) the number of individuals of each species that may be taken by their proposed activity [50 CFR 216.104 (a)(6)]. Take estimates are also necessary to inform the analyses that NMFS must conduct.

In order to help applicants with noise-producing activities understand when their activity might be expected to take a marine mammal (i.e., when an ITA would be needed) and to assist in the necessary quantification of likely takes, NMFS has established acoustic thresholds (discussed below). Acoustic thresholds identify received sound levels above which marine mammals would be expected to be taken (either by behavioral harassment or auditory injury), if exposed. In short, animals predicted to be exposed to levels at or above the acoustic threshold are predicted to be taken in the specified manner (i.e., by behavioral harassment or auditory injury).

The estimated number of animals that will be exposed at or above acoustic thresholds (and, therefore, predicted to be taken) is a valuable piece of both the "negligible impact" and "unmitigable adverse impact" analyses and directly informs whether the take numbers are "small," however, it is only one piece of an effects analysis under the MMPA. The expected occurrence of a take or a particular *number* of estimated takes does not necessarily relate directly to the biological significance of the impacts, i.e., whether the takes will result in adverse impacts on the fitness or health of the individuals taken. The potential and likelihood of impacts on the health and fitness of individuals taken must be determined in consideration of the manner, context, duration, and intensity of those incidental takes.

For example, some takes (such as injuries or those with substantial negative energetic impacts) may have the potential to negatively affect reproductive success or survivorship, depending on the circumstances, while other takes may have no impact on the health or fitness of the affected individual. Typically, while many other factors come into consideration, exposures to higher levels of sound are generally expected to

---

[2] Under the MMPA implementing regulations, a negligible impact is defined as an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival (50 CFR § 216.103).

[3] An unmitigable adverse impact is defined as an impact resulting from the specified activity that is: 1) likely to reduce the availability of the species to a level insufficient for a harvest to meet subsistence needs by: causing marine mammals to abandon or avoid hunting areas; directly displacing subsistence users; or, placing physical barriers between the marine mammals and the subsistence users; AND 2) cannot be sufficiently mitigated by other measures to increase the availability of marine mammals to allow subsistence needs to be met.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement 4-12
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 15 of 92
Exhibit 19, page 15 of 92

result in more severe effects – and it is worth noting that, in the quantification of takes, due to the geometry of how sound spreads through water and NMFS historical "step" thresholds (where every exposure above a single level is estimated to be a take), the majority of the predicted number of takes would be expected to be on the lower end of levels associated with the effect the threshold illustrates, just above the threshold (i.e., less likely to be significant). If the analysis predicts that the activity is likely to adversely affect the reproductive success or survivorship of any individual marine mammals, then additional analysis must consider how the anticipated fitness effects to those individuals would likely affect the population (e.g., rates of recruitment and survival), in consideration of the species status. Additionally, the negligible impact analysis considers impacts on marine mammal habitat, such as impacts on prey species or the more difficult-to-quantify acoustic habitat impacts that can translate into chronic effects from longer-term exposure to increased sound levels.

Finally, the need to ensure "no unmitigable adverse impacts" to the availability of marine mammals for subsistence uses requires consideration of far more than just take numbers, both because activities can interfere with a hunt without ever affecting a marine mammal (e.g., by blocking access of hunters to marine mammals), and because it is possible for noise to affect marine mammals in a way that would make them more difficult to hunt without always rising to the level of a take (e.g., as traditional knowledge suggests, making them "skittish.")

### 4.2.6.2 Current Acoustic Thresholds

When assessing impacts to marine mammals from sound sources, NMFS has historically used the following acoustic thresholds for the types of sound sources analyzed in this EIS (meaning that take is predicted to occur, or assumed to have occurred, if animals are exposed at or above these levels). These thresholds have been applied to all marine mammal species under NMFS' jurisdiction.

- **Level A Harassment (potential injury) from all sound sources[4]: 180 and 190 dB re 1 μPa (rms) received level for cetaceans and pinnipeds, respectively.** These received levels represent the levels above which, in the view of a panel of bioacoustics specialists before TTS measurements for marine mammals became available, one could not be certain that there would be no injurious effects, auditory or otherwise, to marine mammals (NMFS 1995, 2000).

- **Level B Harassment (behavioral harassment) from impulse sources (e.g., seismic airguns): 160 dB re 1 μPa (rms) received level for all species.** This sub-injurious threshold was based on measured avoidance responses observed in whales in the wild. Specifically, the 160 dB rms re: 1μPa threshold was derived from data for mother-calf pairs of migrating gray whales (Malme et al. 1983, 1984) and bowhead whales (Richardson et al. 1985; Richardson et al. 1986) responding when exposed to seismic airguns.

- **Level B Harassment (behavioral harassment) from continuous sources (e.g., drilling): 120 dB re 1 μPa (rms) received level for all species.** This threshold originates from research on baleen whales, specifically migrating gray whales (Malme et al.1984; predicted 50% probability of avoidance) and bowhead whales reacting when exposed to industrial (e.g., drilling and dredging) activities (non-impulsive sound source) (Richardson et al. 1990).

---

[4] Different Level A Harassment thresholds have been used by NMFS for other types of sound sources not analyzed in this EIS (e.g., explosives). Those thresholds are not listed here, as they are not relevant to the activity types analyzed in this document.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-13
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 16 of 92
Exhibit 19, page 16 of 92

#### 4.2.6.3    Revision of Acoustic Thresholds

Concurrently with the development of this EIS, NMFS undertook a rigorous process of revising and updating the thresholds for estimating onset of auditory injury (which NMFS considers the onset of Level A Harassment in the context of the MMPA) to incorporate newer science and utilize improved methods. In addition to ensuring that NMFS is using the appropriate acoustic thresholds in its decision-making processes, the development of these revised acoustic thresholds includes the creation of a single document/ reference that clearly articulates the thresholds, how they were scientifically derived, and how NMFS plans to apply them pursuant to the multiple NOAA authorities that address noise impacts (e.g., MMPA, ESA).

In the SDEIS, NMFS referenced and discussed the revision of these acoustic thresholds and how they could potentially affect our analyses, as well as our intent to include further discussion in the FEIS. At the time of publication of the SDEIS, NMFS believed that revisions to both auditory injury thresholds, as well as thresholds for acoustic behavioral harassment, would be complete by the time this EIS was finalized. However, because of the complexity involved in appropriately considering context, as well as multiple other technical and policy-related factors, NMFS does not anticipate the revisions to the acoustic thresholds for behavioral harassment will be completed for multiple years. Therefore, the analysis of behavioral effects in this FEIS maintains the current behavioral harassment thresholds (i.e., 160 dB for impulse sources like seismic and 120 dB for continuous sources like drilling), which NMFS determined represent the best available science and are used in combination with other qualitative factors that allow for robust assessment of the full effects of the analyzed actions. However, the revision of the auditory injury thresholds is final, and we consider those revised thresholds in this analysis.

The process for revising the auditory injury thresholds was separate from this NEPA process for Arctic Oil and Gas Exploration. The acoustic threshold revision process includes extensive internal (NOAA) review, multiple external peer reviews, and multiple public review periods. NMFS is aware of the time (sometimes multiple years) and resources that go into the preparation of environmental compliance documentation, and we acknowledge that there will be a transition period during which the new acoustic injury thresholds will be final and available, but many applicants will have already conducted extensive analyses using the historic thresholds. During this time, in some cases it will likely be necessary for NMFS to analyze the effects of activities for which we have take estimates based on historic thresholds, with an inclusion of qualitative consideration of the revised thresholds.

Government agencies must make decisions every day based on the best available science. NEPA requires agencies to conduct environmental impact analyses, some of which (as here) span multiple years during which science and policy related to the actions being considered are constantly evolving. As noted above, the process for revising the auditory injury thresholds included multiple peer reviews and public reviews. The last and final review of the revised auditory injury thresholds was a brief review by both the public and the peer reviewers focusing on a few specific technical changes in early 2016. The auditory injury thresholds considered in this EIS analysis are the new, revised final thresholds that were released by NOAA in July 2016 (see Appendix B). These guidelines include all of the input from the multiple peer-review and public input received throughout the process.

Below, we include a description of the final revised acoustic thresholds for auditory injury, along with a summary of the ways in which changes of the nature discussed might be expected to shape the analysis of effects contained elsewhere in the document (and informed by the current acoustic thresholds). Additionally, we include a brief discussion of NMFS' future plans to revise the behavioral harassment thresholds. As discussed in more detail above and below, acoustic thresholds are only one part of the analysis of marine mammal and subsistence impacts, and the analysis contained elsewhere in this document (informed by both the previous and revised final acoustic thresholds) creates a solid analytical foundation upon which considerations of acoustic threshold revisions can be layered for a fuller understanding of how the anticipated changes may inform future decision-making.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-14
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 17 of 92
Exhibit 19, page 17 of 92

October 2016

#### 4.2.6.4    Auditory Injury Thresholds

As noted above, NMFS has finalized the process of revising its acoustic threshold levels for auditory injury (permanent threshold shift) via its 2016 Technical Guidance (NOAA 2016). Southall et al. (2007) identified dual criteria (using peak pressure sound pressure level [PK] and cumulative sound exposure level [SEL$_{cum}$]) for assessing PTS from multiple pulse sounds. Building upon those proposed levels, NMFS modified them using more recent data, which suggest: 1) that phocids should be separated from otariids when estimating TTS or PTS (because of their inner ear anatomy) and likely incur hearing impairment at lower received levels based on the data currently available (Kastak and Schusterman 1998; Hemilä et al. 2006; Mulsow et al. 2011), and; 2) that marine mammals are more likely to incur TTS and subsequent PTS within the frequency ranges of their best hearing sensitivity (Finneran and Schlundt 2010; Finneran and Jenkins 2012, Finneran 2015). An overview of the final revised auditory injury thresholds and weighting functions is included below. Tables including the final revised thresholds and figures depicting the associated marine mammal auditory weighting functions are included below and in Volume 3 of this FEIS. NMFS (2016), which was released to the public on March 16, 2016 for a last public comment and concurrent follow-up peer review, and describes the derivation of the revised thresholds in detail, is included here as Appendix B.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-15
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG    Document 51-19    Filed 06/13/19    Page 18 of 92
Exhibit 19, page 18 of 92

October 2016

**Table 4.2-4 Final revised auditory injury acoustic threshold levels**

| Hearing Group | PTS Onset Threshold Levels[*] (Received Level) | |
|---|---|---|
| | Impulsive | Non-impulsive |
| Low-Frequency (LF) Cetaceans | *Cell 1* <br> $L_{pk,flat}$: 219 dB <br> $L_{E,LF,24h}$: 183 dB | *Cell 2* <br> $L_{E,LF,24h}$: 199 dB |
| Mid-Frequency (MF) Cetaceans | *Cell 3* <br> $L_{pk,flat}$: 230 dB <br> $L_{E,MF,24h}$: 185 dB | *Cell 4* <br> $L_{E,MF,24h}$: 198 dB |
| High-Frequency (HF) Cetaceans | *Cell 5* <br> $L_{pk,flat}$: 202 dB <br> $L_{E,HF,24h}$: 155 dB | *Cell 6* <br> $L_{E,HF,24h}$: 173 dB |
| Phocid Pinnipeds (PW) (Underwater) | *Cell 7* <br> $L_{pk,flat}$: 218 dB <br> $L_{E,PW,24h}$: 185 dB | *Cell 8* <br> $L_{E,PW,24h}$: 201 dB |
| Otariid Pinnipeds (OW) (Underwater) | *Cell 9* <br> $L_{pk,flat}$: 232 dB <br> $L_{E,OW,24h}$: 203 dB | *Cell 10* <br> $L_{E,OW,24h}$: 219 dB |

[*] Dual metric acoustic threshold levels for impulsive sounds: Use whichever results in the largest effect distance (isopleth). If a non-impulsive sound has the potential of exceeding the peak sound pressure level thresholds associated with impulsive sounds, these thresholds should also be considered.

Note: Peak sound pressure ($L_{pk}$) has a reference value of 1 µPa, and cumulative sound exposure level ($L_E$) has a reference value of $1 µPa^2s$. In this table, thresholds are abbreviated to reflect American National Standards Institute standards (ANSI 2013). However, peak sound pressure is defined by ANSI as incorporating frequency weighting, which is not the intent for this Guidance. Hence, the subscript "flat" is being included to indicate peak sound pressure should be flat weighted or unweighted within the functional hearing range. The subscript associated with cumulative sound exposure level thresholds indicates the designated marine mammal auditory weighting function (LF, MF, and HF cetaceans, and PW and OW pinnipeds) and that the recommended accumulation period is 24 hours. The cumulative sound exposure level thresholds could be exceeded in multitude of ways (i.e., varying exposure levels and durations, duty cycle). It is valuable for action proponents, if possible, to indicate under what conditions these acoustic threshold levels will be exceeded.

Source: NMFS 2016

When considering how the final revised acoustic thresholds for auditory injury outlined above might compare to the current 180/190-dB rms thresholds, it is important to note three important differences in what the two sets of thresholds (former and revised) represent. First, dual criteria are utilized, meaning that whichever is exceeded first is the one that should be used for assessing injury for impulsive sources (in almost all cases, the SEL$_{cum}$ metric will be exceeded first). Second, the thresholds outlined above use the SEL$_{cum}$ metric (which allows for the consideration of how the sound accumulates over time), not the SPL rms metric of the current thresholds (which does not directly take into account the duration of exposure). (Note that the revised PK metric also does not account for accumulation.) This means, for

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement     4-16
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/25/19   Page 19 of 92
Exhibit 19, page 19 of 92

example, that one 100-ms pulse with a received SPL rms level of 161 dB would only have an SEL of 151 dB. However, multiple pulses must be taken into consideration, and, if a receiver were in a position to receive 10 of those same pulses within that same distance, the $SEL_{cum}$ would accumulate up to 161 dB (e.g., $SEL_{cum}$ equals SPL rms levels when the total duration of exposure to the same level is 1 second). Last, the $SEL_{cum}$ thresholds outlined above take into account the frequency range of highest sensitivity for each functional hearing group and are intended to be used in conjunction with frequency weighting functions that are depicted above and outlined in more detail by NMFS (2016; see Appendix B). In short, applying frequency weighting functions considers sound produced by the source in conjunction with the functional hearing group-specific and frequency-specific filter and for any part of the signal that is not in the area of highest sensitivity for that functional hearing group, i.e., more energy is needed to reach the threshold (e.g., range to isopleth decreases).

Because our understanding of marine mammal hearing has advanced greatly, these final revised auditory injury thresholds are notably more complex to apply (primarily in how they consider taxa-specific auditory weighting functions and exposure duration) and have the potential to be challenging for applicants without the benefit of more sophisticated modeling capabilities. Therefore, NMFS has provided simplified methods (i.e., less sophisticated models) to incorporate weighting functions and exposure duration that *may* be used if applicants do not have access to models that cannot account for these factors. This simple method generates a "safe distance" (the distance from the source beyond which a threshold for that metric is not exceeded) and accounts for several factors, including source level, interpulse interval or duty cycle, and velocity of the source, and is independent of exposure duration. Appendix B describes this simplified method in more detail and outlines the simplifying assumptions. This method is considered conservative because of some of the inherent assumptions and is expected to result in a higher take estimate than if more sophisticated modeling (which can be carefully refined to the specific parameters of a given survey/environment) is used.

Appendix G of the FEIS depicts representative 120, 160, 180, and 190-dB isopleths (the latter two representing the distances within which cetaceans and pinnipeds, respectively, could potentially incur auditory injury in the form of PTS based on historic thresholds) from past seismic surveys. As noted previously, in the past, NMFS did not typically authorize Level A take because we assumed marine mammal avoidance of loud sounds and effective mitigation would likely result in avoidance of auditory injury. Using the final revised acoustic thresholds and the simple method referenced above, NMFS calculated the "safe distances" for seismic surveys and a simplified 24-hr accumulation for drilling, which (when the simple method is used) would likely be used in lieu of the historic 180 and 190-dB isopleths to calculate take. By comparing these simple method calculations with the historic 180 and 190-dB isopleths, we can get a sense of the differences between predicted injury using the historic auditory injury thresholds versus using the final revised acoustic thresholds.

Using the simple method (with final revised thresholds and weighting functions) and some basic generalizations (based on data) about larger array seismic surveys (source level of 235 dB RMS SPL, source velocity of 2.315 m/s, 0.01 duty cycle), we calculated the following safe distances for the SEL metric: 2,119 m for low frequency cetaceans, 2 m for mid-frequency cetaceans, 240 m for high frequency cetaceans, 350 m for phocids, and 7 m for otariids. The new acoustic guidance provide dual metrics (SEL and SPL peak) and instruct users to use the more conservative of the two (i.e., the one that would result in the larger isopleth or greater take estimates). In this example, using the SEL metric produces the larger isopleths for all but mid-frequency cetaceans, for which the SPL peak isopleth would be about 6 m, assuming that the SPL peak source level is about 10 dB above the SPL rms level and assuming a spreading coeeficient of 20logR. These safe distances are very much within the realm of the 180 and 190-dB isopleths that have been modeled or measured in past surveys (in fact, they are substantively smaller for mid and high frequency cetaceans and otariids), suggesting that the revisions in the auditory injury thresholds do not change our analysis of impacts notably, and further suggesting that traditionally applied 180 and 190-dB mitigation zones likely provide a similar degree of protection as previously assumed.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-17
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 20 of 20
Exhibit 19, page 20 of 92

Using the simple method (with final revised thresholds and weighting functions) and some basic generalizations (based on data) about drilling activities (source level of 187 dB RMS SPL, activity duration of 24 hours, and transmission loss of 15 logR) the following safe distances were calculated: 309 m for low frequency cetaceans, 17 m for mid-frequency cetaceans, 271 m for high frequency cetaceans, 166 m for phocids, and 12 m for otariids. Measured 180 and 190-dB RMS SPL isopleths for drilling are typically much smaller (on the order of 10 m or less) and injury has not typically been anticipated or authorized. Prior assessments of the unlikelihood of injury would likely not change given the small area encompassed by the safe distance (and resulting small take estimates, if projected) and the expectation that many marine mammals will avoid sounds at these levels. The safe distances above assume that animals remain closer than that to the noise source for a full 24 hours to exceed the exposure threshold, which is quite unlikely. However, the potential for injury should not be entirely ruled out, especially in situations where there is reason to believe that marine mammals need to be in the immediate area for extended periods of time, and some small number may occasionally be authorized.

### 4.2.6.5    Behavioral Harassment Thresholds

As noted above, NMFS is planning to revise the acoustic thresholds for behavioral harassment for all activities. When the DEIS and SDEIS were published, we believed that this process would be complete in time to inform the FEIS, however, we have since realized that that the revision of the behavioral harassment thresholds will take at least an additional couple of years to complete, given some of the known technical and policy challenges associated with such a revision. Given this delay, and in consideration of both the evolving science and the upcoming process, which will include extensive expert and public input and could result in recommended methods that are currently unforeseen, the analysis contained in this FEIS utilizes NMFS' current behavioral harassment thresholds for estimating take. Nonetheless, we outline below some of the limitations of the current thresholds and highlight opportunities to qualitatively consider the most up-to-date information.

The current acoustic threshold for behavioral harassment from impulsive sounds, a 160-dB rms step function, predicts that all animals exposed to levels above 160 dB would be taken, and that no animals exposed to levels below 160 dB would be taken. Both data and logic suggest that this method may oversimplify the relationship between sound exposure and behavioral harassment, and there are other methods available that could better characterize this relationship, given the available data, while also incorporating consideration of variability in individual responses to sound. Dose-response-type curves, or risk functions, when supported by data and with an appropriate cut-off, can be used to more fully describe how exposures to different received levels can result in different outcomes (e.g., number of animals responding in a certain way, probability of individual responses). For example, given a specifically defined response, a risk function could describe how a higher percentage of animals exposed to higher received levels might demonstrate that response, while a lower percentage of animals exposed to lower received levels might demonstrate that response (see example used for Navy mid-frequency sources below). NMFS' preliminarily plans include exploring the use of dose-response or risk function-like curves to characterize the relationship between received sound level and behavioral responses. Further, while other metrics have been explored, based on the available data NMFS' believes that dB rms (the metrics used in the current acoustic thresholds) is still the most appropriate metric to characterize the relationship between received level and behavioral response.

Additionally, as has become increasingly evident and more highlighted in publications (Ellison et al., 2011), the context of an exposure of marine mammals to sound (e.g., the behavioral state of the animal, whether a sound source is approaching and how fast) can affect both how an animal initially responds to a sound and the ultimate impacts of the sound exposure on that individual. NMFS is also exploring additional methods of augmenting the use of a dose-response-like curve to address contextual factors beyond received level (such as distance from the sound or behavioral state of the animal), as well as the more chronic effects of sound sources operated over longer periods of time.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-18
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 21 of 22
Exhibit 19, page 21 of 92

In the future, based on the limited data available, NMFS is considering exploring having different basic acoustic thresholds for mysticetes, odontocetes, and pinnipeds, with the recognition that sometimes there may be sufficient data to suggest that a species within one of those groups is "sensitive" and should have different (lower) acoustic threshold. Because data indicate that not all mysticetes exposed to received levels of 160 dB or above would be expected to be taken (Miller 2005, Malme et al. 1983, 1984, 1985), a dose-response approach for mysticetes, if explored, would likely result in estimates that show fewer takes resulting from exposures to received levels above 160 dB (than when the current step function is used). Alternately, there are also data showing that some portion of mysticetes (including, and perhaps especially, bowheads) exposed to seismic signals at received levels below 160 dB, and potentially down to around 120 dB, may sometimes respond in a manner that NMFS would categorize as a Level B behavioral take, especially in certain contexts, such as within a migratory corridor or if the activity were expected to be continuous over multiple days (Di Iorio and Clark 2009, Richardson et al. 1985/1986, Richardson et al. 1999). A dose-response-like approach incorporating these data, if explored, would likely result in some number of animals exposed at levels below 160 dB being predicted to be taken. However, while considering these approaches through the appropriate process, we believe that the 160-dB is still the best generalized method for predicting when level B harassment occurs.

Fewer data exist showing how odontocetes and pinnipeds (as compared to mysticietes) behaviorally respond to seismic airguns and similar sources. However, what data are available suggest that some percentage of odonotcetes exposed to received levels above 160dB would not be taken and that some percentage exposed to levels below 160 dB may respond in a manner that NMFS would consider Level B harassment (Miller et al. 2005). Alternately, data suggest that not all pinnipeds will be taken at received levels of 160 dB (or higher), and there are no data (with measured received levels) indicating how they would respond to levels below 160 or 165 dB.

In consideration of the acoustic threshold revisions, NMFS qualitatively considers how changes of the nature described above could potentially shape our further analyses of the alternatives in this FEIS. As described above, much of the impact analysis occurs subsequent and in addition to the initial estimate of the number of exposures that are predicted to result in a take. This additional analysis determines whether the anticipated exposures with the potential to injure or disturb marine mammals (counted as takes) would be likely to affect the health or fitness of any individuals (in a manner that would affect survivorship or reproductive success), whether altered health or fitness of the expected number of individuals would adversely affect rates of recruitment or survival, and whether any of the expected effects on individuals would have an unmitigable adverse impact on subsistence uses.

As discussed above, the quantification of anticipated takes is only part of the larger marine mammal impact analysis and is separate from the analysis of the severity of any single one of those takes, which must consider the biological and operational context in which those takes occur. Additionally, the analysis of the potential health and fitness impacts of the expected take, or the population level impacts, includes consideration of the life history of the affected species, their behavioral patterns and distribution within the action area, the duration, season, geographic scope, and operational parameters of the expected activities, along with the potential implementation of multiple mitigation measures intended to minimize the intensity of the effects – and these analyses are not expected to change notably based solely on any anticipated future modification of the behavioral harassment threshold.

Separately, any revisions to the acoustic thresholds also result in changes to the distances from sound sources within which we quantify impacts. NMFS has previously qualitatively acknowledged our concerns regarding the more chronic, longer-term effects of increasing noise levels (at levels below 160 dB) in potentially interfering with marine mammal's ability to detect and interpret important environmental cues (especially for low frequency specialists and low frequency sounds). For example, we outlined the 120-dB isopleths around seismic airgun operations in the original DEIS (even though the current acoustic threshold for behavioral harassment is 160 dB) to give a sense of the geographic scope of these chronic noise concerns. In response to public comments requesting NMFS better address the effects

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement     4-19
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/16/19   Page 22 of 92
Exhibit 19, page 22 of 92

of more chronic and aggregate noise exposure, NMFS has conducted a novel first-order chronic and cumulative analysis, the preliminary results of which have been reported in Section 4.5.2.4.9 and considered in the FEIS analysis.

## 4.2.6.6 Overview of Take Estimates

Tables 4.2-5, 4.2-6, and 4.2-7 contain a representative summary of takes that were predicted to occur in the Beaufort and Chukchi seas based on previously issued IHAs for the different types of activities analyzed in this EIS.

In 2015, NMFS modified the way we calculate take in certain situations and some activities to better account for the duration of the activities, which resulted in take numbers that were sometimes several times higher than those calculated in previous years. While these estimates better account for duration, it is also important to note that the numbers generated with this newer method represent the number of *instances* of take, not the number of *individuals* taken. The higher take estimates generated using the newer methods are expected to be overestimates of the number of individuals taken to differing degrees because of the fact that depending on several factors (activity type, behavior, life history, etc.) individuals are likely taken more than one time on multiple days across the duration of the action. Further, because the takes from each activity type indicated below are simply added together, the totals generated for each alternative do not take into consideration the fact that an animal may be taken by two or more different activities (i.e., just adding activity takes may further overestimate the number of individuals). For example to illustrate both of these points, a bowhead may remain in an area for a couple days feeding and therefore be taken by a stationary drilling activity a couple of times (reflected as two takes in activity estimate), and then move away continuing on its migration and swim through the ensonified zone of a couple of seismic surveys and be taken two more times. In such a scenario, four of the takes represented in the take estimate for a total alternative would actually represent only one individual. Alternately, animals that remain in the general area of these activities all year round or for a season may be taken many more times each. Therefore, although newer methods may increase the estimated take numbers in applications by several times over those reflected in the tables below, because of the reasons above, we determined that the alternative totals below still generally represent the *numbers of individuals* that may be taken by the combined activities. However, in acknowledgement of the generalized nature of these take estimates and the new methods mentioned above, we will consider the possibility that the number of individuals could be twice as high as those reflected in the tables below when we address magnitude or intensity in the impact criteria for behavioral disturbance.

Using the methods described in the previous paragraph, Table 4.2-5 indicates that between 3,460 and 6,920 bowheads might be behaviorally harassed as they travel through the Beaufort Sea under Alternative 2. Fleishman et al. (2016) modeled 80% of the bowhead population (11,566) moving through the Beaufort Sea in a 47-day period and their sound exposure given the modeled sound field of two production islands, one offshore and one nearshore vessel towing a barge, and two offshore and three nearshore seismic survey operations. In the modeled scenario, given a 0.6 probability of modeled aversion to seismic at 160 dB SPL (which seems reasonable), about 22% of the modeled population (2,544 individuals) was exposed to levels of 160 dB or above at some time during their trip through the Beaufort, though only about 1% of the population was exposed to levels above 170 dB. If this number is proportionally corrected for the current minimum population estimate (16,091) passing through the same fields, the exposures above 160 dB SPL would be 3,540. Alternative 2 assumes four 2D/3D seismic surveys, three site clearance, one on-ice survey, and one exploratory drilling program in the Beaufort Sea. Given the general similarity between the levels of activity contemplated in Alternative 2 and the levels of activity contemplated in Ellison et al. (2016; acknowledging that Alternative 2 levels are somewhat higher), and the fact that cumulative exposure to multiple sources is not strictly additive, the exposures modeled in Ellison et al. (2016) generally do not seem to be out of line with the exposures above 160 dB estimated here for Alternative 2.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-20
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 23 of 23
Exhibit 19, page 23 of 92

Separately, note that the estimates presented below all represent Level B behavioral harassment takes and assume no injury (or mortality) based on previous analyses using historical Level A harassment thresholds and assumptions about avoidance and mitigation. As described above, future analyses and calculations utilizing the revised auditory impact thresholds will likely not result in much of a change to predicted numbers, but it is probably not appropriate to rule out the chance of PTS completely, so there may be cases in the future in which, based on the project-specific analysis conducted, NMFS authorizes a small number of Level A harassment takes. However, if so, it would not change the numbers in the table below, as those Level A harassment takes would come from the pool of takes that would otherwise have been estimated as Level B harassment. We also emphasize here that not all takes are biologically significant. Additional contextual analysis is needed and typically only some portion (depending on the circumstances and context of the exposures) of any estimated takes have the potential or likelihood of affecting animal fitness.

**Table 4.2-5 Examples of estimated take for different types of oil and gas exploration activities in the Beaufort Sea using the current behavioral acoustic thresholds, followed by estimated takes if those examples are used to total maximum activity levels for each alternative.**

| BEAUFORT | Bowhead Whale | Beluga Whale | Gray Whale | Minke Whale | Humpback Whale | Harbor Porpoise | Ringed Seal | Bearded Seal | Spotted Seal | Ribbon Seal |
|---|---|---|---|---|---|---|---|---|---|---|
| OBC or OBN Seismic Survey using an 880 in$^3$ array | 20 | 15 | 0 | 0 | 0 | 0 | 225 | 30 | 15 | 0 |
| 3D Seismic Survey using a 3147 in$^3$ array | 400 | 210 | 250 | 0 | 0 | 0 | 7300 | 375 | 20 | 0 |
| Site Clearance and High Resolution Shallow Hazards Survey using a 40 in$^3$ airgun | 300 | 10 | 5 | 0 | 0 | 0 | 140 | 10 | 5 | 0 |
| On-ice Seismic Survey | 0 | 0 | 0 | 0 | 0 | 0 | 500 | 5 | 0 | 0 |
| In-ice 2D Seismic Survey | 240 | 4900 | 20 | 18 | 18 | 18 | 39,200 | 70 | 17 | 17 |
| Exploratory Drilling Program with a drillship | 1500 | 20 | 10 | 0 | 0 | 15 | 440 | 22 | 5 | 2 |
| ALTERNATIVE 2 Total - Maximum levels of all Beaufort activities combined | **3460** | **5385** | **545** | **18** | **18** | **33** | **55385** | **907** | **92** | **19** |
| ALTERNATIVE 3 Total - Maximum levels of all Beaufort activities combined | **5980** | **5650** | **815** | **18** | **18** | **48** | **63630** | **1354** | **142** | **21** |
| ALTERNATIVE 4 Total - Maximum levels of all Beaufort activities combined | **8980** | **5690** | **835** | **18** | **18** | **78** | **64510** | **1398** | **152** | **25** |

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement
Chapter 4 – Environmental Consequences

4-22

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 25 of 92   Exhibit 19, page 25 of 92

**Table 4.2-6 Examples of estimated take for different types of oil and gas exploration activities in the Chukchi Sea using the current behavioral acoustic thresholds, followed by estimated takes if those examples are used to total maximum activity levels for each alternative.**

| CHUKCHI | Bowhead Whale | Beluga Whale | Gray Whale | Minke Whale | Humpback Whale | Fin Whale | Killer Whale | Harbor Porpoise | Ringed Seal | Bearded Seal | Spotted Seal | Ribbon Seal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3D Seismic Survey using a 3000 in³ array | 150 | 190 | 145 | 5 | 5 | 5 | 5 | 20 | 6,500 | 215 | 130 | 10 |
| Site Clearance and High Resolution Shallow Hazards Survey using a 40 in³ array | 5 | 10 | 20 | 2 | 2 | 2 | 5 | 7 | 700 | 30 | 7 | 2 |
| In-ice 2D Seismic Survey | 40 | 50 | 5 | 5 | 5 | 0 | 0 | 5 | 21,300 | 20 | 5 | 5 |
| Exploratory Drilling Program with a drillship | 80 | 15 | 50 | 15 | 15 | 15 | 15 | 15 | 815 | 35 | 20 | 15 |
| Exploratory Drilling Program with a jack-up rig | 70 | 10 | 35 | 5 | 5 | 5 | 20 | 10 | 340 | 160 | 160 | 15 |
| ALTERNATIVE 2 Total - Maximum levels of all Chukchi activities combined | **435** | **475** | **405** | **36** | **36** | **31** | **40** | **81** | **37215** | **575** | **306** | **46** |
| ALTERNATIVE 3 Total - Maximum levels of all Chukchi activities combined | **825** | **890** | **785** | **65** | **65** | **60** | **75** | **150** | **52430** | **1100** | **600** | **85** |
| ALTERNATIVE 4 Total - Maximum levels of all Chukchi activities combined | **985** | **920** | **885** | **95** | **95** | **90** | **105** | **180** | **54060** | **1170** | **640** | **115** |

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement
Chapter 4 – Environmental Consequences

4-23

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 26 of 92   Exhibit 19, page 26 of 92

**Table 4.2-7 Using the examples provided above, estimated takes for total maximum activity levels in both the Beaufort and Chukchi seas combined for each alternative\*.**

| BEAUFORT/CHUKCHI COMBINED | Bowhead Whale | Beluga Whale | Gray Whale | Minke Whale | Humpback Whale | Fin Whale | Killer Whale | Harbor Porpoise | Ringed Seal | Bearded Seal | Spotted Seal | Ribbon Seal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALTERNATIVE 2 Total - Maximum levels of all activities combined | 3895 | 5860 | 950 | 54 | 54 | 31 | 40 | 81 | 92,600 | 1,482 | 398 | 65 |
| ALTERNATIVE 3 Total - Maximum levels of all activities combined | 6805 | 6540 | 1600 | 83 | 83 | 60 | 75 | 150 | 116,060 | 2,454 | 742 | 106 |
| ALTERNATIVE 4 Total - Maximum levels of all activities combined | 9965 | 6610 | 1720 | 113 | 113 | 90 | 105 | 180 | 118,570 | 2,568 | 792 | 140 |

\* Note, for the reasons described above in Section 4.2.6.6, for the purposes of evaluating the magnitude or intensity for the behavioral disturbance impact criteria, NMFS is considering values of twice those indicated in this table.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement      4-24
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG    Document 51-19    Filed 06/08/18    Page 27 of 92    Exhibit 19, page 27 of 92

#### 4.5.1.4    Acoustics

The term acoustics for purposes of this EIS refers to the state of ensonification of the environments of the EIS project area by anthropogenic noise resulting from activities of the alternatives. The acoustic environment is an important habitat component for multiple species. For example, sound is critical to marine mammals for communication, prey and predator detection, and for detecting and interpreting other important environmental clues (e.g., navigation). The presence of increased sound levels from anthropogenic activity and consequent exposures of marine wildlife to these conditions could potentially cause effects. In addition, the acoustic environment influences the success of subsistence uses through disturbance and behavior modification of marine mammals and other subsistence resources, and potentially impeding subsistence harvest activities and use of the environment. This section considers levels of ensonification (intensity), duration and spatial extent of anthropogenic noise produced by Alternative 2 to inform the wildlife and subsistence effects assessments elsewhere in this EIS. Alternative 2 is the first alternative that introduces anthropogenic noise sources associated with oil and gas exploration. The acoustic characteristics of these sources are compiled and discussed in this section specifically for Alternative 2 but the same sources are used in other alternatives and the information presented here is also relevant for those.

The evaluations of acoustics effects in this section consider three criteria: intensity, duration, and extent, as defined in Table 4.5-8 below. The criteria are based on sound levels that have been associated with possible disturbance of marine mammals, although specific impacts are not considered here (see section 4.2.6). Intensity considers the magnitude of the broadband acoustic source levels associated with the activity. Duration considers the time period over which sound sources operate. Extent considers the spatial area over which sound levels exceed the lowest marine mammal disturbance level relative to the Beaufort and Chukchi seas; the impact category of context is not applicable to acoustics, as it is not a resource that can be classified as common, important, or unique (although context in a more general sense is critical to an assessment of acoustic impacts and is therefore discussed in relation to its importance to certain biological resources in those individual sections).

**Table 4.5-8 Impact Criteria for Acoustics**

| Impact Category | Intensity Type | Definition |
|---|---|---|
| **Intensity (Magnitude)** | Low | Broadband acoustic source levels from anthropogenic sources are below 160 dB re 1 uPa @ 1 m (either continuous SPL or 90% rms SPL for impulsive sources). |
| | Medium | Broadband acoustic source levels from anthropogenic sources reach or exceed 160 and are below 200 dB re 1 μPa @ 1 m. |
| | High | Broadband acoustic source levels from anthropogenic sources reach or exceed 200 dB re 1 uPa @ 1 m. |
| **Duration** | Temporary | Acoustic levels are modified for days to one month. |
| | Interim | Acoustic levels are modified for 1 to 6 months (an entire project season). |
| | Long-term | Acoustic levels are increased for more than 6 months in a given year or for multiple months that recur over multiple successive years. |
| **Geographic Extent** | Local | Anthropogenic noise levels are increased above 120 dB re 1 uPa over less than 10% of the EIS project areas. |
| | Regional | Anthropogenic noise levels exceed 120 dB re 1 uPa over at least 10% and less than 50% of the EIS project areas. |
| | State-wide | Anthropogenic noise levels exceed 120 dB re 1 uPa over 50% or more of the EIS project area. |

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-49
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 28 of 92
Exhibit 19, page 28 of 92

Alternative 2 includes exploration activities that would likely require an ITA for possible harassment of marine mammals from noise produced by seismic survey sources, drill rigs and vessels. Other than the No Action Alternative, Alternative 2 contemplates the lowest level of activity.

Noise sources included in Alternative 2 include deep-penetration seismic airgun arrays, seismic survey vessels, including in-ice seismic vessels for winter programs, small airgun arrays for site clearance and high resolution shallow hazards surveys or for use during VSP surveys in conjunction with exploration drilling activities, vibroseis systems for on-ice surveys, and drilling rigs. With the exception of exploratory drilling rigs, all of the source types have operated in the EIS project area environments for commercial oil and gas exploration projects between 2006 and 2010. Most of these projects operated under IHAs that required acoustic measurements of underwater noise sources, and the results are cataloged in a series of monitoring reports submitted to NMFS (see references in Table 4.5-8). The reports dating back to 2006 are publicly available on NMFS' ITA website: http://www.nmfs.noaa.gov/pr/permits/incidental.htm.

Table 4.5-9 lists the specific programs conducted in the EIS project area and the sources included in the reported acoustic measurements that are relevant to understanding sound levels produced by airgun arrays and vessels as included in activities under the alternatives.

**Table 4.5-9 O&G Exploration Projects in the EIS Project Area, 2006- 2015, that have reported measurements of sound levels produced by their activities**

| Project Operator and Year | Primary Survey Type | Location | Water Depths (m) | Airgun Array | Survey Vessel | Support Vessel | Sidescan/Multibeam | Sub-bottom Profiler | Spark/Boom/Pulse | Drilling | Reference |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Shell Offshore Inc. 2006 | 3D<br>3D, SH | Chukchi, Beaufort | 40<br>40-50 | X<br>X | X<br>X | X<br>X | | | <br>X | | Blackwell 2007 |
| GX Technology 2006 | 2D | Chukchi | 30-3,800 | X | | | | | | | Austin & Laurinolli 2007 |
| ConocoPhillips Alaska 2006 | 3D | Chukchi | <50 | X | X | | | | | | MacGillivray & Hannay 2008 |
| Shell Offshore Inc. 2007 | 3D, SH | Chukchi, Beaufort | 40+ | X | X | X | | X | X | | Hannay et al. 2008 |
| Eni and PGS 2008 | OBC | Beaufort | 2-14 | X | X | X | | | | | Warner et al. 2008 |
| BP Alaska 2008 | OBC | Beaufort | 0.3-9.1 | X | X | X | | | | | Aerts et al. 2008 |
| ConocoPhillips Alaska 2008 | SH | Chukchi | 32 | | X | | | | X | | Turner and Trivers 2008 |
| Shell Offshore Inc. 2008 | 3D, SH | Chukchi, Beaufort | 19-44 | X | X | X | | X | X | | Hannay et al. 2009 |
| Shell Offshore Inc. 2009 | SH | Chukchi | 48, 41 | X | X | | | X | | | Warner et al. 2010 |
| Statoil 2010 | 3D | Chukchi | 38-43 | X | | | | | | | O'Neill et al. 2010 |
| Shell Offshore Inc. 2010 | SH,GT | Chukchi, Beaufort | 46-51<br>15-38 | <br>X | X<br>X | | X<br>X | X<br>X | | | Chorney et al. 2011 |

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement
Chapter 4 – Environmental Consequences

4-50

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 29 of 92

Exhibit 19, page 29 of 92

October 2016

| Project Operator and Year | Primary Survey Type | Location | Water Depths (m) | Airgun Array | Survey Vessel | Support Vessel | Sidescan/Multibeam | Sub-bottom Profiler | Spark/Boom/Pulse | Drilling | Reference |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Statoil 2011 | SH,GT, GC | Chukchi | 37 | X | X | X | X | X | | | Warner and McCrodan, 2012 |
| BP 2012 | OBC | Beaufort | 1.8-18 | X | X | | | | | | McPherson and Warner, 2012 |
| ION 2012 | 2D | Beaufort | 50-1016 | X | X | | | | | | Wladichuk et al. 2013 |
| Shell 2012 | DR | Beaufort | | | | X | | | | X | Austin et al. 2013 |
| Shell 2012 | DR | Chukchi | | | | X | | | | X | Austin et al. 2013 |
| Shell 2013 | SH, GT | Chukchi | 42-48 | X | X | X | X | X | | | Reider et al. 2013 |
| TGS 2013 | 2D | Chukchi | 41-48 | X | X | X | | | | | Austin and Baily 2013 |
| SAE 2014 | OBC | Beaufort | 4.0-7.9 | X | | | | | | | Heath et al. 2014 |
| Shell 2015 | Drilling | Chukchi | 46 | | | | | | | X | Austin and Li 2016 |

**Notes:**

2D = 2-Dimensional seismic survey using airgun array sources

3D = 3-Dimensional seismic survey using airgun array sources

OBC = Ocean Bottom Cable or Ocean Bottom Sensor survey using airgun array sources

SH = Site Clearance and high resolution shallow hazards surveys using small airgun arrays, sparkers or boomers or bubble pulsers.

GT = Geotechnical survey using sidescan, multibeam, single beam sonars

GC = Geotechnical Coring

DR = Drilling using drillship or drill rig

## 4.5.1.4.1    Acoustic Propagation Environments

The Alternative 2 noise sources generate acoustic footprints that depend on the source type and location of operation. For this discussion, the overall EIS project area is divided into three primary acoustic environments introduced in Section 3.1.4.1. These environments are the Chukchi shelf, the Beaufort shelf, and Beaufort coastal area. Though the sediment type and water column features may vary across these environments, the primary distinguishing factor for influencing sound propagation in each environment is water depth. The EIS project area on the Chukchi Shelf is comprised of spatially-uniform water depths between approximately 25 m (82 ft.) and 50 m (164 ft.) in the areas of oil and gas activities. Bottom relief over the extent of individual seismic or site clearance survey areas is generally small, typically within 10 percent of the nominal location depth, but spatially-extended 2D surveys can cover larger depth intervals. The Beaufort shelf areas have a larger depth range, from approximately 15 m (50 ft.) to a few hundred meters near the shelf edge; however, most recent exploration activity has occurred in less than 35 m (115 ft.) water depth. The lower depth range limit of 15 m (50 ft.) is due mainly to difficulties towing seismic streamers in shallower water. Surveys in shallower water are performed using OBC/OBN systems with hydrophones deployed on the seabed. OBC surveys were performed by Eni/PGS and BP in 2008 inside the barrier islands of the Beaufort Sea, in water depths less than 5 m (16 ft.), to a few kilometers outside the islands in water depths to approximately 15 m (50 ft.).

## 4.5.1.4.2    Relevant Acoustic Thresholds

Acoustic footprints will be considered in terms of areal extents and source-receiver distances to specific noise thresholds that are pertinent for assessing marine mammal acoustic impacts. NMFS historically

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement     4-51
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG    Document 51-19    Filed 06/18/19    Page 30 of 92
Exhibit 19, page 30 of 30

considered thresholds of 190 and 180 dB re 1 μPa (rms) to be representative of the levels below which we can be confident that PTS (or auditory injury) will not occur, based on TTS data in pinnipeds and cetaceans respectively. Thresholds for marine mammal disturbance are 120 dB and 160 dB re 1 μPa for continuous and pulsed noises, respectively. However, as discussed in Section 4.2.6.4 of this EIS, NMFS has revised its acoustic thresholds for auditory injury. NMFS notes that marine mammals may respond to pulsed noise at levels below 160 dB re 1 μPa (potentially down to 120 dB) in a manner with the potential to impact subsistence uses of those animals, and, therefore, distances to the 120 dB re 1 μPa isopleths are typically identified for both continuous and pulsed sources. Richardson (1995) noted bowhead deflections at 35 km (21 mi) distance from a seismic survey airgun array source in the Alaskan Beaufort Sea, and estimated the corresponding exposure SPL between 125 and 133 dB re 1 μPa. Additionally, as noted earlier (Section 4.2.6), other studies also suggest that some portion of mysticetes may respond to seismic sources at received levels lower than 160 dB (potentially down to 120 dB) in a manner that NMFS would consider harassment, and therefore, we are currently considering revisions to the acoustic thresholds for behavioral harassment. Therefore, acoustic information will be presented pertaining to the occurrence of sound levels at threshold values of 190 dB, 180 dB, 160 dB and 120 dB re 1 μPa.

### 4.5.1.4.3    Acoustic Footprints of Airgun Sources

Airgun array sources generate impulsive sound with source levels typically exceeding 200 dB re 1 μPa @ 1m. The SSV measurements for the oil and gas programs listed in Table 4.5-8 have determined the distances at which certain sound level isopleths from airgun sources are reached. The common approach to determine threshold distances has been to fit smooth curves through broadband rms SPL measurements and then to select the distances at which the curves cross the thresholds (Warner et al. 2008). Conservative estimates of the distances are obtained by shifting the best-fit curves upward in level so they exceed 90 percent of the measurement data values. The distances determined from the shifted curves are referred to as 90th percentile distances. Most of the measurements of airgun array sources have sampled sound levels in both the endfire direction (parallel to airgun array tow direction) and broadside direction (perpendicular to tow direction) to quantify direction-dependent sound emissions. Appendix G provides a summary of the airgun array measurements that have been performed for the programs listed in Table 4.5-9. Measured distances for sound, including seismic survey sound, change depending upon ambient conditions (e.g., wind, waves, salinity, temperature). Therefore, Appendix G provides a snapshot of one set of measurements taken at these sites rather than a static threshold.

The results in Appendix G exhibit variability of the measured levels, even when considering similar sources in the same primary acoustic environment. This can arise due to differences in the source geometry such as the layout of airguns in an array and the tow depth. The results are also dependent on the seafloor sediment types and the structure of the ocean sound speed profile, both factors that influence sound propagation. At present, there is not sufficient geoacoustic information available to quantify these differences and allow the primary acoustic environments to be further subdivided. Instead the measurements have been averaged to provide representative propagation ranges for each environment by size of source.

Representative distances to sound level thresholds of 190, 180, 160 and 120 dB re 1 μPa (rms) for airgun sources were obtained by averaging Appendix G results for offshore and coastal surveys, and are presented in Table 4.5-11. The averages are based on the 90th percentile measured distances and the maxima of broadside and endfire measurements where both directions are sampled. These distances were used to assess the direct and indirect acoustic effects zones from airgun sources for each action alternative.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement        4-52
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 21 of 92
Exhibit 19, page 31 of 92

**Table 4.5-11 Average distances to sound level thresholds from measurements listed in Appendix G for several airgun survey systems.**

The averages are based on 90th percentile distances, where available, and the maxima of broadside and endfire measurements are used where both directions were sampled.

| Array Volume (in$^3$) | Average distance (m) and standard deviation to sound levels (dB re 1 µPa; 90% rms SPL) based on 90th percentile fit | | | |
|---|---|---|---|---|
| | 190 | 180 | 160 | 120 |
| *Chukchi Sea Shelf, 25 to 50 m depth* | | | | |
| 10 | 13 (6) | 44 (10) | 506 (191) | 18380 (6801) |
| 20 | 26 (8) | 76 (10) | 710 (177) | 20333 (4643) |
| 40 | <10 (-) | 76 (-) | 1360 (-) | 41100 (-) |
| 60 | 37 (10) | 127 (26) | 1320 (397) | 27200 (3544) |
| 105 | 10 (3) | 56 (13) | 1550 (50) | 43000 (17000) |
| 1049 | 62 (-) | 179 (-) | 1449 (-) | 30988 (-) |
| ~3200 | 420 (-) | 1350 (-) | 3240 (-) | 61400 (-) |
| *Beaufort Sea Shelf, ≥15 m depth* | | | | |
| 10 | 21 (23) | 53 (48) | 401 (135) | 12710 (3340) |
| 20 | 17 (17) | 54 (41) | 729 (199) | 17475 (5197) |
| 30 | 8 (5) | 30 (22) | 1180 (188) | 24600 (490) |
| 40 | 24 (-) | 158 (-) | 1602 (-) | 9221 (-) |
| 70 | 24 (1) | 84 (10) | 1051 (310) | 27670 (24330) |
| 280 | 89 (-) | 250 (-) | 1750 (-) | 22220 (-) |
| 320 | 360 (-) | 1134 (-) | 4265 (-) | 13313 (-) |
| 640 | 516 (-) | 1386 (-) | 4616 (-) | 14163 (-) |
| 3147 | 889 (32) | 2573 (328) | 11453 (1953) | 74813 (-) |
| 4380 | 341 (54) | 1770 (520) | 12480 (6220) | 96450 (34550) |
| *Beaufort Coastal, <15 m depth* | | | | |
| 10 | 54 (-) | 188 (-) | 1049 (-) | n/a |
| 20 | 52 (31) | 139 (53) | 833 (175) | 6525 (4275) |
| 40 | 147 (9) | 263 (30) | 1016 (83) | 3242 (-) |
| 320 | 260 (-) | 472 (-) | 1545 (-) | 16598 (-) |
| 320 | 195 (-) | 635 (-) | 1818 (-) | n/a |
| 880 | 225 (45) | 485 (90) | 2225 (1021) | 14500 (7015) |

A dash (-) signifies that only one data point was available and standard deviation could not be calculated.

#### 4.5.1.4.4    Acoustic Footprints of Non-Airgun Sources

The non-airgun sources of Alternative 2 include seismic vessels, support vessels, drill rigs (drillships and jack-up rigs) and on-ice surveys using vibroseis. Site clearance surveys also employ high-resolution acoustic sources including multibeam and sidescan sonars, echosounders and sub-bottom profilers. The majority of these sources do not ensonify areas where sound levels exceed NMFS' injury thresholds. However, they may produce sound levels that exceed NMFS' continuous and/or pulsed noise thresholds for marine mammal disturbance (i.e., Level B harassment). Sound source noise emissions are discussed here, and representative distances to the 120 dB re 1 µPa threshold are summarized in Table 4.5-12. This table only presents a representative sample, and other vessels will likely have different sound propagation characteristics.

Support vessel operations in the Beaufort and Chukchi Shelf environments may, depending on the type of vessels employed, individually generate 120 dB re 1 µPa zones extending approximately 1 km to 5.4 km (0.6 to 4 mi) (Chorney et al. 2010). For reference, open water ambient noise levels in the Chukchi Sea in

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement     4-53
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 32 of 92
Exhibit 19, page 32 of 92

the 10 Hz to 24 kHz frequency band can fall below 100 dB re 1 μPa (Fig 3.19 in O'Neill et al. 2010). Noise generated by research vessel *Mt. Mitchell*, transiting at 10 knots over the Burger prospect during Shell's 2010 Geotechnical Survey, reached 120 dB re 1 μPa at 1.6 km distance. Its sound emission levels increased when operating in dynamic positioning (DP) mode, and the estimated distance to 120 dB re 1 μPa increased to 5.6 km (Chorney et al. 2010).Vessel operations in the shallower coastal areas of the Beaufort Sea produce smaller noise footprints due to reduced low frequency sound propagation in shallower water. Acoustic measurements of nine vessels, including two source vessels, three cable lay vessels, and two crew-change/support vessels were made in 9 m water depth during the Eni/PGS 2008 OBC project (Warner et al. 2008). Their 120 dB re 1 μPa threshold distances ranged from 280 m, for a cable lay vessel to 1,300 m (0.8 mi) for a crew change vessel. The average distance was 718 m (0.43 mi), and that value is considered as representative for support vessels in coastal operations.

Drillship sound levels are discussed in Section 2.3.3. An initial estimate of the 120 dB re 1 μPa threshold distance for drilling from a drillship was based on the source level measurements of the drillship *Noble Discoverer* made in 2009 in the South China Sea (Austin and Warner 2010). Those measurements indicated drilling source levels from 178.5 to 185.4 dB re 1 μPa@1m (10 Hz to 24 kHz). Based on that information, acoustic modeling using Marine Operations Noise Model (MONM, JASCO Applied Sciences) estimated the 120 dB re 1 μPa threshold distance at between 1.5 and 2 km (0.9 and 1.2 mi). Subsequently, Shell's 2012 drilling program SSC measurements were reported in their 2012 90-day report (Austin et al., 2012). Drilling of a 26" diameter hole at Shell's Burger-A site in the Chukchi Sea with no other vessels nearby produced a source level of 181 dB re 1μPa@1m and resulted in a 120 dB re 1 μPa distance of 1.5 km. Drilling with a support vessel alongside increased the distance to 2.7 km. The measurements also included short-term auxiliary activities, including excavation of mudline cellar using an auger style drill system, ice management with an icebreaker, and anchor connections involving use of a tug (*Tor Viking*) to attach cables from the drillship to anchors set on the seafloor to hold the *Noble Discoverer* in place. A summary of measurements for these activities is provided in Table 4.5-12.

Shell's drilling project in the Chukchi Sea in 2015 involved two drill ships and more than ten support vessels. A summary of measurement results from drilling at their Burger J prospect using the semi-submersible drillship *Polar Pioneer*, is given in Table 4.5-13.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement     4-54
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/19   Page 22 of 32
Exhibit 19, page 33 of 92

**Table 4.5-12 Sound level threshold distances for drilling by *Noble Discoverer* and related ancillary activities in the Chukchi Sea during Shell's 2012 drill program. Reproduced from Shell's 2013 program Comprehensive Report.**

| Drill Site Activity | rms SPL Threshold Radii (m) | | | |
|---|---|---|---|---|
| | 190 dB re 1 µPa | 180 dB re 1 µPa | 160 dB re 1 µPa | 120 dB re 1 µPa |
| Drilling 26" hole with *MSV Fennica* on DP alongside* | <10 | <10 | 11 | 2687 |
| Drilling 26" hole (no ancillary vessels) | < 10 | < 10 | < 10 | 1500 |
| Drilling of mudline cellar** | < 10 | <10 | 71 | 8159 |
| Ice management | < 10 | < 10 | 60 | 9600** |
| Anchor connection | <10 | 20 | 178 | 14,069** |

\* *MSV Fennica* is a 116 m (381-foot) multipurpose icebreaker and supply vessel.
\*\* Extrapolated from maximum measurement range of 8200 m.

**Table 4.5-13 Sound level threshold distances for drilling by *Polar Pioneer* and related ancillary activities in the Chukchi Sea during Shell's 2015 drill program. Reproduced from Shell's 2015 program 90-Day Report.**

| Activity | rms SPL threshold distances (m) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 190 dB re 1 µPa | | 180 dB re 1 µPa | | 160 dB re 1 µPa | | 120 dB re 1 µPa | |
| | Best fit | 90% fit | Best fit | 90% fit | Best fit | 90% fit | Best fit | 90% fit |
| Circulating1 | 0* | 0* | 0* | 0* | 0* | 0* | 870 | 1,150 |
| Running casing1 | 0* | 0* | <10* | <10* | <10* | <10* | 1,330 | 1,750 |
| Drilling1 | 0* | 0* | 0* | 0* | 0* | 0* | 2,950 | 6,150 |
| MLC construction1 | <10* | <10* | <10* | <10* | 40* | 40* | 19,050* | 20,880* |
| Anchor handling2 | <10** | <10** | <10** | <10** | 40** | 60** | 9,730** | 11,140** |

\*Extrapolated inside of or beyond measurement range from 0.5 km to 16 km.
\*\* Extrapolated inside of or beyond measurement range from 0.1 km to 2.1 km.
1 Measured at Burger J site
2 Measured at Burger V site

Shell's 2015 acoustic analysis also considered the aggregate area ensonified above 120 dB re 1 uPa on a continuous basis due to noise from drilling and all of their support vessels was on average 1264 km². This area corresponds to a circle of radius 20.1 km, although the actual shape of the area depends on support vessel location distribution.

Jack-up drill rigs produce lower level of sounds than vessels as the support legs do not effectively transmit vibrations from on-rig equipment into the water. For the purpose of this evaluation, the 120 dB re 1 µPa threshold distance is based on modeled noise levels predicted by a noise model prediction made for a 2014 exploration drilling program contemplated by ConocoPhillips (O'Neill et al. 2012). This modeling assumed a broadband source level of 167 dB re 1 µPa@1m and estimated the 120 dB re 1 µPa threshold distance at 210 m (689 ft.).

Sounds from on-ice vibroseis systems are discussed in Section 2.3.2. Vibroseis source pressure waveforms are typically frequency sweeps below 100 Hz, though strong harmonics may exist to 1.5 kHz, and with signal durations of 5 to 20 seconds. They are presently categorized as continuous-type sounds (Richardson et al. 1995). The measurement of on-ice vibroseis source levels in shallow water is complicated by interference from bottom and surface reflections, and as a consequence there is considerable variability in the published source levels. Holliday measured an on-ice vibroseis source level of 187 dB re 1 µPa@1m, with bandwidth 10 to 70 Hz (Holliday et al. 1984 as discussed in Richardson et al. 1995). While this source level is several decibels higher than those of vessels, its low operating

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-55
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 34 of 92
Exhibit 19, page 34 of 92

frequency will lead to shorter horizontal propagation distances. It is expected the maximum levels will be similar to or less than those from the larger vessels. The largest 120 dB re 1 μPa threshold distance for vessels in the Eni/PGS 2008 OBC study was 1,300 m (0.8 mi). That distance is assumed for the vibroseis in this analysis.

The measurements referenced in the preceding discussion are summarized in Table 4.5-14a, providing the expected distances to the 120 dB disturbance threshold for each non-airgun source. These values are used in the impact assessments that follow for each alternative.

**Table 4.5-14a Examples of measured distances to
120 dB re 1 μPa for non-airgun sources, from discussion above**

| Source Type | Distance to
120 dB re 1 μPa |
|---|---|
| Drillship alone | 2-6 km (1.2-3.6 mi) |
| Jack-up rig alone | 210 m (689 ft.) |
| Support Vessel in Offshore Operation | 1.6 km (1 mi) |
| Drillship with support vessel fleet | 20.1 km (12.5 mi) |
| Support Vessel in Coastal Operation | 0.72 km (0.43 mi) |
| On-ice vibroseis | 1.3 km (0.78 mi) |

### 4.5.1.4.5    Direct and Indirect Effects

Under Alternative 2, underwater noise levels will increase in the vicinity of seismic survey and support vessels, drill rigs, and airgun sources. The effects considered here are based on the current NMFS rms sound level thresholds for PTS (auditory injury) and disturbance that were discussed above.

#### *Estimates of Total Surface Areas of Ensonification at Threshold Levels*

Table 4.5-14a contains estimates of surface areas ensonified above given threshold levels under Alternative 2 based on the ranges provided in Appendix G. For the purpose of computing these notional areas, the seismic survey activities listed in Table 4.2-1 for Activity Level 1 are distributed among the three environments considered in this EIS. The three 2D/3D surveys and three site clearance or high resolution shallow hazards surveys in the Chukchi Sea are all assumed to be in the mid-depth shelf region; the four exploration surveys and three site clearance or high resolution shallow hazards surveys in the Beaufort Sea are divided between the mid-depth shelf and the shallow-depth coastal regions in the proportions of 3:1 and 2:1 respectively (giving greater representation to the shelf region makes the estimates more precautionary). The source array sizes in the three zones reflect the prevailing configurations for seismic surveys conducted in each region. The percentages are based on nominal surface areas of 263,500 km$^2$ for the Chukchi Sea portion of the EIS project area and 255,350 km$^2$ for the Beaufort portion. Of note, the total surface areas do not subtract out either overlap with other isopleths of concurrent source operation or land area where activities are closer to shore. For that reason, the area ensonified over 120 dB re 1 μPa is likely an overestimate (see Figures 4.7 through 4.12 illustrating conceptual examples). Also of note is that Tables 4.5-14 a-c provide percentages of EIS areas ensonified above 120 dB re 1 μPa for all sources (seismic and drilling/support vessel) and separately for just drilling/support vessels. The latter value is used for assessing Alternatives in terms of magnitude of effect for behavioral disturbance because NMFS applies the 120 dB re 1 μPa threshold only to continuous-type noise sources; impulsive sounds from seismic surveys are evaluated with the 160 dB re 1 μPa threshold. The former (area above 120dB for all sources including seismic) is included to be generally illustrative

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-56
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 25 of 35
Exhibit 19, page 35 of 92

October 2016

and to inform the magnitude of effects on the acoustic environment and acoustic habitat (i.e., animals will hear seismic at these levels and the potential to mask acoustic cues exists).

**Table 4.5-14b Total Surface Areas (km$^2$) Ensonified Above Sound Level Thresholds Under Alternative 2, From Average Distances Listed in Table 4.5-11 and 4.5-14a**

|  | Total Surface Area (km²) to sound level (dB re 1 µPa; 90% rms SPL) | | | |
|---|---|---|---|---|
|  | **190** | **180** | **160** | **120** |
| *Chukchi Sea Shelf, 25 to 50 m depth* | | | | |
| 3 x ~3200 in³ | 2.64 | 26.6 | 1010 | 81398 |
| 3 x 40 in³ | 0.01 | 0.15 | 16.4 | 6973 |
| 1 x drill/support* | | | | 1264 |
| **% Chukchi (all sources)** | **0.00%** | **0.01%** | **0.39%** | **34.02%** |
| **% Chukchi (drill/support* only)** | | | | **0.48%** |
| *Beaufort Sea Shelf, ≥15 m depth* | | | | |
| 3 x ~3200 in³ | 7.44 | 62.4 | 1236 | 52750 |
| 2 x 20 in³ | 0.00 | 0.02 | 3.34 | 1919 |
| 1 x drill/support* | | | | 1264 |
| *Beaufort Coastal, <15 m depth* | | | | |
| 1 x 880 in³ | 0.16 | 0.74 | 15.6 | 661 |
| 1 x 20 in³ | 0.01 | 0.06 | 2.18 | 134 |
| **% Beaufort (all sources)** | **0.00%** | **0.02%** | **0.49%** | **22.22%** |
| **% Beaufort (drill/support* only)** | | | | **0.50%** |
| *Entire Region* | | | | |
| all sources | 10.26 | 89.9 | 2283 | 146362 |
| **% EIS area (all sources)** | **0.00%** | **0.02%** | **0.44%** | **28.21%** |
| **% EIS area (drill/support* only)** | | | | **0.49%** |

*drill/support indicates the combined area ensonified by a drillship and all support vessels.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement        4-57
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 36 of 92
Exhibit 19, page 36 of 92

**Table 4.5-14c Total Surface Areas (km²) Ensonified Above Sound Level Thresholds Under Alternative 3, From Average Distances Listed in Table 4.5-11 and 4.5-14a**

| | | Total Surface Area (km²) to sound level (dB re 1 µPa; 90% rms SPL) | | | |
|---|---|---|---|---|---|
| | | 190 | 180 | 160 | 120 |
| *Chukchi Sea Shelf, 25 to 50 m depth* | | | | | |
| | 5 x ~3200 in³ | 4.39 | 44.33 | 1682.60 | 135663.59 |
| | 5 x 40 in³ | 0.02 | 0.25 | 27.37 | 11621.38 |
| | 2 x drill/support* | | | | 2528 |
| | **% Chukchi (all sources)** | **0.00%** | **0.02%** | **0.65%** | 56.86% |
| | **% Chukchi (drill/support* only)** | | | | **0.96%** |
| *Beaufort Sea Shelf, ≥15 m depth* | | | | | |
| | 4 x ~3200 in³ | 9.92 | 83.16 | 1648.20 | 70333.79 |
| | 3 x 20 in³ | 0.00 | 0.03 | 5.01 | 2878.10 |
| | 2 x drill/support* | | | | 2528 |
| *Beaufort Coastal, <15 m depth* | | | | | |
| | 2 x 880 in³ | 0.32 | 1.48 | 31.11 | 1321.04 |
| | 2 x 20 in³ | 0.02 | 0.12 | 4.35 | 267.51 |
| | **% Beaufort (all sources)** | **0.00%** | **0.03%** | **0.66%** | 30.28% |
| | **% Beaufort (drill/support* only)** | | | | **0.99%** |
| *Entire Region* | | | | | |
| | all sources | 14.67 | 129.4 | 3399 | 227141 |
| | **% EIS area (all sources)** | **0.00%** | **0.02%** | **0.66%** | 43.78% |
| | **% EIS area (drill/support* only)** | | | | **0.97%** |

*drill/support indicates the combined area ensonified by a drillship and all support vessels.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement     4-58
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG    Document 51-19    Filed 06/10/19    Page 37 of 92
Exhibit 19, page 37 of 92

October 2016

**Table 4.5-14d Total Surface Areas (km$^2$) Ensonified Above Sound Level Thresholds Under Alternative 4, 5, and 6, From Average Distances Listed in Table 4.5-11 and 4.5-14a**

| | | Total Surface Area (km²) to sound level (dB re 1 µPa; 90% rms SPL) | | | |
| --- | --- | --- | --- | --- | --- |
| | | **190** | **180** | **160** | **120** |
| *Chukchi Sea Shelf, 25 to 50 m depth* | | | | | |
| | 5 x ~3200 in³ | 4.39 | 44.33 | 1682.60 | 135663.59 |
| | 5 x 40 in³ | 0.02 | 0.25 | 27.37 | 11621.38 |
| | 4 x drill/support* | | | | 5056 |
| | **% Chukchi (all sources)** | **0.00%** | **0.02%** | **0.65%** | 57.81% |
| | **% Chukchi (drill/support* only)** | | | | **1.92%** |
| *Beaufort Sea Shelf, ≥15 m depth* | | | | | |
| | 4 x ~3200 in³ | 9.92 | 83.16 | 1648.20 | 70333.79 |
| | 3 x 20 in³ | 0.00 | 0.03 | 5.01 | 2878.10 |
| | 4 x drill/support* | | | | 5056 |
| *Beaufort Coastal, <15 m depth* | | | | | |
| | 2 x 880 in³ | 0.32 | 1.48 | 31.11 | 1321.04 |
| | 2 x 20 in³ | 0.02 | 0.12 | 4.35 | 267.51 |
| | **% Beaufort (all sources)** | **0.00%** | **0.03%** | **0.66%** | 31.27% |
| | **% Beaufort (drill/support* only)** | | | | **1.98%** |
| *Entire Region* | | | | | |
| | all sources | 14.67 | 129.4 | 3399 | 232197 |
| | **% EIS area (all sources)** | **0.00%** | **0.02%** | **0.66%** | 44.75% |
| | **% EIS area (drill/support* only)** | | | | **1.95%** |

*drill/support indicates the combined area ensonified by a drillship and all support vessels.

#### 4.5.1.4.6      Conclusion

Alternative 2 presents the lowest activity level analyzed of the alternatives, but it represents an increase in activity above current levels of activity in the EIS project area. The distances to PTS thresholds are given in Appendix G (summarized in Table 4.5-11) for deep penetration airgun array sources and shallow hazards sources. The 180 dB re 1 µPa distance for deep penetration seismic sources extends out to 2,570 m for 2D and 3D surveys on the Beaufort Shelf based on measurements of 3147 in$^3$ arrays. All of the sound sources associated with Alternative 2 will ensonify nearby areas above the current marine mammal disturbance threshold of 120 dB re 1 µPa for continuous noise and 160 dB re 1 µPa (90 percent rms) for impulsive noise. Estimated distances to these thresholds for seismic airgun sources are given in Table 4.5-11 and for all other sources in Table 4.5-13a, b, c,. The largest expected distance to the 160 dB re 1 µPa disturbance threshold for airgun sources is 11.4 km (6.8 mi), and to the 120 dB re 1 µPa continuous SPL for non-airgun sources it is the drillship at 10 km (6 mi). The maximum measured 120 dB re 1 µPa radius from airgun sources is 167 km (104 mi) (Austin and Laurinolli, 2007), but the average distance for recent 3-D surveys in the Beaufort and Chukchi Sea is 95 km (59 mi) (Table 4.5-11). The relevance of these disturbance zones to specific marine mammal species is discussed in Sections 4.5.2.4.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-59
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 36 of 38
Exhibit 19, page 36 of 92

Separately, modeled chronic and aggregate effects on acoustic habitat from July through mid-October were substantial at several modeled sites in the Beaufort Sea, with losses of up to 98% of the broadband listening area for mid- and low frequency species and up to 20% of bowhead whale communication space (see Section 4.5.2.4.9 for full explanation of the acoustic habitat analysis). The relevance of these modeled results to specific marine mammal species and their acoustic habitat is discussed in Section 4.5.2.4.

The intensity rating of this alternative is high, as additional exploration activities will introduce sound sources with levels that exceed 200 dB re 1 μPa. Because the exploration activities could continue for several months over successive years, the duration is considered long-term. The spatial extent of these activities is regional, since the distribution of exploration activities over the EIS project area will lead to 25 percent of the EIS project area being exposed to sound levels in excess of 120 dB re 1 μPa. Therefore, the overall impact rating for direct and indirect effects to the acoustic environment under Alternative 2 would be moderate.

### 4.5.1.5    Water Quality

The EPA has the authority to regulate discharges of pollutants to federal waters of the Beaufort and Chukchi seas under the NPDES program. ADEC has the authority to regulate discharges of pollutants to state waters of the Beaufort and Chukchi seas under the APDES program. Wastewater generated from activities within the EIS project area would be discharged in accordance with the conditions of the applicable NPDES and/or APDES permits, as described in Section 3.1.5.1.

The water quality parameters most likely to be affected by the activities described in the alternatives fall into four categories: temperature and salinity; turbidity and total suspended solids; dissolved metals; and hydrocarbons and other organic contaminants. There are many additional metrics for water quality that could be applied to the EIS project area (e.g., pH, fecal coliform counts, residual chlorine concentrations), but considering the nature of the activities described in the alternatives, these four categories encompass the water quality parameters most likely to reflect the potential effects of the alternatives on long-term productivity and sustainability of valued ecosystem components.

The actions proposed in Alternatives 2, 3, 4, and 5 are defined by four action components and various combinations of mitigation measures. The action components are: seismic surveys, site clearance and shallow hazards surveys, on-ice seismic surveys, and exploratory drilling programs, which are described in detail in Chapter 2 of this EIS. The water quality effects of each action component are analyzed separately for each alternative. Overall, seismic surveys, site clearance and shallow hazards surveys, and on-ice seismic surveys are expected to have negligible impacts on water quality. Effects of exploratory drilling on water quality would depend upon the specific techniques used for exploratory drilling, the location of the activity, and mitigation measures implemented, such as reduced discharge and seasonal prohibitions. For example, construction of gravel artificial islands in nearshore waters would result in different impacts to water quality than would drilling from a floating vessel or a jackup rig in OCS waters (see Section 2.3.3).

In any case, exploratory drilling programs would involve discharges to the marine environment that could result in adverse impacts to water quality. The transport, dispersion, and persistence of materials discharged into the marine environment from exploratory drilling operations have been previously evaluated for several areas of the Alaska Arctic OCS. The general conclusions reached in these studies regarding the transport, dispersion, and persistence of drilling discharges are discussed below (from EPA 2006b):

> *The drilling mud discharge separates into an upper and lower plume. Physical descriptions of effluent dynamics and particle transport differ substantially for the two plumes. Drill cuttings (parent material from the drill hole) are generally coarse materials that are deposited rapidly following discharge and settle within the 100-m radius mixing zone. Discharged drilling*

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement    4-60
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 29 of 92
Exhibit 19, page 29 of 92

*Habitat Changes/Contamination*

Seismic airguns may affect invertebrates and fish (prey species used by birds). However there are very few effects on invertebrates and fish from the airgun noise unless they are within a few feet of the sound source (McCauly 1994). These disturbance effects are highly local and transient and not likely to decrease the availability of prey to any bird species. See Section 4.5.2.2 for effects on fish and Section 4.5.2.1 for effects on lower trophic level species.

Exploratory drilling could directly affect a very small area of benthic habitat with increased turbidity and discharge of drilling cuttings. Given the very small number of sites involved in exploratory drilling under Alternative 2 and the temporary nature of the habitat disturbance, the potential for effects on any bird species is considered negligible.

### 4.5.2.3.2    Mitigation Measures

Standard mitigation measures could reduce adverse impacts to marine and coastal birds (see Sections 2.4.10 or 4.5.2.4.16 or Appendix E for detail). This includes aircraft flight paths and altitude restrictions to reduce the chance of disturbing marine and coastal birds. Additionally, in order to help avoid causing bird collisions with seismic survey and support vessels, BOEM may require that those vessels minimize the use of high-intensity work lights, especially within the 20-m-bathymetric contour.

Most of the additional mitigation measures considered in this EIS would not appreciably reduce potentially adverse effects on birds except for Additional Mitigation Measures C3 and C4. These two measures would reduce the risk of contamination from discharges and drilling muds, although the reduction in adverse effects relative to the standard mitigation measures would be limited to small numbers of birds and small areas of benthic habitat. Additional mitigation measures are not required under any of the alternatives and do not affect the summary conclusion below.

### 4.5.2.3.3    Conclusion

Marine and coastal birds are legally protected under the MBTA and two are protected under the ESA. Birds fulfill important ecological roles in the Arctic and are considered to be important or unique resources in a NEPA perspective. In the absence of a large oil spill, the effects of disturbance, injury/mortality, and changes in habitat for marine and coastal birds would likely be temporary, local, and not likely to have population-level effects for any species. The overall effects of oil and gas exploration activities authorized under Alternative 2 on marine and coastal birds would be considered minor according to the impact criteria in Table 4.5-16. Conclusions about impacts to birds in the event of a large oil spill are described in Sections 4.10.6.10 and 4.10.7.10. Impacts are anticipated to be reduced based on the mitigation measures required by BOEM in G&G permits (see Appendix E).

### 4.5.2.4    Marine Mammals

Noise exposure, habitat degradation, and vessel activity (potentially causing displacement from preferred habitats or, though very unlikely, ship strikes) are the primary mechanisms by which activities associated with oil and gas exploration in the Beaufort and Chukchi Seas could directly or indirectly affect marine mammals. The impacts of anthropogenic noise on marine mammals has been summarized in numerous articles and reports including Richardson et al. (1995), Cato et al. (2004), NRC (2003, 2005), Southall et al. (2007), Nowacek et al. (2007), and Weilgart (2007). The following introduction to general effects of noise from oil and gas exploration activities on marine mammals is drawn largely from these and other available literature. Impacts specific to the marine mammal species of interest in the EIS project area are discussed and evaluated separately. Because the occurrence of a large oil spill is a highly unlikely event, it is not part of the proposed action for any alternative. However, in the highly unlikely event a large spill were to occur, it could result in adverse impacts on marine mammals discussed in this section. The oil

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-88
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/18   Page 110 of 214
Exhibit 19, page 40 of 92

spill analysis is not contained in the sections that analyze direct and indirect effects of the alternatives on marine mammals; rather, it is discussed and analyzed separately in Section 4.10 of this EIS.

In this section of the EIS, a general discussion of the potential effects of the various activities on marine mammals is presented first. Following this general discussion, more specific examples and information are presented for the different species or marine mammal groups, where available. Finally, an analysis of the standard and additional mitigation measures is presented for each species or group of marine mammals, as well as analysis for mitigation measures dismissed from further implementation consideration. The impact criteria for marine mammals are outlined for magnitude or intensity, duration, extent, and context in Table 4.5-18.

### Table 4.5-18 Impact Criteria for Marine Mammals

| Type of effect | Impact Component | | Effects Summary |
|---|---|---|---|
| **Behavioral disturbance** | **Magnitude or Intensity** | Low | Changes in behavior due to exploration activity may not be noticeable; animals remain in the vicinity; Level B take of marine mammals is not anticipated |
| | | Medium | Noticeable change in behavior due to exploration activity; animals move away from activity area; Level B take of marine mammals expected, number of individuals taken is less than 30% of population |
| | | High | Level B take of more than 30% of the individuals in the population expected |
| | **Duration** | Temporary | Temporary effect that lasts days to 1 month |
| | | Interim | Temporary effect that lasts 1 to 6 months. Impacts would be frequent or extend for longer time periods (an entire project season). |
| | | Long-term | Effects that last more than 6 months (i.e., one season) in a given year or multi-month effects that recur over multiple successive years. |
| | **Geographic Extent** | Local | Impacts limited geographically; <10% of EIS project area affected |
| | | Regional | Affects resources beyond a local area, potentially throughout the EIS project area |
| | | State-wide | Affects resources beyond the EIS project area |
| | **Context** | Common | Affects usual or ordinary resources in the EIS project area; species are not listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA; impacts *will not* occur in times or areas of specific importance for affected species (e.g., feeding, calving areas, migratory corridor) or across a large portion of the range of a resident population |
| | | Important | 1) Species are listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA but do not also have impacts to important areas, OR 2) Species are *not* listed in this manner, but species abundance trend is declining or, impacts *will* occur in times or areas of specific importance for affected species (e.g., feeding, calving areas, migratory corridor) or across a large portion of the range of a resident population. |
| | | Unique | 1) Species are listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA and; impacts *will* occur in times or areas of specific importance for affected species (e.g., feeding, calving areas, migratory corridor) or across a large portion of the range of a resident population OR 2) Species is not listed, but species is declining and impacts will occur in areas of specific importance. |
| **Injury and mortality** | **Magnitude or Intensity** | Low | No noticeable incidents of injury or mortality |
| | | Medium | Few injuries may occur |
| | | High | Incident of mortality or multiple incidences of injury |
| | **Duration** | Temporary | Injury to affected animal(s) lasts days to 1 month; animal reverts back to pre-activity condition once healed from injury |
| | | Interim | Incidences of injury of affected animal(s) lasts 1 to 6 months; animal reverts back to pre-activity condition once healed from injury |
| | | Long-term | Mortality of animal(s) or incidences of injury persist for more than 6 months; Injury is permanent in some cases |
| | **Geographic Extent** | Local | Impacts local; would not extend to a broad region or sector of the population |
| | | Regional | Impacts would occur beyond a local area |
| | | State-wide | Affects resources beyond the region or EIS project area |

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement
Chapter 4 – Environmental Consequences
4-89

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/06/19   Page 41 of 92
Exhibit 19, page 41 of 92

| Type of effect | Impact Component | | Effects Summary |
|---|---|---|---|
| | **Context** | **Common** | Affects usual or ordinary resources in the EIS project area; species are not listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA |
| | | **Important** | Species is listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA but the population is stable or increasing |
| | | **Unique** | Species are listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA and the population is decreasing |
| **Habitat alterations** | **Magnitude or Intensity** | **Low** | Changes in resource character may not be measurable or noticeable |
| | | **Medium** | Noticeable changes in resource character |
| | | **High** | Acute or obvious changes in resource character |
| | **Duration** | **Temporary** | Habitat would be impacted for days to 1 month; no permanent changes to habitat |
| | | **Interim** | Habitat would be impacted from 1 to 6 months; minimal, temporary alterations to marine mammal habitat |
| | | **Long-term** | Habitat would be impacted for more than 6 months (i.e., one season); potential for permanent changes to marine mammal habitat |
| | **Geographic Extent** | **Local** | Impacts limited geographically; <10% of EIS project area affected |
| | | **Regional** | Affects resources beyond a local area, potentially throughout the EIS project area |
| | | **State-wide** | Affects resources beyond the region or EIS project area |
| | **Context** | **Common** | Affects usual or ordinary resources in the EIS project area; species are not listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA |
| | | **Important** | 1) Species are listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA but do not also have impacts to important areas, OR 2) Species are *not* listed in this manner, but species abundance trend is declining or, impacts *will* occur in times or areas of specific importance for affected species (e.g., feeding, calving areas, migratory corridor) or across a large portion of the range of a resident population. |
| | | **Unique** | 1) Species are listed as threatened or endangered (or proposed for listing) under the ESA and/or as depleted under the MMPA and; impacts *will* occur in times or areas of specific importance for affected species (e.g., feeding, calving areas, migratory corridor) or across a large portion of the range of a resident population OR 2) Species is not listed, but species is declining and impacts will occur in areas of specific importance. |

## 4.5.2.4.1    General Effects of Noise on Marine Mammals

Marine mammals use hearing and sound transmission to perform vital life functions. Sound (hearing and vocalization/echolocation) serves four primary functions for marine mammals, including: (1) providing information about their environment; (2) communication; (3) prey detection; and (4) predator detection. Introducing sound into the ocean environment could disrupt those functions. The distance from oil and gas exploration activities at which noises are audible depends upon source levels, frequency, ambient noise levels, the propagation characteristics of the environment, and sensitivity of the receptor (Richardson et al. 1995, Nowacek et al. 2007).

In assessing potential effects of noise, Richardson et al. (1995) suggested four criteria for defining zones of influence:

*Zone of audibility* – the area within which the marine mammal might hear the noise. Marine mammals as a group have functional hearing ranges of 10 Hz to 180 kHz, with best thresholds near 40 dB (Ketten 1998, Kastak et al. 2005, Southall et al. 2007). These data show reasonably consistent patterns of hearing sensitivity within each of four groups: small odontocetes (such as the harbor porpoise), medium-sized odontocetes (such as the beluga and killer whales), large cetaceans (such as bowhead whales), and pinnipeds.

*Zone of responsiveness* – the area within which the animal reacts behaviorally or physiologically. The behavioral responses of marine mammals to sound depend on: 1) the acoustic characteristics

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-90
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/16/19   Page 42 of 92

Exhibit 19, page 42 of 92

of the noise source; 2) the physical and behavioral state of animals at time of exposure; 3) the ambient acoustic and ecological characteristics of the environment; and 4) the context of the sound (e.g., whether it sounds similar to a predator) (Richardson et al. 1995, Southall et al. 2007). Temporary behavioral effects, however, often merely show that an animal heard a sound and may not indicate lasting consequences for exposed individuals (Southall et al. 2007). Additionally, in the context of the MMPA, not all responses will rise to the level of a "take;" however, NMFS recognizes some responses in certain situations can rise to this level (Southall et al. 2013).

**Zone of masking** – the area within which the noise may interfere with detection of other sounds, including communication calls, prey sounds, or other environmental sounds.

**Zone of hearing loss, discomfort, or injury** – the area within which the received sound level is potentially high enough to cause discomfort or tissue damage to auditory or other systems. This includes temporary threshold shifts (TTS, temporary loss in hearing) or permanent threshold shifts (PTS, permanent loss in hearing at specific frequencies or deafness). Non-auditory physiological effects or injuries that theoretically might occur in marine mammals exposed to strong underwater sound include stress, neurological effects, bubble formation, resonance effects, and other types of organ or tissue damage.

## 4.5.2.4.2    Potential Effects of Noise from Airguns

The effects of airgun noise on marine mammals could include one or more of the following: tolerance; masking of natural sounds; behavioral disturbance; temporary or permanent hearing impairment; or non-auditory physical or physiological effects (Richardson et al. 1995, Gordon et al. 2004, Nowacek et al. 2007, Southall et al. 2007). The effects of noise on marine mammals are highly variable, often depending on species and contextual factors (Ellison et al. 2012, Richardson et al. 1995).

### Tolerance

Richardson et al. (1995) defined tolerance as the occurrence of marine mammals in areas where they are exposed to human activities or manmade noise. In many cases, tolerance develops by the animal habituating to the stimulus (i.e., the gradual waning of responses to a repeated or ongoing stimulus), but because of ecological or physiological requirements, many marine animals may need to remain in areas where they are exposed to chronic stimuli (Richardson et al. 1995). Pulsed sounds from airguns are often detectable in the water at distances of tens of kilometers, without necessarily eliciting behavioral responses. Numerous studies have shown that marine mammals at distances over a few kilometers from operating seismic vessels may show no apparent response (Richardson et al. 1995). That is often true even when pulsed sounds must be readily audible to the animals based on measured received levels and the hearing sensitivity of that mammal group. Although various baleen whales, toothed whales, and (less frequently) pinnipeds have been shown to temporarily react behaviorally to airgun pulses under some conditions, at other times, marine mammals of all three types have shown no overt reactions (Richardson et al. 1995, Stone 2003, Stone and Tasker 2006, Moulton et al. 2005, MacLean and Koski 2005).

### Masking

Masking occurs when biologically meaningful sounds (e.g., communication, predator or prey detection, navigation, other environmental cues) are obscured by ambient or anthropogenic noise (Richardson et al. 1995, Clark et al. 2009). Introduced underwater sound will, through masking, reduce the effective communication distance of a marine mammal species if the frequency of the source is close to that used by the marine mammal and if the anthropogenic sound is present for a substantial period of time (Richardson et al. 1995).

Marine mammals are highly dependent on sound, and their ability to recognize sound signals amid other noise is important in communication, predator and prey detection, navigation and sensing other important environmental cues, and, in the case of toothed whales, echolocation. Even in the absence of manmade

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-91
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 113 of 92
Exhibit 19, page 43 of 92

sounds, the sea is usually noisy. Background ambient noise often interferes with or masks the ability of an animal to detect a sound signal even when that signal is above its absolute hearing threshold. Natural ambient noise includes contributions from wind, waves, precipitation, other animals, and (at frequencies above 30 kHz) thermal noise resulting from molecular agitation (Richardson et al. 1995). Based on autonomous acoustic recordings from September 2006 to June 2009 north of Barrow, Alaska, on the continental slope between the Beaufort and Chukchi Seas, mean monthly spectrum levels (selected to exclude impulsive events) show that months with open-water had the highest noise levels (80-83 dB re: 1 $\mu Pa^2/Hz$ at 20-50 Hz), months with ice coverage had lower spectral levels (70 dB at 50 Hz), and months with both ice cover and low wind speeds had the lowest noise levels (65 dB at 50 Hz). Background noise also can include sounds from human activities. Masking of natural sounds can result when human activities produce high levels of noise. Conversely, if the background level of underwater noise is high (e.g., on a day with strong wind and high waves), an anthropogenic noise source will not be detectable as far away as would be possible under quieter conditions and will itself be masked.

Although some degree of masking is inevitable when high levels of manmade broadband sounds are introduced into the sea, marine mammals have evolved systems and behavior that function to reduce the impacts of masking. Structured signals, such as the echolocation click sequences of small toothed whales, may be readily detected even in the presence of strong background noise because their frequency content and temporal features usually differ strongly from those of the background noise (Au and Moore 1988, 1990). The components of background noise that are similar in frequency to the sound signal in question primarily determine the degree of masking of that signal.

Redundancy and context can also facilitate detection of weak signals. These phenomena may help marine mammals detect weak sounds in the presence of natural or manmade noise. Most masking studies in marine mammals present the test signal and the masking noise from the same direction. The sound localization abilities of marine mammals suggest that, if signal and noise come from different directions, masking would not be as severe as the usual types of masking studies might suggest (Richardson et al. 1995). The dominant background noise may be highly directional if it comes from a particular anthropogenic source such as a ship or industrial site. Directional hearing may substantially reduce the masking effects of these noises by improving the effective signal-to-noise ratio. In the cases of high-frequency hearing by the beluga whale and killer whale, empirical evidence confirms that masking depends strongly on the relative directions of arrival of sound signals and the masking noise (Penner et al. 1986, Dubrovskiy 1990, Bain et al. 1993, Bain and Dahlheim 1994). Toothed whales and probably other marine mammals as well, have additional capabilities besides directional hearing that can facilitate detection of sounds in the presence of background noise. There is evidence that some toothed whales can shift the dominant frequencies of their echolocation signals from a frequency range with a lot of ambient noise toward frequencies with less noise (Au et al. 1974, 1985; Moore and Pawloski 1990; Thomas and Turl 1990; Romanenko and Kitain 1992; Lesage et al. 1999). A few marine mammal species are known to increase the source levels or alter the frequency of their calls in the presence of elevated sound levels (Dahlheim 1987; Au 1993; Lesage et al. 1993, 1999; Terhune 1999; Foote et al. 2004; Parks et al. 2007, 2009; Di Iorio and Clark 2009; Holt et al. 2009).

These data demonstrating adaptations for reduced masking pertain mainly to the very high frequency echolocation signals of toothed whales. There is less information about the existence of corresponding mechanisms at moderate or low frequencies or in other types of marine mammals. For example, Zaitseva et al. (1980) found that, for the bottlenose dolphin, the angular separation between a sound source and a masking noise source had little effect on the degree of masking when the sound frequency was 18 kHz, in contrast to the pronounced effect at higher frequencies. Directional hearing has been demonstrated at frequencies as low as 0.5 to 2 kHz in several marine mammals, including killer whales (Richardson et al. 1995). This ability may be useful in reducing masking at these frequencies. In summary, high levels of noise generated by anthropogenic activities may act to mask the detection of weaker biologically important sounds by some marine mammals. This masking may be more prominent for lower frequencies.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-92
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 44 of 92
Exhibit 19, page 44 of 92

For higher frequencies, such as that used in echolocation by toothed whales, several mechanisms are available that may allow them to reduce the effects of such masking.

Although there is little data describing the ultimate effects of masking on animals, there can be a measurable loss of communication space that would likely be of more concern for low-frequency species (mysticetes) from lower frequency sources, both because of the communication strategies used by mysticetes (they can communicate over 100s of kilometers for days) and the physical propagation properties of lower frequency sounds (less absorption). Analysis of distant (450 to 2800 km) seismic survey sounds and Antarctic blue and fin whale songs suggest that increased background noise levels decrease potential communication distances by 29 to 40 percent (Gedamke 2011). Vessel noise in a heavily trafficked region off New England may have diminished right whale communication space by an estimated 63 to 67 percent (Hatch et al. 2012). Some whales are known to continue calling in the presence of seismic pulses; however, observers typically note some proximity around the source within which the calls decrease in number or become less frequent (Richardson et al. 1986, McDonald et al. 1995, Greene et al. 1999, Nieukirk et al. 2004, Di Iorio and Clark 2009). Additionally, as described above, some marine mammals, such as the small toothed whales communicate within frequency bands that are quite different from the frequencies of background sounds. Marine mammals that are able to use directional hearing may also be less impacted by masking effects. The greatest limiting factor in estimating impacts of masking is a lack of understanding of the spatial and temporal scales over which marine mammals actually communicate, although some estimates of distance are possible using signal and receiver characteristics. Estimates of communication masking, however, depend on assumptions for which data are currently inadequate (Clark et al. 2009).

The *Cumulative Effects of Anthropogenic Underwater Sound on Marine Mammals* is a University of California project sponsored by British Petroleum (BP) for which an expert committee was convened and tasked with developing a model for systematically evaluating the potential effects of multiple sound sources. Although additional work is needed, the model provides a first step to better understanding the cumulative impacts of the sound sources associated with oil and gas exploration (Streever et al. 2012). After outlining a quantitative method, the committee conducted a trial to assess impacts to bowheads based broadly on operational conditions in the Alaskan Beaufort in September and October of 2008. The model results highlighted some of the limitations of the model, which primarily arose from the simplifying assumptions necessary due to the lack of empirical data. However, the model also illustrated how these types of tools can be used for improved, scenario-driven, evaluations of multiple-source sounds (e.g., to compare sound exposure or extra distance traveled off migration path given different individual sound avoidance strategies). Further, the committee recognized the complexities and resource cost of developing and implementing a quantitative model-based framework, and how they may constrain the regular use of such models. However, the committee continues to work on a more qualitative method for more routine use and also to further flesh out the quantitative method.

Through the process of developing this FEIS, commenters recommended that NMFS include a mechanism for better assessing the chronic and aggregate effects of the Alternatives explored in this EIS. NMFS designed and conducted such an analysis and Section 4.5.2.4.9 includes a description of the results and limitations of this first-order assessment. Results losses in broadband listening area and bowhead communication space at 10 specific receiver sites when averaged over July through mid-October.

### Disturbance Reactions

Reactions to sound, if any, depend on species, state of maturity, experience, current activity, reproductive state, time of day, environmental conditions, and many other factors (Richardson et al. 1995, Stone and Tasker 2006). Responses also depend on whether an animal is less likely (habituated) or more likely (sensitized) to respond to sound exposure (Southall et al. 2007). Responses to anthropogenic sounds are highly variable. Meaningful interpretation of behavioral responses should not only consider the relative

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-93
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 45 of 92
Exhibit 19, page 45 of 92

magnitude and severity of reactions but also the relevant acoustic, contextual variables (e.g., proximity, subject experience and motivation, duration, or recurrence of exposure), and ecological variables (Southall et al. 2007).

If a marine mammal reacts briefly to an underwater sound by minimally changing its behavior or moving a short distance, the impacts of the change are unlikely to be substantial to the individual and will not impact the stock or the species as a whole. However, if a sound source displaces marine mammals from an important feeding or breeding area for a prolonged period, impacts on the animals could be noteworthy. Data on short-term reactions (or lack of reactions) do not necessarily provide information about long-term effects. It is not known whether impulsive noises affect marine mammal reproductive rates or distribution and habitat use in subsequent days or years. However, the Western Arctic stock of bowhead whales has been increasing at approximately 3.7 percent per year (Givens et al. 2013), during a period of exposure to exploration activities in the Beaufort and Chukchi seas since the late 1960s. Additionally, enough information is available to make a reasoned choice among alternatives. Further, impacts to other arctic marine mammal species' reproductive rates or stock sizes have not been documented.

Disturbance includes a variety of effects, including subtle changes in behavior, more conspicuous changes in activities, and displacement. Observable reactions of marine mammals to sound include attraction to the sound source, increased alertness, modification to their own sounds, cessation of feeding or interacting, alteration in swimming or diving behavior (change direction or speed), short or long-term habitat abandonment (deflection, short or long-term avoidance), and, possibly, panic reactions, such as stampeding or stranding (Nowacek et al. 2007, Richardson et al. 1995, Southall et al. 2007).

Because the physiological and behavioral responses of the majority of the marine mammals exposed to anthropogenic sound cannot be detected or measured (not all responses visible external to animal, portion of exposed animals underwater [i.e., not visible], many animals located many miles from observers and covering very large area, etc.) and because NMFS must authorize take prior to the impacts to marine mammals, a method is needed to estimate the number of individuals that will be taken, pursuant to the MMPA, based on the proposed action. To this end, NMFS developed acoustic thresholds that estimate at what received sound levels the Level B Harassment, Level A Harassment, and mortality of marine mammals would occur from different types of sounds. The current NMFS acoustic threshold for Level B behavioral harassment is 160 dB re 1 μPa rms received level for impulse noises (such as airgun pulses) and 120 dB re 1 μPa rms for continuous sounds (such as drill ships and icebreaking).

### Noise Induced Threshold Shift

Animals exposed to intense sound may experience reduced hearing sensitivity for some period of time following exposure. This increased hearing threshold is known as noise induced threshold shift (TS). The amount of TS incurred is influenced by amplitude, duration, frequency content, temporal pattern, and energy distribution of the noise (Kryter 1985, Richardson et al. 1995, Southall et al. 2007). It is also influenced by characteristics of the animal, such as behavior, age, history of noise exposure, and health. The magnitude of TS generally decreases over time after noise exposure, and, if it eventually returns to zero, it is known as temporary threshold shift (TTS). If TS does not return to zero after some time, it is known as permanent threshold shift (PTS). Sound levels associated with TTS onset are generally considered to be below the levels that will cause PTS, which is considered to be auditory injury.

NMFS has established acoustic thresholds that identify the received sound levels above which permanent hearing impairment or other injury could potentially occur (Level A take). Historically, NMFS identified 180 and 190 dB re 1 μPa (rms) for cetaceans and pinnipeds, respectively as the received levels above which, in the view of a panel of bioacoustics specialists convened by NMFS before TTS measurements (which inform PTS predictions) for marine mammals became available, one could not be certain that there would be no injurious effects, auditory or otherwise, to marine mammals. As discussed in Section 4.2.6, NMFS recently finalized revisions to these acoustic thresholds (NOAA 2016). The new auditory

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-94
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 46 of 92
Exhibit 19, page 46 of 92

injury thresholds utilize dual metrics, one for peak pressure sound pressure level (PK), and one for cumulative SEL ($SEL_{cum}$) that takes into consideration the duration of the exposure within a day. Calculating exposures with the metric that incorporates duration is slightly more complicated, but it is still likely that most marine mammals avoid ships and/or seismic operations at distances that likely avoid PTS, or evern TTS, onset. In addition, monitoring and mitigation measures often implemented during seismic surveys are designed to detect marine mammals near the airgun array to avoid exposure to sound pulses of a level or duration that may cause hearing impairment. If animals do incur TTS, it is a temporary and reversible phenomenon unless exposure exceeds the TTS-onset threshold by an amount sufficient to cause PTS which, while unlikely, is still possible.

In a study on monkeys, Lonsbury-Martin et al. (1987) found that the long-lasting nature of changes in neural responsiveness suggests that each TTS episode may produce an increment of damage to the ear and eventually contribute to measurable PTS. This was tested by exposing monkeys to short-lasting TTS sound repeatedly for many months and then comparing their cochlear ducts for hearing loss damages. Hamernik et al. (2002) compared the inferior colliculus in chinchillas that were exposed to three different thresholds of noise exposure and found there was a consistent relationship between PTS and TTS. The following subsections summarize the available data on noise-induced hearing impairment in marine mammals.

**Temporary Threshold Shift**

TTS is the mildest form of hearing impairment that can occur during exposure to sound (Kryter 1985). It is not considered to represent physical injury, as hearing sensitivity fully recovers after the sound ends. TTS is defined as a temporary, reversible increase in the threshold of audibility at a specified frequency or portion of an individual's hearing range above a previously established reference level. Sounds must be temporarily louder for an animal to hear them. The amount of TTS is customarily expressed in decibels (ANSI 1995; Yost 2007). Based on data from cetacean TTS measurements (see Finneran 2015 for a review), a TTS of 6 dB is considered the minimum threshold shift clearly larger than any day-to-day or session-to-session variation in a subject's normal hearing ability (Schlundt et al. 2000; Finneran et al. 2000; Finneran et al. 2002). Several physiological mechanisms are thought to be involved with inducing TTS. These include reduced sensitivity of sensory hair cells in the inner ear, changes in the chemical environment in the sensory cells, residual middle-ear muscular activity, displacement of inner ear membranes, increased blood flow, and post-stimulatory reduction in efferent and sensory neural output (Kryter 1994, Ward 1997, Southall et al. 2007).

The magnitude of TTS depends on the level, duration, and frequency (kHz) associated with the noise exposure (Kryter 1985, Richardson et al. 1995, Southall et al. 2007). TTS has only been studied in captive odontocetes and pinnipeds (reviewed in Finneran 2015 and in Appendix B). No hearing or TTS data are available for mysticete species. Few data are available for marine mammals regarding exposure to multiple pulses of sound during seismic surveys (see Lucke et al. 2009 and Finneran et al. 2015). For species or groups of marine mammals for which studies have been conducted, those data or information are presented in the specific subsections below. It is difficult for researchers to present controlled exposures and conduct measurements in the wild, and it is not possible to conduct laboratory experiments on large baleen whales. Using extrapolated data from other species is considered an acceptable proxy for determining TTS in baleen whales or other groups where hearing data do not exist (Southall et al. 2007).

For toothed whales, experiments on a bottlenose dolphin (*Tursiops truncates*) and beluga whale showed that exposure to a single watergun impulse at a received level of 207 kPa (or 30 psi) peak-to-peak (p-p), which is equivalent to 228 dB re 1 mPa (p-p), resulted in a 7 and 6 dB TTS in the beluga whale at 0.4 and 30 kHz, respectively. Thresholds returned to within 2 dB of the pre-exposure level within 4 minutes of the exposure (Finneran et al. 2002). No TTS was observed in the bottlenose dolphin. Finneran et al. (2005) further examined the effects of tone duration on TTS in bottlenose dolphins. Bottlenose dolphins were exposed to 3 kHz tones (non-impulsive) for periods of 1, 2, 4 or 8 seconds (s), with hearing tested at 4.5

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement    4-95
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 47 of 92
Exhibit 19, page 47 of 92

kHz. For 1-s exposures, TTS occurred with SELs of 197 dB, and for exposures >1 s, SEL >195 dB resulted in TTS (SEL is equivalent to energy flux, in dB re 1 mPa2-s). At an SEL of 195 dB, the mean TTS (4 minutes (mins) after exposure) was 2.8 dB. Finneran et al. (2005) suggested that an SEL of 195 dB is the likely threshold for the onset of TTS in dolphins and belugas exposed to tones of durations 1–8 s (i.e., TTS onset occurs at a near constant SEL, independent of exposure duration). That implies that, at least for non-impulsive tones, a doubling of exposure time results in a 3 dB lower TTS threshold. However, the assumption that, in marine mammals, the occurrence and magnitude of TTS is a function of cumulative acoustic energy (SEL) is probably an oversimplification. Kastak et al. (2005) reported preliminary evidence from pinnipeds that, for prolonged non-impulse noise, higher SELs were required to elicit a given TTS if exposure duration was short than if it was longer, i.e., the results were not fully consistent with an equal-energy model to predict TTS onset. Mooney et al. (2009a) showed this in a bottlenose dolphin exposed to octave-band non-impulse noise ranging from 4 to 8 kHz at SPLs of 130 to 178 dB re 1 mPa for periods of 1.88 to 30 minutes (min). Higher SELs were required to induce a given TTS if exposure duration was short than if it was longer. Exposure of the aforementioned bottlenose dolphin to a sequence of brief sonar signals showed that, with those brief (but non-impulse) sounds, the received energy (SEL) necessary to elicit TTS was higher than was the case with exposure to the more prolonged octave-band noise (Mooney et al. 2009b). Those authors concluded that, when using (non-impulse) acoustic signals of duration ~0.5 s, SEL must be at least 210–214 dB re 1 mPa2-s to induce TTS in the bottlenose dolphin. The most recent studies conducted by Finneran et al. also support the notion that exposure duration has a more substantial influence compared to SPL as the duration increases, and that TTS growth data are better represented as functions of SPL and duration rather than SEL alone (Finneran et al. 2010a, 2010b). In addition, Finneran et al. (2010b) conclude that when animals are exposed to intermittent noises, there is recovery of hearing during the quiet intervals between exposures through the accumulation of TTS across multiple exposures. Such findings suggest that when exposed to multiple seismic pulses, partial hearing recovery also occurs during the seismic pulse intervals.

**Permanent Threshold Shift**

PTS is defined as "irreversible elevation of the hearing threshold at a specific frequency" (Yost 2000). It involves physical damage to the sound receptors in the ear and can result in either total or partial deafness or impaired ability to hear sounds in specific frequency ranges (Kryter 1985). Some causes of PTS are severe extensions of effects underlying TTS (e.g., irreparable damage to sensory hair cells). Others involve different mechanisms, for example, exceeding the elastic limits of certain tissues and membranes in the middle and inner ears and resultant changes in the chemical composition of inner ear fluids (Ward 1997, Yost 2000). The onset of PTS is determined by pulse duration, peak amplitude, rise time, number of pulses, inter-pulse interval, location, species and health of the receivers ear (Ketten 1994).

The relationships between TTS and PTS thresholds have not been studied in marine mammals, and there is currently no evidence that exposure to airgun pulses can cause PTS in any marine mammal, however there has been speculation about that possibility (Richardson et al. 1995, Gedamke et al. 2008).

Section 4.2.6.3 outlines NMFS final revisions to auditory injury thresholds. NMFS applied these thresholds to the types of sources analyzed in this EIS (seismic airguns and drilling sources of similar size) and found that the resulting distances at which injurious exposures could not be ruled out (i.e., those at which PTS might be incurred) were similar to those calculated using the 180 and 190-dB historical thresholds, meaning that the revisions to the auditory injury thresholds do not notably change any of the conclusions articulated in earlier versions of the EIS.

It is unlikely that a marine mammal would remain close enough to a large airgun array long enough to incur PTS. The levels of successive pulses received by a marine mammal will increase and then decrease gradually as the seismic vessel approaches, passes and moves away, with periodic decreases also caused when the animal goes to the surface to breath, reducing the probability of the animal being exposed to sound levels large enough to elicit PTS.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-96
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 48 of 92
Exhibit 19, page 48 of 48

### *Non-Auditory Physiological Effects*

Non-auditory physiological effects or injuries could include stress, neurological effects, bubble formation, and other types of organ or tissue damage. If any such effects do occur, they may be limited to unusual situations when animals might be exposed at close range for unusually long periods. Issues that may arise from adverse stress responses over a period of time include accelerated aging, sickness-like symptoms, suppression of the immune system, elevated stress hormones, and suppression of reproduction (physiologically and behaviorally) (Wright et al. 2008).

There are times during an animal's life when they have lower reserves and are more vulnerable to impacts from stressors. For example, if a mammal is stressed at the end of a feeding season just prior to a long distance migration, it may have sufficient energy reserves to cope with the stress. If stress occurs at the end of a long migration or fasting period, energy reserves may not be sufficient to adequately cope with the stress (Tyack 2008, McEwen and Wingfield 2003, and Romano et al. 2004).

Young animals (and fetuses) are sensitive to neurological consequences of the stress response and can suffer permanent neurological alterations. Deep diving marine mammals may also be more sensitive to neurological consequences of stress responses (Wright et al. 2008).

In an examination of beaked whales (which are not found in the Beaufort and Chukchi seas) that were stranded in association with military exercises involving sonar (psychological stressor), intracellular globules composed of acute phase proteins were found in cells in six out of eight livers examined, therefore, there is some indication that a stress response was partly involved (Wright et al. 2008). Hypoxia may also pose an issue for marine mammals being exposed to stressors at depth, due to increases in heart rate, which in turn causes an increase in oxygen consumption. This added oxygen demand could push the whales over the physiological edge. The combination of both the psychological stressor and the physiological stressor may have detrimental consequences (Wright et al. 2008). A study by Rolland et al. (2012) found a decrease in baseline concentrations of faecal adrenal glucocorticoids (fGCs) (a corticosteroid chemical compound produced as a physiological response to stress) in North Atlantic right whales associated with a 6 dB decrease in overall noise levels when ship traffic was reduced in the Bay of Fundy following the events of September 11, 2001. This reduced corticosteriod concentration suggests a reduced stress level in whales as a result of reduced noise exposure. However, it is difficult to definitively link chronic stress responses to long-term, detrimental health effects in large whales. Nonetheless, the study by Rolland et al. (2012) indicates that there is the potential for certain individuals to exhibit stress responses to anthropogenic sounds. Classic stress responses begin when an animal's central nervous system perceives a potential threat to its homeostasis. That perception triggers stress responses regardless of whether a stimulus actually threatens the animal; the mere perception of a threat is sufficient to trigger a stress response (Moberg 2000, Sapolsky et al. 2005, Seyle 1950). Once an animal's central nervous system perceives a threat, it mounts a biological response or defense that consists of a combination of the four general biological defense responses: behavioral responses; autonomic nervous system responses; neuroendocrine responses; or immune responses.

In the case of many stressors, an animal's first and most economical (in terms of biotic costs) response is behavioral avoidance of the potential stressor or avoidance of continued exposure to a stressor. An animal's second line of defense to stressors involves the sympathetic part of the autonomic nervous system and the classical "fight or flight" response which includes the cardiovascular system, the gastrointestinal system, the exocrine glands, and the adrenal medulla to produce changes in heart rate, blood pressure, and gastrointestinal activity that humans commonly associate with "stress." The frequency of such short-term exposures and responses may have an important role on whether or not there would be a significant short- or long-term effect on an animal's welfare. Baker et al. (1983) described two avoidance techniques whales used in response to vessels: horizontal avoidance (faster swimming, and fewer long dives) and vertical avoidance (swimming more slowly but remaining submerged more frequently. Watkins et al. (1981) found that humpback and fin whales appeared startled and increased

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement 4-97
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 49 of 92
Exhibit 19, page 49 of 92

their swimming speed to move away from the approaching vessel. Johada et al. (2003) studied responses of fin whales in feeding areas when they were closely approached by inflatable vessels. The study concluded that close vessel approaches caused the fin whales to swim away from the approaching vessel and to stop feeding. These animals also had increases in blow rates and spent less time at the surface. This suggests increases in metabolic rates, which may indicate a stress response. All these responses can manifest as a stress response in which the mammal undergoes physiological changes with chronic exposure to stressors, it can interrupt essential behavioral and physiological events, alter time budget, or a combination of all these stressors (Frid and Dill 2002, Sapolsky 2000). All of these responses to stressors can cause an abandonment of an area, reduction in reproductive success, and even death (Mullner et al. 2004, and Daan et al. 1996).

An animal's third line of defense to stressors involves its neuroendocrine or sympathetic nervous systems; the system that has received the most study has been the hypothalamus-pituitary-adrenal system (also known as the HPA axis in mammals or the hypothalamus-pituitary-interrenal axis in fish and some reptiles). Unlike stress responses associated with the autonomic nervous system, virtually all neuro-endocrine functions that are affected by stress – including immune competence, reproduction, metabolism, and behavior – are regulated by pituitary hormones. Stress-induced changes in the secretion of pituitary hormones have been implicated in failed reproduction (Moberg 1987, Rivier 1995), altered metabolism (Elasser et al. 2000), reduced immune competence (Blecha 2000), and behavioral disturbance. Increases in the circulation of glucocorticosteroids (cortisol, corticosterone, and aldosterone in marine mammals; see Romano et al. 2004) have been equated with stress for many years.

The primary distinction between stress (which is adaptive and does not normally place an animal at risk) and distress is the biotic cost of the response. During a stress response, an animal uses glycogen stores that can be quickly replenished once the stress is alleviated. In such circumstances, the cost of the stress response would not pose a risk to the animal's welfare. However, when an animal does not have sufficient energy reserves to satisfy the energetic costs of a stress response, energy resources must be diverted from other biotic functions, which impair those functions that experience the diversion. For example, when mounting a stress response diverts energy away from growth in young animals, those animals may experience stunted growth. When mounting a stress response diverts energy from a fetus, an animal's reproductive success and fitness will suffer. In these cases, the animals will have entered a pre-pathological or pathological state which is called "distress" (sensu Seyle 1950) or "allostatic loading" (sensu McEwen and Wingfield 2003). This pathological state will last until the animal replenishes its biotic reserves sufficient to restore normal function. Note that these examples involved a long-term (days or weeks) stress response exposure to stimuli.

Relationships between these physiological mechanisms, animal behavior, and the costs of stress responses have also been documented fairly well through controlled experiment; because this physiology exists in every vertebrate that has been studied, it is not surprising that stress responses and their costs have been documented in both laboratory and free-living animals (for examples see, Holberton et al. 1996, Hood et al. 1998, Jessop et al. 2003, Krausman et al. 2004, Lankford et al. 2005, Reneerkens et al. 2002, Thompson and Hamer 2000). .

For example, Jansen (1998) reported on the relationship between acoustic exposures and physiological responses that are indicative of stress responses in humans (e.g., elevated respiration and increased heart rates). Jones (1998) reported on reductions in human performance when faced with acute, repetitive exposures to acoustic disturbance. Trimper et al. (1998) reported on the physiological stress responses of osprey to low-level aircraft noise, while Krausman et al. (2004) reported on the auditory and physiology stress responses of endangered Sonoran pronghorn to military overflights. Smith et al. (2004a, 2004b) identified noise-induced physiological transient stress responses in hearing-specialist fish (i.e., goldfish) that accompanied short- and long-term hearing losses. Welch and Welch (1970) reported physiological and behavioral stress responses that accompanied damage to the inner ears of fish and several mammals.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                                    4-98
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 50 of 92
Exhibit 19, page 50 of 92

Hearing is one of the primary senses marine mammals use to gather information about their environment and communicate with conspecifics. Although empirical information on the relationship between sensory impairment (TTS, PTS, and acoustic masking) on marine mammals remains limited, it seems reasonable to assume that reducing an animal's ability to gather information about its environment and to communicate with other members of its species would be stressful for animals that use hearing as their primary sensory mechanism. Therefore, NMFS assumes that acoustic exposures sufficient to trigger onset PTS or TTS would be accompanied by physiological stress responses because terrestrial animals exhibit those responses under similar conditions (NRC 2003). More importantly, marine mammals might experience stress responses at received levels lower than those necessary to trigger onset TTS. Based on empirical studies of the time required to recover from stress responses (Moberg 2000), NMFS also assumes that stress responses could persist beyond the time interval required for animals to recover from TTS and might result in pathological and pre-pathological states that would be as significant as behavioral responses to TTS.

There is little information available on sound-induced stress in marine mammals or on its potential to affect the long-term health or reproductive success of marine mammals (Fair and Becker 2000, Hildebrand 2005, Wright et al. 2007a, 2007b). Potential long-term effects, if they occur, would be mainly associated with chronic noise exposure (Nieukirk et al. 2009). As noted above, exposure to low-frequency ship noise, particularly in heavy ship traffic areas, may be associated with chronic stress in whales - Rolland et al. (2012) suggest evidence of a reduction in stress hormone levels associated with reduced exposure of North Atlantic right whales to noise from large commercial vessels. Disruption in feeding, especially within small populations could have impacts on whales, their reproductive success and even the survival of the species (NRC 2005).

Available data on potential stress-related impacts of anthropogenic noise on marine mammals are extremely limited; research on the stress responses of marine mammals and the technologies for measuring hormonal, neuroendocrinological, cardiological, and biochemical indicators of stress in marine mammals are in the early stages of development (ONR 2009). Obtaining samples from free-ranging marine mammals is complicated by the brief periods of time most are visible while either hauled-out or at the surface to breath, by home ranges that may include expansive and inaccessible areas of ocean which limits the potential for continued or repeated monitoring, and many species cannot be easily captured or sampled using traditional methods (ONR 2009). Blood sampling is not currently possible for large, free-swimming whales. Conducting stress research on marine mammals, therefore, requires novel approaches to obtaining physiologic data and samples. Real time measurement of existing stress hormones and biomarkers are further limited by the invasive nature of many of the sampling methods (e.g., chase, restraint), which may, themselves, be stressors that could mask the physiological signal of interest (ONR 2009).

Although extensive terrestrial vertebrate datasets illustrate that the impacts of chronic stress effects can adversely impact individuals through immune suppression, inhibition of other hormonal systems, and the disruption of reproductive function, such studies within marine systems remain rare. Laboratory studies showing explicit stress responses to noise and field noise measurements have increased our ability to compare hormone levels with other potentially causative variables. However, there are no large cross-sectional datasets of stress markers in free-ranging marine populations, which means that we lack an understanding of natural variation within individuals based on sex, age, and reproductive status. Further, we do not fully understand the relationship among various hormones and the quantitative differences that may be expected among sample types (e.g., blood, blubber, feces) in free-ranging individuals. Therefore, there is a current inability to interpret context and the biological significance of variation in stress markers in individuals. Pursuant to NEPA, the full quantitative suite of this information is considered unavailable, however, the absence of this particular information does not inhibit our ability to evaluate the reasonably foreseeable significant adverse impacts on the human environment. The summary above of the available data related to stress effects, combined with the more complete data available regarding the more primary

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-99
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 51 of 92
Exhibit 19, page 51 of 92

direct effects of behavioral disturbance from industry activities allow us to reasonably assess the effects of these activities on marine mammals.

Recent novel, non-invasive approaches developed for collecting corticosteroid and hormone samples from free-swimming large whales include fecal sampling (Hunt et al. 2006) and sampling whale blows (Hogg et al. 2009, NEA 2011). Both techniques have been used to collect samples from North Atlantic right whales (*Eubalaena glacialis*) and show promise. The former, however, is limited by the frequency with which feces are encountered. Methods for sampling whale blows, obtaining sufficiently large samples, and measuring stress hormones were being developed and tested by the New England Aquarium during 2011 (NEA 2011). These methods are still being developed and their practicability and viability have not been tested on Arctic species.

### Linking Disturbance and Sub-lethal Effects to Population Level Effects

Because of the methodological challenges (including difficulty identifying all of the contributing variables), as well as the time and resource commitment necessary, few studies have quantified the ultimate impacts to marine mammal populations associated with disturbance from noise or other causes. Lusseau and Bejder (2007) present data from three long-term studies illustrating the connections between disturbance from whale-watching boats and population-level effects in cetaceans. Across these three multi-year studies, the effects of increased boat traffic from tourism ranged from a 15% decrease in abundance (Shark Bay Australia, bottlenose dolphins, Bejder et al., 2006), a transition from a short-term avoidance strategy to long-term displacement resulting in reduced reproductive success and increased stillbirths (Fiordland New Zealand, bottlenose dolphins, Lusseau 2004), to decreased foraging opportunities and increased traveling time that a simple bioenergetics model equated to decreased energy intake of 18% and increased energy output of 3-4% (Vancouver Island Canada, northern resident killer whale, Williams et al., 2006). These studies are presented because of the lack of similar studies for other activity types, not because of an enhanced concern for whale watching above other activity types. In fact, Weinrich and Corbell (2009) report that the reproductive success of female humpback whales was not affected by whale watching exposures in southern New England.

In order to understand how the effects of activities to individual marine animals may or may not impact stocks and populations, it is necessary to understand not only what the likely disturbances are going to be, but how those disturbances or other impacts may affect the reproductive success and survivorship of individuals, and then how those impacts to individuals translate to population changes. Following on the earlier work of a committee of the U.S. National Research Council (NRC 2005), New et al. (2014), in an effort termed the Potential Consequences of Disturbance (PCoD), outline an updated conceptual model of the relationships linking disturbance to changes in behavior and physiology, health, vital rates, and population dynamics, as depicted in the flow chart below. While this effort targets marine mammals, this conceptual model is broadly applicable in illustrating the potential pathways from individual disturbances to population-level impacts for other taxa.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-100
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/16/19   Page 52 of 92
Exhibit 19, page 52 of 92



**Potential Consequences of Disturbance conceptual model of the relationships linking disturbance to changes in behavior and physiology, health, vital rates, and population dynamics (New et al., 2014).**

As described in the PCoD model, adverse behavioral and physiological changes resulting from disturbance (stimulus or stressor) can either have acute or chronic pathways of affecting vital rates. For example, acute pathways can include changes in behavior or habitat use, or increased stress levels that directly raise the probability of mother-calf separation or predation. Chronic effects on vital rates occur when behavioral or physiological change has an indirect effect on a vital rate that is mediated through changes in health over a period of time, such as when adverse changes in time/energy budgets affects lipid mass, which then affects vital rates (New et al., 2014). New et al. (2014) outlined this general framework and compiled the relevant literature that supports it. Each box in the flow chart above contains added specific examples of types of behavioral, physiological and biological changes, health effects, vital rates and population rates for which there are data illustrating the connections between these stages of effects for certain species and situations. Further, these authors, and others involved in the PCoD effort, have developed state-space energetic models for four example species (southern elephant seal, North Atlantic right whale, beaked whale, and bottlenose dolphin), that illustrate how specific information about anticipated behavioral changes or reduced resource availability can be used to effectively forecast longer-term, population-level impacts (New et al., 2014; New et al., 2013a; Schick et al., 2013; New et al., 2013b).

Unfortunately, empirical data adequate to quantify the relationship between behavioral or physiological changes and fitness impacts does not exist for the majority of marine mammal species and the existing models are very species- and scenario-specific. However, some inferences regarding the relative importance of certain factors may be appropriate for different species in certain circumstances. Meanwhile, to fill this gap in adequate empirical data, an "interim" version of the PCoD framework has been developed that uses a formal expert elicitation process to estimate parameters (and associated uncertainty) that define how changes in behavior or physiology affect vital rates and incorporate them into a stochastic model. The framework can be used to predict the anthropogenic disturbances on animal populations. King et al. (2015) report on the outcome of the first interim PCoD effort to assess the effects of United Kingdom offshore wind farm construction on harbor porpoises. Similar efforts are currently underway to evaluate the effects of Navy activities on beaked whales and sperm whales in certain areas.

### Stranding and Mortality

Causes of strandings and mortality related to sound could include: 1) swimming into shallow water to avoid sound; 2) a change in dive behavior; 3) a physiological change; and 4) tissue damage directly from

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-101
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 52 of 92
Exhibit 19, page 52 of 92

sound exposure, such as through acoustically mediated bubble formation and growth or acoustic resonance of tissues. Some of these are unlikely to apply to airgun impulse sounds.

Seismic pulses and mid-frequency sonar signals are quite different, and some mechanisms by which sonar sounds have been hypothesized to affect beaked whales are unlikely to apply to airgun pulses. Sounds produced by airgun arrays are broadband impulses with most of the energy below 1 kHz. Typical military mid-frequency sonar emits non-impulse sounds at frequencies of 2 to 10 kHz, generally with a relatively narrow bandwidth at any one time. A further difference between seismic surveys and naval exercises is that naval exercises can involve sound sources on more than one vessel. Thus, it is not appropriate to assume that there is a direct connection between the effects of military sonar and seismic surveys on marine mammals. However, evidence that sonar signals can, in special circumstances, lead (at least indirectly) to physical damage and mortality (Balcomb and Claridge 2001, NOAA and USN 2001, Jepson et al. 2003, Fernández et al. 2004, 2005, Hildebrand 2005, Cox et al. 2006) suggests that caution is warranted when dealing with exposure of marine mammals to any high-intensity "pulsed" sound.

There is no conclusive evidence of cetacean strandings or deaths at sea as a result of exposure to seismic surveys, but a few cases of strandings in the general area where a seismic survey was ongoing have led to speculation concerning a possible link between seismic surveys and strandings. Suggestions that there was a link between seismic surveys and strandings of humpback whales in Brazil (Engel et al. 2004) were not well founded (IAGC 2004, IWC 2007). In September 2002, there was a stranding of two Cuvier's beaked whales in the Gulf of California, Mexico, when the Lamont-Doherty Earth Observatory vessel *R/V Maurice Ewing* was operating a 20 airgun (8,490 in$^3$) array in the general area. The link between the stranding and the seismic surveys was inconclusive and not based on any physical evidence (Hogarth 2002, Yoder 2002). A mapping survey using a high-power 12 kHz multi-beam echosounder (MBES) was considered a likely trigger for a highly unusual mass stranding of approximately 100 typically oceanic melon-headed whales (*Peponocephala electra*) in Madagascar in 2008 (Southall et al. 2013). Although the cause is equivocal and other environmental, social, or anthropogenic factors may have facilitated the strandings, the authors determined the MBES the most plausible and likely trigger initiating the stranding response (Southall et al. 2013). While seismic airguns have not been positively associated with strandings, and the sources themselves have different characteristics than those sources that have been found to contribute to the cause of known strandings, some of the hypotheses regarding why animals strand include behaviorally mediated responses in which animals have an adverse behavioral response (which seismic surveys are known to cause) and subsequent secondary behaviors (ascending too fast, swimming into areas that are too shallow, etc) that lead to stranding. However, the species present in the Arctic do not include those deep diving species that have been involved in previous strandings associated with loud manmade sound sources.

## 4.5.2.4.3     Potential Effects from Other Acoustic Sources Used during Surveys

In addition to a single airgun or airgun arrays, the industry typically uses additional acoustic devices during survey activities, such as single and multi-beam echosounders, sub-bottom profilers, and side scan sonars (many of which operate at frequencies outside of the ranges of best hearing for many baleen whales and some pinnipeds). The majority of these sources is smaller and emits sounds at higher frequencies than airguns. The source levels of these devices range from 180 dB re 1 μPa at 1 m to 250 dB re 1 μPa at 1 m and have frequency ranges from 0.2 kHz to 1,600 kHz. Section 2.3.2 of this EIS describes each of these sound sources, with source levels and frequency ranges, in more detail.

Given the directionality and small beam widths for these sources, marine mammal communications are not anticipated to be masked appreciably. Because of the small beam widths, marine mammals would not be in the direct sound field for more than one to two pulses. Additionally, many of these sources emit sounds at frequencies higher than that used by some marine mammals for hearing and/or vocalizing, especially baleen whales.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement         4-102
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 54 of 92
Exhibit 19, page 54 of 92

Behavioral reactions of free-ranging marine mammals to sonars, echosounders, and other sound sources appear to vary by species and circumstance. Observed reactions have included silencing and dispersal by sperm whales (Watkins et al. 1985) and increased vocalizations and no dispersal by pilot whales (Rendell and Gordon 1999). When a 38 kHz echosounder and a 150 kHz acoustic Doppler current profiler were transmitting during studies in the Eastern Tropical Pacific, baleen whales showed no substantial responses, while spotted and spinner dolphins were detected slightly more often and beaked whales less often during visual surveys (Gerrodette and Pettis 2005). Very few data are available on the reactions of pinnipeds to echosounder sounds at frequencies similar to those used during seismic operations. Hastie and Janik (2007) conducted a series of behavioral response tests on two captive gray seals to determine their reactions to underwater operation of a 375 kHz multibeam imaging echosounder that included significant signal components down to 6 kHz. Results indicated that the two seals reacted to the signal by significantly increasing their dive durations. It was determined that the frequencies produced by some sources such as sub-bottom profilers were too high to create TTS and/or PTS among pinnipeds or most cetaceans expected to occur in the area. However, based on some recent reports (Southall et al. 2013 regarding multi-beam echo sounders), NMFS recognizes that these types of sound sources can sometimes result in behavioral responses that rise to the level of take, although, in most cases the vast majority of the operation of these sources will occur while seismic airguns are also operating, which means that the animals in the vicinity of the airgun will already be projected to be taken. At any rate, NMFS will evaluate the potential effects of these source types when analyzing MMPA requests that include the use of such equipment.

#### 4.5.2.4.4     Potential Effects of On-ice Seismic Surveys

Because these activities occur during the winter and early spring months over the ice, no impacts to cetaceans are anticipated, as cetaceans are typically not present in the Beaufort Sea during this time period. Impacts to pinnipeds could potentially occur when they are hauled out on the ice or inside subnivean lairs. Disturbance from noise produced by the seismic survey equipment is expected to include localized displacement from lairs by the seals in proximity (within 150 m [492 ft]) to seismic lines (Kelly et al. 1988). Impacts would only occur to pinnipeds in the Beaufort Sea, as no such surveys are expected to occur in the Chukchi Sea. See Sections 4.5.2.4.10 through 4.5.2.4.15 for details regarding potential effects on bowhead whales, beluga whales, other cetaceans, pinnipeds, walruses, and polar bears, respectively.

#### 4.5.2.4.5     Potential Effects of Aircraft Activities

Potential effects to marine mammals from aircraft activity could involve both acoustic and non-acoustic effects. It is uncertain if the animals react to the sound of the aircraft or to its physical presence flying overhead. Minor and short-term behavioral responses of cetaceans to helicopters have been documented in several locations, including the Beaufort Sea (Richardson et al. 1985a, b, Patenaude et al. 2002). Reactions of hauled out pinnipeds to aircraft flying overhead have been noted, such as looking up at the aircraft, moving on the ice or land, entering a breathing hole or crack in the ice, or entering the water (Born et al. 1999, Blackwell et al. 2004a). Reactions depend on several factors including the animal's behavioral state, activity, group size, habitat, and flight pattern (Richardson et al. 1995). Additionally, a study conducted by Born et al. (1999) found that wind chill was also a factor in level of response of ringed seals hauled out on ice, as well as time of day and relative wind direction. Marine mammal reactions to helicopter disturbance are difficult to predict and may range from no reaction to minor course changes or, occasionally, leaving the immediate area of the activity. Currently, NMFS' threshold for determining if an aircraft overflight may take a marine mammal or not is 1,000 ft. altitude (except for takeoffs, landings, and emergency situations).

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-103
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 55 of 92
Exhibit 19, page 55 of 92

#### 4.5.2.4.6     Potential Effects of Icebreaking and Ice Management Activities

Icebreakers produce more noise while breaking ice than when transiting open waters primarily because of the sounds of propeller cavitation (Richardson et al. 1995). Icebreakers typically ram into heavy ice until losing momentum, then back off to build momentum before ramming again. The highest noise levels usually occur while backing full astern in preparation to ram forward through the ice. Overall, the noise generated by an icebreaker pushing ice is typically 10 to 15 dB greater than the noise produced by the ship underway in open water (Richardson et al. 1995). Roth and Schmidt (2010) noted a source level of 200 dB re 1 µPa at 1 m during backing and ramming of ice. Industry in-ice seismic surveys recently conducted in the U.S. Arctic did not employ the "backing and ramming" approach described above but rather required continuous forward progress at 3-4 knots in mostly newly forming juvenile first year ice or young first year ice less than 0.5 m (1.6 ft) thick instead of in thick, multi-year ice (ION 2012). Sounds generated by the icebreaker moving through relatively light ice conditions are expected to be far below the high sound levels often attributed to "backing and ramming" icebreaking in very heavy ice conditions, which are created by cavitation of the propellers as the vessel is slowed by the ice or reverses direction (Erbe and Farmer 1998, Roth and Schmidt 2010). Icebreaking is considered by NMFS to be a continuous sound. Haley et al. (2010a) estimated that as the icebreaker travels through the ice, a swath 3,500 m (2.17 mi) wide would be subject to sound levels ≥120 dB, based on the source level of 185 dB attenuating to 120 dB in about 1,750 m (1.09 mi).

Icebreaking activities may also have non-acoustic effects such as the potential for causing injury, ice entrapment of animals that follow the ship, and disruption of ice habitat (reviewed in Richardson et al. 1989:315). Ice management activities may also have similar effects when moving ice floes away from drill rigs. The species of marine mammals that may be present and the nature of icebreaker activities are strongly influenced by ice type. Some species are more common in loose ice near the margins of heavy pack ice while others appear to prefer heavy pack ice. Propeller cavitation noise of icebreaking ships in loose ice is likely similar to that in open water while noise is expected to be much greater in areas of heavier pack ice or thick landfast ice where ship speed will be reduced, power levels will be higher, and there will be greater propeller cavitation (Richardson et al. 1995).

There is little information available about the effect on marine mammals of the increased sound levels due to icebreaking, although beluga whales have been documented swimming rapidly away from ships and icebreakers in the Canadian high Arctic (Richardson et al. 1995). Little information is available regarding the effects of icebreaking ships on baleen whales, but a similar behavioral response would be expected as those mentioned above. Whales could be diverted or could rapidly swim away from the source. Please refer to Sections 4.5.2.4.10 through 4.5.2.4.15 for details regarding potential effects on bowhead whales, beluga whales, other cetaceans, pinnipeds, walruses, and polar bears, respectively.

#### 4.5.2.4.7     Potential Effects of Vessel Activity

Reactions of marine mammals to vessels often include changes in general activity (e.g., from resting or feeding to active avoidance), changes in surfacing-respiration-dive cycles, and changes in speed and direction of movement. In heavily trafficked areas, vessel noise may induce stress and mask communication in whales (Hatch et al. 2012, Rolland et al. 2012). Past experiences of the animals with vessels are important in determining the degree and type of response elicited from an animal-vessel encounter. Whale reactions to slow-moving vessels are less dramatic than their reactions to faster and/or erratic vessel movements. Some species have been noted to tolerate slow-moving vessels within several hundred meters, especially when the vessel is not directed toward the animal and when there are no sudden changes in direction or engine speed (Wartzok et al. 1989, Richardson et al. 1995, Heide-Jorgensen et al. 2003). Few authors have specifically described the responses of pinnipeds to boats, and most of the available information on reactions to boats concerns pinnipeds hauled out on land or ice. In places where boat traffic is heavy, there have been cases where seals have habituated to vessel disturbance (Bonner 1982, Jansen et al. 2006).

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-104
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/06/19   Page 56 of 92
Exhibit 19, page 56 of 92

Collisions with seismic or support vessels are possible but highly unlikely. Ship strikes with marine mammals can lead to death by massive trauma, hemorrhaging, broken bones, or propeller wounds (Knowlton and Kraus 2001). Massive propeller wounds can be immediately fatal. If more superficial, whales may be able to survive the collisions (Silber et al. 2009). Vessel speed is a key factor in determining the frequency and severity of ship strikes, with the potential for collision increasing at ship speeds of 15 kn and greater (Laist et al. 2001, Vanderlaan and Taggart 2007).

Incidence of injury caused by vessel collisions appears to be low in the Arctic. Less than 1 percent of bowhead whales have scars indicative of vessel collision. This could be due to either collisions resulting in death (and not accounted for) or a low incidence of co-occurrence of ships and bowhead whales (George et al. 1994).

### 4.5.2.4.8    Potential Effects of Exploratory Drilling

Exploratory drilling could affect marine mammals through noise, discharge of drilling waste, and accidental discharges such as oil spills. Sounds from exploratory drilling are different from airgun sounds. As described in Section 4.5.1.4 (Acoustics), most drilling sounds from vessels produce sounds at relatively low frequencies below 600 Hz with tones up to around 1,850 Hz (Greene 1987). The potential effects of noise from drilling operations are very similar to airguns, although at a lesser magnitude because source levels of drilling units are not as high as airgun arrays.

Exploratory drilling operations may involve the discharge of drill cuttings and drilling fluids directly into the ocean. As described in Section 4.5.1.5 (Water Quality) these discharges could result in elevated concentrations of metals such as chromium, copper, mercury, lead, and zinc, as well as increased concentrations of hydrocarbons and other organic compounds in the water. Some of the discharge streams that may be permitted for oil and gas activities in the proposed action area have been associated with impacts to marine resources, yet, despite a considerable amount of investment in research of exposures of marine mammals to organochlorines or other toxins, there have been no marine mammal deaths in the wild that can be conclusively linked to the direct exposure to such substances (O'Shea 1999). However, the impact of drill cuttings and drilling mud discharges would be local and temporary. Discharged drilling fluid should be well diluted within 100 m (330 ft) so that any impacts would be local and temporary, assuming that whales continue to swim through and past the discharge plume. If toxic contaminants are present in discharges, only a small area of potential habitat and prey base for marine mammals might be contaminated.

Many of the contaminants of concern, including organic contaminants such as organochlorine compounds and PAHs, as well as metals such as chromium and mercury, have the potential to accumulate in marine mammals. Indirect effects to marine mammals could result from exposure to contaminants of concern through the food web and the relevant pathway of exposure would involve trophic transfers of contaminants rather than direct exposure. Monitoring conducted as part of the ANIMIDA and cANIMIDA projects has shown that oil and gas developments in the Alaskan Beaufort Sea "are not contributing ecologically important amounts of petroleum hydrocarbons and metals to the near-shore marine food web of the area" (Neff 2010). Additional mitigation measures C3, C4, and C5 include requirements to ensure reduced discharge of the specific discharge streams identified with potential impacts to marine mammals or marine habitat. Those discharge streams include drill cuttings, drilling fluids, sanitary waste, domestic waste, ballast water, and bilge water. Elimination or reduction of those discharge streams is expected to reduce the potential for adverse impacts to marine mammals. Additional mitigation measures requiring operators to recycle drilling muds may also reduce the potential for adverse impacts to marine mammals and other organisms within the EIS project area.

Accidental discharges of oil or other contaminants could also occur during exploratory drilling and would likely adversely affect marine mammals. Standard mitigation measures requiring operators to have plans in place to minimize the likelihood of a spill would reduce the potential for adverse impacts from such

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-105
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/16/19   Page 57 of 92
Exhibit 19, page 57 of 92

discharges. The effects of a very large oil spill on marine mammals are analyzed in Sections 4.10.6.11 and 4.10.7.11.

## 4.5.2.4.9      Chronic and Aggregate Effects on Acoustic Habitat

In addition to predicting numbers of marine mammals taken by the individual sound sources proposed for use in each alternative (4.2.6), tables 4.5-14(a-c) specifically consider the total surface area ensonified above noise threshold levels corresponding with potential behavioral disturbance effects that could result in take. Other effects on marine mammals or other species, such as masking of conspecific or other important acoustic cues occurs when anthropogenic noise levels begin to exceed ambient noise levels – generally well below the levels corresponding with take. To get a very broad sense of how this might occur in this action, the total surface area ensonified above 120 was included above in Tables 4.5-14 (a-c). While low-level masking may not have an immediate impact, if it occurs for extended periods it has the potential to decrease the value of habitat and can lead to consequent chronic effects.

All of the sound present in a particular location and time, considered as a whole, comprises a "soundscape" (Pijanowski et al., 2011). When examined from the perspective of the animals experiencing it, a soundscape may also be referred to as "acoustic habitat" (Clark et al., 2009, Moore et al., 2012a, Merchant et al., 2015). Higher background noise levels, chronically sustained over time, limit the ability of marine species to detect and interpret important acoustic cues. Through the process of developing this FEIS, commenters recommended that NMFS include a mechanism for better assessing the chronic and aggregate effects of the Alternatives explored in this EIS. Below are the results of a first-order assessment to do so. The complete report is attached as Appendix F (Cumulative and Chronic Effects in the Arctic), and excerpts of the results are included below and are referenced elsewhere in the document, both in relation to changes in the acoustic environment and in potential impacts on marine mammal species. Additional public review (via the MMPA incidental take authorization process) and potentially peer review, of the methods, assumptions, and possible interpretations included in this approach will be solicited in order to ensure appropriate consideration and application of this analysis in a management context. Because this novel analytical exercise was conducted specifically for the purposes of this EIS and has not been published previously, it is presented here formatted similar to that of a journal article, including more detail than other EIS sections to ensure the reader is able to obtain the necessary information to fully understand this exercise without the need to consult appendices or other references.

### *Abstract*

Effective detection of sounds is critical for aquatic animals, and methods are needed to assess and minimize the longer-term and aggregate effects of noise on marine species and their habitat, in addition to acute impacts at closer range. Here, we present the results of a first-order assessment of the chronic and cumulative effects of noise produced by oil and gas exploration activities in the Beaufort and Chukchi Seas. Modeling was conducted for a 3.5-month period (July through mid-October) for 10 locations (receiver sites) of biological importance and for six scenarios corresponding to alternatives in this EIS, including: all three levels of exploration activity (Alternatives 2, 3, and 4) and both with and without proposed time/area closures at each of these activity levels. "Lost listening area" was calculated among scenarios and relative to a baseline ambient noise estimate and considering the hearing sensitivity of low and mid-frequency cetaceans. "Lost communication space" was calculated among scenarios and relative to ambient estimates for a 1/3 octave band representing dominant frequencies of bowhead whale vocalizations. Results are reported as remaining listening area or communication space for a maximum of two depths (5 and 30 m) at each of the 10 locations.

Broadly, results for all three activity levels indicate substantial losses in listening area for both mid- and low frequency species at the three eastern-most sites, with near total loss at the Cross Island site (site 9, >95%), as well as the deeper Beaufort site (site 8, >95%), and significant losses at the Kaktovik site (site 10, >75%). Site 7 (Barrow Canyon) also sustained notable losses across all activity levels but only in

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-106
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 58 of 92
Exhibit 19, page 58 of 58

shallow depths (up to 70%). Site 3 incurred little listening area loss at the lowest level of activity, but loss at shallower depths increased notably with higher levels of activity (up to 72%). The remaining areas incurred virtually no lost listening area in any scenario. At the one receiver site located within a closure area that incurred listening area loss at any level (site 7 in Barrow Canyon), virtually no differences were noted in listening area when the closures were applied, which was likely heavily influenced by the method of removing the top 10% closest seismic shots, which is used to ensure that near-field seismic shots do not dominate the measured noise. Communication space did not notably decrease at any site except site 8 (bowhead migration route with cow-calf pairs) at the deeper depth, which suffered 24-28% loss.

There is ample evidence to support the fact that significant reductions in listening area or communication space can negatively affect aquatic animals; however, data are lacking to document links to consequences for long-lived and often wide-ranging species such as marine mammals. In contrast, with estimation of acoustic harassment, this analysis is not designed to evaluate the exposure of individual animals to seismic sources from one moment to the next. Rather, this analysis is intended to ensure consideration of the longer-term and wider-ranging noise effects from these sources and to augment the more traditional analysis of acute effects (injury and behavioral harassment). While these results are broadly informative (especially when considered as a whole across the U.S. Arctic), it is important to remain cognizant of the methods and simplifying assumptions when making location-specific interpretations and comparisons. For example, the distribution in space and time of seismic, drilling, and vessel activity will significantly influence the resulting cumulative noise exposure at a specific location. Here, projected levels were distributed based on informed conceptual examples, but actualized survey activity may result in higher concentrations in some areas and lower in others. The effect of concentrations of activity in high proximity to selected locations will continue to be offset by the methods applied here to remove the closest 10% of pulses in order to focus on long-term accumulation of energy at regional scales. However, this same method can result in an under-representation of the value of closure areas at maintaining listening and communication space. Similarly, the assumption made here that none of the activity that would have occurred in a closure area would be redistributed outside that area must be carefully considered when interpreting results (i.e., applying closures results in increased levels of activity in remaining area outside of closures). NMFS conducted this first-order chronic and cumulative assessment in response to recommendations made during the public comment period on the DEIS and SDEIS, and we are reporting our initial results as they relate to different scenarios addressed across EIS Alternatives.

### Introduction

Human-produced underwater noise impacts aquatic animals and ecosystems in complex ways, including through acute, chronic, and cumulative effects. Sound is a fundamental component of the physical and biological habitats that many aquatic animals and ecosystems have evolved to rely on over millions of years. Increases in noise and changes in soundscapes (the sounds heard in a particular location, considered as a whole) can lead to reduced ability to detect and interpret environmental cues that animals use to select mates, find food, maintain group structure and relationships, avoid predators, navigate, and perform other critical life functions. Designing noise management techniques to conserve the quality of acoustic habitat in addition to minimizing more direct adverse physical and behavioral impacts necessitates new decision support tools.

Such tools include evaluation of noise influence over longer time and larger spatial scales appropriate to represent the ecological and human activity contexts in which animals are experiencing noise. Additionally, methods are needed to derive metrics associated with these noise field evaluations that can be used to estimate their biological consequences for animals. For example, "loss of communication space" estimates the area over which a specific animal signal, used to communicate with conspecifics in biologically-important contexts (e.g., foraging, mating) can be heard, in noisier relative to quieter conditions (Clark et al. 2009). "Lost listening area" similarly estimates the more generalized contraction of the range over which animals would be able to detect a variety of signals of biological importance,

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                                    4-107
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 59 of 92
Exhibit 19, page 59 of 92

including eavesdropping on predators and prey (Barber et al. 2009). Such metrics do not, in and of themselves, document fitness consequences for the marine animals that live in chronically noisy environments. Fitness consequences, especially mediated through changes in the ultimate survival and reproductive success of whole populations of animals, rather than just individuals, are notoriously difficult to study, and particularly so underwater. However, it is increasingly well documented that aquatic species rely on qualities of natural "acoustic habitats", with researchers quantifying reduced detection of important ecological cues (reviewed in Francis & Barber 2013), as well as survivorship consequences in several species (Simpson et al. 2014; Nedelec et al. 2015). Application of this growing body of best available science to management decisions will therefore necessitate application of new approaches, as well as increasing investment and collaboration amongst scientists and managers to improve their efficacy and applicability to environmental protection.

Appendix F presents the results of a first-order cumulative and chronic effect assessment for noise produced by oil and gas exploration activities in the U.S. Arctic. Sources associated with these activities that were considered to contribute to cumulative, chronic noise levels in this region during the modeled time period included drillships and support vessels and four different types of airgun arrays. Vessel noise, mainly from propellers, is well documented to contribute to, and often dominate, background noise levels in regions where traffic is regular or during time periods where it is omnipresent (Urick 1983). Direct exposure to the intense pulses produced by airguns can result in acute impacts at close ranges. However, in addition, low-frequency dominant seismic airgun noise undergoes multiple reflections at the ocean bottom and surface and refraction through the water column sediment, causing prolonged decay time of the original acoustic signals (Urick 1984). Extended decay time can lead to high sound levels lasting from one impulse to the onset of the next, elevating ambient noise levels (Guan et al. 2015). In addition, low frequency energy from airgun surveys, with access to conducive propagation conditions (e.g., deeper waters), has been documented to travel long distances, contributing to background noise over very large areas. Seismic survey noise has been documented up to 3000 - 4000 km away as the loudest component of underwater ambient noise (Nieukirk et al. 2004, Nieukirk et al. 2012) and can raise background noise levels by 20 dB over 300,000 km$^2$ continuously for days (International Whaling Commission 2005). Baleen whales, including bowhead whales, produce calls that span a low frequency range that overlaps noise produced by airguns (Richardson et al. 1995), and presumably their best hearing abilities fall in this range as well (20 Hz-30 kHz) (reviewed in Ketten et al. 2013). Implications for acoustic masking and reduced communication space resulting from noise produced by airguns surveys and vessels are thus expected to be heightened for baleen whales.

### *Methods and Results*

Appendix F presents details of the methodology applied in this study, including maps of key spatial attributes, and includes tables of all results. Key aspects of methods and results are summarized here, but for significant details and points of clarification, we refer the reader to the Appendix.

Acoustic modeling was conducted for 10 locations, (Table 4.5-19a), termed receiver sites, within the study area to examine cumulative noise produced by four exploration alternatives (Table 4.5-19b). The locations of the receiver sites are given in Table 4.5-19a and shown in the map of Figure 4.4. These sites were chosen to reflect areas of biological interest or diversity, such as important reproduction, feeding, and migrating areas, as well as subsistence hunting areas.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-108
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/03/19   Page 60 of 92
Exhibit 19, page 60 of 92

**Table 4.5-19a. Modeled receiver site locations and water depths.**

| Site | Receiver Site | Latitude | Longitude | Water Depth (m) |
|------|---------------|----------|-----------|-----------------|
| 1 | West of Cape Lisburne | 68.62 | −167.91 | 51.16 |
| 2 | Point Lay | 69.82 | −163.37 | 19.43 |
| 3 | Chukchi leases | 71.13 | −162.43 | 44.26 |
| 4 | Hanna Shoal | 72.15 | −163.33 | 32.02 |
| 5 | Point Franklin | 70.96 | −159.62 | 54.54 |
| 6 | Peard Bay | 71.26 | −157.30 | 54.60 |
| 7 | East of Barrow | 71.52 | −154.85 | 31.23 |
| 8 | Beaufort Sea shelf slope | 71.54 | −150.31 | 1853.82 |
| 9 | Cross Island | 70.56 | −147.90 | 9.43 |
| 10 | Kaktovik | 70.28 | −143.69 | 40.43 |

The activity level alternatives considered here are the same as those addressed in the remainder of this FEIS. These include a no-activity alternative (Alternative 1) and three activity levels (Alternatives 2-4) of increasing seismic and exploratory drilling activities. The number and type of activities in the Beaufort and Chukchi Seas for Alternatives 2-4 are presented in Table 4.5-19b. Two scenarios were considered for each Alternative. The first scenario assumed no closure areas/times. The second scenario excluded (but did not displace) activities or sections of surveys that would result in sound levels of ≥ 160 dB re 1 μPa (rms SPL) within the closure areas of Barrow Canyon, Hanna Shoal, Kasegaluk Lagoon, Ledyard Bay, Cross Island, and Kaktovik. For each Alternative, exemplar locations of activities were chosen. The location of the activities is shown for each Alternative and scenario in Figures 2-7 of Appendix F. Of important note, the number and distribution of activities modeled for each Alternative were based on the conceptual examples described in Section 4.2.5 of the EIS and illustrated in Figures 4.7 to 4.9 and 4.15 to 4.17, not on the maximum possible number of activities. The grey lines shown in these maps outside the closure areas indicate the extended zone required to keep root mean square (rms) seismic sound levels below 160 dB re 1 μPa at the closure area boundaries.

**Table 4.5-19b. Number of modeled activities associated with each alternative in each sea.**

| Activity | Alternative 2 | | Alternative 3 | | Alternative 4 | |
|----------|---------------|---------|---------------|---------|---------------|---------|
| | Beaufort | Chukchi | Beaufort | Chukchi | Beaufort | Chukchi |
| 2D/3D seismic survey (4500/3200 in³ airgun array) | 1 | 1 | 2 | 2 | 4 | 4 |
| 3D ocean bottom cable/node survey (640 in³ airgun array) | 1 | - | 2 | - | 2 | - |
| Shallow hazard survey (40 in³ airgun array) | 1 | 1 | 2 | 3 | 3 | 4 |
| Exploration drilling (Mobile Offshore Drilling Unit with fleet of 8–12 support vessels) | 1 | 1 | 2 | 2 | 4 | 4 |

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement      4-109
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 61 of 92
Exhibit 19, page 61 of 92

Representative acoustic source types were specified for each activity type, with selected airgun array sizes used for seismic exploration representative of those used in the Arctic since 2006 (see Appendix F). The acoustic fields around the receiver sites were modeled at frequencies from 10 Hz to 5 kHz, up to a range of 500 km. Results are provided for two receiver depths: 5 and 30 m.

Cumulative SELs and time-averaged equivalent sound pressure levels ($L_{eq}$) at the selected receiver sites were calculated resulting from all shots from seismic surveys and exploratory drilling activities (which include support vessels), as specified for each Alternative. The accumulation period was three and a half months, from 15 July to 31 October, representing the duration of concentrated activity evaluated in the FEIS. A feature of underwater sound propagation is that nearby sources contribute substantially more SEL than more distant sources, since the exposure levels decay with the square of distance from the source. This causes cumulative SEL received from spatially distributed and moving sources to be dominated by the sources closest to a receiver. However, the duration of exposures from very close sources is typically quite short. While exposures from nearby sources are important for assessing acute effects, their inclusion in a chronic effects assessment can be misleading. To overcome this issue, this approach excluded the highest seismic shot exposures received during a fraction (10%) of the total study time period. No drilling noise was excluded, as it was assumed to remain constant for the full duration of the study period.

Marine mammal hearing frequency weighting filter coefficients were applied to the received levels, and results are presented both with and without weighting. Filters for Low-Frequency Cetacean (LFC) and Mid-Frequency Cetacean (MFC) were used, as defined by Southall et al. (2007). Results of cumulative SEL (Tables 4-6) and $L_{eq}$ (Tables 7, 9 and 11) calculations are presented in Appendix F.

To prepare to estimate lost listening area and changes in communication space for various levels of seismic and exploratory drilling activities, a baseline ambient noise level was assumed. In this study, ambient noise levels were estimated using mean (50th percentile) ambient levels recorded in the Chukchi Sea over the 2014 open-water season. Ambient levels in the Beaufort Sea were also estimated based on those of the Chukchi Sea. Broadband ambient levels (10–5000 Hz) varied between 98.9 and 105.7 dB re 1 µPa, depending on the receiver location. Ambient levels for the 1/3 octave centered at 160Hz ranged between 86.2–91.9 dB re 1 µPa across sites. Mean ambient spectra were assigned to each receiver site based on proximity to the actual recorder sites where ambient noise was measured and on the similarity in water depth between the recorded and modeled receiver sites. Tables 8, 10 and 12 present modeled $L_{eq}$ ***above ambient*** at each receiver site with M-weighting for low- (LFC) and mid-frequency cetaceans (MFC) and without weighting.

The lost listening area assessment method has been applied to in-air noise (Barber et al. 2009) and in National Park soundscape management contexts (NPS 2010). The term "listening area" refers to the region of ocean over which sources of sound can be detected by an animal at the center of the space. Sound sources considered by this method can be the same species (as discussed below for communication space), a different species (e.g., a predator or prey species), natural sounds (such as shifting ice), or anthropogenic sounds. The lost listening area method applied by Barber et al. (2009) calculates a fractional reduction in listening area due to the addition of anthropogenic noise to ambient levels. It does not provide absolute areas or volumes of space; however, a benefit of the lost listening area method is that it does not rely on source levels of the sounds of interest. Instead, the method depends on the rate of sound transmission loss. Such results can be considered with frequency weightings, which represent the hearing sensitivity variations of two marine mammal species groups and transmission loss variations with range, or more generally without weighting. Results are presented as ***a percentage of the original listening area remaining***, due to the increase in noise levels under each Alternative and scenario relative to no activity (ambient conditions), and between each Alternative and scenario (Appendix F, Tables 13 to 18).

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement
Chapter 4 – Environmental Consequences

4-110

The communication space assessment was performed using methods previously implemented for examining anthropogenic noise effects on blue, fin and right whales (Clark et al. 2009, Hatch et al. 2012). Communication space estimates the area within which bowhead whales can detect calls[5] from other bowhead whales. All calculations were performed in the single 1/3-octave frequency band centered at 160 Hz. This frequency band had the highest received sound levels for a large number of bowhead whale calls recorded during a multi-year acoustics survey in the northeastern Chukchi Sea. A 1/3-octave band sound level of 156 dB re 1 µPa at 1 m was specified. An estimate of ~15 dB signal processing gain (which accounts for the animal's ability to not only detect but recognize a signal from an animal of the same species) was applied. Noise $L_{eq}$ across sites and Alternatives in the 1/3-octave band centered at 160Hz ranged from 86.2-92.0 dB re 1 µPa, a similar range to ambient. Noise levels at sites 3, 8, 9, and 10 were most often above ambient (depending on the alternative), but still fell within this min-max range. Tables 19-21 present the area ($km^2$) of communication space at each receiver for the modeled bowhead call under ambient conditions (titled "default") and under each Alternatives and scenario, ***representing lost communication space in both area and percentage***. Tables 22-24 assess relative loss of communication space between the Alternatives.

The results reflect the fact that the locations close to the coast in the Chukchi Sea were relatively distant from the placement of the modeled activities (see Figures 2 through 7 in Appendix F). Effects at these sites (receiver sites 1, 2, 5 and 6) showed little reduction in communication space and listening area, relative to ambient conditions, under any of the Alternatives.

One of the two sites further offshore in the Chukchi, site 4 (Hanna Shoal), showed a negligible (<0.5%) reduction in listening area and no reduction in communication space for any of the Alternatives. Although this site is of key biological interest for walrus and a closure was designed around it, the modeled seismic and drilling activity was some distance from this location.

The other offshore Chukchi site (Site 3) was closer to several of the modeled survey activities. The lowest levels of modeled activity (Alternative 2) did not result in significant lost listening area. However, higher levels of activity (Alternative 4) resulted in an up to 70% reduction of listening area, relative to the area available under ambient conditions. Losses were particularly high for the shallower modeling results (5 meters). Corresponding losses of communication space for bowhead whale calls at this location were less significant, with only 7% of communication space estimated lost under the highest activity levels. Communication space was estimated to be higher for the deeper modeling results at this site (30 meters).

Site 7, east of Barrow (important bowhead whale feeding site), showed more significant impacts from the modeled activities. This site showed decreases in listening area of up to 65% (leaving only 35% of the original area) under the lowest levels of modeled activity (Alternative 2) and up to 70% for Alternative 4. Interestingly, this site did not show corresponding reductions to communication space.

Site 8, which is located in deep water (1854 m) on the edge of the Beaufort Shelf, experienced very large decreases in listening areas due to anthropogenic sound related to exploration activities. Listening areas were reduced up to 98.1% under the lowest modeled activity levels (Alternative 2), leaving as little as 1.9% of the original listening area, due to additions of ~10dB of noise relative to ambient estimates. The corresponding reduction in the listening area for Alternatives 3 and 4 were up to 98.8%. The reductions in bowhead communication space were more significant than for other sites, though still more moderate than listening area losses. Communication space, relative to estimates of ambient, was reduced by up to 19.8% for Alternative 2, 24.2% for Alternative 3 and 26.2% for Alternative 4. The greater sensitivity of this site to exploration activities appears to be due to an upward refracting sound speed profile in the deep water

---

[5] The term "vocalization" is used here to refer to sounds produced by the vibration of tissues surrounding the blowhole of bowhead whales even though these are not produced by vocal chords.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-111
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/hibi19e 62 of 63 of 92
Exhibit 19, page 63 of 92

environment that traps sound from more distant sources in the upper water column. As introduced above, airgun noise can propagate with relatively low transmission loss over large distances.

Site 9, offshore Cross Island, which is important for subsistence hunting of bowheads, also showed substantial reductions in listening areas. Listening area was reduced by up to 98.7% (leaving just 1.3% of the original listening area) for Alternative 2. The reduction was up to 98.8 for Alternatives 3 and 4. These substantial listening area losses were mainly due to the modeled presence of 12 drilling support vessels within 40 km of the receiver site. Resulting received vessel sounds exceeded ambient levels, which were estimated to be quite low in this very shallow area, by more than 10 dB. Reductions to communication space at this site were predicted to be much less than those for listening area; just 1% for all 3 Alternatives.

Site 10, in the Kaktovik whaling area, also showed substantial listening area reductions, but rather small bowhead communication space reductions. The lost listening area was up to 86% for Alternative 2 (leaving only 14% of the Alternative 1 space), up to 92% for Alternative 3, and up to 93% for Alternative 4. The communication space reductions were 0.3% for Alternative 2, 0.4% for Alternative 3, and 0.6% for Alternative 4.

### Discussion

The goal of this analysis was to apply new analytical techniques to support assessment of the biological relevance of noise associated with the FEIS' Alternative levels of oil and gas exploration activity the Beaufort and Chukchi Seas. As stated above, this is considered a first-order analysis, and several simplifying assumptions were necessary. Changes in the distribution of survey and drilling activities would result in differences in the relative amount of noise accumulating at different receiver locations, and that variance was not examined here. Instead, we present results associated with an exemplar distribution of the activity levels examined in the FEIS Alternatives and modification of those distributions to avoid buffered closure areas. Similarly, the approach applied accounts for spatial variance due to factors affecting sound propagation (e.g., topography, bottom type) among the selected locations of documented biological importance to species of key management interest in the region but does not produce results for additional locations (e.g., a uniform map). That said, examination of the key drivers of the results suggest some ability for broader interpretation at other locations.

The metrics reported here (lost listening space and communication space) do not reflect variance in an individual animal's, including an individual bowhead whale's, experience of the noise produced by the modeled activities from one moment to the next. With both sources of noise and animals moving, the time-series of an individual's noise exposure will show considerable variation. The methods applied here are meant to average the conditions generated by introducing low frequency dominant noise sources over a several month period during which animals of key management interest rely on habitats in the study area. It should be noted that this examination is meant to be a companion to additional assessments of the acute effects of the same types of noise sources in the same region; approaches are designed to account for changes in exposure realized by individuals over time, mostly in relatively close proximity to noise sources. Considered as a complement to this, the assessment presented here estimates noise produced by the same sources over much larger spatial scales, and considers how the summation of noise from these sources relates to levels without activity (ambient). Approaches such as the communication space estimation presented here include approximation for the evolved ability of many acoustically active animals, such as bowhead whales, to hear the calls of conspecifics in the presence of some overlapping noise.

The role of ambient noise in setting baselines for evaluation of communication space and listening area loss under different activity levels is central to the interpretation and function of both metrics. Interpretively, both metrics seek to consider the acoustic conditions to which animals have evolved, specifically in places that sustain critical life functions (e.g., feeding, traveling with calves), and estimate degradation in those conditions under various chronically noise-producing scenarios. Ideally, therefore,

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-112
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 64 of 92
Exhibit 19, page 64 of 92

selected baselines can approximate background noise conditions in key habitats with little to no intrusion of human-produced noise. It should be noted that such baselines will include sources of at times significant natural noise (e.g., wind and waves). For long-lived animals such as bowhead whales, contemporary noise measurements represent only, at most, a few generations of noise conditions experienced in the Arctic. However, relative to areas with higher levels of noise-producing human activity, contemporary measurements are a reasonable representation of more historical conditions, in the absence of such data. In this case, the mean (50th percentile) level of broadband measurements made during the summer of 2014 in the Chukchi were used to establish baselines. In other regions, lower percentiles would be necessary to account for periodic human-produced noise within measurement data; however, it is believed that such noises were not present in these recordings.

The largest increases in noise levels resulted from transitioning from no activity (Alternative 1 in the FEIS) to any of the remaining Alternatives (2-4). At several locations, increases in cumulative noise levels associated with transitioning among activity levels (e.g., from Alternative 2 to Alternative 3, to Alternative 4) were lower than those associated with adding any level of activity to no activity. In deeper water, at site 8, transitioning from no activity to the lowest level Alternative for activity (2) resulted in an ~ 10 dB increase in noise levels at the site, while further transitioning to the highest level Alternative for activity (4) resulted in ~12 dB over ambient. Relatedly, the highest reductions in listening area and communication space at this and several other sites resulted from adding activity of any Alternative level to no activity. For example, losses of listening area at site 9 were almost complete under the lowest activity Alternative (2) and thus were relatively unchanged by the addition of significant proximate activity under Alternatives 3 and 4. Such findings for these Arctic locations, where ambient noise levels are, in general, lower than expected for areas with higher levels of noise producing activity, support the general assertion that the quietest marine and terrestrial environments are the most vulnerable to noise intrusions, with areas with lower ambient noise levels more easily elevated noise intrusion (Hatch & Fristrup 2009). Such assertions relate to observations that animals in quiet areas are more likely to perceive subtle noise alterations in their environments (Francis & Barber 2013).

That said, there were significant reductions in listening area at some locations resulting from transitioning between lower and higher activity levels (Alternative 2 vs. 4). Given the shallow depths at most of the receiver locations, losses in listening area and communication space resulting from transitioning between Alternatives were strongly influenced by how many of the additional modeled sources were in their proximity (see Appendix F, Figures 2 through 7). Site 10 experienced large reductions in listening area due to the addition of activity at the lowest levels (up to 83% lost) and significant additional loss was estimated in transitioning from Alternative 2 to Alternatives 3 and 4 (42-5%), due to the addition of 3D survey activity directly to the west of this site under Alternatives 3 and 4. Close-proximity vessel noise associated with exploratory drilling had the potential to strongly influence cumulative noise levels at receiver sites, as, in contrast to modeled noise from airgun shots, noise from vessels in very close proximity to receivers was not excluded from this analysis. This is reflected most strongly in the lost listening area calculations for sites 3 and 9, which were located close to concentrations of exploratory drilling support vessels under various Alternatives. At site 3, levels of modeled activity associated with Alternative 2 did not result in significant reductions in listening area relative to ambient and vessels were located at some distance. However, the addition of activity associated with Alternatives 3 and 4 included both the addition 3D airgun array surveys directly to the west and close proximity vessels, and reduced listening area at this site to only 32-33% what was available under Alternative 2. At site 9, close proximity exploratory drilling activity under all Alternatives drove significant listening area reductions estimated at this location.

The effects of closures (Scenario 2) at maintaining communication space or listening area in the presence of increasing activities levels under Alternatives 2 through 4 was relatively low, though notable in a few cases. Site 3, though not inside a closure area, was close to activities that were curtailed by closures surrounding site 4. Area closures resulted in only a 4.2% reduction in communication space (instead of

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                  4-113
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 65 of 92
Exhibit 19, page 65 of 92

7% without area closures) at site 3 under Alternative 4. Lost listening area and communication space were consistently slightly less at site 7, which was inside a closure area, when the closure was in effect. The methods used in this assessment to remove 10% of shots from survey activity closest to the receiver locations are likely to have reduced the relative difference between accumulated energy resulting from closures (which further eliminated shots that would have taken place within the 160 dB buffered closure areas). This is especially relevant to interpretation of results at locations 7 and 10, which were nested in closure areas that, under non-closure scenario (1), would have been exposed to very proximate survey activity were it not for the removal of the top 10% of shots. This loss of resolution between closure and non-closure results does not adequately capture the reduction in acute noise exposure that would be experienced by animals within the closure if such mitigation is applied. However, again, the methods of this study focused instead on chronic, longer-term exposure associated with low frequency, well-propagating noise. It is well understood that the size of areas necessary to achieve significant reductions of low frequency chronic noise will vary significantly with local propagation conditions. This study does support the general premise that relatively small closures will be more relevant to reductions in regional-scale chronic noise reduction goals in areas with poorer propagation conditions (e.g., shallower) than in areas with well-propagating noise (e.g., deeper). Finally, this assessment did not evaluate the implications of displacing some or all of the activity that would have taken place within the closure to within the remaining area outside the closure. The FEIS does not estimate whether closures would result in lower activity levels and there was no basis for asserting what portion of activity would be redistributed. The implications of such redistribution on cumulative noise levels both within and outside closures would vary considerably. Some sites inside closures could experience reduced cumulative levels (depending on their size and propagation conditions as noted above) while some sites outside closures could experience higher noise levels due to survey levels displaced to their vicinity.

Comparison between the results between the two metrics applied here highlights important interpretive differences in evaluating the biological implications of higher background noise. The strength of the communication space approach is that it evaluates potential contractions in the transmission of a signal of documented importance to a population of animals of key management interest in the region. In this case, maximum losses of communication space for a calling bowhead whale (28%) were estimated to occur at the deepest water location, off the Beaufort Sea shelf slope (site 8), under the highest activity Alternative (4) with no closures in place (scenario 2). This site is within the Fall bowhead whale migration, when adult females are traveling west with calves and regular communication between them is likely important to maintain group cohesion. Losses were significantly higher at 30 meters depth than at 5 meters depth, reflected the fact that modeled noise within the 1/3 octave band centered at 160Hz were higher at 30 meters than at 5 meters.

Losses of broadband listening area, however, far exceeded losses of communication space evaluated at the same locations and under the same activity levels. This is appropriate to the interpretive role of the lost listening space calculation, which is to provide a more conservative estimate of the areas over which animals have access to a variety of acoustic cues of importance to their survival and reproductive success. It is not understood what all cues used by marine mammals are in the Beaufort and Chukchi, but it is well discussed that acoustics provide particularly important information in areas where other sensory cues are diminished (e.g., dark) and where navigation is challenging (e.g., complex coastlines, topography and ice). Documentation of such cues (reviewed in Barber et al. 2009, Slabbekoorn et al. 2010) indicate that they can be well outside of the frequencies that animals use to communicate with conspecifics, are often of lower source levels that conspecific calls and in many cases cannot benefit from evolved capacity to compensate for noise (e.g., gain applied to communication space calculations), due to the absence of mechanism for natural selection to act (e.g., most eavesdropping contexts). Broadband listening space losses in this study were near complete at sites 8 and 9 in the Beaufort, with maximum losses realized under the highest activity Alternative (4). Again, these areas are important for the Fall bowhead whale migration, with calves, and the shallower area at Site 9 (Cross Island) represents an important bowhead whale subsistence area]. Interestingly, listening area losses were higher at 5 meters depth than at 30

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement    4-114
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG    Document 51-19    Filed 06/08/19    Page 66 of 92
Exhibit 19, page 66 of 92

meters depth, reflecting the fact that modeled broadband noise levels were higher at 5 meters than at 30 meters.

### Conclusion

This chronic and cumulative effects study is presented to assist the public and managers in further assessing the effects of noise associated with the Alternatives for oil and gas exploration off the coast of Alaska considered in the FEIS. It is meant to ensure treatment of longer-term and wider-range noise effects from sources such as airguns, used in seismic acquisition, to augment more traditional assessment of their acute effects (e.g., auditory injury and harassment). The metrics applied in this first-order study necessitate several simplifying assumptions and do not, in and of themselves, document the consequences of lost listening area or communication space for the survivorship or reproductive success of individual animals, including marine mammals in the Arctic. However, they do translate a growing body of scientific evidence for concern regarding the degradation of the quality of high value acoustic habitats into quantifiable attributes that can be compared among proposed activity levels and distributions and related to the baseline conditions to which animals have evolved.

## 4.5.2.4.10    Bowhead Whales

This section describes the potential effects of Alternative 2 to bowhead whales. This information is in addition to the information provided in Sections 4.5.2.4.1 through 4.5.2.4.9, which is applicable to marine mammals more generally. Here, we include information specific to bowhead whales.

### 4.5.2.4.10.1    Direct and Indirect Effects

The primary direct and indirect effects on bowhead whales from activities associated with oil and gas exploration in the Beaufort and Chukchi seas considered under Alternative 2 would result from noise exposure. Ship strikes and habitat degradation are also possible but low probability. Sources of noise include 2D/3D seismic survey equipment (airgun arrays), echosounder and sonar devices associated with site clearance and shallow hazards surveys, support, monitoring and receiving vessels associated with these surveys, icebreaking activities, on-ice vibroseis seismic surveys (Beaufort Sea only), exploratory drilling, and helicopter and fixed wing aircraft associated with the different programs. Details of these activities and associated components can be found in Chapter 2.

### Behavioral Disturbance

Anthropogenic noise from oil and gas exploration activities may elicit behavioral responses from bowhead whales. The suite of possible reactions is listed above; known reactions by bowhead whales are included here and described and assessed by region and activity.

**Beaufort Sea Activities**

*2D/3D Seismic Surveys (July through November)*

Airgun arrays are the most common source of seismic survey noise. Baleen whales generally avoid operating airguns, but avoidance distances vary by species, locations, behavioral activities, as well as environmental conditions that influence sound propagation (Richardson et al. 1995, Gordon et al. 2004).

Airgun sounds can propagate horizontally for many kilometers (Greene and Richardson 1988). In waters 25 to 50 m (82 to 164 ft) deep, airgun sound can be detected 50 to 75 km (31 to 46 mi) away; in deeper water, ranges can exceed 100 km (62 mi) (Richardson et al. 1995). Ranges from airgun arrays to SPL thresholds between 190 and 120 dB re 1 µPa rms were measured for most seismic surveys and site clearance programs performed with airgun sources in the Alaskan Beaufort and Chukchi Seas between 2006 and 2015 as a component of IHA requirements. A detailed listing of those results is provided in Appendix G and a summary of the average and standard deviations of the 190, 180 and 160 dB re 1 µPa rms distances by source type and environment is given in Table 4.5-11. For example, the average

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-115
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 67 of 92
Exhibit 19, page 67 of 92

distances to these threshold levels for surveys on the Beaufort Sea Shelf in >15 m water depth using airgun arrays of 3147 in[3] total volume were: 889 m to 190 dB re 1 μPa, 2573 m to 180 dB re 1 μPa, 11452 m to 160 dB re 1 μPa, and 74813 m to 120 dB re 1 μPa rms.

(Refer to Appendix G for additional details on these measurements.)

Observed responses of bowhead whales to seismic noise vary and may depend on multiple contextual factors, such as whether the whales are feeding or migrating. Feeding bowheads tend to show less avoidance of sound sources than do migrating bowheads. Bowhead whales feeding in the Canadian Beaufort Sea in the 1980s showed no obvious behavioral changes in response to airgun pulses from seismic vessels 6 to 99 km (3.7 to 61.5 mi) away, with received sound levels of 107 to 158 dB rms (Richardson et al. 1986). They did, however, exhibit subtle changes in surfacing–respiration–dive cycles. Seismic vessels approaching within approximately 3 to 7 km (1.9 to 4.3 mi), with received levels of airgun sounds of 152 to 178 dB, usually did not elicit strong avoidance reactions (Richardson et al. 1986, 1995, Ljungblad et al. 1988). Richardson et al. (1986) observed feeding bowheads start to turn away from a 30-airgun array with a source level of 248 dB re 1 μPa at a distance of 7.5 km (4.7 mi) and swim away when the vessel was within about 2 km (1.2 mi); other whales in the area continued feeding until the seismic vessel was within 3 km (1.9 mi). More recent studies have similarly shown greater tolerance of feeding bowhead whales to higher sound levels than migrating whales (Miller et al. 2005, Harris et al. 2007, Koski et al. 2009, Christie et al. 2010). Koski et al. (2008, 2009) observed several groups of bowhead whales that continued feeding near seismic surveys in the central Beaufort Sea in 2007 and 2008 where received sound levels reached between 150 and 180 dB re 1 μPa. Data from an industry aerial monitoring program in the Alaskan Beaufort Sea during 2006 through 2008 and 2010 noted bowhead whale mean distance from the center of active seismic operations increased for traveling but not for feeding whales; however, ice conditions appear to be a factor as well (Funk et al. 2011). This apparent tolerance, however, should not be interpreted to mean that bowheads are unaffected by the noise. Feeding bowheads may be so highly motivated to stay in a productive feeding area that they remain in an area with noise levels that could, with long-term exposure, potentially cause some sort of phyisiological impairment. Koski et al. (2009) noted bowhead whales appear more tolerant of higher levels of seismic noise when there is reason to remain in an area, such as the presence of food. However, other factors likely influence distribution relative to seismic activity, including ice cover, water depth, distance from shore, age, size, breeding status, and other disturbances in the area.

Migrating bowhead whales respond behaviorally more strongly to seismic noise pulses than do feeding whales. Bowhead whales migrating west across the Alaskan Beaufort Sea in autumn showed avoidance out to 20 to 30 km (12.4 to 18.6 mi) from a medium-sized airgun source at received sound levels of around 120 to 130 dB re 1 μPa rms (Miller et al. 1999, Richardson et al. 1999). Avoidance of the area did not last more than 12 to 24 hours after seismic shooting stopped. Deflection might start as far as 35 km (21.7 mi) away and may persist 25 to 40 km (15.6 to 24.9 mi) to as much as 40 to 50 km (24.9 to 31.1 mi) after passing seismic-survey operations (Miller et al. 1999). Analyses of data on traveling bowheads in the Alaskan Beaufort Sea also showed a stronger tendency to avoid operating airguns than was evident for feeding bowheads (Christie et al. 2009, Koski et al. 2009). Richardson et al. (1999) suggests migrating bowheads start to show significant behavioral disturbance from multiple pulses at received levels around 120 dB re 1 μPa. Although travelling whales tend to divert around a sound source at lower sound levels than do feeding whales, some travelling whales appeared to tolerate sounds greater than 120 dB (Koski et al. 2009).

Surfacing, respiration, and diving behaviors of bowhead whales change when exposed to seismic activities (Robertson et al. 2013). Surfacing time decreased, particularly for traveling or socializing non-calf bowheads exposed to seismic sounds. Dive duration was also affected, but effects varied with season (more pronounced in autumn than in summer) and whale activity (e.g., traveling vs. feeding). Traveling whales exposed to seismic operations had the shortest surface times and fewest respirations per surfacing, while feeding whales appeared more tolerant (Robertson et al. 2013).

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-116
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/06/19   Page 68 of 92
Exhibit 19, page 68 of 68

The effect of seismic airgun pulses on bowhead whale calling behavior has been extensively studied in the Alaskan Beaufort Sea. Recent analyses indicate that calling rates increase when airgun pulses are first detectable above background levels, then level off at nearly double the calling rate in the absence of seismic sounds. Calling rates decrease and the whales become virtually silent at higher received levels from airgun pulses (Blackwell et al. 2015). During the autumn season in 2007 and 2008, calling rates decreased substantially in the presence of airgun pulses (Blackwell et al. 2010a). During August to October 2007, call localization rates (CLRs) dropped substantially at the onset of airgun use at sites near to (median distance 41-45 km) airguns where median received levels from airgun pulses were 116–129 dB re 1 lPa (10–450 Hz). CLRs did not change at distant (median distance >104 km) sites where median received levels were 99–108 dB re 1 lPa (Blackwell et al. 2013). Reanalysis of data from 2007-2010 indicate that call detection rates dropped rapidly when cumulative sound exposure levels (CSELs) were greater than ~127 dB re 1 $\mu$Pa$^2$·s over 10 minutes and whales are nearly silent at received CSELs close to 160 dB (Blackwell et al. 2015). The decrease could be caused by less or no calling by individual whales, deflection of whales around the seismic activity, or a combination of both. Calls resumed near the seismic operations area shortly after operations ended. Aerial surveys showed high sighting rates of feeding, rather than migrating, whales near seismic operations (Blackwell et al. 2010a). In contrast, reduced calling rates during a similar study in 1996 to 1998 were largely attributed to avoidance of the area by whales that were predominantly migrating, not feeding (Miller et al. 1999, Richardson et al. 1999).

The open water season (July through early November) during which proposed seismic activities would occur (for up to 90 days), overlaps with summer feeding and the late-summer/fall westward migration of bowhead whales across the Alaskan Beaufort Sea. Therefore, the potential for exposure and disturbance is high during this time period. Data available from the BWASP and ASAMM surveys and other surveys (Ashjian et al. 2010, Clarke et al. 2011a, 2011b, 2011c, 2012, 2013, Koski and Miller 2009, Moore et al. 2010, Okkonen et al. 2011) reveal areas where concentrations, including feeding aggregations and/or aggregations of females and calves, are more likely to occur in the Beaufort Sea. These areas include a bowhead whale feeding "hotspot" during late summer to fall from Point Barrow to Smith Bay and the Kaktovik area where whales are occasionally observed feeding as early as July, and often occur in higher concentrations beginning in late-August and September.

Seismic activity in the Beaufort Sea would likely impact bowhead whales, although the level of disturbance will depend on whether the whales are feeding or migrating, as well as other factors such as the age of the animal, whether or not it is habituated to the sound, etc. Responses can range from apparent tolerance to interrupted communication, minor displacement, or avoidance of an area. If multiple 2D/3D seismic surveys occurred in areas with concentrations of bowheads present, large numbers of bowheads could potentially be disturbed or potentially excluded by avoidance from feeding habitat for the duration of the survey period. Most observed disturbance reactions appear to be short-term (meaning the length of the exposure to seismic pulses or less time), and short-term reactions to airgun noises are not necessarily indicative of long-term or biologically significant effects. It is not known whether impulsive sounds affect reproductive rate or distribution and habitat use over periods of days or years. The Western Arctic stock of bowhead whales has, however, been increasing at approximately 3.7 percent per year (Givens et al. 2013), during a period of exposure to exploration activities in the Beaufort and Chukchi seas since the late 1960s. In addition, the potential for increased stress, and the long-term effects of stress, are unknown, as research on stress effects in marine mammals is limited (see discussion above). The level of available information is sufficient to support sound scientific judgments and reasoned managerial decisions, even in the absence of additional data of this type.

In terms of the impact criteria of Table 4.5-18, the disturbance effects of exploratory activity under Alternative 2 would be considered of medium intensity. Additionally, contextually, these impacts take place within a known migratory corridor through which these endangered whales must travel with calves and some may be temporarily displaced from preferred feeding areas. The EIS project area encompasses a

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-117
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 69 of 92
Exhibit 19, page 69 of 92

large portion of bowhead whale habitat between the Bering Strait and Canadian border, so leaving the area entirely to avoid impacts is not a likely option. The duration of exposures from these surveys, for this Alternative is considered interim because it is limited to the open water season, and any behavioral responses by bowhead whales to activities is expected to be temporary and contained primarily within the time-period that an individual is exposed to the sounds, and because while the impacts are expected to be repeated over multiple years, 3D seismic surveys do not necessarily occur in every year. The extent of the impact will depend on the number of seismic activities and associated support vessels in an area. For individual sound source vessels and likely disturbance effects, impacts are expected to be local. However, where acoustic habitat is concerned, and the potential to mask important acoustic cues, the effects are broader and may be more regional in nature. Bowhead whales are considered unique in context, given both their endangered species status and the important migratory areas in which the impacts occur.

### In-ice Seismic Survey (2D/3D) with Icebreaker Support (October to mid-December)

Disturbance effects from seismic activities are anticipated to be the same as described above. The difference with this activity is the additional sound input from icebreaking activities and the extended period of activity into late fall and early winter. The temporal component of this activity and the potential effects of icebreakers are addressed here.

Increased noise from icebreaking activities may present concerns for bowhead whales (NMFS 2010c). Estimated source levels for an icebreaker range from 177 to 191 dB re 1 µPa (Richardson et al. 1995). More recent measurements of the U.S. Coast Guard Cutter Healy found that the sound signature increased approximately 10 dB between 20 Hz and 2kHz when breaking ice (Roth et al. 2013). According to Roth et al. (2013), the highest noise levels resulted while the ship was engaged in backing-and-ramming maneuvers, owing to cavitation when operating the propellers astern or in opposing directions. They found that in frequency bands centered near 10, 50, and 100 Hz, source levels reached 190-200 dB re 1 µPa at 1 m (full octave band) during icebreaking operations. A study by Miles et al. (1987) used models to predict responses of bowhead whales to icebreaker noise and determined that response was likely at distances of 2 to 25 km (1.24 to 15.53 mi). Zones of responsiveness for intermittent sounds, such as an icebreaker pushing ice, were not studied. They further predicted that approximately half of the bowhead whales exhibited avoidance behavior to a traveling icebreaker in open water at 2 to 12 km (1.25 to 7.46 mi) when the sound-to-noise ratio is 30 dB and to an icebreaker pushing ice at a distance of 4.6 to 20 km (2.86 to 12.4 mi) when the sound-to-noise ratio is 30 dB. Migrating bowhead whales avoided an icebreaker-accompanied drillship (with nearly daily icebreaking) by >25 km (>15.5 mi) in 1992 (Brewer et al. 1993).

The additional sound from an icebreaker accompanying seismic activity could cause temporary avoidance of bowhead whales from areas where the vessels are operating and potentially cause temporary deflection of the migration corridor (NMFS 2010c). BWASP and ASAMM surveys flown in September and October of 2006 through 2012 of the Alaskan Beaufort Sea include sightings of bowhead whales through at least mid-October, with sightings occurring from the U.S./Canadian border to Point Barrow (Clarke et al. 2011b, 2011c, 2011d, 2012, 2013). It is during this time period that the likelihood of co-occurrence of bowhead whales and icebreaker-accompanied seismic activity is most probable. Avoidance by bowhead whales of important feeding areas and displacement during migration are possible. The likelihood of interaction diminishes by late October as most bowheads tend to have migrated out of the Beaufort Sea by this time; therefore, impacts to bowhead whales from this type of activity are only anticipated for a short period of time (likely the first few weeks of the survey).

Because in-ice seismic surveys are designed to begin in early to mid-October towards the end of the bowhead whale fall migration westward through the Beaufort Sea, anticipated impacts of in-ice activities would be anticipated to be somewhat lower than those described for 2D/3D seismic surveys above (see Table 4.5-18 for impact criteria definitions). Surveys utilizing icebreakers could, however, cause avoidance and displacement over a larger radius with the additional noise input from the icebreaking

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                     4-118
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/18   Page 70 of 92
Exhibit 19, page 70 of 92

activities, but the period of time over which this activity would overlap with bowhead whales in the Beaufort Sea is much shorter. Based on these factors, anticipated impacts of in-ice activities are anticipated to be of medium intensity, interim duration, local in extent, and would affect a unique resource for any bowhead whales that may occur in vicinity at the beginning of in-ice operations. However, as operations continue, bowheads would no longer occur in the project area, as they overwinter south of the EIS project area.

### Ocean-Bottom-Cable or Node Survey (July to October)

An OBC/OBN seismic survey typically covers a smaller area than the streamer surveys discussed above and may spend several days in an area. One such survey is anticipated in the Beaufort Sea under Alternative 2. OBC/OBN surveys may require the use of dual seismic source vessels working in tandem (see Chapter 2, Table 2.4). Noise and disturbance effects of support vessels are discussed separately below.

Reactions to sounds from OBC/OBN surveys are similar to those reported for 2D/3D streamer seismic surveys. A partially-controlled study of the effect of OBC seismic surveys on westward-migrating bowhead whales was conducted in late summer and fall in the Alaskan Beaufort Sea in 1996 to 1998. Whales avoided the sound source out to 20 to 30 km (12.4 to 18.6 mi) at received sound levels of around 120 to 130 dB re 1 μPa rms (Miller et al. 1999, Richardson et al. 1999). Miller et al. (1999) estimated the deflection may have begun about 35 km (22 mi) to the east. Several bowheads moved into the area close to the seismic vessel during periods when airguns were inactive. Avoidance of the area of seismic operations did not persist beyond 12 to 24 hours after seismic shooting stopped.

The open water season of July to October, during which OBC/OBN surveys are likely to occur, coincides with summer feeding and late-summer/fall migration periods for bowhead whales in the Beaufort Sea. Although most bowhead whales feed in the Canadian Beaufort and Amundson Gulf during the summer months, some may occur near Kaktovik as early as July (Koski and Miller 2009). From late-summer through October, bowhead whales commonly occur in nearshore, shallow waters. The median depths of bowhead sightings during 2006 to 2014 BWASP and ASAMM surveys ranged from 19 to 39 m (62 to 128 ft) (Clarke et al. 2015b). In addition, the distance from which migrating bowheads appear to deflect from OBC/OBN sound sources suggest possible disturbance to whales traveling or feeding farther offshore. Moreover, some OBC/OBN surveys occur inside the barrier islands, where bowhead whales are rarely sighted, thus reducing the potential for effects on the animals from these types of surveys.

Anticipated impacts of OBC/OBN surveys, in terms of magnitude (medium), duration (interim), extent (local), and context (unique) would be similar to those described for 2D/3D seismic surveys above. See Table 4.5-18 for impact criteria definitions. Although disturbance effects may extend 20 to 30 km (12.4 to 18.6 mi) from the sound source, with one OBC/OBN survey anticipated in the Beaufort Sea, short-term effects should remain local.

### Site Clearance and High Resolution Shallow Hazards Survey Programs (July to November)

High-resolution shallow hazards surveys are of short duration, and the airguns are smaller, generating lower energy sounds and a smaller zone of influence than the larger airgun arrays used for 2D/3D seismic surveys (NMFS 2010b). The radii of ensonification at 120, 160, 180, and 190 dB re 1 μPa rms were calculated for sound sources proposed for use in 2010. Radii calculated for the 40 in$^3$ airgun were 14,000 m (45,932 ft), 1,220 m (4,003 ft), 125 m (410 ft), and 35 m (115 ft) for the respective sound source levels. Additional information on measured sound radii for such sound sources in the Beaufort and Chukchi seas between 2006 and 2010 is contained in Table 4.5-9. Ensonified zones were not calculated for side scan sonar, single-beam or multi-beam echosounders, or for the bathymetric sonar (NMFS 2010b), as many of these sources are outside the range of best hearing for mysticetes and possibly for other marine mammals. Additionally, as mentioned above, the beam widths of these sources are narrow,

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement    4-119
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 71 of 92
Exhibit 19, page 71 of 92

which would only expose marine mammals to the sounds for one or two pulses, at most, if the animal swims in the direct beam width of the source.

Bowheads appear to continue normal behavior when exposed to noise generated by high-resolution seismic surveys. Richardson et al. (1985) tested this by firing a single 40 in[3] airgun at a distance of 2 to 5 km (1.2 to 3.1 mi) from whales. Some bowheads continued feeding, surfacing, diving, or traveling when the airgun began firing 3 to 5 km (1.9 to 3.1 mi) away (received noise levels at least 118 to 133 dB re 1 μPa rms). In other tests, some whales oriented away at 2 to 4.5 km (1.2 to 2.8 mi) and at 0.2 to 1.2 km (0.12 to 0.75 mi) (received noise levels at least 124 to 131 and 124 to 134 dB, respectively). Turning, diving, surfacing, respiration and calling were similar with or without airguns (Richardson et al. 1985a, b).

Site clearance and high resolution shallow hazards surveys on active leases in the Beaufort Sea could overlap spatially and temporally with feeding bowhead whales in some years from Harrison Bay to Camden Bay, particularly during their fall migration from the eastern Beaufort Sea to the Chukchi Sea.

Based on the criteria defined in Table 4.5-18, anticipated impacts of these surveys, in terms of magnitude (medium), duration (interim), extent (local), and context (unique) would be similar to those described for 2D/3D seismic surveys above.

_On-ice Vibroseis Survey (January to May)_

The presence of bowhead whales are not likely to overlap with an on-ice vibroseis survey due to their absence from the Beaufort Sea during the winter months. If, however, the activity continues into April and May, it could coincide with the spring migration through the nearshore lead system from the Chukchi Sea into the Beaufort Sea. The migratory pathway of bowheads is more narrowly defined during the spring migration largely due to constraints imposed by ice configurations and leads and fractures. The migration corridor through the Beaufort Sea extends farther offshore than that through the Chukchi Sea (Figure 3.2-6), so migrating whales may be sufficiently distant from noise produced from vibroseis to not be disturbed.

Bowhead whales are sensitive to sound, including on-ice sounds, during the spring migration, as noted by Iñupiat whalers:

> _The whales are very sensitive to noise and water pollution. In the spring whale hunt, the whaling crews are very careful about noise. In my crew, and in other crews I observe, the actual spring whaling is done by rowing small boats, usually made from bearded sealskins. We keep our snow machines well away from the edge of the ice so that the machine sound will not scare the whales_ (NMFS 2013).

_Exploratory Drilling (July through October)_

Exploratory drilling is anticipated to initially occur on active leases offshore of Camden Bay. In addition to a drillship or steel drilling caisson (SDC), there will be additional vessels for support and ice management (potentially as many as 8 to 12 for one drilling operation). Potential impacts from additional vessel traffic will be discussed separately from the effects of the drillship operations (see Associated Vessels and Aircraft below). Multiple sites could be drilled each season with up to three wells being a reasonable number for analysis purposes. This is based on the amount of time needed to drill each individual well and the available amount of time to conduct such operations during the ice free months. See Chapter 2 for details of this activity.

Reactions of bowhead whales to drillship operation noises varies. Whales exhibiting apparently normal behavior were observed several times within 10 to 20 km (6.2 to 12.4 mi) of drillships in the eastern Beaufort Sea, and whales have been sighted within 0.2 to 5 km (0.12 to 3 mi) of drillships (Richardson et al. 1985a, b, Richardson and Malme 1993). Bowheads may, however, avoid drillships and accompanying support vessels at 20 to 30 km (12.4 to 18.6 mi) (MMS 2003). The presence of actively operating

icebreakers in support of drilling operations introduces additional sound into the marine environment and affects responses of whales. In 1992, Brewer et al. (1993) noted that migrating bowhead whales avoided an icebreaker-accompanied drillship by >25 km (>15.5 mi). Richardson et al. (1995) observed avoidance behavior in half of the bowhead whales exposed to 115 dB re 1 μPa rms broadband drillship noises. Reaction levels depended on whale activity, noise characteristics, and the physical situation, similar to that observed with seismic sounds. Richardson and Greene (1995) concluded that the observed playback effects of drilling noise were local and temporary and that effects on distribution, movements, and behavior were not biologically important. Continued long-term monitoring of effects may be needed to better address the issue of biological importance.

Continuous noise emitted from stationary sources, such as drillships, elicits less dramatic behavioral reactions (e.g., changes in swim speed, dive behavior) by bowhead whales than do moving sources, particularly ships (Richardson and Malme 1993). Most observations of bowheads apparently tolerating noise from stationary operations were opportunistic sightings of whales near oil-industry operations; whether more whales would have been present in the absence of those operations is not known. Richardson et al. (1990) performed 12 playback experiments in which bowhead whales in the Alaskan Arctic were exposed to drilling sounds. Whales generally did not respond to exposures in the 100 to 130 dB re 1 μPa rms range, although there was some indication of behavioral changes in several instances.

Some bowheads likely avoid closely approaching drillships by changing their migration speed and direction, making distances at which reactions to drillships occur difficult to determine. In a study by Koski and Johnson (1987), one whale appeared to alter course to stay 23 to 27 km (14.3 to 16.8 mi) from the center of the drilling operation. Migrating whales passed both north and south of the drillship, apparently avoiding the area within 10 km (6.2 mi) of the drillship. No bowheads were detected within 9.5 km (5.9 mi) of the drillship, and few were observed within 15 km (9.3 mi). They concluded westward migrating bowheads appeared to avoid the offshore drilling operation during the fall of 1986, and some may avoid noise from drillships at 20 km (12.4 mi) or more.

Monitoring of the Kuvlum drilling site north of Point Thompson occurred during the 1993 fall bowhead whale migration by Hall et al. (1994). These data were later reanalyzed by Davies (1997) and Schick and Urban (2000). Davies (1997) concurred with Hall et al. (1994) that the whales were not randomly distributed in the study area and that they avoided the area around the drill site at a distance of approximately 20 km (12.4 mi). Hall et al. (1994) noted that the distribution of whales observed in the Kuvlum drilling site is consistent with previous studies (Moore and Reeves 1993), where whales were observed farther offshore in this part of the Beaufort Sea than they were to the east of Barter Island and that it was difficult to separate the effect of the drilling operation from other independent variables, such as water depth. However, Davies (1997) noted whales were closer to shore and in shallower water. Results in Schick and Urban (2000) indicated whales within hearing range of the drillship (<50 km [<31.1 mi]) were distributed farther from the rig than they would be under a random scenario. They concluded the spatial distribution of whales was strongly influenced by the presence of the drillship but lacked data to assess noise levels. Other factors that could influence distribution relative to the drillship were support vessels and icebreakers operating in the vicinity, as well as ice thickness (Schick and Urban 2000). All of these studies noted some level of bowhead whale deflection from active drilling operations.

Bowhead whales, including mothers and calves, may occur in waters west of Kaktovik and near Camden Bay as early as July but more typically from late-August through September (Koski and Miller 2009). It appears to be part of the fall migration corridor. Consequently, there is a high likelihood drilling operations in September or October would coincide with bowhead whales migrating through the area, and would elicit reactions ranging from tolerance (mostly by feeding whales) to displacement and avoidance of the drilling noises.

Based on the impact criteria defined in Table 4.5-18, anticipated impacts of exploratory drilling activities in the Beaufort, in terms of magnitude (medium), duration (interim), extent (local), and context (unique)

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-121
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 72 of 92

Exhibit 19, page 73 of 92

would be similar to those described above for seismic surveys. The zone of possible displacement around a drillship would also be influenced by accompanying support vessel and icebreaker activity and their respective working distances from the drillship or rig. Shell analyzed the composite noise footprint of its drillship and support vessels during its 2015 Chukchi Sea drill program. That analysis determined that the composite noise emissions exceeded 120 dB re 1 μPa over an average area of 1264 km$^2$ (488 mi$^2$) taken over the duration of its activities. This area represents approximately 0.5% of either the Beaufort or Chukchi EIS areas (Austin and Li 2016).

### *Associated Vessels and Aircraft*

Bowhead whales react to approaching vessels at greater distances than they react to most other activities. Vessel sounds vary by vessel size and type, as well as vessel operating conditions. Vessel sounds measured in the Beaufort Sea since 2007 yielded threshold radii to 120 dB re 1 μPa between 120 m (390 ft) for smaller vessels and 13 km (8.1 mi) for large vessels, with a mean value of 2.3 km (1.4 mi) (LGL Alaska Research Associates, Inc. et al. 2013). Vessel-disturbance experiments in the Canadian Beaufort Sea by Richardson and Malme (1993) showed that most bowheads begin to swim rapidly away when fast moving vessels approach directly. Avoidance usually begins when a rapidly approaching vessel is 1 to 4 km (0.62 to 2.5 mi) away. Whales move away more quickly when approached closer than 2 km (1.2 mi) (Richardson and Malme 1993). A few whales reacted at distances of 5 to 7 km (3.1 to 4.3 mi), while others did not react until the vessel was <1 km (<0.62 mi) away. Received noise levels as low as 84 dB re 1 μPa, or 6 dB above ambient, elicited strong avoidance of an approaching vessel from 4 km (2.5 mi) away. During the experiments, vessel disturbance temporarily disrupted activities, and socializing whales moved apart from one another. Fleeing from a vessel usually stopped soon after the vessel passed, but scattering lasted for a longer time period. Some bowheads returned to their original locations after the vessel disturbance (Richardson and Malme 1993). Bowheads react less dramatically to and appear more tolerant of slow-moving vessels, especially if they do not approach directly. Acoustic monitoring in the vicinity of Northstar (an artificial oil production island in the Alaskan Beaufort Sea) indicated that when transient sounds, such as from boats, increased, bowhead whale calls were significantly shorter (Blackwell et al. 2007). Bowhead calling behavior may be affected by exposures to low levels of seismic survey noise from airguns. A study by Blackwell et al. (2013) found calling rates initially increased when they were exposed to low seismic sound levels, then decreased when the exposure levels continued to increase.

Data are not sufficient to determine demographic responses of bowhead whales to vessels. However, more information of this type is not essential for a reasoned choice among alternatives.

Iñupiat whalers expressed concern over vessel impacts on bowhead whales, noting observed displacement caused by barge activity:

> *Bowhead whales have a different view of how they interact with things. For instance, I want to say, again, I've met with you guys, and I explained when I was a whaling captain in '05 was my first year, I saw 100 -- over 100 whales diverted from one barge, and there was no other whales beyond that for the next 15 miles. So I've seen the activity and the diversion of bowhead whales from industry* (testimony provided by Thomas Napageak, Jr. at Nuiqsut Public Scoping Meeting for this EIS, March 11, 2010).

Data on reactions of bowheads to helicopters are limited. Most bowheads showed no obvious response to helicopter overflights at altitudes above 150 m (500 ft) (Richardson and Malme 1993). Patenaude et al. (2002) found that most reactions by bowhead whales to a Bell 212 helicopter occurred when the helicopter was at altitudes of ≤150 m (500 ft) and lateral distances of ≤250 m (820 ft). Reactions included abrupt dives, short surfacings, and breaching, and, most, if not all, reactions seemed brief. The majority of bowheads, however, showed no obvious reaction to single passes, even at those distances. Data were insufficient to analyze effects of repeated low-altitude passes (Patenaude et al. 2002).

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-122
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/08/19   Page 74 of 92
Exhibit 19, page 74 of 92

Fixed-wing aircraft flying at low altitude often cause bowheads to dive rapidly. Reactions to circling aircraft may be conspicuous at altitudes <300 m (1,000 ft), uncommon at 460 m (1,500 ft), and generally undetectable at 600 m (2,000 ft). Repeated low-altitude overflights at 150 m (500 ft) during aerial photogrammetry studies of feeding bowheads sometimes elicited abrupt turns and quick dives (Richardson and Malme 1993). Aircraft on a direct course are audible only briefly, and whales are likely to resume their normal behavior within minutes after the plane passes (Richardson and Malme 1993). Only 2.2 percent of bowheads during the spring migration reacted to Twin Otter overflights at altitudes of 60 to 460 m (197 to 1,509 ft) (Patenaude et al. 2002). Reactions diminished with increasing lateral distance and altitude. Most observed reactions by bowheads occurred when the Twin Otter was at altitudes of ≤182 m (597 ft) and lateral distances of ≤250 m (820 ft). There was little, if any, reaction when the aircraft circled at an altitude of 460 m (1,509 ft) and a radius of 1 km (0.62 mi) (Patenaude et al. 2002). The effects from an encounter with aircraft are brief, and the whales generally resume their normal behavior within minutes.

During their study, Patenaude et al. (2002) observed one bowhead whale cow-calf pair during four passes totaling 2.8 hours of the helicopter and two pairs during Twin Otter overflights. All of the helicopter passes were at altitudes of 15 to 30 m (49 to 98 ft). The mother dove both times she was at the surface, and the calf dove once out of the four times it was at the surface. For the cow-calf pair sightings during the Twin Otter overflights, the authors did not note any behaviors specific to those pairs. Rather, the reactions of the cow-calf pairs were lumped with the reactions of other groups that did not consist of calves.

The likelihood of spatial and temporal overlap between support vessels and aircraft with bowhead whales in the Beaufort Sea is high. The degree of overlap and interaction depends on the spatial and temporal distribution of activities and whether they are broadly dispersed or clustered. The greatest potential for helicopter or fixed-wing aircraft to cause adverse effects on bowhead whales is in areas where whales are aggregated, especially if aggregations contain large numbers of cow/calf pairs. Activities, such as exploratory drilling, will utilize multiple support vessels, as well as resupply trips and flights to the dock at Prudhoe Bay (see Chapter 2, Tables 2.2 and 2.4). The number of kilometers transited by seismic and various types of support vessels in the Beaufort Sea in 2006 to 2008 ranged from 9,580 km (5,953 mi) in 2006 to 67,627 km (42,021 mi) in 2008 (Funk et al. 2010). During operations, most source vessel speeds are relatively slow, in the range of 3 to 5 kn, although transit speeds are likely to be much higher. Source vessel transit speeds for 2D/3D seismic surveys are estimated at 8 to 20 kn (refer to Chapter 2 for details). If such activity coincides with aggregations of whales, then disruption is likely.

Most observed disturbance reactions to vessel and aircraft activity appear to be short-term. The longer term effects of repeated vessel interactions over a broad area or in a local area where there are concentrations of whales are unknown. Based on the impact criteria for marine mammals defined in Table 4.5-18, disturbance effects of vessel and aircraft activity would likely be considered of medium intensity since at least some whales would be displaced, but they are not likely to leave the EIS project area entirely. The duration of disturbance is expected to be interim; long-term effects are unknown. The extent of the impact would depend on the number of support vessels in an area, but, for individual activities, impacts are expected to be local. Multiple activities in one area or in several areas across the migratory corridor could result in a broader, regional impact. Bowhead whales are considered unique in context, given both their endangered species status and protection and importance to North Slope communities as a subsistence resource.

**Chukchi Sea Activities**

*2D/3D Surveys (July through November)*

Effects of 2D/3D seismic noise on bowhead whales in the Chukchi Sea would likely be similar to those described above for the Beaufort Sea. There may be regional differences in sound propagation and areas of ensonification due to bathymetric and water property differences between the two areas (see

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-123
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 75 of 92
Exhibit 19, page 75 of 92

Table 4.5-9, Section 4.5.1.4, Acoustics) that would affect distances at which noise impacts may occur. Differences also exist regionally within the Chukchi Sea OCS. For example, endfire sound level threshold distances for 180, 160, and 120 dB re 1 µPa rms were 1.27 km (0.79 mi), 6.69 km (4.16 mi), and 104.3 km (64.8 mi), respectively, at the Kakapo Prospect and 1.14 km (0.71 mi), 7.15 km (4.44 mi), and 58.4 km (36.3 mi), respectively, at the Burger Prospect (Martin et al. 2010). Additional examples of distances to threshold values for other source types and at other locations are provided in Table 4.5-11.

Most bowhead whales that encounter airgun sounds from seismic operations in the Chukchi Sea would be migrating. At the onset of seismic operations in July, few bowhead whales will likely be in the Chukchi Sea. Whales are occasionally seen feeding during summer in the northeast Chukchi Sea, although those observed in June and July 2009 were in the nearshore waters between Point Franklin and Barrow (Clarke et al. 2011a) with another observed feeding in early July 2012 near Icy Cape (Clarke et al. 2013), well inshore of the federal lease sale areas. In September and October, bowhead whales migrate west from the Beaufort Sea into the Chukchi Sea, and most traverse the lease sale area (Figure 3.2-11). It is during this time that disturbance is most probable. Satellite-tagged bowhead whales were most common in the Chukchi Sea Lease Sale 193 Area in September. In this month, the Lease Area contained 31 percent of the total probability of use for all bowhead whales and the areas with the greatest probability of use were in the northeastern part of the Lease Area. In October, the entrie Lease Area contained 7 percent of the total probability of use for all bowhead whales (Quakenbush et al. 2010a).

As detailed above, migrating bowhead whales in the Beaufort Sea respond to seismic noise pulses at lower received levels than do feeding whales, with avoidance out to 20 to 30 km (12.4 to 18.6 mi) from a medium-sized airgun source at received sound levels of around 120 to 130 dB re 1 µPa rms (Miller et al. 1999, Richardson et al. 1999). The estimated 120 dB re 1 µPa rms sound level threshold distances for seismic operations on the Kakapo and Burger Prospects in the Chukchi Sea were two to three times this distance (Martin et al. 2010). Haley et al. (2010b) found a lower percentage of cetacean sightings near source vessels in the Chukchi Sea, suggesting cetacean avoidance of underwater seismic sound. The small sample size of cetaceans exposed to received sound levels ≥160 dB rms was too small to make strong conclusions. The migration corridor in the Beaufort Sea is more concentrated in a relatively narrow band along the Alaskan coast, whereas the migration through the Chukchi Sea is less defined and spread out over a broader area, providing more area for the whales to migrate through on their way to the overwintering grounds (see Figures 3.2-6 and 3.2-11).

Avoidance at some distance from the sound sources is likely and depends on spatial and temporal overlap with migrating bowhead whales. Operations commencing in July may be complete before the peak of migration in September and October. Surveys starting later in the summer or fall, however, would likely ensonify some portion of the bowhead whale migratory corridor with sound levels known to elicit avoidance responses.

Based on the impact criteria defined in Table 4.5-18, anticipated impacts of these activities, in terms of magnitude (medium), duration (interim), extent (local), and context (unique) would be similar to those described above for the Beaufort Sea. However, impacts are anticipated on a smaller number of animals based on the fact that these activities and bowhead whale migration in the Chukchi Sea would co-occur for a shorter period of time than in the Beaufort Sea.

*In-ice Seismic Survey (2D/3D) with Icebreaker Support (October to mid-December)*

Disturbance effects on bowhead whales that may occur in the vicinity of in-ice seismic surveys with icebreaker support in the Chukchi Sea would likely be similar to those described above for the Beaufort Sea. In-ice seismic surveys could occur both on- and off-lease.

The additional sound from icebreakers accompanying seismic activity could cause temporary avoidance of bowhead whales from areas where the vessels are operating and potentially cause temporary deflection of the migration corridor (NMFS 2010c). Bowhead whales are migrating into and through the Chukchi

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-124
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 76 of 92   Exhibit 19, page 76 of 92

Sea during September and October and typically traverse the Lease Sale 193 area at that time (Clarke et al. 2011a, 2013, Brueggeman et al. 2009, Brueggeman et al. 2010, Quakenbush et al. 2010b). Based on satellite-tag data, most bowheads are along the Chukotka coast by November and December (Quakenbush et al. 2010b), and no bowhead whales have been detected during limited COMIDA aerial surveys in November (Clarke et al. 2011a). Small numbers of bowhead whales have been acoustically detected in the Chukchi Sea until early January during low ice years (Delarue et al. 2009). Migrating bowhead whales and icebreaker-accompanied seismic activity are most likely to co-occur in October. Displacement during migration is possible, though the migratory corridor across the Chukchi Sea is broad and spans approximately 3 degrees of latitude (Quakenbush et al. 2010b).

Anticipated impacts of in-ice activities, in terms of magnitude (medium), duration (interim), extent (local), and context (unique) would be similar to those described for the Beaufort Sea despite the less defined migratory corridor in the Chukchi Sea. However, impacts are anticipated on a smaller number of animals based on the fact that seismic operations and bowhead whale migration would only co-occur for a short period of time at the beginning of operations. If a similar survey were occurring concurrently in the Beaufort Sea, there is a potential for some later migrating bowhead whales to encounter survey activities in both seas. However, there would likely be considerable distance between the two operating programs.

### Site Clearance and High Resolution Shallow Hazards Survey Programs (July to November)

Disturbance effects on bowhead whales from site clearance and high resolution shallow hazards surveys in the Chukchi Sea would likely be similar to those described above for the Beaufort Sea.

Bowhead whales would most likely encounter these operations in the Chukchi Sea during fall migration. Few bowhead whales occur in the Chukchi Sea in July and August (Clarke et al. 2011a). In September and October, bowhead whales migrate west from the Beaufort Sea into and across the Chukchi Sea (Figure 3.2-11). Potential disturbance depends on spatial and temporal overlap with migrating bowhead whales. Operations commencing in July may be complete before the peak of migration in September and October. Surveys starting later in the summer or fall, however, would likely ensonify some portion of the bowhead whale migratory corridor, though the ensonified zones for these types of surveys are much smaller than those for the 2D/3D seismic surveys.

Based on the impact criteria defined in Table 4.5-18, anticipated impacts of these activities, in terms of magnitude (medium), duration (interim), extent (local), and context (unique) would be similar to those described for the Beaufort Sea. However, impacts are anticipated on a smaller number of animals based on the fact that these activities and bowhead whale migration in the Chukchi would only co-occur for a short period of time.

### Exploratory Drilling (July through October)

Known effects of drilling operations on bowhead whales are as described above for the Beaufort Sea and would likely be similar for the Chukchi Sea. Drilling operations in the Chukchi Sea would likely initially occur in areas on federal leases for which exploration plans have recently been submitted or would be submitted during the time period of this EIS and where there have been recent requests for approval of ancillary activities. It is anticipated that either a drillship with eight to twelve support vessels or jackup rig with two to three support vessels would be used for exploratory drilling between early July and late October.

The drilling unit and support vessels typically do not enter the Chukchi Sea until after July 1 when most of the spring bowhead migration is complete. Few bowheads are expected to be encountered during the early season drilling operations, minimizing any effects at that time. Drilling operations occurring during September and October could potentially disturb and displace bowheads migrating through and across the Chukchi Sea.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement
Chapter 4 – Environmental Consequences

4-125

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/03/19   Page 77 of 92
Exhibit 19, page 77 of 92

Anticipated impacts of these activities, in terms of magnitude (medium), duration (interim), extent (local), and context (unique) would be similar to those described above for the Beaufort Sea. However, impacts are anticipated on a smaller number of animals based on the fact that these activities and bowhead whale migration in the Chukchi would only co-occur for a short period of time.

*Associated Vessels and Aircraft*

Known and potential effects of support vessel and aircraft on bowhead whales in the Chukchi Sea are as described above for the Beaufort Sea and would be expected to be similar for the Chukchi Sea.

Bowhead whales feeding and migrating in the Chukchi Sea could encounter numerous seismic vessels, support vessels, and associated aircraft. The number of kilometers transited by seismic and various types of support vessels in the Chukchi Sea in 2006 to 2008 ranged from 48,100 km (29,888 mi) (2007) to 106,838 km (66,386 mi) (2006) (Funk et al. 2010). Vessel sounds vary by vessel size and type, as well as vessel operating conditions. Vessel sounds measured the Chukchi Sea since 2007 yielded radii to 120 dB re 1 μPa between 360 m (1180 ft) for smaller vessels and 19 km (11.8 mi) for the largest vessels with powerful thrusters, with a mean value of 4.4 km (2.7 mi) (LGL Alaska Research Associates, Inc. et al. 2013). Offshore acoustic detections of bowhead whales during a period in mid-September 2012 coincided with the occurrence of numerous support vessels on standby to the southeast of the Burger drill site, suggesting that whales were not actively avoiding the area (LGL Alaska Research Associates, Inc. et al. 2013). The extent of disturbance depends on the areas in which vessels are transiting or operating, the number in a given area, and the time of operation. Bowheads feeding near shore in the northeast Chukchi Sea may be in the flight path for support flights and transits between Wainwright and Nome and possibly more susceptible to disturbance.

Based on the criteria defined in Table 4.5-18, anticipated impacts of these activities, in terms of magnitude (medium), duration (interim), extent (local), and context (unique) would be similar to those described above for the Beaufort Sea. However, impacts should affect a smaller number of animals based on the fact that these activities and bowhead whale migration in the Chukchi Sea would only co-occur for a short period of time.

### Hearing Impairment, Injury, and Mortality

Although the likelihood of such impacts occurring is considered highly unlikely, the primary direct mechanisms of potential hearing impairment, injury, or mortality due to oil and gas exploration activities are hearing loss or damage (auditory injury) and collisions with vessels. The potential effects of a VLOS, which is considered improbable and for which incidental take would not be authorized by NMFS under any alternative, are discussed separately in Section 4.10.

**Auditory Impairment (TTS and PTS)**

Noise induced TS (including TTS and PTS) is described above. The potential for seismic airgun pulses to cause acoustic injury in marine mammals is not well understood (Gedamke et al. 2011), and data on levels or properties of sound that are required to induce TTS are lacking for baleen whales. Recent simulation models, using data extrapolated from TTS in toothed whales, suggest baleen whales 1 km (0.62 mi) or more from seismic surveys could potentially be susceptible to TTS (Gedamke et al. 2011). There is no information on TTS or PTS specifically for bowhead whales.

Because bowhead whales generally respond to loud noise by moving away, they are less likely to suffer hearing loss from increased noise. They are not likely to remain close enough to a large airgun array long enough to incur TTS, let alone PTS. The levels of successive pulses received by a marine mammal would increase and then decrease gradually as the seismic vessel approaches, passes and moves away, with periodic decreases also caused when the animal goes to the surface to breath, reducing the probability of the animal being exposed to sound levels large enough to elicit PTS. However, data suggest that exposures of longer duration and lower levels can lead to more TTS (i.e., onset at lower level and greater

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-126
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 78 of 92
**Exhibit 19, page 78 of 78**

amount of TTS) compared to exposures of higher level and short duration with the same cumulative sound exposure level (Finneran et al. 2010, Kastak et al. 2005, 2007, Kastelein et al. 2012a, b, Mooney et al. 2009), and seismic airguns can ensonify larger areas to higher levels in which whales may remain in the proximity of for longer times. This, in combination with the fact that monitoring reports include occasional observations of bowheads within the 180-dB zone of seismic surveys suggests that TTS and PTS, though unlikely, cannot be entirely ruled out.

Since bowhead whales appear to be more tolerant of noise when feeding, work is needed to determine potential effects of repeated exposure to loud noise at distances tolerated in feeding areas. The potential for increased noise to cause physiological stress responses should also be considered, as it is not currently known (NMFS 2011a). Obtaining data on stress responses in large free-swimming whales would require potentially disruptive invasive techniques.

Section 4.2.6.3 outlines NMFS final revisions to auditory injury thresholds. NMFS applied these thresholds to the types of sources analyzed in this EIS (seismic airguns and drilling sources of similar size) and found that the resulting distances at which injurious exposures could not be ruled out (i.e., those at which PTS might be incurred) were similar to those calculated using the 180 and 190-dB historical thresholds (though actually notably smaller for mid-frequency cetaceans and otariids), meaning that the revisions to the auditory injury thresholds do not notably change any of the conclusions articulated in earlier versions of the EIS. As noted previously, most individual marine mammals are expected to avoid loud sounds at distances that would lead to PTS, and standard mitigation measures to shut down airguns if individuals approach within distances associated with injurious effects are expected to help minimize effects. That said, the potential for PTS cannot be ruled out for bowheads or other low-frequency cetaceans and phocids and is considered highly unlikely to occur for mid-frequency cetaceans and otariids.

Determining effects intensity is not possible, without instances of noise exposures severe enough to result in observed mortality where cause of death could be attributed to sound impulses. There are no known such incidences with bowhead whales. The duration of impact would be temporary for TTS but permanent if PTS were to occur. The extent of such impacts would be local and the context is important, since bowhead whales are listed as endangered (and the population is increasing).

### Ship Strikes

Marine vessels could potentially strike bowhead whales, causing either injury or death. Incidence of ship strikes appears low, but could rise with increasing vessel traffic. Only three ship-strike injuries were documented in the 236 bowhead whales examined from the subsistence harvest from 1976 to 1992 (George et al. 1994). All of the injuries indicate the whales were struck by propellers of large (>30 m [>98.4 ft]) ships.

The low incidence of observed ship strikes, as of the early-1990s, was likely an artifact of the comparatively low rate of vessels passing through most of the bowhead's range or that many bowheads struck by ships do not survive (George et al. 1994). Ship strikes are a major cause of mortality and serious injury in North Atlantic right whales, accounting for 35 percent of deaths from 1970 to 1999 (Knowlton and Kraus 2001). Experimental playback studies revealed that right whales did not respond to sounds of approaching vessels or to actual vessels, suggesting habituation to engine sounds that are ubiquitous throughout most of their range (Nowacek et al. 2004). Most bowhead whales, in contrast, show strong avoidance reactions to approaching ships. Eskimo hunters report that bowheads are less sensitive to approaching boats when they are feeding (George et al. 1994), leaving them more vulnerable to vessel collisions.

The frequency and severity of ship strikes is influenced by vessel speed. The potential for collision increases at speeds of 15 kn and greater (Laist et al. 2001, Vanderlaan and Taggart 2007). For the activities considered under Alternative 2, speeds for most source vessels are relatively slow

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement
Chapter 4 – Environmental Consequences

4-127

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 79 of 92
Exhibit 19, page 79 of 92

(approximately 3 to 5 kn) during oil and gas exploration activities. Transit speeds, however, are likely to be much higher. Seismic survey source vessel transit speeds are, for example, estimated at 8 to 12 kn (refer to Chapter 2, Alternatives for details), suggesting that, if collisions were to occur, they are more likely when vessels are in transit than when conducting active exploration operations. Vessels transiting to the Beaufort or Chukchi seas from Dutch Harbor at the start of the open water season, or returning across these areas to the Bering Strait at the end of the season, transiting between sites, or for resupply in and out of Nome or Wainwright in the Chukchi Sea or Prudhoe Bay in the Beaufort have the highest chance of encountering migrating bowheads or aggregations feeding in more coastal regions of the northeast Chukchi and between Point Barrow and Smith Bay in the Beaufort Sea.

The reported incidence of ship strikes is low, but, since collisions have occurred in the past, the intensity of the impact should be considered medium. The impact would be temporary, although the results (injury or mortality) would be permanent for the individual whale. The extent of impact would be local, given the infrequency of occurrence and the non-random distribution of both bowhead whales and exploration activity in the EIS project area. The context would be important, since bowhead whales are listed as endangered and the population is increasing Refer to Table 4.5-18 for marine mammal impact criteria definitions.

**Small Fuel Spill**

There is the potential for bowhead whales to be exposed to small fuel spills of less than 50 bbl (see Section 4.2.7). If a small spill were to escape containment or response measures, it would not persist very long, resulting in few opportunities to contact bowhead whales. Further, vessel activity associated with spill response would likely keep bowhead whales out of the spill area, and individual whales would likely avoid the spill by leaving the area during spill response activities. Oil generally poorly adheres to the skin of mysticete whales, and cetaceans are believed to have the ability to detect and avoid oil spills (Geraci, 1990; St. Aubin, 1990). Moreover, the weathering process should act to quickly break up or dissipate oil/fuel through the local environment to harmless residual levels that would eventually become undetectable. Therefore, small spills are anticipated to have no more than a negligible level of effect on bowhead whales.

*Habitat Alterations*

Alterations to marine mammal habitat could occur through physical changes, such as to the substrate or sea ice, pollution in the water column, alterations to prey species, or impacts on acoustic habitat relied upon by marine mammals for communication and other functions. This subsection describes the potential impacts of the various activity types on bowhead whale habitat (in the broader sense mentioned here).

Oil and gas exploration activities that may result in alteration of habitat include disturbance of sea ice from icebreaking, disturbance of benthic sediments during drilling, and contamination of the marine environment from discharge of drilling muds and other waste streams from ships and support facilities. Effects of icebreaking and exploratory drilling are discussed above in the introduction to effects on marine mammals (Section 4.5.2.4). Potential effects of a very large oil spill, including long-term displacement from areas impacted by oil, are discussed in Section 4.10. Additional details and impact assessments are provided here.

Potential impacts of drilling mud discharged into the marine environment are among concerns expressed by Iñupiat subsistence hunters:

> I've experienced drilling mud on an iceberg north of Northstar at that time when Northstar was in a stage of being developed. So there were quite a few drilling muds being caught at -- on Northstar on a real calm, calm day. Not even one marine mammal was inside it. And you could hear that Northstar drill rig pounding away. Not one marine mammal, not even one waterfowl was sighted. And the only thing we encountered was an iceberg totally covered with drilling mud.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-128
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 80 of 92
Exhibit 19, page 80 of 92

*It's not a natural mud.* (Testimony provided by Archie Ahkiviana at the Nuiqsut Public Scoping Meeting for this EIS, March 11, 2010).

Adverse effects of discharges on bowhead whales are directly related to whether or not any potentially harmful substances are released into the marine environment and whether they rapidly dilute or bioaccumulate through the food chain. Bowhead whales are long lived, and some individuals potentially could accumulate contaminants. Bowhead whales, however, feed on lower trophic level organisms (zooplankton) so are considered at lower risk of bioaccumulation of contaminants, such as persistent organic compounds, than higher level consumers. Levels of persistent organic compound concentrations in samples collected from bowhead whales in Alaska are low compared to other marine mammals (O'Hara and Becker 2003).

Drill cuttings and drilling mud discharges are regulated by either the EPA NPDES permits or the ADEC APDES permits as detailed in State waters in the Beaufort Sea.Section 4.5.1.5. The impact of drill cuttings and drilling mud discharges would be medium in intensity, local in extent,extent and temporary in duration. Drill cuttings and mud discharges could temporarily displace marine mammals a short distance from the drilling site. The EPA modeled a hypothetical 750 bbl/hr discharge of drilling fluids in 20 m (66 ft) of water in the Beaufort and Chukchi seas and predicted a minimum dilution of 1,326:1 at 100 m (330 ft) from the discharge point (Shell 2011a). Discharged drilling fluid should be well diluted within 100 m (330 ft) so that any impacts would be highly localized and temporary, assuming whales continue to swim through or past the discharge plume. If toxic contaminants are present in discharges, only a small area of potential habitat and prey base might be contaminated. Consequently, the resulting population-level effects would be negligible.

Bottom-founded drilling units or gravel islands could impact small areas of benthic habitat that support epibenthic prey aggregations that bowhead whales feed on, increasing turbidity or sediment suspension in the water column (Mocklin 2011). Exploration drilling on past and current leases would add incrementally to potential discharges into the Beaufort and Chukchi seas but would remain restricted to areas immediately surrounding exploration drilling activity.

Additionally, the acoustic habitat, within which whales use sound to communicate and detect prey, predators, and other environmental cues, can be temporarily altered by the presence of sounds in the frequency bands of the signals of interest for the whales. Depending on the decibel level, frequency, and duration of these sounds, these acoustic habitat alterations may result in reduced ability to detect or interpret some important sounds.

Section 4.5.2.4.9 and Appendix F outline the results and limitations of a first-order aggregate and chronic assessment of oil and gas activities in the Arctic conducted by NMFS in response to public comments on the DEIS and SEIS. Broadly, results suggest that even with the lower predicted activity levels in Alternative 2, substantial losses of listening area (up to 98%) and bowhead communication space (up to 20%), to a lesser degree, would occur in the Beaufort Sea area from July to mid-October (far less loss was noted in the Chukchi). As noted in section 4.5.2.4.9, there is evidence indicating significant reductions in listening area or communication space can negatively affect aquatic animals. Though data are lacking to document links to population consequences for long-lived and often wide-ranging species such as marine mammals, chronic noise effects that impair an animal's ability to detect critical acoustic cues over a relatively large area for 3.5 months must be carefully considered, especially for bowhead whales, which migrate through with calves under conditions where communication is important to maintain group cohesion.

**Effects on Zooplankton**

In a review of available information on the effects of seismic sound on invertebrates, the Canadian Department of Fisheries and Oceans (DFO) reported lethal and/or sublethal effects have sometimes been observed in invertebrates (e.g., crustaceans, gastropods) exposed to airgun sounds at distances of <5 m

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-129
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 81 of 92
Exhibit 19, page 81 of 92

(<16.4 ft) under experimental conditions (DFO 2004). They considered exposure to seismic sound unlikely to result in direct invertebrate mortality, although invertebrates may exhibit short-term behavioral reactions to sound (DFO 2004). They found few studies on the effects of seismic noise on zooplankton. Zooplankton very close to the seismic source may react to the shock wave, but effects are expected to be local (LGL 2010). Potential non-seismic effects on zooplankton are noted above and in the respective sections on Lower Trophic Levels (see, for example, 4.5.2.1).

Potential impacts to bowhead whale habitat (including from discharge and to zooplankton and acoustic habitat) from oil and gas exploration activities permitted under Alternative 2 would, based on the criteria defined in Table 4.5-18, be of low to medium intensity. Most impacts would be local in the area immediately adjacent to the impacts (discharges, sediment disruption, or icebreaking), but disruptions to acoustic habitat could occur across a larger area. Most impacts would also be temporary, though longer-term and regional effects could occur to acoustic habitat and through the process of bioaccumulation through the food web..

### 4.5.2.4.10.2    Conclusion

Like in other resource sections, consideration of the effects of implementation of the required standard mitigation measures is included in the conclusion immediately below. Unlike in other resource sections, the Standard Mitigation Measure section is *not* included immediately prior to this Conclusion section, but rather, the separate section analyzing the measures themselves is included once at the end of the Marine Mammal section after all of the individual species sections because the measures apply to multiple species and including them multiple times in separate species sections would be repetitive and potentially confusing.

Oil and gas exploration activities in the Beaufort and Chukchi seas, as analyzed under Alternative 2, would likely cause behavioral disturbance to bowhead whales, including varying degrees of disturbance to feeding, resting, or migrating bowhead whales depending on actual level of effort, type of activity, time of year, and whether activities run concurrent in the Beaufort and Chukchi seas. Disturbance could lead to displacement from and avoidance of areas of exploration activity. The EIS project area encompasses a portion of bowhead whale habitat between the Bering Strait and Canadian border, so leaving the area entirely to avoid impacts is not likely. The duration of disturbance (and acoustic habitat disturbance) from oil and gas activities is expected to be of long-term duration, lasting less than six months, but repeating over multiple years. Surveys utilizing icebreakers could cause avoidance and displacement over a larger radius with the additional noise input from the icebreaking activities, but the period of time over which this activity would overlap with bowhead whale presence is much shorter. Although bowhead whales react to approaching vessels at greater distances than they react to most other activities, most observed disturbance reactions to vessels and aircraft appear to be brief. The extent of the impact will depend on the number of exploration activities and associated support vessels in an area, but, for individual sound sources, impacts are expected to be local. However, over the course of the season and considering the maximum level of activity potentially conducted under this activity, and considering areas that are potentially ensonified above 120 dB, the geographic scale could be considered regional.

Because whales respond behaviorally to loud noise, and because of the required standard mitigation measures, they are less likely to suffer auditory damage from increased noise due to oil and gas exploration activities. Additionally, based on the required standard mitigation measures, impacts from vessel strikes are considered unlikely.

The geographic area and extent of the population over which effects would be felt (especially considering the distances over which bowhead whales communicate and seismic sounds travel) would likely increase with multiple activities occurring simultaneously or consecutively throughout much of the summer-fall range of this population. Potential long-term effects from repeated disturbance, displacement or habitat disruption on an extremely long-lived species such as the bowhead whale are unknown. The Western Arctic stock of bowhead whales has, however, continued to increase at an estimated 3.7 percent per year

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement        4-130
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 82 of 92
Exhibit 19, page 82 of 92

despite past and present exploration activities within their range (Givens et al. 2013). It is not currently possible to predict which behavioral responses to anthropogenic noise might result in population-level effects for marine mammals, such as bowheads, in the future (NRC 2005).

Bowhead whales are listed as endangered and impacts are expected to occur within an important migratory corridor where almost all mothers and calves will pass through within a year, which places them in the context of being a unique resource in the region. Potential impacts of the combined activities associated with oil and gas exploration considered under Alternative 2 on bowhead whales would likely be of medium to high intensity, interim to long-term duration, and on a local to regional geographic scale. Evaluated collectively, and with consideration given to reduced adverse impacts through the implementation of the standard mitigation measures, as appropriate, the overall impact to bowhead whales is likely to be moderate.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-131
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/03/19   Exhibit 19, page 83 of 92

## Table 4.5-20  Effects Summary for Bowhead Whales

| Type of effect | Impact Component | | Effects Summary |
|---|---|---|---|
| **Behavioral disturbance** | **Magnitude or Intensity** | Low | |
| | | Medium | Lower to moderate levels of activity within this Alternative (akin to recent years) would not result in disturbance of> 30% of population disturbed |
| | | High | Impacts from max level activity expected to exceed take of 30% of population |
| | **Duration** | Temporary | At the lower levels of this Alternative, effects are closer to temporary - could be only couple smaller activities with short-term effects on individuals – and possible could be years with none |
| | | Interim | In most Alternative configurations, all activity types last multiple months and some level of activities are recurring over multiple successive years. Effects to individuals could occur acros multiple months, though less likely for bowheads that migrate through. |
| | | Long-term | |
| | **Geographic Extent** | Local | When the total area ensonified above the behavioral harassment thresholds (160 dB for seismic and 120 dB for drilling) is considered (Table 4.5-14b), the impacts are local. |
| | | Regional | |
| | | State-wide | |
| | **Context** | Common | |
| | | Important | |
| | | Unique | ESA-listed species, impacts across migratory corridor through which mother/calf pairs traverse, potential disruption of feeding and resting |
| **Injury and mortality** | **Magnitude or Intensity** | Low | Injury or death unlikely |
| | | Medium | Though unlikely, cannot rule out PTS to small number of individuals |
| | | High | |
| | **Duration** | Temporary | |
| | | Interim | |
| | | Long-term | Though unlikely, PTS would be permanent if incurred |
| | **Geographic Extent** | Local | Since unlikely, any few impacts would be considered local |
| | | Regional | |
| | | State-wide | |
| | **Context** | Common | |
| | | Important | ESA-listed species, but population is increasing |
| | | Unique | |
| **Habitat alterations** | **Magnitude or Intensity** | Low | Impacts to most habitat features are low in intensity |
| | | Medium | Impacts to acoustic habitat are of medium intensity (~28% of EIS area ensonified over 120 dB, up to 98% lost listening area in some areas of Beaufort, and up to 20% lost bowhead communication space in some areas of Beaufort) |
| | | High | |
| | **Duration** | Temporary | |
| | | Interim | At the lower levels of this Alternative impacts are closer to interim, as could be only couple smaller activities – and possible could be years with none |
| | | Long-term | In most Alternative configurations, all activity types last multiple months and some level of activities are recurring over multiple successive years. |
| | **Geographic Extent** | Local | It is possible that very low-level versions of this Alternative may result in only local effect. |
| | | Regional | When the total area ensonified by all sources above 120 dB is considered (used to indicate where animals will hear it and the potential for masking exists), most scenarios will likely result in regional effects. |
| | | State-wide | |
| | **Context** | Common | |
| | | Important | |
| | | Unique | ESA-listed species, impacts across migratory corridor through which mother/calf pairs traverse, potential disruption of feeding and resting |

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement        4-132
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 84 of 92

Exhibit 19, page 84 of 92

#### 4.5.2.4.11    Beluga Whales

This section describes the potential effects of Alternative 2 to beluga whales. This information is in addition to the information provided in Sections 4.5.2.4.1 through 4.5.2.4.9, which is applicable to marine mammals more generally. Here, we include information specific to beluga whales.

##### 4.5.2.4.11.1    Direct and Indirect Effects

The primary direct and indirect effects on beluga whales from activities associated with oil and gas exploration in the Beaufort and Chukchi seas considered under Alternative 2 would result from noise exposure. Ship strikes and habitat degradation are also possible. Sources of noise include 2D/3D seismic survey equipment (airgun arrays), echosounder and sonar devices associated with site clearance and shallow hazards surveys, support, monitoring and receiving vessels associated with these surveys, icebreaking activities, on ice vibroseis seismic surveys (Beaufort Sea only), exploratory drilling, and helicopter and fixed wing aircraft associated with the different programs. Details of these activities and associated components can be found in Chapter 2.

#### Behavioral Disturbance

**2D/3D Seismic Surveys (July through November)**

Anthropogenic noise from oil and gas exploration activities may elicit behavioral responses from beluga whales. The possible reactions by marine mammals are listed above; known reactions by beluga whales are included here and described and assessed by region and activity. Most of these mechanisms are common to both seas, and these potential effects are discussed together. Where activities or mechanisms are unique to one sea or the other, they are discussed separately. Beluga whales are observed in both seas. Vessels associated with the exploration activities identified in Chapter 2 introduce sound into the water and have a physical presence that could affect beluga whales. Although many of these vessels carried PSOs in the past, beluga whales are rarely seen from these vessels, particularly in the Chukchi Sea.

Miller et al. (2005) reported, based on observations collected during two years of seismic studies in the Beaufort Sea, that beluga whale sightings were unexpectedly high 20-30 km (12.4-18.6 mi) from the seismic vessel, and substantially lower 10-20 km (6.2-12.4 mi) from the vessel, indicating that whales may be avoiding operations by 10-20 km (6.2-12.4 mi). Studies of captive beluga whales have shown that they exhibit changes in behavior when exposed to strong, pulsed sounds similar in duration to those used in seismic surveys (Finneran et al. 2002a), but the received sound levels were relatively high before aversive behaviors were observed (peak to peak level >200 dB re 1 µPa). Behaviors such as vocalizing after the exposure and reluctance to station at the test site were observed (Finneran et al. 2002a). Similar behaviors were observed by a beluga whale exposed to a single underwater pulse similar to those produced by distant underwater explosions (Finneran et al. 2000). The applicability of these observations in trained, captive beluga whales exposed to a single transient sound to the natural environment of free-ranging animals exposed to multiple pulses over time, is unknown.

Most of the energy from airgun arrays is below 100 Hz, which is below the frequencies of calling and best hearing of beluga whales, however, behavioral observations indicate that they are not insensitive to sounds produced by these activities.

Anticipated impacts of 2D/3D surveys would be expected to be of medium magnitude (behavioral disturbance, but less than 30% of population affected), interim duration (between 1 and 6 months, and potentially not always occurring every year), local extent (not spanning more than 10% of the EIS area), and common to important context as, although beluga whales are not ESA-listed, industry activities will overlap with some areas of importance for belugas.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-133
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 85 of 92
Exhibit 19, page 85 of 92

**In-ice Seismic Survey (2D/3D) with Icebreaker Support (October to mid-December)**

While not many studies have been conducted to evaluate the potential interference of icebreaking noise with marine mammal vocalizations, a few studies have looked specifically at icebreaking noise and beluga whales. Erbe and Farmer (1998) reported that the Canadian Coast Guard ship, *Henry Larsen*, ramming ice in the Beaufort Sea, masked recordings of beluga vocalizations at a signal-to-noise ratio of 18 dB. At least six of 17 groups of beluga whales appeared to alter their migration path in response to underwater playbacks of icebreaker sound (Richardson et al., 1995). Received levels from the icebreaker playback were estimated at 78-84 dB in the 1/3-octave band centered at 5,000 Hz, or 8-14 dB above ambient. If beluga whales reacted to an actual icebreaker at received levels of 80 dB, reactions would be expected to occur at distances on the order of 6.2 mi (10 km). Finley et al. (1990) also reported beluga avoidance of icebreaker activities in the Canadian High Arctic at distances of 22-31 mi (35-50 km). In addition to avoidance, changes in dive behavior and pod integrity were also noted. However, an in-ice seismic survey cannot be conducted in ice thick enough to require ramming to break it up.

Erbe and Farmer (2000) modeled zones of impact for the bubbler system noise in addition to the propeller cavitation (ramming) noise. The propagation model predicted that icebreaker bubbler system noise could mask beluga whale communication out to 14 km (8.7 mi) from the vessel over the continental slope, as measured near the surface. The modeled zone of behavioral disturbance for the bubbler system noise extended to approximately 32 km (19.9 mi). Based on historical modeled estimates, in-ice surveys likely result in a larger number of harassed belugas than other activity types.

While Finley and Green (1993) observed belugas reacting to icebreaking from 50 km away, the same rule cannot be perfectly applied to ice management, which is the ice-related activity typically anticipated during the open water season. Unlike ice-breaking, which relies on an icebreaker ship smashing through areas of sea ice, ice management involves pushing or diverting ice away from operations at a relatively slow speed. Consequently ice management activities are expected to be much "quieter" than ice breaking activities, resulting in a much smaller area of effects on beluga whales. Though similar in that they both involve the use of ships with icebreaking capabilities, the two activities are very different, as are the disturbances created by these different activities.

Anticipated impacts of in-ice seismic surveys (2D/3D) with icebreaker support, in terms of magnitude (medium), duration (interim), extent (local), and context (important) would be generally similar to those described for 2D/3D seismic surveys above.

**Ocean-Bottom-Cable or Node Survey (July to October)**

An OBC/OBN seismic survey typically covers a smaller area than the streamer surveys discussed above and may spend several days in an area. One such survey is anticipated in the Beaufort Sea under Alternative 2. Beluga whales are present throughout the Beaufort Sea during this time period and may be concentrated in nearshore areas. Reactions to sounds from OBC/OBN surveys are similar to those reported for 2D/3D steamer seismic surveys. Anticipated impacts of OBC/OBN surveys, in terms of magnitude (medium), duration (interim), extent (local), and context (important) would be similar to those described for 2D/3D seismic surveys above. Although disturbance effects may extend 20 to 30 km (12.4 to 18.6 mi) from the sound source, with one OBC/OBN survey anticipated in the Beaufort Sea, short-term effects should remain local.

**Site Clearance and High Resolution Shallow Hazards Survey Programs (July to November)**

High-resolution shallow hazards surveys are of short duration, and the airguns generate lower energy sounds and have a smaller zone of influence than the larger airgun arrays used for 2D/3D seismic surveys (NMFS 2010b). The radii of ensonification at 120, 160, 180, and 190 dB re 1 μPa rms were calculated for sound sources proposed for use in 2010. Radii calculated for the 40 in$^3$ airgun were 14,000 m (45,932 ft), 1,220 m (4,003 ft), 125 m (410 ft), and 35 m (115 ft) for the respective sound source levels. The beam

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-134
Chapter 4 – Environmental Consequences
Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 86 of 92
Exhibit 19, page 86 of 92

widths of these sources are quite narrow, which would only expose marine mammals to the sounds for one or two pulses at most if the animal swims in the direct beam width of the source. Ensonified zones were not calculated for side scan sonar, single-beam or multi-beam echosounders, or for the bathymetric sonar (NMFS 2010b). The higher frequency sub-bottom profilers, side scan sonar, and echosounders often produce sounds at high enough energy to result in disturbance, to beluga whales. Captive bottlenose dolphins and a beluga whale exhibited changes in behavior when exposed to 1 s tonal signals at frequencies similar to those emitted by some of these higher frequency sound sources and to shorter broadband pulsed signals. Behavioral changes typically involved what appeared to be deliberate attempts to avoid the sound exposure (Schlundt et al. 2000, Finneran et al. 2002a, Finneran and Schlundt 2004). Based on some recent reports (Southall et al. 2013), NMFS recognizes that these types of sound sources can sometimes result in behavioral responses that rise to the level of take. NMFS will take this into consideration when analyzing MMPA requests that include the use of such equipment.

Based on results of noise studies on captive and wild populations of beluga whales, belugas would likely avoid the area directly around the shallow hazard operations using the higher frequency equipment, resulting in a temporary, local effect. If such types of shallow hazard operations were conducted in areas where belugas are feeding or nursing, continued operations may result in displacement from these important habitats. Anticipated impacts of these surveys are similar to those of 2D/3D surveys, but lower in magnitude and extent, and are generally characterized as: magnitude (low), duration (interim), extent (local), and context (common to important) would be similar to those described for 2D/3D seismic surveys above.

**On-ice Vibroseis Survey (January to May)**

Beluga whales are not likely to experience impacts resultant from an on-ice survey due to their absence from the Beaufort Sea during the winter months. If, however, the activity continues into April and May, it could coincide with the spring migration of the Beaufort Sea stock.

**Exploratory Drilling (July through October)**

Reactions of beluga whales to drillship operation sounds vary. As summarized in Richardson et al. (1995), belugas are often observed near drillsites within 100 to 150 m (328.1 to 492.1 ft) from artificial islands, which are production islands and are different than exploratory drilling platforms. However, belugas swimming in the spring leads change course when they came within 1 km (0.62 mi) of a drillship and exhibited aversive behavior when support vessels were operating near the drillship (Richardson et al. 1995). Reactions of belugas (captive and wild) to playbacks of the semisubmersible drillship *SEDCO 708* indicate that belugas exhibit slight avoidance reactions to drillship sounds (Richardson et al. 1995). Furthermore, belugas may not be able to detect the lower frequency sounds of drillships, which usually emit sounds below 1 kHz because they are below their best hearing sensitivity.

Exploration activities (including anchor handling and drilling) in the Beaufort Sea in 2012 occurred on the continental shelf. Belugas sighted from aerial surveys during these activities were off the shelf break, outside of the soundscape created for acoustic analysis (LGL Alaska Research Associates, Inc. et al. 2013). If calculated out to the location of the beluga sighting, the exposure level would have been between 100 and 103.7 median SPL [dB re 1 μPa (rms)], the same median SPL for beluga sightings in the absence of industrial activity in the area. Industrial sound levels to which beluga whales along the shelf break are exposed during drilling activity in the Beaufort Sea are, therefore, similar to typical ambient sound levels in the Beaufort Sea (LGL Alaska Research Associates, Inc. et al. 2013).

Anticipated impacts of exploration activities to beluga whales are likely to be medium in terms of magnitude, interim in duration, local in extent, and important in context.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement        4-135
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/18/19   Page 87 of 92
Exhibit 19, page 87 of 92

**Associated Vessels and Aircraft**

Helicopter noise may be a source of disturbance to beluga whales, particularly during exploratory drilling crew transfers. During spring migration in the Beaufort Sea, beluga whales reacted to helicopter noise more frequently and at greater distances than did bowhead whales (Patenaude et al. 2002). Most reactions occurred when the helicopter passed within 250 m (820 ft) lateral distance at altitudes <150 m (492 ft). Neither species exhibited noticeable reactions to single passes at altitudes >150 m (492 ft). Belugas within 250 m (820 ft) of stationary helicopters on the ice with the engine running showed the most overt reactions. Whales were observed to make only minor changes in direction in response to sounds produced by helicopters, so all reactions to helicopters were considered brief and minor. Patenaude et al. (2002) noted that fewer belugas reacted to a Twin Otter than to a helicopter (3.2% instead of 38%).

Lesage et al. (1999) report that beluga whales changed their call type and call frequency when exposed to vessel noise. Beluga whales have been documented swimming rapidly away from ships and icebreakers in the Beaufort Sea when a ship approached to within 35 to 50 km (21.7 to 31.1 mi) and received levels ranged from 94 to 105 dB re 1 μPa in the 20 to 1,000 Hz band, and they may travel up to 80 km (49.7 mi) from the vessel's track (Finley et al. 1990). In addition to avoidance, changes in dive behavior and pod integrity were also noted.

Anticipated impacts of vessels and helicopters, are considered low in magnitude, interim in duration, and important in context. The extent of the impact would depend on the number of support vessels in an area, but, for individual activities, impacts are expected to be local. Multiple activities in one area or in several areas across the migratory corridor could result in a broader, regional impact.

*Hearing Impairment, Injury, and Mortality*

The primary mechanisms of potential hearing impairment, injury, or mortality of beluga whales due to oil and gas exploration activities are hearing loss or damage (auditory injury) and collisions with vessels.

**Auditory Impairment**

Noise-induced threshold shift, including TTS and PTS, is described in Section 4.5.2.4.

NMFS currently considers the appropriate metric for TTS levels to be the rms received level, which is typically 10 to 15 dB higher than the SEL for the same pulse, therefore, a single airgun pulse would need to have a received level of ~196 to 201 dB to result in a brief, mild TTS in beluga whales. As also noted, NMFS is considering revisions to these injury thresholds, although even with the changes, the 180-dB rms mitigation zone is still expected to protect mid-frequency hearing specialists from potential injury.

As reported in the Section 4.5.1.4 (Acoustics), distances to the 180 dB rms received level from various sizes of airgun arrays are <2,570 m (8,432 ft). Therefore, TTS would be expected if beluga whales remained within this distance from the source vessel during airgun operations. However, beluga whales have been observed to avoid seismic vessels. Some beluga whales summering in the Eastern Beaufort Sea may have avoided the area around seismic program using 2 arrays with 24 airguns per array by 10 to 20 km (6.2 to 12.4 miles), although some occurred as close as 1,540 m (5,052 ft) to the operations (Miller et al. 2005). Based on these observed reactions, the likelihood of beluga whales being exposed to adverse sound levels is low. Recent seismic monitoring studies have confirmed that belugas remained further away from seismic operations than has been shown for other odontocetes (Harris et al. 2007).

Researchers have derived TTS information for odontocetes from studies on the bottlenose dolphin and beluga. For the harbor porpoise tested, the received level of airgun sound that elicited onset of TTS was lower (Lucke et al. 2009). If these results from a single animal are representative, it is inappropriate to assume that onset of TTS occurs at similar received levels in all odontocetes (cf. Southall et al. 2007). Some cetaceans apparently can incur TTS at considerably lower sound exposures than are necessary to elicit TTS in the beluga or bottlenose dolphin Utilizing the evoked-potential technique in captive animals, Popov et al. (2013) tested two belugas for temporary threshold shift (TTS) after exposure to loud noise.

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                4-136
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 88 of 92
Exhibit 19, page 88 of 92

This fatiguing noise had a 0.5 octave bandwidth, with center frequencies ranging from 11.2 to 90 kHz, a level of 165 dB re.1µPa and exposure durations from 1 to 30 min. The highest TTS with the longest recovery duration was produced by noises of lower frequencies (11.2 and 22.5 kHz) and appeared at a test frequency of +0.5 octave. At higher noise frequencies (45 and 90 kHz), the TTS decreased. The TTS effect gradually increased with prolonged exposures ranging from 1 to 30 min. These authors found considerable TTS differences between the two whales tested.

Section 4.2.6.3 outlines NMFS final revisions to auditory injury thresholds. NMFS applied these thresholds to the types of sources analyzed in this EIS (seismic airguns and drilling sources of similar size) and found that the resulting distances at which injurious exposures could not be ruled out (i.e., those at which PTS might be incurred) were similar to those calculated using the 180 and 190-dB historical thresholds for low-frequency specialists and phocids, but were actually notably smaller for mid-frequency cetaceans and otariids. As noted previously, most individual marine mammals are expected to avoid loud sounds at distances that would prevent PTS, and standard mitigation measures to shut down airguns if individuals approach within distances associated with injurious effects are expected to help minimize effects. That said, the potential for PTS cannot be ruled out but is considered *highly* unlikely to occur for mid-frequency cetaceans and otariids.

Exploratory drilling activities are not anticipated to induce TTS or PTS, as source levels for the drill ship and other equipment are typically between 175 and 185 dB re 1 µPa rms.

**Ship Strikes**

Marine vessels could potentially strike beluga whales, causing either injury or death. Incidence of ship strikes are currently low but could rise with increasing vessel traffic.

The frequency and severity of ship strikes is influenced by vessel speed. The potential for collision increases at speeds of 15 kn and greater (Laist et al. 2001, Vanderlaan and Taggart 2007). Most source vessel speeds are relatively slow (approximately 3 to 5 kn) during oil and gas exploration activities. Transit speeds, however, are likely to be much higher. Seismic survey source vessel transit speeds are, for example, estimated at 8 to 20 kn (refer to Chapter 2, Alternatives for details), suggesting that, if collisions were to occur, they are more likely when vessels are in transit. Vessels transiting to the Beaufort or Chukchi seas from Dutch Harbor at the start of the open water season, or returning across these areas to the Bering Strait at the end of the season, transiting between sites, or for resupply in and out of Nome or Wainwright in the Chukchi Sea or Prudhoe Bay in the Beaufort have the highest chance of encountering migrating and feeding beluga whales. Based on the required standard mitigation measures, impacts from vessel strikes are considered unlikely.

**Small Fuel Spill**

There is the potential for beluga whales to be exposed to small fuel spills of less than 50 bbl (see Section 4.2.7). However, few beluga whales are anticipated to occur in the vicinity of oil and gas activities and few would be exposed to a spill. Moreover, if a small spill were to escape containment or response measures, it would dissipate over a few days, resulting in few opportunities to contact beluga whales. Also, vessel activity associated with spill response would likely keep beluga whales out of the spill area, and individual whales would likely avoid the spill by leaving the area during spill response activities. Small spills are anticipated to have no more than a negligible level of effect on beluga whales.

*Habitat Alteration*

Alterations to marine mammal habitat could occur through physical changes, such as to the substrate or sea ice, pollution in the water column, alterations to prey species, or impacts on acoustic habitat relied upon by marine mammals for communication and other functions. This subsection describes the potential impacts of the various activity types on bowhead whale habitat (in the broader sense mentioned here).

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                    4-137
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 80 of 92
Exhibit 19, page 80 of 92

Oil and gas exploration activities that may result in the alteration of beluga whale habitat include drill cuttings and drilling mud discharges from exploratory drilling. The impact of drill cuttings and drilling mud discharges would be local and temporary. Drill cuttings and mud discharges could temporarily displace marine mammals a short distance from the drilling location. Based on a hypothetical EPA model in the Beaufort and Chukchi seas, the potential source of an impact, the discharged drilling fluid is diluted to the extent that any impacts would be minimal and temporary, due to the whale's motility, assuming that the animal continues to swim through the discharge plume (Shell 2011a).

Discharges related to drilling would occur and, if released into the marine environment, effects would remain local in extent in relation to affecting whale habitat and prey populations. The effects of such discharges are anticipated to remain local as a result of rapid deposition and dilution and potential contamination (if toxic contaminants are present in discharges) of an extremely small proportion of the habitat or the prey base available to beluga whales; thus, population-level effects would be negligible, although interim in duration.

Additionally, the acoustic habitat, within which whales use sound to communicate and detect prey, predators, and other environmental cues, can be temporarily altered by the presence of sounds in the frequency bands of the signals of interest for the whales. Depending on the level, frequency, and duration of these sounds, these acoustic habitat alterations can result in reduced ability to detect or interpret important sounds.

Section 4.5.2.4.9 and Appendix F outline the results and limitations of a first-order aggregate and chronic assessment of oil and gas activities in the Arctic conducted by NMFS in response to public comments on the DEIS and SEIS. Broadly, results suggest that even with the lower predicted activity levels in Alternative 2, substantial losses of listening area (up to 98%) will occur in the Beaufort Sea area from July-mid-October. As noted in section 4.5.2.4.9, there is ample evidence to support the fact that significant reductions in listening area can negatively affect aquatic animals. And, while data are lacking to document links to population consequences for long-lived and often wide-ranging species such as marine mammals, it is clear that chronic noise effects that impair an animal's ability to detect critical acoustic cues over a relatively large area for 3.5 months must be carefully considered.

Acoustic impacts to beluga whale habitat are determined to be medium in magnitude, interim in duration, local in extent, and important in context.

### 4.5.2.4.11.2    Conclusion

Like in other resource sections, consideration of the effects of implementation of the required standard mitigation measures is included in the conclusion immediately below. Unlike in other resource sections, the Standard Mitigation Measure section is *not* included immediately prior to this Conclusion section, but rather, the separate section analyzing the measures themselves is included once at the end of the Marine Mammal section after all of the individual species sections because the measures apply to multiple species and including them multiple times in separate species sections would be repetitive and potentially confusing.

Oil and gas exploration activities in the Beaufort and Chukchi seas, as analyzed under Alternative 2, would likely cause behavioral disturbance to beluga whales, including varying degrees of disturbance to feeding, calving, or migrating whales depending on actual level and location of effort, type of activity, time of year, and whether activities run concurrent in the Beaufort and Chukchi seas. Disturbance could lead to displacement from and avoidance of areas of exploration activity. The EIS project area encompasses a large portion of beluga whale habitat between the Bering Strait and Canadian border, so leaving the area entirely to avoid impacts is not likely. The duration of disturbance, and acoustic habitat disturbance, from oil and gas activities is expected to be of interim to long-term duration, lasting less than six months, but repeating over multiple successive years. Surveys utilizing icebreakers could cause avoidance and displacement over a larger radius with the additional noise input from the icebreaking

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement          4-138
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/13/19   Page 90 of 92
Exhibit 19, page 90 of 92

October 2016

activities. The extent of the impact will depend on the number of exploration activities and associated support vessels in an area, but all though impacts are expected to be local in the context of behavioral disturbance, they will likely be regional in the context of habitat alteration when acoustic habitat is considered.

Because whales respond behaviorally to loud noise, and because of the required standard mitigation measures, they are less likely to suffer auditory damage from increased noise due to oil and gas exploration activities. Of note also, although they still respond to these sources, the low frequency sounds from most exploration activities are outside of the range of highest hearing sensitivity for belugas and less likely to overlap with important interspecies communication. The magnitude of impacts is moderate. Additionally, based on the required standard mitigation measures, impacts from vessel strikes are considered unlikely.

Beluga whales in the Arctic are not listed under the ESA. They have feeding and calving areas that are important to the populations, making their context important for behavioral disturbance and habitat alterations.

The intensity and duration of the various effects and activities considered are mostly medium and interim. However, potential long-term effects from repeated disturbance are unknown. Currently, population trends for the Beaufort stock cannot be estimated and are not thought to be declining in the Chukchi stock. Although, individually, the various activities may elicit local effects on beluga whales, the area and extent of the population over which effects occur will likely increase with multiple activities occurring simultaneously or consecutively throughout much of the spring-fall range of the Arctic populations. The summary impact level of Alternative 2 on beluga whales would be considered moderate.

October 2016

## Table 4.5-21  Effects Summary for Beluga Whales

| Type of effect | Impact Component | | Effects Summary |
|---|---|---|---|
| Behavioral disturbance | Magnitude or Intensity | Low | |
| | | Medium | Behavioral harassment occurring, but likely < 30% of population disturbed |
| | | High | |
| | Duration | Temporary | At the lower levels of this Alternative effects are closer to temporary - could be only couple smaller activities with short-term effects on individuals – and possible could be years with none |
| | | Interim | In most Alternative configurations, all activity types last multiple months and some level of activities are recurring over multiple successive years. Effects to individuals could occur across multiple months. |
| | | Long-term | |
| | Geographic Extent | Local | When the total area ensonified above behavioral harassment thresholds (160 dB for seismic and 120 dB for drilling) is considered (Table 4.5-14b), the impacts are local. |
| | | Regional | |
| | | State-wide | |
| | Context | Common | Not ESA-listed. Population status not well known for Chukchi but thought to be stable or increasing in Beaufort. Few overlaps with feeding areas, and wide migratory corridor likely not heavily impacted by activities. |
| | | Important | Some activities may overlap known migratory corridor, and activities may occasionally impact important feeding areas. |
| | | Unique | |
| Injury and mortality | Magnitude or Intensity | Low | Injury or death highly unlikely |
| | | Medium | Though highly unlikely, cannot rule out PTS |
| | | High | |
| | Duration | Temporary | |
| | | | |
| | | Long-term | Though highly unlikely, PTS would be permanent if incurred. |
| | Geographic Extent | Local | Since unlikely, any few impacts would be considered local |
| | | Regional | |
| | | State-wide | |
| | Context | Common | Not ESA-listed, populations not thought to be decreasing |
| | | Important | |
| | | Unique | |

Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement                  4-140
Chapter 4 – Environmental Consequences

Case 3:17-cv-00101-SLG   Document 51-19   Filed 06/10/19   Page 92 of 92
Exhibit 19, page 92 of 92

www.iagc.org

# News Release



International Association of
Geophysical Contractors
***Contact:*** Gail Adams
Vice President, Communications & External Affairs
gail.adams@iagc.org
713-957-8080 – office
281-702-4201– mobile

**FOR IMMEDIATE RELEASE**
April 28, 2017

**IAGC Applauds Administration's First Step to Expand Offshore Exploration, Streamline Seismic**

***Houston, TX*** *– The International Association of Geophysical Contractors (IAGC) President Nikki Martin, today issued the following statement on President Trump's Executive Order calling for the review of federal offshore energy development.*

"The IAGC commends President Trump's Executive Order to review offshore oil and gas leasing plans. The Administration's decision will lead to opening new areas for exploration and development, where stunningly 94 percent of the Nation's waters are currently off limits, and reflects its recognition of the importance of the oil and gas industry to the U.S. economy and long-term security.

"The President has made a significant move in the right direction in correcting the failed energy policies of the previous Administration. Today's action demonstrates a commitment to national energy security, rational decision making based on a clear-eyed review of the best available science, and continued economic well-being of this nation by opening new offshore areas for exploration, streamlining the seismic permitting process, and halting the expansion of restrictive and useless sanctuary designations.

"And while the President has taken some significant strides in turning things around, this Administration still has much work to do to reverse the trend of the previous eight years, if the nation is to have a firm foundation when it comes to energy policy. Following President Trump's action today, we urge the Commerce and Interior Departments to revoke the previous Administration's arbitrary decision to deny Atlantic seismic permits and put in place commonsense protocols for timely decisions on permit applications.

"It is still of the utmost importance that we allow offshore seismic surveys to be conducted, without delay, in the Atlantic and other frontier areas, to allow for informed decisions as a new five-year lease plan is developed. The resulting geophysical data would provide much-needed updated and environmentally safe assessments of the oil and natural gas reserves, enabling policymakers to make effective and strategic decisions whether to open areas for leasing."

###

***About the IAGC***

The IAGC represents more than 125 member companies worldwide from all segments of the geophysical industry and is the only trade organization solely dedicated to representing the industry.  It is the leader in geophysical technical and operations expertise and for more than 45 years, the IAGC has worked to optimize the business and regulatory climate and enhances public understanding to support a strong, viable geophysical industry essential to discovering and delivering the world's energy resources.

# Atlantic OCS
# Proposed Geological and Geophysical Activities

## Mid-Atlantic and South Atlantic Planning Areas

**Final Programmatic Environmental Impact Statement**

**Volume I:  Chapters 1-8, Figures, Tables, and Keyword Index**



**U.S. Department of the Interior**
**Bureau of Ocean Energy Management**
**Gulf of Mexico OCS Region**

BOEM
Bureau of Ocean Energy Management

# SUMMARY

## Introduction

The Bureau of Ocean Energy Management (BOEM) has prepared this Final Programmatic Environmental Impact Statement (Programmatic EIS) to assess environmental impacts of authorizing geological and geophysical survey activities (G&G activities) in the Mid- and South Atlantic Outer Continental Shelf area (Mid- and South Atlantic OCS) and adjacent State waters between 2012 and 2020. The analysis covers G&G activities conducted under BOEM's oil and gas, renewable energy, and marine minerals programs. The Programmatic EIS also addresses impacts in adjacent State waters because environmental impacts of G&G activities in the Mid- and South Atlantic OCS under BOEM's jurisdiction, such as seismic surveys, could impact the States.

The area covered by the Programmatic EIS ("Area of Interest" or "AOI") extends from the mouth of the Delaware Bay to just south of Cape Canaveral, Florida, and from the shoreline (excluding estuaries) to 648 kilometers (km) (403 miles [mi]) from shore. The total AOI is 854,779 km$^2$ (330,032 mi$^2$), and water depths range from 0 to 5,629 meters (m) (0 to 18,468 feet [ft]). The AOI is the area in which the activities of the proposed action would take place and, therefore, the area of potential effect of the Programmatic EIS. BOEM has received nine permit requests for G&G activities in support of oil and gas exploration in the AOI, and industry has expressed interest in expanding G&G activities. Existing survey information on oil and gas resources from the 1970's and 1980's was collected with technology that is now outdated, and new surveys are needed to make informed decisions for energy production and environmental protection. Given the scope of the proposed surveys and their potential impacts, BOEM has determined a Programmatic EIS under the National Environmental Policy Act (NEPA) is needed before permitting any new, large-scale G&G surveys. Furthermore, the Congress has requested preparation of the Programmatic EIS in the Conference Report to the Department of the Interior, Environment, and Related Agencies Appropriation Act, 2010 (Report 111-316).

The Programmatic EIS does not authorize any particular G&G activities. Instead, the Programmatic EIS provides a higher level analysis of impacts from which site-specific NEPA evaluations will draw, or be "tiered" as described in the NEPA regulations of the Council on Environmental Quality (CEQ). Site-specific environmental evaluations will address details of proposed G&G activities, potential impacts, mitigation, and monitoring, and they will support site-specific intergovernmental consultations and decisions on authorizations and conditions to be applied under applicable laws.

## The Alternative Actions

The Programmatic EIS evaluates three potential alternative actions by BOEM: to authorize G&G activities with time-area closures and standard mitigation as described below (**Alternative A, the Proposed Action**); to authorize G&G activities with additional time-area closures, geographic separation of simultaneous seismic airgun surveys, and use of passive acoustic monitoring (**Alternative B, the Preferred Alternative**); and no action - status quo (**Alternative C**). Alternatives A and B are identical with respect to the G&G activities that could be conducted and the expected activity levels during the 2012-2020 period. They differ only in that Alternative B would expand the time-area closure for North Atlantic right whales (NARW) provided in Alternative A; add a time-area closure offshore Brevard County, Florida, to protect nesting sea turtles; consider a 40-km (25-mi) separation between concurrent seismic airgun surveys; require passive acoustic monitoring (PAM) in seismic airgun surveys; and also require use of PAM or similar equipment in some HRG surveys. Alternative B has been identified as the Preferred Alternative. Alternative C is the No Action Alternative required by CEQ regulations implementing NEPA. Under this alternative, no G&G activities associated with oil and gas exploration would occur in the AOI, but G&G activities for renewable energy development and marine minerals use would continue on a site-specific basis. Several additional alternatives were identified during the scoping process, but they were eliminated from detailed analysis for the reasons identified in **Chapter 2.5**. Examples include limiting G&G activities to renewable energy and marine minerals; reprocessing existing G&G data for oil and gas; delaying the permitting process; consolidating and

**Levels of Impact**

The Programmatic EIS evaluates and assigns levels of environmental impact caused by IPFs as follows, with categories tailored as needed to fit characteristics of differing IPFs:

- **Negligible**: Little or no measurable/detectable impact.
- **Minor**: Impacts are detectable, short-term, extensive or localized, but less than severe.
- **Moderate**: Impacts are detectable, short-term, extensive, and severe; or impacts are detectable, short-term or long-lasting, localized, and severe; or impacts are detectable, long-lasting, extensive or localized, but less than severe.
- **Major**: Impacts are detectable, long-lasting, extensive, and severe.

**Environmental Impacts of Alternative A**

### *Impacts on Marine Mammals*

Thirty-nine species of marine mammals occur or may occur within the AOI, including 34 cetacean species, 1 sirenian (the Florida subspecies of the West Indian manatee), and 4 pinnipeds (gray seal, harbor seal, hooded seal, and harp seal). The manatee and the four seal species probably do not occur in the AOI currently; therefore, only 34 marine mammal species are potentially impacted. Six of the potentially impacted marine mammal species are endangered species, including five baleen whales (NARW, blue whale, fin whale, sei whale, and humpback whale) and one toothed whale (sperm whale). The IPFs affecting marine mammals are active acoustic sound sources, vessel and equipment noise, vessel traffic, aircraft traffic and noise, trash and debris, and accidental fuel spills.

#### *Impacts of Active Acoustic Sound Sources*

Alternative A includes extensive seismic airgun surveys, as well as HRG surveys. Airguns produce acoustic pulses that are within the hearing range of all marine mammals. Most HRG surveys use only electromechanical sources, such as side-scan sonars; boomer, sparker, and chirp subbottom profilers; and multibeam depth sounders, some of which have frequencies beyond the functional hearing range of marine mammals. However, some HRG surveys may use small airguns. Based on the scope of the proposed action, seismic airgun surveys and non-airgun HRG surveys could affect individuals from all 34 potentially impacted marine mammal species reported from the AOI.

Incidental take levels of marine mammals through acoustical disturbance was estimated for Alternative A using the Acoustic Integration Model©. The model used both the current NMFS-established criteria and the Southall et al. (2007) criteria to estimate take. The difference between the two sets of criteria for harassment is that NMFS currently uses "precautionary" thresholds that would indicate when the *potential* for Level A or Level B harassment cannot be dismissed. In other words, the sound level may or may not actually cause harassment, but it might. The Southall et al. (2007) criteria estimate threshold levels where harassment may actually occur, and hence these take estimates are lower. **Chapter 4** and **Appendices D** and **E** provide detailed explanations of the models and results.

The "Modeled Marine Mammal Take Estimates" section above summarizes the conservative nature of these modeled estimates. Again, the models do not take into account all of the extensive mitigation measures summarized in **Table S-1** or other caveats discussed below, and actual take through acoustic disturbance is expected to be less than modeled estimates. For example, the Level A incidental takes predicted do not take into account the mitigation measures included in the Seismic Airgun Survey Protocol that establishes a 180-decibel (dB) acoustic exclusion zone around airgun arrays. The acoustic exclusion zone must be clear of any marine mammals and sea turtles for at least 60 minutes before an airgun survey can start. The airgun array is then slowly ramped-up, rather than turned on immediately at full power, so that animals have an opportunity to move away before airgun levels reach potentially disturbing levels. Further, Protected Species Observers (PSOs) continuously monitor the 180-dB exclusion zone for marine mammals and call for the immediate shut down of the airgun array if marine mammals are detected within or approaching this exclusion zone. However, it should be noted that the

effects of mitigation measures, and other caveats described below, cannot be quantified with precision, and mitigation measures may not be fully implemented. For example, visual and PAM are not 100 percent effective due to factors such as physical conditions (e.g., inclement weather), presence of animals at the surface, difficulty in species identification, lack of vocalizing animals, and limitations in equipment used for monitoring. Further, larger acoustic exclusion zones are more difficult to monitor than smaller zones.

For seismic airgun surveys, the total annual Level A and Level B incidental takes were estimated for 2012-2020 using the NMFS and Southall et al. criteria. The modeling predicts Level A harassment of all marine mammal species in the AOI, except the West Indian manatee and the three modeled seal species (gray, harbor, and hooded seals). Using NMFS's 180-dB criterion, the five species with the highest numbers of annual Level A takes are estimated to be as follows:

- bottlenose dolphin (up to 11,748 individuals/year);
- short-beaked common dolphin (up to 6,147 individuals/year);
- Atlantic spotted dolphin (up to 5,848 individuals/year);
- short-finned pilot whale (up to 4,631 individuals/year); and
- striped dolphin (up to 3,993 individuals/year).

Using the Southall et al. (2007) criteria, estimated Level A takes are much lower than predicted by NMFS, with the following top five species:

- Atlantic spotted dolphin (up to 1,496 individuals/year);
- striped dolphin (up to 1,020 individuals/year);
- Risso's dolphin (up to 731 individuals/year);
- pantropical spotted dolphin (up to 263 individuals/year); and
- short-beaked common dolphin (up to 225 individuals/year).

The modeling also predicts Level B harassment of all marine mammal species except the West Indian manatee and the three modeled seals species (gray, harbor, and hooded seals). Using NMFS's 160-dB criterion, the five species with the highest annual Level B take estimates are as follows:

- bottlenose dolphin (up to 1,151,442 individuals/year);
- short-beaked common dolphin (up to 602,424 individuals/year);
- Atlantic spotted dolphin (up to 573,121 individuals/year)
- short-finned pilot whale (up to 453,897 individuals/year); and
- striped dolphin (up to 391,376 individuals/year).

Six potentially impacted marine mammal species in the AOI are endangered species: NARW; blue whale; fin whale; sei whale; humpback whale; and sperm whale. The modeling predicts Level A and Level B incidental takes of all these species. The estimated take is highest for the humpback whale, with estimated Level A takes of up to 12 individuals/year using NMFS's 180-dB criterion (up to 6 individuals/year following Southall et al. [2007]) and Level B takes up to 1,131 individuals/year using NMFS's 160-dB criterion. The modeling predicts Level A incidental takes of 0-2 NARW individuals/year using NMFS's 180-dB criterion and less than one individual using the Southall et al. (2007) criterion. Level B incidental takes of the NARW are estimated by the models to range from 0 to 224 individuals/year. The proposed action includes a time-area closure for NARWs that has been factored into the incidental take calculations. The closure reduces estimated Level A and Level B incidental takes of NARWs by about 67 percent (as compared with no time-area closures). Other mitigation measures not considered in the take models are also expected to reduce actual take.

These modeled take estimates should be regarded as conservative and higher than the probable actual take. The acoustic and impact modeling conducted to support the Programmatic EIS is by its very nature complex and requires numerous assumptions to predict results in scenarios where

- the period modeled is in the future and spans 5 years, during which the knowledge of the source locations and movement, animal locations and movement, oceanographic/acoustic conditions, equipment descriptions and specification, and even the time of the year for each survey are not precisely known;
- the details of marine mammal abundances, distributions, and behavior patterns are not precisely known and are subject to change as animal populations vary from year to year and location to location; and
- the development of new or re-designed survey equipment, survey techniques, survey geometries, or even signal processing approaches could change.

Despite uncertainty and variability in future actions, the use of models require numerous specific details to be identified and used during their calculations. Each of the inputs into the models is therefore purposely developed to be conservative (overly predictive), and this conservativeness accumulates throughout the analysis. For example, representative sound sources are modeled at highest sound levels and always at maximum power and operation; sound levels received by an animal are calculated at highest levels; marine mammal density values used likely exceed actual densities; and models do not include the effect of all mitigations in reducing take estimates. Additional assumptions that add to the conservativeness of the models are noted below. **Chapter 1** and **Appendices D** and **E** provide greater detail on the development and results of these models.

- **Acoustic Source Specifications:** There is a large variation in the size, configuration, and source level of the airgun arrays potentially employed during surveys. The modeling selected one source as representative of those used that was more powerful than about 95 percent of the sources listed in the various survey types. Additionally, it was assumed that the modeled array was always at maximum power and that all airguns were fully operational for fully completed survey scenarios. Similarly, for the mineral resources survey, the most conservative parameters were assumed for source level, signal repetition rate, pulse length, and other factors. These assumptions will not always be met in the field.
- **Acoustic Source Modeling:** For simplicity, the acoustic modeling replaces the actual predicted distributed airgun array sound field with a sound field produced by a single hypothetical single large airgun and a beam pattern. This is fairly accurate in the far-field, which is typically 100-300 m (328-984 ft) from the array center and outward, but in the closer near-field this can greatly overestimate the apparent source level and the subsequent impacts calculated. This conservative near-field approximation could be corrected in the model; however, the approximation is highly dependent on the actual source parameters. It would be difficult to justify making such a correction in the Programmatic EIS, which would greatly enlarge the modeling effort while not necessarily improving accuracy of the estimates.
- **Acoustic Propagation Modeling:** Typically, the acoustic parameters used in acoustic modeling (including sound velocity profile, bottom sediment types/distributions/thicknesses/coefficients, and surface wind and wave values) are averaged seasonal values over reasonably sampled areas and time periods. These averaging processes remove most local variability while capturing the general effect of the sound speed on acoustic propagation. This generally tends to underestimate the transmission loss and therefore overestimate the received levels at all ranges to some degree. Actual *in situ* propagation, therefore, typically displays much more fading and disruption of the signal, especially for signals shorter than 1 second (i.e., airguns).
- **Acoustic Modeling of the Multi-Path:** When a signal propagates through the ocean, it typically follows many pathways between the source and a receiver (e.g., an animal). For example, one path may be directly between the source and receiver, while others may reflect off of the ocean surface or bottom before arriving at the receiver. For most of the models used in acoustic propagation analyses, the model assumes that the signals continue until all of the significant paths have arrived at the

receiver. The energy from these different pathways is then summed to derive a final received value. This is a conservative approach for short signals, like airgun pulses, and this spreading of a signal (and its energy) generally increases as range increases. This is not a simple or easy correction to make since it can also be highly dependent on the receiver's position in range and depth. Therefore, the conservative assumption is used. Additionally, real world localized effects, such as bubble plumes from breaking waves and the scattering of sound from plants and air present near the ocean's surface, also greatly reduce received levels for animals within 3-6 m (10-20 ft) of the ocean's surface.

- **Marine Mammal Density Values:** Marine mammal density values used in acoustic modeling are typically very conservative. As a simple check of their conservatism, a calculation consisting of multiplying each density value by the area that it covers and then summing these values results in total population values that greatly exceed those identified in the Marine Mammal Stock Assessment reports.

- **Marine Mammal Congregations:** Marine mammals, especially dolphins, often occur in pods or groups of animals. When this occurs, the actual density near that pod can be greater than those used in these calculations, but the corresponding density for much of the surrounding areas has been decreased. Statistically, this averages out for multiple model runs that do not account for this. However, when this occurs during actual operations, sources may be turned off, especially since large pods of dolphins, which often can consist of hundreds of animals, are much easier to observe and mitigate for.

Overall impacts from airgun surveys on marine mammals are expected to be **moderate**.

### Impacts of Non-Airgun HRG Surveys

Non-Airgun HRG surveys would use only electromechanical sources such as side-scan sonars; boomer, sparker, and chirp subbottom profilers; and multibeam depth sounders. Boomer and sparker pulses are expected to be within the hearing range of all marine mammals. However, the operating frequency of the representative multibeam system selected for the Programmatic EIS is above the hearing range of all cetaceans. For the representative side-scan sonar and chirp subbottom profiler systems, some frequencies are within the hearing range of cetaceans, but others are not. Frequencies emitted by individual equipment may differ from these representative systems selected for analysis.

Based on the scope of the HRG survey scenarios, any of the 34 potentially impacted marine mammal species within the AOI could be affected. In addition, marine mammals inhabiting primarily shelf-edge or deepwater habitats (e.g., sperm whales, spinner dolphins, etc.) are unlikely to be exposed to noise from most HRG surveys because these surveys would typically be in relatively nearshore waters. High-resolution geophysical surveys for renewable energy projects are expected to occur in waters less than 40 m (131 ft) deep and marine minerals surveys are expected to occur in waters less than 30 m (98 ft) deep. However, HRG surveys for oil and gas are expected to occur in all water depths.

For non-airgun HRG surveys, modeling of incidental take predicts low numbers (a few individuals per survey year) of Level A harassment for all marine mammal species (except manatees and the three seal species modeled) in the AOI. The modeling also predicts Level B harassment (except manatees and the three seal species modeled), with numbers ranging up to several hundred individuals per year (e.g., 92-632 individuals/year for bottlenose dolphin, the species with the highest numbers). All six of the potentially impacted endangered marine mammal species are predicted to have essentially zero Level A incidental takes using both NMFS's 180-dB criterion and the Southall et al. (2007) criteria. The highest estimated Level B incidental takes for these endangered species are estimated for the sperm whale (0-12 individuals/year). All of the endangered mysticete whales have estimated Level B incidental takes of less than one individual/year, with the highest estimate being for NARW (0.19-0.87 individuals/year). These modeled estimates for HRG surveys overstate take levels for the same reasons that they overstate airgun takes.

In conclusion, it is expected that there would be little or no Level A harassment resulting from non-airgun HRG surveys. Depending on the operating frequencies and source levels of the

electromechanical sources used for a particular survey, the underwater noise may be above the hearing range of marine mammals or cause impacts only at very close range. The most likely and extensive effects of HRG surveys on marine mammals would be behavioral responses (Level B harassment). Because most or all Level A harassment would likely be avoided and because of the low numbers of Level B harassments predicted, overall impacts on marine mammals from non-airgun HRG surveys are expected to be **minor**.

### Other Impacts on Marine Mammals

Vessel noise has been observed to elicit a variety of behavioral responses in marine mammals and may contribute to auditory masking. These behavioral responses may include evasive maneuvers such as diving or changes in swimming direction or speed. Alternative A includes a time-area closure for G&G surveys deploying airguns in NARW critical habitat in the periods when vessel speed restrictions are in force under the Right Whale Ship Strike Reduction Rule (from November 15 through April 15) and in the Mid-Atlantic and Southeast U.S. Seasonal Management Areas (SMAs) from November 1 through April 30. Authorizations for other (non-airgun) HRG surveys in these areas may include additional mitigation and monitoring requirements to avoid or reduce impacts on NARWs. These measures would be expected to reduce vessel-related noise impacts to NARWs during their seasonal migration and calving and nursing periods. The time-area closure would also reduce impacts on other marine mammals during those time periods. Based on the expected relatively low volume of vessel traffic associated with project activities within the AOI and the presumption that individuals or groups of marine mammals within the AOI will be familiar with various common vessel-related noises, particularly within frequented shipping lanes, the impacts of vessel noise on marine mammals within the AOI are expected to be **negligible** to **minor**.

Other sound sources associated with Alternative A include drilling-related equipment noise during the completion of up to three deep stratigraphic test wells and up to five shallow test wells during the time period covered by the Programmatic EIS. These sounds may elicit behavioral responses such as changes in swimming direction or speed. However, considering the small number of drilling operations, the continuous nature of sounds produced during these activities, and the mitigation measures in place for Alternative A, it is expected that the noise impacts on marine mammals would be **minor**.

Marine mammals are vulnerable to vessel strikes. However, all authorizations for shipboard surveys would include guidance for vessel strike avoidance. It is unlikely that survey vessels would strike marine mammals because they would travel slowly during surveys (typically between 4.5-6 knots [kn]). In addition, during surveys, waters surrounding survey vessels would be visually monitored by PSOs for marine mammals and turtles. Vessel movements would be subject to BOEM guidance for vessel strike avoidance, and vessel operators would be required to reduce speed in certain areas to comply with the Right Whale Ship Strike Reduction Rule. Vessel traffic impacts are expected to be **negligible**.

Alternative A includes one or two aeromagnetic surveys and the possibility of helicopter traffic in support of drilling of deep stratigraphic and shallow test wells. Low-flying aircraft can disturb marine mammals with noise and visual appearance. However, the exposure of individual marine mammals to aircraft-related noise would be expected to be brief in duration. Considering the relatively low level of aircraft activity included in the proposed action, along with the short duration of potential exposure to noise and visual disturbance, potential impacts from this activity are expected to be **negligible** to **minor**.

Impacts to marine mammals from discarded trash and debris are expected to be avoided through vessel operators' required compliance with U.S. Coast Guard (USCG) and U.S. Environmental Protection Agency (USEPA) regulations. In addition, all authorizations for shipboard surveys would include the Bureau of Safety and Environmental Enforcement (BSEE) guidance for marine debris awareness. Therefore, impacts are expected to be **negligible**.

An accidental fuel spill could affect marine mammals through various pathways: direct contact; inhalation of volatile components; ingestion (directly or indirectly through the consumption of fouled prey species); and, for mysticetes, impairment of feeding by fouling of baleen. Cetacean skin is highly impermeable and is not significantly irritated by brief exposure to diesel fuel; hence, limited direct contact is not likely to produce a significant impact. A small fuel spill would not be likely to result in the death or life-threatening injury of individual marine mammals or the long-term displacement of these animals from preferred feeding or breeding habitats or migratory routes. It is expected that spilled fuel oil or

diesel fuel would rapidly disperse on the sea surface to a very light sheen and would weather rapidly. The impacts would be **negligible** to **minor**.

### Impacts on Sea Turtles

Five sea turtle species occur in the AOI: loggerhead, green, hawksbill, Kemp's ridley, and leatherback turtles. The hawksbill, Kemp's ridley, and leatherback turtles are listed under the ESA as endangered. The green turtle is listed as threatened, except for the Florida breeding population, which is endangered. The Northwest Atlantic population of the loggerhead turtle is classified as threatened. Loggerhead, leatherback, and green turtles are more commonly found within the AOI during nesting season and in certain life stages. Kemp's ridley and particularly hawksbill turtles are less common within the AOI. Green, leatherback, and loggerhead turtles nest on coastal beaches within the AOI, with most nests in southeast Florida. However, loggerhead turtles also nest along the southeast coast as far north as Virginia. The relevant IPFs for sea turtles are active acoustic sound sources, vessel and equipment noise, vessel traffic, aircraft traffic and noise, trash and debris, and accidental fuel spills.

#### Impacts of Active Acoustic Sound Sources

Alternative A includes extensive seismic airgun surveys, as well as HRG surveys, and the low-frequency pulses of airguns that are believed to be within the hearing range of sea turtles. High-resolution geophysical surveys typically use only electromechanical sources such as side-scan sonars; boomer, sparker, and chirp subbottom profilers; and multibeam depth sounders. The survey protocol for HRG sound sources operating at or below 200 kilohertz (kHz) (HRG Survey Protocol) includes establishing a 200-m (656-ft) radius acoustic exclusion zone around the sound source, and visual monitoring by trained PSOs. The HRG Survey Protocol also restricts HRG surveys within the NARW critical habitat from November 15 to April 15 for surveys using equipment that operates at frequencies at and below 30 kHz. Based on the source levels of most boomer and sparker equipment and implementation of the HRG Survey Protocol, impacts on sea turtles from HRG surveys using boomer or sparker subbottom profilers are expected to range from **negligible** to **minor**, based on the distance of the individual sea turtle from the sound pulse.

Seismic airgun surveys could affect all sea turtle species within the AOI, potentially including hawksbill turtles within the southernmost part of the AOI. Subadult and adult turtles may be more likely to be affected by seismic airgun noise than post-hatchling turtles due to the time that the former remain submerged and at depth. Post-hatchling turtles generally reside at or near the sea surface and may be less likely to be harmed by the sound field produced by an airgun array. Seismic airgun surveys in nearshore waters would affect a greater number of individual turtles, particularly species other than leatherbacks. Deepwater surveys are likely to affect fewer individual turtles but are more likely to affect leatherback turtles, particularly within areas of upwelling where individuals may be found in feeding aggregations. Surveys conducted during summer sea turtle nesting periods may affect greater numbers of adult turtles, particularly loggerhead, green, and leatherback turtles, than surveys conducted during non-nesting periods.

Mitigation measures included in the Seismic Airgun Survey Protocol include ramp-up of airgun arrays, visual monitoring of an acoustic exclusion zone by PSOs, and startup and shutdown requirements. These measures are expected to minimize the potential for injury to sea turtles by ensuring that they are not present within an acoustic exclusion zone around the airgun array. The most likely impacts would be short-term behavioral responses; no deaths or life-threatening injuries would be expected. In general, impacts of seismic airgun surveys on sea turtles are expected to range from **negligible** to **minor**.

However, seismic airgun surveys offshore heavily used nesting beaches during the nesting season could temporarily displace breeding and nesting adult turtles and potentially disrupt time-critical activities. Beaches of southeast Florida have been identified as the most important nesting area for loggerhead turtles in the Western Hemisphere. The northern segment of the Archie Carr National Wildlife Refuge (NWR) borders the AOI, and it has been estimated that 25 percent of all loggerhead nesting in the U.S. occurs there. During the 2010 nesting season, there were over 31,000 loggerhead nests in Brevard County, Florida, which is where the Archie Carr NWR is located. It is likely that large numbers of sea turtles would be present in nearshore waters of Brevard County during the nesting season from May 1 to October 31. Many adult females linger near the nesting beaches before and between

# TABLES

Table 4-10

Annual Level A Takes Estimates from Seismic Airgun Sources Using 180-dB Criteria for Marine Mammal Species
during the Project Period (2012-2020)

| Marine Mammal | Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| ORDER CETACEA | | | | | | | | | |
| Suborder Mysticeti (Baleen Whales) | | | | | | | | | |
| Common Minke Whale | 0.000 | 0.000 | 0.342 | 0.666 | 0.101 | 0.364 | 0.285 | 0.196 | 0.144 |
| Sei Whale | 0.000 | 0.000 | 1.965 | 3.855 | 0.648 | 2.473 | 2.009 | 1.567 | 0.925 |
| Bryde's Whale | 0.000 | 0.000 | 1.948 | 3.820 | 0.642 | 2.445 | 1.986 | 1.548 | 0.918 |
| Blue Whale | 0.000 | 0.000 | 2.182 | 4.274 | 0.700 | 2.653 | 2.139 | 1.632 | 1.000 |
| Fin Whale | 0.000 | 0.000 | 4.400 | 8.638 | 1.507 | 5.679 | 4.657 | 3.705 | 2.180 |
| North Atlantic Right Whale | 0.000 | 0.000 | 1.162 | 2.290 | 0.611 | 1.757 | 1.595 | 1.464 | 0.858 |
| Humpback Whale | 0.000 | 0.000 | 5.897 | 11.542 | 1.853 | 7.071 | 5.671 | 4.275 | 2.632 |
| Suborder Odontoceti (Toothed Whales, Dolphins, and Porpoises) | | | | | | | | | |
| Short-beaked Common Dolphin | 0.000 | 0.000 | 3121.383 | 6146.553 | 1114.258 | 4282.933 | 3551.165 | 2919.887 | 1611.226 |
| Pygmy Killer Whale | 0.000 | 0.000 | 2.253 | 4.410 | 0.705 | 2.708 | 2.170 | 1.635 | 0.997 |
| Short-Finned Pilot Whale | 0.000 | 0.000 | 2354.300 | 4631.133 | 840.256 | 3170.157 | 2627.151 | 2145.343 | 1224.552 |
| Long-Finned Pilot Whale | 0.000 | 0.000 | 297.400 | 582.360 | 96.845 | 362.017 | 292.887 | 224.439 | 139.821 |
| Risso's Dolphin | 0.000 | 0.000 | 1619.672 | 3180.466 | 551.169 | 2095.819 | 1717.190 | 1367.649 | 796.896 |
| Northern Bottlenose Whale | 0.000 | 0.000 | 0.127 | 0.250 | 0.043 | 0.174 | 0.143 | 0.116 | 0.061 |
| Pygmy Sperm Whale | 0.000 | 0.000 | 2.371 | 4.592 | 0.559 | 2.140 | 1.562 | 0.872 | 0.770 |
| Dwarf Sperm Whale | 0.000 | 0.000 | 14.844 | 29.005 | 4.264 | 16.952 | 13.300 | 9.592 | 5.939 |
| Atlantic White-sided Dolphin | 0.000 | 0.000 | 4.668 | 9.152 | 1.467 | 5.795 | 4.657 | 3.573 | 2.063 |
| Fraser's Dolphin | 0.000 | 0.000 | 0.242 | 0.468 | 0.055 | 0.210 | 0.151 | 0.079 | 0.076 |
| Sowerby's Beaked Whale | 0.000 | 0.000 | 0.203 | 0.397 | 0.060 | 0.253 | 0.184 | 0.134 | 0.085 |
| Blainville's Beaked Whale | 0.000 | 0.000 | 39.568 | 77.313 | 11.835 | 45.464 | 35.978 | 26.232 | 16.739 |
| Gervais' Beaked Whale | 0.000 | 0.000 | 39.568 | 77.313 | 11.835 | 45.464 | 35.978 | 26.232 | 16.739 |
| True's Beaked Whale | 0.000 | 0.000 | 39.568 | 77.313 | 11.835 | 45.464 | 35.978 | 26.232 | 16.739 |
| Killer Whale | 0.000 | 0.000 | 1.965 | 3.843 | 0.602 | 2.309 | 1.839 | 1.363 | 0.852 |
| Melon-Headed Whale | 0.000 | 0.000 | 2.523 | 4.942 | 0.818 | 3.098 | 2.505 | 1.924 | 1.168 |
| Harbor Porpoise | 0.000 | 0.000 | 7.054 | 13.798 | 2.245 | 8.376 | 6.733 | 5.072 | 3.235 |
| Sperm Whale | 0.000 | 0.000 | 158.828 | 309.723 | 44.502 | 173.124 | 134.518 | 93.561 | 62.258 |
| False Killer Whale | 0.000 | 0.000 | 2.801 | 5.491 | 0.930 | 3.501 | 2.848 | 2.218 | 1.334 |
| Pantropical Spotted Dolphin | 0.000 | 0.000 | 446.741 | 876.082 | 145.967 | 559.932 | 454.020 | 352.985 | 208.113 |
| Clymene Dolphin | 0.000 | 0.000 | 207.184 | 406.191 | 67.382 | 258.155 | 209.054 | 161.919 | 96.038 |
| Striped Dolphin | 0.000 | 0.000 | 2038.848 | 3993.224 | 650.891 | 2483.607 | 2000.683 | 1526.327 | 928.896 |
| Atlantic Spotted Dolphin | 0.000 | 0.000 | 2978.964 | 5847.582 | 988.880 | 3813.267 | 3105.692 | 2446.233 | 1406.107 |
| Spinner Dolphin | 0.000 | 0.000 | 1.949 | 3.821 | 0.634 | 2.429 | 1.967 | 1.523 | 0.903 |
| Rough-Toothed Dolphin | 0.000 | 0.000 | 13.755 | 26.888 | 4.279 | 16.048 | 12.821 | 9.510 | 6.112 |
| Bottlenose Dolphin | 0.000 | 0.000 | 5977.039 | 11748.210 | 2090.846 | 7908.443 | 6521.887 | 5266.486 | 3022.262 |
| Cuvier's Beaked Whale | 0.000 | 0.000 | 276.973 | 541.189 | 82.842 | 318.247 | 251.849 | 183.622 | 117.174 |
| ORDER SIRENIA | | | | | | | | | |
| West Indian Manatee | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| ORDER CARNIVORA | | | | | | | | | |
| Suborder Pinnipedia | | | | | | | | | |
| Hooded Seal | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Gray Seal | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Harbor Seal | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |

Table 4-11

Annual Level B Take Estimates (160-dB criteria) from Airgun Surveys for Marine Mammal Species
during the Project Period (2012-2020)

| Marine Mammal | Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| **ORDER CETACEA** | | | | | | | | | |
| Suborder Mysticeti (Baleen Whales) | | | | | | | | | |
| Common Minke Whale | 0.000 | 0.000 | 33.522 | 65.282 | 9.857 | 35.718 | 27.956 | 19.257 | 14.116 |
| Sei Whale | 0.000 | 0.000 | 192.625 | 377.801 | 63.466 | 242.395 | 196.917 | 153.588 | 90.689 |
| Bryde's Whale | 0.000 | 0.000 | 190.896 | 374.359 | 62.904 | 239.608 | 194.649 | 151.692 | 89.580 |
| Blue Whale | 0.000 | 0.000 | 213.901 | 418.875 | 68.622 | 259.980 | 209.629 | 159.949 | 98.045 |
| Fin Whale | 0.000 | 0.000 | 431.204 | 846.583 | 147.732 | 556.574 | 456.478 | 363.111 | 213.637 |
| North Atlantic Right Whale | 0.000 | 0.000 | 113.846 | 224.490 | 59.848 | 172.225 | 156.298 | 143.499 | 84.052 |
| Humpback Whale | 0.000 | 0.000 | 577.964 | 1131.230 | 181.646 | 692.987 | 555.789 | 419.002 | 257.919 |
| Suborder Odontoceti (Toothed Whales, Dolphins, and Porpoises) | | | | | | | | | |
| Short-beaked Common Dolphin | 0.000 | 0.000 | 305926.755 | 602423.698 | 109208.426 | 419770.312 | 348049.714 | 286178.116 | 157916.298 |
| Pygmy Killer Whale | 0.000 | 0.000 | 220.776 | 432.193 | 69.105 | 265.443 | 212.700 | 160.267 | 97.713 |
| Short-Finned Pilot Whale | 0.000 | 0.000 | 230744.930 | 453897.344 | 82353.473 | 310707.070 | 257487.079 | 210265.101 | 120018.336 |
| Long-Finned Pilot Whale | 0.000 | 0.000 | 29148.152 | 57077.138 | 9491.739 | 35481.323 | 28705.807 | 21997.239 | 13703.882 |
| Risso's Dolphin | 0.000 | 0.000 | 158744.009 | 311717.478 | 54020.063 | 205411.212 | 168301.811 | 134043.314 | 78103.785 |
| Northern Bottlenose Whale | 0.000 | 0.000 | 12.462 | 24.544 | 4.259 | 17.031 | 13.994 | 11.395 | 6.003 |
| Pygmy Sperm Whale | 0.000 | 0.000 | 232.353 | 450.073 | 54.784 | 209.782 | 153.072 | 85.460 | 75.450 |
| Dwarf Sperm Whale | 0.000 | 0.000 | 1454.885 | 2842.740 | 417.949 | 1661.508 | 1303.577 | 940.144 | 582.097 |
| Atlantic White-sided Dolphin | 0.000 | 0.000 | 457.481 | 896.987 | 143.826 | 567.919 | 456.474 | 350.144 | 202.187 |
| Fraser's Dolphin | 0.000 | 0.000 | 23.717 | 45.882 | 5.427 | 20.593 | 14.819 | 7.782 | 7.470 |
| Sowerby's Beaked Whale | 0.000 | 0.000 | 19.910 | 38.905 | 5.903 | 22.874 | 18.068 | 13.148 | 8.286 |
| Blainville's Beaked Whale | 0.000 | 0.000 | 3878.016 | 7577.415 | 1159.902 | 4455.915 | 3526.252 | 2570.966 | 1640.602 |
| Gervais' Beaked Whale | 0.000 | 0.000 | 3878.016 | 7577.415 | 1159.902 | 4455.915 | 3526.252 | 2570.966 | 1640.602 |
| True's Beaked Whale | 0.000 | 0.000 | 3878.016 | 7577.415 | 1159.902 | 4455.915 | 3526.252 | 2570.966 | 1640.602 |
| Killer Whale | 0.000 | 0.000 | 192.589 | 376.649 | 59.002 | 226.289 | 180.233 | 133.567 | 83.546 |
| Melon-Headed Whale | 0.000 | 0.000 | 247.240 | 484.381 | 80.135 | 303.674 | 245.516 | 188.604 | 114.448 |
| Harbor Porpoise | 0.000 | 0.000 | 691.367 | 1352.385 | 219.996 | 820.894 | 659.933 | 497.063 | 317.088 |
| Sperm Whale | 0.000 | 0.000 | 15566.706 | 30355.996 | 4361.663 | 16967.893 | 13184.100 | 9169.873 | 6101.896 |
| False Killer Whale | 0.000 | 0.000 | 274.527 | 538.213 | 91.113 | 343.104 | 279.084 | 217.358 | 130.741 |
| Pantropical Spotted Dolphin | 0.000 | 0.000 | 43785.058 | 85864.840 | 14306.228 | 54878.902 | 44498.535 | 34596.047 | 20397.152 |
| Clymene Dolphin | 0.000 | 0.000 | 20306.091 | 39810.739 | 6604.129 | 25301.751 | 20489.358 | 15869.727 | 9412.707 |
| Striped Dolphin | 0.000 | 0.000 | 199827.536 | 391375.882 | 63793.815 | 243418.330 | 196086.989 | 149595.327 | 91041.146 |
| Atlantic Spotted Dolphin | 0.000 | 0.000 | 291968.246 | 573121.475 | 96920.094 | 373738.318 | 304388.840 | 239755.284 | 137812.574 |
| Spinner Dolphin | 0.000 | 0.000 | 191.026 | 374.513 | 62.127 | 238.022 | 192.750 | 149.292 | 88.549 |
| Rough-Toothed Dolphin | 0.000 | 0.000 | 1348.103 | 2635.268 | 419.376 | 1572.892 | 1256.603 | 932.059 | 599.076 |
| Bottlenose Dolphin | 0.000 | 0.000 | 585809.587 | 1151442.029 | 204923.786 | 775106.463 | 639210.107 | 516168.326 | 296211.886 |
| Cuvier's Beaked Whale | 0.000 | 0.000 | 27146.110 | 53041.902 | 8119.316 | 31191.403 | 24683.766 | 17996.764 | 11484.217 |
| **ORDER SIRENIA** | | | | | | | | | |
| West Indian Manatee | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| **ORDER CARNIVORA** | | | | | | | | | |
| Suborder Pinnipedia | | | | | | | | | |
| Hooded Seal | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Gray Seal | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Harbor Seal | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |

Table 4-15

Comparison of Take Estimates from Acoustic Sources, without Mitigation

| Activity Source and Harassment Level | Incidental Take Estimates - Annual |
|---|---|
| Navy Training (concentrated in the VACAPES, Cherry Point, and Jacksonville Range Complexes) | |
| Level A | 68 |
| Level B | 1,056,582 |
| Beaked Whale Strandings | 10 |
| Navy Testing (concentrated in the VACAPES and Jacksonville Range Complexes) | |
| Level A | 163 |
| Level B | 747,620 |
| Level A, Unmanned Vehicles Demonstrations | ~51 times per year (average from 253 over a 5-yr period) |
| G&G Activities (throughout AOI) | |
| Level A, seismic airgun, 180-dB criterion | Listed species (except West Indian manatee):<br>• sperm whale – 45-310 individuals per year;<br>• humpback whale – 2-12 individuals per year;<br>• all other listed cetacean species – <9 individuals per year.<br>Nonlisted species (except four pinnipeds – hooded seal, gray seal, harbor seal, and harp seal):<br>• short-finned pilot whale – 840-4,631 individuals per year;<br>• bottlenose dolphin – 2,091-11,748 individuals per year;<br>• short-beaked common dolphin – 1,114-6,146 individuals per year;<br>• Atlantic spotted dolphin – 989-5,848 individuals per year;<br>• Risso's dolphin – 551-3,180 individuals per year;<br>• Pantropical spotted dolphin – 146-876 individuals per year;<br>• Long-finned pilot whale – 97-582 individuals per year;<br>• Cuvier's beaked whale – 83-541 individuals per year;<br>• Clymene dolphin – 67-406 individuals per year;<br>• other cetacean species – <100 individuals per year. |
| Level A, seismic airgun, Southall et al. (2007) criterion | Listed species (except fin whale):<br>• humpback whale – 0.7-5.9 individuals per year;<br>• blue whale – 0.2-1.6 individuals per year;<br>• Bryde's whale – 0.1-1.2 individuals per year;<br>• all other listed cetacean species – <1 individual per year.<br>Nonlisted species (species >50 individuals taken per year):<br>• Atlantic spotted dolphin – 202-1,496 individuals per year;<br>• striped dolphin – 158-1,020 individuals per year;<br>• Risso's dolphin – 87-731 individuals per year;<br>• pantropical spotted dolphin – 35-263 individuals per year;<br>• short-beaked common dolphin – 23-225 individuals per year;<br>• short-finned pilot whale – 12-151 individuals per year;<br>• Clymene dolphin – 17-126 individuals per year;<br>• long-finned pilot whale – 15-118 individuals per year. |

Table 4-15.   Comparison of Take Estimates from Acoustic Sources, Without Mitigation (continued).

| Activity Source and Harassment Level | Incidental Take Estimates - Annual |
|---|---|
| Level B, seismic airgun, 160-dB criterion | Listed species (except West Indian manatee):<br>• sperm whale – 4,361-10,356 individuals per year;<br>• North Atlantic right whale – 60-224 individuals per year;<br>• >100 individuals per year for all other listed species.<br>Nonlisted species (except four pinnipeds – hooded seal, gray seal, harbor seal, and harp seal):<br>• bottlenose dolphin – 1,151,442 individuals per year;<br>• short-beaked common dolphin – 602,424 individuals per year;<br>• Atlantic spotted dolphin – 573,121 individuals per year;<br>• short-finned pilot whale – 453,897 individuals per year;<br>• striped dolphin – 391,376 individuals per year;<br>• Risso's dolphin – 311,717 individuals per year. |
| Level A, non-airgun HRG surveys, 180-dB criterion | Listed species (except West Indian manatee):<br>• <1 individual per year for all listed species.<br>Nonlisted species (except four pinnipeds – hooded seal, gray seal, harbor seal, and harp seal):<br>• bottlenose dolphin – <1-6 individuals per year;<br>• Atlantic spotted dolphin – 1-5 individuals per year;<br>• short-beaked common dolphin – 1-4 individuals per year;<br>• short-finned pilot whale, Risso's dolphin, striped dolphin – <1-2 individuals per year;<br>• <1 individual per year for all nonlisted species. |
| Level A, non-airgun HRG surveys, Southall et al. (2007) criterion | Listed species (except fin whale):<br>• all listed cetacean species – <1 individual per year.<br>Nonlisted species (species >50 individuals taken per year):<br>• Atlantic spotted dolphin – <1-7 individuals per year;<br>• short-beaked common dolphin – 0-5 individuals per year;<br>• Risso's dolphin – 0-2 individuals per year;<br>• bottlenose dolphin – <1-2 individuals per year. |
| Level B, non-airgun HRG surveys, 160-dB criterion | Listed species (except West Indian manatee):<br>• sperm whale – <1-12 individuals per year;<br>• all other listed cetacean species – <1 individual per year.<br>Nonlisted species (except four pinnipeds – hooded seal, gray seal, harbor seal, and harp seal):<br>• bottlenose dolphin – 632 individuals per year;<br>• Atlantic spotted dolphin – 490 individuals per year;<br>• short-beaked common dolphin – 379 individuals per year;<br>• short-finned pilot whale – 227 individuals per year;<br>• Risso's dolphin – 170 individuals per year;<br>• striped dolphin – 155 individuals per year;<br>• other cetacean species – <50 individuals per year. |

JEFFREY WOOD
Acting Assistant Attorney General

SARAH D. HIMMELHOCH
(MD Bar. No. 199212160064)
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division 601
D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0097
sarah.himmelhoch@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **LEAGUE OF CONSERVATION VOTERS**, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No. 3:17-cv-00101- SLG |
| | ) |
| v. | ) |
| | ) |
| **DONALD J. TRUMP**, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## FEDERAL DEFENDANTS' ANSWER TO PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendants, President Donald J. Trump, Secretary of the Interior Ryan Zinke, and Secretary of Commerce Wilbur Ross, each in his official capacity, file this answer to the allegations contained in Plaintiffs' Complaint for Injunctive Relief (Rec. Doc. 1). The numbered paragraphs of this answer correspond to the numbered paragraphs in Plaintiffs' complaint.

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          1

## RESPONSE TO SUMMARY

1.      Defendants admit that on April 28, 2017, President Donald J. Trump issued the Executive Order Implementing an America-First Offshore Energy Strategy that, among other things, modified the earlier withdrawal of areas of the Outer Continental Shelf. The remainder of this paragraph constitutes characterization of the Plaintiffs' claims and several Executive Orders and the Defendants' deny these characterizations.

## RESPONSE TO JURISDICTION

2.      The allegations in Paragraph 2 constitute conclusions of law, to which no response is required.

3.      The allegations in Paragraph 3 constitute conclusions of law, to which no response is required.

4.      The allegations in Paragraph 4 constitute conclusions of law, to which no response is required.

## RESPONSE TO PLAINTIFFS

5.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 5 and on that basis deny them.

6.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 6 and on that basis deny them.

7.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 7 and on that basis deny them.

8.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 8 and on that basis deny them.

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          2

9.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 9 and on that basis deny them.

10.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 10 and on that basis deny them.

11.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 11 and on that basis deny them.

12.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 12 and on that basis deny them.

13.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 13 and on that basis deny them.

14.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 14 and on that basis deny them.

15.      Defendants lack sufficient information to either admit or deny the allegations in Paragraph 15 and on that basis deny them.

16.      Defendants deny the allegations in the first sentence of Paragraph 16. The allegations in the remainder of the paragraph purport to characterize Executive Orders that speak for themselves and are the best evidence of their contents. To the extent the allegations of these sentences are inconsistent with the referenced documents they are denied.

17.      Defendants deny the allegations in Paragraph 17.

## **DEFENDANTS**

18.      Defendants admit that Donald J. Trump is the President of the United States and signed the Executive Order Implementing an America-First Offshore Energy Strategy. The

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          3

remainder of this paragraph are legal conclusions to which no response is required.

19.     Defendants admit that Ryan Zinke is the Secretary of the Interior. The remainder of this paragraph are legal conclusions to which no response is required.

20.     Defendants admit that Wilbur Ross is the Secretary of Commerce, and, as such, ensures compliance with specific, delegated obligations under the Endangered Species Act ("ESA") and Marine Mammal Protection Act ("MMPA"). The remainder of this paragraph are legal conclusions to which no response is required.

## RESPONSE TO BACKGROUND

### I.     The Chukchi and Beaufort Seas and Atlantic Ocean

21.     Defendants admit the Arctic Ocean includes, among other areas, the Chukchi and Beaufort Seas. With respect to the remaining sentences of Paragraph 21, Defendants admit that the Arctic Ocean constitute habitat to polar bears, walruses, whales, seals, migratory birds, and other animals, some of which are threatened or endangered; that these species are hunted and fished as part of Alaska Native cultural and subsistence activities. The remaining allegations are vague and ambiguous and lack the necessary context to form a response and therefore no response is required. To the extent a response is required, the Defendants deny the allegations.

22.     The Defendants admit that there are no deepwater ports on the American coastline of the Arctic Ocean. Defendants also admit that the weather in the Arctic Region includes fog, storms, and freezing temperatures even during the summer. The Defendants otherwise deny the remainder of the allegations in Paragraph 22 as vague characterizations of the Plaintiffs' claims.

23.     Defendants admit that there are undersea canyons in the Atlantic Ocean and that these canyons form habitat for corals, whales, swordfish, Bluefin tuna, sea turtles, seabirds, crustaceans,

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG     4

Case 3:17-cv-00101-SLG   Document 49   Filed 05/11/18   Page 4 of 17

and methane-dependent organisms. The Defendants admit that certain whale species seasonally migrate between the Gulf of Maine feeding grounds and calving grounds in Florida. The remaining allegations are vague and ambiguous and lack the necessary context to form a response and therefore no response is required. To the extent a response is required, the Defendants deny the allegations. To the extent that the allegations in Paragraph 23 purport to reference unspecified public documents published by the White House, DOI, and/or DOC and NOAA, those documents speak for themselves and are the best evidence of their contents. To the extent the allegations contradict those documents, the allegations are denied.

24.     The Defendants admit that tourism, recreation, and commercial fisheries are industries in the Mid-Atlantic region and along the Atlantic Coast. The Defendants admit that NOAA maintains annual statistics and reports on the fisheries in the United States. Defendants also admit that the National Marine Fisheries Service Annual Commercial Landing Statistics database tracking annual landings for 2014 in the Atlantic reports that all species landed from the Atlantic in 2014 constitute 1,352,823,250 pounds (see https://www.st.nmfs.noaa.gov/pls/webpls/MF_ANNUAL_LANDINGS.RESULTS). That database speaks for itself, and is the best evidence of its contents. To the extent the allegations in Paragraph 24 are inconsistent with these data, Defendants deny the allegations. Defendants are without sufficient information to admit or deny the remaining allegations as stated and on that basis deny them.

25.     Defendants admit that according to the Arctic Report Card: Update for 2016 (https://www.arctic.noaa.gov/Report-Card/Report-Card-2016/ArtMID/5022/ArticleID/271/Surface-Air-Temperature), "[c]urrently the Arctic is warming at more than twice the rate of lower latitudes."

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          5

Defendants also admit that that the Report Card stated the average annual surface air temperature anomaly over land north of 60° N for October 2015 to September 2016 was the highest in the observational record beginning in 1900. Defendants admit that a study by NOAA researchers published in the Journal of Geophysical Research – Oceans found that the ocean temperature of the U.S. Northeast Shelf is projected to warm almost three times faster than the global average. To the extent the remainder of the allegations purport to summarize NOAA research on species, including fish species; sea ice loss; and seawater acidification, NOAA research reports speak for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph 25 are inconsistent with NOAA's research reports they are denied.

## II.      Threats from Offshore Exploration and Development

26.     Defendants admit that some oil and gas development, if conducted without mitigation, could harm marine mammals, birds, and fish. Defendants otherwise deny the allegations of Paragraph 26 as an incomplete description of the effects of oil and gas development that does not take into account mitigation measures that can and are required when certain oil and gas development activities are permitted. To the extent the allegations in Paragraph 26 are characterizations of scientific studies on marine mammals, birds, and fish or are characterizations of documents issued by NMFS regarding specific oil and gas development activities, those documents speak for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with the documents, Defendants deny the allegations.

27.     Paragraph 27 contains Plaintiffs' characterization of these activities and, accordingly no response is required. To the extent a response is required, Defendants deny the allegations as an incomplete and therefore inaccurate description of the nature and effect of seismic surveys. To the extent the allegations in Paragraph 27 are characterizations of seismic studies or are characterizations of documents issued by NMFS regarding specific seismic surveys, those documents speak for themselves and are the best evidence of

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG                6

their contents. To the extent the allegations are inconsistent with the documents, Defendants deny the allegations.

28.    Defendants admit that some seismic surveys, if conducted without mitigation, could harm marine mammals. Defendants otherwise deny the allegations of Paragraph 28 as an incomplete description of the effects of seismic surveys that does not take into account mitigation measures that can and are required when seismic surveys are permitted. Paragraph 28 constitutes Plaintiffs' characterization of the Bureau of Ocean Energy Management's Final Programmatic Environmental Impact Statement for Proposed Geological and Geophysical Activities on the Atlantic OCS which speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the Environmental Impact Statement, they are denied. To the extent the allegations in Paragraph 28 are characterizations of scientific studies on marine mammals or are characterizations of documents issued by NMFS regarding specific seismic surveys, such as the two-month-long seismic survey in 2012 in the Arctic Ocean referenced in the fourth sentence of Paragraph 28, those documents speak for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with the documents, Defendants deny the allegations.

29.    Defendants admit that some seismic surveys, if conducted without mitigation, could harm fish and shellfish. Defendants otherwise deny the allegations of Paragraph 29 as an incomplete description of the effects of seismic surveys that does not take into account mitigation measures that can and are required when seismic surveys are permitted. Defendants are without information sufficient to form a belief regarding plaintiffs' unsupported characterizations regarding reductions in documented catch rates and the longevity of those rates. To the extent the allegations in Paragraph 29 are characterizations of scientific studies on fish and shellfish or are characterizations of

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          7

Case 3:17-cv-00101-SLG   Document 49   Filed 05/11/18   Page 7 of 17

documents issued by NMFS regarding specific seismic surveys, those documents speak for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with the documents, Defendants deny the allegations.

30.    Defendants admit that some exploration and production drilling, if conducted without mitigation, could harm marine mammals, fish, and invertebrates. Defendants otherwise deny the allegations of Paragraph 30 as an incomplete description of the effects of exploration and production drilling that does not take into account mitigation measures that can be and are required when such activities are permitted. Defendants are without information sufficient to form a belief regarding plaintiffs' supported characterizations regarding specific effects. To the extent the allegations in Paragraph 30 are characterizations of scientific studies on marine mammals, fish, and invertebrates or are characterizations of documents issued by NMFS regarding specific exploration and production drilling activities, those documents speak for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with the documents, Defendants deny the allegations.

31.    Defendants admits that oil spills can, and have, occurred during oil and gas exploration and development. Defendants deny that all oil spill cause "irreparable" damage. Defendants deny the second and third sentences in Paragraph 31 as an inaccurate characterization of an Interior study (presumably BOEM's Lease Sale 193 Final Second Supplemental EIS), which speaks for itself and is the best evidence of its contents. Defendants also admit that mechanical containment and recovery, in situ burning, and dispersants constitute three of the methods of responding to an oil spill. Defendants also admit that the oil spilled during the BP Deepwater Horizon Incident soiled over 1,000 miles of coastline.  Defendants deny the remaining allegations in the fourth and fifth sentences of Paragraph 31 because they are speculative and fail to account for the specific circumstances of the hypothetical spill they contend may happen in the Arctic as a result

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG            8

of oil and gas exploration activities. To the extent these allegations refer to any documents issued by NMFS under the MMPA and ESA that examine oil spill probabilities and effects, those documents, if any, speak for themselves and are the best evidence of their contents. To the extent these allegations are inconsistent with those documents, the allegations are denied.

32.     Defendants admit that oil and gas development would result in emissions of gases designated as "greenhouse gases." Defendants are without sufficient information to admit or deny the remaining allegations in this paragraph because they are predictions based on unspecified assumptions and provide insufficient context to allow the Defendants to determine their veracity.

### III.     The Outer Continental Shelf Lands Act

33.     The allegations of Paragraph 33 purport to characterize the Outer Continental Shelf Lands Act ("OCSLA"), which speaks for itself and is the best evidence of its contents. To the extent that the allegations in Paragraph 33 are inconsistent with OCSLA, the allegations are denied.

### IV.     Oil and Gas Activities in the Arctic and Atlantic Oceans

34.     Defendants admit that, pursuant to the duties imposed by OCSLA and other governing statutes and regulations, the Department of the Interior has considered oil and gas exploration and development activity throughout the Outer Continental Shelf and has approved or permitted certain activities to the extent permitted by law. Defendants deny Plaintiffs' characterization of those activities and decisions.

35.     The first two sentences of Paragraph 35 constitute Plaintiffs' characterization of the Department of the Interior's 2002-2007, 2007-2012, 2012-2017, and 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program documents. These documents speak for themselves and constitute the best evidence of their contents. To the extent the allegations are inconsistent with

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          9

these documents, Defendants deny the allegations. Defendants admit that it held four area-wide lease sales pursuant to these programs. Defendants also admit that in February 2008, the Department of the Interior held a lease sale in the Chukchi Sea, but aver that all leases issued as a result of this lease sale were relinquished by April 2017. Defendants admit that the 2007-2012 Program initially included a lease sale in the Atlantic but aver that such lease sale was cancelled.

36.     Defendants admit that Shell Oil or its subsidiaries conducted oil and gas exploration activities on its leases in the Chukchi and Beaufort. Defendants deny that Shell destroyed its oil spill containment dome – it was damaged but later repaired and transported to support operations. Defendants also admit that once on the drill site in the Chukchi Sea, Shell undertook an emergency maneuver to avoid a large ice floe. Defendants further admit that the mobile offshore drilling unit *Kulluk* ran aground in the Gulf of Alaska in 2012 and that the main engine and other equipment of the mobile drill ship *Noble Discoverer* suffered failures in 2012. Defendants also admit that the Coast Guard cited the *Noble Discoverer* for 16 violations in 2013. In addition, Defendants admit that Noble Drilling (U.S.) LLC was sentenced for committing eight felony environmental and maritime crimes arising out of its operation of the drill ship *Noble Discoverer* and the drilling unit *Kulluk* in violation of federal law and that Noble was sentenced to pay $12.2 million dollars in fines and community service payments, as well as to serve a four year period of probation. The remaining allegations are vague and ambiguous and lack the necessary context to form a response and therefore no response is required.  To the extent a response is required, the allegations are denied.

37.     Defendants admit that Shell Oil or its subsidiaries drilled a single exploration well on its lease in the Chukchi Sea in 2015. Defendants admit that both Shell Oil or its subsidiaries and other oil and gas companies have relinquished most of their leases in the Chukchi and Beaufort Seas.

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          10

38.    Defendants admit that various operators have conducted seismic surveying in the Arctic Ocean in the past decade. The remaining allegations are vague and ambiguous and lack the necessary context to form a response and therefore no response is required.  To the extent a response is required, the allegations are denied.

39.    Defendants admit that some companies in the oil and gas industry remain interested in oil and gas development, in the Arctic Ocean. Defendants further admit that President Trump signed Executive Order 13795 on April 28, 2017. Defendants also admit that Eni US, a subsidiary of Italian multinational oil and gas company Eni S.p.A., has submitted an exploration plan to drill into a federal lease in the Beaufort Sea from a pre-existing facility in Alaska state submerged lands and that SAExploration submitted an application to BOEM for a permit to conduct an ocean-bottom node, marine seismic survey in the Beaufort Sea in 2017. Defendants aver that drilling by Eni US commenced in December 2017 and is ongoing. Defendants admit that SAExploration withdrew the permit application in April 2017. Defendants are without information sufficient to form a belief as to the allegations contained in this paragraph regarding the unidentified comments of unidentified industry groups. Defendants deny that the allegations in the fifth sentence are NOAA predictions, rather the National Marine Fisheries Service has incorporated BOEM's proposed scenarios concerning seismic surveys when preparing biological opinions under the ESA.

40.    The Defendants admit that at least six companies have applied to the Bureau of Ocean Energy Management for permits to authorize deep-penetration seismic surveys in the Atlantic Ocean. Defendants also admit that five companies proposing to complete deep penetration seismic surveys in the Atlantic Ocean have applied to the National Marine Fisheries Service for incidental harassment authorizations (IHAs) under the Marine Mammal Protection Act, which the National

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          11

Marine Fisheries Service issues for activities that result in the incidental but unintentional take of small numbers of marine mammals if such take will have a negligible impact on the affected species or stocks and will not have an unmitigable adverse impact on subsistence uses of marine mammals. Notice of the proposed IHAs relating to these deep penetration seismic surveys in the Atlantic Ocean was published in the Federal Register in June 2017, 82 FR 26244 (June 6, 2017). The public comment period closed on July 21, 2017 (82 FR 31048). The Federal Register notice and underlying applications speak for themselves and are the best evidence of their contents.

41. The allegations in the first sentence are vague and ambiguous and lack the necessary context to form a response and therefore no response is required. To the extent a response is required, the allegations are denied. Defendants further deny the allegations in Paragraph 41 as characterization of the permit applications and related Federal Register notice, which speak for themselves and are the best evidence of their content.

42. Defendants admit that seven companies have appealed the denial of the permits and that industry groups have made public statements regarding their view of these appeals. The Defendants deny the first two sentences of Paragraph 42 as Plaintiffs' characterization of the written denials of permit applications issued by the Department of the Interior on January 5, 2017. Those written denials speak for themselves and are the best evidence of their contents. Defendants deny the remaining allegations in the final sentence of Paragraph 42 as Plaintiffs' characterization of a statement by the National Marine Fisheries Service, which is the best evidence of its contents and speaks for itself. To the extent the allegations contradict this statement, they are denied.

43. Defendants admit that seismic surveys are sometimes conducted prior to lease sales as an exploration tool to identify prospective resources. Defendants also admit that survey

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          12

technology is advancing and that results in occasional surveys of previously explored areas. Defendants deny the rest of Paragraph 43 as Plaintiffs' characterization.

**V.      Presidential Withdrawals**

44.      Defendants admit that President Dwight D. Eisenhower established the Key Largo Coral Reef Preserve by withdrawing certain areas from oil and gas leasing on March 19, 1960. Defendants also admit that Presidents Nixon, George H.W. Bush, Clinton and Obama have each withdrawn areas from oil and gas leasing pursuant to OCSLA. Defendants' deny the remainder of the paragraph as Plaintiffs' characterizations of the Executive Orders and Statements making these withdrawals, each of which speaks for itself and is the best evidence of its contents.

45.      Defendants deny the allegations of Paragraph 45.

46.      Defendants admit that on January 27, 2015 President Obama issued the Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska from Leasing Disposition. The remainder of the allegations constitute Plaintiffs' characterization of that Memorandum, which speaks for itself and is the best evidence of its contents. Defendants deny the allegations to the extent they are inconsistent with the Memorandum.

47.      Defendants admit that on December 20, 2016, President Obama issued the Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing and the Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf from Mineral Leasing. The Defendants deny the remaining paragraphs as characterizations of these two memoranda, which speak for themselves and are the best evidence of their contents.

48.      Defendants admit that on December 20, 2016, President Obama issued the

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG      13

Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing and the Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf from Mineral Leasing. The Defendants deny the remaining paragraphs as characterizations of these two memoranda, which speak for themselves and are the best evidence of their contents.

49.     Paragraph 49 constitutes Plaintiffs' characterization of two official statements by the former Secretary of the Interior and Director of the Bureau of Ocean Energy Management. These official statements speak for themselves and are the best evidence of their contents. Defendants deny the allegations to the extent they are inconsistent with the official statements.

50.     The allegations in Paragraph 50 are characterizations of the White House fact sheet, which speaks for itself and is the best evidence of its contents. Defendants deny the allegations to the extent they are inconsistent with the fact sheet.

51.     The allegations in Paragraph 51 summarizes the Presidential Memorandum issued on December 20, 2106, "Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing" and the related White House fact sheet. These documents speak for themselves and are the best evidence of its contents. Defendants deny the allegations to the extent they are inconsistent with President Obama's proclamation, memorandum, and related White House fact sheet.

52.     The allegations in Paragraph 52 are characterizations of the White House fact sheet, which speaks for itself and is the best evidence of its contents. Defendants deny the allegations to the extent they are inconsistent with the fact sheet.

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG                    14

## VII. President Trump's Executive Order

53. Defendants admit that on April 28, 2017 President Donald J. Trump issued Executive Order No. 13795, titled the Executive Order Implementing an American-First Offshore Energy Strategy. Defendants deny the rest of the allegations in Paragraph 53 as Plaintiffs' characterization of that Executive Order, which speaks for itself and is the best evidence of its contents. To the extent the allegations purport to reference NOAA guidance on assessing the effects of sound on marine mammals, that document speaks for itself and is the best evidence of its content.

54. Defendants admit that on May 1, 2017, Secretary Ryan Zinke signed Secretarial Order No. 3350, America-First Offshore Energy Strategy. Defendants deny the remaining allegations in Paragraph 54 as a characterization of that Secretarial Order, which speaks for itself and is the best evidence of its contents.

<u>**RESPONSE TO CLAIMS FOR RELIEF**</u>

<u>**RESPONSE TO FIRST CLAIM FOR RELIEF**</u>
**(Constitutional Violation)**

55. Defendants incorporate by reference their responses to each and every allegation as set forth in this Answer by reference.

56. Defendants deny the allegations of Paragraph 56.

57. Paragraph 57 purports to characterize the Property Clause of the U.S. Constitution, which speaks for itself and is the best evidence of its contents. The Defendants deny the allegations to the extent they are inconsistent with the Property Clause.

58. Paragraph 58 purports to characterize OCSLA Section 12(a), 43 U.S.C. § 1341(a), which speaks for itself and is the best evidence of its contents. The Defendants deny the allegations.

59. Defendants deny the allegations of Paragraph 59.

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          15

Case 3:17-cv-00101-SLG   Document 49   Filed 05/11/18   Page 15 of 17

60.     Defendants deny the allegations of Paragraph 60.

61.     Defendants deny the allegations of Paragraph 61.

## RESPONSE TO SECOND CLAIM FOR RELIEF
### (Statutorily *ultra vires* action)

62.     Defendants incorporate by reference their responses to each and every allegation as set forth in this Answer by reference.

63.     Defendants deny the allegations of Paragraph 63.

64.     Defendants deny the allegations of Paragraph 64.

65.     Defendants deny the allegations of Paragraph 65.

66.     Defendants deny the allegations of Paragraph 66.

## RESPONSE TO PRAYER FOR RELIEF

The remaining paragraphs of Plaintiffs' Complaint set forth Plaintiffs' requests for relief and do not require a response.  To the extent that a response is required, Defendants deny that Plaintiffs are entitled to any relief.

## GENERAL DENIAL

Defendants deny any allegations of the Complaint, express or implied, that are not expressly admitted, denied, or qualified herein.

## AFFIRMATIVE DEFENSES

1.     This Court lacks subject matter jurisdiction.

2.     Plaintiffs' lack standing to assert the claims.

3.     The Complaint fails in whole or in part to state a claim upon which relief can be granted.

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG                16

4.      Defendants reserve the right to assert such affirmative defenses that may appear applicable during the course of this litigation.

Wherefore, Defendants request that this action be dismissed with prejudice, that judgment be entered for Defendants, and that the Court order such other and further relief as the Court deems appropriate.

Respectfully submitted this 12th day of May, 2018.

> JEFFREY H. WOOD
> Acting Assistant Attorney General
> United States Department of Justice
> Environment and Natural Resources Div.
>
> _____/s/_____
> SARAH D. HIMMELHOCH
> 601 D Street NW Suite 6816
> P.O. Box 7611
> Washington, DC 20044-7611
> 202-514-0180
> sarah.himmelhoch@usdoj.gov
>
> *Counsel for Federal Defendants*

FEDERAL DEFENDANTS' ANSWER TO COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,* Case No. 3:17-cv-00101- SLG          17

James D. Linxwiler (Alaska Bar No. 7705185)
Christina A. Rankin (Alaska Bar No. 0306034)
Guess & Rudd P.C.
1029 W. 3rd Ave. #400
Anchorage, AK 99501
Tel: (907) 793-2200
Fax: (907) 793-2299
jlinxwiler@guessrudd.com
crankin@guessrudd.com

Steven J. Rosenbaum (*Pro hac vice*)
Bradley K. Ervin (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. N.W.
Washington, D.C. 20001
Tel: (202) 662-5568
Fax: (202) 778-5568
srosenbaum@cov.com
bervin@cov.com

*Attorneys for Intervenor American Petroleum
Institute*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | No. 3:17-cv-00101 (SLG) |

## ANSWER, DEFENSES AND AFFIRMATIVE DEFENSES OF DEFENDANT-INTERVENOR AMERICAN PETROLEUM INSTITUTE

1

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 26   Filed 07/28/17   Page 1 of 20

Defendant-Intervenor American Petroleum Institute ("API") hereby answers and asserts its affirmative defenses with respect to the Complaint. The numbered paragraphs of this Answer correspond to the numbered paragraphs of the Complaint.

1.      API admits that President Obama issued Presidential Memoranda on December 20, 2016 and January 27, 2015 regarding the leasing of portions of the Outer Continental Shelf ("OCS") in the Arctic Ocean and the Atlantic Ocean. API further admits that President Trump signed Executive Order 13795, entitled "Implementing an America-First Offshore Energy Strategy," on April 28, 2017. This paragraph contains plaintiffs' characterization of the Presidential Memoranda and Executive Order 13795, to which no response is required. API respectfully refers the Court to the Presidential Memoranda and Executive Order 13795 for a complete and accurate statement of their contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the Presidential Memoranda and Executive Order 13795. The remainder of this paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations, and denies that plaintiffs' are entitled to any relief.

2.      This paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations. To the extent the allegations purport to characterize federal statutes, the statutes speak for themselves and are the best evidence of their contents, and, therefore, no response is required.

3.      This paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API

2

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 26   Filed 07/28/17   Page 2 of 20

denies the allegations. To the extent the allegations purport to characterize federal statutes, the statutes speak for themselves and are the best evidence of their contents, and, therefore, no response is required.

4.      This paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations. To the extent the allegations purport to characterize federal statutes, the statutes speak for themselves and are the best evidence of their contents, and, therefore, no response is required.

5.      API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff League of Conservation Voters.

6.      API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff Natural Resources Defense Council.

7.      API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff Sierra Club.

8.      API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff Alaska Wilderness League.

9.      API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff Defenders of Wildlife.

10.      API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff Northern Alaska Environmental Center.

11.      API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff Resisting Environmental Destruction in Indigenous Lands.

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

12.     API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff Center for Biological Diversity.

13.     API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff Greenpeace, Inc.

14.     API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiff The Wilderness Society.

15.     API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiffs' members.  API denies the remaining allegations contained in this paragraph.

16.     This paragraph contains plaintiffs' characterization of Executive Order 13795, to which no response is required.  API respectfully refers the Court to Executive Order 13795 for a complete and accurate statement of its contents.  To the extent any response is required, API denies that this paragraph accurately and completely summarizes Executive Order 13795.  API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiffs' members.  The remainder of this paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response.  To the extent any response is required, API denies the allegations.

17.     This paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response.  To the extent any response is required, API denies the allegations, and denies that plaintiffs' are entitled to any relief.

18.     Admitted that defendant Donald J. Trump is the President of the United States. API further admits that President Trump signed Executive Order 13795 on April 28, 2017.  The remainder of this paragraph represents a characterization of the plaintiffs' allegations and legal

4

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 26   Filed 07/28/17   Page 4 of 20

conclusions and therefore requires no response.  To the extent any response is required, API denies the allegations.

19.    Admitted that defendant Ryan Zinke is the Secretary of the Department of the Interior ("DOI").  To the extent this paragraph purports to characterize the Secretary's legal responsibilities, the relevant laws and regulations speak for themselves and are the best evidence of their contents, and, therefore, no response is required.

20.    Admitted that defendant Wilbur Ross is the Secretary of the Department of Commerce ("Commerce").  To the extent this paragraph purports to characterize the Secretary's legal responsibilities, the relevant laws and regulations speak for themselves and are the best evidence of their contents, and, therefore, no response is required.

21.    API admits that the Chukchi and Beaufort Seas are located in the Arctic Ocean within the jurisdiction of the United States.  API further admits that federally-listed and non-listed species reside in the Chukchi and Beaufort Seas.  API acknowledges that the risk of climate change is a serious problem that requires research for solutions and effective policies that allow us to meet our energy needs while protecting the environment.  API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding indigenous Alaska Native activities.  To the extent this paragraph purports to characterize federal statutes or administrative actions, the statutes and administrative actions speak for themselves and are the best evidence of their contents, and, therefore, no response is required.  To the extent any response is required, API denies that this paragraph accurately and completely summarizes the statutes and administrative actions.  API denies the remaining allegations contained in this paragraph.

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

22.     API admits that the Chukchi and Beaufort Seas are subject to ice cover and other weather conditions typical of the Arctic environment.  API further admits that the coastal regions of the Chukchi and Beaufort Seas include eight communities and few roads, and do not include a Coast Guard station.  API avers that oil and gas drilling operations have been conducted in the Chukchi and Beaufort Seas since 1981.  The remainder of this paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response.  To the extent any response is required, API denies the allegations.

23.     API admits that federally-listed species reside in the Atlantic Ocean, and that other non-listed species reside in the Atlantic Ocean.  API further admits that certain species of whale migrate through the Atlantic Ocean.  API admits that the Atlantic Ocean includes undersea geological features, including undersea canyons.  API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding the Atlantic Ocean environment. To the extent any response is required, API denies the allegations.

24.     API admits that a wide range of businesses along the U.S. Atlantic coast contribute to region's economy.  API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding economic statistics from an unidentified source for an un-delineated region.  API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding an unidentified petition to President Obama. To the extent any response is required, API denies the allegations.

25.     API acknowledges that the risk of climate change is a serious problem that requires research for solutions and effective policies that allow us to meet our energy needs while protecting the environment.  API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding unidentified statistics and predictions regarding

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

future impacts from climate change. API denies the remaining allegations contained in this paragraph.

26. Denied.

27. API admits that geological and geophysical activities, including seismic surveying, may use airgun arrays to map subsea mineral resources to inform the federal government of the value of mineral resources underlying submerged lands within United States jurisdiction, and to inform oil and gas exploration and development companies of promising oil and gas prospects. This paragraph contains plaintiffs' characterization of seismic surveying operations, and, accordingly, no response is required. To the extent any response is required, API denies that this paragraph accurately and completely summarizes seismic operations. API denies the remaining allegations contained in this paragraph.

28. API admits that the National Marine Fisheries Service ("NMFS") is an agency within the United States Department of Commerce. API further admits that the Bureau of Ocean Energy Management ("BOEM") is an agency within DOI. API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding an unidentified NMFS estimate for an unidentified seismic survey in the Arctic Ocean. This paragraph contains plaintiffs' characterization of BOEM's Final Programmatic Environmental Impact Statement for Proposed Geological and Geophysical Activities on the Atlantic OCS, to which no response is required. API respectfully refers the Court to the Final Programmatic Environmental Impact Statement for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the Final Programmatic Environmental Impact Statement. API denies the remaining allegations contained in this paragraph.

7

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

29.     Denied.

30.     Denied.

31.     API admits that mechanical containment and recovery, in situ burning, and dispersants are among the methods for responding to an oil spill. API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding unidentified DOI conclusions regarding the Chukchi Sea. API is without sufficient information to form a belief as to the allegations contained in this paragraph regarding plaintiffs' predictions relating to an oil spill in the Atlantic Ocean. API denies the remaining allegations contained in this paragraph.

32.     API acknowledges that the risk of climate change is a serious problem that requires research for solutions and effective policies that allow us to meet our energy needs while protecting the environment. API denies the remaining allegations contained in this paragraph.

33.     This paragraph represents plaintiffs' characterization of the Outer Continental Lands Act ("OCSLA") and its implementing regulations and, accordingly, no response is required. API respectfully refers the Court to the OCSLA and the implementing regulations for a complete and accurate statement of their contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the statutory and regulatory regime applicable to oil and gas exploration, development, and production.

34.     This paragraph represents plaintiffs' characterization of the structured process for federal government approval of oil and gas leasing and development under the OCSLA as well as unidentified actions taken by unidentified government agencies within that process. API respectfully refers the Court to the OCSLA and the government's actions under the OCSLA for a

8

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 26   Filed 07/28/17   Page 8 of 20

complete and accurate statement of their contents. To the extent any response is required, API denies that this paragraph accurately summarizes the OCSLA or the government's actions pursuant to the OCSLA.

35.     API admits that DOI has conducted lease sales in the Beaufort Sea and the Chukchi Sea leasing areas. This paragraph represents plaintiffs' characterization of those sales and of the DOI's draft and final five-year leasing programs under the OCSLA. API respectfully refers the Court to the DOI's draft and final five-year leasing programs and the DOI's offshore lease sale statistics for a complete and accurate statement of their contents. To the extent any response is required, API denies that this paragraph accurately summarizes the DOI's draft and final five-year leasing programs and the DOI's offshore lease sales.

36.     API admits that Shell Exploration and Production conducted oil and gas development operations on its federal offshore leases in the Chukchi and Beaufort Seas pursuant to DOI-approved permits. API admits that the mobile offshore drilling unit *Kulluk* ran aground in the Gulf of Alaska in 2012. API further admits that the mobile drill ship *Noble Discoverer* suffered failures with its main engine and other equipment in 2012. The remainder of this paragraph represents plaintiffs' characterization of factual and legal circumstances of Shell's operations in the Chukchi and Beaufort Seas in 2012, and, accordingly, no response is required. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the factual and legal circumstances of Shell's operations in the Chukchi and Beaufort Seas in 2012.

37.     API admits that Shell Exploration and Production conducted oil and gas drilling operations, including an exploratory test well, on a federal offshore lease in the Chukchi Sea in 2015. API further admits that some leaseholders have relinquished federal OCS leases in the

9

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 26   Filed 07/28/17   Page 9 of 20

Chukchi and Beaufort Seas. The remainder of this paragraph represents plaintiffs' characterization of the actions of federal OCS leaseholders in the Chukchi and Beaufort Seas, and, accordingly, no response is required. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the actions of federal OCS leaseholders in the Chukchi and Beaufort Seas.

38. API admits that seismic surveys have been conducted in the Arctic Ocean in the past decade. The remainder of this paragraph represents plaintiffs' characterization of the extent of seismic surveying the Arctic Ocean, and, accordingly, no response is required. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the extent of seismic surveying in the Arctic Ocean.

39. API admits that some companies in the oil and gas industry remain interested in oil and gas development consistent with environmental safeguards in the Arctic Ocean. API further admits that President Trump signed Executive Order 13795 on April 28, 2017. API admits that Eni US, a subsidiary of Italian multinational oil and gas company Eni S.p.A. has submitted an exploration plan to drill into a federal lease in the Beaufort Sea from a pre-existing facility in Alaska state waters. API admits that SAExploration submitted an application to BOEM for a permit to conduct an ocean-bottom node, marine seismic survey in the Beaufort Sea in 2017. API avers that SAExploration withdrew the permit application in April 2017. API is without information sufficient to form a belief as to the allegations contained in this paragraph regarding the unidentified comments of unidentified industry groups on the most recent five-year leasing program. API is without information sufficient to form a belief as to the allegations contained in this paragraph regarding the unidentified comments of unidentified industry groups representing seismic operators. API is without information sufficient to form a belief as to the

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

allegations contained in this paragraph regarding an unidentified prediction from NMFS regarding seismic surveying. To the extent any response is required, API denies the allegations.

40. API admits that BOEM is an agency within DOI that reviews and issues permits for seismic surveys on the federal OCS. API further admits that NMFS is an agency within Commerce with the authority to authorize certain takes of marine mammals pursuant to the Marine Mammal Protection Act ("MMPA"). API admits that BOEM is evaluating permit applications submitted by seven companies to conduct geological and geophysical activities in the Atlantic Ocean. API further admits that NMFS has solicited public comments on its proposal to issue authorizations to incidentally take marine mammals under the MMPA during specified geophysical survey activities by four applicants in the Atlantic Ocean. The remainder of this paragraph represents plaintiffs' characterization of the permit applications submitted to BOEM and NMFS. API respectfully refers the Court to the permit applications for a complete and accurate statement of their contents. To the extent any response is required, API denies that this paragraph accurately summarizes the permit applications.

41. This paragraph represents plaintiffs' characterization of the permit applications submitted to BOEM and NMFS to conduct geological and geophysical activities in the Atlantic and Arctic Oceans. API respectfully refers the Court to the permit applications for a complete and accurate statement of their contents. To the extent any response is required, API denies that this paragraph accurately summarizes the permit applications.

42. API admits that the 2017-2022 five-year leasing program does not schedule any OCS lease sales in the Atlantic Ocean. API further admits that Abigail Ross Hopper was the Director of BOEM on January 5, 2017. API admits that BOEM denied six applications for permits to conduct geological and geophysical activities in the Atlantic OCS, and that permit

11
Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG Document 26 Filed 07/28/17 Page 11 of 20

applicants appealed the denials to the Interior Board of Land Appeals. API further admits that in January 2017, NMFS temporarily suspended processing applications for authorization to conduct geophysical survey activities in the Atlantic Ocean. API is without information sufficient to form a belief as to the allegations contained in this paragraph regarding the unidentified and undated comments of former BOEM Director Hopper. The remainder of this paragraph represents plaintiffs' characterization of BOEM's and NMFS' decisions regarding permit applications. API respectfully refers the Court to the decisions for a complete and accurate statement of their contents. To the extent any response is required, API denies that this paragraph accurately summarizes the decisions.

43. API admits that the OCSLA and implementing regulations authorize BOEM to issue permits for geological and geophysical activities on un-leased OCS lands. API further admits that geological and geophysical activities may occur prior to lease sales to inform the federal government of the value of mineral resources underlying submerged lands within United States jurisdiction, and to inform oil and gas exploration and development companies of promising oil and gas prospects. API also admits that technological advances may support subsequent geological and geophysical activities on previously surveyed areas in order to better value and identify available mineral resources. The remainder of this paragraph represents plaintiffs' characterization of seismic surveying operations, and, accordingly, no response is required. To the extent any response is required, API denies that this paragraph accurately and completely summarizes seismic operations.

44. API admits that the OCSLA authorizes the President to withdraw federal OCS lands from disposition for oil and gas leasing. This paragraph contains plaintiffs' characterization of the OCSLA and, accordingly, no response is required. API respectfully refers

12

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 26   Filed 07/28/17   Page 12 of 20

the Court to the OCSLA for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the President's authority. The remainder of this paragraph represents plaintiffs' characterization of unidentified decisions issued by Presidents Eisenhower, Nixon, George H.W. Bush, and Clinton and, accordingly, no response is required. API respectfully refers the Court to the decisions for a complete and accurate statement of their contents. To the extent any response is required, API denies that this paragraph accurately summarizes the decisions.

45. This paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations. API avers that a president has modified areas withdrawn from disposition for oil and gas leasing under the OCSLA prior to Executive Order 13795.

46. API admits that President Obama issued a Presidential Memorandum on January 27, 2015 withdrawing portions of the Arctic OCS from disposition for oil and gas leasing under the Section 12(a) of the OCSLA. The remainder of this paragraph represents plaintiffs' characterization of the January 27, 2015 Presidential Memorandum. API respectfully refers the Court to the January 27, 2015 Presidential Memorandum for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the January 27, 2015 Presidential Memorandum.

47. API admits that President Obama issued a Presidential Memorandum on December 20, 2016 withdrawing portions of the Atlantic OCS from disposition for oil and gas leasing under the Section 12(a) of the OCSLA. The remainder of this paragraph represents plaintiffs' characterization of the December 20, 2016 Presidential Memorandum. API respectfully refers the Court to the December 20, 2016 Presidential Memorandum for a complete

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the December 20, 2016 Presidential Memorandum.

48. API admits that President Obama issued a Presidential Memorandum on January 27, 2015 withdrawing portions of the Arctic OCS from disposition for oil and gas leasing under the Section 12(a) of the OCSLA. This paragraph contains plaintiffs' characterization of the January 27, 2015 Presidential Memorandum. API respectfully refers the Court to the January 27, 2015 Presidential Memorandum for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the January 27, 2015 Presidential Memorandum. The remainder of this paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations.

49. API admits that President Obama issued a Presidential Memorandum on January 27, 2015 withdrawing portions of the Arctic OCS from disposition for oil and gas leasing under the Section 12(a) of the OCSLA. API admits that Sally Jewell was the Secretary of DOI on January 27, 2015. API further admits that Abigail Ross Hopper was the Director of BOEM on January 27, 2015. API is without information sufficient to form a belief as to the allegations contained in this paragraph regarding the unidentified and undated comments of former DOI Secretary Jewell and former BOEM Director Hopper. API respectfully refers the Court to the unidentified and undated comments for a complete and accurate statement of their contents.

50. API admits that the federal government issued a fact sheet relating to the January 27, 2015 Presidential Memorandum. The remainder of this paragraph represents plaintiffs' characterization of the fact sheet relating to the January 27, 2015 Presidential Memorandum.

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

API respectfully refers the Court to the fact sheet for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the fact sheet.

51.     API admits that President Obama issued a Presidential Memorandum on December 20, 2016 withdrawing portions of the Atlantic OCS from disposition for oil and gas leasing under the Section 12(a) of the OCSLA. This paragraph contains plaintiffs' characterization of the December 20, 2016 Presidential Memorandum. API respectfully refers the Court to the December 20, 2016 Presidential Memorandum for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the December 20, 2016 Presidential Memorandum. The remainder of this paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations.

52.     API admits that the federal government issued a fact sheet relating to the December 20, 2016 Presidential Memorandum. The remainder of this paragraph represents plaintiffs' characterization of the fact sheet relating to the December 20, 2016 Presidential Memorandum. API respectfully refers the Court to the fact sheet for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the fact sheet.

53.     API admits that President Trump signed Executive Order 13795, entitled "Implementing an America-First Offshore Energy Strategy," on April 28, 2017. The remainder of this paragraph represents plaintiffs' characterization of Executive Order 13795, to which no response is required. API respectfully refers the Court to Executive Order 13795 for a complete

15

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 26   Filed 07/28/17   Page 15 of 20

and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes Executive Order 13795.

54. API admits that the Secretary of the Interior issued Secretarial Order No. 3350 on May 1, 2017. API further admits that, among other things, Secretarial Order No. 3350 further implements Executive Order 13795. The remainder of this paragraph represents plaintiffs' characterization of Secretarial Order No. 3350, to which no response is required. API respectfully refers the Court to Secretarial Order No. 3350 for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes Secretarial Order No. 3350.

55. API incorporates by reference its answers to paragraphs 1-54.

56. This paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations. To the extent the allegations purport to characterize federal statutes or the United States Constitution, the statutes and the Constitution speak for themselves and are the best evidence of their contents, and, therefore, no response is required.

57. This paragraph contains plaintiffs' characterization of the United States Constitution and, accordingly, no response is required. API respectfully refers the Court to the Constitution for a complete and accurate statement of its contents. To the extent any response is required, API denies that this paragraph accurately and completely summarizes the Constitution. The remainder of this paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations.

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

58.     This paragraph contains plaintiffs' characterization of the OCSLA and, accordingly, no response is required.  API respectfully refers the Court to the OCSLA for a complete and accurate statement of its contents.  To the extent any response is required, API denies that this paragraph accurately and completely summarizes the authority of the President. The remainder of this paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response.  To the extent any response is required, API denies the allegations.

59.     This paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response.  To the extent any response is required, API denies the allegations.

60.     Denied.

61.     Denied.

62.     API incorporates by reference its answers to paragraphs 1-61.

63.     This paragraph represents a characterization of the plaintiffs' allegations and legal conclusions and therefore requires no response.  To the extent any response is required, API denies the allegations.  To the extent the allegations purport to characterize federal statutes, the statutes speak for themselves and are the best evidence of their contents, and, therefore, no response is required.

64.     This paragraph contains plaintiffs' characterization of the OCSLA and, accordingly, no response is required.  API respectfully refers the Court to the OCSLA for a complete and accurate statement of its contents.  To the extent any response is required, API denies that this paragraph accurately and completely summarizes the authority of the President. The remainder of this paragraph represents a characterization of the plaintiffs' allegations and

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

legal conclusions and therefore requires no response. To the extent any response is required, API denies the allegations.

65. Denied.

66. Denied.

## DEFENSES AND AFFIRMATIVE DEFENSES

1. Plaintiffs lack standing.

2. Plaintiffs have failed to state a claim upon which relief can be granted.

3. Plaintiffs failed to exhaust administrative remedies.

4. Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations or repose.

5. Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches, waiver and/or estoppel.

6. Plaintiffs are not entitled to any of the relief requested in the Complaint because the hardship that would be imposed by such relief is greatly disproportionate to any hardship that plaintiffs or those they purport to represent might suffer in its absence.

WHEREFORE, API prays this Court deny plaintiffs' request for relief, dismiss the complaint with prejudice and grant such further relief as the Court deems appropriate.

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

Respectfully submitted,

*/s/ James D. Linxwiler*
James D. Linxwiler (Alaska Bar No. 7705185)
Christina A. Rankin (Alaska Bar No. 0306034)
Guess & Rudd P.C.
1029 W. 3rd Ave. #400
Anchorage, AK 99501
Tel: (907) 793-2200
Fax: (907) 793-2299
jlinxwiler@guessrudd.com
crankin@guessrudd.com

Steven J. Rosenbaum (*Pro hac vice*)
Bradley K. Ervin (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. N.W.
Washington, D.C. 20001
Tel: (202) 662-5568
Fax: (202) 778-5568
srosenbaum@cov.com
bervin@cov.com

*Attorneys for Intervenor American Petroleum Institute*

July 28, 2017

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of July, 2017, I caused a true and correct copy of the

foregoing Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors to be filed with

the Court electronically and served by the Court's CM/ECF System upon the following:

Erik Grafe
Earthjustice
441 W. 5th Ave., Suite 301
Anchorage, AK 99501
Tel: 907-792-7102
Fax: 907-277-1390
Email: egrafe@earthjustice.org

Eric P. Jorgensen
Earthjustice
325 Fourth Street
Juneau, AK 99801
Tel: 907-586-2751
Fax: 907-463-5891
Email: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501
Tel: 360-534-9900
Email: nlawrence@nrdc.org

Nancy S. Marks
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
Tel: 212-727-2700
Fax: 415-795-4799
Email: nmarks@nrdc.org

*Counsel for Plaintiffs*

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, N.W.
Washington, D.C. 20004
Tel: 202-514-0180
Fax: 202-514-0057
Email: sarah.himmelhoch@usdoj.gov

*Counsel for Federal Defendants*

 */s/ James D. Linxwiler*
James D. Linxwiler

Answer, Defenses, and Affirmative Defenses of Defendant-Intervenors
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)