No. 19-35460
(Consolidated with Nos. 19-35461 and 19-35462)

———————————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

LEAGUE OF CONSERVATION VOTERS, et al.,
*Plaintiffs/Appellees*,

v.

JOSEPH R. BIDEN, in his official capacity as
President of the United States, et al.,
*Defendants/Appellants.*

———————————

Appeal from the United States District Court for the District of Alaska
No. 3:17-cv-00101 (Hon. Sharon L. Gleason)

———————————

**FEDERAL APPELLANTS' SUPPLEMENTAL BRIEF**

———————————

JEAN E. WILLIAMS
*Acting Assistant Attorney General*

Of Counsel:                          JUSTIN D. HEMINGER
                                     *Attorney*
DENNIS DAUGHERTY                     Environment and Natural Resources Division
SUSAN HOVEN CASON                    U.S. Department of Justice
*Attorneys*                          Post Office Box 7415
Division of Mineral Resources        Washington, D.C. 20044
Office of the Solicitor              (202) 514-5442
U.S. Department of the Interior      justin.heminger@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 1

ARGUMENT ................................................................................................ 3

I.      The appeals are moot because the President has revoked the
challenged action. ................................................................................ 3

II.    The decisions below should be vacated. .................................................. 9

CONCLUSION ........................................................................................... 10

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Akiachak Native Community v. U.S. Department of the Interior*,
   827 F.3d 100 (D.C. Cir. 2016) .............................................................. 10

*Arizonans for Official English v. Arizona*,
   520 U.S. 43 (1997) ....................................................................... 4, 9

*Ashwander v. TVA*,
   297 U.S. 288 (1936) ......................................................................... 5

*Campbell-Ewald Co. v. Gomez*,
   577 U.S. 153 (2016) ......................................................................... 5

*Center for Biological Diversity v. Lohn*,
   511 F.3d 960 (9th Cir. 2007) .............................................................. 8

*City of Mesquite v. Aladdin's Castle, Inc.*,
   455 U.S. 283 (1982) ......................................................................... 7

*City News & Novelty, Inc. v. City of Waukesha*,
   531 U.S. 278 (2001) ......................................................................... 7

*Clarke v. United States*,
   915 F.2d 699 (D.C. Cir. 1990) ............................................................ 8

*Dilley v. Gunn*,
   64 F.3d 1365 (9th Cir. 1995) .............................................................. 9

*Forest Guardians v. U.S. Forest Service*,
   329 F.3d 1089 (9th Cir. 2003) ............................................................ 5

*In re Burell*,
   415 F.3d 994 (9th Cir. 2005) .............................................................. 4

*Kremens v. Bartley*,
   431 U.S. 119 (1977) ......................................................................... 5

*Mayfield v. Dalton*,
    109 F.3d 1423 (9th Cir. 1997).........................................................9, 10

*Nevada v. United States*,
    699 F.2d 486 (9th Cir. 1983) ........................................................4, 5, 6

*Nome Eskimo Community v. Babbitt*,
    67 F.3d 813 (9th Cir. 1995) .................................................................5

*Public Utilities Commission v. FERC*,
    100 F.3d 1451 (9th Cir. 1996)......................................................5, 6, 8, 9

*United States v. Munsingwear, Inc.*,
    340 U.S. 36 (1950)...........................................................................1, 9

*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*,
    513 U.S. 18 (1994)................................................................................9

*Wyoming v. USDA*,
    414 F.3d 1207 (10th Cir. 2005)............................................................10

## Constitution

U.S. Const. Art. III, § 2, cl. 1. ..........................................................4

## Statute

Outer Continental Shelf Lands Act
    43 U.S.C. § 1341 ...................................................................................2

## Executive Materials

82 Fed. Reg. 20,815 (May 3, 2017)..................................................1

86 Fed. Reg. 7,037 (Jan. 25, 2021)...................................................2

This brief responds to the Court's January 27, 2021 order directing the parties to file supplemental briefs on "the impact of the January 20, 2021 Executive Order on these appeals."

## INTRODUCTION

Plaintiffs' suit challenges a provision of Executive Order 13795, which President Trump issued in 2017. 82 Fed. Reg. 20,815 (May 3, 2017). In 2019, Federal Appellants and Intervenors-Defendants-Appellants State of Alaska and American Petroleum Institute (API) appealed the district court's judgment vacating that provision. The appeals were argued and submitted to this Court in June 2020. Since then, a new Administration has taken office. And on January 20, 2021, President Biden issued Executive Order 13990, which revoked Executive Order 13795.

Revocation of Executive Order 13795 renders these appeals moot. The Court can no longer grant any effective relief to Plaintiffs-Appellees (collectively, the League). This Court therefore should follow the "established practice" of federal courts to "vacate the judgment below and remand with a direction to dismiss." *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950).

## BACKGROUND

As explained in our opening brief (at 7-8), these consolidated appeals involve a challenge to Section 5 of Executive Order 13795 (the 2017 Executive

Order). In Section 5, President Trump, citing the President's authority under Section 12(a) of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1341(a), modified three of President Obama's withdrawals of areas of the Outer Continental Shelf in the Arctic and Atlantic Oceans, effectively terminating the withdrawals and reopening those areas for *potential* oil and gas leasing. 2-ER-286.

Ten environmental organizations (the League) sued President Trump and the Secretaries of the Interior and Commerce in the District of Alaska. 2-ER-310-333. The League asserted two claims against President Trump: (1) a constitutional claim; and (2) an *ultra vires* claim for exceeding statutory authority. 2-ER-331-332. The League sought declaratory and injunctive relief against President Trump and the Secretaries. 2-ER-332-333. Alaska and API intervened as defendants.

In March 2019, the district court granted summary judgment to the League. Rejecting the Federal Appellants' justiciability arguments, including standing and ripeness, the court held that President Trump had exceeded his authority under Section 12(a) of OCSLA. 1-ER-1-32. The court vacated Section 5 of the 2017 Executive Order. 1-ER-30-31. The Federal Appellants, Alaska, and API each appealed that judgment, and this Court heard oral argument in June 2020.

On January 20, 2021, President Biden issued Executive Order 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7,037 (Jan. 25, 2021) (Attachment). Section 1 of

Executive Order 13990 identifies policies and priorities of the new Administration, including protecting the environment and confronting the climate crisis. Section 4 addresses Arctic specific issues, including invoking OCSLA Section 12(a) to reinstate one of President Obama's Arctic withdrawals and his Bering Sea withdrawal, both of which had been terminated in the 2017 Executive Order. Finally, in Section 7, the President revoked a number of prior Presidential actions, including as relevant here, the 2017 Executive Order in its entirety.

## ARGUMENT

### I. The appeals are moot because the President has revoked the challenged action.

The 2017 Executive Order reopened large areas of the Outer Continental Shelf for potential oil and gas leasing. Federal Appellants argued in their opening brief that, even with that 2017 Executive Order in place, possible future oil and gas activities in the reopened areas were too speculative to establish the League's standing. Federal Appellants Opening Brief 11-25. Federal Appellants explained that the League's challenge to the Order was likewise unripe, either constitutionally or equitably, until additional events transpired, beyond the reopening of the areas in question. *Id*. at 25-30. Even if the League had the requisite interest that must exist at the beginning of the litigation (standing), that interest must, if the case is to be justiciable, continue throughout the litigation's existence. Any interest the League had at the time this litigation commenced is

3

now moot, because President Biden's Executive Order 13990 eliminates even the *possibility* of leasing in areas covered by the 2017 Executive Order.

Article III of the Constitution grants federal courts jurisdiction only to hear "Cases" or "Controversies." U.S. Const. Art. III, § 2, cl. 1. An "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citation omitted). If a case becomes moot, this Court loses jurisdiction and may not render a judgment on the merits. *In re Burell*, 415 F.3d 994, 998 (9th Cir. 2005). Moreover, because this case implicates serious constitutional questions over the reviewability of presidential action, the court must give particularly "close consideration" to whether the conflict is "really necessary." *Arizonans for Official English*, 520 U.S. at 75. The answer here is no.

*First*, the appeals are moot because the President has revoked Section 5 of the 2017 Executive Order—the only action that the League challenged. This Court has held that the withdrawal of an agency action moots a challenge to that action: "when actions complained of have been completed or terminated, declaratory judgment and injunctive actions are precluded by the doctrine of mootness." *Nevada v. United States*, 699 F.2d 486, 487 (9th Cir. 1983) (challenge to the Interior Secretary's moratorium on settlement of federal lands was moot when the Secretary rescinded the moratorium). Applications of this rule abound in this

4

Circuit. *See Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1094-96 (9th Cir. 2003) (challenge to Forest Service policy was moot when the Service clarified its policy); *Public Utilities Commission v. FERC*, 100 F.3d 1451, 1458-59 (9th Cir. 1996) (challenge to pipeline permit was moot when permittee declined to accept permit); *Nome Eskimo Community v. Babbitt*, 67 F.3d 813, 815-16 (9th Cir. 1995) (challenge to lease sale was moot once lease sale was cancelled).

That rule likewise applies here. The League challenged Section 5 of the 2017 Executive Order as violating the Constitution and exceeding delegated authority under OCSLA Section 12(a). The President's revocation of the challenged Order was "the end of the 'case,' constitutionally and practically." *Nome Eskimo Community*, 67 F.3d at 815. All "declaratory judgment and injunctive actions" challenging Section 5 of the Order are now "precluded by the doctrine of mootness." *Nevada*, 699 F.2d at 487. If there were any doubt, sound principles of constitutional avoidance weigh against this Court seeking to review a presidential action that is now a dead letter. *See Kremens v. Bartley*, 431 U.S. 119, 136-37 (1977); *Ashwander v. TVA*, 297 U.S. 288, 345-47 (1936).

*Second*, the appeals are moot because there is no relief for the Court to grant. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (a case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party") (citation omitted). The League asked the district court to

declare that Section 5 of the 2017 Executive Order was unlawful, to enjoin the Secretaries from relying on Section 5, and to direct the Secretaries to comply with President Obama's withdrawals. 2-ER-332-333.

Section 5 of the 2017 Executive Order was revoked by the President and therefore no longer has legal effect. As a result, the withdrawals by President Obama that were subject to Section 5 are valid and in effect, and prevent the Interior Department from considering those areas of the Outer Continental Shelf for potential leasing.[*] The President's act of revocation therefore provides the League with all of the relief that it sought. *See Nevada*, 699 F.2d at 487 (When "actions complained of have been completed or terminated, declaratory judgment" is also "precluded by the doctrine of mootness."). Because the 2017 Executive Order no longer has any legal effect, the Court cannot grant any effective relief that would advance the League's claimed interests, and the case therefore is moot. *Public Utilities Commission*, 100 F.3d at 1458 ("The court must be able to grant effective relief, or it lacks jurisdiction and must dismiss the appeal."); *see also*

---

[*] The President terminated the 2017 Executive Order in its entirety, so it no longer has any legal effect on any past withdrawal that it sought to modify. Executive Order 13990 § 7. To be sure, in a separate section of Executive Order 13990, the President also explicitly "reinstated" two of President Obama's withdrawals that the 2017 Executive Order had terminated. *Id*. § 4(b). The President's choice to refer directly to those two withdrawals in a separate section of Executive Order 13990 focused on the Arctic does not mean that the 2017 Executive Order continues to govern President Obama's other withdrawals not expressly mentioned.

*Deutsche Bank National Trust Co. v. FDIC*, 744 F.3d 1124, 1135-38 (9th Cir. 2014) (applying prudential mootness, which allows a court to "dismiss an appeal not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief") (citation omitted).

*Third*, Section 5 of the 2017 Executive Order no longer threatens any potential harm to the League and its members. The League claimed that its members faced a concrete and imminent threat of future aesthetic injuries because the Order had "catalyzed" seismic surveying activities in previously-withdrawn areas of the Outer Continental Shelf. Even if the League's claims were justiciable, *but see* Federal Appellants Opening Brief 11-45, revocation of the Order severs any potential link between the Order and seismic surveying.

*Fourth*, no exception can save these appeals from mootness. The exception for a defendant's "voluntary cessation" of "allegedly illegal conduct" does not apply here. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (citation omitted). That exception exists because "a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001). The President did not provisionally alter the challenged action to moot this case, only later to possibly reissue the same action. Rather, the President revoked the 2017 Executive Order to advance the new Administration's

7

policies and priorities. *See* Executive Order 13990 § 1; *Board of Trustees of Glazing Health & Welfare Trust v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) (en banc) ("voluntary cessation of challenged conduct by government officials" receives "more solicitude" than similar action by private parties) (citation omitted); *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (en banc) (at least absent "overwhelming evidence," courts should not "impute such manipulative conduct to a coordinate branch of government").

Nor does this case fit within the "capable of repetition, yet evading review" exception to mootness. *Public Utilities Commission*, 100 F.3d at 1459-60. This exception applies in "exceptional circumstances," *id*. at 1460, and only where there is both (1) "a reasonable expectation that the same complaining party will be subject to the same injury again," and (2) an injury that is so "inherently limited in duration" that "it is likely always to become moot before federal court litigation is completed," *Center for Biological Diversity v. Lohn*, 511 F.3d 960, 965 (9th Cir. 2007) (internal citations and quotations omitted). There is no "reasonable expectation" that the President will reinstate Section 5 of the 2017 Executive Order, given his decision to revoke that Section—and the entire Order—in light of the Administration's stated policies. Executive Order 13990 § 1. And any possible future action is unlikely to be so "inherently limited in duration" that it would evade review.

In sum, these appeals are moot. The Court therefore should dismiss these appeals and remand to the district court with directions to dismiss the case.

## II. The decisions below should be vacated.

When a case becomes moot on appeal, the "established practice" is to vacate the decision below. *Arizonans for Official English*, 520 U.S. at 71. Vacatur under these circumstances "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance." *Munsingwear, Inc.*, 340 U.S. at 40. This Court's general approach to *Munsingwear* vacatur is "automatic." *Public Citizens*, 100 F.3d at 1461 (citation omitted).

Vacatur of the decisions below is warranted. As Executive Order 13990 reveals, the President revoked the 2017 Executive Order to advance the new Administration's policy objectives, not to evade judicial review. Executive Order 13990 § 1. In other words, the presidential act that caused mootness is "wholly unrelated to this lawsuit and would have occurred in the absence of this litigation." *Dilley v. Gunn*, 64 F.3d 1365, 1372 (9th Cir. 1995); *cf. Chambers*, 941 F.3d at 1198 (granting "more solicitude" to government officials than private litigants in a mootness inquiry). Therefore, it does not fit the circumstances where vacatur would be inappropriate because "the party seeking relief from the judgment below caused the mootness by voluntary action." *U.S. Bancorp Mortgage Co. v. Bonner*

*Mall Partnership*, 513 U.S. 18, 24 (1994); *see Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir. 1997) (noting that when mootness is caused by voluntary action of the party seeking relief from the judgment, "we generally remand with instructions to the district court to weigh the equities and determine whether it should vacate its own judgment").

Even if the President's policy-driven action were to fall within an exception to *Munsingwear* vacatur, a vacatur request by Appellants Alaska or API should be granted because neither party took any action causing the case to become moot. *See, e.g.*, *Akiachak Native Community v. U.S. Department of the Interior*, 827 F.3d 100, 115 (D.C. Cir. 2016) (granting vacatur because of Defendant-Intervenor Alaska's request when the Department of Interior caused mootness by rescinding a rule); *Wyoming v. USDA*, 414 F.3d 1207, 1213 (10th Cir. 2005); *id.* at 1213 n.6 ("By vacating the judgment of the district court, the rights of the defendant-intervenors, the nonprevailing parties seeking appellate relief, are preserved.").

In short, vacatur is appropriate.

## CONCLUSION

For these reasons, the Court should dismiss the appeals, vacate the decisions below, and remand the matter with instructions to dismiss the case as moot.

Respectfully submitted,

s/ *Justin D. Heminger*

Of Counsel:                          JEAN E. WILLIAMS
                                     *Acting Assistant Attorney General*
DENNIS DAUGHERTY                     JUSTIN D. HEMINGER
SUSAN HOVEN CASON                    *Attorney*
*Attorneys*                          Environment and Natural Resources Division
Division of Mineral Resources        U.S. Department of Justice
Office of the Solicitor              Post Office Box 7415
U.S. Department of the Interior      Washington, D.C. 20044
                                     (202) 514-5442
                                     justin.heminger@usdoj.gov

March 15, 2021
DJ 90-1-18-14968

11

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**        19-35460

I am the attorney or self-represented party.

**This brief contains 2,331 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[ X ]  complies with the length limit designated by court order dated January 27, 2021 (Case No. 19-35460, Docket Entry 82).

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    s/ Justin D. Heminger

**Date**        March 15, 2020

# ATTACHMENT

## Presidential Documents

Executive Order 13990 of January 20, 2021

### Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy*. Our Nation has an abiding commitment to empower our workers and communities; promote and protect our public health and the environment; and conserve our national treasures and monuments, places that secure our national memory. Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice. In carrying out this charge, the Federal Government must be guided by the best science and be protected by processes that ensure the integrity of Federal decision-making. It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis.

**Sec. 2**. *Immediate Review of Agency Actions Taken Between January 20, 2017, and January 20, 2021*. (a) The heads of all agencies shall immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are or may be inconsistent with, or present obstacles to, the policy set forth in section 1 of this order. For any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions. In addition, for the agency actions in the 4 categories set forth in subsections (i) through (iv) of this section, the head of the relevant agency, as appropriate and consistent with applicable law, shall consider publishing for notice and comment a proposed rule suspending, revising, or rescinding the agency action within the time frame specified.

(i) Reducing Methane Emissions in the Oil and Gas Sector: "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration," 85 FR 57398 (September 15, 2020), by September 2021.

(ii) Establishing Ambitious, Job-Creating Fuel Economy Standards: "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 FR 51310 (September 27, 2019), by April 2021; and "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks," 85 FR 24174 (April 30,

2020), by July 2021. In considering whether to propose suspending, revising, or rescinding the latter rule, the agency should consider the views of representatives from labor unions, States, and industry.

(iii) Job-Creating Appliance- and Building-Efficiency Standards: "Energy Conservation Program for Appliance Standards: Procedures for Use in New or Revised Energy Conservation Standards and Test Procedures for Consumer Products and Commercial/Industrial Equipment," 85 FR 8626 (February 14, 2020), with major revisions proposed by March 2021 and any remaining revisions proposed by June 2021; "Energy Conservation Program for Appliance Standards: Procedures for Evaluating Statutory Factors for Use in New or Revised Energy Conservation Standards," 85 FR 50937 (August 19, 2020), with major revisions proposed by March 2021 and any remaining revisions proposed by June 2021; "Final Determination Regarding Energy Efficiency Improvements in the 2018 International Energy Conservation Code (IECC)," 84 FR 67435 (December 10, 2019), by May 2021; "Final Determination Regarding Energy Efficiency Improvements in ANSI/ASHRAE/IES Standard 90.1–2016: Energy Standard for Buildings, Except Low-Rise Residential Buildings," 83 FR 8463 (February 27, 2018), by May 2021.

(iv) Protecting Our Air from Harmful Pollution: "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units—Reconsideration of Supplemental Finding and Residual Risk and Technology Review," 85 FR 31286 (May 22, 2020), by August 2021; "Increasing Consistency and Transparency in Considering Benefits and Costs in the Clean Air Act Rulemaking Process," 85 FR 84130 (December 23, 2020), as soon as possible; "Strengthening Transparency in Pivotal Science Underlying Significant Regulatory Actions and Influential Scientific Information," 86 FR 469 (January 6, 2021), as soon as possible.

(b) Within 30 days of the date of this order, heads of agencies shall submit to the Director of the Office of Management and Budget (OMB) a preliminary list of any actions being considered pursuant to section (2)(a) of this order that would be completed by December 31, 2021, and that would be subject to OMB review. Within 90 days of the date of this order, heads of agencies shall submit to the Director of OMB an updated list of any actions being considered pursuant to section (2)(a) of this order that would be completed by December 31, 2025, and that would be subject to OMB review. At the time of submission to the Director of OMB, heads of agencies shall also send each list to the National Climate Advisor. In addition, and at the same time, heads of agencies shall send to the National Climate Advisor a list of additional actions being considered pursuant to section (2)(a) of this order that would not be subject to OMB review.

(c) Heads of agencies shall, as appropriate and consistent with applicable law, consider whether to take any additional agency actions to fully enforce the policy set forth in section 1 of this order. With respect to the Administrator of the Environmental Protection Agency, the following specific actions should be considered:

(i) proposing new regulations to establish comprehensive standards of performance and emission guidelines for methane and volatile organic compound emissions from existing operations in the oil and gas sector, including the exploration and production, transmission, processing, and storage segments, by September 2021; and

(ii) proposing a Federal Implementation Plan in accordance with the Environmental Protection Agency's "Findings of Failure To Submit State Implementation Plan Revisions in Response to the 2016 Oil and Natural Gas Industry Control Techniques Guidelines for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) and for States in the Ozone Transport Region," 85 FR 72963 (November 16, 2020), for California, Connecticut, New York, Pennsylvania, and Texas by January 2022.

(d) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order and any actions taken pursuant to section 2(a) of this order to any court with jurisdiction over pending litigation related to those agency actions identified pursuant to section (2)(a) of this order, and may, in his discretion, request that the court stay or otherwise dispose of litigation, or seek other appropriate relief consistent with this order, until the completion of the processes described in this order.

(e) In carrying out the actions directed in this section, heads of agencies shall seek input from the public and stakeholders, including State local, Tribal, and territorial officials, scientists, labor unions, environmental advocates, and environmental justice organizations.

**Sec. 3.** *Restoring National Monuments.* (a) The Secretary of the Interior, as appropriate and consistent with applicable law, including the Antiquities Act, 54 U.S.C. 320301 *et seq.,* shall, in consultation with the Attorney General, the Secretaries of Agriculture and Commerce, the Chair of the Council on Environmental Quality, and Tribal governments, conduct a review of the monument boundaries and conditions that were established by Proclamation 9681 of December 4, 2017 (Modifying the Bears Ears National Monument); Proclamation 9682 of December 4, 2017 (Modifying the Grand Staircase-Escalante National Monument); and Proclamation 10049 of June 5, 2020 (Modifying the Northeast Canyons and Seamounts Marine National Monument), to determine whether restoration of the monument boundaries and conditions that existed as of January 20, 2017, would be appropriate.

(b) Within 60 days of the date of this order, the Secretary of the Interior shall submit a report to the President summarizing the findings of the review conducted pursuant to subsection (a), which shall include recommendations for such Presidential actions or other actions consistent with law as the Secretary may consider appropriate to carry out the policy set forth in section 1 of this order.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Grand Staircase-Escalante, Bears Ears, and Northeast Canyons and Seamounts Marine National Monuments, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 4.** *Arctic Refuge.* (a) In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.

(b) In Executive Order 13754 of December 9, 2016 (Northern Bering Sea Climate Resilience), and in the Presidential Memorandum of December 20, 2016 (Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing), President Obama withdrew areas in Arctic waters and the Bering Sea from oil and gas drilling and established the Northern Bering Sea Climate Resilience Area. Subsequently, the order was revoked and the memorandum was amended in Executive Order 13795 of April 28, 2017 (Implementing an America-First Offshore Energy Strategy). Pursuant to section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), Executive Order 13754 and the Presidential Memorandum of December 20, 2016, are hereby reinstated in their original form, thereby restoring the original withdrawal of certain offshore areas in Arctic waters and the Bering Sea from oil and gas drilling.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Coastal Plain Oil and Gas Leasing Program in the Arctic National Wildlife Refuge and other related programs, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 5.** *Accounting for the Benefits of Reducing Climate Pollution.* (a) It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account. Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The ''social cost of carbon'' (SCC), ''social cost of nitrous oxide'' (SCN), and ''social cost of methane'' (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions. They are intended to include changes in net agricultural productivity, human health, property damage from increased flood risk, and the value of ecosystem services. An accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

(b) There is hereby established an Interagency Working Group on the Social Cost of Greenhouse Gases (the ''Working Group''). The Chair of the Council of Economic Advisers, Director of OMB, and Director of the Office of Science and Technology Policy shall serve as Co-Chairs of the Working Group.

(i) Membership. The Working Group shall also include the following other officers, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council.

(ii) Mission and Work. The Working Group shall, as appropriate and consistent with applicable law:

(A) publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies shall use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published;

(B) publish a final SCC, SCN, and SCM by no later than January 2022;

(C) provide recommendations to the President, by no later than September 1, 2021, regarding areas of decision-making, budgeting, and procurement by the Federal Government where the SCC, SCN, and SCM should be applied;

(D) provide recommendations, by no later than June 1, 2022, regarding a process for reviewing, and, as appropriate, updating, the SCC, SCN, and SCM to ensure that these costs are based on the best available economics and science; and

(E) provide recommendations, to be published with the final SCC, SCN, and SCM under subparagraph (A) if feasible, and in any event by no later than June 1, 2022, to revise methodologies for calculating the SCC, SCN, and SCM, to the extent that current methodologies do not adequately take account of climate risk, environmental justice, and intergenerational equity.

(iii) Methodology. In carrying out its activities, the Working Group shall consider the recommendations of the National Academies of Science, Engineering, and Medicine as reported in Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide (2017) and other pertinent scientific literature; solicit public comment; engage with the public and stakeholders; seek the advice of ethics experts; and ensure that the SCC, SCN, and SCM reflect the interests of future generations in avoiding threats posed by climate change.

**Sec. 6**. *Revoking the March 2019 Permit for the Keystone XL Pipeline.* (a) On March 29, 2019, the President granted to TransCanada Keystone Pipeline, L.P. a Presidential permit (the ''Permit'') to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada (the ''Keystone XL pipeline''), subject to express conditions and potential revocation in the President's sole discretion. The Permit is hereby revoked in accordance with Article 1(1) of the Permit.

(b) In 2015, following an exhaustive review, the Department of State and the President determined that approving the proposed Keystone XL pipeline would not serve the U.S. national interest. That analysis, in addition to concluding that the significance of the proposed pipeline for our energy security and economy is limited, stressed that the United States must prioritize the development of a clean energy economy, which will in turn create good jobs. The analysis further concluded that approval of the proposed pipeline would undermine U.S. climate leadership by undercutting the credibility and influence of the United States in urging other countries to take ambitious climate action.

(c) Climate change has had a growing effect on the U.S. economy, with climate-related costs increasing over the last 4 years. Extreme weather events and other climate-related effects have harmed the health, safety, and security of the American people and have increased the urgency for combatting climate change and accelerating the transition toward a clean energy economy. The world must be put on a sustainable climate pathway to protect Americans and the domestic economy from harmful climate impacts, and to create well-paying union jobs as part of the climate solution.

(d) The Keystone XL pipeline disserves the U.S. national interest. The United States and the world face a climate crisis. That crisis must be met with action on a scale and at a speed commensurate with the need to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory. At home, we will combat the crisis with an ambitious plan to build back better, designed to both reduce harmful emissions and create good clean-energy jobs. Our domestic efforts must go hand in hand with U.S. diplomatic engagement. Because most greenhouse gas emissions originate beyond our borders, such engagement is more necessary and urgent than ever. The United States must be in a position to exercise vigorous climate leadership in order to achieve a significant increase in global climate action and put the world on a sustainable climate pathway. Leaving the Keystone XL pipeline permit in place would not be consistent with my Administration's economic and climate imperatives.

**Sec. 7**. *Other Revocations.* (a) Executive Order 13766 of January 24, 2017 (Expediting Environmental Reviews and Approvals For High Priority Infrastructure Projects), Executive Order 13778 of February 28, 2017 (Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the ''Waters of the United States'' Rule), Executive Order 13783 of March 28, 2017 (Promoting Energy Independence and Economic Growth), Executive Order 13792 of April 26, 2017 (Review of Designations Under the Antiquities Act), Executive Order 13795 of April 28, 2017 (Implementing an America-First Offshore Energy Strategy), Executive Order 13868 of April 10, 2019 (Promoting Energy Infrastructure and Economic Growth), and Executive Order 13927 of June 4, 2020 (Accelerating the Nation's Economic Recovery from the COVID–19 Emergency by Expediting Infrastructure Investments and Other Activities), are hereby revoked. Executive Order 13834 of May 17, 2018

(Efficient Federal Operations), is hereby revoked except for sections 6, 7, and 11.

(b) Executive Order 13807 of August 15, 2017 (Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects), is hereby revoked. The Director of OMB and the Chair of the Council on Environmental Quality shall jointly consider whether to recommend that a replacement order be issued.

(c) Executive Order 13920 of May 1, 2020 (Securing the United States Bulk-Power System), is hereby suspended for 90 days. The Secretary of Energy and the Director of OMB shall jointly consider whether to recommend that a replacement order be issued.

(d) The Presidential Memorandum of April 12, 2018 (Promoting Domestic Manufacturing and Job Creation Policies and Procedures Relating to Imple- mentation of Air Quality Standards), the Presidential Memorandum of Octo- ber 19, 2018 (Promoting the Reliable Supply and Delivery of Water in the West), and the Presidential Memorandum of February 19, 2020 (Devel- oping and Delivering More Water Supplies in California), are hereby revoked.

(e) The Council on Environmental Quality shall rescind its draft guidance entitled, ''Draft National Environmental Policy Act Guidance on Consider- ation of Greenhouse Gas Emissions,'' 84 FR 30097 (June 26, 2019). The Council, as appropriate and consistent with applicable law, shall review, revise, and update its final guidance entitled, ''Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews,'' 81 FR 51866 (August 5, 2016).

(f) The Director of OMB and the heads of agencies shall promptly take steps to rescind any orders, rules, regulations, guidelines, or policies, or portions thereof, including, if necessary, by proposing such rescissions through notice-and-comment rulemaking, implementing or enforcing the Ex- ecutive Orders, Presidential Memoranda, and draft guidance identified in this section, as appropriate and consistent with applicable law.

**Sec. 8.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2021.*

[FR Doc. 2021–01765
Filed 1–22–21; 11:15 am]
Billing code 3295–F1–P